1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Hon. James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AUBRY MCMAHON,

          Plaintiff,

   v.

WORLD VISION, INC.,

          Defendant.

Case No.:  2:21-cv-00920-JLR

**PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
ON LIABILITY**

**NOTE DATE: MAY 5, 2023**

## I.      INTRODUCTION

Plaintiff Aubry McMahon ("Plaintiff") moves this Court for an order granting summary judgment against Defendant World Vision, Inc. ("Defendant" or "World Vision") on her claims that it unlawfully discriminated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Washington Law Against Discrimination ("WLAD"), Rev. Code Wash. ("RCW") § 49.60. It is undisputed that Defendant rescinded its job offer to Plaintiff for the position of customer service representative because it learned she was in a same-sex marriage. Although Defendant is a religious organization, the First Amendment ministerial exception does not apply here. Neither Title VII's co-religionist exemption nor any other statute immunizes Defendant from liability for its blatant unlawful discrimination.

PLAINTIFF'S SJ MOTION
Page 1
2:21-CV-00920-JLR

## II.     UNDISPUTED FACTS RELEVANT TO THIS MOTION

### A.     Defendant Extends an Offer of Employment to Plaintiff

Plaintiff is an openly gay woman. Exhibit ("Exh."[1]) 9 to Declaration of Casimir Wolnowski (dated Apr. 11, 2023) at 64:12-13, 85:24-86:1, 92:2. She became engaged to her girlfriend in November 2019, and they got married in September 2020. *Id.* at 29:10-11. Plaintiff became pregnant around June 2020 via a sperm donor from a "cryobank." *Id.* at 35:1-63, 6:20-22. Their child was born on March 6, 2021. *Id.* at 43:9-12.

In or around November or December 2020, Plaintiff saw a job posting for the position of customer service representative with Defendant on the website Indeed.com. Exh. 9, at 139:18-22; 148:22-25; Exh. 10, at 12:3-8. In brief, according to the job description, a customer service representative fields inbound calls and makes outbound calls to donors and potential donors utilizing a "standard script" in order to "sell" and "up-sell" those individuals on World Vision products and programs. Exh. 1. (The job posting in its entirety can be found at Exh. 1.)

According to Defendant's "applicant tracking system," Plaintiff submitted her job application materials on or about November 25, 2020. Exh. 2; Exh. 9, at 186:14-24; Exh. 11, at 15:24-16:4; 110:12-15. Following an interview process, a verbal offer of employment was definitively made to Plaintiff on January 4, 2021. Exh. 11, at 46:24-47:6; 112:10-14. The following day, a formal written offer letter of employment was sent to Plaintiff (dated January 5, 2021). Exh. 3; Exh. 11, at 47:24-48:6. The letter stated, in pertinent part: "On behalf of [Defendant], I am pleased to provide you with this letter as written confirmation of our verbal offer for the full-time position of Donor/Customer Service Representative (DCR Trainee) commencing 2/1/2021." Exh. 3.

---

[1] All exhibits cited herein (i.e., as "Exh. __") are references to exhibits attached to the Declaration of Casimir Wolnowski dated April 11, 2023.

PLAINTIFF'S SJ MOTION
Page 2
2:21-CV-00920-JLR

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

**B.      Defendant Becomes Aware of Plaintiff's Sexual Orientation and Same-Sex Marriage**

On January 5, 2021, Plaintiff sent an email to an individual named Catherine Miolla ("Miolla")—who held the position of talent acquisition partner of human resources with Defendant, Exh. 11, at 11:23-12:5—which read:

> Hey there, I just have a quick question! My wife and I are expecting our first baby in March and I wanted to see if I would qualify for any time off since I'll be a new employee? I will be the one having the baby so I just wanted to check to see if any time would be allowed off. If not, no worries, thanks so much!

Exh. 4.

Shortly thereafter, an individual named Christine Talbot ("Talbot")—who at the time held the position of senior vice president of human resources with Defendant, Exh. 12, at 11:16-21—became aware that Plaintiff had sent an email "with the follow-up question" of the nature described above. Exh. 12, at 19:22-20:6. According to Talbot, "[t]he nature of the email raised a question as to whether or not [Plaintiff] was able to be in compliance with [Defendant's] required standards of conduct."[2] As to this, Talbot clarified that "in [Plaintiff's January 5, 2021] email, [Plaintiff] self-identifies herself being married to another woman. And [Defendant's] standards of conduct require … to be eligible for employment, [ ] that a job applicant or a job offeree affirm their ability to live according to [Defendant's] standards of conduct which specifically names marriage to be a biblical covenant between a man and a woman." Exh. 12, at 21:18-25. In light of this email, Talbot also formed a belief that Plaintiff might be gay. Exh. 12, at 25:8-22.

**C.      Defendant Rescinds the Job Offer Extended to Plaintiff**

---

[2] The precise World Vision standard of conduct to which she was referring reads, in full: "Examples of behaviors that we believe are not in alignment with our standards of conduct and therefore unacceptable behavior for employees include: Any sexual conduct outside of a marriage; (pause) [World Vision] defines marriage as between a man and a woman." Exh. 5; Exh. 12, at 21:18-25.

PLAINTIFF'S SJ MOTION
Page 3
2:21-CV-00920-JLR

1    Shortly after being made aware of the contents of Plaintiff's January 5, 2021, email, Talbot

2    determined that "if [Plaintiff] was indeed in a same-sex marriage and unable to comply with

3    [Defendant's] standards of conduct, that the job offer would, based on [Defendant's] policy, need to

4    be rescinded." Exh. 12, at 46:17-20. As such, Talbot concluded that the offer of employment

5    extended by Defendant to Plaintiff would be rescinded on the basis of the "inability for [Plaintiff] to

6    meet one of the fundamental requirements of employment with [Defendant], which [was] affirming

7    and complying with the standards of conduct which were described in the interview process," Exh.

