# EXHIBIT 11

Catherine Miolla
March 02, 2023

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
-------------------------------------------------x

AUBRY MCMAHON,

             Plaintiff,    Case No.: 2:21-cv-00920

     -against-

WORLD VISION, INC.,

             Defendant.

-------------------------------------------------x

             VIDEO CONFERENCE
             DEPOSITION

             March 2, 2023
             1:00 p.m.


             EXAMINATION BEFORE TRIAL of

CATHERINE MIOLLA, a nonparty witness on behalf

of the Defendant herein, taken by the attorney(s)

for the Plaintiff, pursuant to Notice, held at

the above-mentioned time and place, before

THERESA RATIGAN, a shorthand reporter and Notary

Public within and for the State of New York.

Catherine Miolla
March 02, 2023

---

Page 2

```
 1
 2      A P P E A R A N C E S :
 3
 4      NISAR LAW GROUP, PC
            Attorneys for Plaintiff
 5          60 East 42nd Street, Suite 4600
            New York, New York 10165
 6
        BY: CASEY WOLNOWSKI, ESQ.
 7          cwolnowski@nisarlaw.com
 8
 9      GAMMON & GRANGE, PC
            Attorneys for Defendant
10          1945 Old Gallows Road
            Tysons, Virginia 22182
11
        BY: SCOTT J. WARD, ESQ.
12          sjw@gg-law.com
            J. MATTHEW SZYMANSKI, ESQ.
13          jms@gg-law.com
14
15
16      A L S O   P R E S E N T :
17      STEVE McFARLAND, Chief Legal Officer for
            World Vision Incorporated
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1            S T I P U L A T I O N S
 2            IT IS HEREBY STIPULATED AND AGREED
 3   by and between the parties hereto, through their
 4   respective counsel, that the certification, sealing,
 5   and filing of the within examination will be, and the
 6   same are hereby waived;
 7
 8            IT IS FURTHER STIPULATED AND AGREED that
 9   all objections, except as to the form of the
10   question, will be reserved to the time of the trial;
11
12            IT IS FURTHER STIPULATED AND AGREED that
13   the within examination may be signed before any
14   Notary Public with the same force and effect as if
15   signed and sworn to before this Court.
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1                    C. Miolla
 2            (Time noted:  1:03 p.m.)
 3            THE REPORTER:  Good afternoon.  My name
 4   is Theresa Ratigan.  I'm with U.S. Legal
 5   Support, and I am the court reporter this
 6   afternoon.
 7            The attorneys participating in this
 8   deposition acknowledge that I am not
 9   physically present in the deposition room and
10   that I will be reporting this deposition
11   remotely.
12            They further acknowledge that, in lieu of
13   an oath administered in person, I will
14   administer the oath remotely under penalty of
15   perjury.
16            The parties and their counsel consent to
17   this arrangement and waive any objections to
18   this manner of reporting.
19            Please indicate your agreement by stating
20   your name and your agreement on the record;
21   counsels only, please.
22            MR. WOLNOWSKI:  Casey Wolnowski; I agree.
23            MR. WARD:  Scott Ward; I agree.
24            MR. SZYMANSKI:  Matthew Szymanski; I
25   agree.
```

---

Page 5

```
 1                    C. Miolla
 2            (Identification of witness verified)
 3   C A T H E R I N E   M I O L L A, a nonparty witness
 4   herein, after having first been duly sworn by a
 5   Notary Public of the State of New York, upon being
 6   examined, testified as follows:
 7   BY THE REPORTER:
 8        Q    Please state your name for the record.
 9        A    Catherine Miolla.
10        Q    And your address for the record, please?
11        A    4123 East Carla Vista Drive, and that's
12   in Gilbert, Arizona 85295.
13   EXAMINATION BY MR. WOLNOWSKI:
14        Q    Good afternoon, Ms. Miolla.  Let me go
15   over some of the general ground rules.  My name is
16   Casey Wolnowski.  I represent the plaintiff, Aubry
17   McMahon, with respect to her lawsuit against World
18   Vision Incorporated.
19            You are not personally a defendant in
20   this lawsuit; do you understand?
21        A    Yes.
22        Q    I'm going to ask you a series of
23   questions concerning the circumstances surrounding
24   Ms. McMahon seeking employment with World Vision.  My
25   goal today is not to confuse you.
```

Catherine Miolla
March 02, 2023

C. Miolla

1
2      If you do not understand a question that
3  I ask you, please tell me that you don't understand
4  or ask me to rephrase the question, and I will do my
5  best to do that.  In other words, unless you tell me,
6  I'll assume that by you answering the question, you
7  had no problem understanding the question; is that
8  okay?
9      A    Yes.
10     Q    If you want to take a break, we can do
11 that; however, all that I ask is that if there is a
12 pending question, please answer it before we take a
13 break.
14     Do you understand?
15     A    Yes.
16     Q    Please verbalize your answers.  Shaking
17 of the head or answers such as "uh-huh" may not
18 necessarily be clear for the court reporter who is
19 typing down your answers today.
20     Also, please wait until I finish my
21 question before you answer.  Not only will that make
22 for the creation of a cleaner record, it will also
23 make the court reporter's life easier today.
24     Do you understand?
25     A    Yes.

C. Miolla

1
2      Q    Given that we are conducting this
3  deposition via video, there are few questions I would
4  like to ask.
5      Is there anyone else in the room where
6  you're currently sitting?
7      A    No.
8      Q    If anyone enters the room where you are
9  sitting during the deposition, I kindly ask that you
10 please identify that person for me.
11     Do you have any documents in front of you
12 or anything viewable on your computer screen aside
13 from this video platform?
14     A    No.
15     Q    If at any point that changes, please
16 inform me of what documents you have in front of you
17 or what is on your screen.
18     I also kindly ask you not to communicate
19 with your attorney or any other individual when
20 testifying on the record; this includes communication
21 via text, e-mail, instant messaging, GChat, WhatsApp,
22 or any other electronic chat function.
23     You were previously sworn in by the court
24 reporter.
25     Thus, are you aware that you are under

C. Miolla

1
2  oath?
3      A    Yes.
4      Q    Do you understand that the oath you just
5  took is the same oath you would take if this were a
6  trial before a judge?
7      A    Yes.
8      Q    Do you understand that the oath you just
9  took mandates that you tell the truth, the whole
10 truth, and nothing but the truth?
11     A    Yes.
12     Q    The questions I'm about to ask you are
13 routine that I ask every person before I depose them.
14     Are you under the influence of drugs or
15 alcohol today?
16     A    No.
17     Q    Are you under the influence of any
18 medication which may impair your ability to
19 understand my questions or to tell the truth?
20     A    No.
21     Q    Can you think of any reason why you
22 cannot provide truthful testimony here today?
23     A    No.
24     Q    Has anybody told you not to give truthful
25 testimony here today?

C. Miolla

1
2      A    No.
3      Q    Did you review any documents in
4  preparation for today's deposition?
5      A    No.
6      Q    Did you listen to any audio recordings in
7  preparation for today's deposition?
8      A    No.
9      Q    Did you speak with anyone aside from your
10 attorney in preparation for today's deposition?
11     A    No.
12     Q    I may use the acronym LGBTQ at points
13 throughout this deposition.  I will advise that for
14 the purposes of this deposition, LGBTQ stands for
15 lesbian, gay, bisexual, transgender, queer or
16 questioning.
17     Do you understand?
18     A    Yes.
19     MR. WARD:  I'm just going to register for
20 the record an objection to the definition as
21 one that has ambiguity within it.  That's
22 sufficient.
23     Thank you.
24     Q    Ms. Miolla, have you ever been deposed
25 before?

Catherine Miolla
March 02, 2023

Page 10

C. Miolla

1
2       A    No.
3       Q    For whom are you currently employed?
4       A    World Vision.
5       Q    Ms. Miolla, do you have a bachelor's
6   degree?
7       A    Yes.
8       Q    From where?
9       A    Pacific Lutheran University.
10      Q    When did you receive it?
11      A    I received it in 2015.
12      Q    Is that the year you graduated from
13  college?
14      A    Yes.
15      Q    Do you have any advanced degrees beyond a
16  bachelor's degree?
17      A    No.
18      Q    When did you first start working for
19  World Vision?
20      A    I start interning with World Vision in
21  April of 2015.
22      Q    What was the next position you had with
23  World Vision after intern?
24      A    My next position was a limited-term role
25  within the same team in HR.

Page 11

C. Miolla

1
2       Q    And for how long did that role last?
3       A    About one year.
4       Q    What was the next job you held after that
5   with World Vision?
6       A    After that, I was on our team that worked
7   on the human resources help desk.
8       Q    For how long did you have that job?
9       A    I think about a year as well.
10      Q    What job did you have after the job with
11  respect to being on the team that worked on the HR
12  help desk?
13      A    After that, I was on our benefits team.
14      Q    And how long did you hold that position?
15      A    I think about two years.
16      Q    What was the next job you held with World
17  Vision after that?
18      A    My next job was on our recruiting team.
19      Q    And approximately how long did you have
20  the job on the recruiting team?
21      A    I've been on our recruiting team, I
22  think, for about four years.
23      Q    What positions or position did you hold
24  with World Vision in January of 2021?
25      A    I think it was just a recruiter on our

Page 12

C. Miolla

1
2   recruiting team or talent acquisitions specialist.
3       Q    Do you recall if you held the position of
4   talent acquisition partner of human resources?
5       A    That sounds right.
6       Q    Do you recall whether or not that was
7   your title as it appeared in signature blocks on
8   e-mails?
9       A    I believe that's correct.
10      Q    If you could, Ms. Miolla, please explain
11  to me what were the primary duties and
12  responsibilities of a person holding the title of
13  talent acquisition partner, human resources in
14  January of 2021.
15      A    Those responsibilities would be reviewing
16  candidate applications, conducting interviews, and
17  working with our hiring managers.
18      Q    What you just described, were these the
19  duties and responsibilities that you personally
20  maintained while working for World Vision
21  Incorporated in January of 2021?
22      A    Yes.
23      Q    From your knowledge, experience, and
24  observations, have those duties and responsibilities
25  changed at all between January of 2021 and today?

Page 13

C. Miolla

1
2       A    No.
3       Q    If you could, please walk me through a
4   typical week of work for you as a talent acquisition
5   partner, human resources for World Vision
6   Incorporated around January of 2021.
7       A    A typical week would include time
8   reviewing candidate applications, reaching out to
9   candidates, conducting phone interviews, and talking
10  with our hiring managers and scheduling interviews
11  for them, as well as administrative tasks.
12      Q    Approximately how many hours a week did
13  you work in January of 2021?
14      A    Around 40.
15      Q    Did your job title change at all at any
16  point after January of 2021?
17      A    At one point I churned (sic) -- changed
18  to a senior talent acquisition specialist.
19      Q    Do you recall around when that occurred?
20      A    I believe it was around March of last
21  year; so March 2022.
22      Q    Is that the position that you currently
23  hold?
24      A    Yes.
25      Q    In January of 2021, where was the office

Catherine Miolla
March 02, 2023

Page 14

C. Miolla

2 physically located from which you primarily worked?

3     A     Seattle, Washington -- or Federal Way,
4 Washington.

5     Q     In January of 2021, from your
6 recollection, how frequently did you go into the
7 office to work itself?

8     A     At that point, almost never.

9     Q     Do you work out of an office as of today,
10 March 2nd, 2023?

11    A     No.

12    Q     And from where do you physically work as
13 of today, March 2nd, 2023?

14    A     I work from home in Gilbert, Arizona.

15    Q     Approximately how many days a year do you
16 actually work in any office or anywhere outside of
17 Arizona?

18    A     As of now?

19    Q     Correct.

20    A     Less than five days a year.

21    Q     In the month of January of 2021, that's
22 the -- the entire month, how frequently did you work
23 physically in a World Vision office as opposed to
24 working remotely?

25    A     I didn't go into the office at that time.

Page 15

C. Miolla

2     Q     Most people didn't.

3           Ms. Miolla, I'd like to shift gears
4 somewhat, and I'd like to ask you some questions
5 about a person named Aubry McMahon, who also
6 occasionally goes by the name of Aubry Atwood.

7           Going forward, if I refer to Aubry
8 McMahon, I'm also referring to Aubry Atwood; do you
9 understand?

10    A     Yes.

11    Q     They are indeed the same person; do you
12 understand that?

13    A     Yes.

14    Q     At some point, did you come to learn that
15 a person named Aubry McMahon or Aubry Atwood had
16 applied for employment with World Vision
17 Incorporated?

18    A     Yes.

19    Q     Do you know how she applied for work; was
20 it through Indeed, was it directly through a World
21 Vision Web site, was it through a recruiter,
22 something else?

23    A     I don't remember the source.

24    Q     Okay.  How did you first learn about
25 Aubry McMahon applying for employment with World

Page 16

C. Miolla

2 Vision Incorporated?

3     A     I first saw her application in our
4 applicant tracking system.

5     Q     Ms. Miolla, as for this applicant
6 tracking system, if you can recall in January of
7 2021, was this something that you checked daily,
8 weekly, hourly, something else?

9     A     Probably daily.

10    Q     What was your role specifically with
11 respect to Aubry McMahon and the application process
12 for potential employment with World Vision
13 Incorporated?

14    A     Can you ask that again?

15    Q     Sure.

16          What was your role specifically with
17 respect to Aubry McMahon and the application process
18 for potential employment with World Vision
19 Incorporated?

20    A     I was the assigned recruiter to the role
21 that she had applied for.

22    Q     And if you can explain to me, what does
23 an assigned recruiter -- question withdrawn.

24          If you can explain to me, in January of
25 2021, what was your job as an assigned recruiter as

Page 17

C. Miolla

2 it related to Aubry McMahon's application?

3     A     My role -- role was to review the
4 application, and then move for- -- forward to other
5 steps like the online assessment, phone screen, and
6 video interview with the hiring managers.

7     Q     Now, you had mentioned that you were the
8 assigned recruiter to the position for which Aubry
9 McMahon had applied.

10          If you can recall, what position was
11 that?

12    A     It was the donor/customer service
13 representative trainee position.

14    Q     And from your recollection, were you the
15 assigned recruiter for all people who applied to
16 World Vision Incorporated for that position?

17    A     At that time, yes.

18    Q     Was there anybody else who was assigned
19 to be the recruiter for that particular position with
20 World Vision Incorporated, from your recollection?

21    A     Not at that time.

22    Q     Has that changed since January of 2021?

23    A     Sometimes now when we hire, there's
24 couple of us that work on it together.

25    Q     So if I'm understanding, what you're

Catherine Miolla
March 02, 2023

C. Miolla

1
2 explaining is that back in January 2021, you were the
3 sole person; however, since then, at some point,
4 there have been more than just one person who is the
5 assigned recruiter for the customer service trainee
6 position?
7      A      Sometimes, yes.
8      Q      Ms. Miolla, from 2020 going into 2021,
9 how many interactions did you have with Aubry McMahon
10 whether it be via in person, telephone, e-mail, video
11 conference, or any other form of communication?
12      A      I don't remember the exact number.
13      Q      Would you say it was fewer than five?
14      A      No.
15      Q      Would you say it fewer -- excuse me,
16 would you say it was between six and ten?
17      A      Can you ask the question again?
18      Q      Sure.
19             From 2020 going into 2021, how many
20 interactions did you have with Aubry McMahon whether
21 it be via in person, telephone, e-mail, video
22 conference, or any other form of communication?
23      A      And would each e-mail count as its own
24 interaction?
25      Q      Yes.  Let's count that as an interaction,

C. Miolla

1
2 as well as any phone call, video conference, or any
3 time you would have met in person.
4      A      Okay.  I still don't know the exact
5 amount.
6      Q      Would you say it was between six and ten?
7      A      Probably more.
8      Q      Would you say it was between 11 and 15?
9      A      That sounds roughly correct.  I don't
10 remember the exact number of e-mails.
11      Q      Would you say it was between 16 and 20?
12      A      Probably somewhere between ten and 20.
13      Q      Of those ten to 20 interactions you had,
14 how many would you state were e-mails?
15      A      I think we -- I think there were only
16 three times when it wasn't an e-mail.
17      Q      Okay.  So the non-e-mails, you would say
18 those were approximately three communications?
19      A      From what I can remember.
20      Q      If you could, please explain to me the
21 three communications which were non-e-mail related.
22 This is again, time period is from 2020 going into
23 2012.
24      A      Well, the first time I talked to her on
25 the phone was when she did her initial phone

C. Miolla

1
2 interview.  I was a part of her second interview at
3 the time, which was a video interview.  And then
4 after that, I think we talked on the phone maybe one
5 or two more times.
6      Q      When you mention that you spoke on the
7 telephone one or two more times, was one of these a
8 phone screening, or was that described as one of the
9 first phone calls that you made with her?
10      A      The first time we talked on the phone was
11 her phone screen interview.
12      Q      Okay.  And when you mention that you
13 spoke to her one or two more times, are you including
14 in that the January 8th phone call where Melanie
15 Freiberg was also a participant on that call?
16      A      Yes.
17      Q      Okay.  If you could, Ms. Miolla, please
18 explain to me everything you can remember about that
19 first phone call, which was the initial phone
20 interview with Ms. McMahon.
21      A      I remember going through the three sets
22 of standard questions we have for that position,
23 which include questions around the candidate's skills
24 and experience, the logistics of the position, and
25 then our faith and standards of conduct section.

C. Miolla

1
2      Q      Approximately how long did the phone call
3 last?
4      A      I don't remember exactly.  Maybe around
5 30 minutes.
6      Q      Do you recall when that phone call took
7 place?
8      A      I don't remember the date, but I think it
9 was December of 2020.
10      Q      If you could, please explain to me
11 everything you can remember about the second
12 communication you had with her, which was non-e-mail,
13 which I believe you described as a video interview.
14      A      Yes.  The video interview was with
15 myself, and Anthony Williams was our representative
16 from the call center for that interview, he's our --
17 the senior director of the call center, and the two
18 of us asked her interview questions about her job
19 experience and skills.
20      Q      Approximately how long did that video
21 call last, from your recollection?
22      A      I don't remember exactly, but probably
23 also maybe around 30 minutes.
24      Q      If you could, please explain to me
25 everything you can remember about the third call or

Catherine Miolla
March 02, 2023

Page 22

C. Miolla

1
2 third non-e-mail communication you had with
3 Ms. McMahon.
4        A    I think actually the third time we talked
5 was when I just called her personally and offered her
6 the job.  So I think there were four.
7        Q    As for this third communication, do you
8 recall when that occurred; was that on or about
9 January 4th, 2021?
10       A    Yes, I believe so.
11       Q    And I'm sorry, I didn't ask you this
12 before, but as for that second communication, the
13 video conference where Mr. Williams was also present,
14 do you recall the date of that video conference?
15       A    I don't recall the date.
16       Q    Do you recall the month and year?
17       A    I know that it would have been in between
18 the phone screen and the offer, so I think it would
19 have been December of 2020.
20       Q    Okay.  And just so we're clear, the
21 fourth and final non-e-mail communication that you
22 had with Ms. McMahon, would that have been the
23 telephone call where Melanie Freiberg was also
24 present on January the 8th, 2021?
25       A    Yes.

Page 23

C. Miolla

1
2        Q    Now, Ms. Miolla, I'm going to share with
3 you a document which has previously been marked as
4 Plaintiff's Exhibit 6.
5             Ms. Miolla, what I'm sharing with you is
6 a document which was previously marked Plaintiff's
7 Exhibit 6.  It's a document bearing Bates-stamp
8 numbers WV 67 through 70.  I will represent that this
9 document was exchanged during discovery phase of
10 litigation in this matter.
11            Please review this document and let me
12 know once you've completed.
13       A    (Perusing a document)
14            Okay.  I've reviewed it.
15       Q    Ms. Miolla, do you recognize this
16 document?
17       A    Yes.
18       Q    Have you ever seen it before?
19       A    Yes.
20       Q    If you can, and to the extent you know,
21 please explain to me what this document is.
22       A    This is the script of interview
23 information and questions we used at the time for the
24 customer service representative trainee position, as
25 well as Aubry's answers to the questions.

Page 24

C. Miolla

1
2        Q    And just so we're clear, Ms. Miolla, when
3 you say "we," you're -- could you tell me who the
4 "we" is; is that World Vision Incorporated?
5        A    Yes, World Vision.
6        Q    Okay.  And so we're clear, I believe that
7 you said that this was the phone screen script that
8 was utilized during the phone screening of Aubry
9 McMahon?
10       A    Yes.
11       Q    And you, in fact, conducted that phone
12 screening; is that also true?
13       A    Yes.
14       Q    In Section 1 of this document, a section
15 titled "Intro/Logistics," there are certain headings
16 which are in bold and italicized font.  One which
17 reads, "Things to discuss prior to interview
18 questions."
19            Do you see those?
20       A    Yes.
21       Q    Were you the person who created those
22 topics to discuss?
23       A    I don't remember.  I believe I helped
24 create it.
25       Q    Do you remember how many people assisted

Page 25

C. Miolla

1
2 in the creation of the language for these topics?
3        A    I don't remember.
4        Q    Would you say it was more than three?
5        A    Probably not.
6        Q    If you can recall, when was the script
7 for this phone screening document created?  And when
8 I say "when," I'm asking month and year or season and
9 year, anything to the best of your recollection.
10       MR. WARD:  I'm going to object as to
11       form.
12       But you may answer.
13       A    Well, I think it depends on which section
14 you're referring to.  I don't believe it was all
15 created at the same time.
16       Q    If you can recall, when was the phone
17 screening document that has been marked Plaintiff's
18 Exhibit 6 completed?
19       A    Can you explain what you mean by
20 "completed"?
21       Q    Well, I'll try to explain it this way.
22            It would seem that at some point there
23 was a final draft of a phone screening that would
24 then be utilized in screening candidates for the
25 customer service trainee representative position.

Catherine Miolla
March 02, 2023

Page 26

C. Miolla

1
2          If you know and if you can recall, when
3  did that script or that final draft become finalized?
4          A     I believe it would have been become
5  finalized before we started any interviews for this
6  particular class, so roughly maybe October of 2020.
7          Q     Now, aside from you, do you know the
8  identity of the person or persons who created these
9  topics for this phone screening document, as in what
10  are their names?
11          A     I don't remember.
12          Q     Did you speak with Aubry McMahon on a
13  phone screening about these two aforementioned topics
14  in Section 1?
15          A     Yes.
16          Q     In Section 2 of this document, a section
17  titled "Background and Skills," there appear to be a
18  number of questions which are in bold font lettering.
19  The first one being, "Why are you interested in this
20  position at World Vision and why do you want to work
21  for a call/contact center?"
22          Do you see those?
23          A     Yes.
24          Q     Did you also participate in the creation
25  of these topics for the phone screening document?

Page 27

C. Miolla

1
2          A     I participated, yes.
3          Q     Did you speak with Aubry McMahon on a
4  phone screening about these two aforementioned
5  topics -- excuse me, in -- about these aforementioned
6  topics in Section 2?
7          A     Yes.
8          Q     Now, under each bold font heading in
9  Section 2 of this phone screening document, there
10  appear to be some writing suggesting it was a
11  response by the applicant.
12          Do you see that?
13          A     Yes.
14          Q     In Section 2 underneath each question in
15  bold font, were these the responses given by
16  Ms. McMahon?
17          A     Yes.
18          Q     If you know, who wrote these specific
19  responses which appear under each question in bold
20  font in Section 2 of this document?
21          A     I typed her answer as she was speaking
22  them.
23          Q     Now, when you say you typed her answer,
24  did you write it verbatim, did you paraphrase,
25  something else?

Page 28

C. Miolla

1
2          A     I don't remember exactly.  I generally
3  try to write word for word as best I can.
4          Q     So it's fair to say that you tried to
5  give the person's answer as accurate as possible, but
6  not necessarily verbatim; is that more or less
7  accurate?
8          A     Yes, that's accurate.
9          Q     I'd like to turn your attention to
10  Section 3, a section entitled "Christian Commitment,"
11  which appears at the bottom of the second page, and
12  then goes over onto the subsequent two pages.
13          Do you see that?
14          A     Yes.
15          Q     Now, on the third and fourth pages, which
16  are marked WV 69 and 70 respectively, there appear to
17  be orange boxes that contain questions and then text
18  underneath.
19          Do you see that?
20          A     Yes.
21          Q     Were you one of the persons who created
22  the questions to ask that appear in the orange boxes?
23          A     No.
24          Q     Do you know the identity of the person or
25  the people who created the questions to ask that

Page 29

C. Miolla

1  appear in the orange boxes?
2
3          A     I don't know specifically.
4          Q     Were you nevertheless directed to ask
5  these questions as part of the phone screening you
6  conducted when you spoke with Aubry McMahon?
7          A     Yes, I was instructed to ask these
8  questions.
9          Q     And if you can recall, who is the person
10  or who are the persons who instructed you to ask
11  these questions?
12          A     This was part of our -- this is part of
13  our script for all job applications, so I wasn't
14  instructed by anyone in particular.
15          Q     Was it nevertheless, from your
16  recollection, a directive that you answer all
17  questions as part of the phone screening, including
18  the ones that appear in the orange boxes?
19          A     Yes.
20          MR. WARD:  I'll object -- object to form,
21      but that's fine.
22          Q     And if you can recall, who directed you
23  to ask all questions including the ones that appear
24  in the red boxes (sic)?
25          MR. WARD:  Objection as to form.

