# EXHIBIT 12

Christine Talbot
March 08, 2023

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
--------------------------------------------------x

AUBRY MCMAHON,

                    Plaintiff,      Case No.:  2:21-cv-00920

          -against-

WORLD VISION, INC.,

                    Defendant.

--------------------------------------------------x

                    VIDEO CONFERENCE
                    DEPOSITION

                    March 8, 2023
                    1:00 p.m.



                    EXAMINATION BEFORE TRIAL of

CHRISTINE TALBOT, a nonparty witness on behalf

of the Defendant herein, taken by the attorney(s)

for the Plaintiff, pursuant to Notice, held at

the above-mentioned time and place, before

THERESA RATIGAN, a shorthand reporter and Notary

Public within and for the State of New York.

Christine Talbot
March 08, 2023

---

**Page 2**

```
1
2      A P P E A R A N C E S :
3
4      NISAR LAW GROUP, PC
           Attorneys for Plaintiff
5          60 East 42nd Street, Suite 4600
           New York, New York 10165
6
       BY: CASEY WOLNOWSKI, ESQ.
7          cwolnowski@nisarlaw.com
8
9      GAMMON & GRANGE, PC
           Attorneys for Defendant
10         1945 Old Gallows Road, Suite 650
           Tysons, Virginia 22182
11
       BY: SCOTT J. WARD, ESQ.
12         sjw@gg-law.com
           J. MATTHEW SZYMANSKI, ESQ.
13         jms@gg-law.com
14
15
16     A L S O   P R E S E N T :
17     STEVE McFARLAND, Chief Legal Officer for
           World Vision Incorporated
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
1            S T I P U L A T I O N S
2         IT IS HEREBY STIPULATED AND AGREED
3      by and between the parties hereto, through their
4      respective counsel, that the certification, sealing,
5      and filing of the within examination will be, and the
6      same are hereby waived;
7
8         IT IS FURTHER STIPULATED AND AGREED that
9      all objections, except as to the form of the
10     question, will be reserved to the time of the trial;
11
12        IT IS FURTHER STIPULATED AND AGREED that
13     the within examination may be signed before any
14     Notary Public with the same force and effect as if
15     signed and sworn to before this Court.
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
1                    C. Talbot
2              (Time noted:  1:02 p.m.)
3              THE REPORTER:  Good afternoon.  My name
4      is Theresa Ratigan.  I'm with U.S. Legal
5      Support, and I am the court reporter this
6      afternoon.
7              The attorneys participating in this
8      deposition acknowledge that I am not
9      physically present in the deposition room and
10     that I will be reporting this deposition
11     remotely.
12             They further acknowledge that, in lieu of
13     an oath administered in person, I will
14     administer the oath remotely under penalty of
15     perjury.
16             The parties and their counsel consent to
17     this arrangement and waive any objections to
18     this manner of reporting.
19             Please indicate your agreement by stating
20     your name and your agreement on the record;
21     counsels only, please.
22             MR. WOLNOWSKI:  Casey Wolnowski, I agree.
23             MR. WARD:  And Scott Ward, counsel for
24     World Vision; I agree.
25             (Identification of witness verified)
```

---

**Page 5**

```
1                    C. Talbot
2      C H R I S T I N E   T A L B O T, a nonparty witness
3      herein, after having first been duly sworn by a
4      Notary Public of the State of New York, upon being
5      examined, testified as follows:
6      BY THE REPORTER:
7         Q     Please state your name for the record.
8         A     Christine Ann Talbot.
9         Q     And your address, ma'am, for the record?
10        A     7050 East Sunrise Drive, Unit 9106,
11     Tucson, Arizona 85750.
12     EXAMINATION BY MR. WOLNOWSKI:
13        Q     Good morning, Ms. Talbot.  Let me go over
14     some of the general ground rules.  My name is Casey
15     Wolnowski.  I represent the plaintiff, Aubry McMahon,
16     with respect to her lawsuit against World Vision
17     Incorporated.
18             You are not personally a defendant in
19     this lawsuit; do you understand?
20        A     Yes.
21        Q     I'm going to ask you a series of
22     questions concerning the circumstances surrounding
23     Ms. McMahon seeking employment with World Vision.  My
24     goal today is not to confuse you.  If you do not
25     understand a question that I ask you, please tell me
```

Christine Talbot
March 08, 2023

Page 6

C. Talbot
1
2    that you don't understand or ask me to rephrase the
3    question and I will do my best to do that; in other
4    words, unless you tell me, I'll assume that by you
5    answering the question, you had no problem
6    understanding the question.
7            Is that okay?
8        A    Yes.
9            MR. WOLNOWSKI:  Let's go off the record
10    for one moment.
11           (Discussion held off the record)
12       Q    If you want to take a break, we can do
13    that; however, all that I can ask is that if there is
14    a pending question, please answer it before we take a
15    break.
16           Do you understand?
17       A    I do.
18       Q    Please verbalize your answers.  Shaking
19    of the head or answers such as "uh-huh" may not
20    necessarily be clear for the court reporter who is
21    typing down your answers.  Also, please wait until I
22    finish my question before you answer it.  Not only
23    will that make for the creation of a cleaner record,
24    it will also make the court reporter's life easier
25    today.

Page 7

C. Talbot
1
2            Is that okay?
3        A    Uh-huh, yes.
4        Q    Given that we are conducting this
5    deposition via video, there are a few questions I
6    would like to ask.
7            Is there anyone else in the room where
8    you are currently sitting?
9        A    There is not.
10       Q    If anybody enters the room where you are
11    sitting during the deposition, I kindly ask that you
12    identify that person for me.
13           Do you have any papers or documents in
14    front of you or anything viewable on your computer
15    screen aside from this video platform?
16       A    There are no papers or documents on my
17    desk here available to me.
18       Q    Is there anything on your computer screen
19    aside from this video platform?
20       A    No.
21       Q    I also kindly ask you not to communicate
22    with your attorney or any other individual when
23    testifying on the record.  This includes
24    communication via text, e-mail, instant messaging,
25    GChat, WhatsApp, or any other electronic chat

Page 8

C. Talbot
1
2    function; is that okay?
3        A    That's fine.  Yes, that's okay.
4        Q    You were previously sworn in by the court
5    reporter; thus, are you aware that you are under
6    oath?
7        A    Yes.
8        Q    Do you understand that the oath you just
9    took is the same oath you would take if this were a
10    trial before a judge?
11       A    Yes.
12       Q    Do you understand that with the oath you
13    just took, you agreed to tell the truth, the whole
14    truth, and nothing but the truth?
15       A    Yes.
16       Q    The questions I'm about to ask you are
17    routine that I ask every person I am deposing.
18           Are you under the influence of drugs or
19    alcohol today?
20       A    I am not.
21       Q    Are you under the influence of any
22    medication which may impair your ability to
23    understand my questions or to tell the truth?
24       A    I am not.
25       Q    Can you think of any reason why you

Page 9

C. Talbot
1
2    cannot provide truthful testimony today?
3        A    No.
4        Q    Has anybody told you not to give truthful
5    testimony here today?
6        A    No.
7        Q    Did you review any documents in
8    preparation for today's deposition?
9        A    Yes.
10       Q    Which documents did you review, ma'am?
11       A    The donor contact services job posting,
12    and the World Vision U.S. business ethics and
13    standards of conduct policy.
14       Q    Anything else?
15       A    No.
16       Q    Did you listen to any audio recordings in
17    preparation for today's deposition?
18       A    No.
19       Q    Did you speak with anyone aside from your
20    attorney in preparation for today's deposition?
21       A    No.
22       Q    I may use the acronym LGBTQ at points
23    throughout this deposition.  I will advise that for
24    the purposes of this deposition today, LGBTQ stands
25    for lesbian, gay, bisexual, transgender, queer or

Christine Talbot
March 08, 2023

Page 10

C. Talbot
1
2    questioning.
3            Do you understand?
4        A    I do.
5        Q    Ms. Talbot, have you ever been deposed
6    before?
7        A    No.
8        Q    For whom are you currently employed?
9        A    I'm not currently employed.
10       Q    If you can recall, when was the last date
11   that you were employed by World Vision in any
12   capacity?
13       A    February 3rd.
14       Q    Of which year, ma'am?
15       A    Of 2023.
16       Q    Do you have a bachelor's degree?
17       A    I do.
18       Q    From where?
19       A    Wheaton College, Wheaton, Illinois.
20       Q    When did you receive it?
21       A    In 1985.
22       Q    Do you have any advanced degrees beyond a
23   bachelor's degree?
24       A    No completed degree.
25       Q    Have you taken any educational courses in

Page 11

C. Talbot
1
2    furtherance of an advanced degree beyond a
3    bachelor's?
4        A    Yes.
5        Q    Can you explain those to me?
6        A    Multiple courses at Illinois Benedictine
7    University in human resources and organizational
8    behavior.
9        Q    Is there any particular reason why you
10   haven't completed it?
11       A    Got married, bought a house, travelled
12   for a living.
13       Q    Ms. Talbot, when did you first start
14   working for World Vision?
15       A    April 2015.
16       Q    What was your position when you first
17   started working for World Vision?
18       A    Senior vice president, human resources.
19       Q    Have you held any other position aside
20   from that position with World Vision?
21       A    No.
22       Q    So is it correct to say that the role
23   that you have -- excuse me, the role that you had of
24   senior vice president with HR in April of 2015 is the
25   same position that you held in February of 2023 until

Page 12

C. Talbot
1
2    your employment ceased?
3        A    Yes.
4        Q    Have you held any other position with
5    World Vision aside from that position?
6        A    No.
7        Q    Please explain to me what were the
8    primary duties and responsibilities of a person
9    holding the title of senior vice president of human
10   resources with World Vision in January of 2021.
11       A    My primary responsibilities were to lead
12   the human resource function.
13       Q    And if you could, please explain to what
14   leading the human resource function entailed in
15   January of 2021.
16       A    Overseeing the recruitment of talent for
17   the organization.  Overseeing training, employee
18   engagement, employee benefits, compensation
19   administration, administering the personal policies
20   of the organization.
21       Q    From your knowledge, experience, and
22   recollection, did those duties and responsibilities
23   change materially at all between January of 2021 and
24   February of 2023?
25       A    No.

Page 13

C. Talbot
1
2        Q    If you could, Ms. Talbot, please walk me
3    through a typical week of work for you as a senior
4    vice president for human resources with World Vision
5    around January of 2021.
6        A    I would describe a typical week as
7    multiple one-on-one meetings with my direct reports,
8    meetings with other senior leaders; regular meetings
9    with them.  Lots of time on -- on Zoom.  Lots of time
10   on Zoom.  Preparation of documents, PowerPoints,
11   et cetera, in preparation for upcoming meetings.
12       Q    Anything else?
13       A    A typical week could have included a
14   meeting with the CEO, the global head of HR,
15   committees within the organization that meet on a
16   periodic basis.  Could include a meeting with my
17   extended team.
18       Q    Thank you.
19            In January of 2021, where was the office
20   physically located for which you primarily worked?
21       A    Federal Way, Washington.
22       Q    From your recollection, in the month of
23   January of 2021, how frequently did you work
24   physically in the Federal Way World Vision office as
25   opposed to working remotely?

Christine Talbot
March 08, 2023

Page 14

C. Talbot
1
2      A    I don't have a clear recollection of
3  where we were in January of 2021 in the pandemic, so
4  I -- I probably was working full time from home.
5      Q    In January of 2021, Ms. Talbot, where did
6  you live?
7      A    Federal Way, Washington.
8      Q    At what point did you move from Federal
9  Way, Washington after January of 2021?
10      A    I haven't formally moved from Federal
11  Way, Washington.  My primary residence is Federal
12  Way, Washington.
13      Q    And if I might ask, why are you in
14  Arizona right now, as of the date of this deposition?
15      A    I own a second home here and I snowbird
16  in the winter.
17      Q    Understood.
18           If you can, please explain to me the
19  circumstances of your departure of employment with
20  World Vision.
21      A    I retired.
22      Q    I'd like to ask you some questions about
23  a person named Aubry McMahon who also occasionally
24  goes by the name Aubry Atwood.
25           Going forward, if I refer to Aubry

Page 15

C. Talbot
1
2  McMahon, I'm also referring to Aubry Atwood; do you
3  understand?
4      A    Yes.
5      Q    At some point, did you come to learn that
6  a person named Aubry McMahon or Aubry Atwood had
7  applied for employment with World Vision
8  Incorporated?
9      A    Yes.
10      Q    How did you first learn about this?
11      A    What -- could you clarify what "this" --
12  what are you referring to, "this"?
13      Q    Let me rephrase the question.
14           How did you first learn that a person
15  named Aubry McMahon or Aubry Atwood had applied for
16  employment with World Vision Incorporated?
17      A    I would have learned about her
18  application after an offer was extended.
19      Q    I think my question is more akin to how
20  did you learn about it in terms of did somebody tell
21  you, did you receive an e-mail, someone send you a
22  letter in the mail, something else?
23      A    I -- yeah, I would have been informed by
24  Melanie Freiberg.
25      Q    So you say you "would have been informed

Page 16

C. Talbot
1
2  by Melanie Freiberg."
3           Is she the person who told you about
4  Aubry McMahon having applied for employment with
5  World Vision?
6      A    To the best of my recollection, yes,
7  Melanie Freiberg.
8      Q    If you can recall, what was your role
9  specifically with respect to Aubry McMahon in the
10  application process for potential employment with
11  World Vision?
12      A    So I oversee multiple functions in human
13  resources, and one of those is recruitment.  Melanie
14  Freiberg was a direct report to me, and she oversaw
15  the recruitment activities.
16      Q    Prior to January 4th, 2021 -- which is
17  the date, I will represent to you, is the date an
18  offer of employment was made to Aubry McMahon -- how
19  many interactions did you personally have with Aubry
20  McMahon whether it be via in person, telephone,
21  e-mail, video conference, or any other form of
22  communication?
23      A    I did not have any communications with
24  Aubry McMahon.
25      Q    Ms. Talbot, I'd like to show you what has

Page 17

C. Talbot
1
2  been previously marked as Plaintiff's Exhibit
3  Number 2.  This is a document which is Bate-stamped
4  WV 78 to 79.  I will represent to you that this
5  document was exchanged during the discovery phase of
6  litigation in this matter.
7           If you can, please review this document
8  and let me know once you've completed doing so.
9           If you'd like to read the document, I ask
10  you kindly not to do it aloud.
11      A    I -- I would like to read the document.
12      Q    I would like you to do so, too, but if
13  you were going to read out loud --
14      A    No, I won't read --
15      Q    -- then I would ask that we go off the
16  record.
17      A    No, I won't read out loud.  I'm just
18  looking at how I open this.  I have to download it.
19      MR. WOLNOWSKI:  Let's go off the record.
20      (Discussion held off the record)
21      MR. WOLNOWSKI:  Okay.  Let's go back on.
22      Q    Ms. Talbot, do you recognize this
23  document?
24      A    I do not.
25      Q    Have you ever seen it before?

Christine Talbot
March 08, 2023

Page 18

C. Talbot

1
2    A    No.
3    Q    Based on your review of this document, is
4  it correct that via letter dated January 5th, 2021, a
5  written confirmation of an offer of employment was
6  given to Aubry McMahon to work for World Vision in
7  the position of donor/customer service representative
8  trainee?
9         MR. WARD:  I'll object as to form.
10        But you can answer.
11    A    Yeah, I believe that's what this letter
12  represents.
13    Q    Based upon your review of this letter, is
14  it correct that the job itself was to commence on
15  February 1st, 2021?
16    A    I would need to go back and look at the
17  letter again, I didn't re- -- recall the specific
18  dates in the letter.
19    Q    That's okay.  Yeah, I will just -- to
20  make things easier, I will direct your attention to
21  the first sentence at the top of the first page.
22    A    Yes, I see the words "commencing on
23  February 1st, 2021."
24    Q    Prior to an offer of employment being
25  made to Aubry McMahon, were you aware that an offer

Page 19

C. Talbot

1
2  of employment was going to be made to Aubry McMahon?
3    A    No.
4    Q    Ms. Talbot, I'd like to show you a
5  document which was previously marked Plaintiff's
6  Exhibit Number 3.  One moment, ma'am.
7         This is a document that is marked WV 80.
8  It has -- it was exchanged during discovery phase of
9  litigation in this matter.
10        Please review this document and let me
11  know once you've completed doing so.
12    A    (Perusing a document)
13        I've -- I've read it.
14    Q    Do you recognize this document?
15    A    I don't recall seeing this document.
16    Q    Have you ever seen it before?
17    A    I don't recall that I have.
18    Q    For the record, I will represent that
19  Exhibit 3 is an e-mail from Aubry McMahon to
20  Catherine Miolla dated January 5th, 2021, sent at
21  11:56 a.m.
22        If you can recall, how did you first come
23  to learn of this e-mail, if you can recall?
24        MR. WARD:  I'll object as to form.
25        You may answer.

Page 20

C. Talbot

1
2    A    I don't recall specifically when or -- I
3  don't recall specifically how I would have been
4  informed about it.  I do recall that I was informed
5  that there was an e-mail from Aubry with the
6  follow-up question of this nature.  I recall being
7  informed, I don't recall the details of how I was
8  informed.
9    Q    Do you recall if the e-mail was forwarded
10  on to you or provided to you in a different way,
11  perhaps, printed off and handed to you, something
12  along those lines?
13    A    I don't recall it being printed off and
14  handed it to me, no.  And I don't recall how I was
15  informed.
16    Q    Okay.  You had testified you don't recall
17  how you were informed about this January 5th e-mail,
18  but do you recall the person who informed you,
19  whether it be Melanie Freiberg, Catherine Miolla, or
20  somebody else?
21    A    I can tell you normally it would be
22  Melanie who would inform me of anything specific to
23  the recruiting function that she felt I should be
24  aware of, so it would -- it would have been Melanie
25  that would have told me.

Page 21

C. Talbot

1
2    Q    Do you recall why Melanie told you?
3        MR. WARD:  I'm going to object as to
4  form.
5        You may answer.
6    A    Yes.
7    Q    Could you please explain to me?
8    A    The nature of the e-mail raised a
9  question as to whether or not Aubry was able to be in
10  compliance with our required standards of conduct.
11    Q    And if you could explain to me -- when
12  you say "the nature of the e-mail," could you
13  please -- specifically, what was about -- it about
14  the nature of the e-mail that caused you and others
15  to have that questioning?
16        MR. WARD:  Object as to form.
17        You may answer.
18    A    Well, in the e-mail, Aubry
19  self-identifies herself being married to another
20  woman.  And our standards of conduct require -- you
21  know, to be eligible for employment, require that a
22  job applicant or a job offeree affirm their ability
23  to live according to our standards of conduct which
24  specifically names marriage to be a biblical covenant
25  between a man and a woman.

Christine Talbot
March 08, 2023

Page 22

1                    C. Talbot
2        Q     Aside from what you just explained, was
3  there anything else about the nature of the contents
4  of this e-mail that caused you or others, to the
5  extent you know, to have questions?
6        A     I can't think of anything.
7        Q     So first things first, who is Catherine
8  Miolla who is the recipient of this January 5th
9  e-mail?
10       A     Catherine is a recruiter for World Vision
11 U.S.
12       Q     Is talent acquisition partner another
13 term that is synonymous with recruiter?
14       A     Yes.
15       Q     From your recollection, was that the
16 circumstance in January of 2021 as well?
17       A     The circumstance being?
18       Q     The circumstan- -- let me -- I'll
19 rephrase the question.
20             Were the title talent acquisition partner
21 and recruiter interchangeable or synonymous with one
22 other as of January of 2021?
23       A     Yes.
24       Q     In January of 2021, were you Ms. Miolla's
25 supervisor?

Page 23

1                    C. Talbot
2        A     No.
3        Q     In January of 2021, were you her boss?
4        A     No.
5        Q     To the extent you know, could you have
6  terminated her employment?
7        A     Yes.
8        Q     To the extent you know, could you have
9  directed her daily work activities in January of
10 2021?
11       A     Highly unlikely.
12       Q     At some point, did you form a belief that
13 Aubry McMahon may be a woman?
14       A     I'm confused by this phrase, "formed a
15 belief."
16             Can -- can you --
17       Q     Well --
18       A     -- maybe clarify that?
19       Q     Sure.
20             At some point, did you ever learn that
21 Aubry was a woman?
22             MR. WARD:  I'm going to object as to
23       form.
24             You may answer.
25       A     Yes.