8    12, at 58:11-24, in that she was in a same-sex marriage. Exh. 12, at 29:2-9. Talbot alone made the

9    ultimate decision to rescind the offer of employment extended to Plaintiff by Defendant, Exh. 12, at

10   60:3-20; Exh. 13, at 74:4-10, and the reason described above was the one and only reason. Exh. 12,

11   at 58:22-24.

12   On January 8, 2021, Miolla emailed Plaintiff and rescinded the job offer. Exh. 6. While

13   Talbot couldn't recall the specifics of directing someone to inform Plaintiff of Defendant's decision

14   to rescind the job offer, given her position, Talbot would have been the one who directed a

15   communication to the job offeree informing her of the decision. Exh. 12, at 64:22-65:2.

16   In light of this email, Plaintiff and certain individuals employed by Defendant participated

17   in a telephone call later that same day (January 8, 2021). Exh. 13, at 98:21-99:2. The two participants

18   from Defendant on this call were Melanie Freiberg ("Freiberg")—who held the position of "HR

19   Director talent management," Exh. 13, at 11:14-16—and Miolla. Exh. 13, at 100:10-14. During this

20   telephone call, the following exchange occurred, in pertinent part:

21       Plaintiff: So, um, the offer's being—what's that word? Sorry.
         Freiberg: Basically, pulled back.

22       Plaintiff: Okay. Is—is that because I'm in a same-sex relationship?
         Freiberg: Well, it is because, um, the standards of conduct, yeah, are to not have any

23       sexual [ ] conduct outside of marriage, and marriage is defined as being between a

24

man and a woman. So that's—that's the behavior that all employees have to comply with.

Exh. 13, at 105:17-106:5; 106:21-24.

On January 8, 2021, Miolla updated Defendant's applicant tracking system confirming that the job offer made to Plaintiff had definitively been rescinded. Exh. 2; Exh. 11, at 112:15-113:4.

### III.     ARGUMENT

Federal Rule of Civil Procedure 56(a) provides a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Both Title VII and WLAD prohibit discharge or discrimination in the terms or conditions of employment because of sex and sexual orientation. 42 U.S.C. § 2000e-2(a)(1); *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1754 (2020); RCW § 49.60.030(1); *Davis v. Port Angeles Sch. Dist.*, Case No. C20-5448-BHS-SKV, 2021 U.S. Dist. LEXIS 254455, at *23 (W.D. Wash., Oct. 1, 2021). Further, "under the WLAD, 'it is an unfair practice for any employer ... to discharge or bar any person from employment because of [his or her]... marital status ... .'." *Busey v. Richland Sch. Dist.*, 172 F. Supp. 3d 1167 (E.D. Wash. 2016) (quoting RCW § 49.60.180(2) (edit omitted)).

A plaintiff does not have to rely on the *McDonnell Douglas* framework to prove a case of disparate treatment. *See Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855 (9th Cir. 2002) (en banc), *aff'd*, 539 U.S. 90 (2003). Nor does she need to identify a similarly situated individual who was treated better in order to prevail. *See Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013) (citing *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (Title VII context) (other citation omitted)). Instead, she may "simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated

PLAINTIFF'S SJ MOTION
Page 5
2:21-CV-00920-JLR

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

the [employer]" and that the employer's actions adversely affected the plaintiff in some way. *McGinest*, 360 F.3d at 1122; *See Pac. Shores Props.*, 730 F.3d at 1158.

Direct evidence, in the context of a discrimination claim, is defined as "'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision.'" *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004) (quoting *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426 (8th Cir. 1999)); *see also Freitas v. Kyo-Ya Hotels & Resorts, LP*, CIVIL NO. 12-00358; CIVIL NO. 12-00359 SOM/KSC (Consolidated Cases), 2013 U.S. Dist. LEXIS 163938, at *12 (D. Haw. Nov. 18, 2013) (Title VII context). Here, direct evidence—Talbot's deposition testimony—establishes that Defendant rescinded its job offer to Plaintiff because it learned she was in a same-sex marriage.

**A.      Plaintiff Legal Claims are Established as a Matter of Law**

**a.      Sex and Sexual Orientation Discrimination Under Title VII and the WLAD**

Title VII provides that it is an "unlawful employment practice" for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ..." 42 U.S.C. § 2000e-2(a)(1). "Discrimination based on sexual orientation amounts to discrimination based on sex under Title VII." *Defrancesco v. Arizona Bd. of Regents*, No. 21-16530, 2023 U.S. App. LEXIS 1270, at *3 (9th Cir. Jan. 19, 2023) (citing *Bostock*, 140 S. Ct. at 1741). Notably, "[a]n employer who fires an individual for being homosexual ... fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids." *Bostock*, 140 S. Ct.

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

at 1737.

The WLAD prohibits discharge or discrimination in the terms and conditions of employment due to sex and sexual orientation. *See, e.g., Davis* 2021 U.S. Dist. LEXIS 254455, at *12 (citing RCW § 49.60.030(1)).

Discrimination against an employee because she is in a same-sex marriage is per se unlawful sex discrimination because "changing the employee's sex would have yielded a different choice by the employer…." *Bostock*, 140 S. Ct. at 1741. As set forth below, it is undisputed that if Plaintiff had been a man, Defendant would not have rescinded its job offer because she was married to a woman. Therefore, Plaintiff's sex played "an unmistakable and impermissible role" in Defendant's decision to revoke its job offer to her because she was in a same-sex marriage. *Id.* at 1741-42. Furthermore, Defendant's policy of employing men who are married to women but not women who are married to women constitutes unlawful "sex-plus" discrimination. *See, e.g.*, *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971).