Catherine Miolla
March 02, 2023

Page 30

C. Miolla

1
2          You may answer.
3      A      I don't know specific names, but it would
4  be like our HR leadership and legal team, I think.
5      Q      Did you ask these questions which appear
6  on the orange boxes on pages WV 69 and 70 to
7  Ms. McMahon during your phone screening?
8      A      Yes.
9      Q      Do Aubry's responses to these questions
10 appear in the respective text in the sections below
11 each question?
12     A      Yes.
13     Q      Now, I'd like to ask you, please review
14 the questions and the answers to those that appear in
15 the orange boxes and the text below, and please let
16 me know once you've done that.
17     A      (Perusing a document)
18          I'm finished reviewing.
19     Q      Ms. Miolla, from your recollection, were
20 these, in fact, Aubry's responses to each question
21 that appears below each orange box on pages 3 and 4
22 of Plaintiff's Exhibit 6?
23     A      I believe so, yes.
24     Q      Did you write verbatim what Ms. McMahon
25 said in response, did you paraphrase, something else?

Page 31

C. Miolla

1
2      A      I did my best to write verbatim.
3      Q      And how did you enter these responses
4  into this document; did you utilize a computer, did
5  you handwrite something and then go back and add them
6  into a master document, something else?
7      A      I typed them into a computer.
8      Q      And when you say "typed them into a
9  computer," was the document that you're looking at in
10 Plaintiff's Exhibit 6, was it the Word doc?
11     A      Yes, it was a Word doc.
12          MR. WOLNOWSKI:  Off the record.
13          (Discussion held off the record)
14          MR. WOLNOWSKI:  Back on.
15     Q      Ms. Miolla, I'd like to direct your
16 attention to the bottom of the third page, namely,
17 the fourth bullet down which reads, "Examples of
18 behaviors that we believe are not in alignment with
19 our standards of conduct and therefore unacceptable
20 behavior for employees include," and then the second
21 dash down reads, "Any sexual conduct outside of
22 marriage; (pause) WV defines marriage as between a
23 man and a woman."
24          Do you see that?
25     A      Yes.

Page 32

C. Miolla

1
2      Q      If you know, why is the word "pause"
3  written into the document?
4      A      I don't really know other than that when
5  we're reading this as recruiters, we were supposed to
6  take a pause at that time.
7      Q      Now, I don't see any other part of this
8  document which directs the reader or the screener, if
9  you will, to pause or to do anything which might
10 adjust a normal speech pattern.
11          Do you know why that is?
12          MR. WARD:  I'll object as to form.
13          But you may answer.
14     A      I don't know why that is.
15     Q      It would seem that the pause was
16 intentional.
17          Now, as a person who had a hand in the
18 creation of this document, please tell me everything
19 that you can remember about decision -- about the
20 decision to include that word "pause" in this
21 section.
22          MR. WARD:  I'll object as to form.
23     A      I wasn't involved at all in the creation
24 of this part.
25     Q      Understood.

Page 33

C. Miolla

1
2          Ms. Miolla, did you read this sentence
3  after the fourth bullet when you spoke with Ms. --
4  Ms. McMahon during your phone screen?
5      A      Yes.
6      Q      Okay.  Did you read the text after that
7  second dash when you spoke with Ms. McMahon during
8  her phone screen with you?
9      A      Yes.
10     Q      When you initially read that text next to
11 that second dash, did Ms. McMahon say anything to
12 you?
13     A      No.
14     Q      I'd like to focus on the final three
15 questions which appear in the three orange boxes on
16 the fourth page; the "fourth page" being the one
17 that's Bates-stamped WV 70.
18          For the words that appear in each of
19 these three boxes, did you read these questions to
20 Ms. McMahon verbatim, to your recollection?
21     A      Yes.
22     Q      Do you have any belief that you may not
23 have asked exactly what is written on this page when
24 you spoke with Ms. McMahon?
25          MR. WARD:  Objection as to form.

Catherine Miolla
March 02, 2023

Page 34

C. Miolla

1
2      You may answer.
3      A     I read these questions exactly as they're
4  written.
5      Q     And for each response, was the response
6  as written on this page and below each orange box,
7  was that what Ms. McMahon told you verbatim?
8      A     Yes.
9      Q     Either during the phone screening or at
10 any time before an offer or employment was extended
11 to Ms. McMahon, did you personally ever have any
12 belief that Ms. McMahon was gay?
13     A     No.
14           MR. WARD:  I'll object to the form of the
15 question.
16     Q     If you understand the question,
17 Ms. Miolla, you can answer.
18     A     Can you ask it again?
19     Q     Sure.
20           Either during the phone screening or at
21 any time before an offer of employment was extended
22 to Ms. McMahon, did you personally ever have any
23 belief that Ms. McMahon was gay?
24           MR. WARD:  Same objection.
25           You may answer.

Page 35

C. Miolla

1
2      A     No.
3      Q     Either during the phone screening or at
4  any time before an offer of employment was extended
5  to Ms. McMahon, did you personally ever have any
6  belief that Ms. McMahon was in a same-sex marriage?
7            MR. WARD:  Objection as to form.
8            You may answer.
9      A     No.
10     Q     Either during the phone screening or at
11 any time before an offer of employment was extended
12 to Ms. McMahon, did you personally have any belief
13 that Ms. McMahon was a woman?
14     A     Yes.
15     Q     And how did you form that belief?
16     A     I'm not sure exactly.
17     Q     Well, do you recall when you formed that
18 belief?
19     A     Probably when I reviewed her application.
20     Q     And if you can explain to me, how is it
21 that you formed that belief upon reviewing her
22 application?
23     A     I think I reviewed her name, and then
24 when I talked with her and how she referred to
25 herself.

Page 36

C. Miolla

1
2      Q     So is it fair to say that the name Aubry
3  suggested to you that she may be a woman?
4            MR. WARD:  I'll object as to form.
5            You may answer.
6      A     Suggested to me that she may be, yes.
7      Q     When you spoke with Ms. McMahon on the
8  telephone and you heard her voice, did the sound of
9  her voice contribute to your belief that Ms. McMahon
10 was probably a woman?
11     A     I think so, yes.
12     Q     Ms. Miolla, to your knowledge and based
13 on your experience, if Ms. McMahon had disclosed that
14 she was in a same-sex marriage as part of her
15 telephone -- telephone screening, would an offer of
16 employment have been extended by World Vision to
17 Ms. McMahon?
18           MR. WARD:  I'm going to object to the
19 form and calling for speculation.
20           You may answer to the extent you know.
21     A     Can you ask the question again or
22 rephrase, please?
23     Q     Sure.
24           To your knowledge and based on your
25 experience, if Ms. McMahon had disclosed that she was

Page 37

C. Miolla

1
2  in a same-sex marriage as part of her telephone
3  screening, would an offer of employment have been
4  extended by World Vision Incorporated to Ms. McMahon?
5            MR. WARD:  Same objection.
6            You may answer.
7      A     At this point in the process, I would
8  have asked her if she could comply with the standards
9  of conduct.
10     Q     If she had said yes, would an offer of
11 employment have been extended by World Vision to
12 Ms. McMahon?
13           MR. WARD:  Same objection as to form.
14           You may answer.
15     A     If she had said she could comply with the
16 standards of conduct?
17     Q     Yes.
18     A     We would move forward to the next step if
19 there were no other concerns.
20     Q     What if she had said no?
21           MR. WARD:  Same objection as to form.
22           You may answer.
23     A     If a candidate says that they can't
24 comply with the standards of conduct, we don't move
25 them forward.

Catherine Miolla
March 02, 2023

C. Miolla

1
2      Q      To your knowledge and based on your
3   experience, if Ms. McMahon had disclosed that she was
4   gay as part of her telephone screening, would an
5   offer of employment have been extended by World
6   Vision Incorporated to Ms. McMahon?
7           MR. WARD:  I'm going to -- same objection
8      as to form.
9           You may answer.
10     A      My part in this process at this point is
11  just asking the question of if they comply with the
12  standards of conduct.
13     Q      So is it fair to say that, at this point
14  of -- of the process which is during the phone
15  screening, is that you, in essence, are compiling
16  information to then pass along to a decision maker;
17  is that a fair way to encapsulate what your tasks and
18  responsibilities were?
19     A      My responsibility is to gather the
20  information throughout all of the questions in the
21  phone screen to then move to the next steps which
22  includes the hiring manager as the ultimate decision
23  maker.
24     Q      Did you have the power to flat out deny
25  somebody's employment solely --

C. Miolla

1
2           MR. WARD:  Objection to the --
3      Q      -- following the phone screen portion?
4           MR. WARD:  Sorry.
5           Objection as to form.
6           You may answer.
7      A      Can you rephrase that?
8           MR. WOLNOWSKI:  Ms. Ratigan, could you
9      read that back?  And if rephrase is needed,
10     I'll do my best.
11          (WHEREUPON, the previous question was
12     read by the court reporter.)
13     Q      And to be clear, Ms. Miolla, when I say
14  "you," I mean you personally as in Catherine Miolla.
15     A      I'm able to not move someone forward past
16  the stage if they don't meet the requirements for any
17  reason.
18     Q      After this phone screening with
19  Ms. McMahon, which I will represent occurred on or
20  about December 4, 2020, what was the next step in
21  considering Ms. McMahon for employment with World
22  Vision?
23     A      The next step for this position is a
24  written, typing speed, and data entry test.
25     Q      So if you could, Ms. Miolla, based on

C. Miolla

1
2   your knowledge and experience, explain to me the
3   general process in considering somebody for
4   employment as a customer service representative or
5   donor/customer service representative trainee after
6   his or her phone screening such as the one in which
7   Ms. McMahon was involved on or about December 4,
8   2020.
9      A      The next step is the assessment I just
10  mentioned, and then a subsequent interview with a
11  leader from the call center.
12     Q      And then if you could, please explain to
13  me what happens after that; if a person passes both
14  the -- the typing proficiency portion and then that
15  next interview that you've just described, what is
16  the next step?
17     A      The next step at that time would be
18  references and a background check.
19     Q      And assuming the applicant passes the
20  references and background check portion, what is the
21  next step?
22     A      I believe the next step is the offer.
23          MR. WOLNOWSKI:  If it's all right, we
24     should take a quick five-minute break; is that
25     okay with everybody?

C. Miolla

1
2           Ms. Miolla, most importantly, is that
3      okay with you?
4           THE WITNESS:  Yes.
5           MR. WOLNOWSKI:  All right.  So let's just
6      be back in -- it'll probably be less than five
7      minutes, but let's just say let's be back at
8      1:58; I have 1:53.
9           Thank you, everybody.  We'll be right
10     back.
11          MR. WARD:  Okay.
12          (WHEREUPON, a brief recess was taken,
13     after which the following transpired:)
14          (Time noted:  2:00 p.m.)
15  CONTINUED EXAMINATION BY MR. WOLNOWSKI:
16     Q      Ms. Miolla, did you pass this telephone
17  screening document marked as Plaintiff's Exhibit 6
18  along to anybody?
19     A      I believe I just upload it to our
20  applicant tracking system.
21     Q      Do you recall if you notified anybody
22  that either the phone screening had been completed as
23  to Aubry McMahon or that you had uploaded the phone
24  screen document?
25     A      I would have just let the hiring team in

Catherine Miolla
March 02, 2023

Page 42

C. Miolla

1
2  the call center know that we had another candidate
3  ready to interview.
4        Q    And do you recall if you, in fact, did
5  that with Aubry McMahon?
6        A    I think that I did.
7        Q    Okay.  And if you can tell me, if you can
8  remember, you said that you would have informed a
9  person or informed a manager.
10       Do you remember the identity of that
11  individual?
12       A    I don't remember exactly in this scenario
13  other than Anthony since he was on the next
14  interview.
15       Q    And what was Anthony's last name?
16       A    Thomas.
17       Q    Ms. Miolla, after this phone screen, when
18  was the next time you learned anything about
19  Ms. McMahon's potential employment with World Vision
20  Incorporated?
21       A    After this phone screen?
22       Q    Correct.
23       A    Well, the next thing I would have learned
24  would have been that she passed the written
25  assessment.

Page 43

C. Miolla

1
2        Q    Do you recall around when that was?
3        A    Not exactly.
4        Q    To your knowledge and from your
5  recollection, please tell me everyone you can
6  remember who had any role in deciding to extend an
7  offer of employment to Aubry McMahon to work for
8  World Vision Incorporated.
9        A    I don't remember.
10       Q    From your knowledge and from your
11  recollection, was it more than three people?
12       A    I don't think so.
13       Q    So from your knowledge and recollection,
14  it was three or fewer?
15       A    I think so.
16       Q    Were you one of the individuals who
17  recommended an offer of employment be extended to
18  Aubry McMahon?
19       A    I was the one who conducted her phone
20  screen and let the hiring team know there weren't
21  issues at the time.
22       Q    So my question I think is a little more
23  focussed as to whether or not you recommended an
24  offer of employment be extended.
25       Are -- are you saying that yes, you were,

Page 44

C. Miolla

1
2  by virtue of those actions you just described?
3       MR. WARD:  I'm going to object as to
4  form.
5       But you may answer.
6       A    Well, generally, the hiring decision is
7  of the hiring manager or the hiring team.
8       Q    If you can remember, who was the hiring
9  manager responsible for Aubry McMahon's application
10 in January 2021 and December of 2020?
11      A    I don't remember the hiring manager, but
12 the representative who was part of her interview was
13 Anthony.
14      Q    Do you recall if Melanie Freiberg played
15 any role in the determination to extend an offer of
16 employment to Aubry McMahon?
17      A    I don't believe so.
18      Q    Do you recall if Christine Talbot played
19 any role in the decision to extend an offer of
20 employment to Aubry McMahon?
21      A    I don't believe so.
22      Q    At some point, an offer of employment was
23 extended to Ms. McMahon for the position of
24 donor/customer service representative; is that
25 correct?

Page 45

C. Miolla

1
2       A    Yes.
3       MR. WARD:  Objection as to form.
4       You may answer.
5       Q    Do you know who made the ultimate
6  decision to extend an offer of employment to Aubry
7  McMahon to work at World Vision Incorporated?
8       A    Can you rephrase that?
9       Q    Do you know who made the ultimate
10 decision to extend an offer of employment to Aubry
11 McMahon to work at World Vision Incorporated?
12      And let me back up for a moment, because
13 I don't want there to be any confusion.
14      I had previously asked you about who was
15 involved in the decision-making process, for which
16 you testified and provided answers.
17      I'm now asking a slightly different
18 question, which is whether or not you know who made
19 the ultimate decision to extend an offer of
20 employment to Aubry McMahon to work at World Vision
21 Incorporated.
22      A    I don't think it was necessarily one
23 person making the ultimate decision.
24      Q    If you can recall, who were the persons
25 who contributed to making the ultimate decision to

Catherine Miolla
March 02, 2023

Page 46

                    C. Miolla
1
2    extend an offer of employment to Aubry McMahon to
3    work at World Vision Incorporated?
4         A     I don't remember anyone specifically
5    being involved other than who I've already mentioned.
6         Q     You reached out to Aubry McMahon on
7    January 4th, 2021 to verbally extend her an offer
8    with World Vision; is that correct?
9         A     I believe so, yes.
10        Q     Well, irrespective of the date, who, if
11   anyone, directed you to do that?
12        A     That would have been like the standard
13   next step in our process, so her having passed the
14   previous steps would move us to the next step.
15        Q     So if I'm understanding, there wasn't a
16   directive, so to speak, but that you were following
17   the protocol that had been created by World Vision;
18   is that more or less an accurate description?
19             MR. WARD:  Objection as to form.
20             You may answer.
21        A     I believe that's accurate.
22        Q     Ms. Miolla, you sent Aubry McMahon a
23   letter on or about January -- well, let me back up.
24             When you spoke with Ms. McMahon on
25   January 4th, if you could, please explain to me

Page 47

                    C. Miolla
1
2    everything you can remember about that conversation.
3         A     I don't remember specifics other than
4    letting her know that she was being extended the job
5    offer and that I would be sending the written offer
6    letter.
7         Q     And how long did that telephone
8    conversation last?
9         A     I don't remember.
10        Q     Would you say it was shorter than three
11   minutes?
12        A     Probably.
13        Q     In response to you telling her that she
14   would be extended an offer, from your recollection,
15   what, if anything, did Aubry say to you in response?
16        A     I don't remember what she said.
17        Q     And do you recall if she accepted the
18   position?
19        A     I don't remember if she did on that phone
20   call.
21        Q     Did she say that she was looking forward
22   to working at World Vision or something to that end?
23        A     I don't remember.
24        Q     Ms. Miolla, you sent Aubry McMahon a
25   letter on or about January 5th, 2021 which served as

Page 48

                    C. Miolla
1
2    a written confirmation of the verbal offer made to
3    her for the position of donor/customer service
4    representative with -- trainee with World Vision; is
5    that correct?
6         A     Yes.
7         Q     I'd like to show what has been previously
8    marked as Plaintiff's Exhibit Number 2.
9             This is a document which is Bates-stamped
10   WV 78 to 79.  I will represent that this document was
11   exchanged during the discovery phase of litigation in
12   this matter.
13             If you could, please review this document
14   and let me know once you've completed doing so.
15        A     (Perusing a document)
16             I've completed reviewing it.
17        Q     Ms. Miolla, do you recognize this
18   document?
19        A     Yes.
20        Q     Have you ever seen it before?
21        A     Yes.
22        Q     Is this letter a written confirmation of
23   an offer of employment for Aubry McMahon to work for
24   World Vision Incorporated?
25        A     It's a written confirmation of her offer

Page 49

                    C. Miolla
1
2    to be a donor/customer service representative
3    trainee.
4         Q     In the first sentence of this document,
5    it states that the job itself was to commence on
6    February 1st, 2021.
7             Is that the -- correct that this document
8    states that?
9         A     Yes.
10        Q     Is it accurate that the job itself would
11   indeed commence on February 1st, 2021?
12        A     That's when the training would have
13   started, yes.
14        Q     And at the bottom of page 1 of this
15   document, it bears your name -- correction, excuse
16   me.  Let me go back.
17             Not of page 1, but as of the first page,
18   the one marked WV 78, it bears your name; correct?
19        A     Yes.
20        Q     Okay.  In January of 2021, did you
21   regularly send out letters bearing your name at the
22   bottom such as the one marked as Plaintiff's Exhibit
23   Number 2?
24        A     Yes.
25        Q     Do you know why your name appears there

Catherine Miolla
March 02, 2023

Page 50

C. Miolla

1   as opposed to somebody else's?
2
3       A    Not really, other than that I was the
4   assigned recruiter.
5       Q    And this document was sent via a version
6   that was DocuSign; correct?
7       A    I believe so.
8            MR. WOLNOWSKI:  Off the record.
9            (Discussion held off the record)
10           MR. WOLNOWSKI:  Back on.
11      Q    Ms. Miolla, do you know if Aubry McMahon
12  ever returned a signed copy of this letter, whether
13  it be via DocuSign or otherwise?
14      A    I don't think she did.
15      Q    Now, Ms. Miolla, that same day,
16  January 5th, 2021, Aubry McMahon sent you an e-mail;
17  correct?
18      A    I believe so, yes.
19      Q    Do you recall receiving an e-mail from
20  Ms. McMahon on or about January 5th, 2021 disclosing
21  to you that she was pregnant?
22      A    I remember getting the e-mail, but I
23  don't remember exactly what it said.
24      Q    So as you sit here today, you don't
25  recall whether or not you received an e-mail on

Page 51

C. Miolla

1   January 5th, 2021 disclosing to you that Ms. McMahon
2   was pregnant?
3
4       A    I can't remember the exact content of the
5   e-mail.
6       Q    I'm sorry, could you repeat that?  You
7   broke up just a tad.
8            (WHEREUPON, the requested portion of the
9            testimony was read by the court reporter.)
10           MR. WOLNOWSKI:  Thank you.
11      Q    Do you recall receiving an e-mail from
12  Ms. McMahon on or about January 5th, 2021 disclosing
13  to you that she was expecting her first baby in March
14  of that year?
15      A    I don't remember if it included that
16  specific de- -- those specific details.
17      Q    Do you recall receiving an e-mail from
18  Ms. McMahon on or about January 5th asking you if she
19  would qualify for time off since she'll be a new
20  employee?
21      A    I remember she asked something about time
22  off, but I don't remember exactly what she asked.
23      Q    Do you recall receiving an e-mail from
24  Ms. McMahon on or about January 5th, 2021 disclosing
25  to you that she had a wife?

Page 52

C. Miolla

1
2       A    I don't remember exactly what was in the
3   e-mail.  I believe the word "wife" was in the e-mail.
4       Q    Do you recall receiving an e-mail from
5   Ms. McMahon on or about January 5th, 2021 disclosing
6   that she was LGBTQ?
7            MR. WARD:  Objection as to form.
8            You may answer.
9       A    I don't remember the specifics of that
10  being in the e-mail.
11      Q    One moment.  Bear with me, please,
12  Ms. Miolla.
13           Thank you for your patience, Ms. Miolla.
14           I'd like to show you what is marked as
15  Plaintiff's Exhibit 3.  It's a document that bears
16  Bates-stamp Number WV 80.  I will represent that this
17  document was exchanged during the discovery phase of
18  litigation in this matter.
19           If you could, please review this document
20  and let me know once you've completed doing so.
21      A    (Perusing a document)
22           I've reviewed the document.
23      Q    Do you recognize this document?
24      A    Yes.
25      Q    Have you ever seen it before?

Page 53

C. Miolla

1
2       A    Yes.
3       Q    Did you receive this e-mail from Aubry
4   McMahon on January 5th of 2021?
5       A    I believe so, yes.
6       Q    Now that you've had a chance to review
7   it, does this e-mail disclose to you that Ms. McMahon
8   was pregnant?
9       A    I believe so.
10      Q    Well, she does state, "I will be the one
11  having the baby."
12           In light of this, does that help clarify
13  as to whether or not in this e-mail Ms. McMahon was
14  advising you that she was pregnant?
15      A    Can you ask the question again?
16           MR. WOLNOWSKI:  Ms. Ratigan, could you
17           please read it back?
18           (WHEREUPON, the previous question was
19           read by the court reporter.)
20      A    I -- I believe so, yes.
21      Q    In reviewing this e-mail and in light of
22  your prior answers, does this e-mail help clarify as
23  to whether or not Ms. McMahon asked you if she
24  qualified for any time off?
25      A    Yes.

Catherine Miolla
March 02, 2023

Page 54

C. Miolla

1
2    Q    In light of reviewing this e-mail and in
3  light of your prior testimony, does this e-mail
4  disclose to you that Ms. McMahon was expecting her
5  first baby in March?
6    A    Yes.
7    Q    In reviewing this e-mail and in light of
8  your prior testimony, does this e-mail disclose to
9  you that Ms. McMahon had a wife?
10   A    Yes.
11   Q    In reviewing this e-mail and in light of
12  your prior testimony, does this e-mail disclose that
13  she is LGBTQ --
14        MR. WARD:  Objection --
15   Q    -- in your opinion?
16        MR. WARD:  Objection as to form.
17        You may answer.
18   A    Well, I just know the facts of the
19  e-mail, which indicate that she has a wife.
20   Q    Did you formulate an opinion upon reading
21  this as to whether or not Aubry McMahon may be gay?
22        MR. WARD:  Objection as to form.
23        You may answer.
24   A    I don't remember.
25   Q    Well, as you read it now?

Page 55

C. Miolla

1
2        MR. WARD:  Same objection.
3        You may answer.
4    A    I think I just recognized that I needed
5  to get guidance on how to respond.
6    Q    I think my question is, as you read the
7  e-mail now, do you believe that, in reading this
8  e-mail, that you were informed that somebody may be
9  gay?
10        MR. WARD:  I'm going to object as to form
11        and as argumentative and as to relevance.
12        But you may answer to the extent you
13        know.
14   A    I just know the facts of the e-mail.
15   Q    And what are the facts of the e-mail?
16   A    That she has a question, that she has a
17  wife, that she's expecting her first baby in March.
18   Q    When you first read this, from your
19  recollection in Jan- -- on January 5th, 2021, did you
20  think that Aubry McMahon might be gay?
21        MR. WARD:  Objection as to form.
22        You may answer.
23   A    I just remember thinking that I needed
24  guidance from my leadership.  I don't remember my
25  thoughts other than that.