Page 24

1                    C. Talbot
2        Q     Do you recall when?
3        A     No.
4        Q     Do you recall how you learned?
5        A     I don't recall the specific conversation.
6  I would learn such facts by talking with Melanie.
7        Q     From your recollection, did you surmise
8  that Aubry may be a woman based upon her first name;
9  Aubry being more traditionally a female's name than a
10 male?
11             MR. WARD:  I'm going to object as to
12       form.
13             You may answer.
14       A     Yeah, I don't recall specifically that
15 the -- that the name Aubry was a prominent indicator.
16       Q     Did you form a belief that Aubry was a
17 woman based upon the contents of this January 5th
18 e-mail in which she states and advises that she's
19 going to be having a baby?
20             MR. WARD:  I'm going to object as to
21       form.
22             You may answer.
23       A     That would have been part of it.
24       Q     Can you recall anything else that was
25 part of it?

Page 25

1                    C. Talbot
2             MR. WARD:  Form objection.
3             You may answer.
4        A     Melanie would have presented me with what
5  she understood from Catherine and from Aubry's
6  application and self-identification.  I would have
7  learned from Melanie.
8        Q     At some point, did you form a belief that
9  Aubry McMahon may be gay?
10             MR. WARD:  I'm going to object as to
11       form.
12             You may answer.
13       A     I believed it to be a possibility, yes.
14       Q     And when did you conclude that it may be
15 a possibility?
16       A     In the --
17             MR. WARD:  I'll object -- sorry.
18             I'll object as to form.
19             You may answer.
20       A     In -- in being informed that she was --
21 by her own e-mail telling us that she had a wife, I
22 assumed also to be a she.
23       Q     At some point, did you form a belief that
24 Aubry McMahon may be in a same-sex marriage?
25             MR. WARD:  I'll object as to form.

Christine Talbot
March 08, 2023

Page 26

C. Talbot

1
2            You may answer.
3      A     I believed that to be a possibility.
4      Q     And when did you believe that that may
5  have been a possibility?
6      A     When informed by Melanie of the contents
7  of this e-mail.
8      Q     Okay.  So I have some slightly different
9  questions, Ms. Talbot, so please follow along.
10           Did you ever learn that it was in fact
11 true that Aubry McMahon was gay?
12           MR. WARD:  Objection as to form.
13           You may answer.
14      A     You know, I don't know that I learned
15 specifically that Aubry was gay, but that Aubry, by
16 her own self-admission, was in a same-sex marriage.
17      Q     So if I'm understanding your response,
18 you're stating that you've never conclusively learned
19 whether or not she was indeed gay; is that a fair
20 characterization?
21           MR. WARD:  Objection as to --
22      A     To the best of my --
23           MR. WARD:  -- form.
24           You may answer.
25      A     To best of my recollection, I don't

Page 27

C. Talbot

1
2  recall definitively learning she was gay, to the best
3  of my recollection.
4      Q     And that includes ever; is that correct?
5           MR. WARD:  Same objection.
6      A     Yeah.
7           MR. WARD:  You can answer.
8      A     Yeah.
9      Q     Did you ever learn that it was in fact
10 true that Aubry McMahon was in a same-sex marriage?
11      A     To the best of my recollection, yes, I
12 did learn that it was validated that she was in a
13 same-sex marriage.
14      Q     If you can recall, when did you learn?
15      A     I don't recall specifically when I
16 learned other than in that general time frame.
17      Q     Did you learn definitely at some point
18 between January 5th and January 8 of 2021?
19           MR. WARD:  Objection as to form.
20           You may answer.
21      A     Again, I wouldn't remember the specific
22 dates.  It would have been in that general time
23 frame.
24      Q     Do you recall if you learned definitely
25 after it was communicated to Ms. McMahon that the

Page 28

C. Talbot

1
2  offer of employment was rescinded, which occurred on
3  or about January 8th, 2021?
4      A     Could you repeat that?  Could you say
5  that again?
6           MR. WOLNOWSKI:  Ms. Ratigan, if you
7       could, could you please read that back?
8           (WHEREUPON, the previous question was
9       read by the court reporter.)
10           MR. WARD:  Objection as to form.
11           You may answer.
12      A     I'm having a hard time answering that
13 question.  It -- it -- it feels like there's a couple
14 parts to that.  I -- I just -- could -- could you
15 break it down --
16      Q     Absolutely.
17      A     Thank you.
18      Q     I mean -- okay.
19      A     Yeah.
20      Q     So I can represent to you that the offer
21 of employment made to Ms. McMahon was rescinded
22 definitely on January 8th, 2021.  Right.  So I'm --
23 I'm telling you that.  So for purposes of my
24 question, let's establish that as true.
25      A     Okay.

Page 29

C. Talbot

1
2      Q     Did you learn that it was in fact true
3  that Aubry McMahon was in a same-sex marriage before
4  the offer of employment was rescinded, or after, if
5  you know at all?
6      A     I -- I knew that Aubry was in a same-sex
7  marriage and unable to comply with our required
8  standards of conduct prior to the job offer being
9  rescinded.
10      Q     And how did you learn that it was in fact
11 true that Aubry McMahon was in a same-sex marriage;
12 did somebody tell you, did somebody e-mail you,
13 perhaps somebody text messaged you; if you can
14 recall, how did you learn?
15           MR. WARD:  Objection as to form.
16           You may answer.
17      A     Yeah, I -- I don't recall whether it was
18 e-mail -- likely, it was in conversation with
19 Melanie.
20      Q     Ms. Talbot, you had a number of
21 communications with various folks at World Vision
22 from January 5th, 2021 to January 8th, 2021 on the
23 topic or topics involving Aubry McMahon; is that
24 correct?
25      A     I don't recall those specifically.

Christine Talbot
March 08, 2023

Page 30

C. Talbot

1
2    Q    I'd like to show you what will be marked
3    Plaintiff's Exhibit 14.  I will represent to you that
4    this was a document that was supplied during the
5    discovery phase of litigation.  It does not bear a
6    Bates-stamped number.  It is Defendant World Vision's
7    privileged log.
8         If you could, please review this document
9    and let me know once you've completed doing so.
10        MR. WARD:  Can we pause just because the
11        download is not working for me, so if you'd
12        give me a minute -- and we can go off the
13        record, I just need to --
14        MR. WOLNOWSKI:  Let's go off the record.
15        (Discussion held off the record)
16        (WHEREUPON, the above-referred-to
17        document, Defendant World Vision's Privilege
18        Log, Updated August 5, 2022, two pages, was
19        marked as Plaintiff's Exhibit 14, for
20        identification, as of this date.)
21        MR. WOLNOWSKI:  Please go back on the
22        record.
23        MR. WARD:  Okay.  Thank you.
24        Mr. Wolnowski, since we're looking at a
25        privilege log, obviously it involved

Page 31

C. Talbot

1
2    privileged communications, I'm just going to
3    register at the front end an objection on the
4    basis of attorney/client privilege and work
5    product doctrine.
6         I'm going to instruct the witness not to
7    answer as to the content of any conversations
8    that included legal counsel or that involved
9    advice to or from legal counsel.
10        I wanted to put that on the record at the
11        front end, and then let you proceed with your
12        questions, and then lets me just have my focus
13        for objections as we get into this.
14        MR. WOLNOWSKI:  Thank you very much,
15        Counsel.
16        Q    Ms. Talbot, have you had a chance to
17   review the document marked Plaintiff's Exhibit 14?
18        A    Yes.
19        Q    Have you ever seen this document before?
20        A    No.
21        Q    So I am not interested about the specific
22   content of any communications with respect to the
23   questions that I'm going to ask you, and I would like
24   to make that clear for you.
25        A    Okay.

Page 32

C. Talbot

1
2    Q    Is it correct that on January 5th, 2021,
3    you sent an e-mail to Melanie Freiberg, Steve
4    McFarland, and Jean Thompson?
5        A    Which date, please?
6        Q    January 5th of 2021.  And for, perhaps,
7    clarity purposes, I'm going to direct your attention
8    to halfway down the first page.
9        A    Yes, I see that registered.
10        Q    Is it correct that on January 5th, 2021,
11   you sent an e-mail to Melanie Freiberg, Steve
12   McFarland, and Jean Thompson?
13        A    Based upon the record represented here,
14   yes.
15        Q    What role did Melanie Freiberg hold with
16   World Vision Incorporated in January of 2021?
17        A    Director, talent management.
18        Q    Was she a subordinate of yours in
19   January of 2021?
20        A    Yes.
21        Q    Were you her supervisor in January of
22   2021?
23        A    Yes.
24        Q    Were you her boss in January of 2021?
25        A    Yes.

Page 33

C. Talbot

1
2    Q    To the extent you know, what role did
3    Steve McFarland hold with World Vision Incorporated
4    in January of 2021?
5        A    Steve was general counsel.
6        MR. WOLNOWSKI:  Off the record.
7        (Discussion held off the record)
8        MR. WOLNOWSKI:  Back on.
9        Q    What role did Jean Thompson hold with
10   World Vision Incorporated in January of 2021?
11        A    Jean was the assigned employment attorney
12   to work with HR.
13        Q    Ms. Talbot, after reviewing this
14   document, would you agree that from January 5th, 2021
15   to January 8th, 2021, you were either the sender or
16   receiver of 11 e-mail communications with Melanie
17   Freiberg, Steve McFarland, and/or Jean Thompson?
18        A    It appears that 11 is about the right
19   number.
20        Q    Ms. Talbot, at some point on or about
21   January 6th, 2021, were you a participant in an
22   e-mail chain with Melanie Freiberg and Catherine
23   Miolla with respect to how to respond to Aubry
24   McMahon's January 5th, 2021 disclosures?
25        A    Did you say January 6th or --

Christine Talbot
March 08, 2023

Page 34

C. Talbot

1
2   Q    Yes.
3   A    January 6th.
4        Well, since I don't remember these
5   communication exchanges specifically back in 2021,
6   I'm looking at what's of record here, and on
7   January 6th, I'm not seeing anything with my
8   involvement with Catherine Miolla on that day based
9   upon this record here.
10  Q    Okay.  Well, if you could, Ms. Talbot, I
11  kindly ask you to set aside Plaintiff's Exhibit 14,
12  because I'd like to show you another document.
13  A    Okay.
14  Q    Ms. Talbot, I'd like to show you what
15  will be marked as Plaintiff's Exhibit Number 15.
16  It is a document which bears Bates-stamped
17  Numbers WV 6095 to 6096.  It is a document which I
18  can represent to you was exchanged during the
19  discovery phase of litigation in this matter.
20       If you could, please review this document
21  and let me know once you've concluded doing so.
22  A    I have pulled it up and I'll begin
23  reading it.
24  Q    Sounds good.  Thank you.
25       MR. WOLNOWSKI:  Let's go off the record.

Page 35

C. Talbot

1
2        (Discussion held off the record)
3        (WHEREUPON, the above-referred-to
4        document, Bates-stamped Numbers WV-006095
5        through WV-006096, was marked as Plaintiff's
6        Exhibit 15, for identification, as of this
7        date.)
8        MR. WOLNOWSKI:  Okay.  Let's go back on.
9   Q    Ms. Talbot, do you recognize this
10  document?
11  A    I don't recall it specifically, but it --
12  it -- it is indeed my writing, now that I see this.
13  Q    Do you have any reason to dispute that
14  the e-mail sent and received by you on January 6th,
15  2021 is indeed accurate as displayed here in
16  Plaintiff's Exhibit 15?
17  A    I don't have any reason to dispute
18  authenticity.
19  Q    Plaintiff's 15 seems to be an e-mail
20  chain involving you, Melanie Freiberg, and Catherine
21  Miolla which took place on January 6th, 2021; is that
22  correct?
23  A    Yes.
24  Q    Now, in these e-mails, you mention
25  something about reviewing a script.

Page 36

C. Talbot

1
2        Do you see that?
3   A    I do.
4   Q    What were you referring in this e-mail as
5   to a script?
6        MR. WARD:  So I'm going to object on the
7        basis of attorney/client privilege and work
8        product.
9        To the extent you can answer that without
10       involving any sort of legal advice or
11       counselor discussion, you may answer; but
12       otherwise, I instruct the witness not to
13       answer.
14  A    I would generally represent that in our
15  interview processes, we have consistent and specific
16  practices around all phases of recruitment.
17  Q    To the extent you can recall, was a
18  script in development for use to discuss with Aubry
19  McMahon?
20       MR. WARD:  Same privilege objection.
21       You may answer subject to that.
22  A    I don't have any recollection of any
23  script being developed specifically for any
24  particular candidate, including Aubry.
25  Q    Do you recall ever receiving a script

Page 37

C. Talbot

1
2   from either Melanie Freiberg, Catherine Miolla, or
3   anybody else for that matter?
4   A    I don't recall that.
5   Q    In your e-mail on January 6th, 2021, you
6   mention offering to practice with Melanie and
7   Catherine.
8        Do you see that?
9   A    Yes.
10  Q    Well, what were you referring in this
11  e-mail?
12       MR. WARD:  I'll make the same objection
13       that subject to the privilege objection, you
14       may answer.
15  A    Yes.  That it would be my practice in a
16  variety of circumstances involving employees or
17  managers or potentially job candidates or leaders
18  that if one of my staff members was planning for an
19  important conversation, that they would have the
20  opportunity to, you know, prac- -- practice so that
21  they could deliver with their intent and do so with
22  kindness.
23  Q    In this e-mail that you sent to both
24  Melanie and Catherine on January 6th, there seems to
25  be some content about a candidate not being a good

Christine Talbot
March 08, 2023

Page 38

C. Talbot

1  fit.
2
3          Do you see that?
4      A    Are you referring to my words describing
5  "One time I had a finalist, high-level HR external
6  candidate"?
7      Q    Yes.  If I can be a little more clear.
8          In the e-mail that you sent on
9  January 6th to Melanie and Catherine, you wrote, and
10  I quote, in part, "It is always hard when a candidate
11  doesn't turn out to be a fit as originally
12  evaluated."
13          Do you see that?
14      A    I do.
15      Q    Did you write that?
16      A    That would be my writing, yes.
17      Q    Did you have any discussions with Melanie
18  Freiberg and Catherine Miolla regarding Aubry McMahon
19  not being a good fit either before or after you sent
20  this January 6th e-mail?
21          MR. WARD:  So I'll repeat my objection
22          based on privilege.
23              Subject to that objection, you may
24          answer.
25      A    Well, based upon the log that you showed

Page 39

C. Talbot

1  me previously that records the dates of different
2  conversations, I would have.
3      Q    If you could, please explain everything
4  you can remember about those discussions with Melanie
5  and Catherine.
6          MR. WARD:  And I'll again object as to
7          privilege.
8              To the extent that you can answer without
9          discussing the legal advice, you may answer.
10      A    Well, I don't have lots of specific
11  recollection, let me be clear about that, but
12  generally, the discussions would have been about
13  whether this candidate was able to comply with our
14  required standards of conduct, and so therefore, be a
15  fit to join the organization as an employee.
16      Q    Is it fair to say that on or about
17  January 6th, 2021, if a candidate was in a same-sex
18  marriage, then that would be a disqualifier for
19  employment on the basis that -- by virtue of that
20  same-sex marriage, they would not be able to comply
21  with World Vision's standards of conduct?
22          MR. WARD:  I'm going to object as to
23          form.
24              You may answer.
25

Page 40

C. Talbot

1      A    Well, if an employee can't comply with
2  the standards and -- and affirm that they are able to
3  comply with the standards of conduct, then they
4  wouldn't be eligible for employment; and yes, that
5  was true in January of 2021.
6      Q    Ms. Talbot, in response to this
7  January 6th e-mail, Melanie Freiberg responded and
8  said in part, "I would love to take you up on your
9  offer to practices," and then mentions looking at
10  your calendar.
11          Do you see that?  It's at the top of
12  page WV 6095.
13      A    I do.
14      Q    Did you and Melanie Freiberg have any
15  discussion after this e-mail during which you engaged
16  in any practice?
17      A    I don't recall it specifically, that
18  conversation.  It -- it -- it -- it may have
19  happened, I just don't recall it specifically.
20      Q    Did you engage in any practicing with
21  Catherine Miolla between January 5th and January 8th,
22  2021?
23      A    I can't remember.
24      Q    Ms. Talbot, I'd like to show you what

Page 41

C. Talbot

1  will be marked Plaintiff's Exhibit Number 16.  It is
2  a document bearing Bates-stamped Numbers WV 6097 and
3  6098.  I can represent to you that this is a document
4  that was exchanged during the discovery phase of
5  litigation in this matter.
6          If you could, please review this document
7  and let me know once you've completed doing so.
8          MR. WOLNOWSKI:  Off the record.
9          (Discussion held off the record)
10          (WHEREUPON, the above-referred-to
11          document, Bates-stamped WV-006097 through
12          WV-006098, was marked as Plaintiff's
13          Exhibit 16, for identification, as of this
14          date.)
15          MR. WOLNOWSKI:  Okay.  Okay.  Back on.
16      Q    Ms. Talbot, do you recognize this
17  document?
18      A    I don't.  I -- it's a meeting invite -- I
19  recognize it as an internal organization invite.  I
20  don't have specific recollection of this specific
21  invite.
22      Q    Do you recall receiving this RingCentral
23  invite --
24      A    I don't --

Christine Talbot
March 08, 2023

Page 42

C. Talbot

1
2    Q    -- on or about --
3    A    Yeah, I don't recall specifically
4    receiving it.
5    Q    Do you have any reason to doubt that you
6    did, in fact, receive it, however?
7    A    Based upon this written document, I don't
8    have any reason to think that I did not receive it.
9    Q    On January 6th, 2021, Melanie Freiberg
10   sent an e-mail to both you and Catherine Miolla to
11   join a RingCentral meeting at 12 o'clock noon that
12   day; is that correct?
13   A    Based upon this meeting invite, yes.
14   Q    From your recollection, is the document I
15   just showed you to which is marked Plaintiff's
16   Exhibit 16 that particular invite?
17   A    It would appear so.
18   Q    Did you attend that meeting?
19   A    I don't know.  I don't recall.
20   Q    The subject line of that e-mail is
21   entitled "Dry run (Catherine/Melanie/Christine)."
22        Do you see that?
23   A    I do.
24   Q    During this RingCentral call, was the
25   topic of Aubry McMahon being a woman discussed?

Page 43

C. Talbot

1
2        MR. WARD:  I'm going to object as to
3    form.
4        You may answer.
5    A    Well, it doesn't say that specifically
6    here, but I think that that could be possible.
7    Q    During this RingCentral call, was the
8    topic of Aubry McMahon's sexual orientation
9    discussed?
10       MR. WARD:  I'm going to object as to
11   form.
12   A    I don't recall.
13   Q    During this RingCentral call, was the
14   topic of Aubry McMahon being gay discussed?
15       MR. WARD:  I'm going to object as to
16   form.
17   A    I don't recall.
18   Q    During this RingCentral call, was the
19   topic of Aubry McMahon being in a same-sex marriage
20   discussed?
21       MR. WARD:  I'll object as to form.
22   A    I just don't recall the -- this specific
23   meeting.  I do not recall this specific meeting.
24   Q    Either during or following this
25   RingCentral call, did you conclude that if Aubry

Page 44

C. Talbot

1
2    McMahon was indeed gay, that her offer of employment
3    would be rescinded?
4        MR. WARD:  I'm going to object as to
5    form.
6    A    World Vision would not rescind a job
7    offer because of someone being gay.
8    Q    So I think you had answered this with an
9    answer that describes World Vision's policy, and I'm
10   not sure that that answers the question.  I'm going
11   to read the question back to you.
12       Either during or following this
13   RingCentral call, did you conclude that if Aubry
14   McMahon was indeed gay, that the offer of employment
15   would be rescinded?
16       MR. WARD:  Same objection as to form.
17   A    A job offer would not be rescinded by
18   World Vision for a person identifying as gay.
19   Q    So is the answer to my question that you
20   concluded that it would not be rescinded on account
21   of her being gay; is that accurate?
22       MR. WARD:  I'm going to object as to
23   form; mischaracterizes testimony.
24   A    A job offer would be rescinded if a
25   candidate was unable to comply with our hiring

Page 45

C. Talbot

1
2    requirements which include being able to affirm and
3    commit to living in accordance with our standards of
4    conduct.
5    Q    So, Ms. Talbot, I appreciate that you're
6    informing me about World Vision's policies.  Right.
7        My question is about your personal
8    conclusions.  Now, if you want to tell me that your
9    conclusion was in accord with World Vision's
10   policies, please do so, and then inform me what
11   policy it is that you're following, but just telling
12   me what the policy was, I don't believe is answering
13   my question.
14       Do you understand my concern?
15   A    I do.  Let me try again.
16   Q    Sure.  Just let me -- I'm going to read
17   it one more time, and let's see if --
18   A    Okay.  Thank you.
19   Q    Okay.  Yes.  But I do appreciate that
20   you're giving me information.  I just want to make
21   sure that we're getting responses.
22       Either during or following this
23   RingCentral call, did you conclude that if Aubry
24   McMahon was indeed gay, that the offer of employment
25   would be rescinded?