A plaintiff establishes a Title VII violation by showing that the employer took an adverse action because of sex. *See Bostock*, 140 S. Ct. at 1739. "So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." *Id.* "When it comes to Title VII … a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision." *Id.* "It doesn't matter if other factors besides the plaintiff's sex contributed to the decision." *Id.* at 1741. "[T]he law makes each instance of discriminating against an individual employee because of that individual's sex an independent violation of Title VII." *Id.* at 1742.[3]

---

[3] In a Title VII discrimination case, liability can sometimes follow even if sex wasn't a but-for cause of the challenged employment decision but merely "a motivating factor." *Bostock*, 140 S. Ct. at 1740 (citing 42 U.S.C. § 2000e-2(m)). *See also Costa*, 299 F.3d at 854. By contrast, proof of but-for causation is always a path to relief under Title VII. *See Bostock*, 140 S. Ct. 1739-40.

PLAINTIFF'S SJ MOTION
Page 7
2:21-CV-00920-JLR

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

"Because of" as used in the WLAD means only that a protected characteristic be "a substantial factor" in the employment decision. A "'substantial factor' means that the protected characteristic was a significant motivating factor bringing about the employer's decision." *Scrivener v. Clark College*, 181 Wn.2d 439, 444-45, 334 P.3d 541 (2014). The protected characteristic does not have to be a determining factor or a but-for cause of the employer's action. *See MacKay v. Acorn Custom Cabinetry, Inc.*, 127 Wn.2d 302, 309-11, 898 P.2d 284 (1995).

Plaintiff is entitled to summary judgment on her claims of sex discrimination under Title VII and sex and sexual orientation discrimination under the WLAD because it is undisputed that her being in a same-sex marriage was a but-for cause of Defendant's revocation of the customer service representative job offer. It is undisputed that Plaintiff was subjected to an adverse employment action by her job offer being rescinded. Exh. 6; Exh. 13, at 105:17-106:5; 106:21-24; *E.g.*, *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 172 P.3d 688 (2007); *Palma v. County of Stanislaus*, No. 1:17-CV-0819 AWI EPG, 2017 U.S. Dist. LEXIS 209465 (C.D. Cal. Dec. 20, 2017). It is also undisputed that Plaintiff's being in a same-sex marriage was a but-for cause of Defendant's decision to rescind her job offer.

When Talbot was asked at her deposition if Plaintiff had been a man married to a woman, would she have been in violation of World Vision's standards of conduct insofar as they related to same-sex marriage, she replied: "If [Plaintiff] was a man and was married to a woman and was willing to affirm, you know, living in accord with the standards of conduct, not in a same-sex marriage, but married to someone of the opposite sex, that would make [Plaintiff] eligible for employment as it related to that particular requirement." Exh. 12, at 68:12-69:5. Freiberg reiterated this at her deposition:

Q: And so is it possible that somebody could be in alignment with [Defendant's]

PLAINTIFF'S SJ MOTION
Page 8
2:21-CV-00920-JLR

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

standards of conduct as it relates to same-sex marriage, but yet be in a same-sex marriage?

A: It would not be possible in a same-sex marriage to comply with the expectation surrounding marriage.

Exh. 13, at 102:15-22.

In sum, World Vision revoked its job offer to Plaintiff because of a hiring policy that facially discriminates with respect to sex and sexual orientation because it prohibits the employment of any individual who is in a same-sex marriage. Defendant admits it would not have rescinded its employment offer to Plaintiff if she had been a man married to a woman. Therefore, Plaintiff is entitled to summary judgment on her claims of sex discrimination under Title VII, and sex and sexual orientation discrimination under the WLAD.

### b.    Discrimination Based on Marital Status Under the WLAD

The WLAD marital status protection makes it unlawful for an employer to discriminate because of "marital status." RCW § 49.60.180(3). "Marital status" is the legal status of being "married, single, separated, divorced, or widowed." RCW § 49.60.040(7). Under the WLAD, a prevailing plaintiff must demonstrate that the employer (1) acted with a discriminatory motive and (2) the discriminatory motivation was a "significant or substantial factor" in an employment decision. *Busey v. Richland Sch. Dist.*, 172 F. Supp. 3d 1167, 1180 (E.D. Wash. 2016) (citation omitted). Where, as here, the employer takes an adverse action because the employee has engaged in "extra-marital" sexual conduct, the employer has engaged in marital status discrimination in violation of the WLAD because "the status and conduct are so directly linked." *Id.* at 1181.

Here, it is undisputed that Plaintiff's marital status was at least a substantial factor in (and was, in fact, a but-for cause in) Defendant's decision to rescind the job offer formally extended to her on January 5, 2021. Significantly, Talbot testified to the following:

PLAINTIFF'S SJ MOTION
Page 9
2:21-CV-00920-JLR

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

> Our standards of conduct at World Vision specifically say to the job candidate that a requirement for being employed is the willingness and ability to affirm and live in compliance with our standards of conduct, a component of which references the biblical covenant of a marriage between a man and a woman. If an applicant is unable or unwilling to affirm *and comply* with that standard, they're not eligible for employment.

Exh. 12, at 47:3-12 (emphasis added).

Talbot testified that an applicant's being gay, in and of itself, would not be the basis for Defendant rescinding a job offer. Exh. 12, at 45:22-46:8. Thus, had Plaintiff been merely gay and unmarried, her offer of employment would not have been rescinded. In other words, the fact that she was *married* to a woman was indisputably a substantial factor in her suffering an adverse employment action. Therefore, she is entitled to summary judgment on her marital status discrimination claim.

**B.      All of Defendant's Affirmative Defenses Fail as a Matter of Law**

Defendant's Answer asserts 44 separate affirmative defenses. Dkt. No. 14 at pp. 12-17. Most of them are threadbare, make sweeping conclusions, and are devoid of any facts. Such defenses do not provide "enough factual content to identify the factual grounds on which an affirmative defense rests" and therefore are inadequate to "provide fair notice to a plaintiff...." *E.g.*, *Rosen v. Masterpiece Marketing Group, LLC*, 222 F. Supp. 3d 793, 802 (C.D. Cal. 2016). "Fair notice generally requires that the defendant state the nature and grounds for the affirmative defense." *Kaiser v. CSL Plasma Inc,* 240 F. Supp. 3d 1129, 1134 (W.D. Wash. 2017). A plaintiff is entitled to summary judgment with respect to improperly pled affirmative defenses. *Id.* Plaintiff has addressed, both above and below, the merits of the affirmative defenses as to which she has fair notice and can respond. With respect to the rest, Plaintiff requests summary judgment based on Defendant's failure to comply with Fed. R. Civ. P. 8(c).