Page 56

C. Miolla

1
2    Q    And why did you conclude that you needed
3  guidance from leadership?
4    A    She just had several questions that I
5  felt like I wasn't able to answer on my own.
6    Q    And what were those questions?
7    A    Well, her question really was to take
8  time off.
9    Q    Any other questions?
10   A    Not explicitly in this e-mail.
11   Q    So upon reading this, you didn't think
12  that there were any questions which needed to be
13  addressed in light of the fact that she might be in a
14  same-sex marriage; is that correct?
15   A    I wanted guidance as to how to move
16  forward if she were to be -- if there were to be
17  issues with anything related to the standards of
18  conduct.
19   Q    And what standards of conduct in
20  particular did you think there may be questions
21  surrounding?
22   A    Potentially the statement in the
23  standards of conduct which at the time read as any
24  sexual conduct outside of a marriage with World
25  Vision believing marriage to be between a man and a

Page 57

C. Miolla

1
2  woman.
3    Q    Did you think there were any questions
4  which potentially needed to be addressed in light of
5  the fact that Aubry McMahon might be gay?
6        MR. WARD:  Objection as to form.
7    A    I don't know.
8    Q    So it's not a definitive no, is what
9  you're saying; correct?
10        MR. WARD:  Objection as to form.
11   A    I'm not sure.
12   Q    And why would Aubry McMahon's sexual
13  orientation of being gay have anything to do with
14  whether or not she could work for World Vision --
15        MR. WARD:  Objection.
16   Q    -- in January of 2021?
17        MR. WARD:  Objection; form,
18        argumentative.
19   A    I just felt like I needed to talk with my
20  management about if she was in alignment with the
21  standards of conduct as well as her time off
22  question.
23   Q    From your recollection in January of
24  2021, what, if anything, did the standards of conduct
25  say about a person who is LGBTQ working for World

Catherine Miolla
March 02, 2023

Page 58

C. Miolla

1    C. Miolla
2    Vision?
3              MR. WARD:  Objection as to form.
4              You may answer.
5        A    The standards of conduct doesn't use that
6    language.  It reads as we read earlier.
7        Q    Was there ever any discussion about
8    bringing it to the attention of managers or
9    supervisors if somebody disclosed that they were gay?
10             MR. WARD:  Objection as to form.
11       A    Can you ask that again?
12       Q    Sure.
13             Was there any policy or protocol in place
14   in January of 2021 to address a potential applicant
15   as being gay with a manager or supervisor?
16             MR. WARD:  Objection as to form.
17       A    No.
18       Q    Upon receiving this e-mail, what is the
19   first thing that you did?
20       A    I believe I talked to my manager, Melanie
21   Freiberg.
22       Q    And what did you -- what did you say to
23   her?
24       A    I let her know this was the e-mail I
25   received and asked her how I should move forward.

Page 59

C. Miolla

1    C. Miolla
2        Q    Did Melanie Freiberg come into possession
3    of this e-mail in any way, from your recollection?
4        A    I don't remember.
5        Q    Do you recall whether or not you
6    forwarded it on to her?
7        A    I don't recall.
8        Q    Upon notifying Melanie Freiberg as to the
9    existence of this e-mail, what, if anything, did she
10   say to you with respect to the content of the e-mail?
11       A    I don't remember her saying anything
12   about the content.
13       Q    Well, if you can, just explain to me the
14   first time that you spoke with about this e-mail
15   from Aubry McMahon on January the 5th.
16       A    All I remember is letting her know the
17   content of the e-mail and asking her how I should
18   move forward.
19       Q    And what did she say in response to that?
20       A    I believe she said that we should talk to
21   our legal team.
22       Q    How long did that conversation last with
23   Melanie Freiberg?
24       A    I don't remember.
25       Q    Would you say it was less than three

Page 60

C. Miolla

1    C. Miolla
2    minutes?
3        A    I don't remember.
4        Q    Would you say it was more than three
5    minutes?
6        A    I don't remember.
7        Q    Was it more than ten minutes?
8        A    I don't remember.
9        Q    Was it more than 20 minutes?
10       A    I don't think so.
11       Q    So from your recollection, it could have
12   been anywhere from a couple of seconds to 20 minutes?
13             MR. WARD:  Objection as to form.  It
14             mischaracterizes.
15       A    I don't remember anything more specific
16   than that in terms of the length.
17       Q    So is it fair to say that the
18   conversation could have lasted only a couple minutes?
19       A    I don't remember.
20       Q    Is it fair to say the conversation could
21   have lasted 20 minutes?
22             MR. WARD:  Objection as to form.  And,
23             Counsel, I think this has been asked and
24             answered.  You've gotten a consistent response
25             to every variation on the theme.  At this

Page 61

C. Miolla

1    C. Miolla
2    point, it's just badgering the witness.
3              MR. WOLNOWSKI:  If the witness
4    understands the question, she can answer it.
5        A    I don't remember the length of the call.
6        Q    I'd like to show you what has been marked
7    as Plaintiff's Exhibit Number 4.
8              Ms. Miolla, I'd like to show you what is
9    marked as Plaintiff's Exhibit Number 4.  It is a
10   document that is Bates-stamped WV 231 to 232.  I will
11   represent that this is a document that was exchanged
12   during the discovery phase of litigation in this
13   matter.
14             Please review this document and let me
15   know once you've completed doing so.
16       A    (Perusing a document)
17             I've finished reviewing it.
18       Q    Do you recognize this document?
19       A    Yes.
20       Q    Have you ever seen it before?
21       A    Yes.
22       Q    This appears to be an e-mail chain
23   between you and Melanie Freiberg regarding Aubry
24   McMahon; would you agree?
25       A    Yes.

Catherine Miolla
March 02, 2023

Page 62

C. Miolla

1
2  Q    In January of 2021, who was Melanie
3  Freiberg?
4  A    She was my direct manager.
5  Q    From your recollection, did she hold the
6  position of director talent management, HR for World
7  Vision?
8  A    I believe so, yes.
9  Q    Was she your supervisor in January of
10  2021?
11  A    Yes.
12  Q    Was she your boss in January of 2021?
13  A    Yes.
14  Q    On January 5th, 2021 at 3:07 p.m.,
15  Melanie Freiberg e-mailed you and asked you to send
16  Aubry an e-mail to connect on the telephone; is that
17  correct?
18  A    Yes.
19  Q    Do you know why she asked you to do that?
20  A    I don't remember exactly.
21  Q    Did Melanie Freiberg want to be on a
22  telephone call with Aubry McMahon?
23        MR. WARD:  Objection as to form.
24  A    Can you ask that again?
25  Q    If you know and if you recall, did

Page 63

C. Miolla

1
2  Melanie Freiberg want to be on a call with Aubry
3  McMahon?
4  A    I think so.
5  Q    Do you know why?
6  A    I don't remember exactly why.
7  Q    Did she ever explain to you why?
8  A    I don't remember.
9  Q    Ms. Miolla, I'd like to show you what
10  will be -- excuse me, what has been marked as
11  Plaintiff's Exhibit 5.  It's a document bearing
12  Bates-stamped number WV 2858.  Ms. Miolla, I will
13  represent that this document was exchanged during the
14  discovery phase of litigation in this matter.
15        If you could, please review this document
16  and let me know once you've completed doing so.
17  A    (Perusing a document)
18        I've completed review.
19  Q    Do you recognize this document?
20  A    Yes.
21  Q    Have you ever seen it before?
22  A    Yes.
23  Q    This document appears to be an e-mail
24  sent by you to Melanie Freiberg at 11 o'clock p.m. in
25  which you wrote in the body, "Hi Melanie, Aubry's

Page 64

C. Miolla

1
2  phone interview is attached.  The standards of
3  conduct section with her responses is the last
4  section.  Let me know if you need anything else."
5        Do you see that?
6  A    Yes.
7  Q    Did you write that?
8  A    I believe so.
9  Q    Do you have any reason to doubt that this
10  is an e-mail that you sent to Melanie Freiberg on
11  January 5th?
12  A    No.
13  Q    It appears as though there was an
14  attachment to this e-mail entitled "Aubry Atwood
15  phone screen," and it appears to be a .doc document.
16        Do you see that?
17  A    Yes.
18  Q    Did you attach that document to this
19  January 5th e-mail?
20  A    I believe so, yes.
21  Q    Do you have any reason to doubt that you
22  attached that document to this January 5th e-mail?
23  A    No.
24  Q    Is the attachment to that e-mail the same
25  document I previously showed you, which was marked

Page 65

C. Miolla

1
2  Plaintiff's Exhibit Number 6?
3  A    I think so.
4  Q    Well, was there a separate phone screen
5  document that was in existence aside from the one
6  that I showed you marked Plaintiff's Exhibit 6?
7  A    No.
8  Q    Why did you attach that document to this
9  e-mail?
10  A    I think Melanie asked to see it.
11  Q    If you can recall, when did Ms. Freiberg
12  ask you to send it to her?
13  A    When?
14  Q    Yes, when.  As in if you can recall the
15  day, the time, anything else you can recall.
16  A    I don't remember.
17  Q    If you can, tell me everything you can
18  remember about the communication in which she asked
19  or directed you to send her the phone screen
20  document.
21  A    I don't remember any of it.
22  Q    Do you recall if it was something that
23  was requested via telephone?
24  A    I don't remember.
25  Q    Did you ever ask or inquire with Melanie

Catherine Miolla
March 02, 2023

Page 66

C. Miolla

1    C. Miolla
2    Freiberg, or anyone else for that matter, why she or
3    they wanted to see the Aubry McMahon phone screen
4    document?
5            MR. WARD:  Objection as to form.
6            You may answer.
7       A    No, I don't think so.
8       Q    Now, Ms. Miolla, this is a long question,
9    so bear with me.
10           From the time you received the
11   January 5th, 2021 e-mail from Aubry McMahon through
12   January 8th of 2021, approximately how many
13   conversations with either Melanie Freiberg, Christine
14   Talbot, or both did you have regarding Aubry McMahon
15   whether it be over the phone, via video conference,
16   in person, or otherwise?
17      A    I don't remember.
18      Q    Would you say it was fewer than three?
19      A    I don't remember.
20      Q    Would you say it was between four and
21   ten?
22      A    Possibly.
23      Q    Would you say it was between 11 and 15?
24      A    I don't think so.
25      Q    For the ones in which legal counsel was

Page 67

C. Miolla

1    not present, tell me everything you can remember
2    about those conversations.
3       A    I don't remember any of the
4    conversations.
5       Q    So the conversations that you had with
6    Melanie Freiberg and/or Christine Talbot between
7    January 5th of 2021 and January 8th, 2021, your
8    testimony here today is that you can't remember
9    anything that was discussed in any of those
10   conversations regarding Aubry McMahon?
11           MR. WARD:  Objection as to form.
12      A    No, I don't remember any specifics.
13      Q    Well, not about specifics.  I'm asking
14   you whether you remember anything about those
15   conversations.
16           MR. WARD:  Objection as to form.
17      A    I don't remember anything other than what
18   I've already shared.
19      Q    From your recollection, how many times
20   did the issue of Aubry McMahon potentially being in a
21   same-sex marriage come up during those conversations
22   with either Melanie Freiberg, Christine Talbot, or
23   both from January 5th to January 8th, 2021 in which
24   you were either a participant or present?

Page 68

C. Miolla

1    C. Miolla
2            MR. WARD:  Objection as to form.
3            You may answer.
4       A    I don't remember.
5       Q    Would you say it was one or more?
6       A    I don't remember.
7       Q    Would you say it was more than five?
8       A    I don't remember.
9       Q    So as you testify here today, it could
10   have been zero; is that fair to say?
11           MR. WARD:  I'm going to object as to
12   form.
13           But you may answer.
14      A    It's possible it was zero.  I don't
15   remember.
16      Q    Okay.
17           MR. WARD:  I'm -- I'm going to want to
18   take a break now since there's no question
19   pending.
20           So should we take about five minutes?
21           MR. WOLNOWSKI:  Absolutely.
22           Is that okay with you, Ms. Miolla?
23           THE WITNESS:  Yes.
24           MR. WOLNOWSKI:  All righty.  Let's circle
25   back at 2:47.

Page 69

C. Miolla

1    C. Miolla
2            Does that work for you, Mr. Ward?
3            MR. WARD:  I think that works.
4            Thank you.
5            MR. WOLNOWSKI:  All right.  Thank you.
6            (WHEREUPON, a brief recess was taken,
7    after which the following transpired:)
8            (Time noted:  2:49 p.m.)
9            MR. WOLNOWSKI:  We're back on the record.
10   CONTINUED EXAMINATION BY MR. WOLNOWSKI:
11      Q    We just took a seven-minute break there.
12           During the break, Ms. Miolla, did you
13   speak with anybody?
14      A    No.
15      Q    What did you do during the break?
16      A    I went to the bathroom and pet my cat.
17      Q    What's your cat's name?
18      A    Muffin.
19      Q    That's a good name.
20           MR. WOLNOWSKI:  Could we go off the
21   record for a moment?
22           (Discussion held off the record)
23           MR. WOLNOWSKI:  Back on.
24      Q    Ms. Miolla, from January 5th to
25   January 8th of 2021, in your conversations with

Catherine Miolla
March 02, 2023

Page 70

C. Miolla

1
2  Melanie Freiberg or Christine Talbot, how many times
3  did the issue of Aubry McMahon potentially being gay
4  come up during those conversations in which you were
5  either a participant or present?
6              MR. WARD:  I'm going to object to form.
7       A    I don't remember.
8       Q    Did it come up at all, from your
9  recollection?
10             MR. WARD:  Same objection.
11      A    I don't remember.
12      Q    So it could have come up and you just
13  don't remember, instead of definitively saying it
14  never came up; is that accurate?
15             MR. WARD:  Same objection.
16      A    I'm not sure.
17      Q    Ms. Miolla, I'd like to show you what has
18  been previously marked as Plaintiff's Exhibit
19  Number 7.  It is a document which bears Bates-stamp
20  Number WV 240 to 241.
21             If you can, please review this document
22  and let me know once you've completed doing so.
23             If I haven't mentioned already, I will
24  represent that this document was exchanged during the
25  discovery phase of litigation in this matter.

Page 71

C. Miolla

1
2       A    (Perusing a document)
3             I've reviewed the document.
4       Q    Okay.  Ms. Miolla, have you ever seen
5  this document before?
6       A    Not as a document.
7       Q    If you can, please explain to me how
8  you've seen it in non-document form.
9       A    I think I remember it as like a meeting
10  invite.
11      Q    At some point between January 5th and
12  January 8th of 2021, Melanie Freiberg sent an e-mail
13  to both you and Christine Talbot to join a
14  RingCentral meeting; is that correct?
15             MR. WARD:  Objection as form.
16             You may answer.
17      A    I think so based on this.
18      Q    Do you recall receiving that invite?
19      A    Sort of.
20      Q    After having seen Plaintiff's Exhibit 7,
21  does this refresh your recollection as to whether or
22  not you received a RingCentral invite from Melanie
23  Freiberg?
24      A    Yes.
25      Q    From your recollection, when did you

Page 72

C. Miolla

1
2  receive this RingCentral invite?
3       A    I don't remember.
4       Q    Do you recall the date?
5       A    No, I don't remember.
6       Q    Do you recall if it was sometime between
7  January 5th and January 8th of 2021?
8       A    I don't remember.
9       Q    The subject line of the invite which is
10  in Plaintiff's Exhibit 7 states, "Dry run,
11  Christine/Melanie/Christine"; correct?
12      A    Yes.
13      Q    Now, before we get into the meeting
14  itself, who is Christine Talbot?
15      A    Christine Talbot was our senior vice
16  president of human resources.
17      Q    In January of 2021, was Christine Talbot
18  your supervisor?
19      A    No.
20      Q    Was she your supervisor's supervisor?
21      A    Yes.
22      Q    In January of 2021, was Christine Talbot
23  your boss?
24      A    No.
25      Q    Did you attend the dry run RingCentral

Page 73

C. Miolla

1
2  meeting that is the subject of this invite?
3       A    I don't remember.
4       Q    Irrespective of it being a dry run or a
5  RingCentral meeting, do you recall having some kind
6  of meeting with Melanie Freiberg and Christine Talbot
7  in or around early January of 2028 relating -- excuse
8  me, in or around January 5th to January 8th of 2021
9  relating to Aubry McMahon?
10      A    I don't remember.
11      Q    Do you remember any meetings in which a
12  dry run of something was discussed?
13      A    I don't remember.
14      Q    I'd like to show you a document which is
15  marked Plaintiff's Exhibit Number 8.  I can represent
16  to you, Ms. Miolla, that this document bears
17  Bates-stamped Numbers WV 242 to 244, and it is a
18  document which was exchanged during the discovery
19  phase of this litigation in this case.
20             If you could, please review this document
21  and let me know once you've completed doing so.
22      A    (Perusing a document)
23             I've reviewed the document.
24      Q    Do you recognize this document?
25      A    Sort of.

Catherine Miolla
March 02, 2023

Page 74

C. Miolla

1
2    Q    Have you ever seen it before?
3    A    I think so.
4    Q    Plaintiff's Exhibit 8 seems to be an
5    e-mail chain involving you, Melanie Freiberg, and
6    Christine Talbot which took place on January 6th,
7    2021 in the morning.
8         Would you agree?
9    A    Yes.
10   Q    In these e-mails, Christine Talbot
11   mentions something about reviewing a script.
12        Do you see that?
13   A    Yes.
14   Q    Do you know to what she was referring in
15   this e-mail relating to a script?
16   A    No, I don't remember.
17   Q    In this e-mail dated January 6th, 2021 at
18   8:43 a.m. to you and Ms. Freiberg, Christine Talbot
19   mentions offering to practice with you.
20        Do you see that?
21   A    Yes.
22   Q    Do you know to what she was referring in
23   this e-mail relating to practicing something with
24   you?
25   A    I don't remember.

Page 75

C. Miolla

1
2    Q    On or about January 6th, 2021 or
3    thereafter, did you ever practice anything with
4    Christine Talbot?
5    A    I don't remember.
6    Q    Do you recall receiving this e-mail?
7    A    I didn't remember until you showed it to
8    me.
9    Q    In light of me showing it to you, does it
10   refresh your recollection as to whether or not you
11   received this e-mail?
12   A    Yes.
13   Q    Do you recall after having reviewed it
14   that you did indeed receive this e-mail on or about
15   8:43 a.m. in the morning on January 6th, 2021?
16   A    Yes, I think so.
17   Q    Well, in light of reviewing it now, does
18   it refresh your recollection about you and/or Melanie
19   and Christine Talbot discussing anything involving a
20   script on or about January 6th, 2021?
21   A    I don't remember anything other than
22   what's being shown here.
23   Q    In rejecting applicants in general in
24   January of 2021, was it common practice that a script
25   would be utilized in informing him or her that an

Page 76

C. Miolla

1
2    offer was being rescinded?
3         MR. WARD:  Objection as to form.
4         You may answer.
5    A    I don't think I've ever been involved in
6    an offer being rescinded other than this time, so I
7    don't know.
8    Q    In your experience at World Vision, how
9    many offers have been extended in which you have been
10   a participant in some way, shape, or form?
11   A    Offers extended?
12   Q    Correct.  As in offer were made.
13   A    Hundreds.
14   Q    When you say "hundreds," that could mean
15   anywhere from 200 to 900.
16        Could you try to be a little more
17   precise; is it between 2- and 400, 400 and 600, 6- to
18   800, something else?
19   A    I'm not sure.
20   Q    Was it more -- is it -- has it been more
21   than 200?
22   A    Possibly.
23   Q    Has it been more than 400?
24   A    I'm not sure.
25   Q    Has it been more than 600?

Page 77

C. Miolla

1
2    A    I'm not sure.
3    Q    If you can look at the top of the second
4    page, that's page WV 243, Melanie Freiberg e-mailed
5    Christine Talbot, and you were on that e-mail.  It's
6    an e-mail dated January 6th, 2021, was sent at
7    9:46 a.m.  Melanie writes -- to the extent you can
8    read -- I know there's a portion that's chopped
9    off -- "Christine, thank you so much for the words of
10   encouragement," and mentions that she would love to
11   take her up on her offer to practices.
12        In reviewing this, does it refresh your
13   recollection as to whether or not either you or
14   Melanie Freiberg practiced anything with Christine
15   Talbot around January 6th or January 7th of 2021?
16   A    I don't remember.
17   Q    Ms. Miolla, I'd like to show you a
18   document which has been marked Plaintiff's Exhibit 9.
19   I can represent to you that it is a document bearing
20   Bates-stamped Numbers WV 81 to 82.  It is a document
21   which has been exchanged during the discovery phase
22   of litigation in this case.
23        If you could, please review this document
24   and let me know once you've completed doing so.
25   A    (Perusing a document)

Catherine Miolla
March 02, 2023

| | |
|---|---|
| Page 78 | Page 79 |

Page 78

C. Miolla

1
2    I've finished reviewing.
3    Q    Ms. Miolla, do you recognize the document
4    that I have shown you which has been marked
5    Plaintiff's Exhibit 9?
6    A    Yes.
7    Q    Have you ever seen it before?
8    A    Yes.
9    Q    This document appears to be an e-mail
10   chain between you and Aubry McMahon beginning
11   January 5th of 2021 and ending January 8th, 2021.
12       Would you agree?
13   A    Yes.
14   Q    And is it correct that the latest e-mail
15   appears at the end of the second page, and the most
16   recent e-mail appears at the top of the first page?
17   A    Yeah, that looks to be correct.
18   Q    I'd like to direct your attention to the
19   middle section of the second page, that page being
20   marked WV 82.  It is an e-mail which you sent to
21   Ms. McMahon on January 5th, 2021 at 4:59 p.m., and it
22   reads, "Hi Aubry, thank you for your e-mail and
23   questions.  Do you have time tomorrow afternoon to
24   discuss by phone?  I have a few interviews scheduled,
25   but could give you a call around 4:00 p.m. EST if

Page 79

C. Miolla

1
2    that would work for you?  Thanks, Catherine."
3        Did you indeed send that e-mail to
4    Ms. McMahon?
5    A    Yes.
6    Q    Why did you send her that e-mail?
7    A    I believe I was given guidance to talk
8    with her on the phone about her questions.
9    Q    Who gave you that guidance?
10   A    I don't remember exactly.  I think it may
11   have been Melanie and our legal team.
12   Q    And what kind of guidance was Melanie
13   asking you to get from Aubry McMahon?
14       MR. WARD:  I'm going to object to the
15   question to the extent that it calls for any
16   attorney/client privileged information and
17   instruct the witness not to answer as to any
18   communications that either involved counsel or
19   involved counsel's legal advice.
20       To the extent there's anything remaining
21   after that, you may answer.
22       MR. WOLNOWSKI:  Well, the question
23   involved Melanie Freiberg.
24       MR. WARD:  Yes.  But the witness just
25   testified that some of the conversation

Page 80

C. Miolla

1
2    involved a counselor -- that they sought
3    guidance from counsel.  So it's quite possible
4    that Ms. Freiberg's advice includes or
5    incorporates advice of counsel.
6        It's an appropriate objection and an
7    appropriate instruction.
8        MR. WOLNOWSKI:  And if she understands
9    the question, she can answer.
10       MR. WARD:  To the --
11   Q    You understand the question, Ms. --
12       MR. WARD:  To the --
13   Q    -- Miolla?
14       MR. WOLNOWSKI:  You've made your
15   objection.
16       Thank you.
17       MR. WARD:  To the extent it does not call
18   for privileged information.  So when you say
19   she may answer, you have to include that,
20   Counsel.  You understand that as well as I do.
21       MR. WOLNOWSKI:  You've made your
22   objection.
23   Q    In light of the question and counsel's
24   objection, you can answer, Ms. Miolla.
25       MR. WARD:  To the extent that it does not

Page 81

C. Miolla

1
2    involve privileged information.
3        MR. WOLNOWSKI:  You've made your
4    objection multiple times.
5        Thank you, Mr. Ward.
6        MR. WARD:  Mr. Wolnowski, then give your
7    question accurately.  You've done that before.
8    Do the question correctly.
9    Q    Ms. Miolla, please answer in light of the
10   question and the objection posed.
11   A    I don't even remember the question.
12       Can you please repeat?
13       MR. WOLNOWSKI:  Ms. Ratigan, could you
14   please repeat the question?
15       (WHEREUPON, the previous question was
16   read by the court reporter.)
17       MR. WARD:  Same objections.
18   A    I don't remember any guidance that was
19   just from Melanie.
20   Q    When you say "that was just from
21   Melanie," could you please explain what "that" is in
22   that sentence?
23       MR. WARD:  Same objection as to
24   privilege.
25   A    Guidance.