Christine Talbot
March 08, 2023

Page 46

C. Talbot

1    C. Talbot
2         MR. WARD:  And I'm going to object as to
3    form, and also asked and answered.
4    A    I'm thinking.
5         First of all, I don't have specific
6    recollection that the outcome off of this call
7    resulted in a particular decision.  Being gay would
8    not be the basis of rescinding a job offer.
9    Q    Ms. Talbot, either during or following
10   this RingCentral call, did you conclude that if Aubry
11   McMahon was indeed in a same-sex marriage, that the
12   offer of employment would be rescinded?
13        MR. WARD:  I'm going to object as to
14   form.
15   A    I concluded at some point -- I cannot
16   link it to this specific meeting in my recollection.
17   I concluded that at some point, if Aubry was in a
18   same-sex marriage and unable to comply with our
19   standards of conduct, that the job offer would, based
20   upon our policy, need to be rescinded.
21   Q    If you could, Ms. Talbot, please explain
22   to me, if it's possible, how would somebody who's in
23   a same-sex marriage also be willing to comply with
24   the standards of conduct; is that possible?
25        MR. WARD:  I'm going to object; calls for

Page 47

C. Talbot

1    speculation and form in general.
2    A    Our standards of conduct at World Vision
3    specifically say to the job candidate that a
4    requirement for being employed is the willingness and
5    ability to affirm and live in compliance with our
6    standards of conduct, a component of which references
7    the biblical covenant of a marriage between a man and
8    a woman.
9         If an applicant is unable or unwilling to
10   affirm and comply with that standard, they're not
11   eligible for employment.
12   Q    And just so we're clear, that that was
13   the advisory as it existed in January of 2021?
14        MR. WARD:  I'm going to object as to
15   form.
16   A    That's what was reflected in our
17   standards of conduct and business and ethics policy
18   at that time.  I -- I'm unclear about the word
19   "advisory."
20   Q    Well, let me ask you a different way.
21        The protocol or rule which you just
22   described, was that the protocol or rule in existence
23   in January of 2021?
24        MR. WARD:  I'm going to object as to

Page 48

C. Talbot

1    C. Talbot
2    form.
3         You may answer.
4    A    Yes, that was the policy in 2021.
5    Q    And specifically in January of 2021?
6    A    Yes.
7    Q    At any time between January 5th and
8    January 8th, 2021, did you ever make an independent
9    decision that you were going to rescind the offer of
10   employment made to Aubry McMahon?
11   A    What do you mean "an independent
12   decision"?
13   Q    Well, a decision by yourself.
14   A    I would not have made an independent
15   decision.
16   Q    Well, I'm not asking what you would have
17   done.  I'm asking whether or not you did it.
18   A    No, I didn't -- I didn't make that
19   decision independently.  No.
20   Q    Do you know how the decision to rescind
21   Aubry McMahon's offer was communicated to Aubry
22   McMahon herself?
23   A    I don't recall specifically.
24   Q    Ms. Talbot, I'd like to show you what has
25   been previously marked as Plaintiff's Exhibit 9.  Is

Page 49

C. Talbot

1    a document bearing Bates-stamped Numbers WV 81 to 82.
2    I can represent that this document was supplied
3    during the discovery phase of the litigation in this
4    case.
5         Please review the document and let me
6    know once you've completed doing so.
7         MR. WOLNOWSKI:  Let's go off the record
8    for one moment.
9         (WHEREUPON, a brief recess was taken,
10        after which the following transpired:)
11        (Time noted:  2:18 p.m.)
12        MR. WOLNOWSKI:  Okay.  Let's go back on.
13   CONTINUED EXAMINATION BY MR. WOLNOWSKI:
14   Q    Ms. Talbot, we just took a five-minute
15   break.
16        Did you talk to anybody during that
17   break?
18   A    I talked to the cleaning lady who just
19   showed up.
20   Q    Okay.  Did you talk about this case?
21   A    No, I did not.
22   Q    I didn't think -- I assumed the answer
23   was no, but I figured I would ask.
24        Did -- did you -- aside from speaking to

Christine Talbot
March 08, 2023

Page 50

C. Talbot

1
2    the cleaning lady, is there anything else you did on
3    this five-minute break?
4         A    Bio break.
5         Q    Okay.  So, Ms. Talbot, I've showed you a
6    document marked Plaintiff's Exhibit 9.
7              Have you ever seen this document before?
8         A    I -- I may have actually seen -- I may
9    have actually seen this at some point.
10        Q    Okay.
11        A    I don't recall what point, but I -- but I
12   may have, it looks familiar.
13        Q    And do you recall when you first reviewed
14   this document?
15        A    No.  I -- I could only tell you it looks
16   familiar.
17        Q    Do you recall who sent it to you?
18        A    I don't.
19        Q    This document appears to be an e-mail
20   chain between Catherine Miolla and Aubry McMahon
21   beginning January 5th and ending January 8, 2021;
22   would you agree?
23        A    Yes.
24        Q    In this January 8th, 2021 e-mail, which
25   appears at the top of the first page, the page

Page 51

C. Talbot

1
2    Bates-stamped WV 81, Ms. Miolla wrote to Ms. McMahon,
3    "Aubry, since our communication on Tuesday, I've
4    tried several times to get in touch with you to
5    discuss a discrepancy in your interview responses.
6    Since I have not heard back from you to resolve the
7    discrepancy, I am rescinding the job offer that was
8    extended to you on Monday, January 4th."
9              Do you see that, Ms. Talbot?
10        A    Yeah, I do.
11        Q    Do you know what was the discrepancy
12   referenced by Ms. Miolla in this January 8th, 2021
13   e-mail?
14        A    I believe I do.
15        Q    If you could, please explain to me
16   what -- what it was.
17        A    Well, the discrepancy would have been
18   Aubry's answers in the interview screening process
19   surrounding our standards of conduct, a requirement
20   for employment, and subsequent information indicating
21   Aubry being in a same-sex marriage, which would
22   mitigate being able to be in compliance with those --
23   those standards of conduct that we have regarding the
24   biblical covenant of marriage between a man and a
25   woman.

Page 52

C. Talbot

1
2         Q    Ms. Talbot, I'd like to show you what has
3    been previously marked Plaintiff's Exhibit 6.  It is
4    a document bearing Bates-stamped Numbers WV 67 to
5    WV 70.  I can represent that this document was
6    exchanged during the discovery phase of litigation in
7    this case.
8              If you could, please review this document
9    and let me know once you've completed doing so.
10             MR. WOLNOWSKI:  Off.
11             (Discussion held off the record)
12             MR. WOLNOWSKI:  Back on.
13        Q    Ms. Talbot, do you recognize this
14   document?
15        A    I haven't seen this document with these
16   answers, no.  Uh-uh, no.
17        Q    Is it fair to say today is the first time
18   that you've ever seen this document?
19        A    Yes, it is fair to say that.
20        Q    To your knowledge, was it this document
21   which contained the purported discrepancy as eluded
22   to in the January 8th e-mail from Ms. Miolla to
23   Ms. McMahon?
24        A    Well, there is a discrepancy between the
25   answers that are recorded here from Aubry and the

Page 53

C. Talbot

1
2    representation in the subsequent e-mail of being in a
3    same-sex marriage that would present a discrepancy.
4         Q    If you could, Ms. Talbot, please explain
5    to me what the discrepancy is from this document
6    which is marked Plaintiff's Exhibit 6.
7              MR. WARD:  Objection as to form.
8              You may answer.
9         A    Well, in -- in this document which
10   represents the interview process, if you look on the
11   page that identifies -- under the "Key Points in
12   Christian Conduct Conversation," and you look at the
13   examples of behaviors that we -- referring to World
14   Vision -- believe are not in alignment with our
15   standards of conduct and therefore unacceptable
16   behavior for employees or employment, since this was
17   an employment screening conversation, it, in that
18   second bullet, refers to sexual conduct outside of a
19   marriage, defined as between a man and a woman.
20             What I'm reading here is when Aubry was
21   asked, "Do you have any questions about the standards
22   of conduct or the expectations of compliance," the
23   response provided by Aubry was, "No, not at all."
24             Then the follow-up question, you know,
25   it's important that you know the expectations so you

Christine Talbot
March 08, 2023

Page 54

C. Talbot

1  can decide if, you know, there's a right
2  organizational fit, and the specific, "Are you
3  willing and able to comply with the standards of
4  conduct," the answer I'm reading here is yes, "I'm
5  aligned, yes."
6
7        And those answers would be in discrepancy
8  with an e-mail requesting information about benefits
9  for a same-sex spouse.
10       Q   So, Ms. Talbot, just so we're clear,
11 between January 5th and January 8th, 2021, was this
12 phone screen document ever brought to your attention?
13       A   I don't recall.  I know I haven't seen
14 this -- as I said before, I haven't seen this
15 document before.  I don't recall seeing this before.
16       Q   Was the contents of this phone screening
17 document discussed between you and/or Ms. Miolla or
18 Ms. Freiberg between January 5th and January 8th,
19 2021?
20            MR. WARD:  So I'm going to -- I'm going
21       to --
22            THE WITNESS:  Yes.
23            MR. WARD:  And -- just let me
24       register my objection, because I'm going to
25       object.

Page 55

C. Talbot

1        To the extent that calls for information
2  that comes within the attorney/client or the
3  work product privilege, I'll object to form.
4        Subject to disclosing any attorney/client
5  information or other privileged information,
6  you may answer to the extent of your
7  knowledge.
8  A   Could I have the question repeated for
9
10 me, please?
11            MR. WOLNOWSKI:  Ms. Ratigan, could you
12       please read it back?
13            (WHEREUPON, the previous question was
14       read by the court reporter.)
15       Q   Ms. Talbot, do you understand the
16 question?
17       A   Yeah, I do.
18       I -- I believe it would have been.
19       Q   If you could, please tell me everything
20 you can remember about those conversations.
21            MR. WARD:  I'm going to repeat the
22       privilege objection, and instruct the witness,
23       you can answer to the extent that it doesn't
24       involve -- involve legal counsel or legal
25       counsel's advice.

Page 56

C. Talbot

1       A   Well, if you go back to the document you
2  previously shared with me about all of the privileged
3  discussions that were recorded, what that reminded me
4  of and what would be true in deciphering the
5  situation with, you know, such a discrepancy and a
6  job offer, those conversations would have included
7  one or more attorneys, and I cannot give back to you
8  specific recall of conversations on dates of which I
9  can't remember.
10      Q   Well, do you know, was -- excuse me, is
11 Ms. Miolla an attorney?
12      A   No.
13      Q   Is Ms. Freiberg an attorney?
14      A   No.
15      Q   But you did have conversations with them
16 about the contents of the standards of conduct phone
17 screen document between January 5th, 2021 and
18 January 8th, 2021; correct?
19      A   That's likely.  What I don't recall is
20 which of any of those conversations were had without
21 the presence of legal counsel.  And what would be
22 likely is that all of those conversations would have
23 involved legal counsel, but we can go back to the log
24 and look and see.

Page 57

C. Talbot

1            MR. WARD:  Well, I'm -- just so I'm clear
2  on the record, my objection is both as to
3  conversations that involve counsel, but also
4  conversations that discuss advice of counsel.
5  My understanding is the privilege protects
6  that for any organization that's discussing
7  counsel internally, even if in that
8  conversation, counsel is not in the room.
9        So to the extent that the conversation
10 discussed things that were not intertwined
11 with advice of counsel, and you recall, that's
12 something that can be answered; but to the
13 extent that it's intertwined with advice of
14 counsel, my instruction is not to answer.
15      A   I -- I would like to characterize that in
16 questions of an employment nature, it would -- it --
17 it -- it had been my practice and our practice to
18 involve counsel for advice.
19      Q   So I am just asking about communications
20 in which no counsel was present with either
21 Ms. Miolla or Ms. Freiberg as it relates to the
22 content of the phone screen doc and the standards of
23 conduct.
24
25       Do you have any recollection of those

Christine Talbot
March 08, 2023

Page 58

1                 C. Talbot
2   communications?
3        A    I -- I can't -- I do not specifically
4   recall that there was any conversation that would
5   have been with Catherine or Melanie without counsel
6   present.  I -- I -- I -- I can't remember if there
7   was or if there wasn't.
8        Q    Okay.  To your knowledge, what was the
9   reason or reasons why the job offer extended to Aubry
10  McMahon was rescinded?
11       A    Well, the reason that the offer would
12  have been rescinded is the inability for Aubry to
13  meet one of the fundamental requirements of
14  employment with World Vision U.S., which would be
15  affirming and complying with the standards of conduct
16  which were described in the interview process.
17       Q    Now, when you answered that question, you
18  said that "it would have been."
19            Was that, in fact, the reason?
20       A    Yes.  To the best of my recollection,
21  yes.
22       Q    Was there any other reason?
23       A    I don't recall any other reason that that
24  offer would have been rescinded.
25       Q    Was it because she disclosed that she was

Page 59

1                 C. Talbot
2   gay?
3            MR. WARD:  I'm going to object as to
4       form.
5       A    It would not have been because she
6   disclosed she was gay.
7       Q    You had responded to that question saying
8   "it would not have been."
9            Was it --
10      A    It was not -- the job offer was not
11  rescinded because she was gay.
12      Q    Was the job offer rescinded because she
13  was not as expedient as desired in getting back to
14  Catherine with respect to e-mails sent to her?
15      A    The job offer --
16           MR. WARD:  I'm going to --
17      A    -- was not rescinded --
18           MR. WARD:  Sorry.  I'm going to object as
19      to form.
20           You may answer.
21      A    The job offer was not rescinded because
22  of the timeliness or lack thereof in responding to
23  Catherine's questions.
24      Q    Ms. Talbot, I'm going to read you
25  something, and then I'd like to know whether or not

Page 60

1                 C. Talbot
2   you agree with it.
3            The following question and answer were
4   interposed at the deposition of Melanie Freiberg.
5   Specifically, it's at page 74, lines 4 through 10.
6            "Question:  If you know, who was the
7   person or who were the persons who made the ultimate
8   decision to rescind the offer of employment extended
9   to Aubry McMahon by World Vision Incorporated?
10           "Answer:  The person who made the
11  ultimate decision to rescind the offer was Christine
12  Talbot, senior vice president of human resources."
13           Do you agree with Ms. Freiberg's answer
14  to that question?
15      A    I do.
16      Q    So just so we're clear, were you the
17  person who made the ultimate decision to rescind the
18  offer of employment extended to Aubry McMahon to work
19  for World Vision Incorporated?
20      A    Yes.  It was the duty of my job.
21      Q    Did you communicate this decision to
22  either Catherine Miolla or Melanie Freiberg?
23      A    I don't recall, but I would have, yes.
24  Yes.
25      Q    If you can recall, how did you

Page 61

1                 C. Talbot
2   communicate it to them; was it done via telephone,
3   e-mail, video conference, handwritten letter,
4   something else?
5       A    I -- I -- I don't -- I don't recall the
6   specifics of the communication.
7       Q    Irrespective of the method, do you recall
8   when you communicated it to either of them?
9       A    I don't recall the specific date or time.
10  It would have been in the time frame in which we're
11  talking about this occurred.
12      Q    Okay.  Have you ever been made aware that
13  at some point Melanie Freiberg and Catherine Miolla
14  spoke with Aubry McMahon on the telephone regarding
15  World Vision's decision to rescind the job offer?
16      A    Repeat that question, please.
17      Q    Have you ever been made aware that at
18  some point, Melanie Freiberg and Catherine Miolla
19  spoke with Aubry McMahon on the telephone regarding
20  World Vision's decision to rescind the job offer?
21      A    I think I might have a vague recollection
22  that they did.
23      Q    And if you can recall, how did you learn
24  about this call?
25      A    I don't remember that.  I don't remember

Christine Talbot
March 08, 2023

Page 62

C. Talbot

1    that.
2        Q       Ms. Talbot, I'd like to provide you with
3    what has been previously marked Plaintiff's
4    Exhibit 10 which is an MP3 audio file.  I will
5    represent to you that this audio file was exchanged
6    during discovery phase of litigation in this matter.
7            MR. WOLNOWSKI:  So we can go off the
8        record.
9            (Discussion held off the record)
10           MR. WOLNOWSKI:  Let's go back on the
11       record.
12       Q       Ms. Talbot, were you able to listen to
13   the audio file which I supplied you which has been
14   previously marked Plaintiff's Exhibit Number 10?
15       A       Yes, I was.
16       Q       Do you recognize this audio file?
17       A       I do not.
18       Q       Have you ever listened to it before?
19       A       I have not.
20       Q       Do you know who the two individuals are
21   that are speaking in that audio file?
22       A       I believe the two individuals are
23   Catherine -- well, no, I guess I'm not sure.  One of
24   them is obviously Aubry, but I'm not clear if the

Page 63

C. Talbot

1    other person was Melanie Freiberg or Catherine
2    Miolla, but I would believe it was one of those two,
3    or both of them, perhaps, were on the call.
4        Q       So I can represent to you that pursuant
5    to the sworn deposition testimony of both Melanie
6    Freiberg and Catherine Miolla, the two speakers on
7    the call, which is represented in Plaintiff's
8    Exhibit 10, were Melanie Freiberg and Aubry McMahon.
9    I'm representing that to you.
10       A       Okay.
11       Q       Ms. Talbot, do you know if anybody else
12   was a participant on this call?
13       A       I -- I don't know that.  I don't know.
14       Q       Were you personally on this phone call?
15       A       I was not on the phone.
16       Q       Do you know why you were not personally
17   on this telephone call?
18       A       Why would I be on such a call?  I --
19       Q       Well, hypothetically, someone could have
20   directed you to be on the call, it could have been
21   part of your job functions to be on a call of this
22   nature, Melanie may have asked you to be on this call
23   as a personal favor; so there could be a -- a
24   rationale as to why you would or wouldn't be on a

Page 64

C. Talbot

1    particular call.
2            I'm just asking if from your
3    recollection, do you know why you were not personally
4    on the call?
5            MR. WARD:  I'm going to object as to
6        form.
7            But you may answer.
8        A       Yeah.  I don't -- I don't recall being
9    requested to be on the call.  My job duties as a
10   senior vice president would not typically include
11   being on a call with a candidate.
12       Q       If you can remember, did you direct
13   anybody to make a telephone call to Aubry McMahon
14   rescinding her offer of employment with World Vision?
15       A       I don't recall directing someone to call
16   her with -- with -- with that.
17       Q       Did you advise somebody to communicate to
18   Aubry McMahon, whether it be telephone or otherwise,
19   that the offer of employment was going to be
20   rescinded?
21       A       I don't recall the specifics of my
22   telling or directing.  I can say that having made the
23   decision, yes, I would have directed a communication
24   to the -- the job offeree to be informed of the

Page 65

C. Talbot

1    decision.
2        Q       Would you agree that Melanie Freiberg
3    states in this audio recording, "Well, it is because,
4    um, the standards of conduct, yeah, are to, um, not
5    have any sexual conduct outside of marriage, and
6    marriage is defined as being between a man and a
7    woman, so that's the behavior that all employees have
8    to comply with"?
9            MR. WARD:  I'm going to object as to
10       form.
11       A       Having heard the recording for the first
12   time and one time, what you played back sounds like
13   what I remembered hearing just now, though I don't
14   know if you were reading word for word from a
15   transcript of it or not, but it -- it -- it sounds
16   like what I heard.
17       Q       Ms. Talbot, would you agree that
18   according to Melanie Freiberg, as stated to Aubry
19   McMahon in this audio recording, the reason the offer
20   of employment made by World Vision to Aubry McMahon
21   was being rescinded was because she was in a same-sex
22   marriage?
23           MR. WARD:  I'm going to object as to form
24       and misrepresentation.