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

1

### a.    Title VII's Statutory Exemption for Religious Employers Does Not Apply

The first affirmative defense raised by Defendant in its Answer avers that Plaintiff's claims are barred pursuant to the religious employer exemption, 42 U.S.C. § 2000e-1(a). Dkt. No. 14, at p. 12. That provision reads in its entirety as follows:

> [42 U.S.C. §§ 2000e *et seq.*] shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a).

It is settled law in the Ninth Circuit that this provision bars only *religious* discrimination claims brought against a religious employer. *Spencer v. World Vision, Inc.*, 633 F.3d 723, 724 (9th Cir. 2011) (per curiam) ("World Vision, Inc. qualifies as an entity exempt under 42 U.S.C. § 2000e-1(a) from Title VII's general prohibition against religious discrimination"). To this end, "the Ninth Circuit, however, has squarely limited the federal exemption to barring claims of religious discrimination, holding that while 'religious institutions may base relevant hiring decisions upon religious preferences, they are not immune from liability for discrimination' on other grounds protected by Title VII." *Richardson v. Northwest Christian Univ.*, 242 F. Supp. 3d 1132, 1153 (D. Or. 2017) (quoting *E.E.O.C. v. Fremont Christian Sch.*, 781 F.2d 1362, 1366 (9th Cir. 1986) (edits omitted)); *see also EEOC v. Pacific Press Pub. Ass'n.*, 676 F.2d 1272, 1279 (9th Cir. 1982) (although Congress permits religious organizations to discriminate in favor of members of their own faith, religious employers are not immune from liability for discrimination based on sex).

Here, with respect to Title VII, Plaintiff alleges only a claim of sex discrimination. Plaintiff

does not allege that she suffered discrimination on account of her religion.[4] Therefore, Defendant's Title VII affirmative defense based on the religious employer exemption fails as a matter of law. Accordingly, Plaintiff is entitled to summary judgment on this affirmative defense.

### b.    The Ministerial Exception Does Not Bar Plaintiff's Claims

Defendant's affirmative defense that Plaintiff's statutory discrimination claims are barred by the First Amendment's ministerial exception, Affirmative Defense 7, Dkt. No. 14 at p. 14, also fails as a matter of law. The U.S. Supreme Court first recognized this exception in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012). The Court held that the exception bars "an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her." *Id.* at 196. In that case, the U.S. Supreme Court held that the determination of whether a particular employee qualifies as a minister should be made on a case-by-case basis, stating "[w]e are reluctant, however, to adopt a rigid formula for deciding when an employee qualifies as a minister." *Id.* at 190. The Supreme Court relied on the following factors in its analysis: "the formal title … the substance reflected in that title, her own use of that title, and the important religious functions … performed for the Church." *Id.* at 192. The ministerial exception is an "affirmative defense … not a jurisdictional bar." *Id.* at 195 n.4. Therefore, an employer who asserts the ministerial exception as defense has the burden of proving it. *DeWeese-Boyd v. Gordon College*, 487 Mass. 31, 43, 163 N.E.3d 1000 (2021) (citing *Hosanna-Tabor*, 565 U.S. at 195 n.4). The Supreme Court revisited the ministerial exception in *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020). In that case, the Court clarified the *Hosanna-Tabor* test and ruled that the ministerial exception applies to employees with "vital religious duties," or those

---

[4] In any event, Plaintiff is Christian. Exh. 9, at 14:8-11.

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

"playing a vital part in carrying out the mission of the church," and whose roles are important "in the life of the religion" according to the employer. *Id.* at 2064-2066. Courts are "to take all relevant circumstances into account and to determine whether each particular position implicate[s] the fundamental purpose of the exception." *Id.* at 2067. The job of customer service representative which Defendant offered Plaintiff does not come close to meeting these legal standards.

"What matters, at bottom, is what an employee does." *Id.* at 2064. What the customer service representative position at issue in this case does can be gleaned from the job description Defendant posted (Exh. 1). Under the section "The Job," it reads:

> As a Customer Service Representative, you will participate in a training program to gain a working knowledge and understanding of the position and to perform the essential functions of the job at a level of performance that consistently meets expectations. You will learn, understand and develop the skills necessary to acquire and maintain donor relationships through basic inbound and outbound calls. Serve as a liaison between donors and the general public as well as provide basic levels of customer service for all special programs. Help carry out our Christian organization's mission, vision, and strategies. Personify the ministry of World Vision by witnessing to Christ and ministering to others through life, deed, word and sign. You will also …
>
> 1. Keep Christ central in our individual and corporate lives. Attend and participate in the leadership of devotions, weekly Chapel services, and regular prayer.
>
> 2. Maintain reliable, regular attendance. Report to work on time and return from breaks and lunches on time.
>
> 3. Under supervision, learn to answer inbound customer service calls and make outbound calls, to current and potential donors in response to all media presentations and World Vision products and services. Answer incoming calls using an Automated Call Distribution system utilizing a standard script for guidance. Recognize and respond to up-sell opportunities and actively cross-sell other [World Vision] programs when appropriate.
>
> 4. Through training and active participation, gain the skills necessary to assess callers' needs and input information accurately and efficiently using data entry and ten-key skills.
>
> 5. Achieve and maintain an acceptable level of individual statistics to accomplish

PLAINTIFF'S SJ MOTION
Page 13
2:21-CV-00920-JLR

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

Call Center business goals.

6. Develop skills to utilize technology for maintaining and updating donor information as appropriate.

7. Accepts constructive feedback and welcomes instruction and direction.

8. Under supervision, research and effectively respond to inquiries utilizing a variety of resource materials and methods.