Catherine Miolla
March 02, 2023

1                    C. Miolla
2       Q    So as you sit here today, you don't know
3   what kind of guidance you were seeking to get from
4   Aubry; is that correct?
5            MR. WARD:  I'm going to object as to
6       form.
7       A    Can you ask your question again?
8            MR. WOLNOWSKI:  Could you please read it
9       back, Teri?
10           (WHEREUPON, the previous question was
11      read by the court reporter.)
12           MR. WARD:  Yes, objection as to form.
13      A    Can you rephrase your question?  I don't
14  understand it.
15      Q    So if I'm understanding this, Melanie
16  asked you to get guidance from Aubry; is that
17  correct?
18      A    No.
19      Q    So what did Melanie tell you to do?
20           MR. WARD:  And I'm going to repeat the
21      attorney/client privilege objection.
22           You may answer to the extent it doesn't
23      involve attorney/client information.
24      A    I don't have any information that doesn't
25  involve attorney/client privilege information.

1                    C. Miolla
2       Q    On January 6th at 7:14 p.m., you then
3   e-mailed Ms. McMahon and wrote, "Hi Aubry, I don't
4   believe I've heard back from you, so just wanted to
5   check in again and see if you would be available for
6   a call soon to discuss?  Thank you."
7            Did you send that e-mail?
8       A    Yes.
9       Q    And in response, Ms. McMahon wrote, "Hey
10  there, so sorry, I've been crazy busy with my sister
11  getting married.  That sounds great.  I can talk on
12  Friday at any point if you're available."
13           She send you that e-mail?
14           MR. WARD:  Objection as to form.
15           You may answer.
16      Q    Did she send you that e-mail, Ms. Miolla?
17      A    I believe so, yes.
18      Q    Do you have any reason to doubt that
19  Aubry McMahon sent you that e-mail which appears on
20  the bottom of the first page on January 6th, 2021 at
21  5:40 p.m.?
22      A    No.
23      Q    And in response, on January 7th of 2021
24  at 8:54 a.m., you wrote, "No problem, Aubry.  How
25  about Friday at 1:00 p.m. EST?  If that works for

1                    C. Miolla
2   you, I will give you a call at that time.  Thank you,
3   Catherine."
4            Did you send Aubry McMahon that e-mail?
5       A    Yes.
6       Q    On January 8th of 2021 at 10:59 a.m., did
7   you send Aubry McMahon an e-mail which read, "Hi
8   Aubry, just wanted to check and make sure that
9   1:00 p.m. EST works for me to give you a call today?
10  If I don't hear from you, I'll try calling at that
11  time.  Thank you, Catherine."
12           Did you send that e-mail?
13      A    Yes.
14      Q    And in response, on Friday, January 8th,
15  2021 at 9:01 a.m., Aubry McMahon wrote to you, "That
16  sounds great, thanks so much."
17           Is that correct?
18      A    Yes.
19      Q    After this e-mail from Aubry to you on
20  January 8th, 2021 at 9:01 a.m., did the two of you
21  connect via telephone at 1 o'clock p.m. EST that day?
22      A    No.
23      Q    Did you try to call Aubry McMahon at
24  1 o'clock p.m. EST?
25      A    Yes.

1                    C. Miolla
2       Q    And when you made that phone call, please
3   tell me what, if anything, you can remember about
4   that phone call.
5       A    I think I just remember her not answering
6   the call.
7       Q    Ms. Miolla, at 2 o'clock, you sent an
8   e-mail to Aubry McMahon which stated, "Aubry, since
9   our communication on Tuesday, I've tried several
10  times to get in touch with you to discuss a
11  discrepancy in your interview responses.  Since I
12  have not heard back from you to resolve the
13  discrepancy, I am rescinding the job offer that was
14  extended to you on Monday, January 4th.  I wish you
15  all the best in your future endeavors.  Catherine."
16           Did you send that?
17      A    Yes.
18      Q    Ms. Miolla, was it urgent that you speak
19  with Aubry McMahon in light of her January 5th, 2021
20  e-mail inquiring about potential time off which
21  appears at the bottom e-mail on page WV 82?
22      A    Was it urgent?
23      Q    Yes.
24      A    I don't know.
25      Q    Well, at any point in this e-mail chain,

Catherine Miolla
March 02, 2023

Page 86

C. Miolla

1                                    C. Miolla
2  did you inform Ms. McMahon that it was urgent that
3  you and her speak on the telephone?
4      A    It doesn't appear that I wrote the word
5  "urgent" in these e-mails.
6      Q    Did you ever express a sense of urgency,
7  in your opinion?
8          MR. WARD:  Objection as to form.
9          You may answer.
10     A    I -- from these e-mails, it looks like I
11  was trying to contact her fairly quickly.
12     Q    So is that a yes?
13     A    What was the original question?
14         MR. WOLNOWSKI:  Could you read back the
15    original question, Ms. Ratigan?
16         (WHEREUPON, the previous question was
17    read by the court reporter.)
18         MR. WARD:  Same objection.
19     A    I don't know.
20     Q    Did you ever tell Ms. McMahon via any
21  other form of communication other than e-mail that it
22  was urgent that you and her speak regarding her
23  January 5th, 2021 e-mail to you?
24     A    No.
25     Q    In your opinion, as you read this e-mail

Page 87

C. Miolla

1                                      C. Miolla
2  chain, is it fair to say that Aubry McMahon would
3  have no reason to believe that the two of you
4  speaking was urgent given what's written?
5         MR. WARD:  I object as to form and calls
6    for speculation.
7         You may answer.
8     A    I think it's clear that we -- I was
9  trying to reach her multiple times.
10     Q    But is it clear from these e-mails that
11  it's urgent that you and her speak?
12     A    I don't know.
13     Q    Well, to be clear, wasn't the job in
14  question for which she had been offered employment
15  commencing February 1st, 2021; nearly a month in the
16  future?
17     A    Yes.
18     Q    And, in fact, didn't Ms. McMahon advise
19  you that she was, in her words, "crazy busy" with her
20  sister getting married?
21     A    That's written here, yes.
22     Q    So is it fair to say that Ms. McMahon
23  notified you around this time that she was busy?
24         MR. WARD:  Objection as to form.
25         You may answer.

Page 88

C. Miolla

1                                      C. Miolla
2     A    She indicates here that she's busy.
3     Q    Did you understand that Ms. McMahon was
4  busy upon reading these e-mails in or around
5  January 7th, 2021?
6     A    I understand that she said she was busy
7  in her e-mail on the 6th.
8     Q    Did you believe her?
9     A    I think so.
10     Q    Let me ask you a different question.
11         Did you have any reason to disbelieve
12  her?
13     A    I don't think so.
14     Q    I'd like to direct your attention to the
15  top e-mail on the first page of the document marked
16  WV 81.
17         What was the discrepancy you referenced
18  in that e-mail?
19     A    I don't remember.
20     Q    Well, let's look at the first e-mail
21  then.  It's on the bottom of the second page, the one
22  marked WV 82.
23         In reviewing this first e-mail which
24  Aubry McMahon sent to you on January 5th, 2021, does
25  it refresh your recollection as to what that

Page 89

C. Miolla

1                                      C. Miolla
2  discrepancy may have been?
3     A    I'm not sure.
4     Q    Was the discrepancy involving something
5  involving the standards of conduct?
6     A    I believe so.
7     Q    In reviewing this January 5th e-mail from
8  Aubry McMahon to you, was the discrepancy -- does it
9  refresh your recollection as to whether the
10  discrepancy was the fact that Aubry McMahon was
11  having a baby?
12     A    Can you ask that again?
13     Q    Sure.
14         In reviewing this e-mail, does it refresh
15  your recollection that the discrepancy regarding the
16  standards of conduct was that Aubry McMahon was
17  having a baby?
18     A    No, I don't think so.
19     Q    In reviewing this e-mail, does it refresh
20  your recollection as to whether or not the
21  discrepancy at issue was her needing time off?
22     A    No, I don't think so.
23     Q    In reviewing this e-mail from
24  January 5th, does it refresh your recollection as to
25  the discrepancy as to the standards of conduct, her

Catherine Miolla
March 02, 2023

Page 90

C. Miolla

1  
2  disclosing that she was in a same-sex marriage?
3      A    I believe it was related to the standards
4  of conduct, yes.
5      Q    When you say "it was related to the
6  standards of conduct," do you mean her being in a
7  same-sex marriage?
8      A    I mean the potential discrepancy.
9      Q    So is that a yes?
10      A    Can you ask your original question?
11      Q    Sure.
12          In reviewing this e-mail, does it refresh
13  your recollection as to whether the discrepancy with
14  respect to standards of conduct related to
15  Ms. McMahon disclosing that she was in a same-sex
16  marriage?
17          MR. WARD:  Objection as to form.
18          You may answer.
19      A    I don't think I fully understand the
20  question.
21      Q    Okay.  So you e-mailed Ms. McMahon about
22  a discrepancy in her -- about a discrepancy that you
23  wanted to discuss; correct?
24      A    Yes.
25      Q    And you previously testified that you

Page 91

C. Miolla

1  
2  don't recall what that discrepancy was; is that
3  accurate?
4      A    Yes.
5      Q    Now I'm asking you to review this e-mail
6  and see if it refreshes your recollection.  I've
7  asked you a couple things about whether or not the
8  discrepancy involved certain things that Ms. McMahon
9  disclosed in this January 5 e-mail.  That's not a
10  question, but that's what I'm saying.
11          Now I'm asking you, is that -- if
12  reviewing this and in reviewing this, the fact that
13  she disclosed being in a same-sex marriage, was that
14  the discrepancy that needed to be discussed?
15          MR. WARD:  Same objection as before.
16          You may answer.
17      A    I just remember receiving guidance about
18  discussing if her answers to the standards of conduct
19  were accurate.
20      Q    And if you can recall specifically, what
21  questions needed to be discussed?  If you'd like, you
22  can look at the document if it's going to help you
23  answer the question.
24      A    And which document are you referring to?
25      Q    It was the first document I showed you

Page 92

C. Miolla

1  
2  marked Plaintiff's Exhibit 6.
3      A    And your question again?
4      Q    My question is, what was the discrepancy
5  that needed to be addressed with Aubry McMahon based
6  upon your having reviewed this January 5th e-mail and
7  allowing it to refresh your recollection?
8      A    I just remember that we were wanting to
9  contact her to find out if she was indeed in
10  alignment with our standards of conduct.
11      Q    And specifically what portion or portions
12  of the standards of conduct were you seeking to
13  clarify that she was in alignment?
14      A    I think primarily the line that reads any
15  sexual conduct outside of a marriage; World Vision
16  defines marriage as between a man and woman.
17      Q    And was that sought to be clarified
18  because Ms. McMahon had disclosed she was in a
19  same-sex marriage?
20          MR. WARD:  Objection as to form.
21          You may answer.
22      A    I believe her e-mail was why we wanted to
23  talk with her again about the standards of conduct.
24      Q    And what about that e-mail prompted you
25  to want to have that conversation with her?

Page 93

C. Miolla

1  
2      A    Her question about the -- her having a
3  wife and expecting their first baby, her question in
4  that first -- second sentence.
5      Q    Now, in reviewing this e-mail dated
6  January 5th, 2021, does it refresh your recollection
7  as to whether one of the discrepancies that you
8  wanted to discuss with her was the fact that she
9  disclosed in this e-mail to you that she was gay?
10          MR. WARD:  Objection as to form.
11          You may answer.
12      A    We wanted to discuss that portion of the
13  standards of conduct again.
14      Q    As it relates to Aubry McMahon
15  potentially being gay?
16          MR. WARD:  Same objection as to form.
17      A    As it relates to her being able to comply
18  with the standards of conduct.
19      Q    And is that with respect to her being
20  gay?
21          MR. WARD:  Objection as to form.
22      A    We don't ask that question.  We just ask
23  the standards of conduct and ask if they can comply.
24      Q    Did the fact of Aubry McMahon disclosing
25  to you that she was gay have any impact on whether

Catherine Miolla
March 02, 2023

Page 94

C. Miolla

1    you wanted to discuss with her discrepancies -- or
2    potential discrepancies in her responses during her
3    phone screening?
4
5            MR. WARD:  Objection as to form.
6            You may answer.
7        A    Well, at that point, I was following
8    our -- guidance from my leadership and legal counsel.
9        Q    I'm not sure that answers the question.
10   I think you -- you froze there for a moment.
11       A    Can you ask your question again?
12           MR. WOLNOWSKI:  Ms. Ratigan, could you
13       please read my question back?
14           (WHEREUPON, the previous question was
15       read by the court reporter.)
16           MR. WARD:  Same objection.
17       A    At that point, I didn't feel like I was
18   making that call.  I was following guidance from my
19   leadership and legal counsel.
20       Q    So the guidance that was expressed to
21   you, right -- and I don't want to know about what was
22   discussed with legal counsel, but from nonlegal
23   counsel, the guidance that was expressed to you, what
24   was discussed with you?
25           MR. WARD:  I'm going to object on the

Page 95

C. Miolla

1
2    grounds of privilege and on the grounds that
3    legal counsel's guidance may be incorporated
4    in other conversations.
5            I'll instruct the witness not to answer
6    as to any guidance that came from legal
7    counsel directly or indirectly.
8        A    I believe all guidance involved legal
9    counsel.
10       Q    Well, if you can, without telling me what
11   was discussed, please tell me with whom you discussed
12   it.
13           MR. WARD:  Objection as to form.
14           You may answer.
15       A    Sorry, can you repeat your question?  I
16   think my Internet froze.
17       Q    Sure.
18           MR. WOLNOWSKI:  Ms. Ratigan, could you
19       please read it back?
20           (WHEREUPON, the previous question was
21       read by the court reporter.)
22       A    So you'd like names?
23       Q    Yes, please.
24       A    I remember Melanie Freiberg, Steve
25   McFarland, and I believe Jean Thompson.

Page 96

C. Miolla

1
2        Q    And if you can tell me, who -- what role
3    did Jean Thompson have in January of 2021, if you
4    remember?
5        A    I don't know.
6        Q    Was he an attorney?
7        A    She's on our legal team.
8        Q    Okay.
9        A    Or maybe it was just Steve.  I don't
10   remember at that point.
11       Q    Ms. Miolla, to the extent you know, what
12   was the reason or reasons why the job offer extended
13   to Aubry McMahon was rescinded?
14       A    I believe it was because she wasn't in
15   compliance with our standards of conduct.
16       Q    Was that the only reason?
17       A    That's my understanding.
18       Q    And if you could, please explain to me
19   what portion of the standards of conduct she was not
20   in compliance which formed the basis for the
21   rescission.
22       A    I believe it was the line we've looked at
23   previously, which is any sexual conduct outside of a
24   marriage, with World Vision defines a marriage
25   between a man and a woman.

Page 97

C. Miolla

1
2        Q    And again, I don't want to know what
3    legal counsel told you, but who communicated to you
4    that this was the reason, as -- as you have described
5    it?
6            MR. WARD:  I'm going to object as to
7        privilege.
8            But you can answer to the extent it
9        doesn't involve privilege.
10       A    I don't remember who exactly from legal
11   it was.
12       Q    Okay.  But somebody in -- question
13   withdrawn.
14           And just to be clear, to your knowledge,
15   the only reason that the offer of employment made to
16   Aubry McMahon was rescinded was because it was
17   concluded that she was not in compliance with World
18   Vision's standards of conduct; is that correct?
19       A    I believe so, yes.
20       Q    From your knowledge, did it have anything
21   to do with the expediency or lack thereof in
22   communicating with you via e-mail on January --
23   between January 5th and January 8th?
24           MR. WARD:  Objection as to form.
25           You may answer.

Catherine Miolla
March 02, 2023

Page 98

C. Miolla

1
2    A    I don't believe so.
3    Q    What role, if any, did you personally
4  play in the final determination to rescind the job
5  offer made to Aubry McMahon?
6    A    I wasn't personally involved in the
7  decision.
8    Q    To the extent you know, who made the
9  final decision to rescind the job offer made to Aubry
10 McMahon to work at World Vision Incorporated?
11   A    I'm not sure who exactly from our HR,
12 leadership, and legal team.
13   Q    Was it Melanie Freiberg?
14   A    I don't know.
15   Q    Was it Christine Talbot?
16   A    I don't know.
17   Q    Now, after you sent the e-mail to Aubry
18 McMahon on January 8th, which appears at the top of
19 page WV 81, did you have occasion to be on a
20 telephone call with Aubry McMahon?
21   A    Sorry, can you rephase that?
22   Q    Sure.
23        Now, after this e-mail that you sent to
24 Aubry McMahon on January 8th of 2021, the one at the
25 top of page WV 81, did you have occasion to be on a

Page 99

C. Miolla

1
2  telephone call with Aubry McMahon; in other words,
3  did you speak with Aubry McMahon on a telephone call
4  after this?
5    A    Yes.
6    Q    If you can, please tell me everything you
7  can remember about that telephone call.
8    A    I remember Melanie Freiberg and I both
9  being on call with Aubry, and Melanie doing most of
10 the talking. I -- I think I introduced Melanie, and
11 then she and -- Melanie and Aubry talked from then
12 on.
13   Q    Who initiated the call?
14   A    Can you define what you mean by
15 "initiated"?
16        MR. WARD:  I'm sorry, let me just flag.
17        The witness was breaking up on me.  I
18        don't know if it was breaking up on everyone
19        else.
20        MR. WOLNOWSKI:  Okay.  So let's just
21        start afresh here.  I'll repeat the question.
22   Q    If you can remember, who initiated that
23 call?
24   A    I was just asking if you could define
25 what you meant by "initiate."

Page 100

C. Miolla

1
2    Q    Sure.
3        Let's start with the fact -- as to
4  whether or not it was a telephone call.
5        Was it a telephone call in which you,
6  Ms. Freiberg, and Aubry participated, or was it --
7    A    Yes.
8    Q    -- something else, perhaps a video
9  conference, a Zoom call, a Morse code communication?
10       MR. WARD:  You forgot some before.
11   A    It was a telephone call.
12   Q    Do you remember the person who -- well,
13 question withdrawn.
14       I'll ask, did you or Melanie call Aubry,
15 or did Aubry call either one of you to initiate the
16 call?
17   A    I believe after this e-mail, Aubry placed
18 a call to me that I missed, and then Melanie and I
19 called her back.
20   Q    And when you and Melanie spoke with Aubry
21 McMahon, was it just one telephone call or was it
22 multiple telephone calls?
23   A    I believe it was just one.
24   Q    Do you recall when that phone call was
25 made, as in what time of day?

Page 101

C. Miolla

1
2    A    About -- I just believe it was sometime
3  that Friday afternoon after this e-mail.
4    Q    To the extent you know, who were all the
5  participants on that call?
6    A    To the extent I know, it was myself,
7  Melanie, and Aubry.
8    Q    How long did that telephone call last?
9    A    I think less than ten minutes.
10   Q    Would you say it was less than five
11 minutes?
12   A    I don't remember.
13   Q    Would you say it was less than two
14 minutes?
15   A    I don't remember.
16   Q    Would you say it was more than one
17 minute?
18   A    I think so.
19   Q    Okay.  So is it fair to say that you
20 think it was between one and ten minutes?
21   A    Yes.
22   Q    If you can, please tell me everything
23 that you can remember that was said in that phone
24 call.
25   A    I remember that I started the call and

Catherine Miolla
March 02, 2023

Page 102

C. Miolla

1
2  introduced Melanie, and then Melanie and Aubry talked
3  from there.
4      Q     Okay.  And please tell me everything that
5  was discussed between Melanie and Aubry, to the
6  extent you remember.
7      A     I don't remember the extent of their
8  conversation.
9      Q     Ms. Miolla, I'd like to share with you
10 what has been marked as Plaintiff's Exhibit 10.  It
11 is an audio file.  It is in MP3 format.  It is a
12 item which was exchanged during the discovery phase
13 of litigation in this case.
14           If you could, please listen to it on your
15 own and let me know once you've completed doing so.
16 It's approximately 35 seconds long.
17           MR. WOLNOWSKI:  Going off the record.
18           (Discussion held off the record)
19     A     I've listened to the recording.
20     Q     One moment.
21           Ms. Miolla, do you recognize this audio
22 file?
23     A     Sort of.
24     Q     Have you ever listened to it before?
25     A     Not the audio file.  I was on the phone

Page 103

C. Miolla

1  call.
2      Q     Now that you've listened to it, do you
3  recall the conversation which occurred on
4  January 8th, 2021 in which you were a participant
5  with Ms. McMahon and Ms. Freiberg?
6      A     I recall that happened, yes.
7      Q     In light of having listened to this, does
8  it refresh your recollection about the -- anything
9  that was said during that telephone call?
10     A     I remember that section being part of the
11 phone call, but I don't remember specifics around
12 what else was said.
13     Q     After having listen to that audio
14 recording, to your knowledge, is that Aubry McMahon
15 and Melanie Freiberg as the two people speaking on
16 the audio?
17     A     To my knowledge, yes.
18     Q     Would you agree that Melanie Freiberg
19 states in this audio recording, "Well, it's because,
20 um, the standards of conduct, yeah, are to, um, not
21 have any sexual conduct outside of marriage, and
22 marriage is defined as being between a man and a
23 woman, so that's the behavior that all employees have
24 to comply with"?
25

Page 104

C. Miolla

1
2      A     I believe so, yes.
3      Q     Do you know what standard of conduct
4  Melanie Freiberg was referring to in this audio?
5      A     I believe it was the one she read after
6  that.
7      Q     Ms. Miolla, based upon your listening to
8  this audio, was the reason the offer of employment
9  made by World Vision to Aubry McMahon rescinded
10 because she was in a same-sex marriage?
11           MR. WARD:  Objection as to form.
12           You may answer.
13     A     I believe it was, as Melanie said, that
14 she wasn't in alignment with the standards of
15 conduct.
16     Q     And to your knowledge, was this standard
17 of conduct she was referencing one that prohibited
18 World Vision Incorporated employees from being in a
19 same-sex marriage?
20           MR. WARD:  Objection as to form.
21           You may answer.
22     A     I'm not sure.
23     Q     So as you sit here today, you don't know
24 whether or not World Vision Incorporated prohibits
25 employees from being in same-sex marriages --

Page 105

C. Miolla

1
2           MR. WARD:  Objection --
3      Q     -- in order to continue their employment
4  with World Vision?
5           MR. WARD:  Objection as to form.
6           You may answer.
7      A     Well, my part of the role is to read the
8  standards of conduct and ask whether or not they
9  agree with it.  So beyond that, it's up to the
10 candidate.
11     Q     I don't think that answers my question.
12 I -- I'm not asking what your role was.  I'm asking
13 if you know something.
14           MR. WOLNOWSKI:  Ms. Ratigan, could you
15 please read the question back?
16           (WHEREUPON, the previous question was
17 read by the court reporter.)
18     A     We ask employees to comply with what's
19 written in the standards of conduct.
20     Q     I'm not sure that answers the question.
21 I'm not asking a question about what you ask
22 potential employees or employees to do.
23           MR. WOLNOWSKI:  Ms. Ratigan, could you
24 please read back the question?
25           (WHEREUPON, the previous question was

Catherine Miolla
March 02, 2023

Page 106

C. Miolla

1          C. Miolla
2          read by the court reporter.)
3               MR. WARD:  So I'm going to object as to
4          form and object as asked and answered.
5               THE WITNESS:  So I answer?
6               MR. WARD:  To the extent you can.
7          A    I don't know.
8          Q    Okay.  In light of listening to this
9     audio recording, was the employment offer made to
10    Aubry McMahon by World Vision rescinded because she
11    was gay?
12              MR. WARD:  Objection as to form.
13              You may answer.
14         A    No.
15         Q    So was it because Aubry McMahon was in
16    violation of World Vision Incorporated's standards of
17    conduct for employees as they related to her being in
18    a same-sex marriage that this disqualified her from
19    working for World Vision Incorporated?
20              MR. WARD:  Objection as to form.
21         A    I believe she -- her offer was rescinded
22    because our leadership team and legal determined she
23    was not in compliance with the standards of conduct.
24         Q    To your knowledge, if Aubry McMahon had
25    been a man married to a woman, would she have been in

Page 107

C. Miolla

1     violation of World Vision Incorporated's standards
2     of -- standards of conduct for employees?
3               MR. WARD:  Objection as to form, it calls
4          for speculation.
5          A    I don't know.
6          Q    So you don't know whether or not a man
7     who's married to a woman would violate the standards
8     of conduct for World Vision?
9          A    Well, I would read the standards of
10    conduct and ask them if they could comply.
11         Q    I'm not sure that answers the question
12    about what -- I'm not asking what you would ask an
13    employee.
14              MR. WOLNOWSKI:  Ms. Ratigan, could you
15         read back the question?
16              (WHEREUPON, the previous question was
17         read by the court reporter.)
18         A    I don't know whether or not someone can
19    comply with the standards of conduct.  I ask them
20    that.
21         Q    Again, I'm not sure that answers the
22    question.
23              MR. WOLNOWSKI:  If you could, please read
24         the question back, Ms. Ratigan.