Christine Talbot
March 08, 2023

Page 66

C. Talbot

1        C. Talbot
2            You may answer.
3        A    Well, what I heard Melanie say is that
4   because she couldn't comply with the standards of
5   conduct, a specific standard referenced in -- in that
6   being, being in a marriage with a man versus a woman
7   or not being in a same sex.  That's what I heard.
8   The inability to comply with the standards of conduct
9   would be the reason that that -- that the offer was
10  being rescinded.
11       Q    Based upon listening to this audio, would
12  you agree that Melanie Freiberg's rationale as
13  conveyed to Aubry McMahon was in accord with what
14  your decision was as it related to rescinding the
15  offer of employment?
16           MR. WARD:  I'm going to object as to
17       form.
18           You may answer.
19       A    Could -- could you just repeat that --
20  that question for me, Teri?
21           (WHEREUPON, the previous question was
22       read by the court reporter.)
23           MR. WARD:  I'm going to object as to
24       form.
25       A    I'm sorry, could I just hear it one more

Page 67

C. Talbot

1   time?  I'm -- I'm sorry, it -- there's a lot to that.
2   Just -- just read it to me one more time, Teri.
3        Q    Well, let me -- let me rephrase the
4   question, maybe it's easier.
5        A    Okay.  Okay.  Thanks.
6        Q    Based upon reviewing this audio, was the
7   reason as expressed to Aubry McMahon by Melanie
8   Freiberg the same reason that you decided to rescind
9   the offer of employment?
10           MR. WARD:  So I'm going to object as to
11       form and to foundation.
12       A    Mel- -- Melanie conveyed the reason for
13  the job offer rescission based upon inability for
14  Aubry to comply with our standards of conduct, and
15  that was the basis of the decision that I made to
16  rescind the offer.
17       Q    Ms. Talbot, to your knowledge, if Aubry
18  McMahon had been a man married to a woman, would she
19  have been in violation of World Vision's standards of
20  conduct for employees?
21           MR. WARD:  I'm going to object as to form
22       and calling for speculation.
23       A    You know, what I can tell you is that if
24  a job applicant represents that they're in a same-sex

Page 68

C. Talbot

1        C. Talbot
2   marriage, be it two women or two men, and they are
3   unable to comply with our standards of conduct which
4   specifically references the biblical covenant of
5   marriage between a man and a woman, that would be the
6   basis of whether they would be eligible for
7   employment or not.
8        Q    So I believe that your answer reflects a
9   policy of World Vision, and I'm asking specifically
10  about Aubry McMahon, an interplay between her and
11  that policy.  So I'm going to ask again.
12           If Aubry McMahon had been a man married
13  to a woman, would she have been in violation of World
14  Vision's standards of conduct?
15           MR. WARD:  So I'm going to object as to
16       form and in still calling for speculation.
17           THE WITNESS:  So am I being instructed to
18       answer the question?
19           MR. WARD:  You -- you may answer to the
20       extent you understand the question, but I'm --
21       I mean, I'm -- I'm registering my objection as
22       to the form of the question.
23       A    If Aubry was a man and was married to a
24  woman and was willing and able to affirm, you know,
25  living in accord with the standards of conduct, not

Page 69

C. Talbot

1   in a same-sex marriage, but married to someone of the
2   opposite sex, that would make Aubry eligible for
3   employment as it related to that particular
4   requirement.
5        Q    To your knowledge, if Aubry McMahon had
6   been a man married to a woman, would the offer of
7   employment been rescinded?
8           MR. WARD:  I'm going to object on the
9       same grounds; form, speculation.
10       A    I'm thinking.
11           If Aubry was able to comply with our
12  standards of conduct and -- and the other
13  requirements for being hired for the role, I think
14  she would be eligible for -- for a job offer.
15       Q    Ms. Talbot, to your knowledge, if Aubry
16  McMahon had previously been in a same-sex marriage
17  but had been divorced and single at the time of her
18  having applied, and confirmed that she was willing
19  and able to comply with the standards of conduct if
20  employed by World Vision, would the offer of
21  employment have been rescinded?
22           MR. WARD:  I'm going to object as to
23       form, foundation, and speculation.
24           I don't think that's a fair question,

Christine Talbot
March 08, 2023

Page 70

C. Talbot

1           C. Talbot
2       Counsel.
3               MR. WOLNOWSKI:  If she understands the
4       question, she can answer.
5               MR. WARD:  If she understands it.
6       A       I would like to say that we don't ask
7   about the former marital status or history of a job
8   candidate; it would not be a fact that would come
9   into play of which we would be aware based upon our
10  inquiry.
11      Q       What if somebody had voluntarily
12  disclosed it?
13              MR. WARD:  Same objections.
14      A       The hiring process is based upon
15  screening or affirming and complying in the present
16  with the standards of conduct.
17      Q       So I'm not sure that answers the
18  question.
19              If Aubry McMahon had previously been in a
20  same-sex marriage but had been divorced and single at
21  the time of her having applied and voluntarily
22  disclosed that she had previously been in a same-sex
23  marriage, but nevertheless stated that she was
24  willing and able to comply with the standards of
25  conduct if employed by World Vision, would the offer

Page 71

C. Talbot

1   of employment have been rescinded?
2       Q       MR. WARD:  So I'm going to object; form,
3   foundation, speculation, compound-complex.
4               You're presenting a hypothetical and
5   talking about it as though it's Ms. McMahon.
6       It's not.
7               Can you ask an appropriate question for a
8       fact witness, please?
9               MR. WOLNOWSKI:  No.  She can answer if
10      she understands it.
11              Thank you, Counselor.
12      A       I'm thinking.
13              I understand the question.  I understand
14  it's hypothetical.  I understand it's not relevant,
15  to the best of my understanding of the facts that
16  we're talking about, that it's applicable to this
17  particular job offer rescind.  And if you're asking
18  me to opine about other scenarios that could be
19  applicable to other people, then that feels like a
20  different question to me.
21      Q       If you could, please answer it then.
22              MR. WARD:  I think she just did.
23              MR. WOLNOWSKI:  No, she didn't.
24      Q       Could you please answer the question?
25

Page 72

C. Talbot

1       A       So let me clarify, if I could.
2               Are you asking me that if another
3   candidate voluntarily disclosed in the screening for
4   employment eligibility process that they'd been in a
5   previous same-sex marriage, and also, in the
6   employment screen for eligibility for hire, indicated
7   that they were able to currently be in compliance --
8   were willing and able to be in compliance with our
9   standards of conduct, could they be considered for
10  employment; is that what you're asking me?
11      Q       Yes, that's a -- I think a good
12  alternative way of putting it.
13      A       Okay.  They would be eligible for
14  consideration for employment, yes.
15      Q       Understood.
16              And is that by virtue of not being in a
17  same-sex marriage at the time of application?
18              MR. WARD:  Objection as to form;
19              mischaracterizes testimony.
20      A       If that -- if that candidate affirmed
21  their willingness and ability in the present to
22  comply with the standards of conduct as described in
23  the interview, they would be eligible for
24  consideration for employment.
25

Page 73

C. Talbot

1       Q       I'd like to show you what has been
2   previously marked Plaintiff's Exhibit Number 12.  It
3   is a document bearing Bates-stamped Numbers WV 2852
4   to 2853.  I will represent to you that this document
5   was exchanged during the discovery phase of
6   litigation.
7               Please review this document and let me
8   know once you've completed doing so.
9               MR. WOLNOWSKI:  Off the record.
10              (Discussion held off the record)
11      Q       Do you recognize this document?
12      A       I do not.
13      Q       Have you ever seen it before?
14      A       No.  It appears to be a document
15  published by a person I don't know, and published on
16  the Web site with which I'm unfamiliar.
17      Q       I'd like to direct your attention to the
18  second page of the document, the one marked WV 2853,
19  and the text under the heading which reads
20  "Employment and Sexual Orientation"; do you see that?
21      A       I do.
22      Q       Have you had a chance to review those two
23  paragraphs under that heading?
24      A       Yes.
25

Christine Talbot
March 08, 2023

Page 74

C. Talbot

1               C. Talbot
2     Q    So if I'm understanding this correctly,
3  and to the extent you know, the policy of World
4  Vision Incorporated, at least as of March 11th, 2022,
5  is that being gay is not a disqualifier for being
6  employed by World Vision, but being in a same-sex
7  marriage is.
8            MR. WARD:  Objection as to form.
9     Q    Would you agree with that understanding?
10           MR. WARD:  Objection as to form.
11    A    Please repeat -- please read it back,
12  Teri; would you?
13          (WHEREUPON, the previous question was
14     read by the court reporter.)
15           MR. WARD:  So same objection as to form.
16    A    So being in a same-sex marriage would
17  prohibit an applicant from being in a marriage
18  between a man and a woman, which is a requirement to
19  be compliant with the standards of conduct.
20     Q    Do you know if this was the policy of
21  World Vision Incorporated as of January of 2021?
22    A    Yes.
23           MR. WARD:  Objection to form.
24     Q    Ms. Talbot, to the extent you know or to
25  the extent you were told by anybody at World Vision,

Page 75

C. Talbot

1  what is the basis for one being in a same-sex
2  marriage serving as a disqualifier for employment
3  with World Vision?
4    A    Well, this is spelled out really well in
5  the document I would believe that you have, which is
6  the -- the policy -- the ethics -- business and
7  ethics policy and the supporting explanation of the
8  standards of conduct and expectations of behavior.
9  And throughout that document, it reflects the basis
10  for the sincerely held beliefs of the organization,
11  and it is filled with biblical references, of course
12  that being the source for -- for the Christian faith.
13  So I think it's -- it's very well articulated in --
14  in that policy and in that supporting document.
15     Q    I don't want to mischaracterize your
16  testimony, but is the short answer, in essence, the
17  Bible, that's the basis -- that's from where the
18  policy derives?
19           MR. WARD:  I'll object as to form.
20          You may answer.
21    A    Well, the sincerely held religious
22  beliefs of the Christian organization World Vision
23  U.S. is drawn from the Bible, yes.
24     Q    To your knowledge and to the extent you

Page 76

C. Talbot

1  know, isn't being gay also prohibited in the Bible?
2           MR. WARD:  Objection as to form and
3     foundation.
4    A    I'm not a theologian.  I know what the
5  organization's sincerely held beliefs are, and I just
6  don't recall documents of World Vision really talking
7  about being gay, but what they talk about is the
8  biblical covenant of marriage.
9         Maybe -- maybe I -- I need a different
10  question.
11     Q    Well, you had said that there are the
12  organa- -- organization's sincerely held beliefs as
13  to this, if I understand your response, regarding
14  whether or not being gay is prohibited by the Bible.
15         Did you -- did you state that in your
16  answer?
17           MR. WARD:  I'm going to --
18    A    Yes.
19           MR. WARD:  I'm going to object to form
20     and to mischaracterization.
21           MR. WOLNOWSKI:  Okay.
22     Q    You can answer the question.
23         Is -- is that -- if I'm -- am I
24  understanding your explanation correctly?

Page 77

C. Talbot

1          MR. WOLNOWSKI:  That's really the
2  question, is -- is that -- that something she
3  said in response.
4          MR. WARD:  But, Counselor, you just
5  mischaracterized her prior testimony.
6         Please give her an accurate question.
7     Q    If you understand the question, you can
8  answer.
9    A    I -- I --
10         MR. WOLNOWSKI:  Look, Mr. -- Counselor,
11  if you want to give follow-up questions, you
12  can do so after I've concluded my deposition.
13  You have that right.  But you do not have the
14  right to direct me what I can and cannot ask
15  the deponent.  If you want to have an
16  objection, direct her not to answer, you have
17  that right.  But to ask me to, you know, ask
18  her different questions, I'm just simply not
19  going to do that.  You don't have that right.
20  Thank you, Counselor.
21         MR. WARD:  I have the right to object.  I
22  will continue to exercise that right as the
23  rules permit.
24    A    Could I have the question repeated to me,

Christine Talbot
March 08, 2023

Page 78

C. Talbot

1
2  please, at this point?
3      Q    Well, let me ask you -- I'll ask you a
4  different question.
5      A    Thank you.
6      Q    Are you aware of World Vision's sincerely
7  held beliefs regarding whether or not gay -- being
8  gay is prohibited by the Bible?
9          MR. WARD:  Objection as to form.
10         You may answer.
11     A    I would honestly want to go back to
12 the -- the standards of con- -- conduct document and
13 the -- the foundations of the organization's
14 sincerely held beliefs and go back through that.
15 It's not something I have memorized, but I would -- I
16 would look to that document to be refreshed about the
17 organization's belief about being gay.
18     Q    Are you personally familiar with the Book
19 of Leviticus?
20     A    I know it's in the Bible, and at some
21 point in my life, I've read it.
22     Q    Are you familiar with the following
23 passage found at Chapter 20, verse 13, in the Book of
24 Leviticus:  "If a man lies with a man, as one does
25 with a woman, both of them have done what is

Page 79

C. Talbot

1
2  detestable; they are to be put to death; their blood
3  will be on their own heads"?
4          Are you familiar with that verse?
5      A    I'm not.
6      Q    Well, I can represent that that came from
7  the Bible which was provided to me in discovery by
8  your -- by World Vision's legal counsel.
9          Now, according to that Faith and Action
10 Study Bible produced in discovery, Leviticus states
11 that its contents were given to Moses by God at
12 Mount Sinai.  And when I say "Mount Sinai," I'm
13 speaking of the mountain on the Sinai Peninsula of
14 Egypt, not the hospital network in New York.  Just
15 want to attribute it to the appropriate speaker for
16 the sake of the record.
17         The passage and the verse that I read to
18 you, would you personally agree that it condemns
19 homosexuality?
20         MR. WARD:  Objection as to form.
21     A    I'm struggling, honestly, with the
22 relevance of my personal interpretation and
23 understanding of that Bible verse as it relates to
24 the cares and claims of this case.
25     Q    Are you declining to answer on that

Page 80

C. Talbot

1
2  basis?
3      A    If I can legitimately, I -- I would.  I
4  am uncomfortable acting as a theological interpreter
5  of the Bible in this deposition.  I -- yeah.
6      Q    So my understanding is you're refusing to
7  answer the question.
8      A    Is -- is your question to ask me to be a
9  theological interpreter of the Bible in this
10 deposition?
11     Q    The way this works is I ask questions,
12 you answer them.  It's not the other way around.
13         MR. WARD:  But Mr. -- Mr. --
14         MR. WOLNOWSKI:  Counselor, if you'd like
15 to put an objection on the record, you may.
16         MR. WARD:  Counsel, I am objecting on the
17     record.  Let me be very clear, you're allowed
18     to seek either admissible evidence or evidence
19     that's likely to lead to admissible evidence.
20         You've laid zero foundation for how the
21     witness' personal opinion about the meaning of
22     one verse that you have selected out the
23     Bible, in exclusion of the entire rest of the
24     Bible, is relevant to her position, let alone
25     to World Vision's position.  So I -- I am

Page 81

C. Talbot

1
2  objecting pretty strenuously based on
3  foundation and relevance.
4      If you want to try and lay one, that's
5  fine; but I just want to have a very clear
6  record that you're kind of taking us out in
7  the hinterlands here, and I -- I don't think
8  this is admissible and I don't think it's
9  likely to lead to admissible evidence.  I
10 think it's a frolic and a detour, to be quite
11 honest.
12         MR. WOLNOWSKI:  So are you directing
13 the -- your client not to answer?
14         MR. WARD:  I am registering my objection
15 on the record.
16         To the extent that the client understands
17 the question and has an opinion, she is free
18 to express her personal opinion.
19     A    I'd like to say that I don't have a
20 personal opinion of how that Bible verse --
21     Q    To the extent you know, in January of
22 2021, was it the policy of World Vision that
23 homosexuality violated the covenants of the Bible?
24         MR. WARD:  Objection as to form.
25         MR. WOLNOWSKI:  Are you directing the

Christine Talbot
March 08, 2023

Page 82

C. Talbot

1  C. Talbot
2  witness not to answer?
3       MR. WARD:  I simply objected as to form,
4  Counsel.
5       A    I would defer to the scriptural
6  references and content of World Vision's standard of
7  conduct document, that I don't have memorized but is
8  available, in order to accurately reflect the
9  sincerely held beliefs of the organization.
10      Q    Okay.  So I think we should take a moment
11 for you to review that.
12      A    Okay.
13      Q    Is that okay with you?
14      A    Yes.
15      MR. WARD:  I'm sorry, what's the "that";
16 the standards of conduct?
17      MR. WOLNOWSKI:  Yes.
18      MR. WARD:  Thank you.
19      Q    Do you have that document in front of
20 you, Ms. Talbot?
21      A    No, I -- okay.  I -- I will have to go
22 get it.  It was sent to me, so --
23      MR. WARD:  I believe that's an exhibit
24 you may have provided, Mr. Wolnowski.  I can
25 try and pull up the version that you provided,

Page 83

C. Talbot

1  if that's helpful, or if you've got it at
2  hand, that would be great.
3       MR. WOLNOWSKI:  Well, let's go off the
4  record.
5       (Discussion held off the record)
6       (WHEREUPON, a brief recess was taken,
7  after which the following transpired:)
8       (Time noted:  3:31 p.m.)
9       MR. WOLNOWSKI:  Let's go back on the
10 record.
11 CONTINUED EXAMINATION BY MR. WOLNOWSKI
12      Q    Ms. Talbot, when we went off, you had
13 mentioned that you wanted to review a document as it
14 related to your ability to answer the question that I
15 had posed.
16      MR. WOLNOWSKI:  And if you could,
17 Ms. Ratigan, could you read back the question
18 that was interposed prior to Ms. Talbot
19 needing to review that document?
20      (WHEREUPON, the previous question was
21 read by the court reporter.)
22      MR. WARD:  Objection as to form.
23      You may answer.
24      A    So now it's -- that question is directed

Page 84

C. Talbot

1  back to me; am I correct?
2       Q    Yes.
3       A    Okay.
4       Q    And if you could, now that you've had a
5  chance to review the document that you had mentioned,
6  are you able to answer that question?
7       A    Yes, I believe so.  I am looking at the
8  document and I had a chance to review it, and in that
9  document, it -- it represents Christian behaviors
10 that the organization deems as being nonacceptable
11 sexual conduct outside the biblical covenant of
12 marriage between a man and a woman.  And my
13 understanding of a homosexual relationship is that it
14 would be between same-sex partners in contrast to the
15 definition presented by World Vision's policy being
16 between specifically opposite sex; man and a woman.
17      Q    In January of 2021, did being homosexual
18 offend the standards of conduct of employees for
19 World Vision?
20      MR. WARD:  Objection as to form.
21      A    I need clarity on the reference to
22 "offend."  If I -- if I heard you correctly, you used
23 the word "offend."
24      What do you mean by that?

Page 85

C. Talbot

1  Q    Does it not comport?
2       A    Oh.  So this policy wasn't in fact -- was
3  in -- was in effect in January of 2021, and it would
4  have applied at that time, this sincerely held
5  religious belief that sexual conduct outside the
6  biblical covenant of marriage is to be between a man
7  and a woman.
8       Q    So homosexuality would not comport with
9  World Vision's standards of conduct; is that correct?
10      MR. WARD:  Objection as to form and asked
11 and answered.
12      A    I -- I -- I -- I would say what the
13 beliefs reflected here are talking about is sexual
14 conduct in a biblical covenant of marriage.  It's not
15 saying anything specifically about homosexuality.
16 It's talking about marriage and sexual conduct.
17 Those are the two things referenced here.
18      Q    I'd like to show you what will be marked
19 Plaintiff's Exhibit Number 17.  It is a document
20 which is Bates-stamped WV 1818.  I can represent that
21 this document was exchanged during the discovery
22 phase of litigation in this matter.
23      If you could, please review this document
24 and let me know once you've completed doing so.

Christine Talbot
March 08, 2023

Page 86

C. Talbot

1
2     A     I'm still pulling it up.  Give me a
3  moment, please.
4         MR. WOLNOWSKI:  Okay.  We can go off.
5         (Discussion held off the record)
6         (WHEREUPON, the above-referred-to
7     document, Bates-stamped WV-001818, was marked
8     as Plaintiff's Exhibit 17, for identification,
9     as of this date.)
10     Q     Do you recognize this document?
11     A     You know, I -- I -- it -- it's not -- I
12  don't have recollection of this.
13     Q     Have you ever seen it before?
14     A     I -- I don't recall this document.
15     Q     I can represent to you that this document
16  appears to an e-mail sent from a person named Andrea
17  McDaniel Smith on January 10th, 2020.
18         Do you dispute that this e-mail was
19  indeed sent to you on January 10th, 2020?
20     A     No, I don't dispute that, I just don't
21  have recollection of it.
22     Q     If you can recall, who is Andrea McDaniel
23  Smith?
24     A     Andrea McDaniel Smith is an external
25  recruiter at a search firm.