9. Learn and effectively communicate World Vision's involvement in ministries and projects around the world.

10. Work collaboratively with team members.

11. Be sensitive to Donor's needs and pray with them when appropriate.

12. Perform other duties as assigned.

13. Keep informed of organizational announcements, activities and changes via regular reading of the WVUS Intranet and other corporate communication tools.

Exh. 1.

Nothing about the job title of customer service representative or Donor/Customer Service Representative (DCR Trainee) in any way implies that the position is ministerial in nature. *See Palmer v. Liberty Univ.*, CASE NO. 6:20-cv-31, 2021 U.S. Dist. LEXIS 248963, at *15 (W.D. Va. 2021) ("nothing about [Plaintiff's] job title or the way that [Defendant] held her out indicates that she was a minister."), *appeal filed* (Dec. 29, 2021). The job title of customer service representative is purely secular. Also, there is nothing in the job description that indicates that a customer service representative undertakes "vital religious duties," those "vital [ ] in carrying out the mission of the church," or whose role is important "in the life of the religion." *Cf. Our Lady of Guadalupe*, 140 S. Ct. at 2064, 2066. As the job description makes clear, the main duties of the customer service position relate to furthering Defendant's charitable activities and are entirely secular.

PLAINTIFF'S SJ MOTION
Page 14
2:21-CV-00920-JLR

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

Indeed, the customer service job description merely *touches* upon religion, but only vaguely. The religious aspects, of which there are only arguably three, are:

> Help carry out our Christian organization's mission, vision, and strategies. Personify the ministry of World Vision by witnessing to Christ and ministering to others through life, deed, word and sign;

> Keep Christ central in our individual and corporate lives. Attend and participate in the leadership of devotions, weekly Chapel services, and regular prayer; and,

> Be sensitive to Donor's needs and pray with them when appropriate.

Critically, Defendant does not hold customer service representatives out to the public as ministers. *Cf. Hosanna-Tabor*, 565 U.S. at 191. There is no requirement that a candidate for this position have any formal religious educational training. Exh. 10, at 13:13-21. In fact, there is no requirement to have had *any* religious training whatsoever to hold the customer service representative position to which Plaintiff applied. Exh. 10, at 14:22-15:3. The only formal education requirement for an applicant for the customer service position is to be a high school graduate or have a GED equivalent. Exh. 10, at 13:22-14:3.

Upon the conclusion of training as a customer service representative, there is no process for commissioning a customer service representative as a minister. Exh. 10, at 15:19-16:3. *Cf. Hosanna-Tabor*, 565 U.S. at 191. Per the job description, the tasks associated with the customer service representative position are to "learn, understand and develop the skills necessary to acquire and maintain donor relationships through basic inbound and outbound calls. … [s]erve as a liaison between donors and the general public as well as provide basic levels of customer service for all special programs." Exh. 1. When Freiberg, who was Defendant's 30(b)(6) designee, was asked whether the main duty of a customer service representative is to "acquire and maintain donor relationships through the basic inbound and outbound calls," she agreed. Exh. 10, at 20:20-24.

PLAINTIFF'S SJ MOTION
Page 15
2:21-CV-00920-JLR

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

Although not dispositive, the amount of time an employee spends on secular versus religious duties is relevant to whether that employee falls within the ministerial exception. *Hosanna-Tabor*, 565 U.S. at 194. Here, it is undisputed that customer service representatives spend most of their time performing secular customer service duties.

Customer service representatives receive inbound calls from individuals who are "potentially existing donors or may be looking to donate" or customer service representatives will "make outbound calls to existing donors." Exh. 10, at 22:10-18. Customer service representatives learn of existing donors' identities through access to a database maintained by Defendant. Exh. 10, at 22:19-23. Donors are predominantly Christian, but not exclusively. Exh. 10, at 22:24-23:4.

One of the enumerated job requirements listed above (#11) reads: "Be sensitive to Donor's needs and pray with them when appropriate." Freiberg testified that while praying with donors is *encouraged*, it is not a requirement for the position of a customer service representative. Exh. 10, at 24:2-11. In fact, in a "guidance document," Exh. 10, at 26:20-25, bearing the heading "Showing Empathy on a Call During a Crisis (Talking Points)"—which was a document used to assist customer service representatives in communicating with donors—under each heading there is a sentence which reads: "If comfortable, offer to pray with the donor over the phone." Exh. 14. Freiberg testified that this sentence is intended to inform the customer service representative that he or she has a choice to offer to pray rather than it being mandatory, and that "there is not … disciplinary action if [the customer service representatives] don't pray [with donors]." Exh. 10, at 30:14-23.

Defendant provides to all its employees a document entitled "Giving Word to Our Faith" framework (abbreviated shorthand as "GWF Framework"), which "references [Defendant's] beliefs in terms of what [it] believe[s], what [it] experiences in the world, and how [it] guide[s] messaging around our Christian faith." Exh. 10, at 32:5-12. The GWF Framework states: "The Giving Word to

PLAINTIFF'S SJ MOTION
Page 16
2:21-CV-00920-JLR

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

our Faith messaging framework is guidance to enable us to speak boldly and unapologetically to people of various contexts about what our faith and Christian identity mean for our work." Exh. 7. Further, a handbook on the GWF Framework advises that it is intended to be utilized "[t]o create clarity and understanding about how our faith influences our work." Exh. 8, at p. WV-006121.

The framework document states: "The examples provided below are indicative only and based on insights about contextual audiences gathered during workshops. End users will need to articulate their own insights for their audiences and apply the framework accordingly." Exh. 7. Freiberg made clear that these two sentences communicate to employees that it is their choice whether or not to implement these ideas and "provides some discretion on how to utilize [the framework]." Exh. 10, at 40:15-21.