Page 108

C. Miolla

1               It's actually a very straightforward
2          question.
3          A    I don't think I'm understanding the
4     question.
5          Q    If a man discloses that he's married to a
6     woman and is seeking employment with World Vision,
7     would that disqualify him for employment with World
8     Vision?
9               MR. WARD:  Then I'll repeat the same two
10         objections.
11         A    I don't believe someone sharing just that
12    fact would disqualify them unless they said they
13    didn't comply with the standards of conduct.
14         Q    To your knowledge, if Aubry McMahon had
15    been a man and married to a woman and stated that she
16    complied with World Vision's standards of conduct,
17    would the offer of employment extended to her on
18    January 5th been rescinded by World Vision?
19              MR. WARD:  Objection as to form and
20         calling for speculation.
21              You may answer.
22         A    Sorry, I think you cut out.
23              Can you ask that again?
24              MR. WOLNOWSKI:  Can you please read that

Page 109

C. Miolla

1     back, Ms. Ratigan?
2               (WHEREUPON, the previous question was
3          read by the court reporter.)
4          A    I don't believe the offer would have been
5     rescinded if she confirmed that she could comply with
6     the standards of conduct.
7          Q    Ms. Miolla, I'd like to show you what
8     will be marked Plaintiff's Exhibit 13.
9               MR. WOLNOWSKI:  Let's go off the record
10         for a moment.
11              (Discussion held off the record)
12         Q    Ms. Miolla, I'd like to show you what
13    will be marked Plaintiff's Exhibit 13.  It's a
14    document bearing Bate-stamped Number WV 65 as a
15    document which was exchanged during the discovery
16    phase of litigation.
17              (WHEREUPON, the above-referred-to
18         document, Bates-stamped WV-000065, was marked
19         as Plaintiff's Exhibit 13, for identification,
20         as of this date.)
21         Q    Please review this document and let me
22    know once you've completed doing so.
23         A    (Perusing a document)
24              I've reviewed the document.

Catherine Miolla
March 02, 2023

Page 110

C. Miolla

1            MR. WOLNOWSKI:  I would just like to mark
2  for the record that I am continuing with the
3  numbering of the deposition exhibits from
4  where I left off with the previous deposition
5  of Ms. Freiberg for the sake of clarity.
6        Q  Ms. Miolla, do you recognize this
7  document?
8        A  Yes.
9        Q  Have you ever seen it before?
10       A  Not as a document.
11       Q  Can you please tell me what this document
12 shows?
13       A  It shows the steps that have happened
14 within the applicant tracking system.
15       Q  Near the top of this document, it reads,
16 "History of Events and Comments"; do you see that?
17       A  Yes.
18       Q  These fields seem to be in ascending
19 order from a number 13 entry which was made on
20 November 25th, 2020 to the number 1 entry which was
21 made on January 8th, 2021; would you agree?
22       A  Yes.
23       Q  Can you please explain to me what this
24 is?

Page 111

C. Miolla

1        A  I think any time anything would -- any
2  step happens with a candidate in the system, the
3  system automatically records it as a line item.
4        Q  Now, Ms. Miolla, from your
5  recollection -- question withdrawn.
6        Ms. Miolla, it appears as though you
7  created practically all of these fields; is that
8  correct?
9        A  They're created automatically.  So
10 because I was assigned to this requisition, it has my
11 name by all of them.
12       Q  Is there any fields, from your
13 recollection, or any actions which are missing as
14 they relate to Aubry McMahon?
15       A  I don't think so.
16       Q  Ms. Miolla, I'd like to focus on
17 numbers 2 and 1, with the question as to number 2
18 first.
19       Do you see field number 2?  It appears
20 about a quarter of the way down.
21       A  Yes.
22       Q  It reads, "Profile moved from
23 background-reference check to offer extended."
24       Do you see that?

Page 112

C. Miolla

1        A  Yes.
2        Q  And states that the creator was Catherine
3  Miolla; do you see that?
4        A  Yes.
5        Q  Did you input that field, or was it
6  created in a different way?
7        A  It's created automatically when I move
8  her profile to a certain step.
9        Q  Based upon your review of this document,
10 is it correct to conclude that an offer of employment
11 was definitively made to Aubry McMahon on
12 January 4th, 2021?
13       A  I believe so.
14       Q  And now turning to number 1, which is
15 right above number 2, it reads, "Profile moved from
16 offer extended to archive, do not consider."
17       Do you see that?
18       A  Yes.
19       Q  Did you input that field on January 8th,
20 2021, or was it created in a different way?
21       A  It's created automatically when I -- when
22 a candidate's moved to a certain phase.
23       Q  Based on your review of this document, is
24 it correct to conclude that the offer of employment

Page 113

C. Miolla

1  made to Aubry McMahon was definitively rescinded on
2  January 8th, 2021?
3        A  Yes, I believe so.
4        MR. WOLNOWSKI:  Okay.  Let's take a
5  ten-minute break and then return around --
6  we'll let's call it an eight -- we're off the
7  record, Teri.
8        (Discussion held off the record)
9        (WHEREUPON, a brief recess was taken,
10 after which the following transpired:)
11       (Time noted:  4:07 p.m.)
12 CONTINUED EXAMINATION BY MR. WOLNOWSKI:
13       Q  Ms. Miolla, I'd like to show you what has
14 been marked as Plaintiff's Exhibit Number 1.  I can
15 represent it's a document which bears Bate-stamped
16 Numbers WV 48 through 50.  It is a document which has
17 been exchanged during the discovery phase of
18 litigation in this case.
19       If you could, please review it and let me
20 know once you've concluded reviewing it.
21       A  (Perusing a document)
22       I'm finished reviewing.
23       Q  Ms. Miolla, do you recognize this
24 document?

Catherine Miolla
March 02, 2023

Page 114

C. Miolla

1
2    A    Yes.
3    Q    Can you tell me what it is?
4    A    It's a job posting for the donor/customer
5    service representative trainee position.
6    Q    To your knowledge, was this the
7    particular job for which Aubry McMahon had applied
8    with World Vision?
9    A    I believe so, yes.
10   Q    How familiar are -- are you with the
11   responsibilities and requirements of an individual in
12   the position of customer service representative with
13   World Vision as it existed in January of 2021?
14   A    I have never personally done the job, but
15   at that time, I had been recruiting for it for a bit
16   of time, so I'd say somewhat familiar.
17   Q    Okay.  I'd like to direct your attention
18   to Section 1 -- excuse me, I'd like to direct your
19   attention to the section which states, "The Job."  It
20   appears there are two Section 1s, but in any case --
21   and it lists a number of things which appear to be
22   job requirements; do you see that?
23   A    Yes.
24   Q    If you could, how would you describe
25   numbers 1 through 13; are they obligatory, are they

Page 115

C. Miolla

1    advisory, something else?
2    MR. WARD:  I'll object as to form.
3    But you may answer.
4    A    I think those are examples of the common
5    tasks that someone in this role could expect to be
6    doing.
7    Q    Are all of them obligatory; as in other
8    words, are they all things that a person in this role
9    would be required to do?
10   A    Yes, I believe so.
11   Q    I'd like to direct your attention to
12   number 1.  It appears at the top of page 49.
13   The second sentence states, "Attend and
14   participate in a leadership of devotions, weekly
15   chapel services, regular prayer."
16   Do you see that?
17   A    Yes.
18   Q    To your knowledge, does that require
19   customer service representatives to lead prayer?
20   A    Yes, I believe so.
21   Q    And was there any training incorporated
22   with -- with customer service representatives leading
23   prayer?
24   A    I'm not sure.

Page 116

C. Miolla

1
2    Q    And with respect to leading prayer, to
3    whom would they be leading prayer for?
4    A    I believe in this role, they could be
5    leading prayer with their coworkers or -- and/or the
6    donors that they're talking to.
7    Q    And if you can, please explain to me the
8    requirements for leading prayer; was it during
9    meetings, during phone calls, and under what
10   circumstances were they required to lead prayer?
11   A    I don't know the specifics, but I think
12   in this role they could be leading prayers during the
13   activities mentioned in number 1, like devotions with
14   the team or phone calls with their donors, as
15   mentioned in number 11.
16   Q    Okay.  Was it required that customer
17   service representatives lead prayer with either
18   donors or fellow employees?
19   A    I'm not sure.
20   Q    Was it something that was just suggested,
21   rather than an actual requirement of the job?
22   A    I believe that they -- the -- for this
23   role, they were -- are regular parts of the job that
24   would be required.
25   Q    Like what?

Page 117

C. Miolla

1
2    A    What do you mean?
3    Q    Well, you said that there are regular
4    parts of the job that would require one to lead
5    prayer.
6    I said, like what?
7    A    Oh, like the previous activities I have
8    mentioned, like the team devotions and the phone
9    calls with donors.
10   Q    Was it on every phone call that a
11   customer service representative was required to lead
12   prayer with donors?
13   A    I don't think it's necessarily every
14   phone call.
15   Q    Well, how frequently then was it
16   required?
17   A    I'm not sure.
18   Q    Well, was it required one out of every
19   five phone calls?
20   A    I'm not sure.
21   Q    And which prayers were donors required --
22   excuse me, which prayers were customer service
23   representative required to utilized?
24   MR. WARD:  I'm going to object as to
25   form.

Catherine Miolla
March 02, 2023

Page 118

C. Miolla

1
2    A    What do you mean by "which prayers were
3  they required to utilize"?
4    Q    Would you agree there's different prayers
5  in the Christian faith; correct?
6    A    I suppose so, yes.
7    Q    Okay.  Which of those prayers were
8  required of use -- of use by customer service
9  representatives, if any?
10    MR. WARD:  I'm going to object as to
11    form.
12    A    I'm not sure of anything specific
13  required other than that they -- the agents would
14  often ask donors if they had prayer requests and then
15  pray with them.
16    Q    Okay.  So if I'm understanding this, it
17  was required that if a donor asks to pray, that the
18  customer service representative was obliged to do so;
19  is that accurate?
20    A    I think it would be -- if the donor asked
21  for prayer, I think it would at least be strongly
22  encouraged the agent pray with them.
23    Q    But it isn't required; correct?
24    A    I -- I'm -- that's outside of my
25  knowledge.

Page 119

C. Miolla

1
2    Q    Was it required that customer service
3  representatives initiate prayer with the donors
4  without being asked by the donors?
5    MR. WARD:  Objection as to form.
6    You may answer.
7    A    I'm not sure if it's required or not.  I
8  think it's a big part of the role.
9    Q    Is it a big part of the role because it's
10  encouraged or because it's mandatory?
11    MR. WARD:  Objection as to form.
12    You may answer.
13    A    To the best of my knowledge, I would say
14  that it's required, and therefore, that's why it's
15  explicitly stated on this list.
16    Q    And if you could point out to me where it
17  states that it's required to lead prayer.  If you
18  could tell me the page number and -- and kind of
19  explain to me where on that page it states that it's
20  required that a customer service representative lead
21  prayers.
22    MR. WARD:  Objection as to form.
23    You may answer.
24    A    Well, I shared earlier that I feel like
25  all of these numbers are requirements of the role,

Page 120

C. Miolla

1
2  and the requirements listed that speak to prayer are
3  number 1 and number 11.
4    Q    So is your testimony that number 1 states
5  that there's a requirement that a customer service
6  representative lead prayer?
7    A    Well, the word "required" isn't listed in
8  the statement, but I believe that all of these are
9  things that are required in the role.
10    Q    All right.  But I'm specifically talking
11  about prayer.
12    So is it your testimony here today that
13  so much of Section 1, which states, "Attend and
14  participate in the leadership of devotions, weekly
15  chapel services, and regular prayer," that the word
16  "participant" is understood, at least insofar as your
17  understanding of the job description, to mean that a
18  customer service representative leads prayer?
19    MR. WARD:  I'm going to object as to
20    form; mischaracterizing prior testimony.
21    You may answer.
22    A    I think number 1 is stating that they
23  would be included in leadership of devotion and
24  regular prayer.  And oftentimes, in leadership of our
25  devotionals together, that includes leading prayer.

Page 121

C. Miolla

1
2    Q    And how frequently, when you say
3  "oftentimes," is --
4    A    I'm not sure --
5    Q    -- it a requirement, that is?
6    A    I'm not sure exactly how often for this
7  particular role.
8    Q    Is there any kind of training when it
9  comes to leading prayer as it relates --
10    A    I don't know.
11    Q    -- to the customer service
12  representative?
13    A    I'm not sure.
14    Q    It states in Section 11, "Be sensitive to
15  donor's needs and pray with them when appropriate."
16    Do you see that?
17    A    Yes.
18    Q    Can you explain to me what it means when
19  it says "when appropriate"?
20    A    I think that could be a variety of
21  things; if the donor asks for prayer, if you're
22  having a conversation and you ask the donor if they
23  want prayer.
24    Q    Is this just your opinion or is this the
25  required duties and responsibilities of World Vision,

Catherine Miolla
March 02, 2023

Page 122

C. Miolla

1
2  to your knowledge?
3           MR. WARD:  I'm going to object as to
4       form.
5       A       This list is the requirements.  What I
6  just --
7       Q       Right.
8       A       -- tried to explain is my opinion of how
9  to explain it.
10      Q       So what is World Vision's position,
11 insofar as you know, as what is an appropriate time
12 and not an appropriate time to pray with donors?
13          MR. WARD:  Objection as to form.
14      A       I don't think I have any additional
15 knowledge in -- other than what I already shared
16 about when would be an appropriate or non-appropriate
17 time.
18      Q       Well, I'm not asking about your opinion.
19 I'm asking if you know what World Vision's official
20 policy is insofar as how it relates to the mandatory
21 job responsibilities and requirements of somebody in
22 the position of customer service representative.
23          MR. WARD:  Objection as to form.
24      A       I don't know the initial policy related
25 to this.

Page 123

C. Miolla

1
2       Q       Is somebody in the position of customer
3  service representative, insofar as the job existed in
4  January of 2021, required to teach the religion to
5  anybody; whether it be donors, fellow employees, or
6  anybody else?
7           MR. WARD:  Objection as to form.
8       A       I don't believe they are required to
9  teach religion in this role.
10      Q       With respect to attending weekly chapel
11 services, did you attend weekly chapel services in
12 January of 2021?
13      A       Did I personally?
14      Q       Yes.
15      A       Yes.
16      Q       Can you explain to me what that entailed?
17 I understand that January of 2021 was still in many
18 ways, you know, during COVID, so if you could, please
19 explain to me what that entailed for you.
20      A       Well, it would vary week to week, but
21 since COVID, we would join chapel virtually and
22 listen and sometimes interact via the chat to the
23 worship or the -- and/or the speaker that was at that
24 chapel.
25      Q       Were customer service representatives,

Page 124

C. Miolla

1
2  people employed in that position, attendees at these
3  weekly chapel services that you attended?
4       A       I believe so.
5       Q       Were there different weekly chapel
6  services that were -- were attended by other people,
7  or was it just one weekly chapel service that anybody
8  who worked for World Vision could attend?
9       A       Just one chapel service for all of World
10 Vision U.S.
11      Q       Did you ever lead prayer during those
12 weekly chapel services?
13      A       Did I personally?
14      Q       Yes.
15      A       No, I don't believe so.
16      Q       Was that, to your knowledge, a
17 requirement of your job with World Vision, was to
18 lead daily chapel services?
19      A       Not chapel --
20          MR. WARD:  Objection as to form.
21          You may answer.
22      A       Not -- I wasn't required to lead within
23 chapel.
24      Q       Were you required to lead prayer not
25 within chapel?

Page 125

C. Miolla

1
2       A       I've been required to lead devotions on
3  my team.
4       Q       And who's directed you to do that?
5       A       I don't remember being specifically told
6  by one person, but that's kind of the understanding
7  from leadership.
8       Q       In January of 2021, who was in charge --
9  excuse me, who was the supervisor or boss for the
10 customer service representatives employed by World
11 Vision?
12      A       I don't remember.
13      Q       Do you remember if he or she required
14 customer service representatives to lead prayer
15 amongst employees?
16      A       I believe they would have.
17          (Continued on page 126 so that the
18          conclusion of the testimony may be accompanied
19          by the jurat.)
20
21
22
23
24
25

Catherine Miolla
March 02, 2023

Page 126

C. Miolla

1
2
3    Q    Well, I'm not asking whether they would
4  have done something.  I'm asking whether or not you
5  know if they actually did.
6    A    Oh, well, I'm not sure.  I'm not in their
7  daily meetings.
8    MR. WOLNOWSKI:  Okay.  I have no further
9    questions.
10    MR. WARD:  Very good.
11    (WHEREUPON, the examination of this
12    witness was concluded at 4:24 p.m.)
13
14    _____
15        CATHERINE MIOLLA
16
17  Subscribed and sworn to before me
   this ___ day of _____ 2023.
18
19
20    _____
       NOTARY PUBLIC
21
22
23
24
25

Page 127

C. Miolla

1
2
3    I N D E X
4
5  WITNESS          EXAMINATION BY        PAGE
6  Catherine Miolla   Casey Wolnowski         5
7
8
9        EXHIBITS
10
11  PLAINTIFF'S
   EXHIBITS    DESCRIPTION            PAGE
12
13    Bates-stamped WV-000064        109
14
15    (WHEREUPON, original exhibits marked
16    during today's deposition were retained by
17    U.S. Legal Support.)
18
19
20
21
22
23
24
25

Page 128

C. Miolla

1
2  ERRATA SHEET FOR THE TRANSCRIPT OF:
   Case Name:  AUBRY MCMAHON v WORLD VISION, INC.
3  Proceeding Date:  March 2, 2023
   Deponent:  CATHERINE MIOLLA
4  Place:  Remote Video Conference
5    * PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND
       NOTE THE REASON FOR SAME *
6
7  PG / LN  /  NOW READS _/  SHOULD READ  /  REASON
8  ____/____/_____/_____/_____
9  ____/____/_____/_____/_____
10 ____/____/_____/_____/_____
11 ____/____/_____/_____/_____
12 ____/____/_____/_____/_____
13 ____/____/_____/_____/_____
14 ____/____/_____/_____/_____
15 ____/____/_____/_____/_____
16 ____/____/_____/_____/_____
17 ____/____/_____/_____/_____
18 ____/____/_____/_____/_____
19 Under penalties of perjury, I declare that I have
   read the foregoing transcript and that the facts
20 stated in it are true.
21 _____    _____
   CATHERINE MIOLLA              DATE
22
23 Subscribed and sworn to before me
   this ___ day of _____ 2023.
24
25 _____
          NOTARY PUBLIC

Page 129

C. Miolla

1
2
3    C E R T I F I C A T E
4
5    I, THERESA RATIGAN, a Shorthand Reporter and
6  Notary Public of the State of New York, do hereby
7  certify:
8    That the witness whose examination is
9  hereinbefore set forth, was duly sworn, and that such
10  examination is a true record of the testimony given
11  by such witness.
12    I further certify that I am not related to any
13  of the parties to this action by blood or marriage;
14  and that I am in no way interested in the outcome of
15  this matter.
16    IN WITNESS WHEREOF, I have hereunto set my
17  hand this 10th day of March 2023.
18
19
20    _____
       THERESA RATIGAN
21
22
23
24
25

Catherine Miolla
March 02, 2023

---

**Exhibits**

---

**EX 0013 Cathe
rine Miolla 0
30223**
  109:9,14,20
  127:12

---

**1**

---

**1**
  24:14 26:14
  49:14,17
  84:21,24
  110:21
  111:18
  112:15
  113:15
  114:18,25
  115:13
  116:13
  120:3,4,13,
  22
**10**
  102:10
**10:59**
  84:6
**11**
  19:8 63:24
  66:23 116:15
  120:3 121:14
**126**
  125:17
**13**
  109:9,14,20
  110:20
  114:25
**15**
  19:8 66:23
**16**
  19:11
**1:00**
  83:25 84:9
**1:03**
  4:2

**1:53**
  41:8
**1:58**
  41:8
**1s**
  114:20
**1st**
  49:6,11
  87:15

---

**2**

---

**2**
  26:16 27:6,
  9,14,20 48:8
  49:23 85:7
  111:18,20
  112:16
**2-**
  76:17
**20**
  19:11,12,13
  60:9,12,21
**200**
  76:15,21
**2012**
  19:23
**2015**
  10:11,21
**2020**
  18:8,19
  19:22 21:9
  22:19 26:6
  39:20 40:8
  44:10 110:21
**2021**
  11:24 12:14,
  21,25 13:6,
  13,16,25
  14:5,21
  16:7,25
  17:22 18:2,
  8,19 22:9,24
  44:10 46:7
  47:25 49:6,
  11,20 50:16,
  20 51:2,12,

  24 52:5 53:4
  55:19 57:16,
  24 58:14
  62:2,10,12,
  14 66:11,12
  67:8,24
  69:25 71:12
  72:7,17,22
  73:8 74:7,17
  75:2,15,20,
  24 77:6,15
  78:11,21
  83:20,23
  84:6,15,20
  85:19 86:23
  87:15 88:5,
  24 93:6 96:3
  98:24 103:5
  110:22
  112:13,21
  113:3 114:13
  123:4,12,17
  125:8
**2022**
  13:21
**2023**
  14:10,13
**2028**
  73:7
**231**
  61:10
**232**
  61:10
**240**
  70:20
**241**
  70:20
**242**
  73:17
**243**
  77:4
**244**
  73:17
**25th**
  110:21
**2858**
  63:12

**2:00**
  41:14
**2:47**
  68:25
**2:49**
  69:8
**2nd**
  14:10,13

---

**3**

---

**3**
  28:10 30:21
  52:15
**30**
  21:5,23
**35**
  102:16
**3:07**
  62:14

---

**4**

---

**4**
  30:21 39:20
  40:7 61:7,9
**40**
  13:14
**400**
  76:17,23
**4123**
  5:11
**48**
  113:17
**49**
  115:13
**4:00**
  78:25
**4:07**
  113:12
**4:59**
  78:21
**4th**
  22:9 46:7,25
  85:14 112:13

Catherine Miolla
March 02, 2023

**5**

5
  63:11 91:9
50
  113:17
5:40
  83:21
5th
  47:25 50:16,
  20 51:2,12,
  18,24 52:5
  53:4 55:19
  59:15 62:14
  64:11,19,22
  66:11 67:8,
  24 69:24
  71:11 72:7
  73:8 78:11,
  21 85:19
  86:23 88:24
  89:7,24 92:6
  93:6 97:23
  108:19

**6**

6
  23:4,7 25:18
  30:22 31:10
  41:17 65:2,6
  92:2
6-
  76:17
600
  76:17,25
65
  109:15
67
  23:8
69
  28:16 30:6
6th
  74:6,17
  75:2,15,20
  77:6,15

83:2,20 88:7

**7**

7
  70:19 71:20
  72:10
70
  23:8 28:16
  30:6 33:17
78
  48:10 49:18
79
  48:10
7:14
  83:2
7th
  77:15 83:23
  88:5

**8**

8
  73:15 74:4
80
  52:16
800
  76:18
81
  77:20 88:16
  98:19,25
82
  77:20 78:20
  85:21 88:22
85295
  5:12
8:43
  74:18 75:15
8:54
  83:24
8th
  20:14 22:24
  66:12 67:8,
  24 69:25
  71:12 72:7
  73:8 78:11

84:6,14,20
97:23 98:18,
24 103:5
110:22
112:20 113:3

**9**

9
  77:18 78:5
900
  76:15
9:01
  84:15,20
9:46
  77:7

**A**

a.m.
  74:18 75:15
  77:7 83:24
  84:6,15,20
ability
  8:18
able
  39:15 56:5
  93:17
above
  112:16
above-
referred-to
  109:18
Absolutely
  68:21
accepted
  47:17
accompanied
  125:18
accurate
  28:5,7,8
  46:18,21
  49:10 70:14
  91:3,19
  118:19
accurately
  81:7

acknowledge
  4:8,12
acquisition
  12:4,13
  13:4,18
acquisitions
  12:2
acronym
  9:12
actions
  44:2 111:14
activities
  116:13 117:7
actual
  116:21
add
  31:5
additional
  122:14
address
  5:10 58:14
addressed
  56:13 57:4
  92:5
adjust
  32:10
administer
  4:14
administered
  4:13
administrativ
e
  13:11
advanced
  10:15
advice
  79:19 80:4,5
advise
  9:13 87:18
advising
  53:14
advisory
  115:2
aforementione
d
  26:13 27:4,5