Page 87

C. Talbot

1
2     Q     According to this e-mail, it appears she
3  works for a company called CarterBaldwin Executive
4  Search; would you agree?
5     A     Yeah, I -- I -- I -- I have known Andrea
6  to work for that firm, yes.
7     Q     Isn't it true, generally speaking,
8  CarterBaldwin provides executive search services for
9  a variety of industries including higher education
10  and nonprofit organizations?
11     A     Yes, that's my understanding of what they
12  do.
13     Q     If you can recall, who is the person
14  named Lily that is referenced in this e-mail?
15     A     I don't recall.  I don't recall.
16     Q     From your recollection, was a person
17  named Lily being considered for a position with World
18  Vision in or around January of 2020?
19     A     I -- I don't recall this name, Lily.
20     Q     I'd like to direct your attention to the
21  final sentence of this e-mail which reads, "Supports
22  World Vision's standards of conduct belief in
23  traditional marriage."
24         Do you see that?
25     A     I did see that.

Page 88

C. Talbot

1
2     Q     Did she include that in an e-mail that
3  she sent to you on January 10th?
4     A     Well, I could only say I didn't recall
5  this e-mail, but I see this in the e-mail that I have
6  said -- you know, I'm not disputing that it was sent
7  to me or that this exchange happened, I just don't
8  have recollection of this e-mail or the -- the
9  concepts of this e-mail.
10     Q     Do you know why she wrote that in this
11  e-mail?
12         MR. WARD:  Objection as to form.
13     A     Can I ask you, what do you mean what --
14  what do you mean she wrote "this"; could you clarify
15  "this"?
16     Q     Sure.  This last sentence which starts
17  with the word "Supports."
18     A     Well, if I recall about this time -- and
19  I don't recall specifically -- we did have -- during
20  my tenure, we did have an engagement with Carter- --
21  CarterBaldwin to search for a role and -- and made
22  known to CarterBaldwin the requirements of World
23  Vision to be considered for employment being both the
24  ability to affirm either the Apostles' Creed or our
25  statement of faith and to affirm and being willing to

Page 89

C. Talbot

1
2  comply with our standards of conduct.  That's
3  something that a recruiter outside of the
4  organization would -- would need to understand in
5  order to effectively help us find qualified and
6  employment-eligible prospects.
7     Q     But it appears as though Lily was in a
8  traditional marriage, based upon the content of this
9  e-mail; wouldn't you agree?
10     A     I -- I -- I see man and woman
11  references -- husband and wife in here.  That's what
12  I would take away from this, yes.
13     Q     In January of 2020, to the extent you
14  know, Ms. Talbot, was it a disqualifier for
15  employment with World Vision for a person to so much
16  as support the idea of people being in a same-sex
17  marriage even if he or she isn't actually in one
18  himself or herself?
19         MR. WARD:  Objection as to form.
20     A     I would -- I would ask you to repeat --
21  repeat that question.
22     Q     Ms. Talbot, to the extent you know, in
23  January of 2020, was it a disqualifier for employment
24  with World Vision for a person to so much as support
25  the idea of people being in a same-sex marriage even

Christine Talbot
March 08, 2023

Page 90

C. Talbot

1
2  if he or she wasn't actually in one himself or
3  herself?
4          MR. WARD:  Same objection as to form.
5          You may answer.
6      A    An applicant's personal beliefs about
7  same-sex marriage were not a part of the interview or
8  screening process.
9      Q    What if somebody voluntarily disclosed
10 that information during the interview process; in
11 other words, what if somebody disclosed, "I'm in a
12 traditional marriage; however, I support people
13 having the ability to be in a same-sex marriage if
14 they wish" --
15         MR. WARD:  Objection --
16     Q    -- from your knowledge and your
17 experience, would that have served as a disqualifier?
18         MR. WARD:  Objection as to form.
19     A    It wouldn't have disqualified somebody
20 from being considered.  But to be considered, they
21 would need to be able to affirm the Christian faith
22 and affirm or comply -- be willing and -- and able to
23 comply with the standards of conduct.
24     Q    Ms. Talbot, to the extent you know, why
25 is the belief in traditional marriage so important to

Page 91

C. Talbot

1
2  World Vision at least with respect to eligibility for
3  employment?
4          MR. WARD:  Objection as to form.
5          You may answer.
6      A    One thing that's important to know is
7  I -- the -- the standards of conduct and the core
8  documents of the organization were written and
9  established prior to my employment.  I can't say that
10 I can be, you know, the best or, in fact, a
11 spokesperson as to the motivations or the importance
12 of all aspects of all that's included in the
13 standards of conduct or other -- the organization's
14 other documents.  I would say that everything that is
15 included in that policy and those standards of
16 conduct is important and was important enough to --
17 to codify in that document.
18     Q    To your knowledge, why weren't other
19 things codified in that document; for example, why
20 wasn't the affirmation that one will not engage in
21 gambling made part of the standards of conduct?
22 Again, this is to the extent you know.  I'm not
23 asking to speculate.  I'm just asking if you know.
24     A    Well, I never was in any conversation
25 that specifically addressed that question, Do we put

Page 92

C. Talbot

1
2  gambling in or do we not put gambling in, because I
3  wasn't a part of any of the creation of the document.
4          I -- I would say, however, having, you
5  know, looked at the document again here afresh a few
6  minutes ago -- and I -- I shut it down, I can pull it
7  back up -- I think that question is really addressed
8  in there because it addressed the fact that the list
9  of things isn't exhaustive, but, in fact, the
10 document, as I understand it, seeks to provide a set
11 of biblical precepts supported by scripture that
12 would characterize Christian behavior, and one can
13 use those precepts in that document and answer
14 questions that's needed not contained in the
15 document.  One of them, for example, is, Does it
16 glorify God?  There's some other content in there
17 about stewardship.
18         So the fact that everything isn't
19 addressed in the rationale why this is in or that's
20 in, I wasn't a part of creating those documents, and
21 I can't answer something like that specifically, but
22 I always would go back to that document; what -- how
23 is Christian conduct being described, what are the
24 precepts, what are the scriptures, and what are the
25 questions to ask about whatever those specific things

Page 93

C. Talbot

1
2  might be, but --
3      Q    It wasn't always the policy that being in
4  a same-sex marriage acted as a disqualifier for
5  employment with World Vision; correct?
6          MR. WARD:  Objection as to form.
7          You may answer.
8      A    Well, there was a time that predates me
9  that I understand, in the history of the
10 organization, there were a couple of dates when there
11 was a -- there was a policy change.
12     Q    Ms. Talbot, I'd like to show you what
13 will be marked Plaintiff's Exhibit 18.  It's a
14 document bearing Bates-stamped Numbers 1152 to 1153.
15         If you could, please review this document
16 and let me know once you've had the chance to
17 conclude doing so.
18     A    Okay.
19         (WHEREUPON, the above-referred-to
20 document, Bates-stamped WV-001152 through
21 WV-001153, was marked as Plaintiff's
22 Exhibit 18, for identification, as of this
23 date.)
24     A    Okay.  I have the document open.  I'm
25 just going to begin to look it over.

Christine Talbot
March 08, 2023

Page 94

C. Talbot

1
2      (Perusing a document)
3      Okay.  I've had a chance to look at that.
4    Q    Do you recognize this document?
5    A    I saw the name of the document and I know
6  the existence of this document.
7    Q    I'm sorry, could you repeat that?
8    A    I saw the name of the document at the
9  bottom of the page, and I know of the existence of
10 this document.
11   Q    Have you ever seen it before?
12   A    I don't specifically recall seeing this.
13   Q    I'd like to direct your attention to
14 the first page, it's under a section entitled
15 "Question 2," and then under a subsection entitled
16 "Supporting Points."
17        It reads, "In 2014, in deference to the
18 authority of local churches, World Vision removed the
19 phrase 'between a man and a woman' in our policy on
20 marriage.  But our board quickly reinstated it when
21 we realized our partners and the public understood
22 our decision to mean that we had redefined what it
23 meant to be a Christian organization."
24        Continuing onto the next page, in the
25 last paragraph of that subsection, it reads, and I

Page 95

C. Talbot

1  quote, "As the culture tide was changing, the board
2  was attempting to take what they thought was a
3  measured approach.  The decision endorsed the idea of
4  allowing avowed Christians in same-sex marriages to
5  work at World Vision based on the pastoral guidance
6  of their church/denomination.  A few days after the
7  policy change was announced, the board reversed it
8  per management's recommendation."
9
10        Now, Ms. Talbot, I know that this change
11 predates your date of commencement; correct?
12   A    Yes, that's correct.
13   Q    Did you ever learn with any kind of
14 specificity why the policy was changed back by the
15 board so quickly in 2014?
16   A    Well, what -- what I knew is actually --
17 or heard is actually what is reflected in -- in this
18 document.  There was something here that I read that
19 I had also heard, and it was this part about -- about
20 where -- where it says, "but our board quickly
21 reinstated it when" -- meaning the policy of marriage
22 between a man and a woman -- "when we realized our
23 partners and the public understood our decision to
24 mean that we had redefined what it meant to be a
25 Christian organization."

Page 96

C. Talbot

1
2        And that was -- what's printed here is
3  what, you know, my understanding was once I joined
4  the organization and learned more about this.
5        MR. WOLNOWSKI:  All right.  Let's take a
6  five-minute break, and I'll be back in --
7  4 o'clock.
8        THE WITNESS:  Okay.
9        MR. WARD:  Very good.  Thank you.
10       (WHEREUPON, a brief recess was taken,
11 after which the following transpired:)
12       (Time noted:  4:00 p.m.)
13       MR. WOLNOWSKI:  Ms. Talbot, I have no
14 further questions.
15       Thank you.
16       (Continued on page 97 so that the
17 conclusion of the testimony may be accompanied
18 by the jurat.)
19
20
21
22
23
24
25

Page 97

C. Talbot

1
2        MR. WARD:  Very good.  Thank you.
3  I have no questions.
4        MR. WOLNOWSKI:  Okay.
5        (WHEREUPON, the examination of this
6  witness was concluded at 4:01 p.m.)
7
8  _____
   CHRISTINE TALBOT
9
10
11 Subscribed and sworn to before me
   this ___ day of _____ 2023.
12
13
   _____
14     NOTARY PUBLIC
15
16
17
18
19
20
21
22
23
24
25

Christine Talbot
March 08, 2023

Page 98

```
1                    C. Talbot
2
3                 I N D E X
4
5  WITNESS           EXAMINATION BY          PAGE
6  Christine Talbot   Mr. Wolnowski            5
7
8
9                    EXHIBITS
10
11  PLAINTIFF'S
    EXHIBITS    DESCRIPTION                  PAGE
12
    14          World Vision's Privilege Log,
13              Updated August 5, 2022        30
14  15          Bates-stamped WV-00695 through
                WV-006096                      35
15
    16          Bates-stamped WV-006097 through
16              WV-006098                      41
17  17          Bates-stamped WV-001818        86
18  18          Bates-stamped WV-001152 through
                WV-001153                      93
19
20
21              (WHEREUPON, original exhibits marked
22          during today's deposition were retained by
23          U.S. Legal Support.)
24
25
```

Page 99

```
1                    C. Talbot
2   ERRATA SHEET FOR THE TRANSCRIPT OF:
    Case Name:  AUBRY MCMAHON v WORLD VISION, INC.
3   Proceeding Date:  March 8, 2023
    Deponent: CHRISTINE TALBOT
4   Place:  Remote Video Conference
5      * PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND
            NOTE THE REASON FOR SAME *
6
7   PG / LN  /   NOW READS   _/   SHOULD READ   /   REASON
    ___/____/_____/_____/_____
8   ___/____/_____/_____/_____
    ___/____/_____/_____/_____
9   ___/____/_____/_____/_____
    ___/____/_____/_____/_____
10  ___/____/_____/_____/_____
    ___/____/_____/_____/_____
11  ___/____/_____/_____/_____
    ___/____/_____/_____/_____
12  ___/____/_____/_____/_____
    ___/____/_____/_____/_____
13  ___/____/_____/_____/_____
    ___/____/_____/_____/_____
14  ___/____/_____/_____/_____
    ___/____/_____/_____/_____
15  ___/____/_____/_____/_____
    ___/____/_____/_____/_____
16  ___/____/_____/_____/_____
    ___/____/_____/_____/_____
17  ___/____/_____/_____/_____
    ___/____/_____/_____/_____
18  ___/____/_____/_____/_____
    ___/____/_____/_____/_____
19  Under penalties of perjury, I declare that I have
    read the foregoing transcript and that the facts
20  stated in it are true.
21  _____    _____
    CHRISTINE TALBOT              DATE
22
23  Subscribed and sworn to before me
    this ___ day of _____ 2023.
24
25  _____
             NOTARY PUBLIC
```

Page 100

```
1                    C. Talbot
2
3            C E R T I F I C A T E
4
5       I, THERESA RATIGAN, a Shorthand Reporter and
6   Notary Public of the State of New York, do hereby
7   certify:
8       That the witness whose examination is
9   hereinbefore set forth, was duly sworn, and that such
10  examination is a true record of the testimony given
11  by such witness.
12      I further certify that I am not related to any
13  of the parties to this action by blood or marriage;
14  and that I am in no way interested in the outcome of
15  this matter.
16      IN WITNESS WHEREOF, I have hereunto set my
17  hand this 14th day of March 2023.
18
19
20
             THERESA RATIGAN
21
22
23
24
25
```

Christine Talbot
March 08, 2023

---

### Exhibits

**EX 0014 Chris
tine Talbot 0
30823**
  30:3,19
  31:17 34:11
  98:12
**EX 0015 Chris
tine Talbot 0
30823**
  34:15 35:6,
  16 98:14
**EX 0016 Chris
tine Talbot 0
30823**
  41:2,14
  42:16 98:15
**EX 0017 Chris
tine Talbot 0
30823**
  85:20 86:8
  98:17
**EX 0018 Chris
tine Talbot 0
30823**
  93:13,22
  98:18

---

#### 1

**10**
  60:5 62:5,15
  63:9
**10th**
  86:17,19
  88:3
**11**
  33:16,18
**1152**
  93:14
**1153**
  93:14
**11:56**
  19:21

---

**11th**
  74:4
**12**
  42:11 73:3
**13**
  78:23
**14**
  30:3,19
  31:17 34:11
**15**
  34:15 35:6,
  16,19
**16**
  41:2,14
  42:16
**17**
  85:20 86:8
**18**
  93:13,22
**1818**
  85:21
**1985**
  10:21
**1:02**
  4:2
**1st**
  18:15,23

---

#### 2

**2**
  17:3 94:15
**20**
  78:23
**2014**
  94:17 95:15
**2015**
  11:15,24
**2020**
  86:17,19
  87:18 89:13,
  23
**2021**
  12:10,15,23
  13:5,19,23
  14:3,5,9
  16:16 18:4,

---

  15,23 19:20
  22:16,22,24
  23:3,10
  27:18 28:3,
  22 29:22
  32:2,6,10,
  16,19,22,24
  33:4,10,14,
  15,21,24
  34:5 35:15,
  21 37:5
  39:18 40:6,
  23 42:9
  47:14,24
  48:4,5,8
  50:21,24
  51:12 54:11,
  19 56:18,19
  74:21 81:22
  84:18 85:4
**2022**
  30:18 74:4
**2023**
  10:15 11:25
  12:24
**2852**
  73:4
**2853**
  73:5,19
**2:18**
  49:12

---

#### 3

**3**
  19:6,19
**3:31**
  83:9
**3rd**
  10:13

---

#### 4

**4**
  60:5 96:7
**4:00**
  96:12

---

**4th**
  16:16 51:8

---

#### 5

**5**
  30:18
**5th**
  18:4 19:20
  20:17 22:8
  24:17 27:18
  29:22 32:2,
  6,10 33:14,
  24 40:22
  48:7 50:21
  54:11,18
  56:18

---

#### 6

**6**
  52:3 53:6
**6095**
  34:17 40:13
**6096**
  34:17
**6097**
  41:3
**6098**
  41:4
**67**
  52:4
**6th**
  33:21,25
  34:3,7
  35:14,21
  37:5,24
  38:9,20
  39:18 40:8
  42:9

---

#### 7

**70**
  52:5
**7050**
  5:10

---

Christine Talbot
March 08, 2023

**74**
 60:5
**78**
 17:4
**79**
 17:4

---

**8**

**8**
 27:18 50:21
**80**
 19:7
**81**
 49:2 51:2
**82**
 49:2
**85750**
 5:11
**8th**
 28:3,22
 29:22 33:15
 40:22 48:8
 50:24 51:12
 52:22 54:11,
 18 56:19

---

**9**

**9**
 48:25 50:6
**9106**
 5:10
**97**
 96:16

---

**A**

**a.m.**
 19:21
**ability**
 8:22 21:22
 47:6 72:22
 83:15 88:24
 90:13

**able**
 21:9 39:14,
 21 40:3 45:2
 51:22 54:4
 62:13 68:24
 69:12,20
 70:24 72:8,9
 84:7 90:21,
 22
**above-
referred-to**
 30:16 35:3
 41:11 86:6
 93:19
**Absolutely**
 28:16
**accompanied**
 96:17
**accord**
 45:9 66:13
 68:25
**accordance**
 45:3
**account**
 44:20
**accurate**
 35:15 44:21
 77:7
**accurately**
 82:8
**acknowledge**
 4:8,12
**acquisition**
 22:12,20
**acronym**
 9:22
**acted**
 93:4
**acting**
 80:4
**Action**
 79:9
**activities**
 16:15 23:9
**address**
 5:9

**addressed**
 91:25 92:7,
 8,19
**administer**
 4:14
**administered**
 4:13
**administering**
 12:19
**administratio
n**
 12:19
**admissible**
 80:18,19
 81:8,9
**advanced**
 10:22 11:2
**advice**
 31:9 36:10
 39:10 55:25
 57:5,12,14,
 19
**advise**
 9:23 64:18
**advises**
 24:18
**advisory**
 47:14,20
**affirm**
 21:22 40:3
 45:2 47:6,11
 68:24 88:24,
 25 90:21,22
**affirmation**
 91:20
**affirmed**
 72:21
**affirming**
 58:15 70:15
**afresh**
 92:5
**afternoon**
 4:3,6
**ago**
 92:6
**agree**
 4:22,24

**33:14 50:22
 60:2,13
 65:3,18
 66:12 74:9
 79:18 87:4
 89:9**
**agreed**
 8:13
**agreement**
 4:19,20
**akin**
 15:19
**alcohol**
 8:19
**aligned**
 54:6
**alignment**
 53:14
**allowed**
 80:17
**allowing**
 95:5
**aloud**
 17:10
**alternative**
 72:13
**and/or**
 33:17 54:17
**Andrea**
 86:16,22,24
 87:5
**Ann**
 5:8
**announced**
 95:8
**answer**
 6:14,22
 18:10 19:25
 21:5,17
 23:24 24:13,
 22 25:3,12,
 19 26:2,13,
 24 27:7,20
 28:11 29:16
 31:7 36:9,
 11,13,21
 37:14 38:24

Christine Talbot
March 08, 2023

39:9,10,25
43:4 44:9,19
48:3 49:23
53:8 54:5
55:7,23
57:15 59:20
60:3,10,13
64:8 66:2,18
68:8,18,19
70:4 71:10,
22,25 75:17,
21 76:17,23
77:9,17
78:10 79:25
80:7,12
81:13 82:2
83:15,24
84:7 90:5
91:5 92:13,
21 93:7
answered
44:8 46:3
57:13 58:17
85:12
answering
6:5 28:12
45:12
answers
6:18,19,21
44:10 51:18
52:16,25
54:7 70:17
anybody
7:10 9:4
37:3 49:17
63:12 64:14
74:25
anyone
7:7 9:19
Apostles'
88:24
appears
33:18 50:19,
25 73:15
86:16 87:2
89:7
applicable
71:17,20

applicant
21:22 47:10
67:25 74:17
applicant's
90:6
application
15:18 16:10
25:6 72:18
applied
15:7,15 16:4
69:19 70:21
85:5
appreciate
45:5,19
approach
95:4
appropriate
71:8 79:15
April
11:15,24
Arizona
5:11 14:14
around
13:5 36:16
80:12 87:18
arrangement
4:17
articulated
75:14
asked
46:3 53:21
63:23 85:11
asking
48:16,17
57:20 64:3
68:9 71:18
72:3,11
91:23
aspects
91:12
assigned
33:11
assume
6:4
assumed
25:22 49:23

attempting
95:3
attend
42:18
attention
18:20 32:7
54:12 73:18
87:20 94:13
attorney
7:22 9:20
33:11 56:12,
14
attorney/
client
31:4 36:7
55:3,5
attorneys
4:7 56:8
attribute
79:15
Atwood
14:24 15:2,
6,15
Aubry
5:15 14:23,
24,25 15:2,
6,15 16:4,9,
18,19,24
18:6,25
19:2,19 20:5
21:9,18
23:13,21
24:8,9,15,16
25:9,24
26:11,15
27:10 29:3,
6,11,23
33:23 36:18,
24 38:18
42:25 43:8,
14,19,25
44:13 45:23
46:10,17
48:10,21
50:20 51:3,
21 52:25
53:20,23
58:9,12