Accordingly, the limited religious functions performed by customer service representatives are not job requirements. The customer service representative job description *encourages* but does not mandate those employees to pray with potential donors, and if a customer service representative chooses not to pray with donors, he or she is not subject to any disciplinary action. Moreover, the GWF Framework and the insights contained therein for communicating with others is not mandatory. Instead, they advise that employees will need to articulate their own insights for their audiences and apply the framework accordingly, or not at all. If a customer service representative wishes to abandon the use of the GWF Framework messaging in carrying out his or her job, or interpret its use however he or she wants, he or she has every right to do so without fear of discipline. In short, the relatively minor religious aspects of the customer service position job description are not required duties of the position.

With respect to so much of the job requirement that mandates customer service representatives to "Attend and participate in the leadership of devotions, weekly Chapel services,

and regular prayer" (i.e., #1), Freiberg testified that every customer service representative or trainee was required to attend "devotions" when the "entire donor contact center shuts down" and that every representative would attend chapel. Exh. 10, at 43:18-44:3. Freiberg characterized participating in devotions as an "indirect" way in which World Vision staff members *teach* the word of the Lord and that this is accomplished through "sharing Scripture" or "things that they have heard [ ] within their church." Exh. 10, at 16:4-16. Notably, participating in devotions is a function tasked to every World Vision employee. Exh. 11, at 124:24-125:7; Exh. 13, at 22:11-19. Defendant contends that teaching the word of the Lord is an essential function of every position at World Vision on account of working "in a Christian organization and bearing witness of Christ." Exh. 10, at 17:3-21. Freiberg even went a step further and remarked that teaching the word of the Lord is a main function of simply "being Christian" in general, Exh. 10, at 18:7-21, being a "representative of Christ," Exh. 10, at 16:22-25, and in essence, that working for a Christian organization per se obligates one to teach the Christian faith, whether it be to co-workers, donors, or basically anyone.

While Defendant, as a religious organization, has the right to require its employees to perform religious functions, its doing so does not make every employee a "minister" under the First Amendment. One of the factors the U.S. Supreme Court found significant in *Hosanna-Tabor* in holding that the employee fell within the ministerial exception was that she had "a role distinct from that of most of [the church's] members." 565 U.S. at 191. It is undisputed the religious aspects of the customer service representative position also apply to Defendant's employees generally. Defendant's argument that working for a religious organization in some capacity that furthers its religious mission automatically triggers the ministerial exception is contrary to law.

Other cases involving the ministerial exception demonstrate its inapplicability here. In *Hosanna-Tabor,* the plaintiff, Perich, was employed by an evangelical Lutheran church and school

PLAINTIFF'S SJ MOTION
Page 18
2:21-CV-00920-JLR

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

as a "called teacher" who taught a religion class four days a week and led her students in prayer three times a day. 565 U.S. at 192. Perich held herself out as a minister and the church held her out as a minister as well. *Id.* at 191-92. "In light of these considerations—the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church—we conclude that Perich was a minister covered by the ministerial exception." *Id.* at 192.

In *Our Lady of Guadalupe*, the plaintiff was employed by a Roman Catholic primary school as a "lay fifth or sixth grade teacher" and part of the curriculum she taught included religion. 140 S. Ct. at 2056. Like the teacher in *Hosanna-Tabor*, the teacher in *Our Lady of Guadalupe* "performed vital religious duties." *Id.* at 2066. Underlying both these decisions was the Supreme Court's recognition that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* at 2064.

Similarly, in *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, the plaintiff was "entrusted with communicating the Catholic faith to children, supervising guidance counselors, and advising the principal on matters related to the school's religious mission." 41 F.4th 931, 940 (7th Cir. 2022) (edits omitted). As in *Hosanna-Tabor,* the school held the employee out as minister. *Id.* She was identified as a "minister of the faith" in her job description and employed under a "Ministry Contract." Accordingly, the ministerial exception barred the plaintiff's discrimination claims. *Id.* at 942.

However, not every teacher who has some religious responsibilities falls within the ministerial exception. In *Palmer v. Liberty Univ.*, CASE NO. 6:20-cv-31, 2021 U.S. Dist. LEXIS 248963, at *15 (W.D. Va. Dec. 1, 2021), *appeal filed* (Dec. 29, 2021), the plaintiff was an art

professor for a Christian university. In determining the ministerial exception did not apply to the plaintiff, the court balanced the four *Hosanna-Tabor* factors[5] as addressed above. The court found that the plaintiff's job duties were primarily secular, even despite praying with her students and starting each class session with a prayer and attending convocation with her students. The plaintiff had no formal religious training. *Id.* at *15. Neither the plaintiff nor the school held her out as a minister. The fact that the plaintiff and the school regarded her as a "Christian teacher" did not make her a minister. *Id.* at *14. Lastly, the court concluded that "the evidence in the record [did] not support that [the plaintiff] did anything more ministerial, such as … giving religious lessons" and emphasized that "[t]he question is not what [the plaintiff] was supposed to do or *encouraged to do*, but what she actually did." *Id.* at *22 (emphasis added). The court concluded because "the core function" of the plaintiff's job was secular, the ministerial exception did not apply, even though she performed some religious functions such as praying with her students. *Id.* at *22.

*DeWeese-Boyd v. Gordon College*, 487 Mass. 31, 63 N.E.3d 1000 (2021), likewise shows that just because an employee performs some religious functions for a religious organization, that does not bring the employee within the ministerial exception. There, the plaintiff, who was an associate professor of social work at a private Christian liberal arts college, was required to "engage in teaching and scholarship from a Christian perspective and integrate her [Christian] faith into her work." *Id.* at 47. The college argued that this integration of religion into daily life and work is part of the college's mission for everyone in its employ, "whether they be coaches, food service workers, or transportation providers." *Id.* at 54. However, the Massachusetts Supreme Judicial Court cautioned that "[t]he integration of religious faith and belief with daily life and work is a common

---

[5] *Palmer* post-dates *Our Lady of Guadalupe* and makes clear that even after *Our Lady of Guadalupe*, the *Hosanna-Tabor* factors are still relevant to whether a particular employee falls within the ministerial exception.