Catherine Miolla
March 02, 2023

**afresh**
99:21
**afternoon**
4:3,6 5:14
78:23 101:3
**agent**
118:22
**agents**
118:13
**agree**
4:22,23,25
61:24 74:8
78:12 103:19
105:9 110:22
118:4
**agreement**
4:19,20
**alcohol**
8:15
**alignment**
31:18 57:20
92:10,13
104:14
**allowing**
92:7
**ambiguity**
9:21
**amount**
19:5
**and/or**
67:7 75:18
116:5 123:23
**answer**
6:12,21
25:12 27:21,
23 28:5
29:16 30:2
32:13 34:2,
17,25 35:8
36:5,20
37:6,14,22
38:9 39:6
44:5 45:4
46:20 52:8
54:17,23
55:3,12,22
56:5 58:4

61:4 66:6
68:3,13
71:16 76:4
79:17,21
80:9,19,24
81:9 82:22
83:15 86:9
87:7,25
90:18 91:16,
23 92:21
93:11 94:6
95:5,14
97:8,25
104:12,21
105:6 106:5,
13 108:22
115:4 119:6,
12,23 120:21
124:21
**answered**
60:24 106:4
**answering**
6:6 85:5
**answers**
6:16,17,19
23:25 30:14
45:16 53:22
91:18 94:9
105:11,20
107:12,22
**Anthony**
21:15 42:13
44:13
**Anthony's**
42:15
**anybody**
8:24 17:18
41:18,21
69:13 123:5,
6 124:7
**anyone**
7:5,8 9:9
29:14 46:4,
11 66:2
**appeared**
12:7
**appears**
28:11 30:21

49:25 61:22
63:23 64:13,
15 78:9,15,
16 83:19
85:21 98:18
111:7,20
114:20
115:13
**applicant**
16:4,5 27:11
40:19 41:20
58:14 110:15
**applicants**
75:23
**application**
16:3,11,17
17:2,4
35:19,22
44:9
**applications**
12:16 13:8
29:13
**applied**
15:16,19
16:21 17:9,
15 114:7
**applying**
15:25
**appropriate**
80:6,7
121:15,19
122:11,12,16
**approximately**
11:19 13:12
14:15 19:18
21:2,20
66:12 102:16
**April**
10:21
**archive**
112:17
**argumentative**
55:11 57:18
**Arizona**
5:12 14:14,
17

**around**
13:6,14,19,
20 20:23
21:4,23 43:2
73:7,8 77:15
78:25 87:23
88:4 103:12
113:6
**arrangement**
4:17
**ascending**
110:19
**asked**
21:18 33:23
37:8 45:14
51:21,22
53:23 58:25
60:23 62:15,
19 65:10,18
82:16 91:7
106:4 118:20
119:4
**asking**
25:8 38:11
45:17 51:18
59:17 67:14
79:13 91:5,
11 99:24
105:12,21
107:13
122:18,19
**asks**
118:17
121:21
**assessment**
17:5 40:9
42:25
**assigned**
16:20,23,25
17:8,15,18
18:5 50:4
111:11
**assisted**
24:25
**assume**
6:6
**assuming**
40:19

Catherine Miolla
March 02, 2023

attach
  64:18 65:8
attached
  64:2,22
attachment
  64:14,24
attend
  72:25 115:14
  120:13
  123:11 124:8
attended
  124:3,6
attendees
  124:2
attending
  123:10
attention
  28:9 31:16
  58:8 78:18
  88:14
  114:17,19
  115:12
attorney
  7:19 9:10
  96:6
attorney/
client
  79:16 82:21,
  23,25
attorneys
  4:7
Atwood
  15:6,8,15
  64:14
Aubry
  5:16 15:5,6,
  7,8,15,25
  16:11,17
  17:2,8 18:9,
  20 24:8
  26:12 27:3
  29:6 36:2
  41:23 42:5
  43:7,18
  44:9,16,20
  45:6,10,20
  46:2,6,22

47:15,24
48:23 50:11,
16 53:3
54:21 55:20
57:5,12
59:15 61:23
62:16,22
63:2 64:14
66:3,11,14
67:11,21
70:3 73:9
78:10,22
79:13 82:4,
16 83:3,19,
24 84:4,7,8,
15,19,23
85:8,19 87:2
88:24 89:8,
10,16 92:5
93:14,24
96:13 97:16
98:5,9,17,
20,24 99:2,
3,9,11
100:6,14,15,
17,20 101:7
102:2,5
103:15 104:9
106:10,15,24
108:15
111:15
112:12 113:2
114:7
Aubry's
  23:25 30:9,
  20 63:25
audio
  9:6 102:11,
  21,25
  103:14,17,20
  104:4,8
  106:9
automatically
  111:4,10
  112:8,22
available
  83:5,12

aware
  7:25

___

B

___

baby
  51:13 53:11
  54:5 55:17
  89:11,17
  93:3
bachelor's
  10:5,16
back
  18:2 31:5,14
  39:9 41:6,7,
  10 45:12
  46:23 49:16
  50:10 53:17
  68:25 69:9,
  23 82:9 83:4
  85:12 86:14
  94:13 95:19
  100:19
  105:15,24
  107:16,25
  109:2
background
  26:17 40:18,
  20
background-
reference
  111:24
badgering
  61:2
based
  36:12,24
  38:2 39:25
  71:17 92:5
  104:7
  112:10,24
basis
  96:20
Bate-stamped
  109:15
  113:16
Bates-stamp
  23:7 52:16

70:19
Bates-stamped
  33:17 48:9
  61:10 63:12
  73:17 77:20
  109:19
bathroom
  69:16
bear
  52:11 66:9
bearing
  23:7 49:21
  63:11 77:19
  109:15
bears
  49:15,18
  52:15 70:19
  73:16 113:16
beginning
  78:10
behavior
  31:20 103:24
behaviors
  31:18
belief
  33:22 34:12,
  23 35:6,12,
  15,18,21
  36:9
believe
  12:9 13:20
  21:13 22:10
  24:6,23
  25:14 26:4
  30:23 31:18
  40:22 41:19
  46:9,21
  50:7,18 52:3
  53:5,9,20
  55:7 58:20
  59:20 62:8
  64:8,20 79:7
  83:4,17 87:3
  88:8 89:6
  90:3 92:22
  95:8,25
  96:14,22

97:19 98:2
100:17,23
101:2 104:2,
5,13 106:21
108:12 109:5
112:14 113:4
114:9
115:11,21
116:4,22
120:8 123:8
124:4,15
125:16

**believing**
56:25

**below**
30:10,15,21
34:6

**benefits**
11:13

**best**
6:5 25:9
28:3 31:2
39:10 85:15
119:13

**big**
119:8,9

**bisexual**
9:15

**bit**
114:15

**blocks**
12:7

**body**
63:25

**bold**
24:16 26:18
27:8,15,19

**boss**
62:12 72:23
125:9

**bottom**
28:11 31:16
49:14,22
83:20 85:21
88:21

**box**
30:21 34:6

**boxes**
28:17,22
29:2,18,24
30:6,15
33:15,19

**break**
6:10,13
40:24 68:18
69:11,12,15
113:6

**breaking**
99:17,18

**brief**
41:12 69:6
113:10

**bringing**
58:8

**broke**
51:7

**bullet**
31:17 33:3

**busy**
83:10 87:19,
23 88:2,4,6

———————————

**C**

———————————

**call**
19:2 20:14,
15,19 21:2,
6,16,17,21,
25 22:23
40:11 42:2
47:20 61:5
62:22 63:2
78:25 80:17
83:6 84:2,9,
23 85:2,4,6
94:18 98:20
99:2,3,7,9,
13,23 100:4,
5,9,11,14,
15,16,18,21,
24 101:5,8,
24,25 103:2,
10,12 113:7
117:10,14

**call/contact**
26:21

**called**
22:5 100:19

**calling**
36:19 84:10
108:21

**calls**
20:9 79:15
87:5 100:22
107:4 116:9,
14 117:9,19

**candidate**
12:16 13:8
37:23 42:2
105:10 111:3

**candidate's**
20:23 112:23

**candidates**
13:9 25:24

**Carla**
5:11

**case**
73:19 77:22
102:13
113:19
114:20

**Casey**
4:22 5:16

**cat**
69:16

**cat's**
69:17

**Catherine**
5:9 39:14
79:2 84:3,11
85:15 112:3

**center**
21:16,17
26:21 40:11
42:2

**certain**
24:15 91:8
112:9,23

**chain**
61:22 74:5
78:10 85:25

87:2

**chance**
53:6

**change**
13:15

**changed**
12:25 13:17
17:22

**changes**
7:15

**chapel**
115:16
120:15
123:10,11,
21,24 124:3,
5,7,9,12,18,
19,23,25

**charge**
125:8

**chat**
7:22 123:22

**check**
40:18,20
83:5 84:8
111:24

**checked**
16:7

**chopped**
77:8

**Christian**
28:10 118:5

**Christine**
44:18 66:13
67:7,23 70:2
71:13 72:14,
15,17,22
73:6 74:6,
10,18 75:4,
19 77:5,9,14
98:15

**Christine/**
**melanie/**
**christine**
72:11

**churned**
13:17

Catherine Miolla
March 02, 2023

circle
68:24
circumstances
5:23 116:10
clarified
92:17
clarify
53:12,22
92:13
clarity
110:6
class
26:6
cleaner
6:22
clear
6:18 22:20
24:2,6 39:13
87:8,10,13
97:14
code
100:9
college
10:13
come
15:14 59:2
67:22 70:4,
8,12
comes
121:9
commence
49:5,11
commencing
87:15
Comments
110:17
Commitment
28:10
common
75:24 115:5
communicate
7:18
communicated
97:3
communicating
97:22

communication
7:20 18:11,
22 21:12
22:2,7,12,21
65:18 85:9
86:21 100:9
communication
s
19:18,21
79:18
compiling
38:15
completed
23:12 25:18,
20 41:22
48:14,16
52:20 61:15
63:16,18
70:22 73:21
77:24 102:15
109:23
compliance
96:15,20
97:17 106:23
complied
108:17
comply
37:8,15,24
38:11 93:17,
23 103:25
105:18
107:11,20
108:14 109:6
computer
7:12 31:4,7,
9
concerns
37:19
conclude
56:2 112:11,
25
concluded
97:17 113:21
conclusion
125:18
conduct
20:25 31:19,

21 37:9,16,
24 38:12
56:18,19,23,
24 57:21,24
58:5 64:3
89:5,16,25
90:4,6,14
91:18 92:10,
12,15,23
93:13,18,23
96:15,19,23
97:18
103:21,22
104:3,15,17
105:8,19
106:17,23
107:3,9,11,
20 108:14,17
109:7
conducted
24:11 29:6
43:19
conducting
7:2 12:16
13:9
conference
18:11,22
19:2 22:13,
14 66:15
100:9
confirmation
48:2,22,25
confirmed
109:6
confuse
5:25
confusion
45:13
connect
62:16 84:21
consent
4:16
consider
112:17
considering
39:21 40:3

consistent
60:24
contact
86:11 92:9
content
51:4 59:10,
12,17
continue
105:3
continued
41:15 69:10
113:13
125:17
continuing
110:3
contribute
36:9
contributed
45:25
conversation
47:2,8 59:22
60:18,20
79:25 92:25
102:8 103:4
121:22
conversations
66:13 67:3,
5,6,11,16,22
69:25 70:4
95:4
copy
50:12
correct
12:9 14:19
19:9 42:22
44:25 46:8
48:5 49:7,18
50:6,17
56:14 57:9
62:17 71:14
72:11 76:12
78:14,17
82:4,17
84:17 90:23
97:18 111:9
112:11,25
118:5,23

Catherine Miolla
March 02, 2023

correction
  49:15
correctly
  81:8
counsel
  4:16 60:23
  66:25 79:18
  80:3,5,20
  94:8,19,22,
  23 95:7,9
  97:3
counsel's
  79:19 95:3
counselor
  80:2
counselor's
  80:23
counsels
  4:21
count
  18:23,25
couple
  17:24 60:12,
  18 91:7
court
  4:5 6:18,23
  7:23 39:12
  51:9 53:19
  81:16 82:11
  86:17 94:15
  95:21 105:17
  106:2 107:18
  109:4
COVID
  123:18,21
coworkers
  116:5
crazy
  83:10 87:19
create
  24:24
created
  24:21 25:7,
  15 26:8
  28:21,25
  46:17 111:8,
  10 112:7,8,

  21,22
creation
  6:22 25:2
  26:24 32:18,
  23
creator
  112:3
customer
  18:5 23:24
  25:25 40:4
  114:12
  115:20,23
  116:16
  117:11,22
  118:8,18
  119:2,20
  120:5,18
  121:11
  122:22
  123:2,25
  125:10,14
cut
  108:23

D

daily
  16:7,9
  124:18
dash
  31:21 33:7,
  11
data
  39:24
date
  21:8 22:14,
  15 46:10
  72:4 109:21
dated
  74:17 77:6
  93:5
day
  50:15 65:15
  84:21 100:25
days
  14:15,20

de-
  51:16
December
  21:9 22:19
  39:20 40:7
  44:10
deciding
  43:6
decision
  32:19,20
  38:16,22
  44:6,19
  45:6,10,19,
  23,25 98:7,9
decision-
making
  45:15
defendant
  5:19
define
  99:14,24
defined
  103:23
defines
  31:22 92:16
  96:24
definition
  9:20
definitive
  57:8
definitively
  70:13 112:12
  113:2
degree
  10:6,16
degrees
  10:15
deny
  38:24
depends
  25:13
depose
  8:13
deposed
  9:24
deposition
  4:8,9,10

  7:3,9 9:4,7,
  10,13,14
  110:4,5
describe
  114:24
described
  12:18 20:8
  21:13 40:15
  44:2 97:4
description
  46:18 120:17
desk
  11:7,12
details
  51:16
determination
  44:15 98:4
determined
  106:22
devotion
  120:23
devotionals
  120:25
devotions
  115:15
  116:13 117:8
  120:14 125:2
different
  45:17 88:10
  112:7,21
  118:4 124:5
direct
  31:15 62:4
  78:18 88:14
  114:17,18
  115:12
directed
  29:4,22
  46:11 65:19
  125:4
directive
  29:16 46:16
directly
  15:20 95:7
director
  21:17 62:6

directs
  32:8
disbelieve
  88:11
disclose
  53:7 54:4,8,
  12
disclosed
  36:13,25
  38:3 58:9
  91:9,13
  92:18 93:9
discloses
  108:6
disclosing
  50:20 51:2,
  12,24 52:5
  90:2,15
  93:24
discovery
  23:9 48:11
  52:17 61:12
  63:14 70:25
  73:18 77:21
  102:12
  109:16
  113:18
discrepancies
  93:7 94:2,3
discrepancy
  85:11,13
  88:17 89:2,
  4,8,10,15,
  21,25 90:8,
  13,22 91:2,
  8,14 92:4
discuss
  24:17,22
  78:24 83:6
  85:10 90:23
  93:8,12 94:2
discussed
  67:10 73:12
  91:14,21
  94:22,24
  95:11 102:5
discussing

75:19 91:18
discussion
  31:13 50:9
  58:7 69:22
  102:18
  109:12 113:9
disqualified
  106:18
disqualify
  108:8,13
doc
  31:10,11
  64:15
document
  23:3,6,7,9,
  11,13,16,21
  24:14 25:7,
  17 26:9,16,
  25 27:9,20
  30:17 31:4,
  6,9 32:3,8,
  18 41:17,24
  48:9,10,13,
  15,18 49:4,
  7,15 50:5
  52:15,17,19,
  21,22,23
  61:10,11,14,
  16,18 63:11,
  13,15,17,19,
  23 64:15,18,
  22,25 65:5,
  8,20 66:4
  70:19,21,24
  71:2,3,5,6
  73:14,16,18,
  20,22,23,24
  77:18,19,20,
  23,25 78:3,9
  88:15 91:22,
  24,25
  109:15,16,
  19,22,24,25
  110:8,11,12,
  16 112:10,24
  113:16,17,
  22,25

documents
  7:11,16 9:3
Docusign
  50:6,13
doing
  48:14 52:20
  61:15 63:16
  70:22 73:21
  77:24 99:9
  102:15
  109:23 115:7
donor
  118:17,20
  121:21,22
donor's
  121:15
donor/
customer
  17:12 40:5
  44:24 48:3
  49:2 114:4
donors
  116:6,14,18
  117:9,12,21
  118:14
  119:3,4
  122:12 123:5
doubt
  64:9,21
  83:18
draft
  25:23 26:3
Drive
  5:11
drugs
  8:14
dry
  72:10,25
  73:4,12
duly
  5:4
duties
  12:11,19,24
  121:25

E

e-mail
  7:21 18:10,
  21,23 19:16
  50:16,19,22,
  25 51:5,11,
  17,23 52:3,
  4,10 53:3,7,
  13,21,22
  54:2,3,7,8,
  11,12,19
  55:7,8,14,15
  56:10 58:18,
  24 59:3,9,
  10,14,17
  61:22 62:16
  63:23 64:10,
  14,19,22,24
  65:9 66:11
  71:12 74:5,
  15,17,23
  75:6,11,14
  77:5,6 78:9,
  14,16,20,22
  79:3,6 83:7,
  13,16,19
  84:4,7,12,19
  85:8,20,21,
  25 86:21,23,
  25 88:7,15,
  18,20,23
  89:7,14,19,
  23 90:12
  91:5,9 92:6,
  22,24 93:5,9
  97:22 98:17,
  23 100:17
  101:3
e-mailed
  62:15 77:4
  83:3 90:21
e-mails
  12:8 19:10,
  14 74:10
  86:5,10
  87:10 88:4

Catherine Miolla
March 02, 2023

earlier
    58:6 119:24
early
    73:7
easier
    6:23
East
    5:11
eight
    113:7
either
    34:9,20
    35:3,10
    41:22 66:13
    67:23,25
    70:5 77:13
    79:18 100:15
    116:17
electronic
    7:22
else's
    50:2
employed
    10:3 124:2
    125:10
employee
    51:20 107:14
employees
    31:20 103:24
    104:18,25
    105:18,22
    106:17 107:3
    116:18 123:5
    125:15
employment
    5:24 15:16,
    25 16:12,18
    34:10,21
    35:4,11
    36:16 37:3,
    11 38:5,25
    39:21 40:4
    42:19 43:7,
    17,24 44:16,
    20,22 45:6,
    10,20 46:2
    48:23 87:14

97:15 104:8
105:3 106:9
108:7,8,18
112:11,25
encapsulate
    38:17
encouraged
    118:22
    119:10
encouragement
    77:10
end
    47:22 78:15
endeavors
    85:15
ending
    78:11
entailed
    123:16,19
enter
    31:3
enters
    7:8
entire
    14:22
entitled
    28:10 64:14
entry
    39:24
    110:20,21
essence
    38:15
EST
    78:25 83:25
    84:9,21,24
Events
    110:17
everybody
    40:25 41:9
everyone
    43:5 99:18
exact
    18:12 19:4,
    10 51:4
exactly
    21:4,22 28:2
    33:23 34:3

35:16 42:12
43:3 50:23
51:22 52:2
62:20 63:6
79:10 97:10
98:11 121:6
EXAMINATION
    5:13 41:15
    69:10 113:13
examined
    5:6
examples
    31:17 115:5
exchanged
    23:9 48:11
    52:17 61:11
    63:13 70:24
    73:18 77:21
    102:12
    109:16
    113:18
excuse
    18:15 27:5
    49:15 63:10
    73:7 114:18
    117:22 125:9
Exhibit
    23:4,7 25:18
    30:22 31:10
    41:17 48:8
    49:22 52:15
    61:7,9 63:11
    65:2,6 70:18
    71:20 72:10
    73:15 74:4
    77:18 78:5
    92:2 102:10
    109:9,14,20
    113:15
exhibits
    110:4
existed
    114:13 123:3
existence
    59:9 65:5
expect
    115:6

expecting
    51:13 54:4
    55:17 93:3
expediency
    97:21
experience
    12:23 20:24
    21:19 36:13,
    25 38:3 40:2
    76:8
explain
    12:10 16:22,
    24 19:20
    20:18 21:10,
    24 23:21
    25:19,21
    35:20 40:2,
    12 46:25
    59:13 63:7
    71:7 81:21
    96:18 110:24
    116:7 119:19
    121:18
    122:8,9
    123:16,19
explaining
    18:2
explicitly
    56:10 119:15
express
    86:6
expressed
    94:20,23
extend
    43:6 44:15,
    19 45:6,10,
    19 46:2,7
extended
    34:10,21
    35:4,11
    36:16 37:4,
    11 38:5
    43:17,24
    44:23 47:4,
    14 76:9,11
    85:14 96:12
    108:18
    111:24

112:17

**extent**
23:20 36:20
55:12 77:7
79:15,20
80:17,25
82:22 96:11
97:8 98:8
101:4,6
102:6,7
106:6

---

**F**

**fact**
24:11 30:20
42:4 56:13
57:5 87:18
89:10 91:12
93:8,24
100:3 108:13

**facts**
54:18 55:14,
15

**fair**
28:4 36:2
38:13,17
60:17,20
68:10 87:2,
22 101:19

**fairly**
86:11

**faith**
20:25 118:5

**familiar**
114:10,16

**February**
49:6,11
87:15

**Federal**
14:3

**feel**
94:17 119:24

**fellow**
116:18 123:5

**felt**
56:5 57:19

**fewer**
18:13,15
43:14 66:18

**field**
111:20
112:6,20

**fields**
110:19
111:8,13

**file**
102:11,22,25

**final**
22:21 25:23
26:3 33:14
98:4,9

**finalized**
26:3,5

**find**
92:9

**fine**
29:21

**finish**
6:20

**finished**
30:18 61:17
78:2 113:23

**first**
5:4 10:18
15:24 16:3
19:24 20:9,
10,19 26:19
49:4,17
51:13 54:5
55:17,18
58:19 59:14
78:16 83:20
88:15,20,23
91:25 93:3,4
111:19

**five**
14:20 18:13
41:6 68:7,20
101:10
117:19

**five-minute**
40:24

**flag**
99:16

**flat**
38:24

**focus**
33:14 111:17

**focussed**
43:23

**following**
39:3 41:13
46:16 69:7
94:7,18
113:11

**follows**
5:6

**font**
24:16 26:18
27:8,15,20

**for-**
17:4

**forgot**
100:10

**form**
18:11,22
25:11 29:20,
25 32:12,22
33:25 34:14
35:7,15
36:4,19
37:13,21
38:8 39:5
44:4 45:3
46:19 52:7
54:16,22
55:10,21
57:6,10,17
58:3,10,16
60:13,22
62:23 66:5
67:12,17
68:2,12 70:6
71:8,15
76:3,10
82:6,12
83:14 86:8,
21 87:5,24
90:17 92:20
93:10,16,21

94:5 95:13
97:24
104:11,20
105:5 106:4,
12,20 107:4
108:20 115:3
117:25
118:11
119:5,11,22
120:20
122:4,13,23
123:7 124:20

**format**
102:11

**formed**
35:17,21
96:20

**formulate**
54:20

**forward**
15:7 17:4
37:18,25
39:15 47:21
56:16 58:25
59:18

**forwarded**
59:6

**four**
11:22 22:6
66:20

**fourth**
22:21 28:15
31:17 33:3,
16

**Freiberg**
20:15 22:23
44:14 58:21
59:2,8,23
61:23 62:3,
15,21 63:2,
24 64:10
65:11 66:2,
13 67:7,23
70:2 71:12,
23 73:6
74:5,18
77:4,14
79:23 95:24

Catherine Miolla
March 02, 2023

98:13 99:8
100:6 103:6,
16,19 104:4
110:6
**Freiberg's**
80:4
**frequently**
14:6,22
117:15 121:2
**Friday**
83:12,25
84:14 101:3
**front**
7:11,16
**froze**
94:10 95:16
**fully**
90:19
**function**
7:22
**future**
85:15 87:16

---

**G**

**gather**
38:19
**gave**
79:9
**gay**
9:15 34:12,
23 38:4
54:21 55:9,
20 57:5,13
58:9,15 70:3
93:9,15,20,
25 106:11
**GCHAT**
7:21
**gears**
15:3
**general**
5:15 40:3
75:23
**generally**
28:2 44:6