60:9,18
61:14,19
62:25 63:9
64:14,19
65:19,21
66:13 67:8,
15,18 68:10,
12,23 69:3,
6,12,16
70:19
Aubry's
25:5 51:18
audio
9:16 62:5,6,
14,17,22
65:4,20
66:11 67:7
August
30:18
authenticity
35:18
authority
94:18
available
7:17 82:8
avowed
95:5
aware
8:5 18:25
20:24 61:12,
17 70:9 78:6

___

B

baby
24:19
bachelor's
10:16,23
11:3
back
17:21 18:16
28:7 30:21
33:8 34:5
35:8 41:16
44:11 49:13
51:6 52:12
55:12 56:2,

Christine Talbot
March 08, 2023

8,24 59:13
62:11 65:13
74:11 78:11,
14 83:10,18
84:2 92:7,22
95:14 96:6
based
18:3,13
24:8,17
32:13 34:8
38:22,25
42:7,13
46:19 66:11
67:7,14
70:9,14 81:2
89:8 95:6
basis
13:16 31:4
36:7 39:20
46:8 67:16
68:6 75:2,
10,18 80:2
Bate-stamped
17:3
Bates-stamped
30:6 34:16
35:4 41:3,12
49:2 51:2
52:4 73:4
85:21 86:7
93:14,20
bear
30:5
bearing
41:3 49:2
52:4 73:4
93:14
bears
34:16
begin
34:22 93:25
beginning
50:21
behavior
11:8 53:16
65:8 75:9
92:12

behaviors
53:13 84:10
belief
23:12,15
24:16 25:8,
23 78:17
85:6 87:22
90:25
beliefs
75:11,23
76:6,13
78:7,14 82:9
85:14 90:6
believe
18:11 26:4
45:12 51:14
53:14 55:18
62:23 63:3
68:8 75:6
82:23 84:8
believed
25:13 26:3
Benedictine
11:6
benefits
12:18 54:8
best
6:3 16:6
26:22,25
27:2,11
58:20 71:16
91:10
Bible
75:18,24
76:2,15
78:8,20
79:7,10,23
80:5,9,23,24
81:20,23
biblical
21:24 47:8
51:24 68:4
75:12 76:9
84:12 85:7,
15 92:11
Bio
50:4

bisexual
9:25
blood
79:2
board
94:20 95:2,
8,15,20
Book
78:18,23
boss
23:3 32:24
bottom
94:9
bought
11:11
break
6:12,15
28:15 49:16,
18 50:3,4
96:6
brief
49:10 83:7
96:10
brought
54:12
bullet
53:18
business
9:12 47:18
75:7

---

## C

calendar
40:11
call
42:24 43:7,
13,18,25
44:13 45:23
46:6,10
61:24 63:4,
8,13,15,18,
19,21,22,23
64:2,5,10,
12,14,16
called
87:3

calling
67:23 68:16
calls
46:25 55:2
candidate
36:24 37:25
38:6,10
39:14,18
44:25 47:4
64:12 70:8
72:4,21
candidates
37:17
capacity
10:12
cares
79:24
Carter-
88:20
Carterbaldwin
87:3,8
88:21,22
case
49:5,21 52:7
79:24
Casey
4:22 5:14
Catherine
19:20 20:19
22:7,10 25:5
33:22 34:8
35:20 37:2,
7,24 38:9,18
39:6 40:22
42:10 50:20
58:5 59:14
60:22 61:13,
18 62:24
63:2,7
Catherine's
59:23
Catherine/
melanie/
christine
42:21
caused
21:14 22:4

Christine Talbot
March 08, 2023

ceased
  12:2
CEO
  13:14
cetera
  13:11
chain
  33:22 35:20
  50:20
chance
  31:16 73:23
  84:6,9 93:16
  94:3
change
  12:23 93:11
  95:8,10
changed
  95:14
changing
  95:2
Chapter
  78:23
characterizat
ion
  26:20
characterize
  57:16 92:12
chat
  7:25
Christian
  53:12 75:13,
  23 84:10
  90:21 92:12,
  23 94:23
  95:25
Christians
  95:5
Christine
  5:8 60:11
church/
denomination
  95:7
churches
  94:18
circumstan-
  22:18

circumstance
  22:16,17
circumstances
  5:22 14:19
  37:16
claims
  79:24
clarify
  15:11 23:18
  72:2 88:14
clarity
  32:7 84:22
cleaner
  6:23
cleaning
  49:19 50:2
clear
  6:20 14:2
  31:24 38:7
  39:12 47:13
  54:10 57:2
  60:16 62:25
  80:17 81:5
client
  81:13,16
codified
  91:19
codify
  91:17
College
  10:19
come
  15:5 19:22
  70:8
comes
  55:3
commence
  18:14
commencement
  95:11
commencing
  18:22
commit
  45:3
committees
  13:15

communicate
  7:21 60:21
  61:2 64:18
communicated
  27:25 48:21
  61:8
communication
  7:24 16:22
  34:5 51:3
  61:6 64:24
communication
s
  16:23 29:21
  31:2,22
  33:16 57:20
  58:2
company
  87:3
compensation
  12:18
completed
  10:24 11:10
  17:8 19:11
  30:9 41:8
  49:7 52:9
  73:9 85:25
compliance
  21:10 47:6
  51:22 53:22
  72:8,9
compliant
  74:19
comply
  29:7 39:14,
  21 40:2,4
  44:25 46:18,
  23 47:11
  54:4 65:9
  66:4,8 67:15
  68:3 69:12,
  20 70:24
  72:23 89:2
  90:22,23
complying
  58:15 70:15
component
  47:7

comport
  85:2,9
compound-
complex
  71:4
computer
  7:14,18
con-
  78:12
concepts
  88:9
concern
  45:14
conclude
  25:14 43:25
  44:13 45:23
  46:10 93:17
concluded
  34:21 44:20
  46:15,17
  77:13
conclusion
  45:9 96:17
conclusions
  45:8
conclusively
  26:18
condemns
  79:18
conduct
  9:13 21:10,
  20,23 29:8
  39:15,22
  40:4 45:4
  46:19,24
  47:3,7,18
  51:19,23
  53:12,15,18,
  22 54:5
  56:17 57:24
  58:15 65:5,6
  66:5,8
  67:15,21
  68:3,14,25
  69:13,20
  70:16,25
  72:10,23

Christine Talbot
March 08, 2023

74:19 75:9
78:12 82:7,
16 84:12,19
85:6,10,15,
17 87:22
89:2 90:23
91:7,13,16,
21 92:23
**conducting**
7:4
**conference**
16:21 61:3
**confirmation**
18:5
**confirmed**
69:19
**confuse**
5:24
**confused**
23:14
**consent**
4:16
**consideration**
72:15,25
**considered**
72:10 87:17
88:23 90:20
**consistent**
36:15
**contact**
9:11
**contained**
52:21 92:14
**content**
31:7,22
37:25 57:23
82:6 89:8
92:16
**contents**
22:3 24:17
26:6 54:16
56:17 79:11
**continue**
77:23
**continued**
49:14 83:12
96:16

**Continuing**
94:24
**contrast**
84:15
**conversation**
24:5 29:18
37:19 40:19
53:12,17
57:9,10 58:4
91:24
**conversations**
31:7 39:3
55:20 56:7,
9,16,21,23
57:4,5
**conveyed**
66:13 67:13
**core**
91:7
**correct**
11:22 18:4,
14 27:4
29:24 32:2,
10 35:22
42:12 56:19
84:2 85:10
93:5 95:11,
12
**correctly**
74:2 76:25
84:23
**counsel**
4:16,23
31:8,9 33:5
55:24 56:22,
24 57:4,5,8,
9,12,15,19,
21 58:5 70:2
79:8 80:16
82:4
**counsel's**
55:25
**counselor**
31:15 36:11
71:12 77:5,
11,21 80:14
**counsels**

4:21
**couple**
28:13 93:10
**course**
75:12
**courses**
10:25 11:6
**court**
4:5 6:20,24
8:4 28:9
55:14 66:22
74:14 83:22
**covenant**
21:24 47:8
51:24 68:4
76:9 84:12
85:7,15
**covenants**
81:23
**creating**
92:20
**creation**
6:23 92:3
**Creed**
88:24
**culture**
95:2

---

**D**

---

**daily**
23:9
**date**
10:10 14:14
16:17 30:20
32:5 35:7
41:15 61:9
86:9 93:23
95:11
**dated**
18:4 19:20
**dates**
18:18 27:22
39:2 56:9
93:10
**day**
34:8 42:12

**days**
95:7
**death**
79:2
**decide**
54:2
**decided**
67:9
**deciphering**
56:5
**decision**
46:7 48:9,
12,13,15,19,
20 60:8,11,
17,21 61:15,
20 64:24
65:2 66:14
67:16 94:22
95:4,23
**declining**
79:25
**deems**
84:11
**defendant**
5:18 30:6,17
**defer**
82:5
**deference**
94:17
**defined**
53:19 65:7
**definitely**
27:17,24
28:22
**definition**
84:16
**definitively**
27:2
**degree**
10:16,23,24
11:2
**degrees**
10:22
**deliver**
37:21
**departure**
14:19

Christine Talbot
March 08, 2023

deponent
  77:16
deposed
  10:5
deposing
  8:17
deposition
  4:8,9,10
  7:5,11 9:8,
  17,20,23,24
  14:14 60:4
  63:6 77:13
  80:5,10
derives
  75:19
describe
  13:6
described
  47:23 58:16
  72:23 92:23
describes
  44:9
describing
  38:4
desired
  59:13
desk
  7:17
details
  20:7
detestable
  79:2
detour
  81:10
developed
  36:23
development
  36:18
different
  20:10 26:8
  39:2 47:21
  71:21 76:10
  77:19 78:4
direct
  13:7 16:14
  18:20 32:7
  64:13 73:18

77:15,17
  87:20 94:13
directed
  23:9 63:21
  64:24 83:25
directing
  64:16,23
  81:12,25
Director
  32:17
disclosed
  58:25 59:6
  70:12,22
  72:4 90:9,11
disclosing
  55:5
disclosures
  33:24
discovery
  17:5 19:8
  30:5 34:19
  41:5 49:4
  52:6 62:7
  73:6 79:7,10
  85:22
discrepancy
  51:5,7,11,17
  52:21,24
  53:3,5 54:7
  56:6
discuss
  36:18 51:5
  57:5
discussed
  42:25 43:9,
  14,20 54:17
  57:11
discussing
  39:10 57:7
discussion
  6:11 17:20
  30:15 33:7
  35:2 36:11
  40:16 41:10
  52:11 62:10
  73:11 83:6
  86:5

discussions
  38:17 39:5,
  13 56:4
displayed
  35:15
dispute
  35:13,17
  86:18,20
disputing
  88:6
disqualified
  90:19
disqualifier
  39:19 74:5
  75:3 89:14,
  23 90:17
  93:4
divorced
  69:18 70:20
doc
  57:23
doctrine
  31:5
document
  17:3,5,7,9,
  11,23 18:3
  19:5,7,10,
  12,14,15
  30:4,8,17
  31:17,19
  33:14 34:12,
  16,17,20
  35:4,10
  41:3,4,7,12,
  18 42:7,14
  49:2,3,6
  50:6,7,14,19
  52:4,5,8,14,
  15,18,20
  53:5,9
  54:12,15,17
  56:2,18
  73:4,5,8,12,
  15,19 75:6,
  10,15 78:12,
  16 82:7,19
  83:14,20
  84:6,9,10

85:20,22,24
  86:7,10,14,
  15 91:17,19
  92:3,5,10,
  13,15,22
  93:14,15,20,
  24 94:2,4,5,
  6,8,10 95:18
documents
  7:13,16 9:7,
  10 13:10
  76:7 91:8,14
  92:20
doing
  17:8 19:11
  30:9 34:21
  41:8 49:7
  52:9 73:9
  85:25 93:17
donor
  9:11
donor/
customer
  18:7
doubt
  42:5
download
  17:18 30:11
drawn
  75:24
Drive
  5:10
drugs
  8:18
Dry
  42:21
duly
  5:3
duties
  12:8,22
  64:10
duty
  60:20

Christine Talbot
March 08, 2023

---

**E**

---

**e-mail**
  7:24 15:21
  16:21 19:19,
  23 20:5,9,17
  21:8,12,14,
  18 22:4,9
  24:18 25:21
  26:7 29:12,
  18 32:3,11
  33:16,22
  35:14,19
  36:4 37:5,
  11,23 38:8,
  20 40:8,16
  42:10,20
  50:19,24
  51:13 52:22
  53:2 54:8
  61:3 86:16,
  18 87:2,14,
  21 88:2,5,8,
  9,11 89:9
**e-mails**
  35:24 59:14
**easier**
  6:24 18:20
  67:5
**East**
  5:10
**education**
  87:9
**educational**
  10:25
**effect**
  85:4
**effectively**
  89:5
**Egypt**
  79:14
**either**
  33:15 37:2
  38:19 43:24
  44:12 45:22
  46:9 57:21

  60:22 61:8
  80:18 88:24
**electronic**
  7:25
**eligibility**
  72:5,7 91:2
**eligible**
  21:21 40:5
  47:12 68:6
  69:3,15
  72:14,24
**eluded**
  52:21
**employed**
  10:8,9,11
  47:5 69:21
  70:25 74:6
**employee**
  12:17,18
  39:16 40:2
**employees**
  37:16 53:16
  65:8 67:21
  84:19
**employment**
  5:23 12:2
  14:19 15:7,
  16 16:4,10,
  18 18:5,24
  19:2 21:21
  23:6 28:2,21
  29:4 33:11
  39:20 40:5
  44:2,14
  45:24 46:12
  47:12 48:10
  51:20 53:16,
  17 57:17
  58:14 60:8,
  18 64:15,20
  65:21 66:15
  67:10 68:7
  69:4,8,22
  71:2 72:5,7,
  11,15,25
  73:21 75:3
  88:23 89:15,
  23 91:3,9

  93:5
**employment-
eligible**
  89:6
**end**
  31:3,11
**ending**
  50:21
**endorsed**
  95:4
**engage**
  40:21 91:20
**engaged**
  40:16
**engagement**
  12:18 88:20
**entailed**
  12:14
**enters**
  7:10
**entire**
  80:23
**entitled**
  42:21 94:14,
  15
**essence**
  75:17
**establish**
  28:24
**established**
  91:9
**et**
  13:11
**ethics**
  9:12 47:18
  75:7,8
**evaluated**
  38:12
**evidence**
  80:18,19
  81:9
**EXAMINATION**
  5:12 49:14
  83:12
**examined**
  5:5

**examples**
  53:13
**exchange**
  88:7
**exchanged**
  17:5 19:8
  34:18 41:5
  52:6 62:6
  73:6 85:22
**exchanges**
  34:5
**exclusion**
  80:23
**excuse**
  11:23 56:11
**executive**
  87:3,8
**exercise**
  77:23
**exhaustive**
  92:9
**exhibit**
  17:2 19:6,19
  30:3,19
  31:17 34:11,
  15 35:6,16
  41:2,14
  42:16 48:25
  50:6 52:3
  53:6 62:5,15
  63:9 73:3
  82:23 85:20
  86:8 93:13,
  22
**existed**
  47:14
**existence**
  47:23 94:6,9
**expectations**
  53:22,25
  75:9
**expedient**
  59:13
**experience**
  12:21 90:17
**explain**
  11:5 12:7,13

14:18 21:7,
11 39:4
46:21 51:15
53:4
**explained**
22:2
**explanation**
75:8 76:25
**express**
81:18
**expressed**
67:8
**extended**
13:17 15:18
51:8 58:9
60:8,18
**extent**
22:5 23:5,8
33:2 36:9,17
39:9 55:2,7,
23 57:10,14
68:20 74:3,
24,25 75:25
81:16,21
89:13,22
90:24 91:22
**external**
38:5 86:24

---

**F**

---

**fact**
26:10 27:9
29:2,10 42:6
58:19 70:8
71:9 85:3
91:10 92:8,
9,18
**facts**
24:6 71:16
**fair**
26:19 39:17
52:17,19
69:25
**faith**
75:13 79:9
88:25 90:21

**familiar**
50:12,16
78:18,22
79:4
**favor**
63:24
**February**
10:13 11:25
12:24 18:15,
23
**Federal**
13:21,24
14:7,8,10,11
**feels**
28:13 71:20
**felt**
20:23
**female's**
24:9
**figured**
49:24
**file**
62:5,6,14,
17,22
**filled**
75:12
**final**
87:21
**finalist**
38:5
**find**
89:5
**fine**
8:3 81:5
**finish**
6:22
**firm**
86:25 87:6
**first**
5:3 11:13,16
15:10,14
18:21 19:22
22:7 24:8
32:8 46:5
50:13,25
52:17 65:12
94:14

**fit**
38:2,11,19
39:16 54:3
**five-minute**
49:15 50:3
96:6
**focus**
31:12
**folks**
29:21
**follow**
26:9
**follow-up**
20:6 53:24
77:12
**following**
43:24 44:12
45:11,22
46:9 49:11
60:3 78:22
83:8 96:11
**follows**
5:5
**form**
16:21 18:9
19:24 21:4,
16 23:12,23
24:12,16,21
25:2,8,11,
18,23,25
26:12,23
27:19 28:10
29:15 39:24
43:3,11,16,
21 44:5,16,
23 46:3,14
47:2,16 48:2
53:7 55:4
59:4,19 64:7
65:11,24
66:17,24
67:12,22
68:16,22
69:10,24
71:3 72:19
74:8,10,15,
23 75:20
76:3,20 78:9

79:20 81:24
82:3 83:23
84:21 85:11
88:12 89:19
90:4,18 91:4
93:6
**formally**
14:10
**formed**
23:14
**forward**
14:25
**forwarded**
20:9
**found**
78:23
**foundation**
67:12 69:24
71:4 76:4
80:20 81:3
**foundations**
78:13
**frame**
27:16,23
61:10
**free**
81:17
**Freiberg**
15:24 16:2,
7,14 20:19
32:3,11,15
33:17,22
35:20 37:2
38:18 40:8,
15 42:9
54:18 56:14
57:22 60:4,
22 61:13,18
63:2,7,9
65:3,19 67:9
**Freiberg's**
60:13 66:12
**frequently**
13:23
**frolic**
81:10

Christine Talbot
March 08, 2023

front
 7:14 31:3,11
 82:19
full
 14:4
function
 8:2 12:12,14
 20:23
functions
 16:12 63:22
fundamental
 58:13
furtherance
 11:2

———————

G

gambling
 91:21 92:2
gay
 9:25 25:9
 26:11,15,19
 27:2 43:14
 44:2,7,14,
 18,21 45:24
 46:7 59:2,6,
 11 74:5
 76:2,8,15
 78:7,8,17
GCHAT
 7:25
general
 5:14 27:16,
 22 33:5 47:2
generally
 36:14 39:13
 87:7
getting
 45:21 59:13
give
 9:4 30:12
 56:8 77:7,12
 86:2
given
 7:4 18:6
 79:11

giving
 45:20
global
 13:14
glorify
 92:16
goal
 5:24
God
 79:11 92:16
goes
 14:24
going
 5:21 14:25
 17:13 19:2
 21:3 23:22
 24:11,19,20
 25:10 31:2,
 6,23 32:7
 36:6 39:23
 43:2,10,15
 44:4,10,22
 45:16 46:2,
 13,25 47:15,
 25 48:9
 54:20,24
 55:21 59:3,
 16,18,24
 64:6,20
 65:10,24
 66:16,23
 67:11,22
 68:11,15
 69:9,23 71:3
 76:18,20
 77:20 93:25
good
 4:3 5:13
 34:24 37:25
 38:19 72:12
 96:9
great
 83:3
ground
 5:14
grounds
 69:10

guess
 62:24
guidance
 95:6

———————

H

halfway
 32:8
hand
 83:3
handed
 20:11,14
handwritten
 61:3
happened
 40:20 88:7
hard
 28:12 38:10
head
 6:19 13:14
heading
 73:20,24
heads
 79:3
hear
 66:25
heard
 51:6 65:12,
 17 66:3,7
 84:23 95:17,
 19
hearing
 65:14
held
 6:11 11:19,
 25 12:4
 17:20 30:15
 33:7 35:2
 41:10 52:11
 62:10 73:11
 75:11,22
 76:6,13
 78:7,14 82:9
 83:6 85:5
 86:5

help
 89:5
helpful
 83:2
high-level
 38:5
higher
 87:9
Highly
 23:11
hinterlands
 81:7
hire
 72:7
hired
 69:14
hiring
 44:25 70:14
history
 70:7 93:9
hold
 32:15 33:3,9
holding
 12:9
home
 14:4,15
homosexual
 84:14,18
homosexuality
 79:19 81:23
 85:9,16
honest
 81:11
honestly
 78:11 79:21
hospital
 79:14
house
 11:11
HR
 11:24 13:14
 33:12 38:5
human
 11:7,18
 12:9,12,14
 13:4 16:12
 60:12