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

requirement in many, if not all, religious institutions." *Id.* The Court recognized that expanding the ministerial exception beyond those "individuals who play certain key roles" in a religious institution to all employees who integrate faith into their work would have enormous consequences and result in the "elimination of civil law protection against discrimination." *Id.* (citing *Our Lady of Guadalupe*, 140 S. Ct. at 2060). "[T]he ministerial exception has been carefully circumscribed to avoid unnecessary conflict with civil law." *Id.* Ultimately, the *DeWeese-Boyd* court concluded that the plaintiff was "expected and required to be a Christian teacher and scholar, but not a minister." *Id.* She was, first and foremost, a professor of social work. *Id.* at 47.

Similarly, the job at issue here was, first and foremost, that of a customer service representative. While Defendant may have expected customer service representatives to advance Christian values in their work, they were not expected to be ministers. The grounds for applying the ministerial exception here are even weaker than in *DeWeese-Boyd* and *Palmer* as Plaintiff had no role in the religious education. The critical inquiry for whether an employee falls within the ministerial exception is what the *employee* does, *Our Lady of Guadalupe*, 140 S. Ct. at 2064, not what the *employer* does. The regular and normal day-to-day job responsibilities of the customer service position at issue were predominantly acquiring and maintaining donor relationships through inbound and outbound telephone calls. Those job duties and responsibilities were overwhelmingly secular. The religious duties associated with the position were few and not "vital" ones. *Cf. Hosanna-Tabor*, 565 U.S. at 2066. Customer service representatives are not ministers. This Court should reject Defendant's averment that essentially every employee who works for World Vision falls within the ministerial exception.

Where the ministerial exception applies, an employee has no recourse under either federal or state anti-discrimination laws. *See DeWeese-Boyd*, 487 Mass. at 42. Title VII was enacted to

implement the Equal Protection Clause of the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976). The laws against workplace discrimination in Washington are "an explicit, well-defined, and dominant public policy." *Int'l Union of Operating Engineers v. Port of Seattle*, 176 Wn.2d 712, 721 (2013). While Defendant has the constitutional right "to choose those who will guide it on its way," *Hosanna-Tabor*, 565 U.S. at 196, the First Amendment does not give Defendant a carte blanche exemption from the laws against employment discrimination. *See DeWeese-Boyd*, 487 Mass. at 42. The undisputed facts here demonstrate that the customer service position does not qualify for the ministerial exception. Therefore, Plaintiff is entitled to summary judgment on Defendant's ministerial exception affirmative defense.

### c.   Defendant's BFOQ Affirmative Defense Fails as a Matter of Law

Defendant also invokes Title VII's bona fide occupational qualification ("BFOQ") defense, 42 U.S.C. § 2000-2(e)(1). Dkt. No. 14, p. 12. That provision reads as follows:

> [I]t shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify, or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program, on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.

42 U.S.C. § 2000e-2(e)(1). Defendant's fifth affirmative defense relies upon the WLAD's BFOQ defense. Dkt. No. 14 at p. 13.

"The BFOQ defense is written narrowly, and this Court has read it narrowly." *Int'l Union, United Auto., Aerospace & Ag. Implement Workers of Am., UAW, v. Johnson Controls, Inc.*, 499 U.S. 187, 201 (1991). Title VII "limits the situations in which discrimination is permissible to 'certain instances' where sex discrimination is 'reasonably necessary' to the 'normal operation' of

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

the 'particular' business." *Id.* "But the most telling is term is 'occupational'; this indicates that these objective, verifiable requirements must concern job-related skills and aptitudes." *Id.* "By modifying 'qualification' with 'occupational,' Congress narrowed the term to qualifications that affect an employee's ability to the job." *Id.*

Similar to the Title VII BFOQ defense, the WLAD BFOQ applies "narrowly to jobs for which a particular quality of protected statues will be essential to or will contribute to the accomplishment of the purposes of the job." WAC 162-16-240. To establish a BFOQ under Washington law, the employer must show that "excluding members of a particular protected status group is essential to the purposes of the job." *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 358 (2007) (internal quotation marks omitted). Furthermore, the employer must "establish that all or substantially all persons in the excluded class would be unable to efficiently perform the duties of the position at issue, and the essence of the operation would be undermined by hiring anyone in that excluded class." *Id.* (internal quotation marks omitted).

Defendant's Title VII and WLAD BFOQ defenses both fail as a matter of law. The job Defendant offered Plaintiff and later rescinded was that of a customer service representative. Defendant has a facially discriminatory hiring policy that precludes the employment of individuals in same-sex marriages. Put another way, Defendant requires married employees to be in a heterosexual marriage as a condition of employment. Such a requirement does not even constitute an "occupational qualification" within the meaning of Title VII because the requirement in no way relates to the "job-related skills and aptitudes" of a customer service representative. Whether Plaintiff was in a same-sex or heterosexual marriage had no impact on her ability to do the customer service representative job.

Defendant contends that 42 U.S.C. § 2000(e)(1) allows it "to make employment decisions

based on religion—all aspects of religious observance and practice." Affirmative Defense, Dkt. 14, p. 2. The fatal flaw in this argument, with Defendant's religious employer argument *supra*, is that Plaintiff has brought a Title VII claim for sex discrimination, not religious discrimination. That's because Defendant's prohibition on hiring employees in same-sex marriages constitutes unlawful sex discrimination, not unlawful religious discrimination. Accordingly, Plaintiff is entitled to summary judgment on Defendant's BFOQ defenses.