**getting**
50:22 83:11
87:20
**Gilbert**
5:12 14:14
**give**
8:24 28:5
78:25 81:6
84:2,9
**given**
7:2 27:15
79:7 87:4
**goal**
5:25
**goes**
15:6 28:12
**going**
5:22 9:19
15:7 18:8,19
19:22 20:21
23:2 25:10
36:18 38:7
44:3 55:10
68:11,17
70:6 79:14
82:5,20
91:22 94:25
97:6 102:17
106:3 117:24
118:10
120:19 122:3
**good**
4:3 5:14
69:19
**graduated**
10:12
**great**
83:11 84:16
**ground**
5:15
**grounds**
95:2
**guidance**
55:5,24
56:3,15
79:7,9,12
80:3 81:18,

25 82:3,16
91:17 94:8,
18,20,23
95:3,6,8

---

**H**

**hand**
32:17
**handwrite**
31:5
**happened**
103:7 110:14
**head**
6:17
**heading**
27:8
**headings**
24:15
**hear**
84:10
**heard**
36:8 83:4
85:12
**held**
11:4,16 12:3
31:13 50:9
69:22 102:18
109:12 113:9
**help**
11:7,12
53:12,22
91:22
**helped**
24:23
**Hey**
83:9
**hire**
17:23
**hiring**
12:17 13:10
17:6 38:22
41:25 43:20
44:6,7,8,11
**History**
110:17

**hold**
11:14,23
13:23 62:5
**holding**
12:12
**home**
14:14
**hourly**
16:8
**hours**
13:12
**HR**
10:25 11:11
30:4 62:6
98:11
**human**
11:7 12:4,13
13:5 72:16
**hundreds**
76:13,14

---

**I**

**identificatio
n**
5:2 109:20
**identify**
7:10
**identity**
26:8 28:24
42:10
**impact**
93:25
**impair**
8:18
**importantly**
41:2
**include**
13:7 20:23
31:20 32:20
80:19
**included**
51:15 120:23
**includes**
7:20 38:22
80:4 120:25

Catherine Miolla
March 02, 2023

including
  20:13 29:17,
  23
incorporated
  5:18 12:21
  13:6 15:17
  16:2,13,19
  17:16,20
  24:4 37:4
  38:6 42:20
  43:8 45:7,
  11,21 46:3
  48:24 95:3
  98:10
  104:18,24
  106:19
  115:22
Incorporated'
s
  106:16 107:2
incorporates
  80:5
indeed
  15:11,20
  49:11 75:14
  79:3 92:9
indicate
  4:19 54:19
indicates
  88:2
indirectly
  95:7
individual
  7:19 42:11
  114:11
individuals
  43:16
influence
  8:14,17
inform
  7:16 86:2
information
  23:23 38:16,
  20 79:16
  80:18 81:2
  82:23,24,25

informed
  42:8,9 55:8
informing
  75:25
initial
  19:25 20:19
  122:24
initially
  33:10
initiate
  99:25 100:15
  119:3
initiated
  99:13,15,22
input
  112:6,20
inquire
  65:25
inquiring
  85:20
instant
  7:21
instruct
  79:17 95:5
instructed
  29:7,10,14
instruction
  80:7
intentional
  32:16
interact
  123:22
interaction
  18:24,25
interactions
  18:9,20
  19:13
interested
  26:19
intern
  10:23
Internet
  95:16
interning
  10:20
interview

17:6 20:2,3,
  11,20 21:13,
  14,16,18
  23:22 24:17
  40:10,15
  42:3,14
  44:12 64:2
  85:11
interviews
  12:16 13:9,
  10 26:5
  78:24
Intro/
logistics
  24:15
introduced
  99:10 102:2
invite
  71:10,18,22
  72:2,9 73:2
involve
  81:2 82:23,
  25 97:9
involved
  32:23 40:7
  45:15 46:5
  76:5 79:18,
  19,23 80:2
  91:8 95:8
  98:6
involving
  74:5 75:19
  89:4,5
irrespective
  46:10 73:4
issue
  67:21 70:3
  89:21
issues
  43:21 56:17
italicized
  24:16
item
  102:12 111:4

J

Jan-
  55:19
January
  11:24 12:14,
  21,25 13:6,
  13,16,25
  14:5,21
  16:6,24
  17:22 18:2
  20:14 22:9,
  24 44:10
  46:7,23,25
  47:25 49:20
  50:16,20
  51:2,12,18,
  24 52:5 53:4
  55:19 57:16,
  23 58:14
  59:15 62:2,
  9,12,14
  64:11,19,22
  66:11,12
  67:8,24
  69:24,25
  71:11,12
  72:7,17,22
  73:7,8 74:6,
  17 75:2,15,
  20,24 77:6,
  15 78:11,21
  83:2,20,23
  84:6,14,20
  85:14,19
  86:23 88:5,
  24 89:7,24
  91:9 92:6
  93:6 96:3
  97:22,23
  98:18,24
  103:5 108:19
  110:22
  112:13,20
  113:3 114:13
  123:4,12,17
  125:8

**Jean**
95:25 96:3

**job**
11:4,8,10,
16,18,20
13:15 16:25
21:18 22:6
29:13 47:4
49:5,10
85:13 87:13
96:12 98:4,9
114:4,7,14,
19,22
116:21,23
117:4 120:17
122:21 123:3
124:17

**join**
71:13 123:21

**judge**
8:6

**jurat**
125:19

———————

**K**

**kind**
73:5 79:12
82:3 119:18
121:8 125:6

**kindly**
7:9,18

**know**
15:19 19:4
22:17 23:12,
20 26:2,7
27:18 28:24
29:3 30:3,16
32:2,4,11,14
36:20 42:2
43:20 45:5,
9,18 47:4
48:14 49:25
50:11 52:20
54:18 55:13,
14 57:7
58:24 59:16
61:15 62:19,

25 63:5,16
64:4 70:22
73:21 74:14,
22 76:7
77:8,24 82:2
85:24 86:19
87:12 94:21
96:5,11 97:2
98:8,14,16
99:18 101:4,
6 102:15
104:3,23
105:13 106:7
107:6,7,19
109:23
113:21
116:11
121:10
122:11,19,24
123:18

**knowledge**
12:23 36:12,
24 38:2 40:2
43:4,10,13
97:14,20
103:15,18
104:16
106:24
108:15 114:6
115:19
118:25
119:13
122:2,15
124:16

———————

**L**

**lack**
97:21

**language**
25:2 58:6

**lasted**
60:18,21

**latest**
78:14

**lawsuit**
5:17,20

**lead**
115:20
116:10,17
117:4,11
119:17,20
120:6
124:11,18,
22,24 125:2,
14

**leader**
40:11

**leadership**
30:4 55:24
56:3 94:8,19
98:12 106:22
115:15
120:14,23,24
125:7

**leading**
115:23
116:2,3,5,8,
12 120:25
121:9

**leads**
120:18

**learn**
15:14,24

**learned**
42:18,23

**left**
110:5

**legal**
4:4 30:4
59:21 66:25
79:11,19
94:8,19,22
95:3,6,8
96:7 97:3,10
98:12 106:22

**length**
60:16 61:5

**lesbian**
9:15

**letter**
46:23 47:6,
25 48:22
50:12

**lettering**
26:18

**letters**
49:21

**letting**
47:4 59:16

**LGBTQ**
9:12,14 52:6
54:13 57:25

**lieu**
4:12

**life**
6:23

**light**
53:12,21
54:2,3,7,11
56:13 57:4
75:9,17
80:23 81:9
85:19 103:8
106:8

**limited-term**
10:24

**line**
72:9 92:14
96:22 111:4

**list**
119:15 122:5

**listed**
120:2,7

**listen**
9:6 102:14
103:14
123:22

**listened**
102:19,24
103:3,8

**listening**
104:7 106:8

**lists**
114:21

**litigation**
23:10 48:11
52:18 61:12
63:14 70:25
73:19 77:22
102:13

Catherine Miolla
March 02, 2023

109:17
113:19
**little**
43:22 76:16
**located**
14:2
**logistics**
20:24
**long**
11:2,8,14,19
21:2,20 47:7
59:22 66:8
101:8 102:16
**look**
77:3 88:20
91:22
**looked**
96:22
**looking**
31:9 47:21
**looks**
78:17 86:10
**love**
77:10
**Lutheran**
10:9

---

**M**

**made**
20:9 45:5,9,
18 48:2
76:12 80:14,
21 81:3 85:2
97:15 98:5,
8,9 100:25
104:9 106:9
110:20,22
112:12 113:2
**maintained**
12:20
**make**
6:21,23 84:8
**maker**
38:16,23
**making**
45:23,25

94:18
**man**
31:23 56:25
92:16 96:25
103:23
106:25 107:7
108:6,16
**management**
57:20 62:6
**manager**
38:22 42:9
44:7,9,11
58:15,20
62:4
**managers**
12:17 13:10
17:6 58:8
**mandates**
8:9
**mandatory**
119:10
122:20
**manner**
4:18
**March**
13:20,21
14:10,13
51:13 54:5
55:17
**mark**
110:2
**marked**
23:3,6 25:17
28:16 41:17
48:8 49:18,
22 52:14
61:6,9 63:10
64:25 65:6
70:18 73:15
77:18 78:4,
20 88:15,22
92:2 102:10
109:9,14,19
113:15
**marriage**
31:22 35:6
36:14 37:2

56:14,24,25
67:22 90:2,
7,16 91:13
92:15,16,19
96:24
103:22,23
104:10,19
106:18
**marriages**
104:25
**married**
83:11 87:20
106:25 107:8
108:6,16
**master**
31:6
**matter**
23:10 48:12
52:18 61:13
63:14 66:2
70:25
**Matthew**
4:24
**Mcfarland**
95:25
**Mcmahon**
5:17,24
15:5,8,15,25
16:11,17
17:9 18:9,20
20:20 22:3,
22 24:9
26:12 27:3,
16 29:6
30:7,24
33:4,7,11,
20,24 34:7,
11,12,22,23
35:5,6,12,13
36:7,9,13,
17,25 37:4,
12 38:3,6
39:19,21
40:7 41:23
42:5 43:7,18
44:16,20,23
45:7,11,20
46:2,6,22,24

47:24 48:23
50:11,16,20
51:2,12,18,
24 52:5
53:4,7,13,23
54:4,9,21
55:20 57:5
59:15 61:24
62:22 63:3
66:3,11,14
67:11,21
70:3 73:9
78:10,21
79:4,13
83:3,9,19
84:4,7,15,23
85:8,19
86:2,20
87:2,18,22
88:3,24
89:8,10,16
90:15,21
91:8 92:5,18
93:14,24
96:13 97:16
98:5,10,18,
20,24 99:2,3
100:21
103:6,15
104:9
106:10,15,24
108:15
111:15
112:12 113:2
114:7
**Mcmahon's**
17:2 42:19
44:9 57:12
**mean**
25:19 39:14
76:14 90:6,8
99:14 117:2
118:2 120:17
**means**
121:18
**meant**
99:25

medication
  8:18
meet
  39:16
meeting
  71:9,14
  72:13 73:2,
  5,6
meetings
  73:11 116:9
Melanie
  20:14 22:23
  44:14 58:20
  59:2,8,23
  61:23 62:2,
  15,21 63:2,
  24,25 64:10
  65:10,25
  66:13 67:7,
  23 70:2
  71:12,22
  73:6 74:5
  75:18 77:4,
  7,14 79:11,
  12,23 81:19,
  21 82:15,19
  95:24 98:13
  99:8,9,10,11
  100:14,18,20
  101:7 102:2,
  5 103:16,19
  104:4,13
mention
  20:6,12
mentioned
  17:7 40:10
  46:5 70:23
  116:13,15
  117:8
mentions
  74:11,19
  77:10
messaging
  7:21
met
  19:3
middle
  78:19

minute
  101:17
minutes
  21:5,23 41:7
  47:11 60:2,
  5,7,9,12,18,
  21 68:20
  101:9,11,14,
  20
Miolla
  4:1 5:1,9,14
  6:1 7:1 8:1
  9:1,24 10:1,
  5 11:1 12:1,
  10 13:1 14:1
  15:1,3 16:1,
  5 17:1 18:1,
  8 19:1 20:1,
  17 21:1 22:1
  23:1,2,5,15
  24:1,2 25:1
  26:1 27:1
  28:1 29:1
  30:1,19
  31:1,15 32:1
  33:1,2 34:1,
  17 35:1
  36:1,12 37:1
  38:1 39:1,
  13,14,25
  40:1 41:1,2,
  16 42:1,17
  43:1 44:1
  45:1 46:1,22
  47:1,24
  48:1,17 49:1
  50:1,11,15
  51:1 52:1,
  12,13 53:1
  54:1 55:1
  56:1 57:1
  58:1 59:1
  60:1 61:1,8
  62:1 63:1,9,
  12 64:1 65:1
  66:1,8 67:1
  68:1,22
  69:1,12,24

70:1,17
  71:1,4 72:1
  73:1,16 74:1
  75:1 76:1
  77:1,17
  78:1,3 79:1
  80:1,13,24
  81:1,9 82:1
  83:1,16 84:1
  85:1,7,18
  86:1 87:1
  88:1 89:1
  90:1 91:1
  92:1 93:1
  94:1 95:1
  96:1,11 97:1
  98:1 99:1
  100:1 101:1
  102:1,9,21
  103:1 104:1,
  7 105:1
  106:1 107:1
  108:1 109:1,
  8,13 110:1,7
  111:1,5,7,17
  112:1,4
  113:1,14,24
  114:1 115:1
  116:1 117:1
  118:1 119:1
  120:1 121:1
  122:1 123:1
  124:1 125:1
mischaracteri
zes
  60:14
mischaracteri
zing
  120:20
missed
  100:18
missing
  111:14
moment
  45:12 52:11
  69:21 94:10
  102:20
  109:11

Monday
  85:14
month
  14:21,22
  22:16 25:8
  87:15
morning
  74:7 75:15
Morse
  100:9
move
  17:4 37:18,
  24 38:21
  39:15 46:14
  56:15 58:25
  59:18 112:8
moved
  111:23
  112:16,23
MP3
  102:11
Muffin
  69:18
multiple
  81:4 87:9
  100:22

_____

N

_____

name
  4:3,20 5:8,
  15 15:6
  35:23 36:2
  42:15 49:15,
  18,21,25
  69:17,19
  111:12
named
  15:5,15
names
  26:10 30:3
  95:22
necessarily
  6:18 28:6
  45:22 117:13
need
  64:4

needed
  39:9 55:4,23
  56:2,12
  57:4,19
  91:14,21
  92:5
needing
  89:21
needs
  121:15
never
  14:8 70:14
  114:14
non-
appropriate
  122:16
non-document
  71:8
non-e-mail
  19:21 21:12
  22:2,21
non-e-mails
  19:17
nonlegal
  94:22
nonparty
  5:3
normal
  32:10
Notary
  5:5
noted
  4:2 41:14
  69:8 113:12
notified
  41:21 87:23
notifying
  59:8
November
  110:21
number
  18:12 19:10
  26:18 48:8
  49:23 52:16
  61:7,9 63:12
  65:2 70:19,
  20 73:15

109:15
110:20,21
111:18,20
112:15,16
113:15
114:21
115:13
116:13,15
119:18
120:3,4,22
numbering
  110:4
numbers
  23:8 73:17
  77:20 111:18
  113:17
  114:25
  119:25

O

oath
  4:13,14 8:2,
  4,5,8
object
  25:10 29:20
  32:12,22
  34:14 36:4,
  18 44:3
  55:10 68:11
  70:6 79:14
  82:5 87:5
  94:25 97:6
  106:3,4
  115:3 117:24
  118:10
  120:19 122:3
objection
  9:20 29:25
  33:25 34:24
  35:7 37:5,
  13,21 38:7
  39:2,5 45:3
  46:19 52:7
  54:14,16,22
  55:2,21
  57:6,10,15,
  17 58:3,10,

16 60:13,22
62:23 66:5
67:12,17
68:2 70:10,
15 71:15
76:3 80:6,
15,22,24
81:4,10,23
82:12,21
83:14 86:8,
18 87:24
90:17 91:15
92:20 93:10,
16,21 94:5,
16 95:13
97:24
104:11,20
105:2,5
106:12,20
107:4 108:20
119:5,11,22
122:13,23
123:7 124:20
objections
  4:17 81:17
  108:11
obligatory
  114:25 115:8
obliged
  118:18
observations
  12:24
occasion
  98:19,25
occasionally
  15:6
occurred
  13:19 22:8
  39:19 103:4
October
  26:6
offer
  22:18 34:10,
  21 35:4,11
  36:15 37:3,
  10 38:5
  40:22 43:7,
  17,24 44:15,

19,22 45:6,
10,19 46:2,7
47:5,14
48:2,23,25
76:2,6,12
77:11 85:13
96:12 97:15
98:5,9 104:8
106:9,21
108:18 109:5
111:24
112:11,17,25
offered
  22:5 87:14
offering
  74:19
offers
  76:9,11
office
  13:25 14:7,
  9,16,23,25
official
  122:19
oftentimes
  120:24 121:3
okay
  6:8 15:24
  19:4,17
  20:12,17
  22:20 23:14
  24:6 33:6
  40:25 41:3,
  11 42:7
  49:20 68:16,
  22 71:4
  90:21 96:8
  97:12 99:20
  101:19 102:4
  106:8 113:5
  114:17
  116:16
  118:7,16
once
  23:12 30:16
  48:14 52:20
  61:15 63:16
  70:22 73:21
  77:24 102:15

Catherine Miolla
March 02, 2023

109:23
113:21
**one**
9:21 11:3
13:17 18:4
20:4,7,8,13
24:16 26:19
28:21 33:16
40:6 43:16,
19 45:22
49:18,22
52:11 53:10
65:5 68:5
88:21 93:7
98:24
100:15,21,23
101:16,20
102:20
104:5,17
117:4,18
124:7,9
125:6
**ones**
29:18,23
66:25
**online**
17:5
**opinion**
54:15,20
86:7,25
121:24
122:8,18
**opposed**
14:23 50:2
**orange**
28:17,22
29:2,18
30:6,15,21
33:15 34:6
**order**
105:3 110:20
**orientation**
57:13
**original**
86:13,15
90:10
**outside**
14:16 31:21

56:24 92:15
96:23 103:22
118:24

---

**P**

**p.m.**
4:2 41:14
62:14 63:24
69:8 78:21,
25 83:2,21,
25 84:9,21,
24 113:12
**Pacific**
10:9
**page**
28:11 31:16
33:16,23
34:6 49:14,
17 77:4
78:15,16,19
83:20 85:21
88:15,21
98:19,25
115:13
119:18,19
125:17
**pages**
28:12,15
30:6,21
**paraphrase**
27:24 30:25
**part**
20:2 29:5,
12,17 32:7,
24 36:14
37:2 38:4,10
44:12 103:11
105:7 119:8,
9
**participant**
20:15 67:25
70:5 76:10
103:5 120:16
**participants**
101:5

**participate**
26:24 115:15
120:14
**participated**
27:2 100:6
**participating**
4:7
**particular**
17:19 26:6
29:14 56:20
114:7 121:7
**parties**
4:16
**partner**
12:4,13 13:5
**parts**
116:23 117:4
**pass**
38:16 41:16
**passed**
42:24 46:13
**passes**
40:13,19
**past**
39:15
**patience**
52:13
**pattern**
32:10
**pause**
31:22 32:2,
6,9,15,20
**penalty**
4:14
**pending**
6:12 68:19
**people**
15:2 17:15
24:25 28:25
43:11 103:16
124:2,6
**period**
19:22
**perjury**
4:15
**person**
4:13 7:10

8:13 12:12
15:5,11,15
18:3,4,10,21
19:3 24:21
26:8 28:24
29:9 32:17
40:13 42:9
45:23 57:25
66:16 100:12
115:9 125:6
**person's**
28:5
**personally**
5:19 12:19
22:5 34:11,
22 35:5,12
39:14 98:3,6
114:14
123:13
124:13
**persons**
26:8 28:21
29:10 45:24
**perusing**
23:13 30:17
48:15 52:21
61:16 63:17
71:2 73:22
77:25 109:24
113:22
**pet**
69:16
**phase**
23:9 48:11
52:17 61:12
63:14 70:25
73:19 77:21
102:12
109:17
112:23
113:18
**phone**
13:9 17:5
19:2,25
20:4,8,9,10,
11,14,19
21:2,6 22:18
24:7,8,11

Catherine Miolla
March 02, 2023

25:7,16,23
26:9,13,25
27:4,9 29:5,
17 30:7
33:4,8 34:9,
20 35:3,10
38:14,21
39:3,18 40:6
41:22,23
42:17,21
43:19 47:19
64:2,15
65:4,19
66:3,15
78:24 79:8
85:2,4 94:4
100:24
101:23
102:25
103:12
116:9,14
117:8,10,14,
19
physically
4:9 14:2,12,
23
place
21:7 58:13
74:6
plaintiff
5:16
Plaintiff's
23:4,6 25:17
30:22 31:10
41:17 48:8
49:22 52:15
61:7,9 63:11
65:2,6 70:18
71:20 72:10
73:15 74:4
77:18 78:5
92:2 102:10
109:9,14,20
113:15
platform
7:13
play
98:4

played
44:14,18
please
4:19,21 5:8,
10 6:3,12,
16,20 7:10,
15 12:10
13:3 19:20
20:17 21:10,
24 23:11,21
30:13,15
32:18 36:22
40:12 43:5
46:25 48:13
52:11,19
53:17 61:14
63:15 70:21
71:7 73:20
77:23 81:9,
12,14,21
82:8 85:2
94:13 95:11,
19,23 96:18
99:6 101:22
102:4,14
105:15,24
107:24
108:25
109:22
110:12,24
113:20 116:7
123:18
point
7:15 13:16,
17 14:8
15:14 18:3
25:22 37:7
38:10,13
44:22 61:2
71:11 83:12
85:25 94:7,
17 96:10
119:16
points
9:12
policy
58:13
122:20,24

portion
39:3 40:14,
20 51:8 77:8
92:11 93:12
96:19
portions
92:11
posed
81:10
position
10:22,24
11:14,23
12:3 13:22
17:8,10,13,
16,19 18:6
20:22,24
23:24 25:25
26:20 39:23
44:23 47:18
48:3 62:6
114:5,12
122:10,22
123:2 124:2
positions
11:23
possession
59:2
possible
28:5 68:14
80:3
Possibly
66:22 76:22
posting
114:4
potential
16:12,18
42:19 58:14
85:20 90:8
94:3 105:22
potentially
56:22 57:4
67:21 70:3
93:15
power
38:24
practically
111:8

practice
74:19 75:3,
24
practiced
77:14
practices
77:11
practicing
74:23
pray
118:15,17,22
121:15
122:12
prayer
115:16,20,24
116:2,3,5,8,
10,17 117:5,
12 118:14,21
119:3,17
120:2,6,11,
15,18,24,25
121:9,21,23
124:11,24
125:14
prayers
116:12
117:21,22
118:2,4,7
119:21
precise
76:17
pregnant
50:21 51:3
53:8,14
preparation
9:4,7,10
present
4:9 22:13,24
67:2,25 70:5
president
72:16
previous
39:11 46:14
53:18 81:15
82:10 86:16
94:14 95:20
105:16,25

107:17 109:3
110:5 117:7
**previously**
7:23 23:3,6
45:14 48:7
64:25 70:18
90:25 96:23
**primarily**
14:2 92:14
**primary**
12:11
**prior**
24:17 53:22
54:3,8,12
120:20
**privilege**
81:24 82:21,
25 95:2
97:7,9
**privileged**
79:16 80:18
81:2
**probably**
16:9 19:7,12
21:22 25:5
35:19 36:10
41:6 47:12
**problem**
6:7 83:24
**process**
16:11,17
37:7 38:10,
14 40:3
45:15 46:13
**proficiency**
40:14
**profile**
111:23
112:9,16
**prohibited**
104:17
**prohibits**
104:24
**prompted**
92:24
**protocol**
46:17 58:13

**provide**
8:22
**provided**
45:16
**Public**
5:5
**purposes**
9:14

---

**Q**

---

**qualified**
53:24
**qualify**
51:19
**quarter**
111:21
**queer**
9:15
**question**
6:2,4,6,7,
12,21 16:23
18:17 27:14,
19 30:11,20
34:15,16
36:21 38:11
39:11 43:22
45:18 53:15,
18 55:6,16
56:7 57:22
61:4 66:8
68:18 79:15,
22 80:9,11,
23 81:7,8,
10,11,14,15
82:7,10,13
86:13,15,16
87:14 88:10
90:10,20
91:10,23
92:3,4 93:2,
3,22 94:9,
11,13,14
95:15,20
97:12 99:21
100:13
105:11,15,