Christine Talbot
March 08, 2023

husband
  89:11
hypothetical
  71:5,15
hypothetically
  63:20

_____

I

idea
  89:16,25
  95:4
identification
  4:25 30:20
  35:6 41:14
  86:8 93:22
identifies
  53:11
identify
  7:12
identifying
  44:18
Illinois
  10:19 11:6
impair
  8:22
importance
  91:11
important
  37:19 53:25
  90:25 91:6,
  16
inability
  58:12 66:8
  67:14
include
  13:16 45:2
  64:11 88:2
included
  13:13 31:8
  56:7 91:12,
  15
includes
  7:23 27:4

including
  36:24 87:9
Incorporated
  5:17 15:8,16
  32:16 33:3,
  10 60:9,19
  74:4,21
indeed
  26:19 35:12,
  15 44:2,14
  45:24 46:11
  86:19
independent
  48:8,11,14
independently
  48:19
indicate
  4:19
indicated
  72:7
indicating
  51:20
indicator
  24:15
individual
  7:22
individuals
  62:21,23
industries
  87:9
influence
  8:18,21
inform
  20:22 45:10
information
  45:20 51:20
  54:8 55:2,6
  90:10
informed
  15:23,25
  20:4,7,8,15,
  17,18 25:20
  26:6 64:25
informing
  45:6
inquiry
  70:10

instant
  7:24
instruct
  31:6 36:12
  55:22
instructed
  68:17
instruction
  57:15
intent
  37:21
interactions
  16:19
interchangeable
  22:21
interested
  31:21
internal
  41:20
internally
  57:8
interplay
  68:10
interposed
  60:4 83:19
interpretation
  79:22
interpreter
  80:4,9
intertwined
  57:11,14
interview
  36:15 51:5,
  18 53:10
  58:16 72:24
  90:7,10
invite
  41:19,20,22,
  24 42:13,16
involve
  55:24 57:4,
  19
involved
  30:25 31:8
  56:24

involvement
  34:8
involving
  29:23 35:20
  36:10 37:16
Irrespective
  61:7

_____

J

January
  12:10,15,23
  13:5,19,23
  14:3,5,9
  16:16 18:4
  19:20 20:17
  22:8,16,22,
  24 23:3,9
  24:17 27:18
  28:3,22
  29:22 32:2,
  6,10,16,19,
  21,24 33:4,
  10,14,15,21,
  24,25 34:3,7
  35:14,21
  37:5,24
  38:9,20
  39:18 40:6,
  8,22 42:9
  47:14,24
  48:5,7,8
  50:21,24
  51:8,12
  52:22 54:11,
  18 56:18,19
  74:21 81:21
  84:18 85:4
  86:17,19
  87:18 88:3
  89:13,23
Jean
  32:4,12
  33:9,11,17
job
  9:11 18:14
  21:22 29:8
  37:17 44:6,

Christine Talbot
March 08, 2023

17,24 46:8,
19 47:4 51:7
56:7 58:9
59:10,12,15,
21 60:20
61:15,20
63:22 64:10,
25 67:14,25
69:15 70:7
71:18
**join**
39:16 42:11
**joined**
96:3
**judge**
8:10
**jurat**
96:18

---

### K

**Key**
53:11
**kind**
81:6 95:13
**kindly**
7:11,21
17:10 34:11
**kindness**
37:22
**knew**
29:6 95:16
**know**
17:8 19:11
21:21 22:5
23:5,8 26:14
29:5 30:9
33:2 34:21
37:20 41:8
42:19 48:20
49:7 51:11
52:9 53:24,
25 54:2,13
56:6,11
59:25 60:6
62:21 63:12,
14,17 64:4

65:15 67:24
68:24 73:9,
16 74:3,20,
24 76:2,5
77:18 78:20
81:21 85:25
86:11 88:6,
10 89:14,22
90:24 91:6,
10,22,23
92:5 93:16
94:5,9 95:10
96:3
**knowledge**
12:21 52:20
55:8 58:8
67:18 69:6,
16 75:25
90:16 91:18
**known**
87:5 88:22

---

### L

**lack**
59:22
**lady**
49:19 50:2
**laid**
80:20
**lawsuit**
5:16,19
**lay**
81:4
**lead**
12:11 80:19
81:9
**leaders**
13:8 37:17
**leading**
12:14
**learn**
15:5,10,14,
20 19:23
23:20 24:6
26:10 27:9,
12,14,17

29:2,10,14
61:23 95:13
**learned**
15:17 24:4
25:7 26:14,
18 27:16,24
96:4
**learning**
27:2
**legal**
4:4 31:8,9
36:10 39:10
55:24 56:22,
24 79:8
**legitimately**
80:3
**lesbian**
9:25
**let alone**
80:24
**lets**
31:12
**letter**
15:22 18:4,
11,13,17,18
61:3
**Leviticus**
78:19,24
79:10
**LGBTQ**
9:22,24
**lies**
78:24
**lieu**
4:12
**life**
6:24 78:21
**Lily**
87:14,17,19
89:7
**line**
42:20
**lines**
20:12 60:5
**link**
46:16

**list**
92:8
**listen**
9:16 62:13
**listened**
62:19
**listening**
66:11
**litigation**
17:6 19:9
30:5 34:19
41:6 49:4
52:6 62:7
73:7 85:23
**little**
38:7
**live**
14:6 21:23
47:6
**living**
11:12 45:3
68:25
**local**
94:18
**located**
13:20
**log**
30:7,18,25
38:25 56:24
**look**
18:16 53:10,
12 56:25
77:11 78:16
93:25 94:3
**looked**
92:5
**looking**
17:18 30:24
34:6 40:10
84:8
**looks**
50:12,15
**lot**
67:2
**lots**
13:9 39:11

Christine Talbot
March 08, 2023

loud
  17:13,17
love
  40:9

---

M

---

made
  16:18 18:25
  19:2 28:21
  48:10,14
  60:7,10,17
  61:12,17
  64:23 65:21
  67:16 88:21
  91:21
mail
  15:22
make
  6:23,24
  18:20 31:24
  37:12 45:20
  48:8,18
  64:14 69:3
male
  24:10
man
  21:25 47:8
  51:24 53:19
  65:7 66:6
  67:19 68:5,
  12,23 69:7
  74:18 78:24
  84:13,17
  85:7 89:10
  94:19 95:22
management
  32:17
management's
  95:9
managers
  37:17
manner
  4:18
March
  74:4

marital
  70:7
marked
  17:2 19:5,7
  30:2,19
  31:17 34:15
  35:5 41:2,13
  42:15 48:25
  50:6 52:3
  53:6 62:4,15
  73:3,19
  85:19 86:7
  93:13,21
marriage
  21:24 25:24
  26:16 27:10,
  13 29:3,7,11
  39:19,21
  43:19 46:11,
  18,23 47:8
  51:21,24
  53:3,19
  65:6,7,23
  66:6 68:2,5
  69:2,17
  70:20,23
  72:6,18
  74:7,16,17
  75:3 76:9
  84:13 85:7,
  15,17 87:23
  89:8,17,25
  90:7,12,13,
  25 93:4
  94:20 95:21
marriages
  95:5
married
  11:11 21:19
  67:19 68:12,
  23 69:2,7
materially
  12:23
matter
  17:6 19:9
  34:19 37:3
  41:6 62:7
  85:23

Mcdaniel
  86:17,22,24
Mcfarland
  32:4,12
  33:3,17
Mcmahon
  5:15,23
  14:23 15:2,
  6,15 16:4,9,
  18,20,24
  18:6,25
  19:2,19
  23:13 25:9,
  24 26:11
  27:10,25
  28:21 29:3,
  11,23 36:19
  38:18 42:25
  43:14,19
  44:2,14
  45:24 46:11
  48:10,22
  50:20 51:2
  52:23 58:10
  60:9,18
  61:14,19
  63:9 64:14,
  19 65:20,21
  66:13 67:8,
  19 68:10,12
  69:6,17
  70:19 71:6
Mcmahon's
  33:24 43:8
  48:21
mean
  28:18 48:11
  68:21 84:25
  88:13,14
  94:22 95:24
meaning
  80:21 95:21
meant
  94:23 95:24
measured
  95:4
medication
  8:22

meet
  13:15 58:13
meeting
  13:14,16
  41:19 42:11,
  13,18 43:23
  46:16
meetings
  13:7,8,11
Mel-
  67:13
Melanie
  15:24 16:2,
  7,13 20:19,
  22,24 21:2
  24:6 25:4,7
  26:6 29:19
  32:3,11,15
  33:16,22
  35:20 37:2,
  6,24 38:9,17
  39:5 40:8,15
  42:9 58:5
  60:4,22
  61:13,18
  63:2,6,9,23
  65:3,19
  66:3,12
  67:8,13
members
  37:18
memorized
  78:15 82:7
men
  68:2
mention
  35:24 37:6
mentioned
  83:14 84:6
mentions
  40:10
messaged
  29:13
messaging
  7:24
method
  61:7

Christine Talbot
March 08, 2023

minute
 30:12
minutes
 92:6
Miolla
 19:20 20:19
 22:8 33:23
 34:8 35:21
 37:2 38:18
 40:22 42:10
 50:20 51:2,
 12 52:22
 54:17 56:12
 57:22 60:22
 61:13,18
 63:3,7
Miolla's
 22:24
mischaracteri
zation
 76:21
mischaracteri
ze
 75:16
mischaracteri
zed
 77:6
mischaracteri
zes
 44:23 72:20
misrepresenta
tion
 65:25
mitigate
 51:22
moment
 6:10 19:6
 49:19 82:10
 86:3
Monday
 51:8
month
 13:22
morning
 5:13
Moses
 79:11

motivations
 91:11
Mount
 79:12
mountain
 79:13
move
 14:8
moved
 14:10
MP3
 62:5
multiple
 11:6 13:7
 16:12

———————

**N**

———————

name
 4:3,20 5:7,
 14 14:24
 24:8,9,15
 87:19 94:5,8
named
 14:23 15:6,
 15 86:16
 87:14,17
names
 21:24
nature
 20:6 21:8,
 12,14 22:3
 57:17 63:23
necessarily
 6:20
need
 18:16 30:13
 46:20 76:10
 84:22 89:4
 90:21
needed
 92:14
needing
 83:20
network
 79:14

never
 26:18 91:24
nonacceptable
 84:11
nonparty
 5:2
nonprofit
 87:10
noon
 42:11
Notary
 5:4
noted
 4:2 49:12
 83:9 96:12
number
 17:3 19:6
 29:20 30:6
 33:19 34:15
 41:2 62:15
 73:3 85:20
Numbers
 34:17 35:4
 41:3 49:2
 52:4 73:4
 93:14

———————

**O**

———————

oath
 4:13,14 8:6,
 8,9,12
object
 18:9 19:24
 21:3,16
 23:22 24:11,
 20 25:10,17,
 18,25 36:6
 39:7,23
 43:2,10,15,
 21 44:4,22
 46:2,13,25
 47:15,25
 54:25 55:4
 59:3,18 64:6
 65:10,24
 66:16,23

67:11,22
68:15 69:9,
23 71:3
75:20 76:20
77:22
objected
 82:3
objecting
 80:16 81:2
objection
 25:2 26:12,
 21 27:5,19
 28:10 29:15
 31:3 36:20
 37:12,13
 38:21,23
 44:16 53:7
 54:24 55:22
 57:3 68:21
 72:19 74:8,
 10,15,23
 76:3 77:17
 78:9 79:20
 80:15 81:14,
 24 83:23
 84:21 85:11
 88:12 89:19
 90:4,15,18
 91:4 93:6
objections
 4:17 31:13
 70:13
obviously
 30:25 62:25
occasionally
 14:23
occurred
 28:2 61:11
offend
 84:19,23,24
offer
 15:18 16:18
 18:5,24,25
 28:2,20
 29:4,8 40:10
 44:2,7,14,
 17,24 45:24
 46:8,12,19

Christine Talbot
March 08, 2023

48:9,21 51:7
56:7 58:9,
11,24 59:10,
12,15,21
60:8,11,18
61:15,20
64:15,20
65:20 66:9,
15 67:10,14,
17 69:7,15,
21 70:25
71:18
**offeree**
21:22 64:25
**offering**
37:6
**office**
13:19,24
**okay**
6:7 7:2 8:2,
3 17:21
18:19 20:16
26:8 28:18,
25 30:23
31:25 34:10,
13 35:8
41:16 45:18,
19 49:13,21
50:5,10 58:8
61:12 63:11
67:6 72:14
76:22 82:10,
12,13,21
84:4 86:4
93:18,24
94:3 96:8
**once**
17:8 19:11
30:9 34:21
41:8 49:7
52:9 73:9
85:25 93:16
96:3
**one**
6:10 16:13
19:6 22:21
37:18 38:5
45:17 49:9

56:8 58:13
62:24 63:3
65:13 66:25
67:3 73:19
75:2 78:24
80:22 81:4
89:17 90:2
91:6,20
92:12,15
**one-on-one**
13:7
**open**
17:18 93:24
**opine**
71:19
**opinion**
80:21 81:17,
18,20
**opportunity**
37:20
**opposed**
13:25
**opposite**
69:3 84:17
**order**
82:8 89:5
**organa-**
76:13
**organization**
12:17,20
13:15 39:16
41:20 57:7
75:11,23
82:9 84:11
89:4 91:8
93:10 94:23
95:25 96:4
**organization'
s**
76:6,13
78:13,17
91:13
**organizational**
11:7 54:3
**organizations**
87:10

**orientation**
43:8 73:21
**originally**
38:11
**outcome**
46:6
**outside**
53:18 65:6
84:12 85:6
89:3
**oversaw**
16:14
**oversee**
16:12
**Overseeing**
12:16,17

---

**P**

**p.m.**
4:2 49:12
83:9 96:12
**page**
18:21 32:8
40:13 50:25
53:11 60:5
73:19 94:9,
14,24 96:16
**pages**
30:18
**pandemic**
14:3
**papers**
7:13,16
**paragraph**
94:25
**paragraphs**
73:24
**part**
24:23,25
38:10 40:9
63:22 90:7
91:21 92:3,
20 95:19
**participant**
33:21 63:13

**participating**
4:7
**particular**
11:9 36:24
42:16 46:7
64:2 69:4
71:18
**parties**
4:16
**partner**
22:12,20
**partners**
84:15 94:21
95:23
**parts**
28:14
**passage**
78:23 79:17
**pastoral**
95:6
**pause**
30:10
**penalty**
4:14
**pending**
6:14
**Peninsula**
79:13
**people**
71:20 89:16,
25 90:12
**periodic**
13:16
**perjury**
4:15
**permit**
77:24
**person**
4:13 7:12
8:17 12:8
14:23 15:6,
14 16:3,20
20:18 44:18
60:7,10,17
63:2 73:16
86:16 87:13,
16 89:15,24

Christine Talbot
March 08, 2023

personal
  12:19 45:7
  63:24 79:22
  80:21 81:18,
  20 90:6
personally
  5:18 16:19
  63:15,17
  64:4 78:18
  79:18
persons
  60:7
perusing
  19:12 94:2
phase
  17:5 19:8
  30:5 34:19
  41:5 49:4
  52:6 62:7
  73:6 85:23
phases
  36:16
phone
  54:12,16
  56:17 57:23
  63:15,16
phrase
  23:14 94:19
physically
  4:9 13:20,24
place
  35:21
plaintiff
  5:15
Plaintiff's
  17:2 19:5
  30:3,19
  31:17 34:11,
  15 35:5,16,
  19 41:2,13
  42:15 48:25
  50:6 52:3
  53:6 62:4,15
  63:8 73:3
  85:20 86:8
  93:13,21

planning
  37:18
platform
  7:15,19
play
  70:9
played
  65:13
please
  4:19,21 5:7,
  25 6:14,18,
  21 12:7,13
  13:2 14:18
  17:7 19:10
  21:7,13 26:9
  28:7 30:8,21
  32:5 34:20
  39:4 41:7
  45:10 46:21
  49:6 51:15
  52:8 53:4
  55:10,12,19
  61:16 71:9,
  22,25 73:8
  74:11 77:7
  78:2 85:24
  86:3 93:15
point
  14:8 15:5
  23:12,20
  25:8,23
  27:17 33:20
  46:15,17
  50:9,11
  61:13,18
  78:2,21
points
  9:22 53:11
  94:16
policies
  12:19 45:6,
  10
policy
  9:13 44:9
  45:11,12
  46:20 47:18
  48:4 68:9,11
  74:3,20

75:7,8,15,19
  81:22 84:16
  85:3 91:15
  93:3,11
  94:19 95:8,
  14,21
posed
  83:16
position
  11:16,19,20,
  25 12:4,5
  18:7 80:24,
  25 87:17
possibility
  25:13,15
  26:3,5
possible
  43:6 46:22,
  24
posting
  9:11
potential
  16:10
potentially
  37:17
Powerpoints
  13:10
prac-
  37:20
practice
  37:6,15,20
  40:17 57:18
practices
  36:16 40:10
practicing
  40:21
precepts
  92:11,13,24
predates
  93:8 95:11
preparation
  9:8,17,20
  13:10,11
presence
  56:22
present
  4:9 53:3

57:21 58:6
  70:15 72:22
presented
  25:4 84:16
presenting
  71:5
president
  11:18,24
  12:9 13:4
  60:12 64:11
pretty
  81:2
previous
  28:8 55:13
  66:21 72:6
  74:13 83:21
previously
  8:4 17:2
  19:5 39:2
  48:25 52:3
  56:3 62:4,15
  69:17 70:19,
  22 73:3
primarily
  13:20
primary
  12:8,11
  14:11
printed
  20:11,13
  96:2
prior
  16:16 18:24
  29:8 77:6
  83:19 91:9
privilege
  30:17,25
  31:4 36:7,20
  37:13 38:22
  39:8 55:4,22
  57:6
privileged
  30:7 31:2
  55:6 56:3
probably
  14:4

Christine Talbot
March 08, 2023

problem
  6:5
proceed
  31:11
process
  16:10 51:18
  53:10 58:16
  70:14 72:5
  90:8,10
processes
  36:15
produced
  79:10
product
  31:5 36:8
  55:4
prohibit
  74:17
prohibited
  76:2,15 78:8
prominent
  24:15
prospects
  89:6
protects
  57:6
protocol
  47:22,23
provide
  9:2 62:3
  92:10
provided
  20:10 53:23
  79:7 82:24,
  25
provides
  87:8
public
  5:4 94:21
  95:23
published
  73:16
pull
  82:25 92:6
pulled
  34:22

pulling
  86:2
purported
  52:21
purposes
  9:24 28:23
  32:7
pursuant
  63:5
put
  31:10 79:2
  80:15 91:25
  92:2
putting
  72:13

---

## Q

qualified
  89:5
queer
  9:25
question
  5:25 6:3,5,
  6,14,22
  15:13,19
  20:6 21:9
  22:19 28:8,
  13,24 44:10,
  11,19 45:7,
  13 53:24
  55:9,13,16
  58:17 59:7
  60:3,6,14
  61:16 66:20,
  21 67:5
  68:18,20,22
  69:25 70:4,
  18 71:8,14,
  21,25 74:13
  76:11,23
  77:3,7,8,25
  78:4 80:7,8
  81:17 83:15,
  18,21,25
  84:7 89:21
  91:25 92:7

  94:15
questioning
  10:2 21:15
questions
  5:22 7:5
  8:16,23
  14:22 22:5
  26:9 31:12,
  23 53:21
  57:17 59:23
  77:12,19
  80:11 92:14,
  25 96:14
quickly
  94:20 95:15,
  20
quite
  81:10
quote
  38:10 95:2