### d.   Defendant's Remaining Constitutionally Based Affirmative Defenses Fail as a Matter of Law.

In its Answer, Defendant asserts a hodgepodge of affirmative defenses grounded in the First Amendment and other constitutional provisions. Most of these are limited to one sentence, *e.g.*, Dkt. No. 14, p. 14, at ¶¶12-15, and provide no specificity as to what facts (if any) form the bases for these defenses. What can be discerned is that Defendant suggests the overarching principle of religious autonomy bars any employment discrimination claim arising from a religious employer's application of the religious doctrine regardless of whether the employee is subject to the ministerial exception. However, it is submitted that such an expansive reading of the church autonomy doctrine would render the ministerial exception superfluous. *See Starkey v. Roman Catholic Archdiocese of Indianapolis*, 496 F. Supp. 3d 1195, 1206 (S.D. Ind. 2020) ("If [a religious organization] could claim that religious autonomy protects employment decisions regardless of whether the position was religious or secular, it is not clear why the Supreme Court reaffirmed the ministerial exception's narrow application to only those employees who have responsibilities that lie at the very core of the mission of a private religious school.") (quotations and citation omitted).

The ministerial exception is the only constitutional defense potentially available to Defendant with respect to Plaintiff's statutory discrimination claims. Any other constitutional

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

1    defense fails as a matter of law. The Court should grant Plaintiff summary judgment with respect to

2    Defendant's other constitutional defenses.

3           **e.      Plaintiff's Claims Are Not Barred Under the WLAD**

4           In its Answer, Defendant asserts that Plaintiff's claims under the WLAD are barred

5    pursuant to the statutory religious employer exception provided in RCW § 49.60.040(11), and to the

6    extent that that statutory religious exception under the WLAD might be interpreted *not* to protect

7    Defendant, Plaintiff's claims under that statute are subject to and cannot survive strict scrutiny under

8    the First Amendment. See Dkt. No. 14, p. 12, at ¶¶ 3-4. Defendant's arguments are contrary to

9    established law.

10          In *Woods v. Seattle's Union Gospel Mission*, 197 Wn.2d 231, 481 P.3d 1060 (2021), the

11   plaintiff challenged the WLAD's non-profit religious exception, the precise once implicated here,

12   RCW 49.60.040(11), on the grounds that allowing a religious employer to discriminate against a job

13   applicant could unlawfully infringe on his fundamental rights and said exception would therefore

14   violate Washington Constitution's equal protection guarantee. In *Woods*, the Washington Supreme

15   Court found that two of plaintiff's fundamental rights were implicated—his right to marry and his

16   right to sexual orientation—and the court determined that RCW 49.60.040(11) may be

17   constitutionally invalid as applied to that plaintiff. The court went on to state that the test that should

18   be applied in making that determination is whether or not the employee's position fits within the

19   ministerial exception consistent with the tests laid out in *Hosanna-Tabor* and *Our Lady of*

20   *Guadalupe*. *Id.*, at 250-51. Because *Woods* represents the Washington Supreme Court's definitive

21   interpretation of RCW 49.60.040(11), this Court is bound by it. *E.g.*, *In re Kirkland*, 915 F.2d 1236,

22   1239-39 (9th Cir. 1990).

23          As to Defendant's averment that Plaintiff's claims under the WLAD cannot survive a strict

24

scrutiny analysis, the WLAD, RCW 49.60, is a "neutral, generally applicable law subject to rational basis review." *State v. Arlene's Flowers, Inc.*, 193 Wn.2d 469, 523, 441 P.3d 1203 (2019), *cert. denied*, 141 S. Ct. 2884 (2021). The WLAD clearly meets that standard as it is rationally related to the government's legitimate interest in the "elimination and prevention of discrimination in employment." RCW 49.60.010.

### f.    Defendant's RFRA Affirmative Defense Also Fails as Matter of Law

Defendant asserts an affirmative defense stating without any specificity: "Plaintiff's claims are barred pursuant to the federal Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1, *et seq.*" Dkt. No. 14, p. 25, at ¶ 23. This assertion is contrary to Ninth Circuit law.

RFRA prohibits the government from burdening a person's exercise of religion unless the challenged government action is the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000bb-1. RFRA does not apply to a lawsuit between private parties. *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 833-34 (9th Cir. 1999); "The text of the statute makes quite clear that Congress intended RFRA to apply only to suits in which the government is a party." *General Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010); *accord Listecki v. Official Committee of Unsecured Creditors*, 780 F.3d 731, 736-37 (7th Cir. 2015) (recognizing the Ninth Circuit has also held that "RFRA does not apply in suits where the government is not a party").[6] Accordingly, Plaintiff is entitled to judgment as a matter of law on this affirmative defense as well.

---

[6] Although the Second Circuit held to the contrary in *Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006), over the vigorous dissent of now Justice Sotomayor, the Second Circuit has subsequently expressed "doubts" that *Hankins* was correctly decided given that the decision is contrary to the plain text of the statute. *Rweyemamu v. Cote*, 520 F.3d 198, 203 n.2 (2d Cir. 2008).

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007

## IV.    CONCLUSION

There are no genuinely disputed issues of material fact and Plaintiff is entitled to judgment as a matter of law on her claims of discrimination on account of her sex (female), sexual orientation (gay), and marriage status (married to a person of the same sex). Accordingly, the Court should enter summary judgment in Plaintiff's favor on all claims.

RESPECTFULLY SUBMITTED this 11th day of April 2023.

**NISAR LAW GROUP, P.C.**

By: */s/ Casimir Wolnowski*
Casimir Wolnowski
One Grand Central Place
60 East 42nd Street, Suite 4600
New York, New York 10165
Phone: (646) 889-1007
Fax:  (516) 604-0157
Email : cwolnowski@nisarlaw.com
Admitted *Pro Hac Vice*

I certify that this memorandum contains 8,310 words in compliance with the Court's Order of April 5, 2023 (Dkt # 21).

**FRANK FREED SUBIT & THOMAS LLP**

By: */s/ Michael C. Subit*
Michael C. Subit, WSBA No. 29189
705 Second Avenue, Suite 1200
Seattle, Washington 98104
Phone: (206) 682-6711
Fax:  (206) 682-0401
Email: msubit@frankfreed.com

*Attorneys for Plaintiff*

PLAINTIFF'S SJ MOTION
Page 27
2:21-CV-00920-JLR

NISAR LAW GROUP, P.C.
60 East 42nd Street, Ste. 4600
New York, NY 10165
Ph: (646) 889-1007