16,20,21,24,
25 107:12,
16,17,23,25
108:3,5
109:3 111:6,
18
**questioning**
9:16
**questions**
5:23 7:3
8:12,19 15:4
20:22,23
21:18 23:23,
25 24:18
26:18 28:17,
22,25 29:5,
8,11,17,23
30:5,9,14
33:15 34:3
38:20 56:4,
6,9,12,20
57:3 78:23
79:8 91:21
**quick**
40:24
**quickly**
86:11
**quite**
80:3

---

**R**

---

**Ratigan**
4:4 39:8
53:16 81:13
86:15 94:12
95:18
105:14,23
107:15,25
109:2
**reach**
87:9
**reached**
46:6
**reaching**
13:8

**read**
33:2,6,10,19
34:3 39:9,12
51:9 53:17,
19 54:25
55:6,18
56:23 58:6
77:8 81:16
82:8,11 84:7
86:14,17,25
94:13,15
95:19,21
104:5 105:7,
15,17,24
106:2
107:10,16,
18,24 108:25
109:4
**reader**
32:8
**reading**
32:5 54:20
55:7 56:11
88:4
**reads**
24:17 31:17,
21 58:6
78:22 92:14
110:16
111:23
112:16
**ready**
42:3
**reason**
8:21 39:17
64:9,21
83:18 87:3
88:11 96:12,
16 97:4,15
104:8
**reasons**
96:12
**recall**
12:3,6 13:19
16:6 17:10
21:6 22:8,
14,15,16
25:6,16 26:2

29:9,22
35:17 41:21
42:4 43:2
44:14,18
45:24 47:17
50:19,25
51:11,17,23
52:4 59:5,7
62:25 65:11,
14,15,22
71:18 72:4,6
73:5 75:6,13
91:2,20
100:24
103:4,7

**receive**
10:10 53:3
72:2 75:14

**received**
10:11 50:25
58:25 66:10
71:22 75:11

**receiving**
50:19 51:11,
17,23 52:4
58:18 71:18
75:6 91:17

**recent**
78:16

**recess**
41:12 69:6
113:10

**recognize**
23:15 48:17
52:23 61:18
63:19 73:24
78:3 102:21
110:7 113:24

**recognized**
55:4

**recollection**
14:6 17:14,
20 21:21
25:9 29:16
30:19 33:20
43:5,11,13
47:14 55:19
57:23 59:3

60:11 62:5
67:20 70:9
71:21,25
75:10,18
77:13 88:25
89:9,15,20,
24 90:13
91:6 92:7
93:6 103:9
111:6,14

**recommended**
43:17,23

**record**
4:20 5:8,10
6:22 7:20
9:20 31:12,
13 50:8,9
69:9,21,22
102:17,18
109:10,12
110:3 113:8,
9

**recording**
102:19
103:15,20
106:9

**recordings**
9:6

**records**
111:4

**recruiter**
11:25 15:21
16:20,23,25
17:8,15,19
18:5 50:4

**recruiters**
32:5

**recruiting**
11:18,20,21
12:2 114:15

**red**
29:24

**refer**
15:7

**referenced**
88:17

**references**
40:18,20

**referencing**
104:17

**referred**
35:24

**referring**
15:8 25:14
74:14,22
91:24 104:4

**refresh**
71:21 75:10,
18 77:12
88:25 89:9,
14,19,24
90:12 92:7
93:6 103:9

**refreshes**
91:6

**regarding**
61:23 66:14
67:11 86:22
89:15

**register**
9:19

**regular**
115:16
116:23 117:3
120:15,24

**regularly**
49:21

**rejecting**
75:23

**relate**
111:15

**related**
17:2 19:21
56:17 90:3,
5,14 106:17
122:24

**relates**
93:14,17
121:9 122:20

**relating**
73:7,9
74:15,23

**relevance**
55:11

**religion**
123:4,9

**remaining**
79:20

**remember**
15:23 18:12
19:10,19
20:18,21
21:4,8,11,
22,25 24:23,
25 25:3
26:11 28:2
32:19 42:8,
10,12 43:6,9
44:8,11 46:4
47:2,3,9,16,
19,23 50:22,
23 51:4,15,
21,22 52:2,9
54:24 55:23,
24 59:4,11,
16,24 60:3,
6,8,15,19
61:5 62:20
63:6,8
65:16,18,21,
24 66:17,19
67:2,4,9,13,
15,18 68:4,
6,8,15 70:7,
11,13 71:9
72:3,5,8
73:3,10,11,
13 74:16,25
75:5,7,21
77:16 79:10
81:11,18
85:3,5 88:19
91:17 92:8
95:24 96:4,
10 97:10
99:7,8,22
100:12
101:12,15,
23,25 102:6,
7 103:11,12

Catherine Miolla
March 02, 2023

125:5,12,13

**remotely**
4:11,14
14:24

**repeat**
51:6 81:12,
14 82:20
95:15 99:21
108:10

**rephase**
98:21

**rephrase**
6:4 36:22
39:7,9 45:8
82:13

**reporter**
4:3,5 5:7
6:18 7:24
39:12 51:9
53:19 81:16
82:11 86:17
94:15 95:21
105:17 106:2
107:18 109:4

**reporter's**
6:23

**reporting**
4:10,18

**represent**
5:16 23:8
39:19 48:10
52:16 61:11
63:13 70:24
73:15 77:19
113:16

**representative**
17:13 21:15
23:24 25:25
40:4,5
44:12,24
48:4 49:2
114:5,12
117:11,23
118:18
119:20
120:6,18
121:12

122:22 123:3

**representatives**
115:20,23
116:17 118:9
119:3 123:25
125:10,14

**requested**
51:8 65:23

**requests**
118:14

**require**
115:19 117:4

**required**
115:10
116:10,16,24
117:11,16,
18,21,23
118:3,8,13,
17,23 119:2,
7,14,17,20
120:7,9
121:25
123:4,8
124:22,24
125:2,13

**requirement**
116:21 120:5
121:5 124:17

**requirements**
39:16
114:11,22
116:8 119:25
120:2 122:5,
21

**requisition**
111:11

**rescind**
98:4,9

**rescinded**
76:2,6 96:13
97:16 104:9
106:10,21
108:19 109:6
113:2

**rescinding**
85:13

**rescission**
96:21

**resolve**
85:12

**resources**
11:7 12:4,13
13:5 72:16

**respect**
5:17 11:11
16:11,17
59:10 90:14
93:19 116:2
123:10

**respective**
30:10

**respectively**
28:16

**respond**
55:5

**response**
27:11 30:25
34:5 47:13,
15 59:19
60:24 83:9,
23 84:14

**responses**
27:15,19
30:9,20 31:3
64:3 85:11
94:3

**responsibilities**
12:12,15,19,
24 38:18
114:11
121:25
122:21

**responsibility**
38:19

**responsible**
44:9

**return**
113:6

**returned**
50:12

**review**
9:3 17:3
23:11 30:13
48:13 52:19
53:6 61:14
63:15,18
70:21 73:20
77:23 91:5
109:22
112:10,24
113:20

**reviewed**
23:14 35:19,
23 52:22
71:3 73:23
75:13 92:6
109:25

**reviewing**
12:15 13:8
30:18 35:21
48:16 53:21
54:2,7,11
61:17 74:11
75:17 77:12
78:2 88:23
89:7,14,19,
23 90:12
91:12 93:5
113:21,23

**right**
12:5 40:23
41:5,9 69:5
94:21 112:16
120:10 122:7

**righty**
68:24

**Ringcentral**
71:14,22
72:2,25 73:5

**role**
10:24 11:2
16:10,16,20
17:3 43:6
44:15,19
96:2 98:3
105:7,12
115:6,9
116:4,12,23

119:8,9,25
120:9 121:7
123:9
**room**
4:9 7:5,8
**roughly**
19:9 26:6
**routine**
8:13
**rules**
5:15
**run**
72:10,25
73:4,12

---

**S**

---

**sake**
110:6
**same-sex**
35:6 36:14
37:2 56:14
67:22 90:2,
7,15 91:13
92:19
104:10,19,25
106:18
**saying**
43:25 57:9
59:11 70:13
91:10
**says**
37:23 121:19
**scenario**
42:12
**scheduled**
78:24
**scheduling**
13:10
**Scott**
4:23
**screen**
7:12,17 17:5
20:11 22:18
24:7 33:4,8
38:21 39:3
41:24 42:17,

21 43:20
64:15 65:4,
19 66:3
**screener**
32:8
**screening**
20:8 24:8,12
25:7,17,23,
24 26:9,13,
25 27:4,9
29:5,17 30:7
34:9,20
35:3,10
36:15 37:3
38:4,15
39:18 40:6
41:17,22
94:4
**script**
23:22 24:7
25:6 26:3
29:13 74:11,
15 75:20,24
**season**
25:8
**Seattle**
14:3
**second**
20:2 21:11
22:12 28:11
31:20 33:7,
11 77:3
78:15,19
88:21 93:4
115:14
**seconds**
60:12 102:16
**section**
20:25 24:14
25:13 26:14,
16 27:6,9,
14,20 28:10
32:21 64:3,4
78:19 103:11
114:18,19,20
120:13
121:14

**sections**
30:10 33:19
**see**
24:19 26:22
27:12 28:13,
19 31:24
32:7 64:5,16
65:10 66:3
74:12,20
83:5 91:6
110:17
111:20,25
112:4,18
114:22
115:17
121:16
**seeking**
5:24 82:3
92:12 108:7
**send**
49:21 62:15
65:12,19
79:3,6 83:7,
13,16 84:4,
7,12 85:16
**sending**
47:5
**senior**
13:18 21:17
72:15
**sense**
86:6
**sensitive**
121:14
**sentence**
33:2 49:4
81:22 93:4
115:14
**separate**
65:4
**series**
5:22
**served**
47:25
**service**
17:12 18:5
23:24 25:25

40:4,5 44:24
48:3 49:2
114:5,12
115:20,23
116:17
117:11,22
118:8,18
119:2,20
120:5,18
121:11
122:22
123:3,25
124:7,9
125:10,14
**services**
115:16
120:15
123:11
124:3,6,12,
18
**sets**
20:21
**seven-minute**
69:11
**several**
56:4 85:9
**sexual**
31:21 56:24
57:12 92:15
96:23 103:22
**Shaking**
6:16
**shape**
76:10
**share**
23:2 102:9
**shared**
67:19 119:24
122:15
**sharing**
23:5 108:12
**she'll**
51:19
**shift**
15:3
**shorter**
47:10

Catherine Miolla
March 02, 2023

show
  48:7 52:14
  61:6,8 63:9
  70:17 73:14
  77:17 109:8,
  13 113:14
showed
  64:25 65:6
  75:7 91:25
showing
  75:9
shown
  75:22 78:4
shows
  110:13,14
sic
  13:17 29:24
signature
  12:7
signed
  50:12
sister
  83:10 87:20
sit
  50:24 82:2
  104:23
site
  15:21
sitting
  7:6,9
skills
  20:23 21:19
  26:17
slightly
  45:17
sole
  18:3
solely
  38:25
somebody's
  38:25
Sort
  71:19 73:25
  102:23
sought
  80:2 92:17

sound
  36:8
sounds
  12:5 19:9
  83:11 84:16
source
  15:23
speak
  9:9 26:12
  27:3 46:16
  69:13 85:18
  86:3,22
  87:11 99:3
  120:2
speaker
  123:23
speaking
  27:21 87:4
  103:16
specialist
  12:2 13:18
specific
  27:18 30:3
  51:16 60:15
  118:12
specifically
  16:10,16
  29:3 46:4
  91:20 92:11
  120:10 125:5
specifics
  47:3 52:9
  67:13,14
  103:12
  116:11
speculation
  36:19 87:6
  107:5 108:21
speech
  32:10
speed
  39:24
spoke
  20:6,13 29:6
  33:3,7,24
  36:7 46:24
  59:14 100:20

stage
  39:16
standard
  20:22 46:12
  104:3,16
standards
  20:25 31:19
  37:8,16,24
  38:12 56:17,
  19,23 57:21,
  24 58:5 64:2
  89:5,16,25
  90:3,6,14
  91:18 92:10,
  12,23 93:13,
  18,23 96:15,
  19 97:18
  103:21
  104:14
  105:8,19
  106:16,23
  107:2,3,8,
  10,20
  108:14,17
  109:7
stands
  9:14
start
  10:18,20
  99:21 100:3
started
  26:5 49:13
  101:25
state
  5:5,8 19:14
  53:10
stated
  85:8 108:16
  119:15
statement
  56:22 120:8
states
  49:5,8 72:10
  103:20 112:3
  114:19
  115:14
  119:17,19
  120:4,13

  121:14
stating
  4:19 120:22
step
  37:18 39:20,
  23 40:9,16,
  17,21,22
  46:13,14
  111:3 112:9
steps
  17:5 38:21
  46:14 110:14
Steve
  95:24 96:9
straightforwa
rd
  108:2
strongly
  118:21
subject
  72:9 73:2
subsequent
  28:12 40:10
sufficient
  9:22
suggested
  36:3,6
  116:20
suggesting
  27:10
supervisor
  58:15 62:9
  72:18,20
  125:9
supervisor's
  72:20
supervisors
  58:9
Support
  4:5
suppose
  118:6
supposed
  32:5
sure
  16:15 18:18
  34:19 35:16

36:23 57:11
58:12 70:16
76:19,24
77:2 84:8
89:3,13
90:11 94:9
95:17 98:11,
22 100:2
104:22
105:20
107:12,22
115:25
116:19
117:17,20
118:12 119:7
121:4,6,13
**surrounding**
5:23 56:21
**sworn**
5:4 7:23
**system**
16:4,6 41:20
110:15
111:3,4
**Szymanski**
4:24

------

**T**

------

**tad**
51:7
**take**
6:10,12 8:5
32:6 40:24
56:7 68:18,
20 77:11
113:5
**taken**
41:12 69:6
113:10
**Talbot**
44:18 66:14
67:7,23 70:2
71:13 72:14,
15,17,22
73:6 74:6,
10,18 75:4,

19 77:5,15
98:15
**talent**
12:2,4,13
13:4,18 62:6
**talk**
57:19 59:20
79:7 83:11
92:23
**talked**
19:24 20:4,
10 22:4
35:24 58:20
99:11 102:2
**talking**
13:9 99:10
116:6 120:10
**tasks**
13:11 38:17
115:6
**teach**
123:4,9
**team**
10:25 11:6,
11,13,18,20,
21 12:2 30:4
41:25 43:20
44:7 59:21
79:11 96:7
98:12 106:22
116:14 117:8
125:3
**telephone**
18:10,21
20:7 22:23
36:8,15 37:2
38:4 41:16
47:7 62:16,
22 65:23
84:21 86:3
98:20 99:2,
3,7 100:4,5,
11,21,22
101:8 103:10
**tell**
6:3,5 8:9,19
24:3 32:18
42:7 43:5

65:17 67:2
82:19 85:3
86:20 95:11
96:2 99:6
101:22 102:4
110:12 114:3
119:18
**telling**
47:13 95:10
**ten**
18:16 19:6,
12,13 60:7
66:21 101:9,
20
**ten-minute**
113:6
**Teri**
82:9 113:8
**terms**
60:16
**test**
39:24
**testified**
5:6 45:16
79:25 90:25
**testify**
68:9
**testifying**
7:20
**testimony**
8:22,25 51:9
54:3,8,12
67:9 120:4,
12,20 125:18
**text**
7:21 28:17
30:10,15
33:6,10
**thank**
9:23 41:9
51:10 52:13
69:4,5 77:9
78:22 80:16
81:5 83:6
84:2,11
**thanks**
79:2 84:16

**theme**
60:25
**thereof**
97:21
**Theresa**
4:4
**thing**
42:23 58:19
**things**
24:17 91:7,8
114:21 115:9
120:9 121:21
**think**
8:21 11:9,
15,22,25
19:15 20:4
21:8 22:4,6,
18 25:13
30:4 35:23
36:11 42:6
43:12,15,22
45:22 50:14
55:4,6,20
56:11,20
57:3 60:10,
23 63:4
65:3,10
66:7,24 69:3
71:9,17 74:3
75:16 76:5
79:10 85:5
87:8 88:9,13
89:18,22
90:19 92:14
94:10 95:16
99:10 101:9,
18,20 105:11
108:4,23
111:2,16
115:5 116:11
117:13
118:20,21
119:8 120:22
121:20
122:14
**thinking**
55:23

Catherine Miolla
March 02, 2023

third
 21:25 22:2,
 4,7 28:15
 31:16
Thomas
 42:16
Thompson
 95:25 96:3
thoughts
 55:25
three
 19:16,18,21
 20:21 25:4
 33:14,15,19
 43:11,14
 47:10 59:25
 60:4 66:18
time
 4:2 13:7
 14:25 17:17,
 21 19:3,22,
 24 20:3,10
 22:4 23:23
 25:15 32:6
 34:10,21
 35:4,11
 40:17 41:14
 42:18 43:21
 51:19,21
 53:24 56:8,
 23 57:21
 59:14 65:15
 66:10 69:8
 76:6 78:23
 84:2,11
 85:20 87:23
 89:21 100:25
 111:2 113:12
 114:15,16
 122:11,12,17
times
 19:16 20:5,
 7,13 67:20
 70:2 81:4
 85:10 87:9
title
 12:7,12
 13:15

titled
 24:15 26:17
today
 5:25 6:19,23
 8:15,22,25
 12:25 14:9,
 13 50:24
 67:9 68:9
 82:2 84:9
 104:23
 120:12
today's
 9:4,7,10
told
 8:24 34:7
 97:3 125:5
tomorrow
 78:23
top
 77:3 78:16
 88:15 98:18,
 25 110:16
 115:13
topics
 24:22 25:2
 26:9,13,25
 27:5,6
touch
 85:10
tracking
 16:4,6 41:20
 110:15
trainee
 17:13 18:5
 23:24 25:25
 40:5 48:4
 49:3 114:5
training
 49:12 115:22
 121:8
transgender
 9:15
transpired
 41:13 69:7
 113:11
trial
 8:6

true
 24:12
truth
 8:9,10,19
truthful
 8:22,24
try
 25:21 28:3
 76:16 84:10,
 23
trying
 86:11 87:9
Tuesday
 85:9
turn
 28:9
turning
 112:15
two
 11:15 20:5,
 7,13 21:17
 26:13 27:4
 28:12 84:20
 87:3 101:13
 103:16
 108:10
 114:20
typed
 27:21,23
 31:7,8
typical
 13:4,7
typing
 6:19 39:24
 40:14

---

U

U.S.
 4:4 124:10
uh-huh
 6:17
ultimate
 38:22 45:5,
 9,19,23,25
unacceptable
 31:19

underneath
 27:14 28:18
understand
 5:20 6:2,3,
 14,24 8:4,8,
 19 9:17
 15:9,12
 34:16 80:11,
 20 82:14
 88:3,6 90:19
 123:17
understanding
 6:7 17:25
 46:15 82:15
 96:17 108:4
 118:16
 120:17 125:6
understands
 61:4 80:8
understood
 32:25 120:16
University
 10:9
upload
 41:19
uploaded
 41:23
urgency
 86:6
urgent
 85:18,22
 86:2,5,22
 87:4,11
utilize
 31:4 118:3
utilized
 24:8 25:24
 75:25 117:23

---

V

variation
 60:25
variety
 121:20
vary
 123:20

Catherine Miolla
March 02, 2023

**verbal**
48:2
**verbalize**
6:16
**verbally**
46:7
**verbatim**
27:24 28:6
30:24 31:2
33:20 34:7
**verified**
5:2
**version**
50:5
**vice**
72:15
**video**
7:3,13 17:6
18:10,21
19:2 20:3
21:13,14,20
22:13,14
66:15 100:8
**viewable**
7:12
**violate**
107:8
**violation**
106:16 107:2
**virtually**
123:21
**virtue**
44:2
**Vision**
5:18,24
10:4,19,20,
23 11:5,17,
24 12:20
13:5 14:23
15:16,21
16:2,12,18
17:16,20
24:4,5 26:20
36:16 37:4,
11 38:6
39:22 42:19
43:8 45:7,

11,20 46:3,
8,17 47:22
48:4,24
56:25 57:14
58:2 62:7
76:8 92:15
96:24 98:10
104:9,18,24
105:4
106:10,16,19
107:2,9
108:7,9,19
114:8,13
121:25
124:8,10,17
125:11
**Vision's**
97:18 108:17
122:10,19
**Vista**
5:11
**voice**
36:8,9

---

## W

**wait**
6:20
**waive**
4:17
**walk**
13:3
**want**
6:10 26:20
45:13 62:21
63:2 68:17
92:25 94:21
97:2 121:23
**wanted**
56:15 66:3
83:4 84:8
90:23 92:22
93:8,12 94:2
**wanting**
92:8
**Ward**
4:23 9:19

25:10 29:20,
25 32:12,22
33:25 34:14,
24 35:7
36:4,18
37:5,13,21
38:7 39:2,4
41:11 44:3
45:3 46:19
52:7 54:14,
16,22 55:2,
10,21 57:6,
10,15,17
58:3,10,16
60:13,22
62:23 66:5
67:12,17
68:2,11,17
69:2,3 70:6,
10,15 71:15
76:3 79:14,
24 80:10,12,
17,25 81:5,
6,17,23
82:5,12,20
83:14 86:8,
18 87:5,24
90:17 91:15
92:20 93:10,
16,21 94:5,
16,25 95:13
97:6,24
99:16 100:10
104:11,20
105:2,5
106:3,6,12,
20 107:4
108:10,20
115:3 117:24
118:10
119:5,11,22
120:19
122:3,13,23
123:7 124:20
**Washington**
14:3,4
**way**
14:3 25:21

38:17 59:3
76:10 111:21
112:7,21
**ways**
123:18
**Web**
15:21
**week**
13:4,7,12
123:20
**weekly**
16:8 115:15
120:14
123:10,11
124:3,5,7,12
**went**
69:16
**Whatsapp**
7:21
**wife**
51:25 52:3
54:9,19
55:17 93:3
**Williams**
21:15 22:13
**withdrawn**
16:23 97:13
100:13 111:6
**witness**
5:2,3 41:4
61:2,3 68:23
79:17,24
95:5 99:17
106:5
**Wolnowski**
4:22 5:13,16
31:12,14
39:8 40:23
41:5,15
50:8,10
51:10 53:16
61:3 68:21,
24 69:5,9,
10,20,23
79:22 80:8,
14,21 81:3,
6,13 82:8

Catherine Miolla
March 02, 2023

86:14 94:12
95:18 99:20
102:17
105:14,23
107:15,24
108:25
109:10 110:2
113:5,13
**woman**
31:23 35:13
36:3,10 57:2
92:16 96:25
103:24
106:25 107:8
108:7,16
**word**
28:3 31:10,
11 32:2,20
52:3 86:4
120:7,15
**words**
6:5 33:18
77:9 87:19
99:2 115:9
**work**
13:4,13
14:7,9,12,
14,16,22
15:19 17:24
26:20 43:7
45:7,11,20
46:3 48:23
57:14 69:2
79:2 98:10
**worked**
11:6,11 14:2
124:8
**working**
10:18 12:17,
20 14:24
47:22 57:25
106:19
**works**
69:3 83:25
84:9
**World**
5:17,24
10:4,19,20,

23 11:5,16,
24 12:20
13:5 14:23
15:16,20,25
16:12,18
17:16,20
24:4,5 26:20
36:16 37:4,
11 38:5
39:21 42:19
43:8 45:7,
11,20 46:3,
8,17 47:22
48:4,24
56:24 57:14,
25 62:6 76:8
92:15 96:24
97:17 98:10
104:9,18,24
105:4
106:10,16,19
107:2,9
108:7,8,17,
19 114:8,13
121:25
122:10,19
124:8,9,17
125:10
**worship**
123:23
**write**
27:24 28:3
30:24 31:2
64:7
**writes**
77:7
**writing**
27:10
**written**
32:3 33:23
34:4,6 39:24
42:24 47:5
48:2,22,25
87:4,21
105:19
**wrote**
27:18 63:25
83:3,9,24

84:15 86:4
**WV**
23:8 28:16
30:6 31:22
33:17 48:10
49:18 52:16
61:10 63:12
70:20 73:17
77:4,20
78:20 85:21
88:16,22
98:19,25
109:15
113:17
**WV-000065**
109:19

---

**Y**

---

**yeah**
78:17 103:21
**year**
10:12 11:3,9
13:21 14:15,
20 22:16
25:8,9 51:14
**years**
11:15,22
**York**
5:5

---

**Z**

---

**zero**
68:10,14
**Zoom**
100:9