---

## R

raised
  21:8
Ratigan
  4:4 28:6
  55:11 83:18
rationale
  63:25 66:12
  92:19
re-
  18:17
read
  17:9,11,13,
  14,17 19:13
  28:7,9 44:11
  45:16 55:12,
  14 59:24
  66:22 67:3
  74:11,14
  78:21 79:17
  83:18,22
  95:18
reading
  34:23 53:20
  54:5 65:15

reads
  73:20 87:21
  94:17,25
realized
  94:21 95:22
reason
  8:25 11:9
  35:13,17
  42:5,8 58:9,
  11,19,22,23
  65:20 66:9
  67:8,9,13
reasons
  58:9
recall
  10:10 16:8
  18:17 19:15,
  17,22,23
  20:2,3,4,6,
  7,9,13,14,
  16,18 21:2
  24:2,4,5,14,
  24 27:2,14,
  15,24 29:14,
  17,25 35:11
  36:17,25
  37:4 40:18,
  20 41:23
  42:3,19
  43:12,17,22,
  23 48:23
  50:11,13,17
  54:13,15
  56:9,20
  57:12 58:4,
  23 60:23,25
  61:5,7,9,23
  64:9,16,22
  76:7 86:14,
  22 87:13,15,
  19 88:4,18,
  19 94:12
receive
  10:20 15:21
  42:6,8
received
  35:14

Christine Talbot
March 08, 2023

receiver
 33:16
receiving
 36:25 41:23
 42:4
recess
 49:10 83:7
 96:10
recipient
 22:8
recognize
 17:22 19:14
 35:9 41:17,
 20 52:13
 62:17 73:12
 86:10 94:4
recollection
 12:22 13:22
 14:2 16:6
 22:15 24:7
 26:25 27:3,
 11 36:22
 39:12 41:21
 42:14 46:6,
 16 57:25
 58:20 61:21
 64:4 86:12,
 21 87:16
 88:8
recommendatio
n
 95:9
record
 4:20 5:7,9
 6:9,11,23
 7:23 17:16,
 19,20 19:18
 30:13,14,15,
 22 31:10
 32:13 33:6,7
 34:6,9,25
 35:2 41:9,10
 49:8 52:11
 57:3 62:9,
 10,12 73:10,
 11 79:16
 80:15,17
 81:6,15

83:5,6,11
 86:5
recorded
 52:25 56:4
recording
 65:4,12,20
recordings
 9:16
records
 39:2
recruiter
 22:10,13,21
 86:25 89:3
recruiting
 20:23
recruitment
 12:16 16:13,
 15 36:16
redefined
 94:22 95:24
refer
 14:25
reference
 84:22
referenced
 51:12 66:5
 85:18 87:14
references
 47:7 68:4
 75:12 82:6
 89:11
referring
 15:2,12 36:4
 37:10 38:4
 53:13
refers
 53:18
reflect
 82:8
reflected
 47:17 85:14
 95:17
reflects
 68:8 75:10
refreshed
 78:16

refusing
 80:6
regarding
 38:18 51:23
 61:14,19
 76:14 78:7
register
 31:3 54:24
registered
 32:9
registering
 68:21 81:14
regular
 13:8
reinstated
 94:20 95:21
related
 66:14 69:4
 83:15
relates
 57:22 79:23
relationship
 84:14
relevance
 79:22 81:3
relevant
 71:15 80:24
religious
 75:22 85:6
remember
 27:21 34:4
 39:5 40:24
 55:20 56:10
 58:6 61:25
 64:13
remembered
 65:14
reminded
 56:4
remotely
 4:11,14
 13:25
removed
 94:18
repeat
 28:4 38:21
 55:21 61:16

66:19 74:11
 89:20,21
 94:7
repeated
 55:9 77:25
rephrase
 6:2 15:13
 22:19 67:4
report
 16:14
reporter
 4:3,5 5:6
 6:20 8:5
 28:9 55:14
 66:22 74:14
 83:22
reporter's
 6:24
reporting
 4:10,18
reports
 13:7
represent
 5:15 16:17
 17:4 19:18
 28:20 30:3
 34:18 36:14
 41:4 49:3
 52:5 62:6
 63:5 73:5
 79:6 85:21
 86:15
representatio
n
 53:2
representative
 18:7
represented
 32:13 63:8
representing
 63:10
represents
 18:12 53:10
 67:25 84:10
requested
 64:10

Christine Talbot
March 08, 2023

requesting
    54:8
require
    21:20,21
required
    21:10 29:7
    39:15
requirement
    47:5 51:19
    69:5 74:18
requirements
    45:2 58:13
    69:14 88:22
rescind
    44:6 48:9,20
    60:8,11,17
    61:15,20
    67:9,17
    71:18
rescinded
    28:2,21
    29:4,9 44:3,
    15,17,20,24
    45:25 46:12,
    20 58:10,12,
    24 59:11,12,
    17,21 64:21
    65:22 66:10
    69:8,22 71:2
rescinding
    46:8 51:7
    64:15 66:14
rescission
    67:14
residence
    14:11
resolve
    51:6
resource
    12:12,14
resources
    11:7,18
    12:10 13:4
    16:13 60:12
respect
    5:16 16:9
    31:22 33:23

59:14 91:2
respond
    33:23
responded
    40:8 59:7
responding
    59:22
response
    26:17 40:7
    53:23 76:14
    77:4
responses
    45:21 51:5
responsibilit
ies
    12:8,11,22
rest
    80:23
resulted
    46:7
retired
    14:21
reversed
    95:8
review
    9:7,10 17:7
    18:3,13
    19:10 30:8
    31:17 34:20
    41:7 49:6
    52:8 73:8,23
    82:11 83:14,
    20 84:6,9
    85:24 93:15
reviewed
    50:13
reviewing
    33:13 35:25
    67:7
right
    14:14 28:22
    33:18 45:6
    54:2 77:14,
    15,18,20,22,
    23 96:5
Ringcentral
    41:23 42:11,

24 43:7,13,
    18,25 44:13
    45:23 46:10
role
    11:22,23
    16:8 32:15
    33:2,9 69:14
    88:21
room
    4:9 7:7,10
    57:9
routine
    8:17
rule
    47:22,23
rules
    5:14 77:24
run
    42:21

———————

S

———————

sake
    79:16
same-sex
    25:24 26:16
    27:10,13
    29:3,6,11
    39:18,21
    43:19 46:11,
    18,23 51:21
    53:3 54:9
    65:22 67:25
    69:2,17
    70:20,22
    72:6,18
    74:6,16 75:2
    84:15 89:16,
    25 90:7,13
    93:4 95:5
saying
    59:7 85:16
says
    95:20
scenarios
    71:19

Scott
    4:23
screen
    7:15,18
    54:12 56:18
    57:23 72:7
screening
    51:18 53:17
    54:16 70:15
    72:4 90:8
script
    35:25 36:5,
    18,23,25
scriptural
    82:5
scripture
    92:11
scriptures
    92:24
search
    86:25 87:4,8
    88:21
second
    14:15 53:18
    73:19
section
    94:14
see
    18:22 32:9
    35:12 36:2
    37:8 38:3,13
    40:12 42:22
    45:17 51:9
    56:25 73:21
    87:24,25
    88:5 89:10
seeing
    19:15 34:7
    54:15 94:12
seek
    80:18
seeking
    5:23
seeks
    92:10
selected
    80:22

Christine Talbot
March 08, 2023

self-
admission
  26:16
self-
identificatio
n
  25:6
self-
identifies
  21:19
send
  15:21
sender
  33:15
senior
  11:18,24
  12:9 13:3,8
  60:12 64:11
sentence
  18:21 87:21
  88:16
series
  5:21
served
  90:17
service
  18:7
services
  9:11 87:8
serving
  75:3
set
  34:11 92:10
several
  51:4
sex
  66:7 69:3
  84:17
sexual
  43:8 53:18
  65:6 73:21
  84:12 85:6,
  14,17
Shaking
  6:18
shared
  56:3

short
  75:17
show
  16:25 19:4
  30:2 34:12,
  14 40:25
  48:24 52:2
  73:2 85:19
  93:12
showed
  38:25 42:15
  49:20 50:5
shut
  92:6
simply
  77:19 82:3
Sinai
  79:12,13
sincerely
  75:11,22
  76:6,13
  78:6,14 82:9
  85:5
single
  69:18 70:20
site
  73:17
sitting
  7:8,11
situation
  56:6
slightly
  26:8
Smith
  86:17,23,24
snowbird
  14:15
sort
  36:10
sounds
  34:24 65:13,
  16
source
  75:13
speak
  9:19

speaker
  79:15
speakers
  63:7
speaking
  49:25 62:22
  79:13 87:7
specific
  18:17 20:22
  24:5 27:21
  31:21 36:15
  39:11 41:21
  43:22,23
  46:5,16 54:3
  56:9 61:9
  66:5 92:25
specifically
  16:9 20:2,3
  21:13,24
  24:14 26:15
  27:15 29:25
  34:5 35:11
  36:23 40:18,
  20 42:3 43:5
  47:4 48:5,23
  58:3 60:5
  68:4,9 84:17
  85:16 88:19
  91:25 92:21
  94:12
specificity
  95:14
specifics
  61:6 64:22
speculate
  91:23
speculation
  47:2 67:23
  68:16 69:10,
  24 71:4
spelled
  75:5
spoke
  61:14,19
spokesperson
  91:11

spouse
  54:9
staff
  37:18
standard
  47:11 66:5
  82:6
standards
  9:13 21:10,
  20,23 29:8
  39:15,22
  40:3,4 45:3
  46:19,24
  47:3,7,18
  51:19,23
  53:15,21
  54:4 56:17
  57:23 58:15
  65:5 66:4,8
  67:15,20
  68:3,14,25
  69:13,20
  70:16,24
  72:10,23
  74:19 75:9
  78:12 82:16
  84:19 85:10
  87:22 89:2
  90:23 91:7,
  13,15,21
stands
  9:24
start
  11:13
started
  11:17
starts
  88:16
state
  5:4,7 76:16
stated
  65:19 70:23
statement
  88:25
states
  24:18 65:4
  79:10

Christine Talbot
March 08, 2023

stating
  4:19 26:18
status
  70:7
Steve
  32:3,11
  33:3,5,17
stewardship
  92:17
strenuously
  81:2
struggling
  79:21
Study
  79:10
subject
  36:21 37:13
  38:23 42:20
  55:5
subordinate
  32:18
subsection
  94:15,25
subsequent
  51:20 53:2
Sunrise
  5:10
supervisor
  22:25 32:21
supplied
  30:4 49:3
  62:14
support
  4:5 89:16,24
  90:12
supported
  92:11
supporting
  75:8,15
  94:16
Supports
  87:21 88:17
sure
  23:19 44:10
  45:16,21
  62:24 70:17
  88:16

surmise
  24:7
surrounding
  5:22 51:19
sworn
  5:3 8:4 63:6
synonymous
  22:13,21

T

take
  6:12,14 8:9
  40:9 82:10
  89:12 95:3
  96:5
taken
  10:25 49:10
  83:7 96:10
taking
  81:6
Talbot
  4:1 5:1,8,13
  6:1 7:1 8:1
  9:1 10:1,5
  11:1,13 12:1
  13:1,2 14:1,
  5 15:1 16:1,
  25 17:1,22
  18:1 19:1,4
  20:1 21:1
  22:1 23:1
  24:1 25:1
  26:1,9 27:1
  28:1 29:1,20
  30:1 31:1,16
  32:1 33:1,
  13,20 34:1,
  10,14 35:1,9
  36:1 37:1
  38:1 39:1
  40:1,7,25
  41:1,17 42:1
  43:1 44:1
  45:1,5 46:1,
  9,21 47:1
  48:1,24
  49:1,15

50:1,5 51:1,
  9 52:1,2,13
  53:1,4 54:1,
  10 55:1,15
  56:1 57:1
  58:1 59:1,24
  60:1,12 61:1
  62:1,3,13
  63:1,12 64:1
  65:1,18 66:1
  67:1,18 68:1
  69:1,16 70:1
  71:1 72:1
  73:1 74:1,24
  75:1 76:1
  77:1 78:1
  79:1 80:1
  81:1 82:1,20
  83:1,13,19
  84:1 85:1
  86:1 87:1
  88:1 89:1,
  14,22 90:1,
  24 91:1 92:1
  93:1,12 94:1
  95:1,10
  96:1,13
talent
  12:16 22:12,
  20 32:17
talk
  49:17,21
  76:8
talked
  49:19
talking
  24:6 61:11
  71:6,17 76:7
  85:14,17
team
  13:17
telephone
  16:20 61:2,
  14,19 63:18
  64:14,19
tell
  5:25 6:4
  8:13,23

15:20 20:21
  29:12 45:8
  50:15 55:19
  67:24
telling
  25:21 28:23
  45:11 64:23
tenure
  88:20
Teri
  66:20 67:3
  74:12
term
  22:13
terminated
  23:6
terms
  15:20
testified
  5:5 20:16
testifying
  7:23
testimony
  9:2,5 44:23
  63:6 72:20
  75:17 77:6
  96:17
text
  7:24 29:13
  73:20
Thank
  13:18 28:17
  30:23 31:14
  34:24 45:18
  71:12 77:21
  78:5 82:18
  96:9,15
Thanks
  67:6
theologian
  76:5
theological
  80:4,9
thereof
  59:22
Theresa
  4:4

Christine Talbot
March 08, 2023

thing
  91:6
things
  18:20 22:7
  57:11 85:18
  91:19 92:9,
  25
think
  8:25 15:19
  22:6 42:8
  43:6 44:8
  49:23 61:21
  69:14,25
  71:23 72:12
  75:14 81:7,
  8,10 82:10
  92:7
thinking
  46:14 69:11
  71:13
Thompson
  32:4,12
  33:9,17
thought
  95:3
tide
  95:2
time
  4:2 13:9
  14:4 27:16,
  22 28:12
  38:5 45:17
  47:19 48:7
  49:12 52:17
  61:9,10
  65:13 67:2,3
  69:18 70:21
  72:18 83:9
  85:5 88:18
  93:8 96:12
timeliness
  59:22
times
  51:4
title
  12:9 22:20
today

5:24 6:25
8:19 9:2,5,
24 52:17
today's
  9:8,17,20
told
  9:4 16:3
  20:25 21:2
  74:25
top
  18:21 40:12
  50:25
topic
  29:23 42:25
  43:8,14,19
topics
  29:23
touch
  51:4
traditional
  87:23 89:8
  90:12,25
traditionally
  24:9
trainee
  18:8
training
  12:17
transcript
  65:16
transgender
  9:25
transpired
  49:11 83:8
  96:11
travelled
  11:11
trial
  8:10
true
  26:11 27:10
  28:24 29:2,
  11 40:6 56:5
  87:7
truth
  8:13,14,23

truthful
  9:2,4
try
  45:15 81:4
  82:25
Tucson
  5:11
Tuesday
  51:3
turn
  38:11
two
  30:18 62:21,
  23 63:3,7
  68:2 73:23
  85:18
typical
  13:3,6,13
typically
  64:11
typing
  6:21

_____

          U

_____

U.S.
  4:4 9:12
  22:11 58:14
  75:24
uh-huh
  6:19 7:3
Uh-uh
  52:16
ultimate
  60:7,11,17
unable
  29:7 44:25
  46:18 47:10
  68:3
unacceptable
  53:15
unclear
  47:19
uncomfortable
  80:4
understand
  5:19,25 6:2,

16 8:8,12,23
10:3 15:3
45:14 55:15
68:20 71:14,
15 76:14
77:8 89:4
92:10 93:9
understanding
  6:6 26:17
  57:6 71:16
  74:2,9 76:25
  79:23 80:6
  84:14 87:11
  96:3
understands
  70:3,5 71:11
  81:16
understood
  14:17 25:5
  72:16 94:21
  95:23
unfamiliar
  73:17
Unit
  5:10
University
  11:7
unwilling
  47:10
upcoming
  13:11
Updated
  30:18

_____

          V

_____

vague
  61:21
validated
  27:12
variety
  37:16 87:9
various
  29:21
verbalize
  6:18

Christine Talbot
March 08, 2023

verified
  4:25
verse
  78:23 79:4,
  17,23 80:22
  81:20
version
  82:25
versus
  66:6
vice
  11:18,24
  12:9 13:4
  60:12 64:11
video
  7:5,15,19
  16:21 61:3
viewable
  7:14
violated
  81:23
violation
  67:20 68:13
virtue
  39:20 72:17
Vision
  4:24 5:16,23
  9:12 10:11
  11:14,17,20
  12:5,10
  13:4,24
  14:20 15:7,
  16 16:5,11
  18:6 22:10
  29:21 32:16
  33:3,10
  44:6,18 47:3
  53:14 58:14
  60:9,19
  64:15 65:21
  68:9 69:21
  70:25 74:4,
  6,21,25
  75:4,23 76:7
  81:22 84:20
  87:18 88:23
  89:15,24
  91:2 93:5

94:18 95:6
Vision's
  30:6,17
  39:22 44:9
  45:6,9
  61:15,20
  67:20 68:14
  78:6 79:8
  80:25 82:6
  84:16 85:10
  87:22
voluntarily
  70:11,21
  72:4 90:9

_____

W

_____

wait
  6:21
waive
  4:17
walk
  13:2
want
  6:12 45:8,20
  75:16 77:12,
  16 78:11
  79:15 81:4,5
wanted
  31:10 83:14
Ward
  4:23 18:9
  19:24 21:3,
  16 23:22
  24:11,20
  25:2,10,17,
  25 26:12,21,
  23 27:5,7,19
  28:10 29:15
  30:10,23
  36:6,20
  37:12 38:21
  39:7,23
  43:2,10,15,
  21 44:4,16,
  22 46:2,13,
  25 47:15,25

53:7 54:20,
  23 55:21
  57:2 59:3,
  16,18 64:6
  65:10,24
  66:16,23
  67:11,22
  68:15,19
  69:9,23
  70:5,13
  71:3,23
  72:19 74:8,
  10,15,23
  75:20 76:3,
  18,20 77:5,
  22 78:9
  79:20 80:13,
  16 81:14,24
  82:3,15,18,
  23 83:23
  84:21 85:11
  88:12 89:19
  90:4,15,18
  91:4 93:6
  96:9
Washington
  13:21 14:7,
  9,11,12
way
  13:21,24
  14:7,9,11,12
  20:10 47:21
  72:13 80:11,
  12
Web
  73:17
week
  13:3,6,13
went
  83:13
Whatsapp
  7:25
Wheaton
  10:19
wife
  25:21 89:11
willingness
  47:5 72:22

winter
  14:16
witness
  4:25 5:2
  31:6 36:12
  54:22 55:22
  68:17 71:9
  82:2 96:8
witness'
  80:21
Wolnowski
  4:22 5:12,15
  6:9 17:19,21
  28:6 30:14,
  21,24 31:14
  33:6,8 34:25
  35:8 41:9,16
  49:8,13,14
  52:10,12
  55:11 62:8,
  11 70:3
  71:10,24
  73:10 76:22
  77:2,11
  80:14 81:12,
  25 82:17,24
  83:4,10,12,
  17 86:4
  96:5,13
woman
  21:20,25
  23:13,21
  24:8,17
  42:25 47:9
  51:25 53:19
  65:8 66:6
  67:19 68:5,
  13,24 69:7
  74:18 78:25
  84:13,17
  85:8 89:10
  94:19 95:22
women
  68:2
word
  47:19 65:15
  84:24 88:17

Christine Talbot
March 08, 2023

words
  6:4 18:22
  38:4 90:11
work
  13:3,23 18:6
  23:9 31:4
  33:12 36:7
  55:4 60:18
  87:6 95:6
worked
  13:20
working
  11:14,17
  13:25 14:4
  30:11
works
  80:11 87:3
World
  4:24 5:16,23
  9:12 10:11
  11:14,17,20
  12:5,10
  13:4,24
  14:20 15:7,
  16 16:5,11
  18:6 22:10
  29:21 30:6,
  17 32:16
  33:3,10
  39:22 44:6,
  9,18 45:6,9
  47:3 53:13
  58:14 60:9,
  19 61:15,20
  64:15 65:21
  67:20 68:9,
  13 69:21
  70:25 74:3,
  6,21,25
  75:4,23 76:7
  78:6 79:8
  80:25 81:22
  82:6 84:16,
  20 85:10
  87:17,22
  88:22 89:15,
  24 91:2 93:5
  94:18 95:6

write
  38:15
writing
  35:12 38:16
written
  18:5 42:7
  91:8
wrote
  38:9 51:2
  88:10,14
WV
  17:4 19:7
  34:17 40:13
  41:3 49:2
  51:2 52:4,5
  73:4,19
  85:21
WV-001152
  93:20
WV-001153
  93:21
WV-001818
  86:7
WV-006095
  35:4
WV-006096
  35:5
WV-006097
  41:12
WV-006098
  41:13

_____

            Y
_____

yeah
  15:23 18:11,
  19 24:14
  27:6,8 28:19
  29:17 42:3
  51:10 55:17
  64:9 65:5
  80:5 87:5
year
  10:14
York
  5:4 79:14

_____

            Z
_____

zero
  80:20
Zoom
  13:9,10