# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
--------------------------------------------------x

AUBRY MCMAHON,

              Plaintiff,    Case No.:  2:21-cv-00920

      -against-

WORLD VISION, INC.,

              Defendant.

--------------------------------------------------x

              VIDEO CONFERENCE
              DEPOSITION

              February 16, 2023
              2:00 p.m.


              EXAMINATION BEFORE TRIAL of

MELANIE FREIBERG, a nonparty witness on behalf

of the Defendant herein, taken by the attorney(s)

for the Plaintiff, pursuant to Notice, held at

the above-mentioned time and place, before

THERESA RATIGAN, a shorthand reporter and Notary

Public within and for the State of New York.

Melanie Freiberg
February 16, 2023

Page 2

```
 1
 2    A P P E A R A N C E S :
 3
 4        NISAR LAW GROUP, PC
              Attorneys for Plaintiff
 5            60 East 42nd Street, Suite 4600
              New York, New York 10165
 6
          BY: CASEY WOLNOWSKI, ESQ.
 7            cwolnowski@nisarlaw.com
 8
 9        GAMMON & GRANGE, PC
              Attorneys for Defendant
10            1945 Old Gallows Road
              Tysons, Virginia 22182
11
          BY: SCOTT J. WARD, ESQ.
12            sjw@gg-law.com
              J. MATTHEW SZYMANSKI, ESQ.
13            jms@gg-law.com
14
15
16
      A L S O   P R E S E N T :
17
          STEVE McFARLAND, Chief Legal Officer for
18            World Vision Incorporated
19
20
21
22
23
24
25
```

Page 3

```
 1
 2
              IT IS HEREBY STIPULATED AND AGREED
 3    by and between the parties hereto, through their
 4    respective counsel, that the certification, sealing,
 5    and filing of the within examination will be, and the
 6    same are hereby waived;
 7
 8              IT IS FURTHER STIPULATED AND AGREED that
 9    all objections, except as to the form of the
10    question, will be reserved to the time of the trial;
11
12              IT IS FURTHER STIPULATED AND AGREED that
13    the within examination may be signed before any
14    Notary Public with the same force and effect as if
15    signed and sworn to before this Court.
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                         M. Freiberg
 2        (Time noted:  2:06 p.m.)
 3        THE REPORTER:  Good afternoon.  My name
 4    is Theresa Ratigan.  I'm with U.S. Legal
 5    Support, and I am the court reporter this
 6    afternoon.
 7        The attorneys participating in this
 8    deposition acknowledge that I am not
 9    physically present in the deposition room and
10    that I will be reporting this deposition
11    remotely.
12        They further acknowledge that, in lieu of
13    an oath administered in person, I will
14    administer the oath remotely under penalty of
15    perjury.
16        The parties and their counsel consent to
17    this arrangement and waive any objections to
18    this manner of reporting.
19        Please indicate your agreement by stating
20    your name and your agreement on the record;
21    counsels only, please.
22        MR. WOLNOWSKI:  Yes, Teri.
23        MR. WARD:  My name is Scott Ward, and
24    yes, I agree.
25        (Identification of witness verified)
```

Page 5

```
 1                         M. Freiberg
 2    M E L A N I E   F R E I B E R G, a nonparty witness
 3    herein, after having first been duly sworn by a
 4    Notary Public of the State of New York, upon being
 5    examined, testified as follows:
 6    BY THE REPORTER:
 7        Q    Please state your name for the record.
 8        A    Melanie Freiberg.
 9        Q    And your address for the record?
10        A    12955 Southeast 288th Place in Auburn,
11    Washington, ZIP code 98092.
12    EXAMINATION BY MR. WOLNOWSKI:
13        Q    Good afternoon, Ms. Freiberg.  My name is
14    Casey Wolnowski.  Let me go over some of the ground
15    rules.  I represent the plaintiff, Aubry McMahon,
16    with respect to her lawsuit against World Vision
17    Incorporated.
18        You are not personally a defendant in
19    this lawsuit; do you understand that?
20        A    Yes, I do.
21        Q    I'm going to ask you a series of
22    questions concerning the circumstances surrounding
23    Ms. McMahon seeking employment with World Vision.  My
24    goal today is not to confuse you.  If you do not
25    understand a question that I ask you, please tell me
```

Melanie Freiberg
February 16, 2023

Page 6

1                          M. Freiberg
2    that you do not understand, or ask me to rephrase the
3    question and I will do my best to do that.
4              In other words, unless you tell me, I'll
5    assume that by you answering the question, you had no
6    problem understanding the question; is that okay?
7         A    I understand.
8         Q    If you'd like to take a break, we can do
9    that; however, all that I ask is that if there is a
10   pending question, please answer before we take a
11   break.
12             Do you understand?
13        A    I understand.
14        Q    Please verbalize your answers.  Shaking
15   of head or answers such as "uh-huh" may not
16   necessarily be clear for the court reporter who is
17   typing down your answers today.
18             Also, please wait until I finish my
19   question before you answer.  Not only will that make
20   for the creation of a cleaner record, it will also
21   make the court reporter's life easier today.
22             Is that okay?
23        A    Yes.
24        Q    Given we are conducting this deposition
25   remotely via video, there are a few questions I would

Page 7

1                          M. Freiberg
2    like to ask.
3              Is there anyone else in the room aside
4    from your two attorneys, Mr. Ward and Mr. McFarland,
5    today?
6         A    There is not.
7         Q    If anybody enters the room where you are
8    sitting during the deposition, I kindly ask that you
9    please identify that person for me.
10             Do you have any papers or documents in
11   front of you or anything viewable on the computer
12   screen aside from this video platform?
13        A    I do not.
14        Q    If at any point that changes, please
15   inform me what documents you have in front of you or
16   what is on your screen.
17             I also kindly ask that you not
18   communicate with your attorney or any other
19   individual when testifying on the record, this
20   include communication via text, e-mail, instant
21   messaging, GChat, WhatsApp, or any other electronic
22   chat function.
23             Do you understand that?
24        A    I do.
25        Q    You were previously sworn in by the court

Page 8

1                          M. Freiberg
2    reporter; thus, are you aware that you are under oath
3    today?
4         A    I understand that.
5         Q    Do you understand that the oath you took
6    today is the same oath you would take as if this were
7    a trial before a judge?
8         A    Yes, I do.
9         Q    Do you understand that with the oath you
10   just took, you agreed to tell truth, the whole truth,
11   and nothing but the truth?
12        A    Yes, I understand.
13        Q    The questions that I'm about to ask you
14   are routine that I ask every person before I depose
15   them.
16             Are you under the influence of drugs or
17   alcohol today?
18        A    I am not.
19        Q    Are you under the influence of any
20   medication which may impair your ability to
21   understand my questions or to tell the truth?
22        A    I am not.
23        Q    Can you think of any reason why you
24   cannot provide truthful testimony here today?
25        A    I cannot.

Page 9

1                          M. Freiberg
2         Q    Has anybody told you not to give truthful
3    testimony here today?
4         A    No.
5         Q    Did you review any documents in
6    preparation for today's deposition?
7         A    I did review my own documents.
8         Q    Can you please tell me which documents
9    you reviewed in preparation for today's deposition?
10        A    E-mails that I sent, and I also reviewed
11   documents that included correspondence that I had,
12   and I reviewed basic information like the job
13   description, that sort of thing.
14        Q    Anything else?
15        A    I don't think so, no.
16        Q    Did you listen to any audio recordings in
17   preparation for today's deposition?
18        A    I did listen to an audio recording.
19        Q    Can you please tell me what the audio
20   recording was of?
21        A    It was an audio recording that was taken
22   without my consent by Ms. McMahon that included a
23   portion of the discussion that I had with her on
24   January 8th.
25        Q    Did you speak with anyone aside from your

Melanie Freiberg
February 16, 2023

Page 10

1              M. Freiberg
2    attorney in preparation for today's deposition?
3         A    I did not.
4         Q    Ms. Freiberg, have you ever been deposed
5    before?
6         A    I have not.
7         Q    For whom are you currently employed?
8         A    I'm employed with World Vision.
9         Q    Ms. Freiberg, do you have bachelor's
10   degree?
11        A    I do.
12        Q    From where?
13        A    From Concordia University in Montreal,
14   Canada.
15        Q    When did you receive that degree?
16        A    1989.
17        Q    Do you have any degree beyond a
18   bachelor's degree?
19        A    I do not.
20        Q    When did you first start working for
21   World Vision?
22        A    In 2018.
23        Q    What was your position with World Vision
24   when you first started working for them in 2018?
25        A    My position in 2018 was HR director,

Page 11

1              M. Freiberg
2    talent management.
3         Q    Did you have any position beyond that
4    after 2018?
5         A    My current title is senior director --
6    senior HR director, talent management.
7         Q    And when did you assume that role,
8    Ms. Freiberg?
9         A    I -- last year in 2022.
10        Q    Aside from HR director, talent
11   management, and senior director of talent management,
12   have you held any other positions with World Vision?
13        A    I have not.
14        Q    Ms. Freiberg, what was your job title
15   with World Vision in 2021?
16        A    It was HR director, talent management.
17        Q    In January of 2021, where was the office
18   physically located from which you primarily worked?
19        A    It's located in Federal Way, Washington.
20        Q    Is that the same office out of which you
21   primarily work as of today, February 16th, 2023?
22        A    I primarily work remotely at home since
23   the pandemic.
24        Q    Ms. Freiberg, in the month of January of
25   2021, how frequently did you work in the office

Page 12

1              M. Freiberg
2    physically as opposed to working remotely?
3         A    Well, since the pandemic, I have been
4    working primarily from home.
5         Q    So is it fair to say that since in or
6    around March of 2022, you have been working primarily
7    remotely for World Vision Incorporated?
8         A    Since the pandemic.  Is that when the
9    pandemic started?  Was it -- when did the pandemic
10   start; was it March of --
11        Q    Well, we can di- -- we could probably
12   dispute when it occurred and what parts of the world,
13   but I think generally speaking, it's generally
14   understood that it really hit the United States of
15   America beginning March of 2020.
16        A    Yes.
17        Q    Okay.
18        A    Since --
19        Q    So --
20        A    Since that time, since March of 2020, I
21   have been working primarily from home.
22        Q    Ms. Freiberg, if you could, please
23   explain to me what were the primary duties and
24   responsibilities of a person holding the title of
25   HR director of talent management for World Vision as

Page 13

1              M. Freiberg
2    of January of 2021.
3         A    The primary functions of my role in 2021
4    are that I have responsibility over two teams; the
5    talent acquisition team and the HR business partners.
6         Q    If you could, please explain to me the
7    responsibilities over the talent acquisition team as
8    it existed in January of 2021, from your
9    recollection.
10        A    The talent acquisition team are
11   responsible to work with hiring managers to fill open
12   positions; they post roles, they source applicants,
13   they screen candidates, coordinate interviews, and
14   present offers to candidates.
15        Q    What you just described, were those more
16   or less your core functions with respect to the
17   talent acquisition team as part of the role of
18   HR director, talent management in January of 2021 for
19   World Vision Incorporated?
20             MR. WARD:  I'm going to object as to form
21        and in a -- just -- sorry, I didn't catch it
22        all.  I'm going to object to the form.
23             What month did you say?
24             MR. WOLNOWSKI:  January of 2021.
25             MR. WARD:  Okay.  Thank you.

Melanie Freiberg
February 16, 2023

Page 14

```
 1                   M. Freiberg
 2        A    My core responsibilities were to oversee
 3   the team that performed those functions.
 4        Q    Ms. Freiberg, from your knowledge,
 5   experience, and observations, have those changed at
 6   all between January of 2021 and today?
 7        A    They have not changed.
 8        Q    At any point during your employment with
 9   World Vision Incorporated, have you received training
10   regarding discrimination in the workplace?
11        A    Not specific training regarding
12   discrimination in the workplace.
13        Q    Have you received any training regarding
14   discrimination in the workplace?
15        A    Is your question again tied to January of
16   2021?
17        Q    At any point during your employment with
18   World Vision Incorporated.
19        A    I have received on-boarding in
20   conjunction with my role to help me perform my role,
21   which includes legal as well as, you know, employment
22   policies in support of performing my role.
23        Q    Did any of the on-boarding you received
24   include preventing discrimination in the workplace?
25        A    The -- the -- the on-boarding that I
```

Page 15

```
 1                   M. Freiberg
 2   received was tied to being a religious employer.  So
 3   I learned, you know, World Vision rights as a result
 4   of being a religious employer.
 5        Q    And if you could, please explain to me
 6   what that included.
 7        A    Well, as a religious organization, we are
 8   able to require religious beliefs that align with
 9   World Vision's religious beliefs, and also to have
10   certain expectations around conduct -- employee
11   conduct that support those religious beliefs.
12        Q    When did that training take place as part
13   of the on-boarding process, as you've mentioned?  And
14   by that, I mean, a month and a year or a season and a
15   year, to the best of your recollection.
16        A    Well, on-boarding typically happens at
17   the onset of employment.  I started with World Vision
18   in May of 2018, and the bulk of the on-boarding
19   happened over the course of the first 60 to 90 days.
20   And over the course of time, there is further
21   learning that happens from being on the job that may
22   not be a particular training class or program, but
23   it's just other learning.
24        Q    Are you familiar with a person by the
25   name of Aubry McMahon, or perhaps you know her as
```

Page 16

```
 1                   M. Freiberg
 2   Aubry Atwood?
 3        A    Yes, I am.
 4        Q    Now, Ms. Freiberg, going forward, I'm
 5   going to represent to you that Aubry McMahon and
 6   Aubry Atwood are the same person, and I will refer to
 7   her going forward as Aubry McMahon, or simply Aubry,
 8   or Ms. McMahon.
 9             Do you understand that?
10        A    I do.
11        Q    I'm sorry, I didn't hear your answer.
12        A    I do understand that.
13        Q    Was Aubry McMahon an applicant for
14   employment with World Vision Incorporated?
15        A    Yes.
16        Q    Do you recall the position with World
17   Vision Incorporated for which she applied?
18        A    Yes.  She applied for a position that is
19   internally referenced -- the acronym is DSRT, and it
20   stands for donor services representative trainee.
21        Q    Before we dive into talking about
22   Ms. McMahon and her seeking employment with World
23   Vision Incorporated, I'd first like to speak
24   generally about the position of DSRT as you have
25   described it; is that okay with you?
```

Page 17

```
 1                   M. Freiberg
 2        A    Yes.
 3        Q    I'm going to show you what will be marked
 4   as Plaintiff's Exhibit Number 1.  It is a document
 5   which is Bates-stamped WV 48 through 50.
 6             (WHEREUPON, the above-referred-to
 7        document, Bates-stamped WV-000048 through
 8        WV-000050, was marked as Plaintiff's
 9        Exhibit 1, for identification, as of this
10        date, and displayed by the court reporter.)
11        Q    Ms. Freiberg, please review this document
12   and let me know once you've completed doing so.
13        A    Okay.  Can I review it on a screen,
14   please?
15             MR. WARD:  Let me -- if it's all right,
16        Counsel, let me see if I can show it on a
17        second screen and put that in front of the
18        witness.
19             Give me just one second here.
20             (WHEREUPON, the witness was given the
21        opportunity to review the entirety of the
22        document.)
23             (Time noted:  2:29 p.m.)
24        Q    Have you had a chance to review this
25   document?
```

Melanie Freiberg
February 16, 2023

M. Freiberg

1
2     A     I have.
3     Q     Do you recognize this document?
4     A     I do.
5     Q     Have you ever seen it before?
6     A     Yes, I believe so.
7     Q     What is it?
8     A     It's a job posting.
9     Q     Was this a job posting for the position
10 of customer service representative with World Vision
11 Incorporated?
12    A     It was.
13    Q     Is this the position for which Aubry
14 McMahon applied with World Vision Incorporated?
15    A     Can you -- could I ask the court reporter
16 to just scroll up a little bit further to the -- to
17 looking at the specific dates up top?
18          THE REPORTER:  (Complying)
19    A     Well, what this record shows is that
20 it -- it has a start date of February 1st, it just
21 doesn't have a year on it as the -- to show the start
22 date because we wouldn't normally put that in a
23 posting.  So I -- I believe that this would be the
24 posting that was used for Ms. McMahon, I'm just not
25 able to -- it doesn't show the specific date and year

M. Freiberg

1
2 or the start date for this position.
3     Q     If you can explain to me, exactly what
4 were the core functions and responsibilities of a
5 customer service representative in January of 2021?
6     A     Well, this -- this position is, you know,
7 the voice of World Vision, so this position is
8 responsible to speak with donors and to be able to
9 represent World Vision to those donors.  This person
10 must understand, as it describes in the document, who
11 we are as an organization.  The individual must be
12 able to understand our vision, our mission, our
13 strategies, our work, and must be able to pray with
14 donors, must be able to be a witness to Jesus in how
15 they perform their call center position.
16    Q     Ms. Freiberg, I'd like to direct your
17 attention to page -- the second page, which is WV 49.
18          MR. WOLNOWSKI:  If you could -- Teri, if
19 you could just please scroll down just a bit.
20          THE REPORTER:  (Complying)
21    Q     Ms. Freiberg, I'd like to direct your
22 attention to numbers 11 and 12.
23          Can you see those?
24    A     Yes.
25    Q     Were two of the core functions of a

M. Freiberg

1
2 customer service representative to "be sensitive to
3 donor's needs and pray with them when appropriate,"
4 as well as "perform other duties assigned"?
5     A     Yes.
6     Q     If you could, please explain to me what
7 was contemplated with respect to number 12, which is
8 "perform other duties as assigned."
9     A     I believe that would be a better question
10 for somebody who works in that donor contact services
11 organization.  I would not be able to provide
12 specifics.
13    Q     Okay.  So, Ms. Freiberg, as you sit here
14 today, you don't know what the "other duties as
15 assigned" entails; is that correct?
16    A     That's correct.  I could speculate, but I
17 don't know for certain.
18    Q     Well, I prefer you not to speculate.
19 I -- it's one of those questions where you either
20 know or you don't.  And if you don't know, that's
21 okay; but if you don't know, please tell me you don't
22 know.
23    A     No.  I don't know what those other duties
24 are.
25    Q     Ms. Freiberg, in January of 2021, was it

M. Freiberg

1
2 contemplated that an employee in the position of
3 customer service representative would lead a
4 congregation or be expected to regularly conduct
5 religious services as part of his or her job
6 responsibilities for World Vision Incorporated?
7          MR. WARD:  I'm going to object to the
8          question.  It's vague and ambiguous.  It's
9          also calling for a legal conclusion in some
10         sense.
11              You may answer to the extent you
12         understand it.
13    A     Can you help me understand what you mean
14 by "lead a congregation"?
15    Q     Do you understand what it means to lead a
16 congregation?
17    A     Not in the context of this job.
18    Q     One moment.
19          So I will define "lead" as it's defined
20 by Merriam-Webster as "to guide on a way especially
21 by going in advance or to direct on a course or in a
22 direction or to serve as a channel for."
23          And I will define for you "congregation"
24 per Merriam-Webster as "an assembly of persons or a
25 religion community."

Melanie Freiberg
February 16, 2023

Page 22

1                     M. Freiberg
2              Does that help you in guiding your
3    answer?
4         MR. WARD:  Go ahead, you may answer.
5         A     Well, this role doesn't lead a
6    congregation.  The closest kind of responsibility
7    that would meet this definition is that a member of
8    the donor contact services group may lead devotions
9    for their team, they may be part in leading a chapel
10   in our work, they may lead a donor in prayer.
11        Q     Now, you used the word "may."
12              Is it something that is obligatory as
13   part of the job, to lead devotions, to lead chapels,
14   or lead donors in prayer?
15        A     The devotions are an expectation to
16   participate in devotions.  At World Vision, teams
17   decide how those devotions are lead, whether those
18   devotions are shared among team members or -- you
19   know, so the actual execution may vary across teams.
20   In terms of expectation to lead chapel, it is an
21   expectation to attend chapel, but leading a chapel is
22   not -- it, you know, occurs, you know, based on
23   interest and desire to lead.  And in DCS, each year
24   since I've joined at World Vision, there has been a
25   devo- -- or, sorry, a chapel led by DCS and --

Page 23

1                     M. Freiberg
2         Q     Now, Ms. Freiberg, I -- I want you to
3    finish here, but just so we're clear, what does "DCS"
4    stand for?
5         A     The donor contact services.  So that is
6    the name of this team.
7         Q     Understood.
8               Please continue.
9         A     So I believe I was saying that in the
10   time that I have been at World Vision, each year
11   there is a chapel led by that team -- by DCS, and so
12   it's possible that a -- a team member may take part
13   in leading that or in organizing that chapel.  And --
14   yeah, so that -- that would be the example around
15   chapel.
16        Q     But would it be obligatory and -- in
17   other words, if someone said, "I either can't or
18   won't do that," would that be a disqualifier for
19   work?  And when I say "disqualifier," I mean, would
20   they be -- not be able to work because they are
21   either unable or refusing to lead as opposed to just
22   be --
23              MR. WARD:  Let me --
24        Q     -- as opposed to merely be a participant?
25              MR. WARD:  I'm going to object to the

Page 24

1                     M. Freiberg
2    question; vague and ambiguous, compound and
3    complex, and to the extent it calls for a
4    legal conclusion.
5              And, Counsel, there -- it might be
6    something where we should talk briefly without
7    the witness present, because I want to make
8    sure -- part of what you're asking, I think,
9    is legitimate, but there's part of it that I
10   want to clarify, and I want to do that in a
11   way that doesn't get in the way of your
12   appropriate questioning.  So I don't know, if
13   you -- if you want to keep going, I can keep
14   objecting, we can keep going forward; but if
15   it's helpful to talk outside the presence of
16   the witness, I'm happy to do that as well.
17              MR. WOLNOWSKI:  That's fine.
18              I would -- first, if you can please
19   answer the question.
20              We can speak on a break, if you'd like.
21   But again, I spoke about this with your
22   colleague before the deposition about speaking
23   objections.
24              Again, the rules are very clear that
25   they're limited in terms of objecting and

Page 25

1                     M. Freiberg
2    speaking objections.  I kind of ask that we
3    could all just adhere to those rules.
4              Ms. Freiberg, if you understand the
5    question, if you could please answer it.
6              Teri, it might be easier for you to read
7    it back.
8              (WHEREUPON, the previous question was
9    read by the court reporter.)
10        A     Okay.
11              MR. WARD:  And I renew the same
12   objections.
13              You may answer.
14        A     Okay.  What -- what is a requirement of
15   the role is to be able to lead prayer with donors on
16   call with them.  To lead a devotion or to lead a
17   chapel would not be a required expectation, but it
18   would be welcomed.  On -- on the devotions, each --
19   because each team manages that in their own unique
20   way, I can't speak for what the expectation is at DCS
21   for leading devotions.  In my department, as an
22   example, in human resources, each person leads
23   devotions and we rotate it around, and it's a -- just
24   an expectation.
25        Q     So just to be clear, Ms. Freiberg, you

Melanie Freiberg
February 16, 2023

Page 26

M. Freiberg

1  previously testified, if I understand, that customer
2  service representatives may lead donors in prayer; is
3  that correct?
4       A    And when I said "may," I meant that not
5  every donor call may require prayer.  So it would be
6  at the opportune time, but the expectation to pray
7  is -- is an expectation, because that's part of who
8  we are.
9       Q    And is it an expectation that the
10  customer service representative will initiate prayer?
11      A    I don't know enough about that.
12      Q    Is it an expectation that the customer
13  service representative would lead prayer?
14           MR. WARD:  I'm going to object as vague
15      and ambiguous.
16           But you may answer.
17      A    Well, I -- I think I'm not really
18  understanding the distinction.  The expectation is
19  that the donor contact services representative would
20  pray either with or for or on behalf of the donor,
21  which then means that they may be leading it, or they
22  may be a participant in the prayer, or they may even
23  be a recipient of the prayer.
24      Q    With respect to this number 11 where it

Page 27

M. Freiberg

1  states, "Be sensitive to donor's needs and pray with
2  them when appropriate," to your knowledge, did
3  customer service representatives, at least in
4  January of 2021, did they receive training on when to
5  determine when it was appropriate to engage in prayer
6  with respect to speaking to a donor?
7       A    I'm not familiar with the details of the
8  training program.
9       Q    So your answer is, in essence, you don't
10  know?
11      A    Yes.  I cannot speak to the details
12  and -- I cannot speak to the detail of what the
13  training entails.
14      Q    Do you know if there is any written
15  materials, whether it be a guidebook, instruction
16  manual, training manual, that would outline these or
17  that would contain guidance as to this?
18           MR. WARD:  Objection as to form; vague
19      and ambiguous.
20           You may answer.
21      A    I have not seen that myself in my role.
22      Q    Do you know whether or not one exists?
23      A    I know that there is an extensive
24  training program, but as to the documentation of it,

Page 28

M. Freiberg

1  I -- I don't know.
2       Q    In January of 2021, did a person employed
3  in the position of customer service representative
4  with World Vision Incorporated require a significant
5  degree of religious training followed by a formal
6  process of commissioning?
7           MR. WARD:  I'm going to object to that to
8      the extent it calls for a legal conclusion.
9       A    Can you define "significant religious
10  training"?
11      Q    Well, sure.
12           So according to Merriam-Webster,
13  having -- "significant" is defined as "having meaning
14  or having or likely to have influence or effect."
15           According to Merriam-Webster dictionary,
16  the word "religious" is defined as "relating to or
17  manifesting faithful devotion to an acknowledged
18  ultimate reality or deity."
19           And according to Merriam-Webster
20  dictionary, the word "training" is defined as "the
21  act, process, or method of one that trains or the
22  skill, knowledge, or experience required by one that
23  trains."
24           MR. WARD:  I'm going to renew the same

Page 29

M. Freiberg

1  objections, obviously.
2       A    It -- I think what I can say is that
3  what's needed for the role is what's described in the
4  position as the requirements.
5       Q    Well, what I can say is that, in my view
6  of this, that the posting with respect to customer
7  service representatives as exhibited in Plaintiff's
8  Exhibit 1, it does not state that there is a
9  requirement of significant religious training
10  followed by a formal process of commissioning.
11           Would you agree with my conclusion?
12           MR. WARD:  So I'm going to object to the
13      extent it calls for a legal conclusion to the
14      extent it's seeking an opinion without
15      establishing a foundation, and to the extent
16      that it's calling for speculation.
17           Other than that, you can answer.
18      A    I'm not sure how to answer that question.
19      Q    Well, I asked you for your personal
20  opinion.
21           MR. WARD:  Same objections, obviously.
22      A    I agree that it does not require any sort
23  of religious training or certification, which I think
24  was part of your question.

Melanie Freiberg
February 16, 2023

Page 30

1                           M. Freiberg
2        Q       Does it require any kind of formal
3    process of commissioning?
4                MR. WARD:  I'm going to object to that as
5            vague and ambiguous, and to the extent it
6            calls for a legal conclusion.
7        Q       You can answer the question if you
8    understand it, Ms. Freiberg.
9        A       I -- I don't think I understand the term
10   "commissioning" in the context of the employment of a
11   donor contact services representative.
12       Q       According to Merriam-Webster's
13   dictionary, "commissioning" is a noun related to the
14   word "commission," which is "a formal written warrant
15   granting to perform various acts or duties."
16       A       Well, the -- you know, the -- the closest
17   I can answer your question is that, at the end of the
18   11-week training, a person is -- either passes the
19   training or they don't pass the training, and then
20   they may perform the full essential functions of the
21   role.
22       Q       Does that training period include
23   religious training?
24       A       I don't know the details of the training.
25       Q       Ms. Freiberg, in January of 2021, did a

Page 31

1                           M. Freiberg
2    person employed in the position of customer service
3    representative for World Vision Incorporated have
4    functions similar to those of a minister?
5                MR. WARD:  I'm going to object to the
6            question as vague and ambiguous, as assuming
7            facts not in evidence, and to the extent it
8            calls for a legal conclusion or opinion.
9                Subject to that, you may answer.
10       A       Well, again, I would say that this
11   position in how it's described --
12               If -- if you could scroll up a little
13           bit, Teri.
14               THE REPORTER:  (Complying)
15       A       Sorry.  So number 1 that says, "Keep
16   Christ central in our individual and corporate
17   lives."  So I guess I'd just call that out as similar
18   to what you might experience in a church.
19               And, also, if you could scroll up a
20   little bit more, Teri.
21               THE REPORTER:  (Complying)
22       A       The -- the kind of last sentence that
23   says, "Help carry out our Christian organization's
24   mission, vision, and strategies.  Personify the
25   mission of World Vision by witnessing to Christ and

Page 32

1                           M. Freiberg
2    ministering to others through life, deed, word, and
3    sign," that would be how I would describe it to be an
4    elegies to ministry.
5        Q       So is your answer yes --
6        A       Yeah.
7        Q       -- that a person -- a customer service
8    representative employed by World Vision Incorporated
9    in January of 2021 had functions similar to those of
10   a minister?
11               MR. WARD:  I'll renew the same
12           objections.
13               Subject to that, you may answer.
14       A       I would say yes, that there are
15   similarities in that way.
16       Q       Was it a requirement of the job of
17   customer service representative for World Vision
18   Incorporated in January of 2021 to proclaim the
19   gospel of Jesus Christ?
20       A       Yes.
21       Q       Was it a mandatory duty of a person in
22   the position of customer service representative for
23   World Vision Incorporated in January of 2021 to
24   administer the sacraments?
25               MR. WARD:  I'm going to object as vague

Page 33

1                           M. Freiberg
2    and ambiguous, and including lack of
3            foundation.
4                Other than that, you may answer.
5        A       Can you define that term?
6        Q       Sure.
7                The word "administer," I'll define it
8    pursuant to Merriam-Webster dictionary, "to manage or
9    supervise the execution, use, or conduct of."
10               With respect to the word "sacraments,"
11   according to Merriam-Webster's dictionary, it is
12   defined as "a Christian right, such as baptism or the
13   Eucharist that is believed to have been ordained by
14   Christ and that is held to be a means of defined
15   grace or to be a sign or symbol of a spiritual
16   reality."
17       A       They're very difficult questions to
18   answer.
19               What I would say is that the role of the
20   DCS agent is to be a witness to Jesus Christ and
21   to -- you know, I know we've just read this, but to
22   do this through life, deed, word, and sign.  So that
23   means proclaiming who Jesus is, embracing the power
24   of Jesus and the -- the healing nature of prayer
25   and -- and -- and our love for the poor.

Melanie Freiberg
February 16, 2023

Page 34

M. Freiberg

1
2    Q    Was it an expectation that a customer
3  service representative employed by World Vision
4  Incorporated in January of 2021 would perform
5  baptisms?
6    A    No.
7    Q    Was it an expectation that he or she
8  would administer communion?
9    A    No.
10   Q    Could a customer service
11 representative -- excuse me.  Question withdrawn.
12        Was there an expectation of -- that a
13 customer service representative of World Vision
14 Incorporated could marry people in the Christian
15 faith?
16        MR. WARD:  Object as -- object as vague
17   and ambiguous.
18        You may answer.
19   A    No.
20   Q    In January of 2021, was -- was -- is it
21 expected of a person employed in the position of
22 customer service representative for World Vision
23 Incorporated to perform religious duties for the
24 purpose of religious education or instruction?
25        MR. WARD:  I'll object as vague and

Page 35

M. Freiberg

1
2        ambiguous, and to the extent it calls for a
3        legal conclusion.
4        Subject to that, you may answer.
5    A    Can you repeat the substantive part of
6  the question, the expectation -- just can you
7  complete that last part of the sentence, please?
8        MR. WOLNOWSKI:  Ms. Ratigan, could you
9        read the question back when you have a moment?
10       (WHEREUPON, the previous question was
11       read by the court reporter.)
12       MR. WARD:  Renew the same objections.
13   A    So there was not -- there's not a
14 requirement, but there is an encouragement to
15 participate in leading devotions and -- and chapel --
16 and participating in chapel.  So that can include
17 being educated, but also in serving to educate others
18 through sharing of the word and prayer and -- and
19 religious function in that per-- in that sense.
20   Q    Would you characterize the position of
21 customer service representative as a relatively
22 low-level position in terms of World Vision's
23 employment hierarchy in January of 2021?
24   A    I would describe it as a position that
25 has -- like it has -- you know, it is lower on the

Page 36

M. Freiberg

1
2  pay scale relative to other positions at World
3  Vision, but it is a very essential function -- a very
4  essential role at World Vision because it is the
5  voice of World Vision to the donors.  And I --
6    Q    When did you -- I'm sorry --
7    A    I was just --
8    Q    -- go ahead.
9    A    I was just -- add one more piece to that,
10 which is that, you know, the training program is
11 9-to-11-weeks long, which is a very long period of
12 time for a position.  And so, you know, I just -- I
13 add that just in terms of the depth, I think, that is
14 required for people to be able to perform that role.
15   Q    Anything else, Ms. Freiberg?
16   A    No.  Thank you.
17   Q    When did you first learn about Aubry
18 McMahon applying to work for World Vision
19 Incorporated?
20   A    I learned about her application on
21 January 5th.
22   Q    At some point, did you learn that an
23 offer of employment had been extended to Aubry
24 McMahon to work for World Vision Incorporated in the
25 position of customer service representative?

Page 37

M. Freiberg

1
2    A    No, I did not know of that fact.
3    Q    Ms. Freiberg, I'd like to show you what
4  will be marked as Plaintiff's Exhibit Number 2.  It
5  is a document which bears Bates-stamp numbers WV 78
6  through 79.
7        (WHEREUPON, the above-referred-to
8        document, Bates-stamped WV-000078 through
9        WV-000079, was marked as Plaintiff's
10       Exhibit 2, for identification, as of this
11       date, displayed by the court reporter, and the
12       witness was given the opportunity to review
13       the entirety of the document.)
14       (Time noted:  3:05 p.m.)
15   Q    Ms. Freiberg, have you had a chance to
16 review this document that I've provided to you and
17 which has been marked as Plaintiff's Exhibit
18 Number 2?
19   A    Yes.
20   Q    Do you recognize this document?
21   A    I do.
22   Q    Have you ever seen it before?
23   A    Yes.
24   Q    What is this document?
25   A    This is an offer letter.

Melanie Freiberg
February 16, 2023

Page 38

M. Freiberg
1
2        Q    If you could please explain to me, what
3    is this offer letter meant to communicate?
4        A    It is meant to confirm our offer of
5    employment and the associated details surrounding the
6    job, the pay, the start date, and a few other details
7    that are expectations and requirements for working at
8    World Vision.
9        Q    It appears as though this letter was --
10   question withdrawn.
11            At the bottom of the first page, it
12   appears as though the author or the sender of this
13   letter is a woman by the name of Catherine Miolla;
14   would you agree, Ms. Freiberg?
15       A    Yes, Catherine Miolla is -- was the
16   author of this letter.
17       Q    If you could, please explain to me as of
18   January 5th, 2021 what role Catherine Miolla had with
19   World Vision Incorporated.
20       A    Catherine's position is a talent
21   acquisition partner, which is another word for
22   recruiter.  So she was a recruiter assigned to this
23   class of the DCS trainees that were hired in that
24   time period.
25       Q    Was she part of the talent acquisition

Page 39

M. Freiberg
1
2    team that you oversaw in January of 2021?
3        A    Yes.
4        Q    Was she your subordinate in January of
5    2021?
6        A    Yes.
7        Q    Were you her supervisor?
8        A    Yes.
9        Q    Did you have the power to terminate her
10   employment if you had wished in January of 2021?
11       A    Within limits, but yes, I have hire/fire
12   responsibility in my role.
13       Q    To your knowledge and recollection,
14   Ms. Freiberg, is it correct that an official offer of
15   employment had been made to Aubry McMahon to work for
16   World Vision Incorporated as of January 5th, 2021 at
17   the latest?
18       A    Yes, I agree with that.
19       Q    Would you agree that this letter
20   constitutes an offer of employment for World Vision
21   Incorporated?
22       A    Yes, it is an offer of employment.
23       Q    I will show you what will be marked as
24   Plaintiff's Exhibit Number 3.  It's a document that
25   is Bate-stamped WV 80, and represent that it is a

Page 40

M. Freiberg
1
2    document that was exchanged during the discovery
3    phase of this case's litigation.
4            If you could, Ms. Freiberg, please take a
5    minute to review it and let me know once you've
6    completed doing so.
7            (WHEREUPON, the above-referred-to
8            document, Bates-stamped WV-000080 was marked
9            as Plaintiff's Exhibit 3, for identification,
10           as of this date, and displayed by the court
11           reporter.)
12           THE WITNESS:  I've read it.
13       Q    Okay.  Ms. Freiberg, do you recognize
14   this document?
15       A    I do.
16       Q    Have you ever seen it before?
17       A    I have.
18       Q    When is it that you first saw it, from
19   your recollection?
20       A    On January 5th.
21       Q    Now, Ms. Freiberg, Plaintiff's Exhibit 3
22   is a document which shows an e-mail from Aubry
23   McMahon to Catherine Miolla on Tuesday, January 5th,
24   2021 at 11:56 p.m.  The subject states, "Quick
25   Question," and the body of the e-mail reads -- and

Page 41

M. Freiberg
1
2    I'm going to read this into the transcript.
3            "Hey there, I just have a quick question.
4    My wife and I are expecting our first baby in March
5    and I wanted to see if I would qualify for any time
6    off for this since I'll be a new employee?  I will be
7    the one having the baby, so I just wanted to check to
8    see if any time would be allowed off.  If not, no
9    worries.  Thanks so much.  Aubry."
10           First and foremost, would you agree that
11   this is an e-mail sent from Aubry McMahon to
12   Catherine Miolla on January 5th, 2021?
13       A    Yes, I agree with that.
14       Q    Please explain to me, to the extent that
15   you know, the duties and responsibilities of a talent
16   acquisition professional as that job existed with
17   World Vision Incorporated in January of 2021.
18       A    The role of the talent acquisition
19   partner in 2021 would be to work with hiring managers
20   on open positions to post, they would work through
21   the posting process, they would source applicants as
22   needed, they would screen candidates and/or
23   candidates that would move to hiring manager
24   interviews, they would present those candidates and
25   help facilitate and coordinate interviews and present

Melanie Freiberg
February 16, 2023

Page 42

```
1                  M. Freiberg
2  offers and salaries to these prospective employees
3  to -- to these -- to the successful candidates.
4       Q     Would you agree that in this e-mail, it
5  could be reasonably discerned that Aubry McMahon was
6  in a same-sex marriage with a woman?
7       A     It was a question that we sought to
8  understand.
9       Q     So is your testimony here today that it
10 was not -- it could not be reasonably discerned?
11      A     We sought to clarify whether that was
12 true.
13      Q     When you first read this e-mail, was it
14 your first inclination to understand what Ms. McMahon
15 wrote as her being in a same-sex marriage with a
16 woman, given that Aubry was a woman and mentions in
17 this e-mail that she has a wife?
18            MR. WARD:  I'm going to object as to form
19         and as vague and ambiguous, compound and
20         complex.
21            You may answer.
22      A     Our first inclination was to seek
23 understanding, because in the phone screen that
24 Ms. Miolla conducted with Ms. McMahon, she responded
25 in a way that was contrary to this e-mail, so we
```

Page 43

```
1                  M. Freiberg
2  wanted to seek to understand whether this e-mail was
3  correct.
4       Q     But did you -- when reading this e-mail
5  for the first time, when you read it, did you believe
6  that there was a likelihood that Aubry was in a
7  same-sex marriage with a woman?
8       A     We sought to clarify that was true.  On
9  face value, that's what that would say.
10      Q     I'm not asking what it would say to
11 somebody.  I'm asking what it said to you.
12            Is that how you read it?
13            MR. WARD:  Object as to form.
14            You may answer.
15      A     I think what I'm trying to say is that
16 this e-mail shows disconfirming information to the
17 phone screen that we collected, so we wanted to reach
18 her to understand what -- what was this telling us.
19      Q     Okay.  I'm not sure that answers the
20 question, but let me try to answer in a different
21 way -- let me try to ask it a different way.
22            When you first read this e-mail, did you,
23 Ms. Freiberg, think that Aubry McMahon was in a
24 same-sex marriage with a woman?
25      A     I thought that based off of this e-mail,
```

Page 44

```
1                  M. Freiberg
2  that could be the case.
3       Q     What likelihood would you -- if you
4  recall, did you think that she was married in a
5  same-sex marriage with a woman; would you say greater
6  than 50 percent, less than 50 percent, something
7  else?
8            MR. WARD:  Objection as to form and to
9         the extent it calls for speculation.
10           You may answer.
11      A     I'm not sure what percentage I would
12 allocate to it, but I -- we wanted to know whether
13 this was what she intended to express.
14      Q     So when I ask a question about what you
15 thought, I would ask that you kindly limit your
16 response to what you thought, not "we," as in kind of
17 what a group was trying to do or was thinking.  I'm
18 asking you about your thoughts or opinions or views.
19      A     Okay.  I wanted to know whether she
20 intended to write her wife or if that was an error.
21      Q     Did you ever find out whether or not she
22 indeed was in a same-sex marriage?
23      A     I did.
24      Q     And when did you find out?
25      A     On January 8th.
```

Page 45

```
1                  M. Freiberg
2       Q     And how is it you found out on
3  January the 8th?
4       A     Well, after we received -- after this
5  e-mail was received, Catherine sought to speak with
6  her multiple times.  And finally, on January 8th,
7  Catherine and I spoke with Ms. McMahon, and she
8  confirmed that she was in a same-sex marriage.
9       Q     Ms. Freiberg, when you first read this
10 e-mail that is marked as Plaintiff's Exhibit
11 Number 3, did you discern that Aubry McMahon was
12 somebody who was LGBTQ?  And I will define LGBTQ as
13 an acronym for lesbian, gay, bisexual, transgender,
14 or queer, slash, questioning.
15            MR. WARD:  So I'm going to object to form
16         and as vague and ambiguous.
17            But you may answer.
18      A     I was not looking to determine -- I was
19 not looking to determine whether she identified as
20 LGBTQ.  I was looking to confirm whether she could
21 comply with our standards of conduct.
22      Q     Ms. Freiberg, when you first read this
23 e-mail which is marked as Plaintiff's Exhibit
24 Number 3, did you believe after having first read it
25 that Aubry may have been LGBTQ?
```

Melanie Freiberg
February 16, 2023

Page 46

1                   M. Freiberg
2              MR. WARD:  I'm going to object as to
3        form; vague and ambiguous to the extent --
4              Otherwise, you can answer.
5         A    I -- I agree with the statement "may,"
6   because that was -- the intent was to clarify whether
7   this was true or this was not true.
8         Q    So in reading this e-mail for the first
9   time, you believed that there was a possibility that
10  Aubry McMahon was LGBTQ; is that correct?
11        A    I did not say that.  I -- I -- what I
12  said was that I knew that she had responded in a way
13  that complied with our standards of conduct.  And
14  that if she was in a same-sex marriage, she would not
15  be able to comply with our stan- -- with our
16  standards of conduct.  And I sought to confirm
17  whether that was true or not.
18        Q    So in reading this e-mail for the first
19  time, did you formulate a belief as to whether or not
20  Aubry McMahon may or may not be LGBTQ?
21        A    I did not.
22        Q    So if I'm understanding this, when you
23  read this e-mail and a woman wrote that she had a
24  wife, it didn't connect to you that this person may
25  be LGBTQ?

Page 47

1                   M. Freiberg
2              MR. WARD:  I'm going to object to form;
3        vague and ambiguous and argumentative.
4              You may answer.
5         A    Well, Mr. Wolnowski, what we were seeking
6   to do was dis- -- it -- it was to seek to understand
7   to determine whether this was as it appeared as it
8   was written or whether there was an error.
9         Q    I'm not sure that answers the question.
10             MR. WOLNOWSKI:  Could you please read the
11        question back, Ms. Ratner (sic)?
12             MR. WARD:  Counsel, can you let the
13        witness finish her answer.
14        Q    Were you done with your answer,
15  Ms. Freiberg?
16        A    No, I just have a little bit more to add
17  to that, which is that I did not want to conclude
18  until I had the opportunity to speak with her.
19        Q    But nevertheless, when you first read
20  this e-mail, you thought that there was a possibility
21  that Aubry might be LGBTQ; is that a fair statement?
22             MR. WARD:  I'm going to object to the
23        extent it mischaracterizes or misstates
24        testimony.
25             You may answer.

Page 48

1                   M. Freiberg
2              Oh, and argumentative also.
3         A    I would say that what I was -- what --
4   what I considered was a possibility was that she was
5   not going to be able to comply with our standards of
6   conduct.
7         Q    But when you -- in reading this for the
8   first time, did you ever formulate a belief as to
9   whether or not Aubry McMahon was LGBTQ?
10             MR. WARD:  I'm going to object as asked
11        and answered and vague and ambiguous.
12             You may answer.
13        A    Well, I have to restate my answer, which
14  is that I was -- I -- I formed the belief that she
15  may not be able to comply with our standards of
16  conduct, and so I -- I was seeking to speak with her
17  about that.
18        Q    Again, I'm not sure that answers the
19  question.
20             MR. WOLNOWSKI:  Could you please read
21        back the question, Ms. Ratner?
22             (WHEREUPON, the previous question was
23        read by the court reporter.)
24        A    I did not form that belief because I was
25  not seeking to understand that.  What I was seeking

Page 49

1                   M. Freiberg
2   to understand was her conduct and whether --
3         Q    At any point -- I'm sorry to cut you off.
4        Anything else?
5         A    And just -- and whether she was able to
6   comply with our standards of conduct.
7         Q    At any point after the time that you
8   first read this e-mail, did you formulate a belief as
9   to whether or not Aubry McMahon was LGBTQ?
10             MR. WARD:  I'm going to object to form as
11        vague and ambiguous.
12             You may answer.
13        A    I was able to confirm that she would --
14  was not able to comply with our standards of conduct
15  because of her same-sex marriage on January 8th after
16  speaking with her.
17        Q    I'm not asking about her conformance of
18  standards of conduct.
19             My question is about when you formed a
20  belief as to whether or not she was LGBTQ.
21             MR. WOLNOWSKI:  If you could, Ms. Ratner,
22        please read back the question.
23             (WHEREUPON, the previous question was
24        read by the court reporter.)
25             MR. WARD:  I renew the same objections

Melanie Freiberg
February 16, 2023

Page 50

1                    M. Freiberg
2          and add argumentative.
3               You may answer.
4          A     Okay.  So, Mr. Wolnowski, the -- I --
5     I -- whether she was LGBTQ or not was not relevant or
6     material to World Vision.  We were -- I was seeking
7     to confirm her conduct.  So that is why I cannot
8     answer that I had a belief that she was LGBTQ,
9     because that -- that was not what I was seeking to
10    understand.
11              MR. WARD:  Counsel, we're now at a point
12         where we're about 15 or 20 minutes beyond the
13         five or ten minutes I asked for, so I will
14         need a break at this point.
15              MR. WOLNOWSKI:  Okay.  So let's go off
16         the record, and we will continue in a moment.
17              MR. WARD:  Thank you.
18              (WHEREUPON, a brief recess was taken,
19         after which the following transpired:)
20              (Time noted:  3:51 p.m.)
21    CONTINUED EXAMINATION BY MR. WOLNOWSKI:
22         Q     Ms. Freiberg, was there any point that
23    you either formed a belief or came to learn that
24    Aubry McMahon is LGBTQ?
25              MR. WARD:  Object as to form.

Page 51

1                    M. Freiberg
2               You may answer.
3          A     On January 8th when I spoke with her and
4     she confirmed that she was in a same-sex marriage.
5          Q     So is it fair to say that at no point
6     before that had you either formed a belief or came to
7     learn that Aubry McMahon was LGBTQ?
8               MR. WARD:  Objection to form.
9          A     I would say I didn't form a belief
10    because that's not what I was seeking to determine.
11         Q     So the answer is no, you had not formed a
12    belief or came to learn prior to January the 8th?
13         A     I agree with that.
14         Q     Now, Ms. Freiberg, you received a number
15    of e-mails between January 5th, 2021 and January 8th,
16    2021 with respect to Aubry McMahon; isn't that
17    correct?
18         A     Could you show those to me?
19         Q     Well, I'll -- I'll show you some of them,
20    but I just generally want to know if between those
21    few days, if you received a number of e-mails with
22    respect to Aubry McMahon.
23         A     I did receive some e-mails, but I'm not
24    sure of the number of them.
25         Q     Understood.

Page 52

1                    M. Freiberg
2          Some of those e-mail communications were
3     either from or included legal counsel, whereas other
4     didn't; isn't that correct?
5          A     That is correct.
6          Q     So as it relates to the communications
7     that did not include or involve legal counsel, please
8     tell me the general nature of those communications to
9     the extent that you can remember.
10         A     I received communication from Catherine
11    Miolla that she had received the e-mail from Aubry
12    McMahon.
13         Q     Anything else?
14         A     Catherine Miolla shared with me the
15    e-mail that was sent by Aubry McMahon, and she also
16    shared the phone screen interview that she had
17    conducted with Ms. McMahon.
18         Q     Anything else?
19         A     Not that I'm recalling off the top of my
20    head.
21         Q     I will show you what will be marked as
22    Plaintiff's Exhibit Number 4.  It's a document that
23    is Bates-stamped WV 231 to 232.  It has been supplied
24    during the discovery phase of this case.
25              If you have a moment, please review and

Page 53

1                    M. Freiberg
2     let me know once you have concluded reviewing it.
3               (WHEREUPON, the above-referred-to
4          document, Bates-stamped WV-000231 through
5          WV-000232, was marked as Plaintiff's
6          Exhibit 4, for identification, as of this
7          date, displayed by the court reporter, and the
8          witness was given the opportunity to review
9          the entirety of the document.)
10              (Time noted:  3:57 p.m.)
11         Q     Did you have chance to review this
12    document?
13         A     I did.
14         Q     Do you recognize this document?
15         A     I do.
16         Q     Have you ever seen it before?
17         A     I -- well, yes.  It's the --
18         Q     Now, I can represent to you that some of
19    these e-mails under this e-mail chain which begins on
20    January the 5th are not entirely complete, but from
21    what is there, I have some questions for you; okay,
22    Ms. Freiberg?
23         A     Okay.
24              MR. WOLNOWSKI:  First and foremost, I
25         will call for production for the full e-mail

Melanie Freiberg
February 16, 2023

Page 54

M. Freiberg

1        chain of this.  I will put it in writing and
2        interpose that upon counsel shortly after the
3        deposition.
4
5        Q    Now, Ms. Freiberg, I see that certain
6        e-mails were exchanged between you and Catherine
7        Miolla on January 5th, 2021 regarding Aubry McMahon.
8        Did you and Catherine Miolla have any
9        other communications on January 5th, 2021 relating to
10       Aubry McMahon whether it be by telephone, Zoom,
11       electronic messaging, in person, or otherwise?
12       A    We did have communication before this one
13       where Catherine Miolla shared with me the e-mail that
14       she had received from Ms. McMahon.
15       Q    Did you and Catherine Miolla have any
16       non-e-mail communications on January 5th of 2021
17       relating to Aubry McMahon?
18       A    Yes.  My recollection is that we spoke on
19       a Teams call where Catherine shared with me that she
20       had reviewed an e-mail from Ms. McMahon.
21       Q    So first and foremost, Ms. Freiberg, you
22       said the word "we" in that last response.
23       Who was "we"?
24       A    We, as in World Vision, had received an
25       e-mail.

Page 55

M. Freiberg

1
2        Q    I believe that you said, "We spoke on a
3       Teams call."
4       I'm asking who --
5       A    Oh, I --
6       Q    -- all the people who were present on
7       that Teams call, to the extent you know and can
8       remember.
9       A    Okay.  My apologies.  I misunderstand
10       you.
11       Catherine called me -- Catherine called
12       me on Teams regarding the e-mail that she had
13       received from Ms. McMahon.
14       Q    Was anybody else on that call?
15       A    No.
16       Q    How long did that call last?
17       A    I don't remember for certain, but not
18       very long.  Maybe --
19       Q    When you say -- I'm sorry, I'll -- I'll
20       let you finish.  My apologies.
21       A    You know, some number of minutes; five to
22       ten minutes.
23       Q    So as you testified today, Catherine
24       Miolla called you on January 5th, 2021 to speak about
25       Aubry McMahon and that that phone call lasted

Page 56

M. Freiberg

1        somewhere between five and ten minutes?
2
3        A    To the best of my knowledge.
4        Q    Please tell me everything you can
5        remember about that conversation.
6        A    Well, Catherine shared with me that she'd
7        received the e-mail from Ms. McMahon, and that she
8        had -- I -- I -- I'm not sure I can remember all of
9        the details, but that she essentially showed me the
10       e-mail that Ms. McMahon had sent.  And my
11       recollection is that I asked her about her phone
12       screen that she had had with Ms. McMahon, because the
13       information in her e-mail was contrary to her
14       responses in the phone screen.
15       Q    Did the e-mails that I've showed you at
16       Plaintiff's Exhibit 4, were they exchanged before or
17       after this phone call with Catherine Miolla?
18       A    Are you referring to the e-mail that
19       includes -- that is the January 5th e-mail from
20       Ms. McMahon?
21       Q    No.  I'm referring to the January 5th,
22       2021 e-mail at 3:07 from you to Catherine Miolla that
23       is in Plaintiff's Exhibit Number 4.
24       A    That occurred after when --
25       Q    When you say -- I'm sorry.

Page 57

M. Freiberg

1
2        A    Yeah, I'll just -- sorry, I will finish
3        the sentence.  I realize I'm pausing, and it may feel
4        like my sentence is finished, but this e-mail on
5        January 5th at 3:07, as it's dated here, occurred
6        after Ms. Miolla and I spoke where she shared that
7        she had received an e-mail from Ms. McMahon.
8        Q    During your phone call with Ms. Miolla on
9        January 5th, which you stated lasted somewhere
10       between five and ten minutes, was the topic of Aubry
11       McMahon possibly being in a same-sex marriage
12       discussed?
13       A    It was specifically about the e-mail and
14       how the e-mail was not consistent with the phone
15       screen that was conducted.
16       Q    My question is a little more specific,
17       and it regards whether or not the topic of
18       Ms. McMahon being in a same-sex marriage was
19       discussed on that phone call.
20       A    I don't recall that level of specificity.
21       Q    During that phone call, was it discussed
22       between you and Ms. Miolla that Ms. McMahon may be
23       LGBTQ?
24       A    Not to my recollection.
25       Q    This e-mail chain which I've showed you,

Melanie Freiberg
February 16, 2023

Page 58

M. Freiberg

1  which is part of Plaintiff's Exhibit Number 4,
2  suggests that you wanted to speak with Ms. McMahon on
3  the telephone; is that correct?
4      A    That is correct.
5      Q    If you could, please explain to me why
6  you wanted to talk to her on the telephone.
7      A    It's as I stated before, we wanted to
8  speak with her to ask her about her e-mail and
9  whether she intended to reference her e-mail, and
10 whether she understood that she had responded
11 differently when we asked her if she could comply
12 with our standards of conduct.
13     Q    From your recollection and if you know,
14 did these e-mail communications, which I've showed
15 you at Plaintiff's Exhibit 4, take place after an
16 offer of employment was extended to Aubry McMahon, or
17 before?
18     A    They were after the offer was extended.
19     Q    Ms. Freiberg, I'd like to show you what
20 would be marked Plaintiff's Exhibit Number 5.  It is
21 a document which is Bate-stamped WV 2858, and it is a
22 document which was exchanged in the discovery phase
23 of the litigation.
24                If you could, Ms. Freiberg, please review

Page 59

M. Freiberg

1  and let me know once you've concluded doing so.
2              (WHEREUPON, the above-referred-to
3              document, Bates-stamped WV-002858, was marked
4              as Plaintiff's Exhibit 5, for identification,
5              as of this date, and displayed by the court
6              reporter.)
7      Q    Ms. Freiberg, have you concluded
8  reviewing this document?
9      A    Is it just this one page?
10     Q    Yes.
11     A    Yes.
12     Q    Ms. Freiberg, do you recognize this
13 document?
14     A    Yes.
15     Q    Have you ever seen it before?
16     A    Yes.
17     Q    Can you please tell me what it is?
18     A    It is an e-mail from Catherine Miolla to
19 myself attaching her phone interview.
20     Q    From your recollection, why did Catherine
21 Miolla e-mail you a copy of Aubry's phone interview?
22     A    Because I wanted to use -- to use that in
23 the discussion with Ms. McMahon.
24     Q    Did you ask Ms. Miolla to send you the

Page 60

M. Freiberg

1  phone screen document?
2      A    I am not sure if she is doing that at my
3  request.  I think it's very possible that she is
4  doing that at my request.
5      Q    In this e-mail, Catherine Miolla wrote,
6  "Hi Melanie, Aubry's phone interview is attached.
7  The standards of conduct section with her responses
8  is the last section.  Let me know if you need
9  anything else."
10                Do you know why Catherine Miolla
11 specifically referenced the standards of conduct
12 section in this e-mail?
13     A    Yes.
14     Q    Please tell me why.
15     A    Because the e-mail that Ms. McMahon sent
16 was contrary to her responses in the standards of
17 conduct section of the phone screen.
18     Q    How so?
19     A    In the phone screen, Ms. McMahon was --
20 she was -- the -- our standards of conduct were
21 explained to her.  Examples of behavior or conduct
22 that don't correspond with our standards of conduct
23 were described, and she was asked the question
24 whether she could comply with those standards, and

Page 61

M. Freiberg

1  her response was, "Yes, I can abide."
2      Q    Now, in terms of compliance with
3  standards of conduct, does that mean belief in that
4  standard of conduct, or does that mean conducting
5  oneself in accordance with the standard of conduct?
6      A    It means conducting oneself.
7              MR. WARD:  I was just going to object to
8              form.
9              THE WITNESS:  Okay.
10             MR. WARD:  It's fine.
11             THE WITNESS:  Okay.  Sorry.
12             MR. WARD:  No worries.
13     Q    So is it fair to say that if an
14 individual believed that it was okay for same-sex
15 individuals to marry, that that would not necessarily
16 preclude employment with World Vision Incorporated;
17 but if one were in a same-sex marriage, then that
18 would?
19             MR. WARD:  Objection as to form and
20             speculation.
21             But you may answer.
22     A    I agree with your description.
23     Q    Did you review the phone screen document
24 that was sent from Catherine Miolla to you on

Melanie Freiberg
February 16, 2023

Page 62

M. Freiberg

1 January 5th?
2
3  A Yes, I believe so.
4  Q Do you recall when?
5  A No.
6  Q Do you recall whether or not you reviewed
7 it on January 5th?
8  A You know, I don't have a recollection of
9 opening the document, but I -- I -- I believe I would
10 have.
11  Q Well, rather than speculate, do you
12 recall whether or not you definitely reviewed between
13 January 5th, 2021 and January 8th, 2021?
14  A I can definitely say yes.  In fact, if I
15 can further clarify.  As I reflect, I did -- I did
16 review it on the 5th as we were preparing to speak
17 with her.  So I needed to review the actual responses
18 in preparation of the call with her -- with -- with
19 Ms. McMahon.
20  Q I would like to show you what will be
21 marked Plaintiff's Exhibit Number 6.  It is a
22 document which is Bate-stamped WV 67 through 70.  It
23 is a document which was exchange during the discovery
24 phase of the litigation.
25   Please review the document and let me

Page 63

M. Freiberg

1 know once you've completed doing so.
2
3   (WHEREUPON, the above-referred-to
4   document, Bates-stamped WV-000067 through
5   WV-000070, was marked as Plaintiff's
6   Exhibit 6, for identification, as of this
7   date, displayed by the court reporter, and the
8   witness was given the opportunity to review
9   the entirety of the document.)
10   (Time noted:  4:18 p.m.)
11  Q Ms. Freiberg, have you had a chance to
12 review the document which is Bate-stamped -- excuse
13 me, the document which is marked as Plaintiff's
14 Exhibit Number 6?
15  A Yes.
16  Q Do you recognize this document?
17  A Yes.
18  Q Have you ever seen it before?
19  A Yes.
20  Q What is it?
21  A It is the phone screen that is used for
22 recruiting the DSRT.
23  Q Is the document marked Plaintiff's
24 Exhibit Number 6 the phone interview referenced in
25 Catherine Miolla's e-mail that I just showed you as

Page 64

M. Freiberg

1
2 Plaintiff's Exhibit 5?
3  A Yes.
4  Q Is this document what you received from
5 Catherine Miolla via e-mail on January 5th, 2021?
6  A Yes.
7  Q I'd like to turn your attention to the
8 third and fourth pages, those which are Bate-stamped
9 WV 69 and 70.
10  MR. WOLNOWSKI:  Off record.
11  (Discussion held off the record)
12  Q Ms. Freiberg, if you could, can you
13 explain to me the orange sections that have questions
14 or requests, and then the white sections underneath
15 which appear to be some form of response?
16  A Yes, I can confirm that the orange
17 sections are questions, and the white sections in
18 that box are the candidate's response.
19  Q Now, with respect to this particular
20 document -- now I'm not asking generally, but I'm
21 asking with respect to this specific document -- how
22 were the requests or questions asked of Ms. McMahon
23 derived; in other words, do you know who wrote them?
24  A All right.  These questions are templated
25 questions.  So the -- the verbiage above and the

Page 65

M. Freiberg

1
2 verbiage below that are templated questions for every
3 position at World Vision.
4  Q So it's fair to say that these questions
5 are not unique with respect to a customer service
6 representative candidate?
7  A Yes, that's correct.
8  Q Ms. Freiberg, do you know who the person
9 or persons was or were who actually asked these
10 questions to Ms. McMahon?
11  A Yes.  Catherine Miolla was the recruiter
12 who asked these questions of Ms. McMahon.
13  Q Do you recall when she did that?
14  A I do not have the date.
15  Q In the white boxes below the orange
16 boxes, there appear to be responses.
17  To your knowledge and recollection, are
18 these the responses that were given by Ms. McMahon to
19 each of the specific requests or questions?
20  A Yes.
21  Q Okay.  And just to be clear, does that
22 also -- is that also the same answer with respect to
23 the requests and answers which appear on the fourth
24 page, which is Bates-marked WV 70?
25  MR. WOLNOWSKI:  Ms. Ratner, if you could

Melanie Freiberg
February 16, 2023

Page 66

M. Freiberg

1 scroll up when you have a moment.

2 THE REPORTER:  (Complying)

4 A    Yes.  Those are also -- the white boxes

5 are also Ms. McMahon's --

6 Q    I'm sorry, you cut out there just for a

7 minute.  My apologies.

8 If you could repeat your answer,

9 Ms. Freiberg.

10 A    Yes.  The -- the boxes in white are

11 Ms. McMahon's responses.

12 Q    And just for the sake of completeness,

13 with respect to this fourth page, the questions in

14 the orange boxes were asked also by Ms. Miolla?

15 A    That is correct.

16 MR. WOLNOWSKI:  Ms. Ratner, could you

17 scroll up to the third page, so that way the

18 second half of the document is in the viewer

19 screen?

20 THE REPORTER:  (Complying)

21 Q    Ms. Freiberg, I'd like to direct your

22 attention to so much of this third page as it relates

23 to section II, which has the title or the heading

24 "Key Points in Christian Conduct Conversation."

25 Do you see that section and the bullet

Page 67

M. Freiberg

2 points and the dashes which follow?

3 A    I do.

4 Q    With respect to this document, do you

5 know if section II and the bullet points and dashes

6 below were read to Ms. McMahon during a telephone

7 screening or telephone interview?

8 A    Yes.  It is -- it is our expectation that

9 the recruiters read this verbatim to the candidates.

10 So I wasn't present when Ms. Miolla spoke with

11 Ms. McMahon, but my statement is that, knowing

12 Catherine's work, she would have read this to

13 Ms. McMahon.

14 Q    So your understanding is that it was, in

15 fact, read to Ms. McMahon although you weren't

16 actually on the telephone call; is that correct?

17 A    Correct.

18 Q    And as you sit here today, there's

19 nothing that you know or that you've learned which

20 would make you think otherwise; is that correct?

21 A    That's correct.

22 Q    I'd like to direct your attention to the

23 fourth bullet, Ms. Freiberg.

24 This fourth bullet I will read into the

25 record.  It states, "Examples of behaviors that we

Page 68

M. Freiberg

1 believe are not in alignment with our standards of

2 conduct, and therefore, unacceptable behavior for

3 employees include:"

5 And then there is a second -- well, there

6 are a number of dashes, and the second one, in

7 particular, reads, "Any sexual conduct outside of

8 marriage; pause, WV defines marriage as between a man

9 and a woman."

10 Do you see that, Ms. Freiberg?

11 A    I see that.

12 Q    First and foremost, do you know why the

13 word "pause" is located in that sentence?

14 A    It's just for clarity of communication.

15 Q    And specifically, what clarity is it

16 intended to convey to the reader?

17 A    It's so that the full sentence can be

18 heard and understood.

19 Q    Is it fair to say that World Vision

20 wishes to emphasize how it views the definition of

21 marriage to prospective candidates for employment?

22 MR. WARD:  Objection as to form.

23 You may answer.

24 A    It is to ensure that it is clear.  I --

25 I -- I don't have any -- I -- I don't know that it

Page 69

M. Freiberg

2 would be for emphasis of that point over others, but

3 it's about clarity.

4 Q    So your understanding is that it is

5 intended to be made clear to the potential employee

6 that World Vision defines marriage as between a man

7 and a woman; correct?

8 A    It's intended to show both pieces, that

9 sexual conduct that occur outside of marriage is not

10 in alignment with our standards; and that World

11 Vision further defines marriage as between a man and

12 a woman.

13 Q    So if an individual were engaging in

14 sexual conduct outside of a marriage, irrespective of

15 whether it's tradition or same-sex, this would not be

16 in alignment with World Vision's standards of conduct

17 and would be concluded to be an unacceptable behavior

18 of an employee; is that accurate?

19 MR. WARD:  Objection as to form.

20 You may answer.

21 A    That -- that was a very long sentence.

22 Perhaps, Teri, could you read that back?

23 (WHEREUPON, the previous question was

24 read by the court reporter.)

25 A    Yeah, I'm just trying to understand

Melanie Freiberg
February 16, 2023

Page 70

M. Freiberg

1    the -- the kind of point of the question.
2
3         So if there was sexual conduct outside of
4    a marriage between a man and a woman, that would not
5    be in alignment; and if there was sexual conduct in a
6    same-sex marriage, that also isn't align- -- in
7    alignment; and furthermore, World Vision defines
8    marriage as being between man and a woman.  So that's
9    the way in which it recognizes marriage.
10        Q    So if an individual were in a same-sex
11   marriage, would or would that not be in alignment
12   with World Vision's standards of conduct?
13        A    It would --
14        MR. WARD:  Just objection as to form.
15        You may answer.
16        A    Okay.  It would not be in alignment with
17   our standards of conduct.
18        Q    And as such, it would be unacceptable
19   behavior; is that correct?
20        A    That is correct.
21        MR. WARD:  Objection to form.
22        A    That is correct.
23        Q    Now, having had a chance to review this
24   document, Ms. Freiberg, and in looking back at the
25   e-mail which was sent -- excuse me, which was sent to

Page 71

M. Freiberg

1    you by Catherine Miolla on January 5th, wherein it
2    states, "The standards of conduct section with her
3    responses is the last section," to which section did
4    that refer?
5        A    Okay.  Teri, could you scroll down?
6        THE REPORTER:  (Complying)
7        A    So it's to this section.
8        Q    Okay.  And specifically, why was there
9    communication between you and Ms. Miolla as it
10   related to this last page of Plaintiff's Exhibit
11   Number 6?
12        A    Because the middle question, which reads,
13   "It's important that you know of World Vision's
14   expectation so that you can decide if we are the
15   right organization for you.  Are you willing and able
16   to comply with the standards of conduct if employed
17   by World Vision?"
18        And the question of her was whether she
19   can comply, and she responded, "I'm aligned, yes."
20        Q    And what about her response to this
21   answer caused communication between you and
22   Ms. Miolla, amongst others?
23        A    Because her e-mail referred to her wife,
24   which would then mean that she was not in alignment

Page 72

M. Freiberg

1    to our standards of conduct.
2        Q    Was the issue that she was not in
3    alignment, or was the issue that her phone interview
4    responses was inconsistent with her January 5th
5    e-mail?
6        MR. WARD:  I'm going to object as to
7    form.
8        A    The issue is that it is a World Vision
9    expectation to comply with our standards of conduct,
10   and she re- -- responded in the phone screen to the
11   affirmative, but her e-mail to us, that was
12   contradictory to that.
13        Q    So was her employment rescinded -- excuse
14   me, was the offer of employment rescinded because of
15   an inconsistency, or because she was in a same-sex
16   marriage?
17        MR. WARD:  Objection as to form.
18        A    Well, the offer was rescinded for a few
19   reasons.  The first being that we sought to speak
20   with her to understand the e-mail that she sent, and
21   in spite of several attempts, we were unable to do
22   so, which then caused us to use the e-mail at face
23   value, and we rescinded the offer.  Then when we were
24   able to speak with, her she confirmed that, in fact,

Page 73

M. Freiberg

1    she did mean her wife, and when we reviewed her
2    responses to the -- to this -- to the question that
3    we just reviewed, she indicated that she didn't think
4    that it mattered, she felt that as long as she was
5    okay working for an organization that believed what
6    we believe, that would be sufficient.
7        Q    So if I'm understanding this, there were
8    a number of factors that contributed to her offer of
9    employment having been rescinded; is that correct?
10        A    Yes.
11        Q    The first was, in essence, your inability
12   to get in touch with her when you first reached out
13   to her; is that one factor?
14        MR. WARD:  I'm going to object as to
15   form.
16        But you may answer.
17        A    It was -- it -- it was, and I just would
18   add that it was over the course of multiple attempts
19   over three days.
20        Q    Understood.
21        Was another factor the fact that her
22   answers were -- question withdrawn.
23        Was another factor that her responses to
24   the phone interview were inconsistent with the e-mail

Melanie Freiberg
February 16, 2023

Page 74

M. Freiberg

1
2    that she sent Catherine Miolla on January the 5th?
3        A    I would say yes, and that it was because
4    what she stated to be true was the e-mail as opposed
5    to the phone screen.  And --
6        Q    Was a -- I'm sorry.  My apologies again.
7    I'll -- I'll make sure I wait long enough so that way
8    we can -- you can get your full completed answer.
9        A    Yes.  I actually don't remember what I
10   was going to say as my second point, so go ahead.
11       Q    Was another factor for the determination
12   to rescind the job offer to Ms. McMahon because it
13   was revealed that she was in a same-sex marriage?
14       A    The same-sex marriage would mean that she
15   would not be able to comply with our standards of
16   conduct, so the answer is yes to that.
17       Q    Was Ms. McMahon being LGBTQ a factor in
18   the determination to rescind the job offer extended
19   to her by World Vision Incorporated?
20            MR. WARD:  Objection to form.
21            You may answer.
22       A    No, it wasn't.
23       Q    Ms. Freiberg, at some point after
24   January 5th, 2021, were you a participant in
25   discussions involving the rescission of the job offer

Page 75

M. Freiberg

1
2    extended to Aubry McMahon?
3        A    I was.
4        Q    If you know, who was the person or who
5    were the persons who made the ultimate decision to
6    rescind the offer of employment extended to Aubry
7    McMahon by World Vision Incorporated?
8        A    The person who made the ultimate decision
9    to rescind the offer was Christine Talbot, senior
10   vice president of human resources.
11            Would you like me to spell her name?
12       Q    I will spell it, but thank you very much
13   for offering.
14            (Discussion held off the record)
15       Q    Ms. Freiberg, did you personally play any
16   role in deciding to rescind the job offer made to
17   Aubry McMahon made by World Vision Incorporated?
18            MR. WARD:  Objection as to form.
19            You may answer.
20       A    I was part of the discussion, but not the
21   ultimate decision maker.
22       Q    At some point between January 5th and
23   January 8th, 2021, did you and Christine Talbot
24   discuss how the decision to rescind the offer of
25   employment was going to be communicated to Aubry

Page 76

M. Freiberg

1
2    McMahon?
3        A    No, not specifically with Ms. Talbot.
4        Q    Between January 5th and January 8th of
5    2021, approximately how many times did you speak with
6    Ms. Talbot on the topic of Aubry McMahon?
7        A    Well, there were -- there was a few
8    privileged conversations, but outside of that, I
9    remember one conversation that was about sort of
10   training or role-playing the conversation to be had
11   with Ms. McMahon.
12            MR. WOLNOWSKI:  Just give me one moment
13            here.
14            (Pause in the proceeding)
15            (WHEREUPON, the previous portion of the
16            testimony was read by the court reporter.)
17       Q    So my question first, you said aside from
18   privileged conversations, without -- I don't want to
19   know what was said in those privileged conversations,
20   but from your recollection, approximately how many
21   privileged conversations took place?
22       A    A -- a few.  Maybe two.
23       Q    Okay.  And if you could, please tell me
24   everything you can remember about the conversation
25   you had with Ms. Talbot as it related to role-playing

Page 77

M. Freiberg

1
2    with Aubry McMahon, as you had touched upon just a
3    moment ago in a previous response.
4        A    As that time was centered around
5    anticipating what kind of questions we may receive --
6    and when I say "we," I mean Catherine and I, because
7    both of us were planning to be on the call with
8    Ms. McMahon -- and just receiving, you know, guidance
9    and support from Ms. -- Christine Talbot.
10       Q    Okay.  And approximately when did that
11   conversation take place?
12       A    I expect it would have occurred like
13   around January 5th, maybe the 6th, somewhere in that
14   time frame.
15       Q    Do you recall approximately how long it
16   lasted?
17       A    Maybe 20 minutes, but I'm -- I -- I'm not
18   certain about that.
19       Q    Was anybody else on that call -- or
20   excuse me, was anybody else a participant to that
21   conversation?
22       A    Catherine Miolla was there.
23       Q    Was that a RingCentral meeting,
24   Ms. Freiberg?
25       A    I'm not sure if it was a RingCentral

Melanie Freiberg
February 16, 2023

Page 78

1                    M. Freiberg
2   meeting.
3        Q    Okay.  I'd like to show you what will be
4   marked Plaintiff's Exhibit Number 7.
5             Ms. Freiberg, what I can show you, which
6   will be marked as Plaintiff's Exhibit Number 7, is a
7   document bearing Bates-stamp numbers WV 240 and 241.
8   It's a document which was exchanged in the discovery
9   phase of this litigation.
10            Please review it when you have a moment
11  and let me know once you've concluded doing so.
12            (WHEREUPON, the above-referred-to
13            document, Bates-stamped WV-000240 through
14            WV-000241, was marked as Plaintiff's
15            Exhibit 7, for identification, as of this
16            date, and displayed by the court reporter.)
17            THE WITNESS:  If you're waiting my
18            indication that I've reviewed it, I'm done.
19        Q    Okay.  Ms. Talbot (sic), do you recognize
20  the document that I've shown you marked as
21  Plaintiff's Exhibit Number 7?
22        A    Are you asking Ms. Talbot, or are you
23  asking me?
24        Q    I'm sorry.  My apologies.
25            Ms. Freiberg, have -- do you recognize

Page 79

1                    M. Freiberg
2   the document that I've shown you marked as
3   Plaintiff's Exhibit Number 7?
4        A    Yes, I do.
5        Q    Have you ever seen it before?
6        A    Yes, I -- I guess so.  Yeah.
7        Q    At some point between January 5th and
8   January 8th of 2021, did you disseminate call-in
9   information relating to a RingCentral meeting with
10  you and/or Christine Talbot and Catherine Miolla?
11       A    You're asking if I disseminated that
12  information?
13       Q    Yes.  If you were the one who sent it
14  around so that people could join.
15       A    Oh, okay.  Yes, I initiated the
16  RingCentral call, according to this -- to this
17  document.
18       Q    Well, irrespective of what the document
19  shows, I'm asking you if you recall having
20  disseminated or sending around a -- RingCentral
21  call-in information?
22       A    Well, if I'm honest, I would not have
23  remembered that I did that as opposed to Ms. Talbot's
24  administrative assistant or herself or Catherine.
25       Q    And we had discussed just a moment ago

Page 80

1                    M. Freiberg
2   about a conversation that you had with both
3   Ms. Talbot and Ms. Miolla relating to a script.
4             Is the document that I'm showing you the
5   invitation for the meeting that you had just
6   described?
7             MR. WARD:  I'm going to object as to
8        form.
9             You may answer.
10       A    I'm not understanding the question.  I'm
11  not understanding the connection between the script
12  and this call.
13       Q    Well, follow me, if you will.
14            You have mentioned that you, Christine
15  Talbot, and Catherine Miolla had a discussion where
16  you talked about what you were going to discuss with
17  Aubry; right?
18       A    Yes.
19       Q    And this document, which is Plaintiff's
20  Exhibit 7, appears to be an invitation to join a
21  RingCentral call.
22       A    Correct.
23       Q    Was the conversation that you had with
24  Christine and Catherine a conversation for which this
25  invitation had been sent?

Page 81

1                    M. Freiberg
2        A    It -- it was not about the script that
3   Catherine read to Ms. McMahon.
4        Q    This subject line states, "Dry run" --
5        A    Yes.
6        Q    -- correct?
7        A    Yes.
8        Q    Could you explain what the meaning was
9   between -- behind "Dry run"?
10       A    Yes.  The meaning behind "Dry run" was
11  regarding the ultimate phone call that we had on
12  January 8th with Ms. McMahon where we had -- where we
13  were able to confirm her e-mail and whether she
14  intended to refer to her wife, and whether she
15  confirmed that she had, in fact, indicated that she
16  would comply with our standards of conduct.  And so
17  the dry run was to anticipate questions that could be
18  had in that meeting that we would have with
19  Ms. McMahon.
20       Q    And that dry run meeting or conversation,
21  was that the only communication you had with
22  Christine Talbot between January 5th and
23  January 28th (sic) as it regarded Aubry McMahon?
24            MR. WARD:  Objection as to form.
25            Misstates prior testimony.

Melanie Freiberg
February 16, 2023

Page 82

```
1                    M. Freiberg
2           THE WITNESS:  Do I answer?
3           MR. WARD:  Yeah, you can answer.
4      A    Okay.  It was the only non-privileged
5  meeting that I recall with Ms. Talbot -- with
6  Christine Talbot.
7      Q    Understood.
8           And in early January of 2020 (sic), if
9  you could just please confirm, what position or
10 positions did Christine Talbot hold with World
11 Vision?
12     A    Christine Talbot was the senior vice
13 president of human resources for World Vision.
14     Q    In January of 2021, was Christine Talbot
15 your subordinate, or were you hers, or were you
16 equal?
17     A    I was her subordinate.
18     Q    Is Christine Talbot still employed by
19 World Vision Incorporated, to your knowledge?
20     A    She is not.
21     Q    Do you recall when she ceased working for
22 World Vision Incorporated?
23     A    Yes.  On -- well, I will say it as an
24 approximate date, February 3rd if -- around
25 February 3rd.
```

Page 83

```
1                    M. Freiberg
2      Q    Sure.
3           Of what year, Ms. Freiberg?
4      A    Oh, sorry.  Of 2023.
5      Q    So she ceased working there a couple
6  weeks ago; is that accurate?
7      A    Yes.
8      Q    To the extent you know and if you know,
9  why did she cease working for World Vision
10 Incorporated?
11     A    She retired.
12          MR. WOLNOWSKI:  Okay.  So let's go off
13 the record.
14          (Discussion held off the record)
15          (WHEREUPON, a luncheon recess was taken
16 from 4:52 p.m. to 5:27 p.m., after which the
17 following transpired:)
18          MR. WOLNOWSKI:  Before we continue, just
19 a couple housekeeping things that I noticed
20 while we were on break.
21          Initially wanted to say that I'm going to
22 make a call for production with respect to the
23 posting for the specific job for which Aubry
24 applied.  There was some equivocation about
25 whether Plaintiff's Exhibit 1 was that
```

Page 84

```
1                    M. Freiberg
2  document in light of it having -- not having a
3  year, so again, I will put that in writing
4  and, indeed, opposing counsel can take that
5  under advisement.
6           Second, I will be making a request for
7  production with respect to any written
8  training documentation as it relates to
9  number 11 and number 12 as to prayer, part of
10 Plaintiff's Exhibit Number 1.  Again, I'll put
11 those in writing, you can take it under
12 advisement, but wanted to just put those on
13 the record.
14 CONTINUED EXAMINATION BY MR. WOLNOWSKI:
15     Q    Ms. Freiberg, we just took a break so you
16 could eat lunch; correct?
17     A    That is correct.
18     Q    Did you speak with anybody about your
19 deposition testimony during break?
20     A    Well, what we spoke about was just to
21 continue doing what I was doing, so just advisement
22 to listen carefully --
23     Q    Well --
24     A    -- respond.
25     Q    Okay.  I'm sorry, I didn't mean to
```

Page 85

```
1                    M. Freiberg
2  interrupt.
3           MR. WARD:  Well, I should caution, as to
4  privilege, you can answer the first question,
5  and then just let him ask each question.
6           So I think your question, Casey, if you
7  want to just repeat it, and then --
8           MR. WOLNOWSKI:  Can you read back the
9  question, Ms. Ratner?
10          (WHEREUPON, the previous question was
11 read by the court reporter.)
12     A    The answer is yes.
13     Q    Was it with anybody aside from your
14 attorneys?
15     A    No.
16     Q    Was there anybody who directed you to
17 give any kind of specific testimony upon returning
18 from break?
19     A    No.
20     Q    Ms. Freiberg, at some point on
21 January 6th, 2011 (sic), were you a participant on
22 any e-mails with Christine Talbot and/or Catherine
23 Miolla relating to reviewing a script of some sort?
24     A    I'm not recalling that.
25          (WHEREUPON, the previous question was
```

Melanie Freiberg
February 16, 2023

1            M. Freiberg
2      read by the court reporter.)
3            MR. WOLNOWSKI:  2021.
4            MR. WARD:  I'm sorry, it was on or about
5      January 6 of 2021?
6            MR. WOLNOWSKI:  Yes.
7            (WHEREUPON, the previous question was
8      corrected and read by the court reporter.)
9            MR. WARD:  Thank you.
10      We can agree January 6, 2021.
11      Thank you.
12   Q      Same answer, Ms. Freiberg?
13   A      Maybe a clarifying question.
14          Is -- are you referring to --
15   Q      Let me -- I'll -- I'll ask.  We can
16   just --
17          To be clear, Ms. Freiberg, at some point
18   on or about January 6th of 2021, were you a
19   participant on any e-mails with Christine Talbot
20   and/or Catherine Miolla relating to reviewing a
21   script of some sort?
22   A      I don't remember.
23   Q      Ms. Freiberg, I'd like to show you what
24   will be marked as Plaintiff's Exhibit Number 8.
25   A      Okay.

1            M. Freiberg
2   Q      It is a document which is Bate-stamped
3   WV 242 to 244.  I will represent that this is a
4   document that was exchanged during the discovery
5   phase of litigation in this case.
6          Please review this document and let me
7   know once you have completed doing so.
8          (WHEREUPON, the above-referred-to
9          document, Bates-stamped WV-000242 through
10          WV-000244, was marked as Plaintiff's
11          Exhibit 8, for identification, as of this
12          date, displayed by the court reporter, and the
13          witness was given the opportunity to review
14          the entirety of the document.)
15          (Time noted:  5:34 p.m.)
16   Q      Have you had a chance to review this
17   document?
18   A      I have.
19   Q      Do you recognize this document?
20   A      I do.
21   Q      Have you ever seen it before?
22   A      Yes.
23   Q      So if you notice, at the bottom of the
24   second page, the one that is marked -- Bate-stamped
25   WV 243, there's an e-mail, some of it is cut off,

1            M. Freiberg
2   which was sent from Christine Talbot on Wednesday,
3   January 20-- excuse me, Wednesday, January 6th,
4   2021 at 8:43 a.m. to you and Ms. Miolla.
5          Do you recall receiving this e-mail?
6   A      Yes, I do.  I do now.
7          MR. WOLNOWSKI:  Okay.  Just put on the
8          record, we call for production for the full
9          document that includes all of the text.  We'll
10          put it in writing.
11   Q      At some point on January 6th, 2021, did
12   you, Christine Talbot, and Catherine Miolla
13   participate in an e-mail exchange discussing
14   reviewing a script?
15   A      In accordance with this e-mail, yes.
16   Q      Please explain to me, to the extent you
17   can remember and based on what is not an entirely
18   complete e-mail, what was being discussed in this
19   e-mail from Christine Talbot to you and Catherine
20   Miolla at 8:43 a.m. on January 6th.
21   A      Well, Christine was offering to -- to
22   review the script that we were going to use with
23   Ms. McMahon and practice with us and also pray with
24   us to get us ready for the eventual discussion with
25   Ms. McMahon.

1            M. Freiberg
2   Q      Was a script ever created by anybody?
3   A      It was created under privilege.
4   Q      And if you could explain to me what --
5   "created under privilege" -- you mean by that.
6          MR. WARD:  I'll just, for the record,
7          object to the extent that it calls for
8          attorney/client privileged information.
9          But you can answer to the extent you can
10          answer without disclosing that.
11   A      It means that, I guess, with the
12   protection of our attorney/client privilege, we
13   created some talking points to be able to speak with
14   Ms. McMahon.
15   Q      Do you recall who was involved in the
16   creation of that script?
17   A      Yes.  Steve McFarland and Christine
18   Talbot and myself.
19          MR. WOLNOWSKI:  I'm going to call for
20          production of this document.  I understand
21          that there may be a privilege objection;
22          nevertheless, we can hammer that out.  I want
23          to put it in writing, and certainly opposing
24          counsel can take that under advisement.
25          MR. WARD:  I understand that, and just

Melanie Freiberg
February 16, 2023

Page 90

M. Freiberg
1
2        for the record, we would state it's protected
3    by attorney/client privilege, but we'll wait
4    and respond to the written request.
5        Q    Ms. Freiberg, when it was ultimately
6    discussed with Ms. McMahon, the rescission of her
7    offer of employment, was any sort of script utilized
8    during that call?
9            MR. WARD:  Objection as to form and to
10       the extent it calls for communicative
11       information.
12           You may ask -- answer.
13       A    Yes.
14       Q    And who ultimately utilized that; was it
15   you or somebody else?
16       A    It was ultimately me.
17       Q    In the e-mail which was sent at 8:43 a.m.
18   on January the 6th, Christine seems to mention that
19   sometimes a candidate is not a good fit.
20           Do you see that?
21       A    I do.
22       Q    Did you have any conversation with her
23   about what she meant?
24       A    No, we did not have further conversation
25   about the content of this e-mail.

Page 91

M. Freiberg
1
2        Q    What did you understand it to mean when
3    she stated that sometimes a candidate is not a good
4    fit?
5            MR. WARD:  Objection as to form.
6            You may answer.
7        A    What I understood it to mean was that if
8    her statement of having a wife and not being able to
9    comply with our standards of conduct, that would
10   exclude her from being able to work at World Vision.
11       Q    From your recollection, did that dry run
12   RingCentral conversation take place before or after
13   this January 6 e-mail which was sent to you from
14   Ms. Talbot at 8:43 a.m.?
15       A    Well, from this e-mail, it would have
16   occurred before -- like the e-mail would have
17   occurred before the actual dry run.
18       Q    Okay.  If you know, Ms. Freiberg, how was
19   the rescission of Aubry McMahon's job offer by World
20   Vision Incorporated initially communicated to Aubry
21   McMahon?
22       A    Your question is how the rescission was
23   communicated to Ms. McMahon?
24       Q    Initially communicated to her --
25       A    It was --

Page 92

M. Freiberg
1
2        Q    -- to the extent you know.
3        A    So my understanding is it was
4    communicated to Ms. McMahon in an e-mail from
5    Catherine Miolla to Ms. McMahon.
6        Q    Ms. Freiberg, I'd like to show you what
7    will be marked as Plaintiff's Exhibit Number 9.  It
8    is a document bearing Bate-stamp numbers WV 81 to 82.
9            If you could, please review it at your
10   convenience and let me know once you've had a review.
11   I can represent that this document was exchanged
12   during the discovery phase of litigation in this
13   case.
14           (WHEREUPON, the above-referred-to
15           document, Bates-stamped WV-000081 through
16           WV-000082, was marked as Plaintiff's
17           Exhibit 9, for identification, as of this
18           date, displayed by the court reporter, and the
19           witness was given the opportunity to review
20           the entirety of the document.)
21           (Time noted:  5:44 p.m.)
22       Q    Okay.  Ms. Freiberg, have you had a
23   chance to review the document which has been marked
24   as Plaintiff's Exhibit Number 9?
25       A    I have.

Page 93

M. Freiberg
1
2        Q    Have you ever seen this document before?
3        A    I have.
4        Q    Do you recognize this document?
5        A    I -- I recognize it.
6        Q    At the start of the bottom of the second
7    page, the page which is marked Bate-stamped WV 82 --
8            MR. WOLNOWSKI:  You need to scroll up
9            just a little bit, Ms. Ratner.
10           THE REPORTER:  (Complying)
11       Q    So this is an e-mail chain between
12   Catherine Miolla and Aubry McMahon; correct?
13       A    Yes.
14       Q    And the first e-mail, which is at the
15   bottom of the second page, is the January 5th e-mail
16   that Aubry sent to Ms. Miolla in which she stated
17   amongst other things that she and her wife are
18   expecting their first baby in March.
19           Would you agree?
20       A    I would agree.
21       Q    That e-mail was sent January 5th, 2021 at
22   11:56; correct?
23       A    Yes, that is the time that it's
24   date-stamped.
25       Q    And then Catherine Miolla responded to

Melanie Freiberg
February 16, 2023

Page 94

M. Freiberg

1
2  that at 4:59 p.m. on January 5th, according to this
3  e-mail chain; correct?
4      A    Correct.
5      Q    And in that e-mail, she wrote, "Hi Aubry,
6  thank you for your e-mail and questions.  Do you have
7  time tomorrow afternoon to discuss by phone?  I have
8  a few interviews scheduled, but could give you a call
9  around 4:00 p.m. EST, if that would work for you.
10  Thanks, Catherine."
11          That's what that second e-mail states;
12  correct?
13      A    Yes.
14      MR. WOLNOWSKI:  If you could just scroll
15  up to the first page.
16      THE REPORTER:  (Complying)
17      Q    Now, on Wednesday, January 6th, 2021 at
18  5:40 p.m., Aubry e-mailed Catherine Miolla and wrote,
19  "Hey there, so sorry, I've been crazy busy with my
20  sister getting married.  That sounds great.  I can
21  talk on Friday at any point, if you're available."
22          Do you see that, Ms. Freiberg?
23      A    I see that.
24      Q    Were you aware at any point during
25  January 5th or January 8th, 2021 that Ms. McMahon was

Page 95

M. Freiberg

1
2  involved in what appeared to be her sister getting
3  married?
4      MR. WARD:  Objection as to form.
5      You may answer.
6      A    I was aware as a result of the contents
7  of this e-mail.
8      Q    When did you first see this e-mail that's
9  dated January 6th, 2021, which is marked having been
10  sent at 5:40 p.m.?
11      A    I -- I'm not sure of the exact date and
12  time.
13      Q    Did the fact that Aubry represented that
14  she's been, in her words, "crazy busy" with her
15  sister getting married have any impact on the urgency
16  with which the folks at World Vision Incorporated
17  needed to speak with her?
18      MR. WARD:  I'm going to object as to
19      form.
20      A    Well, it's her -- her response that she
21  was very busy and that she could speak on Friday was
22  granted to her, so we took that into advisement and
23  agreed to speak with her on Friday.
24      Q    In fact, in response to this e-mail,
25  isn't it correct that Catherine Miolla e-mailed Aubry

Page 96

M. Freiberg

1
2  Thursday, January 7th, 2021 at 8:54 a.m. and wrote,
3  "No problem, Aubry.  How about Friday at 1:00 p.m.
4  EST?  If that works for you, I will give you a call
5  at that time.  Thank you, Catherine."
6      MR. WARD:  Objection as to form.
7      You may answer.
8      A    I agree that that is Catherine's response
9  to Ms. McMahon.
10      Q    In this e-mail, does Catherine state
11  anything about an urgency with which they need to
12  talk on the telephone?
13      MR. WARD:  Objection as to form.
14      You may answer.
15      A    No, she does not.
16      Q    Was there any kind of communication, to
17  your knowledge, communicated to Aubry McMahon that if
18  she was unable to make that 1:00 p.m. phone call on
19  Friday, that the offer of employment would be
20  rescinded?
21      A    No, that was not communicated.
22      Q    Were there any communications to Aubry
23  McMahon either by Catherine Miolla or otherwise which
24  communicated an urgency that they needed to speak
25  with her by Friday at 1 o'clock p.m.?

Page 97

M. Freiberg

1
2      MR. WARD:  Objection as to form.
3      You may answer.
4      A    There were no specific communications in
5  that way.
6      Q    I'd like to take you to the top of
7  page 1.
8          On January 8th, 2021 at 2 o'clock p.m.,
9  Catherine Miolla e-mailed Aubry McMahon and wrote,
10  "Aubry, since our communication on Tuesday, I've
11  tried several times to get in touch with you to
12  discuss a discrepancy in your interview responses.
13  Since I have not heard back from you to resolve the
14  discrepancy, I'm rescinding the job offer that was
15  extended to you on Monday, June the 4th.  I wish
16  you all the best in your future endeavors.
17  Catherine."
18          Do you see that, Ms. Freiberg?
19      A    I do see that.
20      Q    Is it fair to say that in this e-mail
21  dated January 8th, 2021 at 2 o'clock p.m., that
22  Ms. Miolla notified Aubry McMahon that the job offer
23  extended to her by World Vision Incorporated had
24  indeed been rescinded?
25      MR. WARD:  Objection as to form.

Melanie Freiberg
February 16, 2023

Page 98

1                    M. Freiberg
2              You may answer.
3      A     Yes, I agree.
4      Q     Now, I believe you already testified to
5  this, but having reviewed this document, does it
6  refresh your recollection as to whether or not the
7  failure to have heard back from Aubry was a factor in
8  World Vision's determination to terminate the --
9  excuse me, not to terminate, but to rescind the offer
10 of employment extended to her by World Vision
11 Incorporated?
12             MR. WARD:  Objection as to form.
13             You may answer.
14     A     Well, I believe I've already answered
15 this in stating that there were multiple reasons --
16 there was more than one reason for rescinding the
17 offer, the first of which was because despite
18 multiple attempts to reach Ms. McMahon, we were
19 unable to do so, and therefore, relied on her written
20 e-mail on face value.
21     Q     To your knowledge, do you know if, after
22 this e-mail, anybody on behalf of World Vision ever
23 spoke on the telephone with Aubry McMahon relating to
24 the rescission of the offer of employment?
25     A     Yes.  On January 8, following this

Page 99

1                    M. Freiberg
2  e-mail, Catherine and I spoke with Ms. McMahon.
3      Q     And with respect to that telephone call,
4  do you recall when it took place, give or take?
5      A     I don't recall the time.
6      Q     Would you say that it happened in the
7  morning?
8      A     I would not say that it happened in the
9  morning.
10     Q     Would you say that it happened in the
11 afternoon?
12     A     Yes.
13     Q     To the best of your recollection, would
14 you say that it happened in the afternoon before
15 3 o'clock p.m.?
16     A     You know, it -- it could --
17             MR. WARD:  Objection as to form.
18             You may answer.
19     A     We could confirm that, because there's, I
20 believe, another e-mail from Ms. McMahon where she
21 replies to -- to Catherine, so it would be after that
22 time.
23     Q     Well, I'm asking you from your
24 recollection.  Not what a document may or may not
25 say.

Page 100

1                    M. Freiberg
2              MR. WARD:  Object as to form.
3              You may answer.
4      A     Yeah.  So it would be in the afternoon
5  after this time; after 2:00 p.m.
6      Q     Approximately how long did the
7  conversation last?
8      A     I would say somewhere within five -- five
9  to ten minutes, perhaps.
10     Q     If you can recall, please tell me all --
11 the names of all the participants on that phone call
12 to your knowledge.
13     A     Participants on that call were Catherine
14 Miolla, Melanie Freiberg, Aubry McMahon.
15     Q     Anybody else, to your knowledge or
16 recollection?
17     A     No.
18     Q     If you can, Ms. Freiberg, please tell me
19 everything you can remember about that telephone
20 call.
21     A     So I began -- so my recollection is that
22 I began speaking.  I -- I believe I congratulated
23 Ms. McMahon on being -- you know, being about to --
24 to have a baby.  I asked her about her e-mail and
25 whether she intended to say that -- she intended

Page 101

1                    M. Freiberg
2  to -- to use the term "wife."  And then I asked --
3  I -- I reread her the -- the section of the script,
4  and reread that section to her to describe what the
5  examples were of conduct that were not acceptable or
6  that -- yeah, were not acceptable.  And then I read
7  the question to her that included the question about
8  would she comply with those standards of conduct, and
9  then I read her response to her and I asked her if
10 that was accurate.
11     Q     Okay.  You told me a lot there about what
12 you said during that telephone call.
13             If you could please tell me what either
14 Aubry McMahon said or Catherine Miolla said.
15     A     Aubry McMahon confirmed that she was
16 referencing her wife.  And when I read the section of
17 the script to her, including her response of "I'm
18 aligned," she did not disagree.
19     Q     Did she give any explanation as to that
20 section, or did she give any kind of further
21 discussion as it related to that?
22             MR. WARD:  Objection as to form.
23             You may answer.
24     A     Her response, though I don't know the
25 word for word, but it was along the lines of, I

Melanie Freiberg
February 16, 2023

M. Freiberg

1  understood that, but I thought if I was okay to work
2  for an organization that believed what World Vision
3  believes, then that would be sufficient.  So again,
4  these are not exact words, but it's the gist of her
5  response.
6       Q     Was that a satisfactory response, in your
7  opinion?
8           MR. WARD:  Objection as to form.
9           You may answer.
10      A     It was satisfactory in the sense that it
11 confirmed that the phone screen was not correct, that
12 she was not in alignment with our standards of
13 conduct.
14      Q     And so is it possible that somebody could
15 be in alignment with the standards of conduct as it
16 relates to same-sex marriage, but yet be in a
17 same-sex marriage?
18          MR. WARD:  Objection as to form.
19      A     It would not be possible in a same-sex
20 marriage to comply with the expectation surrounding
21 marriage.
22      Q     Aside from what you've just told me as it
23 relates to what you said during this telephone call
24 and what Aubry McMahon said during this telephone

*(line numbers 1–25; lines 1–24 shown above, line 25 continues)*

M. Freiberg

1  call, what else was said, if at all, that you can
2  remember?
3       A     I remember questions on her part about
4  whether, you know, the offer was rescinded because
5  she was gay, whether the offer was rescinded because
6  she was in a same-sex marriage, about World Vision's
7  ability to legally do that, so there were -- there
8  were questions along those lines.
9       Q     And from your recollection, how did you
10 answer each of those questions?
11      A     I attempted to respond to the questions
12 in a way that described that World Vision, as a
13 religious organization, could require certain
14 expectations surrounding faith as well as conduct
15 standards -- and I'm just trying to think about other
16 things I said.  That -- you know, that ultimately the
17 offer was not rescinded because she was gay or
18 because she was in a same-sex marriage, but it was
19 because that her conduct would not -- would not
20 comply with our standards of conduct.
21      Q     And this is what you -- you told her;
22 correct?
23      A     Yes.
24      Q     Is there anything else from that

M. Freiberg

1  telephone call that you can remember was discussed?
2       A     Not that I can remember, but I'm happy to
3  answer any questions you might have.
4       Q     My only question right now is whether or
5  not there's anything else from that phone call that
6  you can remember that was said between any of the
7  people who participated in the call?
8       A     Then I do not.
9       Q     Did you make a recording of that
10 telephone call?
11      A     No.  It isn't legal in Washington State
12 to record somebody without their consent.
13      Q     Do you know if World Vision made a
14 recording of that phone call?
15      A     World Vision did not record that call.
16      Q     Did you ever come to learn that someone
17 had recorded at least a portion of that phone call?
18      A     I did come to learn that Aubry recorded
19 that without my consent.
20      Q     Did Catherine Miolla speak at all during
21 that telephone call in which you, Aubry, and her were
22 participants?
23      A     I believe Catherine introduced me
24 initially, but I -- Catherine did not say anything

M. Freiberg

1  further other than possibly goodbye.
2       Q     I would like to show you or produce for
3  you what will be marked as Plaintiff's Exhibit 10.
4  It is an MP3 file which has been exchange during
5  discovery in this case bearing file name IMG,
6  underscore, 5098, space, 3.
7           (WHEREUPON, the above-referred-to
8           document, IMG_5098 3.mps, was deemed marked as
9           Plaintiff's Exhibit 3, for identification, as
10          of this date.)
11          MR. WOLNOWSKI:  We're off the record.
12          (Discussion held off the record)
13          (WHEREUPON, the audio, what was deemed
14          marked Plaintiff's Exhibit 10, was played and
15          transcribed as follows:)
16          "SPEAKER 1:  Yeah, I understand.  So, um,
17          the offer's being -- what's that word?  Sorry.
18          "SPEAKER 2:  Basically, pulled back.
19          "SPEAKER 1:  Okay.  Is -- is that because
20          I'm in a same-sex relationship?
21          "SPEAKER 2:  Well, it is because, um, the
22          standards of conduct, yeah, are to not have
23          any sexual con- -- conduct outside of
24          marriage, and marriage is defined as being

Melanie Freiberg
February 16, 2023

Page 106

M. Freiberg

1  M. Freiberg
2  between a man and a woman.  So that's --
3  that's the behavior that all employees have to
4  comply with.
5      "SPEAKER 1:  Okay.  I understand."
6  Q    Ms. Freiberg, were you able to hear that?
7  A    Yes.
8  Q    Did you recognize this audio file?
9  A    Yes.
10 Q    Have you heard it before?
11 A    Yes.
12     MR. WOLNOWSKI:  I'm going to go off the
13     record for a moment.
14     (Discussion held off the record)
15 Q    So, Ms. Freiberg, I can represent that
16 the audio in question that I just played for you
17 which is moved and marked as Plaintiff's Exhibit 10
18 is an audio file, namely, an MP3, which is 35 seconds
19 in length, and I will read what was said -- well,
20 before I do that, though, let me ask you.
21     Who were the two people speaking in this
22 audio recording?
23 A    The two people speaking were Aubry
24 McMahon and myself, Melanie Freiberg.
25 Q    And what was said is the following:

Page 107

M. Freiberg

1  M. Freiberg
2      Aubry:  "I understand.  So, um, the offer
3  is being -- what's that word?  Sorry."
4      To which you responded:  "Basically,
5  pulled back."
6      Aubry:  "Okay.  Is that because I'm in a
7  same-sex relationship?"
8      You:  "Well, it's because, um, the
9  standards of conduct, yeah, are to, um, not have any
10 sexual conduct outside of marriage, and marriage is
11 defined as being between a man and a woman, so that's
12 the behavior that all employees have to comply with."
13     To which Aubry responds:  "Okay.  I
14 understand."
15     Ms. Freiberg, is that your understanding
16 of the telephone call or the portion thereof that was
17 just played for you?
18 A    That is my understanding of the recording
19 that was made without my consent, yes.
20 Q    Would you agree that, as stated to Aubry
21 McMahon in this audio recording, that one reason the
22 offer of employment made by World Vision Incorporated
23 to her was being rescinded because she was in a
24 same-sex marriage?
25     MR. WARD:  Objection as to form.

Page 108

M. Freiberg

1  M. Freiberg
2  A    Yes, I agree with that.
3  Q    So based on this recording, to your
4  understanding, was the offer of employment made to
5  Aubry McMahon by World Vision Incorporated rescinded
6  because she was LGBTQ, because she was in a same-sex
7  marriage, or for some other reason?
8      MR. WARD:  Objection as to form.
9  A    The reason that the offer was rescinded
10 was for multiple reasons.  The first, because we were
11 unable to reach her; and the second -- and unable to
12 reach her, and therefore concluded her e-mail was
13 correct; and secondly, that she was not able to abide
14 by our standards of conduct as she had previously
15 disclosed she could.
16 Q    And the reason that she could not abide
17 by the standards of conduct was because she was in a
18 same-sex marriage; is that correct?
19     MR. WARD:  Objection as to form.
20 A    Yes, that is correct.
21 Q    So, Ms. Freiberg, was it because Aubry
22 McMahon was in violation of World Vision
23 Incorporated's standards of conduct for employees as
24 they related to her being in a same-sex marriage that
25 this disqualified her from working for World Vision

Page 109

M. Freiberg

1  M. Freiberg
2  Incorporated?
3      MR. WARD:  Objection as to form.  It's
4      been asked and answered, I think.
5      But you may answer.
6  A    Yes, I think I've already answered that.
7  Yes, that -- that is a correct statement.
8      And if I may elaborate, you know, World
9  Vision believes that marriage is ordained by God and
10 is a biblical covenant between a man and a woman, and
11 that sexual conduct occurs within that biblical
12 covenant of marriage; and therefore, being in a
13 same-sex marriage would preclude her from being able
14 to comply with our standards of conduct.
15 Q    And, in fact, did preclude her; correct?
16 A    Yes.
17 Q    In the audio that I just played for you,
18 you don't mention anything about the inability to
19 reach her or the lack of promptness in her responding
20 to e-mails to connect on a call as being a reason for
21 the rescission of her job offer; is that correct?
22     MR. WARD:  I'm going to object as to
23     form, and I'm going to object -- I think it's
24     a misrepresentation.
25 Q    You can answer the question if you

Melanie Freiberg
February 16, 2023

Page 110

1                    M. Freiberg
2    understand it, Ms. Freiberg.
3         A    You know, ultimately, what was most
4    material, it was the inability to comply with our
5    standards of conduct.  So the rescission was on the
6    basis of, without further contact with her, we
7    rescinded the offer; but once we had the confirming
8    information, the decision was -- was sound, it -- it
9    remained in -- in force.
10        Q    But my question, I think, is a little
11   more specific, so let me ask it a different way.
12             In the audio recording that I just played
13   for you, did you say anything about her
14   nonresponsiveness to e-mails as a reason for the
15   rescission of the job offer?
16             MR. WARD:  Counsel, I'm going to object.
17   That's argumentative, that's misrepresenting,
18   and I'm going to object as to form.
19             MR. WOLNOWSKI:  Any others?
20             MR. WARD:  I may have a few if I think
21   about it, but let's be honest, Casey, you're
22   misrepresenting --
23             MR. WOLNOWSKI:  Please, just call me
24   counselor on the record.
25             If she understands the question, she can

Page 111

1                    M. Freiberg
2    answer.
3         A    So I did not mention anything about not
4    being able to get in touch with her in that
5    discussion that we had on January 8th.
6         Q    I'd like to show you what will be marked
7    as Plaintiff's Exhibit 11.
8             (WHEREUPON, the above-referred-to
9    document, Bates-stamped WV-000035 through
10   WV-000036, was marked as Plaintiff's
11   Exhibit 11, for identification, as of this
12   date, and was displayed by the court
13   reporter.)
14             MR. WARD:  Counsel, what are the Bates
15   numbers on this, please?
16             MR. WOLNOWSKI:  Exhibit -- Plaintiff's
17   Exhibit 11 bears Bate-stamp numbers WV 35 and
18   36.  I will represent this is a document that
19   was exchanged during the discovery phase of
20   litigation.
21        Q    If you could, Ms. Freiberg, please review
22   and let me know once you've completed.
23        A    Okay.
24             (WHEREUPON, the witness was given the
25   opportunity to review the entirety of the

Page 112

1                    M. Freiberg
2    document.)
3             (Time noted:  6:20 p.m.)
4             THE WITNESS:  Okay.  I've read it.
5         Q    Ms. Freiberg, do you recognize the
6    document that I've just shown you?
7         A    I do.
8         Q    Have you ever seen it before?
9         A    I have.
10        Q    Can you explain to me what it is?
11        A    It is our standards of conduct document
12   that is attached to our business ethics and Christian
13   conduct policy.
14        Q    When you say "our," are you referring to
15   World Vision Incorporated?
16        A    Yes.
17        Q    Was this document the standards of
18   conduct for which all employees of World Vision
19   Incorporated were required to conduct themselves as
20   of January of 2021?
21        A    Yes.
22        Q    I'd like to direct your attention to the
23   second paragraph of the first page.
24             MR. WOLNOWSKI:  Teri, if you could just
25   scroll up for me when you have a moment.

Page 113

1                    M. Freiberg
2             THE REPORTER:  (Complying)
3         Q    I'd like to direct your attention to the
4    portion of the second paragraph that states -- it's
5    in the middle -- "Therefore, all staff represent
6    WVUS, and more importantly, to Gospel of Jesus
7    Christ, in their work as well as in their private
8    lives."
9             With respect to this sentence, in
10   January of 2021, to your knowledge, was being
11   non-Christian a disqualifier as it related to become
12   employed with World Vision Incorporated?
13             MR. WARD:  Objection as to form.
14        A    Yes.
15        Q    I'd like to direct your attention to the
16   first sentence of the third paragraph.  It starts
17   with the words, "Through life," and reads, "Through
18   life, word, and deed, WVUS staff must be committed to
19   glorifying God and witnessing His love in the person
20   of His son Jesus Christ in all aspects of their lives
21   and work, calling others to a life-changing
22   commitment to serve the poor in the name of Christ."
23             With respect to this sentence, I ask, to
24   your knowledge in January of 2021, was it the
25   position of World Vision Incorporated that gay people

Melanie Freiberg
February 16, 2023

Page 114

M. Freiberg

1  M. Freiberg
2  were incapable of this by virtue of their lifestyle?
3      MR. WARD:  I'm going to object to form,
4    to the extent it calls for a legal conclusion,
5    and foundation, frankly.
6      Q    Do you understand the question,
7  Ms. Freiberg?
8      A    Do I -- I need to answer that question?
9      Q    Yes, please.  And do so truthfully.
10     MR. WARD:  To the extent you understand
11   it and have knowledge -- factual knowledge,
12   you can answer it.
13     MR. WOLNOWSKI:  Please -- okay.  Your
14   speaking objection is now serving as a
15   function to coach the witness.  Please.
16     MR. WARD:  I disagree, Counsel, but if --
17   if you'd like to --
18     MR. WOLNOWSKI:  Thank you.
19     MR. WARD:  -- you could ask --
20     MR. WOLNOWSKI:  Thank you.
21     MR. WARD:  -- the witness --
22     MR. WOLNOWSKI:  If the witness
23   understands the question, she can respond.
24     Q    Do you understand the question,
25  Ms. Freiberg?

Page 115

M. Freiberg

1  M. Freiberg
2      A    Can I ask Teri to please reread it?
3      MR. WOLNOWSKI:  Yes, you may.
4    Teri, please reread it at your earliest
5  convenience.
6      (WHEREUPON, the previous question was
7    read by the court reporter.)
8      MR. WARD:  Repeat all the same
9  objections.
10     A    I don't think I can answer that question.
11  You know what I'm --
12     Q    Why do you think -- go ahead, I'm sorry.
13     A    Yeah.  I think what I'm qualified to
14  answer is what is required to work at World Vision,
15  but ultimately, I'm not in a position to describe,
16  you know, what World Vision believes people can or
17  cannot do.  I know that World Vision -- you know,
18  we -- we love and serve all people, just as Jesus
19  did.  What -- what my role is, is to apply our
20  standards of conduct against, you know, our current
21  and future staff.
22     Q    I'd like to direct your attention to the
23  second page.
24     THE REPORTER:  (Complying)
25     Q    Under number 2, of which the subject

Page 116

M. Freiberg

1  M. Freiberg
2  heading states, "Does WVUS have the right to have
3  such standards that address my behavior outside as
4  well as during my work hours?"
5      And underneath it, it responds, "Yes, it
6  does under decades of well-established law.  The
7  religious freedom guaranteed in the First Amendment
8  to the U.S. Constitution as well as a number of
9  federal statutes, including the Civil Rights Act of
10  1964, guarantee that a church or religious
11  association such as WVUS has the right to consider
12  religious criteria in employment matters.  This
13  includes the right to set and apply to job applicants
14  and employees standards of conduct that are based on
15  sincere religious belief."
16     In light of this section, Ms. Freiberg,
17  to your knowledge, in January of 2021, did this
18  section apply to applicants or employees for World
19  Vision Incorporated for all positions regardless of
20  duties or title?
21     A    Yes.  The standards of conduct, including
22  number 2, apply to all employees.
23     Q    I'd like to direct your attention now to
24  number 3 on that page.
25     MR. WOLNOWSKI:  If you could please

Page 117

M. Freiberg

1  M. Freiberg
2  scroll a little bit up, Ms. Ratner.
3     THE REPORTER:  (Complying)
4     Q    Have you had a chance to read section 3,
5  Ms. Freiberg --
6     A    Yes.  I read it --
7     Q    -- in its entirety?
8     A    I read it initially, yes.
9     Q    I'd like to direct your attention to
10  "Examples of certain behaviors," and there is a
11  section that includes a number of bullet points.  I'd
12  like to direct your attention to the third bullet
13  point going from bottom to top that state, "Sexual
14  conduct outside the biblical covenant of marriage
15  between a man and a woman."
16     A    Okay.
17     Q    To your knowledge, in January of 2021,
18  did this bullet point regard sexual conduct outside
19  marriage, being in a same-sex marriage, or both?
20     MR. WARD:  Objection as to form.
21     A    Well, this bullet applies to all people
22  regardless of their sexual orientation.  It says that
23  sexual conduct outside of the biblical covenant is
24  between a man and a woman, you know, does not comply.
25  So it applies also to heterosexual people.

Melanie Freiberg
February 16, 2023

Page 118

M. Freiberg

1
2  Q    Ms. Freiberg, I'd like to show you what
3  will be marked as Plaintiff's Exhibit 12.  This is a
4  document which was -- is Bate-stamped WV 35 to 36.  A
5  document which was exchanged during the discovery
6  phase of this litigation.
7       MR. WARD:  I'm sorry, Counselor, did you
8  say 35 to 36?
9       Yeah, this is 35 to 36.
10      MR. WOLNOWSKI:  Yes.  My apologies.
11  That's an error on my part.
12      To clarify the record, Plaintiff's
13  Exhibit 12 is actually documents Bate-stamped
14  WV 2852 to 2853.
15  Q    Ms. Freiberg, please review the document
16  presented to you as Plaintiff's Exhibit 12, and let
17  me know once you've completed doing so.
18      (WHEREUPON, the above-referred-to
19      document, Bates-stamped WV-002852 through
20      WV-002853, was marked as Plaintiff's
21      Exhibit 12, for identification, as of this
22      date, displayed by the court reporter, and the
23      witness was given the opportunity to review
24      the entirety of the document.)
25      (Time noted:  6:35 p.m.)

Page 119

M. Freiberg

1
2  Q    Ms. Freiberg, have you had an opportunity
3  to review the document which has been marked as
4  Plaintiff's Exhibit Number 12?
5  A    I have.
6  Q    Have you ever seen this document before?
7  A    No, I have not.
8  Q    After having reviewed it and having a
9  familiarity with the hiring practices of World Vision
10  Incorporated in general, does this document
11  accurately reflect the hiring practices of World
12  Vision Incorporated as they existed in January of
13  2021?
14  A    Yes.
15  Q    Does this document regard individuals
16  seeking employment in the position of customer
17  service representative for World Vision Incorporated
18  in January of 2021?
19      MR. WARD:  Objection as to form and
20      foundation.
21      You may answer.
22  A    I can only say that at the top of the
23  document, it says, Hiring Practices, Donor Contact
24  Services, dash, Confluence.
25  Q    So based upon your knowledge and

Page 120

M. Freiberg

1
2  experience as being a member of the HR team, do you
3  know whether or not these additions existed for the
4  position of customer service representative for World
5  Vision Incorporated in January of 2021?
6  A    Your question was whether -- what -- did
7  you say "addition"?
8  Q    No, conditions.
9  A    Oh, conditions.
10      There is nothing that I read that
11  appeared inconsistent, so I -- I -- I agree with that
12  to the extent that I've seen this document.
13  Q    I'd like to direct your attention to the
14  second page.  It starts with the heading, "Employment
15  and Sexual Orientation."
16      THE REPORTER:  (Complying)
17  Q    I'd like to read it into the record.
18  Under this heading, it states, "We don't ask
19  preemployment questions surrounding one's sexual
20  orientation during the applicant process.  We don't
21  exclude from employment those with a same-sex
22  orientation.  We do expect that all employees,
23  regardless of orientation, abide by our standards of
24  conduct, which among other things, requires employees
25  to remain abstinent outside of marriage between a man

Page 121

M. Freiberg

1
2  and a woman.
3       "We honor employees' privacy, assume the
4  best about their commitments to abide by our
5  standards of conduct, and don't look for involvement
6  in the private lives of individuals.  We take
7  employees at their word in matters of their privates
8  lives, unless we have facts to the contrary.  Our
9  response to potential violations of our standards of
10  conduct that come to our attention is to first ask
11  employees about the situation and treat our employees
12  with sensitivity, discretion, and care, along with
13  providing an opportunity to align with our standards
14  of conduct."
15      With respect to approaching the situation
16  involving the inconsistencies as they related to
17  Aubry McMahon's application materials, would you say
18  that you, Ms. Freiberg, followed this section of the
19  hiring practices document that I've showed you?
20      MR. WARD:  Objection as to form and
21      foundation.
22  A    Well, I guess I -- I would just remind
23  you that I was not a recruiter in the recruitment of
24  Ms. McMahon.  Catherine Miolla was.  So I believe she
25  followed the requirements that are in line with the

Melanie Freiberg
February 16, 2023

Page 122

1                     M. Freiberg
2    document and what you've just read.
3         Q    So according to this document, it appears
4    to me that World Vision Incorporated allows the
5    employment of LGBTQ individuals, but if somebody is
6    in a same-sex marriage, this would be a disqualifier
7    for employment with World Vision Incorporated.
8               Would you agree with that interpretation?
9         MR. WARD:  So I'm going to object as to
10        form, and as to prior testimony, and as to
11        foundation.
12        MR. WOLNOWSKI:  I have not asked her
13        about this document prior to this line of
14        questioning.
15        MR. WARD:  No, but she said she hasn't
16        seen this document before.
17        Q    Do you understand the question,
18   Ms. Freiberg?
19        A    I believe so.
20        Q    Okay.
21        A    So maybe the best way is just for me to
22   state World Vision's practice or approach.  So World
23   Vision does not preclude an LGBTQ employee from
24   working at World Vision so long as they can comply
25   with our standards of conduct.  And as we've looked

Page 123

1                     M. Freiberg
2    before, that means that sexual conduct occurs within
3    the biblical covenant of marriage.  And marriage is
4    between a man and a woman.  So --
5         Q    So if -- I'm sorry, go ahead.
6         A    Yeah.  So it's the conduct expectation
7    versus the status of someone -- someone's orientation
8    that is the behavior that precludes them from
9    employment at World Vision.
10        Q    So if somebody is gay, that's not a
11   disqualifier to work at World Vision in January of
12   2021; correct?
13        A    That is correct.
14        Q    However, if somebody were gay and married
15   to a person of the same sex as them, that would serve
16   as a disqualifier to work for World Vision
17   Incorporated in January of 2021; is that correct?
18        MR. WARD:  Objection.  Objection as to
19        form.
20             You may answer.
21        A    It does on the basis that World Vision's
22   belief of marriage is between a man and a woman, and
23   that sexual conduct occurs within marriage.  And so
24   it is on that basis that someone in a same-sex
25   marriage would be disqualified.

Page 124

1                     M. Freiberg
2         Q    So what if somebody were gay but married
3    to somebody of the opposite sex, would that be a
4    disqualifier -- or rather -- let me strike that.  Let
5    me rephrase.
6               What if somebody were gay but married to
7    somebody from the opposite sex, would they be -- have
8    been able to work for World Vision Incorporated in
9    January of 2021?
10        MR. WARD:  Objection as to form.
11        A    An individual can work for World Vision
12   so long as their conduct remains -- their sexual
13   conduct remains within a covenant of marriage between
14   a man and a woman.  So in your example, the person
15   may be gay, but their sexual activity was confined to
16   the spouse that they had of the opposite gender.
17        Q    So is the policy as it relates to
18   same-sex marriage born out of prohibition of sexual
19   conduct with another person, or is it born out of
20   being contrary to a traditional man-woman marriage?
21        MR. WARD:  I'm going to object as to
22        form.
23             You may answer.
24        A    Well, the first part of the sentence in
25   our conduct expectation is about sexual conduct.  So

Page 125

1                     M. Freiberg
2    it's that sexual conduct occurs within marriage, and
3    then marriage is further defined as being between a
4    man and a woman.
5         Q    So it's fair to say that it's -- in
6    essence, covers two different types of conduct; is
7    that correct?
8         MR. WARD:  Objection as to form.
9              You may answer.
10        A    Yeah, it -- it -- I think the way I think
11   about it is that it covers the sexual conduct first,
12   and then defines marriage to supplement that
13   definition.
14        Q    Understood.
15             If Aubry McMahon had been male and
16   married to a woman, would she have been in violation
17   of World Vision Incorporation standards of conduct
18   for employees?
19        MR. WARD:  Objection as to form.
20             You may answer.
21        A    If Aubry McMahon was a man married to a
22   woman and engaging in sexual conduct, that would not
23   be in violation of our standards of conduct.
24        Q    If Aubry McMahon had been a male and
25   married to a woman, would the offer of employment

Melanie Freiberg
February 16, 2023

Page 126

1           M. Freiberg
2  extended to her on about January 5th, 2021 been
3  rescinded by World Vision Incorporated?
4           MR. WARD:  Objection as to form.
5           You may answer.
6       A    If Aubry McMahon were a man and she were
7  married to a female and would have responded the way
8  she did to the question to say that he, in this case,
9  were -- were in compliance, then that would have met
10 our criteria and the subsequent e-mail to say, My
11 wife and I are expecting a baby, would not have
12 required a further conversation with him.
13      Q    And to that end, her off- -- her offer of
14 employment would not have been rescinded; is that
15 correct?
16          MR. WARD:  Objection as to form.
17          You may answer.
18      A    Well, in this case, it would have been
19 his offer would not have been rescinded, because we
20 described that scenario to be Aubry McMahon as a man.
21      Q    He also wouldn't have been having a baby,
22 though, too; right?
23      A    Well, his wife was having the baby.
24      Q    If Aubry McMahon had been born
25 biologically a female, yet converted to being a male

Page 127

1           M. Freiberg
2  at the time that he had applied for employment with
3  World Vision Incorporated, would he have been in
4  violation of World Vision Incorporated standards of
5  conduct for employees?
6           MR. WARD:  I am going to object to form,
7           and calling for speculation.  I'm not sure
8           about the latitude because you just keep
9           posing hypotheticals.
10          MR. WOLNOWSKI:  Well, Rule 26 is very
11          broad.  I can ask her any question that are
12          reasonably calculated to lead to discovery of
13          admissible evidence proportionate to the needs
14          of the case.
15          MR. WARD:  If relevant to --
16          MR. WOLNOWSKI:  I think that that fits
17          nicely within that broad -- broad allowance.
18          MR. WARD:  If relevant --
19      Q    With that said, Ms. Freiberg, if you can
20 answer the question, please answer it.
21          MR. WARD:  Rule 26 says if relevant to
22          the claims or defenses.
23      Q    Ms. Freiberg, if you understand the
24 question, could you please answer it?
25      A    You know, I'm actually unable to answer

Page 128

1           M. Freiberg
2  that question.  I -- I have not encountered that
3  situation, so I would be seeking guidance.
4           MR. WOLNOWSKI:  Let's take a five-minute
5           break, and we'll be back in five minutes.
6           Off the record, I have 6:48.
7           MR. WARD:  Very good.
8           Thank you.
9           (WHEREUPON, a brief recess was taken,
10          after which the following transpired:)
11          (Time noted:  6:54 p.m.)
12          MR. WOLNOWSKI:  Okay.  I don't have any
13          further questions, Ms. Freiberg.
14          Thank you very much.
15          THE WITNESS:  Thank you.
16          MR. WOLNOWSKI:  We can go off the record.
17          THE REPORTER:  Well, before we do that,
18          can I do housekeeping?
19          This is a federal case, so that means,
20          who's going to be taking copies of the
21          transcript?
22          MR. WOLNOWSKI:  Well, I'll certainly be,
23          you know, purchasing copies, and ordinarily, I
24          exchange copies with opposing counsel.  So
25          I'll only pay for one copy and I'll be

Page 129

1           M. Freiberg
2  providing a copy to them.  I -- I'm hopeful
3  that the professional courtesy is reciprocated
4  with respect to the deposition transcript of
5  Aubry.
6           (Discussion held off the record)
7           MR. SZYMANSKI:  We'd like to request an
8  expedited copy of the transcript by the 22nd.
9           MR. WARD:  And, Matthew, we -- we should
10 pay the difference -- not Casey, but if
11 there's an expedite charge.
12          MR. SZYMANSKI:  Yes.  Yes.  Yes.  Cas- --
13 we're not asking Casey to bear that.
14          THE REPORTER:  Okay.  We're off the
15 record at 7:00 p.m.
16          (WHEREUPON, the examination of this
17 witness was concluded at 7:00 p.m.)
18
19          _____
20          MELANIE FREIBERG
21
22 Subscribed and sworn to before me
   this ___ day of _____ 2023.
23
24
   _____
25          NOTARY PUBLIC

Melanie Freiberg
February 16, 2023

Page 130

```
 1                    M. Freiberg
 2
 3                 I N D E X
 4
 5    WITNESS           EXAMINATION BY        PAGE
 6    Melanie Freiberg  Mr. Wolnowski         5
 7
 8
 9                    EXHIBITS
10
11    PLAINTIFF'S
      EXHIBITS    DESCRIPTION               PAGE
12
      EX 1    Bates-stamped WV-000048 through
13           WV-000050                         17
14    EX 2    Bates-stamped WV-000078 through
             WV-000079                         37
15
      EX 3    Bates-stamped WV-000080          40
16
      EX 4    Bates-stamped WV-000231 through
17           WV-000232                         53
18    EX 5    Bates-stamped WV-002858          59
19    EX 6    Bates-stamped WV-000067 through
             WV-000070                         63
20
      EX 7    Bates-stamped WV-000240 through
21           WV-000244                         78
22    EX 8    Bates-stamped WV-000242 through
             WV-000241                         87
23
24
25
```

Page 131

```
 1                    M. Freiberg
 2
 3              EXHIBITS (Continued:)
 4
      PLAINTIFF'S
 5    EXHIBITS    DESCRIPTION               PAGE
 6    EX 9    Bates-stamped WV-000081 through
             WV-000082                         92
 7
      EX 10   IMG_5098 3.mps (deemed marked)  105
 8
      EX 11   Bates-stamped WV-000035 through
 9           WV-000036                        111
10    EX 12   Bates-stamped WV-002852 through
             WV-002853                        118
11
12          (WHEREUPON, original exhibits marked
13        during today's deposition were retained by
14        U.S. Legal Support.)
15
16          INFORMATION TO BE FURNISHED
17
18    DESCRIPTION                      PAGE/LINE
19    Full e-mail chain re:  Plaintiff's 4    53/24
20    Posting of specific job re:  Plaintiff's 1  83/21
21    Written training documentation relating to
      Plaintiff's 1, numbers 11 and 12        84/6
22
      Full e-mail re:  Plaintiff 8            88/7
23
      "Script" document                      89/19
24
25
```

Page 132

```
 1                    M. Freiberg
 2    ERRATA SHEET FOR THE TRANSCRIPT OF:
      Case Name:  AUBRY MCMAHON v WORLD VISION, INC.
 3    Proceeding Date:  February 16, 2023
      Deponent:  MELANIE FREIBERG
 4    Place:  Remote Video Conference
 5       * PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND
            NOTE THE REASON FOR SAME *
 6
 7    PG / LN  /  NOW READS  _/  SHOULD READ  /  REASON
      ___/____/_____/_____/_____
 8    ___/____/_____/_____/_____
      ___/____/_____/_____/_____
 9    ___/____/_____/_____/_____
      ___/____/_____/_____/_____
10    ___/____/_____/_____/_____
      ___/____/_____/_____/_____
11    ___/____/_____/_____/_____
      ___/____/_____/_____/_____
12    ___/____/_____/_____/_____
      ___/____/_____/_____/_____
13    ___/____/_____/_____/_____
      ___/____/_____/_____/_____
14    ___/____/_____/_____/_____
      ___/____/_____/_____/_____
15    ___/____/_____/_____/_____
      ___/____/_____/_____/_____
16    ___/____/_____/_____/_____
      ___/____/_____/_____/_____
17    ___/____/_____/_____/_____
      ___/____/_____/_____/_____
18    ___/____/_____/_____/_____
      ___/____/_____/_____/_____
19    Under penalties of perjury, I declare that I have
      read the foregoing transcript and that the facts
20    stated in it are true.
21    _____          _____
      MELANIE FREIBERG              DATE
22
      Subscribed and sworn to before me
23    this ___ day of _____ 2023.
24
      _____
25          NOTARY PUBLIC
```

Page 133

```
 1                    M. Freiberg
 2
 3             C E R T I F I C A T E
 4
 5       I, THERESA RATIGAN, a Shorthand Reporter and
 6    Notary Public of the State of New York, do hereby
 7    certify:
 8       That the witness whose examination is
 9    hereinbefore set forth, was duly sworn, and that such
10    examination is a true record of the testimony given
11    by such witness.
12       I further certify that I am not related to any
13    of the parties to this action by blood or marriage;
14    and that I am in no way interested in the outcome of
15    this matter.
16       IN WITNESS WHEREOF, I have hereunto set my
17    hand this 22nd day of February 2023.
18
19
20    _____
      THERESA RATIGAN
21
22
23
24
25
```

**Exhibits**

EX 0001 Melan
ie Freiberg 0
21623
    17:4,9 29:9
    83:25 84:10
    130:12
    131:20,21
EX 0002 Melan
ie Freiberg 0
21623
    37:4,10,17,
    18 130:14
EX 0003 Melan
ie Freiberg 0
21623
    39:24 40:9,
    21 45:10,11,
    23,24 105:10
    130:15
EX 0004 Melan
ie Freiberg 0
21623
    52:22 53:6
    56:16,23
    58:2,16
    130:16
    131:19
EX 0005 Melan
ie Freiberg 0
21623
    58:21 59:5
    64:2 130:18
EX 0006 Melan
ie Freiberg 0
21623
    62:21 63:6,
    14,24 71:11,
    12 130:19
EX 0007 Melan
ie Freiberg 0
21623
    78:4,6,15,21
    79:3 80:20
    130:20

EX 0008 Melan
ie Freiberg 0
21623
    86:24 87:11
    130:22
EX 0009 Melan
ie Freiberg 0
21623
    92:7,17,24
    131:6
EX 0010 Melan
ie Freiberg 0
21623
    105:4,15
    106:17 131:7
EX 0011 Melan
ie Freiberg 0
21623
    111:7,11,17
    131:8
EX 0012 Melan
ie Freiberg 0
21623
    118:3,13,16,
    21 119:4
    131:10

**1**

1
    17:4,9 29:9
    31:15 83:25
    84:10 96:25
    97:7 105:17,
    20 106:5
10
    105:4,15
    106:17
11
    19:22 26:25
    84:9 111:7,
    11,17
11-week
    30:18
11:56
    40:24 93:22

12
    19:22 20:7
    84:9 118:3,
    13,16,21
    119:4
12955
    5:10
15
    50:12
16th
    11:21
1964
    116:10
1989
    10:16
1:00
    96:3,18
1st
    18:20

**2**

2
    37:4,10,18
    97:8,21
    105:19,22
    115:25
    116:22
20
    50:12 77:17
20-
    88:3
2011
    85:21
2018
    10:22,24,25
    11:4 15:18
2020
    12:15,20
    82:8
2021
    11:15,17,25
    13:2,3,8,18,
    24 14:6,16
    19:5 20:25
    27:5 28:3
    30:25 32:9,

18,23 34:4,
20 35:23
38:18 39:2,
5,10,16
40:24 41:12,
17,19 51:15,
16 54:7,9,16
55:24 56:22
62:13 64:5
74:24 75:23
76:5 79:8
82:14 86:3,
5,10,18
88:4,11
93:21 94:17,
25 95:9 96:2
97:8,21
112:20
113:10,24
116:17
117:17
119:13,18
120:5
123:12,17
124:9 126:2
2022
    11:9 12:6
2023
    11:21 83:4
    129:22
22nd
    129:8
231
    52:23
232
    52:23
240
    78:7
241
    78:7
242
    87:3
243
    87:25
244
    87:3
26

Melanie Freiberg
February 16, 2023

127:10,21

**2852**
118:14

**2853**
118:14

**2858**
58:22

**288th**
5:10

**28th**
81:23

**2:00**
100:5

**2:06**
4:2

**2:29**
17:23

---

**3**

**3**
39:24 40:9,
21 45:11,24
99:15 105:7,
10 116:24
117:4

**3.mps**
105:9

**35**
106:18
111:17
118:4,8,9

**36**
111:18
118:4,8,9

**3:05**
37:14

**3:07**
56:22 57:5

**3:51**
50:20

**3:57**
53:10

**3rd**
82:24,25

---

**4**

**4**
52:22 53:6
56:16,23
58:2,16

**48**
17:5

**49**
19:17

**4:00**
94:9

**4:18**
63:10

**4:52**
83:16

**4:59**
94:2

**4th**
97:15

---

**5**

**5**
58:21 59:5
64:2

**50**
17:5 44:6

**5098**
105:7

**5:27**
83:16

**5:34**
87:15

**5:40**
94:18 95:10

**5:44**
92:21

**5th**
36:21 38:18
39:16 40:20,
23 41:12
51:15 53:20
54:7,9,16
55:24 56:19,

21 57:5,9
62:2,7,13,16
64:5 71:2
72:5 74:2,24
75:22 76:4
77:13 79:7
81:22 93:15,
21 94:2,25
126:2

---

**6**

**6**
62:21 63:6,
14,24 71:12
86:5,10
91:13

**60**
15:19

**67**
62:22

**69**
64:9

**6:20**
112:3

**6:35**
118:25

**6:48**
128:6

**6:54**
128:11

**6th**
77:13 85:21
86:18 88:3,
11,20 90:18
94:17 95:9

---

**7**

**7**
78:4,6,15,21
79:3 80:20

**70**
62:22 64:9
65:24

**78**
37:5

**79**
37:6

**7:00**
129:15,17

**7th**
96:2

---

**8**

**8**
86:24 87:11
98:25

**80**
39:25

**81**
92:8

**82**
92:8 93:7

**8:43**
88:4,20
90:17 91:14

**8:54**
96:2

**8th**
9:24 44:25
45:3,6 49:15
51:3,12,15
62:13 75:23
76:4 79:8
81:12 94:25
97:8,21
111:5

---

**9**

**9**
92:7,17,24

**9-to-11-weeks**
36:11

**90**
15:19

**98092**
5:11

Melanie Freiberg
February 16, 2023

**A**

**a.m.**
88:4,20
90:17 91:14
96:2

**abide**
61:2 108:13,
16 120:23
121:4

**ability**
8:20 103:8

**able**
15:8 18:25
19:8,12,13,
14 20:11
23:20 25:15
36:14 46:15
48:5,15
49:5,13,14
71:16 72:25
74:15 81:13
89:13 91:8,
10 106:6
108:13
109:13 111:4
124:8

**above**
64:25

**above-
referred-to**
17:6 37:7
40:7 53:3
59:3 63:3
78:12 87:8
92:14 105:8
111:8 118:18

**abstinent**
120:25

**acceptable**
101:5,6

**accordance**
61:6 88:15

**accurate**
69:18 83:6
101:10

**accurately**
119:11

**acknowledge**
4:8,12

**acknowledged**
28:18

**acquisition**
13:5,7,10,17
38:21,25
41:16,18

**acronym**
16:19 45:13

**across**
22:19

**act**
28:22 116:9

**activity**
124:15

**acts**
30:15

**actual**
22:19 62:17
91:17

**add**
36:9,13
47:16 50:2
73:19

**addition**
120:7

**additions**
120:3

**address**
5:9 116:3

**adhere**
25:3

**administer**
4:14 32:24
33:7 34:8

**administered**
4:13

**administrativ
e**
79:24

**admissible**
127:13

**advance**
21:21

**advisement**
84:5,12,21
89:24 95:22

**affirmative**
72:12

**afternoon**
4:3,6 5:13
94:7 99:11,
14 100:4

**agent**
33:20

**ago**
77:3 79:25
83:6

**agree**
4:24 29:12,
23 38:14
39:18,19
41:10,13
42:4 46:5
51:13 61:23
86:10 93:19,
20 96:8 98:3
107:20 108:2
120:11 122:8

**agreed**
8:10 95:23

**agreement**
4:19,20

**ahead**
22:4 36:8
74:10 115:12
123:5

**alcohol**
8:17

**align**
15:8 121:13

**align-**
70:6

**aligned**
71:20 101:18

**alignment**
68:2 69:10,
16 70:5,7,
11,16 71:25
72:4 102:13,
16

**allocate**
44:12

**allowance**
127:17

**allowed**
41:8

**allows**
122:4

**ambiguous**
21:8 24:2
26:16 27:20
30:5 31:6
33:2 34:17
35:2 42:19
45:16 46:3
47:3 48:11
49:11

**Amendment**
116:7

**America**
12:15

**and/or**
41:22 79:10
85:22 86:20

**answer**
6:10,19
16:11 21:11
22:3,4 24:19
25:5,13
26:17 27:10,
21 29:18,19
30:7,17 31:9
32:5,13
33:4,18
34:18 35:4
42:21 43:14,
20 44:10
45:17 46:4
47:4,13,14,
25 48:12,13
49:12 50:3,8
51:2,11
61:22 65:22
66:8 68:23
69:20 70:15
71:22 73:17
74:8,16,21
75:19 80:9

Melanie Freiberg
February 16, 2023

82:2,3 85:4,
12 86:12
89:9,10
90:12 91:6
95:5 96:7,14
97:3 98:2,13
99:18 100:3
101:23
102:10
103:11 104:4
109:5,25
111:2 114:8,
12 115:10,14
119:21
123:20
124:23
125:9,20
126:5,17
127:20,24,25
answered
48:11 98:14
109:4,6
answering
6:5
answers
6:14,15,17
43:19 47:9
48:18 65:23
73:23
anticipate
81:17
anticipating
77:5
anybody
7:7 9:2
55:14 77:19,
20 84:18
85:13,16
89:2 98:22
100:15
anyone
7:3 9:25
apologies
55:9,20 66:7
74:6 78:24
118:10
appeared
47:7 95:2

120:11
appears
38:9,12
80:20 122:3
applicant
16:13 120:20
applicants
13:12 41:21
116:13,18
application
36:20 121:17
applied
16:17,18
18:14 83:24
127:2
applies
117:21,25
apply
115:19
116:13,18,22
applying
36:18
approach
122:22
approaching
121:15
appropriate
20:3 24:12
27:3,6
approximate
82:24
approximately
76:5,20
77:10,15
100:6
argumentative
47:3 48:2
50:2 110:17
around
12:6 15:10
23:14 25:23
77:4,13
79:14,20
82:24 94:9
arrangement
4:17

asked
29:20 48:10
50:13 56:11
58:12 60:24
64:22 65:9,
12 66:14
100:24
101:2,9
109:4 122:12
asking
24:8 43:10,
11 44:18
49:17 55:4
64:20,21
78:22,23
79:11,19
99:23 129:13
aspects
113:20
assembly
21:24
assigned
20:4,8,15
38:22
assistant
79:24
associated
38:5
association
116:11
assume
6:5 11:7
121:3
assuming
31:6
attached
60:7 112:12
attaching
59:20
attempted
103:12
attempts
72:22 73:19
98:18
attend
22:21

attention
19:17,22
64:7 66:22
67:22 112:22
113:3,15
115:22
116:23
117:9,12
120:13
121:10
attorney
7:18 10:2
attorney/
client
89:8,12 90:3
attorneys
4:7 7:4
85:14
Atwood
16:2,6
Aubry
5:15 15:25
16:2,5,6,7,
13 18:13
36:17,23
39:15 40:22
41:9,11
42:5,16
43:6,23
45:11,25
46:10,20
47:21 48:9
49:9 50:24
51:7,16,22
52:11,15
54:7,10,17
55:25 57:10
58:17 75:2,
6,17,25 76:6
77:2 80:17
81:23 83:23
91:19,20
93:12,16
94:5,18
95:13,25
96:3,17,22
97:9,10,22
98:7,23

Melanie Freiberg
February 16, 2023

100:14
101:14,15
102:25
104:19,22
106:23
107:2,6,13,
20 108:5,21
121:17
125:15,21,24
126:6,20,24
129:5
**Aubry's**
59:22 60:7
**Auburn**
5:10
**audio**
9:16,18,19,
21 105:14
106:8,16,18,
22 107:21
109:17
110:12
**author**
38:12,16
**available**
94:21
**aware**
8:2 94:24
95:6

———————

**B**

**baby**
41:4,7 93:18
100:24
126:11,21,23
**bachelor's**
10:9,18
**back**
25:7 35:9
47:11 48:21
49:22 69:22
70:24 85:8
97:13 98:7
105:19 107:5
128:5

**baptism**
33:12
**baptisms**
34:5
**based**
22:22 43:25
88:17 108:3
116:14
119:25
**basic**
9:12
**Basically**
105:19 107:4
**basis**
110:6
123:21,24
**Bate-stamp**
92:8 111:17
**Bate-stamped**
39:25 58:22
62:22 63:12
64:8 87:2,24
93:7 118:4,
13
**Bates**
111:14
**Bates-marked**
65:24
**Bates-stamp**
37:5 78:7
**Bates-stamped**
17:5,7 37:8
40:8 52:23
53:4 59:4
63:4 78:13
87:9 92:15
111:9 118:19
**bear**
129:13
**bearing**
78:7 92:8
105:6
**bears**
37:5 111:17
**began**
100:21,22

**beginning**
12:15
**begins**
53:19
**behalf**
26:21 98:22
**behavior**
60:22 68:3
69:17 70:19
106:3 107:12
116:3 123:8
**behaviors**
67:25 117:10
**behind**
81:9,10
**belief**
46:19 48:8,
14,24 49:8,
20 50:8,23
51:6,9,12
61:4 116:15
123:22
**beliefs**
15:8,9,11
**believe**
18:6,23 20:9
23:9 43:5
45:24 55:2
62:3,9 68:2
73:7 98:4,14
99:20 100:22
104:24
121:24
122:19
**believed**
33:13 46:9
61:15 73:6
102:3
**believes**
102:4 109:9
115:16
**below**
65:2,15 67:6
**best**
6:3 15:15
56:3 97:16
99:13 121:4

122:21
**better**
20:9
**biblical**
109:10,11
117:14,23
123:3
**biologically**
126:25
**bisexual**
45:13
**bit**
18:16 19:19
31:13,20
47:16 93:9
117:2
**body**
40:25
**born**
124:18,19
126:24
**bottom**
38:11 87:23
93:6,15
117:13
**box**
64:18
**boxes**
65:15,16
66:4,10,14
**break**
6:8,11 24:20
50:14 83:20
84:15,19
85:18 128:5
**brief**
50:18 128:9
**briefly**
24:6
**broad**
127:11,17
**bulk**
15:18
**bullet**
66:25 67:5,
23,24
117:11,12,

Melanie Freiberg
February 16, 2023

18,21
**business**
  13:5 112:12
**busy**
  94:19 95:14,
  21

---

C

---

**calculated**
  127:12
**call**
  19:15 25:16
  26:6 31:17
  53:25 54:19
  55:3,7,14,
  16,25 56:17
  57:8,19,21
  62:18 67:16
  77:7,19
  79:16 80:12,
  21 81:11
  83:22 88:8
  89:19 90:8
  94:8 96:4,18
  99:3 100:11,
  13,20 101:12
  102:24 103:2
  104:2,6,8,
  11,15,16,18,
  22 107:16
  109:20
  110:23
**call-in**
  79:8,21
**called**
  55:11,24
**calling**
  21:9 29:17
  113:21 127:7
**calls**
  24:3 28:9
  29:14 30:6
  31:8 35:2
  44:9 89:7
  90:10 114:4

**Canada**
  10:14
**candidate**
  65:6 90:19
  91:3
**candidate's**
  64:18
**candidates**
  13:13,14
  41:22,23,24
  42:3 67:9
  68:21
**care**
  121:12
**carefully**
  84:22
**carry**
  31:23
**Cas-**
  129:12
**case**
  44:2 52:24
  87:5 92:13
  105:6 126:8,
  18 127:14
  128:19
**case's**
  40:3
**Casey**
  5:14 85:6
  110:21
  129:10,13
**catch**
  13:21
**Catherine**
  38:13,15,18
  40:23 41:12
  45:5,7
  52:10,14
  54:6,8,13,
  15,19 55:11,
  23 56:6,17,
  22 59:19,21
  60:6,11
  61:25 63:25
  64:5 65:11
  71:2 74:2

77:6,22
  79:10,24
  80:15,24
  81:3 85:22
  86:20 88:12,
  19 92:5
  93:12,25
  94:10,18
  95:25 96:5,
  10,23 97:9,
  17 99:2,21
  100:13
  101:14
  104:21,24,25
  121:24
**Catherine's**
  38:20 67:12
  96:8
**caused**
  71:22 72:23
**caution**
  85:3
**cease**
  83:9
**ceased**
  82:21 83:5
**center**
  19:15
**centered**
  77:4
**central**
  31:16
**certain**
  15:10 20:17
  54:5 55:17
  77:18 103:14
  117:10
**certainly**
  89:23 128:22
**certification**
  29:24
**chain**
  53:19 54:2
  57:25 93:11
  94:3
**chance**
  17:24 37:15

53:11 63:11
  70:23 87:16
  92:23 117:4
**changed**
  14:5,7
**changes**
  7:14
**channel**
  21:22
**chapel**
  22:9,20,21,
  25 23:11,13,
  15 25:17
  35:15,16
**chapels**
  22:13
**characterize**
  35:20
**charge**
  129:11
**chat**
  7:22
**check**
  41:7
**Christ**
  31:16,25
  32:19 33:14,
  20 113:7,20,
  22
**Christian**
  31:23 33:12
  34:14 66:24
  112:12
**Christine**
  75:9,23 77:9
  79:10 80:14,
  24 81:22
  82:6,10,12,
  14,18 85:22
  86:19 88:2,
  12,19,21
  89:17 90:18
**church**
  31:18 116:10
**circumstances**
  5:22

Civil
  116:9
claims
  127:22
clarify
  24:10  42:11
  43:8  46:6
  62:15 118:12
clarifying
  86:13
clarity
  68:14,15
  69:3
class
  15:22 38:23
cleaner
  6:20
clear
  6:16  23:3
  24:24 25:25
  65:21 68:24
  69:5 86:17
closest
  22:6 30:16
coach
  114:15
code
  5:11
colleague
  24:22
collected
  43:17
come
  104:17,19
  121:10
commission
  30:14
commissioning
  28:7 29:11
  30:3,10,13
commitment
  113:22
commitments
  121:4
committed
  113:18

communicate
  7:18 38:3
communicated
  75:25 91:20,
  23,24 92:4
  96:17,21,24
communication
  7:20 52:10
  54:12 68:14
  71:10,22
  81:21 96:16
  97:10
communications
  52:2,6,8
  54:9,16
  58:15 96:22
  97:4
communicative
  90:10
communion
  34:8
community
  21:25
complete
  35:7 53:20
  88:18
completed
  17:12 40:6
  63:2 74:8
  87:7 111:22
  118:17
completeness
  66:12
complex
  24:3 42:20
compliance
  61:3 126:9
complied
  46:13
comply
  45:21 46:15
  48:5,15
  49:6,14
  58:12 60:25
  71:17,20
  72:10 74:15

81:16 91:9
101:8 102:21
103:21 106:4
107:12
109:14 110:4
117:24
122:24
Complying
  18:18 19:20
  31:14,21
  66:3,20 71:7
  93:10 94:16
  113:2 115:24
  117:3 120:16
compound
  24:2 42:19
computer
  7:11
con-
  105:24
conclude
  47:17
concluded
  53:2 59:2,8
  69:17 78:11
  108:12
  129:17
conclusion
  21:9 24:4
  28:9 29:12,
  14 30:6 31:8
  35:3 114:4
Concordia
  10:13
conditions
  120:8,9
conduct
  15:10,11
  21:4 33:9
  45:21 46:13,
  16 48:6,16
  49:2,6,14,18
  50:7 58:13
  60:8,12,18,
  21,22,23
  61:4,5,6
  66:24 68:3,7
  69:9,14,16

70:3,5,12,17
71:3,17
72:2,10
74:16 81:16
91:9 101:5,8
102:14,16
103:15,20,21
105:23,24
107:9,10
108:14,17,23
109:11,14
110:5
112:11,13,
18,19 115:20
116:14,21
117:14,18,23
120:24
121:5,10,14
122:25
123:2,6,23
124:12,13,
19,25 125:2,
6,11,17,22,
23 127:5
conducted
  42:24 52:17
  57:15
conducting
  6:24 61:5,7
confined
  124:15
confirm
  38:4 45:20
  46:16 49:13
  50:7 64:16
  81:13 82:9
  99:19
confirmed
  45:8 51:4
  72:25 81:15
  101:15
  102:12
confirming
  110:7
Confluence
  119:24
conformance
  49:17

Melanie Freiberg
February 16, 2023

confuse
  5:24
congratulated
  100:22
congregation
  21:4,14,16,
  23 22:6
conjunction
  14:20
connect
  46:24 109:20
connection
  80:11
consent
  4:16 9:22
  104:13,20
  107:19
consider
  116:11
considered
  48:4
consistent
  57:14
constitutes
  39:20
Constitution
  116:8
contact
  20:10 22:8
  23:5 26:20
  30:11 110:6
  119:23
contemplated
  20:7 21:2
content
  90:25
contents
  95:6
context
  21:17 30:10
continue
  23:8 50:16
  83:18 84:21
CONTINUED
  50:21 84:14
contradictory
  72:13

contrary
  42:25 56:13
  60:17 121:8
  124:20
contributed
  73:9
convenience
  92:10 115:5
conversation
  56:5 66:24
  76:9,10,24
  77:11,21
  80:2,23,24
  81:20 90:22,
  24 91:12
  100:7 126:12
conversations
  76:8,18,19,
  21
converted
  126:25
convey
  68:16
coordinate
  13:13 41:25
copies
  128:20,23,24
copy
  59:22 128:25
  129:2,8
core
  13:16 14:2
  19:4,25
corporate
  31:16
correct
  20:15,16
  26:4 39:14
  43:3 46:10
  51:17 52:4,5
  58:4,5 65:7
  66:15 67:16,
  17,20,21
  69:7 70:19,
  20,22 73:10
  80:22 81:6
  84:16,17

93:12,22
94:3,4,12
95:25 102:12
103:23
108:13,18,20
109:7,15,21
123:12,13,17
125:7 126:15
corrected
  86:8
correspond
  60:23
correspondenc
e
  9:11
counsel
  4:16 17:16
  24:5 47:12
  50:11 52:3,7
  54:3 84:4
  89:24 110:16
  111:14
  114:16
  128:24
counselor
  110:24 118:7
counsels
  4:21
couple
  83:5,19
course
  15:19,20
  21:21 73:19
court
  4:5 6:16,21
  7:25 17:10
  18:15 25:9
  35:11 37:11
  40:10 48:23
  49:24 53:7
  59:6 63:7
  69:24 76:16
  78:16 85:11
  86:2,8 87:12
  92:18 111:12
  115:7 118:22
courtesy
  129:3

covenant
  109:10,12
  117:14,23
  123:3 124:13
covers
  125:6,11
crazy
  94:19 95:14
created
  89:2,3,5,13
creation
  6:20 89:16
criteria
  116:12
  126:10
current
  11:5 115:20
customer
  18:10 19:5
  20:2 21:3
  26:2,11,13
  27:4 28:4
  29:7 31:2
  32:7,17,22
  34:2,10,13,
  22 35:21
  36:25 65:5
  119:16 120:4
cut
  49:3 66:6
  87:25

_____

        D

dash
  119:24
dashes
  67:2,5 68:6
date
  17:10 18:20,
  22,25 19:2
  37:11 38:6
  40:10 53:7
  59:6 63:7
  65:14 78:16
  82:24 87:12
  92:18 95:11

Melanie Freiberg
February 16, 2023

105:11
111:12
118:22
date-stamped
93:24
dated
57:5 95:9
97:21
dates
18:17
day
129:22
days
15:19 51:21
73:20
DCS
22:23,25
23:3,11
25:20 33:20
38:23
decades
116:6
decide
22:17 71:15
deciding
75:16
decision
75:5,8,21,24
110:8
deed
32:2 33:22
113:18
deemed
105:9,14
defendant
5:18
defenses
127:22
define
21:19,23
28:10 33:5,7
45:12
defined
21:19 28:14,
17,21 33:12,
14 105:25
107:11 125:3

defines
68:8 69:6,11
70:7 125:12
definitely
62:12,14
definition
22:7 68:20
125:13
degree
10:10,15,17,
18 28:6
deity
28:19
department
25:21
depose
8:14
deposed
10:4
deposition
4:8,9,10
6:24 7:8
9:6,9,17
10:2 24:22
54:4 84:19
129:4
depth
36:13
derived
64:23
describe
32:3 35:24
101:4 115:15
described
13:15 16:25
29:4 31:11
60:24 80:6
103:13
126:20
describes
19:10
description
9:13 61:23
desire
22:23
detail
27:13

details
27:8,12
30:24 38:5,6
56:9
determination
74:11,18
98:8
determine
27:6 45:18,
19 47:7
51:10
devo-
22:25
devotion
25:16 28:18
devotions
22:8,13,15,
16,17,18
25:18,21,23
35:15
di-
12:11
dictionary
28:16,21
30:13 33:8,
11
difference
129:10
different
43:20,21
110:11 125:6
differently
58:12
difficult
33:17
direct
19:16,21
21:21 66:21
67:22 112:22
113:3,15
115:22
116:23
117:9,12
120:13
directed
85:16

direction
21:22
director
10:25 11:5,
6,10,11,16
12:25 13:18
dis-
47:6
disagree
101:18
114:16
discern
45:11
discerned
42:5,10
disclosed
108:15
disclosing
89:10
disconfirming
43:16
discovery
40:2 52:24
58:23 62:23
78:8 87:4
92:12 105:6
111:19 118:5
127:12
discrepancy
97:12,14
discretion
121:12
discriminatio
n
14:10,12,14,
24
discuss
75:24 80:16
94:7 97:12
discussed
57:12,19,21
79:25 88:18
90:6 104:2
discussing
88:13
discussion
9:23 59:24

Melanie Freiberg
February 16, 2023

64:11 75:14,
20 80:15
83:14 88:24
101:21
105:13
106:14 111:5
129:6
**discussions**
74:25
**displayed**
17:10 37:11
40:10 53:7
59:6 63:7
78:16 87:12
92:18 111:12
118:22
**dispute**
12:12
**disqualified**
108:25
123:25
**disqualifier**
23:18,19
113:11 122:6
123:11,16
124:4
**disseminate**
79:8
**disseminated**
79:11,20
**distinction**
26:19
**dive**
16:21
**document**
17:4,7,11,
22,25 18:3
19:10 37:5,
8,13,16,20,
24 39:24
40:2,8,14,22
52:22 53:4,
9,12,14
58:22,23
59:4,9,14
60:2 61:24
62:9,22,23,
25 63:4,9,

12,13,16,23
64:4,20,21
66:18 67:4
70:24 78:7,
8,13,20
79:2,17,18
80:4,19 84:2
87:2,4,6,9,
14,17,19
88:9 89:20
92:8,11,15,
20,23 93:2,4
98:5 99:24
105:9 111:9,
18 112:2,6,
11,17 118:4,
5,15,19,24
119:3,6,10,
15,23 120:12
121:19
122:2,3,13,
16
**documentation**
27:25 84:8
**documents**
7:10,15 9:5,
7,8,11
118:13
**doing**
17:12 40:6
59:2 60:3,5
63:2 78:11
84:21 87:7
118:17
**donor**
16:20 20:10
22:8,10 23:5
26:6,20,21
27:7 30:11
119:23
**donor's**
20:3 27:2
**donors**
19:8,9,14
22:14 25:15
26:3 36:5
**drugs**
8:16

**dry**
81:4,9,10,
17,20 91:11,
17
**DSRT**
16:19,24
63:22
**duly**
5:3
**duties**
12:23 20:4,
8,14,23
30:15 34:23
41:15 116:20
**duty**
32:21

**E**

**e-mail**
7:20 40:22,
25 41:11
42:4,13,17,
25 43:2,4,
16,22,25
45:5,10,23
46:8,18,23
47:20 49:8
52:2,11,15
53:19,25
54:13,20,25
55:12 56:7,
10,13,18,19,
22 57:4,7,
13,14,25
58:9,15
59:19,22
60:6,13,16
63:25 64:5
70:25 71:24
72:6,12,21,
23 73:25
74:4 81:13
87:25 88:5,
13,15,18,19
90:17,25
91:13,15,16
92:4 93:11,

14,15,21
94:3,5,6,11
95:7,8,24
96:10 97:20
98:20,22
99:2,20
100:24
108:12
126:10
**e-mailed**
94:18 95:25
97:9
**e-mails**
9:10 51:15,
21,23 53:19
54:6 56:15
85:22 86:19
109:20
110:14
**earliest**
115:4
**early**
82:8
**easier**
6:21 25:6
**eat**
84:16
**educate**
35:17
**educated**
35:17
**education**
34:24
**effect**
28:15
**either**
20:19 23:17,
21 26:21
30:18 50:23
51:6 52:3
96:23 101:13
**elaborate**
109:8
**electronic**
7:21 54:11
**elegies**
32:4

**embracing**
33:23
**emphasis**
69:2
**emphasize**
68:20
**employed**
10:7,8 28:3
31:2 32:8
34:3,21
71:17 82:18
113:12
**employee**
15:10 21:2
41:6 69:5,18
122:23
**employees**
42:2 68:4
106:3 107:12
108:23
112:18
116:14,18,22
120:22,24
121:7,11
125:18 127:5
**employees'**
121:3
**employer**
15:2,4
**employment**
5:23 14:8,
17,21 15:17
16:14,22
30:10 35:23
36:23 38:5
39:10,15,20,
22 58:17
61:17 68:21
72:14,15
73:10 75:6,
25 90:7
96:19 98:10,
24 107:22
108:4 116:12
119:16
120:14,21
122:5,7
123:9 125:25

**encountered**
128:2
**encouragement**
35:14
**end**
30:17 126:13
**endeavors**
97:16
**engage**
27:6
**engaging**
69:13 125:22
**ensure**
68:24
**entails**
20:15 27:14
**enters**
7:7
**entirely**
53:20 88:17
**entirety**
17:21 37:13
53:9 63:9
87:14 92:20
111:25 117:7
118:24
**equal**
82:16
**equivocation**
83:24
**error**
44:20 47:8
118:11
**essence**
27:10 73:12
125:6
**essential**
30:20 36:3,4
**essentially**
56:9
**EST**
94:9 96:4
**establishing**
29:16
**ethics**
112:12

126:14 127:2
**Eucharist**
33:13
**eventual**
88:24
**evidence**
31:7 127:13
**exact**
95:11 102:5
**exactly**
19:3
**examination**
5:12 50:21
84:14 129:16
**examined**
5:5
**examples**
60:22 67:25
101:5 117:10
**exchange**
62:23 88:13
105:5 128:24
**exchanged**
40:2 54:6
56:16 58:23
78:8 87:4
92:11 111:19
118:5
**exclude**
91:10 120:21
**excuse**
34:11 63:12
70:25 72:14
77:20 88:3
98:9
**execution**
22:19 33:9
**Exhibit**
17:4,9 29:9
37:4,10,17
39:24 40:9,
21 45:10,23
52:22 53:6
56:16,23
58:2,16,21
59:5 62:21
63:6,14,24
64:2 71:11

78:4,6,15,21
79:3 80:20
83:25 84:10
86:24 87:11
92:7,17,24
105:4,10,15
106:17
111:7,11,16,
17 118:3,13,
16,21 119:4
**exhibited**
29:8
**existed**
13:8 41:16
119:12 120:3
**exists**
27:23
**expect**
77:12 120:22
**expectation**
22:15,20,21
25:17,20,24
26:7,8,10,
13,19 34:2,
7,12 35:6
67:8 71:15
72:10 102:21
123:6 124:25
**expectations**
15:10 38:7
103:15
**expected**
21:4 34:21
**expecting**
41:4 93:18
126:11
**expedite**
129:11
**expedited**
129:8
**experience**
14:5 28:23
31:18 120:2
**explain**
12:23 13:6
15:5 19:3
20:6 38:2,17

41:14 58:6
64:13 81:8
88:16 89:4
112:10
**explained**
60:22
**explanation**
101:19
**express**
44:13
**extended**
36:23 58:17,
19 74:18
75:2,6
97:15,23
98:10 126:2
**extensive**
27:24
**extent**
21:11 24:3
28:9 29:14,
15,16 30:5
31:7 35:2
41:14 44:9
46:3 47:23
52:9 55:7
83:8 88:16
89:7,9 90:10
92:1 114:4,
10 120:12

---

**F**

**face**
43:9 72:23
98:20
**facilitate**
41:25
**fact**
37:2 62:14
67:15 72:25
73:22 81:15
95:13,24
109:15
**factor**
73:14,22,24
74:11,17

98:7
**factors**
73:9
**facts**
31:7 121:8
**factual**
114:11
**failure**
98:7
**fair**
12:5 47:21
51:5 61:14
65:4 68:19
97:20 125:5
**faith**
34:15 103:15
**faithful**
28:18
**familiar**
15:24 27:8
**familiarity**
119:9
**February**
11:21 18:20
82:24,25
**federal**
11:19 116:9
128:19
**feel**
57:3
**felt**
73:5
**female**
126:7,25
**file**
105:5,6
106:8,18
**fill**
13:11
**finally**
45:6
**find**
44:21,24
**fine**
24:17 61:11
**finish**
6:18 23:3

47:13 55:20
57:2
**finished**
57:4
**first**
5:3 10:20,24
15:19 16:23
24:18 36:17
38:11 40:18
41:4,10
42:13,14,22
43:5,22
45:9,22,24
46:8,18
47:19 48:8
49:8 53:24
54:21 68:12
72:20 73:12,
13 76:17
85:4 93:14,
18 94:15
95:8 98:17
108:10
112:23
113:16 116:7
121:10
124:24
125:11
**fit**
90:19 91:4
**fits**
127:16
**five**
50:13 55:21
56:2 57:10
100:8 128:5
**five-minute**
128:4
**folks**
95:16
**follow**
67:2 80:13
**followed**
28:6 29:11
121:18,25
**following**
50:19 83:17
98:25 106:25

128:10
**follows**
5:5 105:16
**force**
110:9
**foremost**
41:10 53:24
54:21 68:12
**form**
13:20,22
27:19 42:18
43:13 44:8
45:15 46:3
47:2 48:24
49:10 50:25
51:8,9 61:9,
20 64:15
68:22 69:19
70:14,21
72:8,18
73:16 74:20
75:18 80:8
81:24 90:9
91:5 95:4,19
96:6,13
97:2,25
98:12 99:17
100:2 101:22
102:9,19
107:25
108:8,19
109:3,23
110:18
113:13 114:3
117:20
119:19
121:20
122:10
123:19
124:10,22
125:8,19
126:4,16
127:6
**formal**
28:6 29:11
30:2,14
**formed**
48:14 49:19

50:23 51:6,
11
**formulate**
46:19 48:8
49:8
**forward**
16:4,7 24:14
**found**
45:2
**foundation**
29:16 33:3
114:5 119:20
121:21
122:11
**fourth**
64:8 65:23
66:13 67:23,
24
**frame**
77:14
**frankly**
114:5
**freedom**
116:7
**Freiberg**
4:1 5:1,8,13
6:1 7:1 8:1
9:1 10:1,4,9
11:1,8,14,24
12:1,22 13:1
14:1,4 15:1
16:1,4 17:1,
11 18:1
19:1,16,21
20:1,13,25
21:1 22:1
23:1,2 24:1
25:1,4,25
26:1 27:1
28:1 29:1
30:1,8,25
31:1 32:1
33:1 34:1
35:1 36:1,15
37:1,3,15
38:1,14
39:1,14
40:1,4,13,21

41:1 42:1
43:1,23 44:1
45:1,9,22
46:1 47:1,15
48:1 49:1
50:1,22
51:1,14 52:1
53:1,22
54:1,5,21
55:1 56:1
57:1 58:1,
20,25 59:1,
8,13 60:1
61:1 62:1
63:1,11
64:1,12
65:1,8 66:1,
9,21 67:1,23
68:1,10 69:1
70:1,24 71:1
72:1 73:1
74:1,23
75:1,15 76:1
77:1,24
78:1,5,25
79:1 80:1
81:1 82:1
83:1,3 84:1,
15 85:1,20
86:1,12,17,
23 87:1 88:1
89:1 90:1,5
91:1,18
92:1,6,22
93:1 94:1,22
95:1 96:1
97:1,18 98:1
99:1 100:1,
14,18 101:1
102:1 103:1
104:1 105:1
106:1,6,15,
24 107:1,15
108:1,21
109:1 110:1,
2 111:1,21
112:1,5
113:1 114:1,
7,25 115:1

116:1,16
117:1,5
118:1,2,15
119:1,2
120:1 121:1,
18 122:1,18
123:1 124:1
125:1 126:1
127:1,19,23
128:1,13
129:1,19
**frequently**
11:25
**Friday**
94:21 95:21,
23 96:3,19,
25
**front**
7:11,15
17:17
**full**
30:20 53:25
68:17 74:8
88:8
**function**
7:22 35:19
36:3 114:15
**functions**
13:3,16 14:3
19:4,25
30:20 31:4
32:9
**future**
97:16 115:21

---

**G**

---

**gay**
45:13 103:6,
18 113:25
123:10,14
124:2,6,15
**GCHAT**
7:21
**gender**
124:16

**general**
52:8 119:10
**generally**
12:13 16:24
51:20 64:20
**getting**
94:20 95:2,
15
**gist**
102:5
**give**
9:2 17:19
76:12 85:17
94:8 96:4
99:4 101:19,
20
**given**
6:24 17:20
37:12 42:16
53:8 63:8
65:18 87:13
92:19 111:24
118:23
**glorifying**
113:19
**goal**
5:24
**God**
109:9 113:19
**going**
5:21 13:20,
22 16:4,5,7
17:3 21:7,21
23:25 24:13,
14 26:15
28:8,25
29:13 30:4
31:5 32:25
41:2 42:18
45:15 46:2
47:2,22
48:5,10
49:10 61:8
72:7 73:15
74:10 75:25
80:7,16
83:21 88:22
89:19 95:18

106:12
109:22,23
110:16,18
114:3 117:13
122:9 124:21
127:6 128:20
**good**
4:3 5:13
90:19 91:3
128:7
**goodbye**
105:2
**gospel**
32:19 113:6
**grace**
33:15
**granted**
95:22
**granting**
30:15
**great**
94:20
**greater**
44:5
**ground**
5:14
**group**
22:8 44:17
**guarantee**
116:10
**guaranteed**
116:7
**guess**
31:17 79:6
89:11 121:22
**guidance**
27:18 77:8
128:3
**guide**
21:20
**guidebook**
27:16
**guiding**
22:2

---

**H**

---

**half**
66:18
**hammer**
89:22
**happened**
15:19 99:6,
8,10,14
**happy**
24:16 104:3
**head**
6:15 52:20
**heading**
66:23 116:2
120:14,18
**healing**
33:24
**hear**
16:11 106:6
**heard**
68:18 97:13
98:7 106:10
**held**
11:12 33:14
64:11 75:14
83:14 105:13
106:14 129:6
**help**
14:20 21:13
22:2 31:23
41:25
**helpful**
24:15
**heterosexual**
117:25
**Hey**
41:3 94:19
**hierarchy**
35:23
**hire/fire**
39:11
**hired**
38:23
**hiring**
13:11 41:19,

23 119:9,11,
23 121:19
**hit**
12:14
**hold**
82:10
**holding**
12:24
**home**
11:22 12:4,
21
**honest**
79:22 110:21
**honor**
121:3
**hopeful**
129:2
**hours**
116:4
**housekeeping**
83:19 128:18
**HR**
10:25 11:6,
10,16 12:25
13:5,18
120:2
**human**
25:22 75:10
82:13
**hypotheticals**
127:9

---

**I**

---

**identificatio
n**
4:25 17:9
37:10 40:9
53:6 59:5
63:6 78:15
87:11 92:17
105:10
111:11
118:21
**identified**
45:19

**identify**
7:9
**II**
66:23 67:5
**IMG**
105:6
**IMG_5098**
105:9
**impact**
95:15
**impair**
8:20
**important**
71:14
**importantly**
113:6
**inability**
73:12 109:18
110:4
**incapable**
114:2
**inclination**
42:14,22
**include**
7:20 14:24
30:22 35:16
52:7 68:4
**included**
9:11,22 15:6
52:3 101:7
**includes**
14:21 56:19
88:9 116:13
117:11
**including**
33:2 101:17
116:9,21
**inconsistenci
es**
121:16
**inconsistency**
72:16
**inconsistent**
72:5 73:25
120:11
**Incorporated**
5:17 12:7

13:19 14:9,
18 16:14,17,
23 18:11,14
21:6 28:5
31:3 32:8,
18,23 34:4,
14,23 36:19,
24 38:19
39:16,21
41:17 61:17
74:19 75:7,
17 82:19,22
83:10 91:20
95:16 97:23
98:11 107:22
108:5 109:2
112:15,19
113:12,25
116:19
119:10,12,17
120:5 122:4,
7 123:17
124:8 126:3
127:3,4
**Incorporated'**
**s**
  108:23
**Incorporation**
  125:17
**indeed**
  44:22 84:4
97:24
**indicate**
  4:19
**indicated**
  73:4 81:15
**indication**
  78:18
**individual**
  7:19 19:11
31:16 61:15
69:13 70:10
124:11
**individuals**
  61:16 119:15
121:6 122:5
**influence**
  8:16,19

28:15
**inform**
  7:15
**information**
  9:12 43:16
56:13 79:9,
12,21 89:8
90:11 110:8
**initially**
  83:21 91:20,
24 104:25
117:8
**initiate**
  26:11
**initiated**
  79:15
**instant**
  7:20
**instruction**
  27:16 34:24
**intended**
  44:13,20
58:10 68:16
69:5,8 81:14
100:25
**intent**
  46:6
**interest**
  22:23
**internally**
  16:19
**interpose**
  54:3
**interpretatio**
**n**
  122:8
**interrupt**
  85:2
**interview**
  52:16 59:20,
22 60:7
63:24 67:7
72:4 73:25
97:12
**interviews**
  13:13 41:24,
25 94:8

**introduced**
  104:24
**invitation**
  80:5,20,25
**involve**
  52:7
**involved**
  89:15 95:2
**involvement**
  121:5
**involving**
  74:25 121:16
**irrespective**
  69:14 79:18
**issue**
  72:3,4,9

---

**J**

**January**
  9:24 11:17,
24 13:2,8,
18,24 14:6,
15 19:5
20:25 27:5
28:3 30:25
32:9,18,23
34:4,20
35:23 36:21
38:18 39:2,
4,10,16
40:20,23
41:12,17
44:25 45:3,6
49:15 51:3,
12,15 53:20
54:7,9,16
55:24 56:19,
21 57:5,9
62:2,7,13
64:5 71:2
72:5 74:2,24
75:22,23
76:4 77:13
79:7,8
81:12,22,23
82:8,14

85:21 86:5,
10,18 88:3,
11,20 90:18
91:13 93:15,
21 94:2,17,
25 95:9 96:2
97:8,15,21
98:25 111:5
112:20
113:10,24
116:17
117:17
119:12,18
120:5
123:11,17
124:9 126:2
**Jesus**
  19:14 32:19
33:20,23,24
113:6,20
115:18
**job**
  9:12 11:14
15:21 18:8,9
21:5,17
22:13 32:16
38:6 41:16
74:12,18,25
75:16 83:23
91:19 97:14,
22 109:21
110:15
116:13
**join**
  79:14 80:20
**joined**
  22:24
**judge**
  8:7

---

**K**

**keep**
  24:13,14
31:15 127:8
**Key**
  66:24

kind
  22:6 25:2
  30:2 31:22
  44:16 70:2
  77:5 85:17
  96:16 101:20
kindly
  7:8,17 44:15
knew
  46:12
know
  14:21 15:3,
  25 17:12
  19:6 20:14,
  17,20,21,22,
  23 22:19,22
  24:12 26:12
  27:11,15,23,
  24 28:2
  30:16,24
  33:21 35:25
  36:10,12
  37:2 40:5
  41:15 44:12,
  19 51:20
  53:2 55:7,21
  58:14 59:2
  60:9,11 62:8
  63:2 64:23
  65:8 67:5,19
  68:12,25
  71:14 75:4
  76:19 77:8
  78:11 83:8
  87:7 91:18
  92:2,10
  98:21 99:16
  100:23
  101:24
  103:5,17
  104:14 109:8
  110:3 111:22
  115:11,16,
  17,20 117:24
  118:17 120:3
  127:25
  128:23

knowing
  67:11
knowledge
  14:4 27:3
  28:23 39:13
  56:3 65:17
  82:19 96:17
  98:21
  100:12,15
  113:10,24
  114:11
  116:17
  117:17
  119:25

---

**L**

---

lack
  33:2 109:19
lasted
  55:25 57:9
  77:16
latest
  39:17
latitude
  127:8
law
  116:6
lawsuit
  5:16,19
lead
  21:3,14,15,
  19 22:5,8,
  10,13,14,17,
  20,23 23:21
  25:15,16
  26:3,14
  127:12
leading
  22:9,21
  23:13 25:21
  26:22 35:15
leads
  25:22
learn
  36:17,22
  50:23 51:7,

12 104:17,19
learned
  15:3 36:20
  67:19
learning
  15:21,23
led
  22:25 23:11
legal
  4:4 14:21
  21:9 24:4
  28:9 29:14
  30:6 31:8
  35:3 52:3,7
  104:12 114:4
legally
  103:8
legitimate
  24:9
length
  106:19
lesbian
  45:13
letter
  37:25 38:3,
  9,13,16
  39:19
level
  57:20
LGBTQ
  45:12,20,25
  46:10,20,25
  47:21 48:9
  49:9,20
  50:5,8,24
  51:7 57:23
  74:17 108:6
  122:5,23
lieu
  4:12
life
  6:21 32:2
  33:22
  113:17,18
life-changing
  113:21

lifestyle
  114:2
light
  84:2 116:16
likelihood
  43:6 44:3
limit
  44:15
limited
  24:25
limits
  39:11
line
  81:4 121:25
  122:13
lines
  101:25 103:9
listen
  9:16,18
  84:22
litigation
  40:3 58:24
  62:24 78:9
  87:5 92:12
  111:20 118:6
little
  18:16 31:12,
  20 47:16
  57:16 93:9
  110:10 117:2
lives
  31:17 113:8,
  20 121:6,8
located
  11:18,19
  68:13
long
  36:11 55:16,
  18 69:21
  73:5 74:7
  77:15 100:6
  122:24
  124:12
look
  121:5
looked
  122:25

looking
  18:17 45:18,
  19,20 70:24
lot
  101:11
love
  33:25 113:19
  115:18
low-level
  35:22
lower
  35:25
lunch
  84:16
luncheon
  83:15

——————————

          M

——————————

made
  39:15 69:5
  75:5,8,16,17
  104:14
  107:19,22
  108:4
make
  6:19,21 24:7
  67:20 74:7
  83:22 96:18
  104:10
maker
  75:21
making
  84:6
male
  125:15,24
  126:25
man
  68:8 69:6,11
  70:4,8 106:2
  107:11
  109:10
  117:15,24
  120:25
  123:4,22
  124:14
  125:4,21

126:6,20
man-woman
  124:20
manage
  33:8
management
  11:2,6,11,16
  12:25 13:18
manager
  41:23
managers
  13:11 41:19
manages
  25:19
mandatory
  32:21
manifesting
  28:18
manner
  4:18
manual
  27:17
March
  12:6,10,15,
  20 41:4
  93:18
marked
  17:3,8 37:4,
  9,17 39:23
  40:8 45:10,
  23 52:21
  53:5 58:21
  59:4 62:21
  63:5,13,23
  78:4,6,14,20
  79:2 86:24
  87:10,24
  92:7,16,23
  93:7 95:9
  105:4,9,15
  106:17
  111:6,10
  118:3,20
  119:3
marriage
  42:6,15
  43:7,24

44:5,22 45:8
  46:14 49:15
  51:4 57:11,
  18 61:18
  68:8,21
  69:6,9,11,14
  70:4,6,8,9,
  11 72:17
  74:13,14
  102:17,18,
  21,22 103:7,
  19 105:25
  107:10,24
  108:7,18,24
  109:9,12,13
  117:14,19
  120:25 122:6
  123:3,22,23,
  25 124:13,
  18,20 125:2,
  3,12
married
  44:4 94:20
  95:3,15
  123:14
  124:2,6
  125:16,21,25
  126:7
marry
  34:14 61:16
material
  50:6 110:4
materials
  27:16 121:17
mattered
  73:5
matters
  116:12 121:7
Matthew
  129:9
Mcfarland
  7:4 89:17
Mcmahon
  5:15,23 9:22
  15:25 16:5,
  7,8,13,22
  18:14,24
  36:18,24

39:15 40:23
  41:11 42:5,
  14,24 43:23
  45:7,11
  46:10,20
  48:9 49:9
  50:24 51:7,
  16,22 52:12,
  15,17 54:7,
  10,14,17,20
  55:13,25
  56:7,10,12,
  20 57:7,11,
  18,22 58:3,
  17 59:24
  60:16,20
  62:19 64:22
  65:10,12,18
  67:6,11,13,
  15 74:12,17
  75:2,7,17
  76:2,6,11
  77:2,8 81:3,
  12,19,23
  88:23,25
  89:14 90:6
  91:21,23
  92:4,5 93:12
  94:25 96:9,
  17,23 97:9,
  22 98:18,23
  99:2,20
  100:14,23
  101:14,15
  102:25
  106:24
  107:21
  108:5,22
  121:24
  125:15,21,24
  126:6,20,24
Mcmahon's
  66:5,11
  91:19 121:17
mean
  15:14 21:13
  23:19 61:4,5
  71:25 73:2

74:14 77:6
84:25 89:5
91:2,7
meaning
28:14 81:8,
10
means
21:15 26:22
33:14,23
61:7 89:11
123:2 128:19
meant
26:5 38:3,4
90:23
medication
8:20
meet
22:7
meeting
77:23 78:2
79:9 80:5
81:18,20
82:5
Melanie
5:8 60:7
100:14
106:24
129:19
member
22:7 23:12
120:2
members
22:18
mention
90:18 109:18
111:3
mentioned
15:13 80:14
mentions
42:16
Merriam-
webster
21:20,24
28:13,16,20
33:8

Merriam-
webster's
30:12 33:11
messaging
7:21 54:11
met
126:9
method
28:22
middle
71:13 113:5
minister
31:4 32:10
ministering
32:2
ministry
32:4
minute
40:5 66:7
minutes
50:12,13
55:21,22
56:2 57:10
77:17 100:9
128:5
Miolla
38:13,15,18
40:23 41:12
42:24 52:11,
14 54:7,8,
13,15 55:24
56:17,22
57:6,8,22
59:19,22,25
60:6,11
61:25 64:5
65:11 66:14
67:10 71:2,
10,23 74:2
77:22 79:10
80:3,15
85:23 86:20
88:4,12,20
92:5 93:12,
16,25 94:18
95:25 96:23
97:9,22
100:14

101:14
104:21
121:24
Miolla's
63:25
mischaracteri
zes
47:23
misrepresenta
tion
109:24
misrepresenti
ng
110:17,22
mission
19:12 31:24,
25
misstates
47:23 81:25
misunderstand
55:9
moment
21:18 35:9
50:16 52:25
66:2 76:12
77:3 78:10
79:25 106:13
112:25
Monday
97:15
month
11:24 13:23
15:14
Montreal
10:13
morning
99:7,9
move
41:23
moved
106:17
MP3
105:5 106:18
multiple
45:6 73:19
98:15,18
108:10

N

name
4:3,20,23
5:7,13 15:25
23:6 38:13
75:11 105:6
113:22
names
100:11
nature
33:24 52:8
necessarily
6:16 61:16
need
50:14 60:9
93:8 96:11
114:8
needed
29:4 41:22
62:17 95:17
96:24
needs
20:3 27:2
127:13
nicely
127:17
non-christian
113:11
non-e-mail
54:16
non-
privileged
82:4
nonparty
5:2
nonresponsive
ness
110:14
Notary
5:4 129:25
noted
4:2 17:23
37:14 50:20
53:10 63:10
87:15 92:21

112:3 118:25
128:11
**notice**
87:23
**noticed**
83:19
**notified**
97:22
**noun**
30:13
**number**
17:4 20:7
26:25 31:15
37:4,18
39:24 45:11,
24 51:14,21,
24 52:22
55:21 56:23
58:2,21
62:21 63:14,
24 68:6
71:12 73:9
78:4,6,21
79:3 84:9,10
86:24 92:7,
24 115:25
116:8,22,24
117:11 119:4
**numbers**
19:22 37:5
78:7 92:8
111:15,17

—————————

O

—————————

**oath**
4:13,14 8:2,
5,6,9
**object**
13:20,22
21:7 23:25
26:15 28:8
29:13 30:4
31:5 32:25
34:16,25
42:18 43:13
45:15 46:2

47:2,22
48:10 49:10
50:25 61:8
72:7 73:15
80:7 89:7
95:18 100:2
109:22,23
110:16,18
114:3 122:9
124:21 127:6
**objecting**
24:14,25
**objection**
27:19 44:8
51:8 61:20
68:22 69:19
70:14,21
72:18 74:20
75:18 81:24
89:21 90:9
91:5 95:4
96:6,13
97:2,25
98:12 99:17
101:22
102:9,19
107:25
108:8,19
109:3 113:13
114:14
117:20
119:19
121:20
123:18
124:10
125:8,19
126:4,16
**objections**
4:17 24:23
25:2,12
29:2,22
32:12 35:12
49:25 115:9
**obligatory**
22:12 23:16
**observations**
14:5

**obviously**
29:2,22
**occur**
69:9
**occurred**
12:12 56:24
57:5 77:12
91:16,17
**occurs**
22:22 109:11
123:2,23
125:2
**off-**
126:13
**offer**
36:23 37:25
38:3,4
39:14,20,22
58:17,19
72:15,19,24
73:9 74:12,
18,25 75:6,
9,16,24 90:7
91:19 96:19
97:14,22
98:9,17,24
103:5,6,18
107:2,22
108:4,9
109:21
110:7,15
125:25
126:13,19
**offer's**
105:18
**offering**
75:13 88:21
**offers**
13:14 42:2
**office**
11:17,20,25
**official**
39:14
**okay**
6:6,22 12:17
13:25 16:25
17:13 20:13,

21 25:10,14
40:13 43:19
44:19 50:4,
15 53:21,23
55:9 61:10,
12,15 65:21
70:16 71:6,9
73:6 76:23
77:10 78:3,
19 79:15
82:4 83:12
84:25 86:25
88:7 91:18
92:22 101:11
102:2 105:20
106:5 107:6,
13 111:23
112:4 114:13
117:16
122:20
128:12
129:14
**on-boarding**
14:19,23,25
15:13,16,18
**once**
17:12 40:5
53:2 59:2
63:2 78:11
87:7 92:10
110:7 111:22
118:17
**one**
17:19 20:19
21:18 27:23
28:22,23
36:9 41:7
54:12 59:10
61:18 68:6
73:14 76:9,
12 79:13
87:24 98:16
107:21
128:25
**one's**
120:19
**oneself**
61:6,7

Melanie Freiberg
February 16, 2023

onset
  15:17
open
  13:11 41:20
opening
  62:9
opinion
  29:15,21
  31:8 102:8
opinions
  44:18
opportune
  26:7
opportunity
  17:21 37:12
  47:18 53:8
  63:8 87:13
  92:19 111:25
  118:23 119:2
  121:13
opposed
  12:2 23:21,
  24 74:4
  79:23
opposing
  84:4 89:23
  128:24
opposite
  124:3,7,16
orange
  64:13,16
  65:15 66:14
ordained
  33:13 109:9
ordinarily
  128:23
organization
  15:7 19:11
  20:11 71:16
  73:6 102:3
  103:14
organization'
s
  31:23
organizing
  23:13

orientation
  117:22
  120:15,20,
  22,23 123:7
outline
  27:17
outside
  24:15 68:7
  69:9,14 70:3
  76:8 105:24
  107:10 116:3
  117:14,18,23
  120:25
oversaw
  39:2
oversee
  14:2

_____

        P

p.m.
  4:2 17:23
  37:14 40:24
  50:20 53:10
  63:10 83:16
  87:15 92:21
  94:2,9,18
  95:10 96:3,
  18,25 97:8,
  21 99:15
  100:5 112:3
  118:25
  128:11
  129:15,17
page
  19:17 38:11
  59:10 65:24
  66:13,17,22
  71:11 87:24
  93:7,15
  94:15 97:7
  112:23
  115:23
  116:24
  120:14
pages
  64:8

pandemic
  11:23 12:3,
  8,9
papers
  7:10
paragraph
  112:23
  113:4,16
part
  13:17 15:12
  21:5 22:9,13
  23:12 24:8,9
  26:8 29:25
  35:5,7 38:25
  58:2 75:20
  84:9 103:4
  118:11
  124:24
participant
  23:24 26:23
  74:24 77:20
  85:21 86:19
participants
  100:11,13
  104:23
participate
  22:16 35:15
  88:13
participated
  104:8
participating
  4:7 35:16
particular
  15:22 64:19
  68:7
parties
  4:16
partner
  38:21 41:19
partners
  13:5
parts
  12:12
pass
  30:19
passes
  30:18

pause
  68:8,13
  76:14
pausing
  57:3
pay
  36:2 38:6
  128:25
  129:10
penalty
  4:14
pending
  6:10
people
  34:14 36:14
  55:6 79:14
  104:8
  106:21,23
  113:25
  115:16,18
  117:21,25
per-
  35:19
percent
  44:6
percentage
  44:11
perform
  14:20 19:15
  20:4,8
  30:15,20
  34:4,23
  36:14
performed
  14:3
performing
  14:22
period
  30:22 36:11
  38:24
perjury
  4:15
person
  4:13 7:9
  8:14 12:24
  15:24 16:6
  19:9 25:22

Melanie Freiberg
February 16, 2023

28:3 30:18
31:2 32:7,21
34:21 46:24
54:11 65:8
75:4,8
113:19
123:15
124:14,19
**personal**
29:20
**personally**
5:18 75:15
**Personify**
31:24
**persons**
21:24 65:9
75:5
**phase**
40:3 52:24
58:23 62:24
78:9 87:5
92:12 111:19
118:6
**phone**
42:23 43:17
52:16 55:25
56:11,14,17
57:8,14,19,
21 59:20,22
60:2,7,18,20
61:24 63:21,
24 72:4,11
73:25 74:5
81:11 94:7
96:18 100:11
102:12
104:6,15,18
**physically**
4:9 11:18
12:2
**piece**
36:9
**pieces**
69:8
**place**
5:10 15:12
58:16 76:21
77:11 91:12

99:4
**plaintiff**
5:15
**Plaintiff's**
17:4,8 29:8
37:4,9,17
39:24 40:9,
21 45:10,23
52:22 53:5
56:16,23
58:2,16,21
59:5 62:21
63:5,13,23
64:2 71:11
78:4,6,14,21
79:3 80:19
83:25 84:10
86:24 87:10
92:7,16,24
105:4,10,15
106:17
111:7,10,16
118:3,12,16,
20 119:4
**planning**
77:7
**platform**
7:12
**play**
75:15
**played**
105:15
106:16
107:17
109:17
110:12
**please**
4:19,21 5:7,
25 6:10,14,
18 7:9,14
9:8,19 12:22
13:6 15:5
17:11,14
19:19 20:6,
21 23:8
24:18 25:5
35:7 38:2,17
40:4 41:14

47:10 48:20
49:22 52:7,
25 56:4
58:6,25
59:18 60:15
62:25 76:23
78:10 82:9
87:6 88:16
92:9 100:10,
18 101:13
110:23
111:15,21
114:9,13,15
115:2,4
116:25
118:15
127:20,24
**point**
7:14 14:8,17
36:22 49:3,7
50:11,14,22
51:5 69:2
70:2 74:10,
23 75:22
79:7 85:20
86:17 88:11
94:21,24
117:13,18
**points**
66:24 67:2,5
89:13 117:11
**policies**
14:22
**policy**
112:13
124:17
**poor**
33:25 113:22
**portion**
9:23 76:15
104:18
107:16 113:4
**posing**
127:9
**position**
10:23,25
11:3 16:16,
18,24 18:9,

13 19:2,6,7,
15 21:2 28:4
29:5 31:2,11
32:22 34:21
35:20,22,24
36:12,25
38:20 65:3
82:9 113:25
115:15
119:16 120:4
**positions**
11:12 13:12
36:2 41:20
82:10 116:19
**possibility**
46:9 47:20
48:4
**possible**
23:12 60:4
102:15,20
**possibly**
57:11 105:2
**post**
13:12 41:20
**posting**
18:8,9,23,24
29:7 41:21
83:23
**potential**
69:5 121:9
**power**
33:23 39:9
**practice**
88:23 122:22
**practices**
119:9,11,23
121:19
**pray**
19:13 20:3
26:7,21 27:2
88:23
**prayer**
22:10,14
25:15 26:3,
6,11,14,23,
24 27:6
33:24 35:18

84:9

**preclude**
61:17
109:13,15
122:23

**precludes**
123:8

**preemployment**
120:19

**prefer**
20:18

**preparation**
9:6,9,17
10:2 62:18

**preparing**
62:16

**presence**
24:15

**present**
4:9 13:14
24:7 41:24,
25 55:6
67:10

**presented**
118:16

**president**
75:10 82:13

**preventing**
14:24

**previous**
25:8 35:10
48:22 49:23
69:23 76:15
77:3 85:10,
25 86:7
115:6

**previously**
7:25 26:2
108:14

**primarily**
11:18,21,22
12:4,6,21

**primary**
12:23 13:3

**prior**
51:12 81:25
122:10,13

**privacy**
121:3

**private**
113:7 121:6

**privates**
121:7

**privilege**
85:4 89:3,5,
12,21 90:3

**privileged**
76:8,18,19,
21 89:8

**probably**
12:11

**problem**
6:6 96:3

**proceeding**
76:14

**process**
15:13 28:7,
22 29:11
30:3 41:21
120:20

**proclaim**
32:18

**proclaiming**
33:23

**produce**
105:3

**production**
53:25 83:22
84:7 88:8
89:20

**professional**
41:16 129:3

**program**
15:22 27:9,
25 36:10

**prohibition**
124:18

**promptness**
109:19

**proportionate**
127:13

**prospective**
42:2 68:21

**protected**
90:2

**protection**
89:12

**provide**
8:24 20:11

**provided**
37:16

**providing**
121:13 129:2

**Public**
5:4 129:25

**pulled**
105:19 107:5

**purchasing**
128:23

**purpose**
34:24

**pursuant**
33:8

**put**
17:17 18:22
54:2 84:3,
10,12 88:7,
10 89:23

---

**Q**

**qualified**
115:13

**qualify**
41:5

**queer**
45:14

**question**
5:25 6:3,5,
6,10,19
14:15 20:9
21:8 24:2,19
25:5,8
29:19,25
30:7,17 31:6
34:11 35:6,
9,10 38:10
40:25 41:3
42:7 43:20
44:14 47:9,

11 48:19,21,
22 49:19,22,
23 57:16
60:24 69:23
70:2 71:13,
19 73:3,23
76:17 80:10
85:4,5,6,9,
10,25 86:7,
13 91:22
101:7 104:5
106:16
109:25
110:10,25
114:6,8,23,
24 115:6,10
120:6 122:17
126:8
127:11,20,24
128:2

**questioning**
24:12 45:14
122:14

**questions**
5:22 6:25
8:13,21
20:19 33:17
53:21 64:13,
17,22,24,25
65:2,4,10,
12,19 66:13
77:5 81:17
94:6 103:4,
9,11,12
104:4 120:19
128:13

**quick**
40:24 41:3

---

**R**

**Ratigan**
4:4 35:8

**Ratner**
47:11 48:21
49:21 65:25
66:16 85:9
93:9 117:2

re-
  72:11
reach
  43:17 98:18
  108:11,12
  109:19
reached
  73:13
read
  25:6,9 33:21
  35:9,11
  40:12 41:2
  42:13 43:5,
  12,22 45:9,
  22,24 46:23
  47:10,19
  48:20,23
  49:8,22,24
  67:6,9,12,
  15,24 69:22,
  24 76:16
  81:3 85:8,11
  86:2,8
  101:6,9,16
  106:19 112:4
  115:7 117:4,
  6,8 120:10,
  17 122:2
reader
  68:16
reading
  43:4 46:8,18
  48:7
reads
  40:25 68:7
  71:13 113:17
ready
  88:24
reality
  28:19 33:16
realize
  57:3
reason
  8:23 98:16
  107:21
  108:7,9,16
  109:20
  110:14

reasons
  72:20 98:15
  108:10
recall
  16:16 44:4
  57:20 62:4,
  6,12 65:13
  77:15 79:19
  82:5,21 88:5
  89:15 99:4,5
  100:10
recalling
  52:19 85:24
receive
  10:15 27:5
  51:23 77:5
received
  14:9,13,19,
  23 15:2
  45:4,5
  51:14,21
  52:10,11
  54:14,24
  55:13 56:7
  57:7 64:4
receiving
  77:8 88:5
recess
  50:18 83:15
  128:9
recipient
  26:24
reciprocated
  129:3
recognize
  18:3 37:20
  40:13 53:14
  59:13 63:16
  78:19,25
  87:19 93:4,5
  106:8 112:5
recognizes
  70:9
recollection
  13:9 15:15
  39:13 40:19
  54:18 56:11

57:24 58:14
  59:21 62:8
  65:17 76:20
  91:11 98:6
  99:13,24
  100:16,21
  103:10
record
  4:20 5:7,9
  6:20 7:19
  18:19 50:16
  64:10,11
  67:25 75:14
  83:13,14
  84:13 88:8
  89:6 90:2
  104:13,16
  105:12,13
  106:13,14
  110:24
  118:12
  120:17
  128:6,16
  129:6,15
recorded
  104:18,19
recording
  9:18,20,21
  104:10,15
  106:22
  107:18,21
  108:3 110:12
recordings
  9:16
recruiter
  38:22 65:11
  121:23
recruiters
  67:9
recruiting
  63:22
recruitment
  121:23
refer
  16:6 71:5
  81:14
reference
  58:10

referenced
  16:19 60:12
  63:24
referencing
  101:16
referred
  71:24
referring
  56:18,21
  86:14 112:14
reflect
  62:15 119:11
refresh
  98:6
refusing
  23:21
regard
  117:18
  119:15
regarded
  81:23
regarding
  14:10,11,13
  54:7 55:12
  81:11
regularly
  21:4
related
  30:13 71:11
  76:25 101:21
  108:24
  113:11
  121:16
relates
  52:6 66:22
  84:8 102:17,
  24 124:17
relating
  28:17 54:9,
  17 79:9 80:3
  85:23 86:20
  98:23
relationship
  105:21 107:7
relative
  36:2

Melanie Freiberg
February 16, 2023

relevant
  50:5 127:15,
  18,21
relied
  98:19
religion
  21:25
religious
  15:2,4,7,8,
  9,11 21:5
  28:6,10,17
  29:10,24
  30:23 34:23,
  24 35:19
  103:14
  116:7,10,12,
  15
remain
  120:25
remained
  110:9
remains
  124:12,13
remember
  52:9 55:8,17
  56:5,8 74:9
  76:9,24
  86:22 88:17
  100:19
  103:3,4
  104:2,3,7
remembered
  79:23
remind
  121:22
remotely
  4:11,14 6:25
  11:22 12:2,7
renew
  25:11 28:25
  32:11 35:12
  49:25
repeat
  35:5 66:8
  85:7 115:8
rephrase
  6:2 124:5

replies
  99:21
reporter
  4:3,5 5:6
  6:16 8:2
  17:10 18:15,
  18 19:20
  25:9 31:14,
  21 35:11
  37:11 40:11
  48:23 49:24
  53:7 59:7
  63:7 66:3,20
  69:24 71:7
  76:16 78:16
  85:11 86:2,8
  87:12 92:18
  93:10 94:16
  111:13 113:2
  115:7,24
  117:3 118:22
  120:16
  128:17
  129:14
reporter's
  6:21
reporting
  4:10,18
represent
  5:15 16:5
  19:9 39:25
  53:18 87:3
  92:11 106:15
  111:18 113:5
representative
  16:20 18:10
  19:5 20:2
  21:3 26:11,
  14,20 28:4
  30:11 31:3
  32:8,17,22
  34:3,11,13,
  22 35:21
  36:25 65:6
  119:17 120:4

representativ
es
  26:3 27:4
  29:8
represented
  95:13
request
  60:4,5 84:6
  90:4 129:7
requests
  64:14,22
  65:19,23
require
  15:8 26:6
  28:5 29:23
  30:2 103:14
required
  25:17 28:23
  36:14 112:19
  115:14
  126:12
requirement
  25:14 29:10
  32:16 35:14
requirements
  29:5 38:7
  121:25
requires
  120:24
reread
  101:3,4
  115:2,4
rescind
  74:12,18
  75:6,9,16,24
  98:9
rescinded
  72:14,15,19,
  24 73:10
  96:20 97:24
  103:5,6,18
  107:23
  108:5,9
  110:7 126:3,
  14,19
rescinding
  97:14 98:16

rescission
  74:25 90:6
  91:19,22
  98:24 109:21
  110:5,15
resolve
  97:13
resources
  25:22 75:10
  82:13
respect
  5:16 13:16
  20:7 26:25
  27:7 29:7
  33:10 51:16,
  22 64:19,21
  65:5,22
  66:13 67:4
  83:22 84:7
  99:3 113:9,
  23 121:15
  129:4
respond
  84:24 90:4
  103:12
  114:23
responded
  42:24 46:12
  58:11 71:20
  72:11 93:25
  107:4 126:7
responding
  109:19
responds
  107:13 116:5
response
  44:16 54:22
  61:2 64:15,
  18 71:21
  77:3 95:20,
  24 96:8
  101:9,17,24
  102:6,7
  121:9
responses
  56:14 60:8,
  17 62:17
  65:16,18

66:11 71:4
72:5 73:3,24
97:12
**responsibilit
ies**
12:24 13:7
14:2 19:4
21:6 41:15
**responsibilit
y**
13:4 22:6
39:12
**responsible**
13:11 19:8
**restate**
48:13
**result**
15:3 95:6
**retired**
83:11
**returning**
85:17
**revealed**
74:13
**review**
9:5,7 17:11,
13,21,24
37:12,16
40:5 52:25
53:8,11
58:25 61:24
62:16,17,25
63:8,12
70:23 78:10
87:6,13,16
88:22 92:9,
10,19,23
111:21,25
118:15,23
119:3
**reviewed**
9:9,10,12
54:20 62:6,
12 73:2,4
78:18 98:5
119:8
**reviewing**

53:2 59:9
85:23 86:20
88:14
**right**
17:15 33:12
64:24 71:16
80:17 104:5
116:2,11,13
126:22
**rights**
15:3 116:9
**Ringcentral**
77:23,25
79:9,16,20
80:21 91:12
**role**
11:7 13:3,17
14:20,22
22:5 25:15
27:22 29:4
30:21 33:19
36:4,14
38:18 39:12
41:18 75:16
115:19
**role-playing**
76:10,25
**roles**
13:12
**room**
4:9 7:3,7
**rotate**
25:23
**routine**
8:14
**Rule**
127:10,21
**rules**
5:15 24:24
25:3
**run**
81:4,9,10,
17,20 91:11,
17

---

### S

**sacraments**
32:24 33:10
**sake**
66:12
**salaries**
42:2
**same-sex**
42:6,15
43:7,24
44:5,22 45:8
46:14 49:15
51:4 57:11,
18 61:15,18
69:15 70:6,
10 72:16
74:13,14
102:17,18,20
103:7,19
105:21
107:7,24
108:6,18,24
109:13
117:19
120:21 122:6
123:24
124:18
**satisfactory**
102:7,11
**saying**
23:9
**says**
31:15,23
117:22
119:23
127:21
**scale**
36:2
**scenario**
126:20
**scheduled**
94:8
**Scott**
4:23

**screen**
7:12,16
13:13 17:13,
17 41:22
42:23 43:17
52:16 56:12,
14 57:15
60:2,18,20
61:24 63:21
66:19 72:11
74:5 102:12
**screening**
67:7
**script**
80:3,11 81:2
85:23 86:21
88:14,22
89:2,16 90:7
101:3,17
**scroll**
18:16 19:19
31:12,19
66:2,17 71:6
93:8 94:14
112:25 117:2
**season**
15:14
**second**
17:17,19
19:17 66:18
68:5,6 74:10
84:6 87:24
93:6,15
94:11 108:11
112:23 113:4
115:23
120:14
**seconds**
106:18
**section**
60:8,9,13,18
66:23,25
67:5 71:3,4,
8 101:3,4,
16,20
116:16,18
117:4,11
121:18

Melanie Freiberg
February 16, 2023

| | | | |
|---|---|---|---|
| sections<br>64:13,14,17<br>see<br>17:16 19:23<br>41:5,8 54:5<br>66:25 68:10,<br>11 90:20<br>94:22,23<br>95:8 97:18,<br>19<br>seek<br>42:22 43:2<br>47:6<br>seeking<br>5:23 16:22<br>29:15 47:5<br>48:16,25<br>50:6,9 51:10<br>119:16 128:3<br>send<br>59:25<br>sender<br>38:12<br>sending<br>79:20<br>senior<br>11:5,6,11<br>75:9 82:12<br>sense<br>21:10 35:19<br>102:11<br>sensitive<br>20:2 27:2<br>sensitivity<br>121:12<br>sentence<br>31:22 35:7<br>57:3,4<br>68:13,17<br>69:21 113:9,<br>16,23 124:24<br>series<br>5:21<br>serve<br>21:22 113:22<br>115:18<br>123:15 | service<br>18:10 19:5<br>20:2 21:3<br>26:3,11,14<br>27:4 28:4<br>29:8 31:2<br>32:7,17,22<br>34:3,10,13,<br>22 35:21<br>36:25 65:5<br>119:17 120:4<br>services<br>16:20 20:10<br>21:5 22:8<br>23:5 26:20<br>30:11 119:24<br>serving<br>35:17 114:14<br>set<br>116:13<br>several<br>72:22 97:11<br>sex<br>123:15<br>124:3,7<br>sexual<br>68:7 69:9,14<br>70:3,5<br>105:24<br>107:10<br>109:11<br>117:13,18,<br>22,23<br>120:15,19<br>123:2,23<br>124:12,15,<br>18,25 125:2,<br>11,22<br>Shaking<br>6:14<br>shared<br>22:18 52:14,<br>16 54:13,19<br>56:6 57:6<br>sharing<br>35:18<br>she'd<br>56:6 | shortly<br>54:3<br>show<br>17:3,16<br>18:21,25<br>37:3 39:23<br>51:18,19<br>52:21 58:20<br>62:20 69:8<br>78:3,5 86:23<br>92:6 105:3<br>111:6 118:2<br>showed<br>56:9,15<br>57:25 58:15<br>63:25 121:19<br>showing<br>80:4<br>shown<br>78:20 79:2<br>112:6<br>shows<br>18:19 40:22<br>43:16 79:19<br>sic<br>47:11 78:19<br>81:23 82:8<br>85:21<br>sign<br>32:3 33:15,<br>22<br>significant<br>28:5,10,14<br>29:10<br>similar<br>31:4,17 32:9<br>similarities<br>32:15<br>simply<br>16:7<br>sincere<br>116:15<br>sister<br>94:20 95:2,<br>15<br>sit<br>20:13 67:18 | sitting<br>7:8<br>situation<br>121:11,15<br>128:3<br>skill<br>28:23<br>slash<br>45:14<br>someone's<br>123:7<br>son<br>113:20<br>sort<br>9:13 29:23<br>76:9 85:23<br>86:21 90:7<br>sought<br>42:7,11 43:8<br>45:5 46:16<br>72:20<br>sound<br>110:8<br>sounds<br>94:20<br>source<br>13:12 41:21<br>Southeast<br>5:10<br>space<br>105:7<br>speak<br>9:25 16:23<br>19:8 24:20<br>25:20 27:12,<br>13 45:5<br>47:18 48:16<br>55:24 58:3,9<br>62:16 72:20,<br>25 76:5<br>84:18 89:13<br>95:17,21,23<br>96:24 104:21<br>SPEAKER<br>105:17,19,<br>20,22 106:5 |

Melanie Freiberg
February 16, 2023

speaking
  12:13 24:22
  25:2 27:7
  49:16 100:22
  106:21,23
  114:14
specific
  14:11 18:17,
  25 57:16
  64:21 65:19
  83:23 85:17
  97:4 110:11
specifically
  57:13 60:12
  68:15 71:9
  76:3
specificity
  57:20
specifics
  20:12
speculate
  20:16,18
  62:11
speculation
  29:17 44:9
  61:21 127:7
spell
  75:11,12
spiritual
  33:15
spite
  72:22
spoke
  24:21 45:7
  51:3 54:18
  55:2 57:6
  67:10 84:20
  98:23 99:2
spouse
  124:16
staff
  113:5,18
  115:21
stan-
  46:15
stand
  23:4

standard
  61:5,6
standards
  45:21 46:13,
  16 48:5,15
  49:6,14,18
  58:13 60:8,
  12,17,21,23,
  25 61:4 68:2
  69:10,16
  70:12,17
  71:3,17
  72:2,10
  74:15 81:16
  91:9 101:8
  102:13,16
  103:16,21
  105:23 107:9
  108:14,17,23
  109:14 110:5
  112:11,17
  115:20
  116:3,14,21
  120:23
  121:5,9,13
  122:25
  125:17,23
  127:4
stands
  16:20
start
  10:20 12:10
  18:20,21
  19:2 38:6
  93:6
started
  10:24 12:9
  15:17
starts
  113:16
  120:14
state
  5:4,7 29:9
  90:2 96:10
  104:12
  117:13
  122:22

stated
  57:9 58:8
  74:4 91:3
  93:16 107:20
statement
  46:5 47:21
  67:11 91:8
  109:7
states
  12:14 27:2
  40:24 67:25
  71:3 81:4
  94:11 113:4
  116:2 120:18
stating
  4:19 98:15
status
  123:7
statutes
  116:9
Steve
  89:17
strategies
  19:13 31:24
strike
  124:4
subject
  31:9 32:13
  35:4 40:24
  81:4 115:25
subordinate
  39:4 82:15,
  17
Subscribed
  129:22
subsequent
  126:10
substantive
  35:5
successful
  42:3
sufficient
  73:7 102:4
suggests
  58:3
supervise
  33:9

supervisor
  39:7
supplement
  125:12
supplied
  52:23
support
  4:5 14:22
  15:11 77:9
sure
  24:8 28:12
  29:19 33:6
  43:19 44:11
  47:9 48:18
  51:24 56:8
  60:3 74:7
  77:25 83:2
  95:11 127:7
surrounding
  5:22 38:5
  102:21
  103:15
  120:19
sworn
  5:3 7:25
  129:22
symbol
  33:15
SZYMANSKI
  129:7,12

─────────

T

take
  6:8,10 8:6
  15:12 23:12
  40:4 58:16
  77:11 84:4,
  11 89:24
  91:12 97:6
  99:4 121:6
  128:4
taken
  9:21 50:18
  83:15 128:9
taking
  128:20

Melanie Freiberg
February 16, 2023

**Talbot**
  75:9,23
  76:3,6,25
  77:9 78:19,
  22 79:10
  80:3,15
  81:22 82:5,
  6,10,12,14,
  18 85:22
  86:19 88:2,
  12,19 89:18
  91:14
**Talbot's**
  79:23
**talent**
  11:2,6,10,
  11,16 12:25
  13:5,7,10,
  17,18 38:20,
  25 41:15,18
**talk**
  24:6,15 58:7
  94:21 96:12
**talked**
  80:16
**talking**
  16:21 89:13
**team**
  13:5,7,10,17
  14:3 22:9,18
  23:6,11,12
  25:19 39:2
  120:2
**teams**
  13:4 22:16,
  19 54:19
  55:3,7,12
**telephone**
  54:10 58:4,7
  67:6,7,16
  96:12 98:23
  99:3 100:19
  101:12
  102:24,25
  104:2,11,22
  107:16
**tell**
  5:25 6:4

8:10,21 9:8,
19 20:21
52:8 56:4
59:18 60:15
76:23
100:10,18
101:13
**telling**
  43:18
**templated**
  64:24 65:2
**ten**
  50:13 55:22
  56:2 57:10
  100:9
**Teri**
  4:22 19:18
  25:6 31:13,
  20 69:22
  71:6 112:24
  115:2,4
**term**
  30:9 33:5
  101:2
**terminate**
  39:9 98:8,9
**terms**
  22:20 24:25
  35:22 36:13
  61:3
**testified**
  5:5 26:2
  55:23 98:4
**testifying**
  7:19
**testimony**
  8:24 9:3
  42:9 47:24
  76:16 81:25
  84:19 85:17
  122:10
**text**
  7:20 88:9
**thank**
  13:25 36:16
  50:17 75:12
  86:9,11 94:6

96:5 114:18,
20 128:8,14,
15
**Thanks**
  41:9 94:10
**thereof**
  107:16
**Theresa**
  4:4
**thing**
  9:13
**things**
  83:19 93:17
  103:17
  120:24
**think**
  8:23 9:15
  12:13 24:8
  26:18 29:3,
  24 30:9
  36:13 43:15,
  23 44:4 60:4
  67:20 73:4
  85:6 103:16
  109:4,6,23
  110:10,20
  115:10,12,13
  125:10
  127:16
**thinking**
  44:17
**third**
  64:8 66:17,
  22 113:16
  117:12
**thought**
  43:25 44:15,
  16 47:20
  102:2
**thoughts**
  44:18
**three**
  73:20
**Thursday**
  96:2
**tied**
  14:15 15:2

**time**
  4:2 12:20
  15:20 17:23
  23:10 26:7
  36:12 37:14
  38:24 41:5,8
  43:5 46:9,19
  48:8 49:7
  50:20 53:10
  63:10 77:4,
  14 87:15
  92:21 93:23
  94:7 95:12
  96:5 99:5,22
  100:5 112:3
  118:25 127:2
  128:11
**times**
  45:6 76:5
  97:11
**title**
  11:5,14
  12:24 66:23
  116:20
**today**
  5:24 6:17,21
  7:5 8:3,6,
  17,24 9:3
  11:21 14:6
  20:14 42:9
  55:23 67:18
**today's**
  9:6,9,17
  10:2
**told**
  9:2 101:11
  102:23
  103:22
**tomorrow**
  94:7
**top**
  18:17 52:19
  97:6 117:13
  119:22
**topic**
  57:10,17
  76:6

Melanie Freiberg
February 16, 2023

touch
  73:13 97:11
  111:4
touched
  77:2
tradition
  69:15
traditional
  124:20
trainee
  16:20
trainees
  38:23
training
  14:9,11,13
  15:12,22
  27:5,9,14,
  17,25 28:6,
  11,21 29:10,
  24 30:18,19,
  22,23,24
  36:10 76:10
  84:8
trains
  28:22,24
transcribed
  105:16
transcript
  41:2 128:21
  129:4,8
transgender
  45:13
transpired
  50:19 83:17
  128:10
treat
  121:11
trial
  8:7
true
  42:12 43:8
  46:7,17 74:4
truth
  8:10,11,21
truthful
  8:24 9:2

truthfully
  114:9
try
  43:20,21
trying
  43:15 44:17
  69:25 103:16
Tuesday
  40:23 97:10
turn
  64:7
two
  7:4 13:4
  19:25 76:22
  106:21,23
  125:6
types
  125:6
typically
  15:16
typing
  6:17

_____

       U

U.S.
  4:4 116:8
uh-huh
  6:15
ultimate
  28:19 75:5,
  8,21 81:11
ultimately
  90:5,14,16
  103:17 110:3
  115:15
unable
  23:21 72:22
  96:18 98:19
  108:11
  127:25
unacceptable
  68:3 69:17
  70:18
underneath
  64:14 116:5

underscore
  105:7
understand
  5:19,25 6:2,
  7,12,13 7:23
  8:4,5,9,12,
  21 16:9,12
  19:10,12
  21:12,13,15
  25:4 26:2
  30:8,9 42:8,
  14 43:2,18
  47:6 48:25
  49:2 50:10
  69:25 72:21
  89:20,25
  91:2 105:17
  106:5 107:2,
  14 110:2
  114:6,10,24
  122:17
  127:23
understanding
  6:6 26:19
  42:23 46:22
  67:14 69:4
  73:8 80:10,
  11 92:3
  107:15,18
  108:4
understands
  110:25
  114:23
understood
  12:14 23:7
  51:25 58:11
  68:18 73:21
  82:7 91:7
  102:2 125:14
unique
  25:19 65:5
United
  12:14
University
  10:13
urgency
  95:15 96:11,
  24

utilized
  90:7,14

_____

       V

vague
  21:8 24:2
  26:15 27:19
  30:5 31:6
  32:25 34:16,
  25 42:19
  45:16 46:3
  47:3 48:11
  49:11
value
  43:9 72:24
  98:20
various
  30:15
vary
  22:19
verbalize
  6:14
verbatim
  67:9
verbiage
  64:25 65:2
verified
  4:25
versus
  123:7
vice
  75:10 82:12
video
  6:25 7:12
view
  29:6
viewable
  7:11
viewer
  66:18
views
  44:18 68:20
violation
  108:22
  125:16,23
  127:4

violations
 121:9
virtue
 114:2
vision
 5:16,23
 10:8,21,23
 11:12,15
 12:7,25
 13:19 14:9,
 18 15:3,17
 16:14,17,23
 18:10,14
 19:7,9,12
 21:6 22:16,
 24 23:10
 28:5 31:3,
 24,25 32:8,
 17,23 34:3,
 13,22 36:3,
 4,5,18,24
 38:8,19
 39:16,20
 41:17 50:6
 54:24 61:17
 65:3 68:19
 69:6,11 70:7
 71:18 72:9
 74:19 75:7,
 17 82:11,13,
 19,22 83:9
 91:10,20
 95:16 97:23
 98:10,22
 102:3 103:13
 104:14,16
 107:22
 108:5,22,25
 109:9
 112:15,18
 113:12,25
 115:14,16,17
 116:19
 119:9,12,17
 120:5 122:4,
 7,23,24
 123:9,11,16
 124:8,11

 125:17 126:3
 127:3,4
Vision's
 15:9 35:22
 69:16 70:12
 71:14 98:8
 103:7 122:22
 123:21
voice
 19:7 36:5

---

W

wait
 6:18 74:7
 90:3
waiting
 78:17
waive
 4:17
want
 23:2 24:7,
 10,13 47:17
 51:20 76:18
 85:7 89:22
wanted
 41:5,7 43:2,
 17 44:12,19
 58:3,7,8
 59:23 83:21
 84:12
Ward
 4:23 7:4
 13:20,25
 17:15 21:7
 22:4 23:23,
 25 25:11
 26:15 27:19
 28:8,25
 29:13,22
 30:4 31:5
 32:11,25
 34:16,25
 35:12 42:18
 43:13 44:8
 45:15 46:2
 47:2,12,22

 48:10 49:10,
 25 50:11,17,
 25 51:8
 61:8,11,13,
 20 68:22
 69:19 70:14,
 21 72:7,18
 73:15 74:20
 75:18 80:7
 81:24 82:3
 85:3 86:4,9
 89:6,25 90:9
 91:5 95:4,18
 96:6,13
 97:2,25
 98:12 99:17
 100:2 101:22
 102:9,19
 107:25
 108:8,19
 109:3,22
 110:16,20
 111:14
 113:13
 114:3,10,16,
 19,21 115:8
 117:20 118:7
 119:19
 121:20
 122:9,15
 123:18
 124:10,21
 125:8,19
 126:4,16
 127:6,15,18,
 21 128:7
 129:9
warrant
 30:14
Washington
 5:11 11:19
 104:12
way
 11:19 21:20
 24:11 25:20
 32:15 42:25
 43:21 46:12
 66:17 70:9

 74:7 97:5
 103:13
 110:11
 122:21
 125:10 126:7
Wednesday
 88:2,3 94:17
weeks
 83:6
welcomed
 25:18
well-
established
 116:6
Whatsapp
 7:21
white
 64:14,17
 65:15 66:4,
 10
wife
 41:4 42:17
 44:20 46:24
 58:10 71:24
 73:2 81:14
 91:8 93:17
 101:2,16
 126:11,23
wished
 39:10
wishes
 68:20
withdrawn
 34:11 38:10
 73:23
witness
 4:25 5:2
 17:18,20
 19:14 24:7,
 16 33:20
 37:12 40:12
 47:13 53:8
 61:10,12
 63:8 78:17
 82:2 87:13
 92:19 111:24
 112:4

114:15,21,22
118:23
128:15
129:17
**witnessing**
31:25 113:19
**Wolnowski**
4:22 5:12,14
13:24 19:18
24:17 35:8
47:5,10
48:20 49:21
50:4,15,21
53:24 64:10
65:25 66:16
76:12 83:12,
18 84:14
85:8 86:3,6
88:7 89:19
93:8 94:14
105:12
106:12
110:19,23
111:16
112:24
114:13,18,
20,22 115:3
116:25
118:10
122:12
127:10,16
128:4,12,16,
22
**woman**
38:13 42:6,
16 43:7,24
44:5 46:23
68:9 69:7,12
70:4,8 106:2
107:11
109:10
117:15,24
121:2 123:4,
22 124:14
125:4,16,22,
25
**word**
22:11 28:17,

21 30:14
32:2 33:7,
10,22 35:18
38:21 54:22
68:13 101:25
105:18 107:3
113:18 121:7
**words**
6:4 23:17
64:23 95:14
102:5 113:17
**work**
11:21,22,25
13:11 19:13
22:10 23:19,
20 36:18,24
39:15 41:19,
20 67:12
91:10 94:9
102:2 113:7,
21 115:14
116:4
123:11,16
124:8,11
**worked**
11:18
**working**
10:20,24
12:2,4,6,21
38:7 73:6
82:21 83:5,9
108:25
122:24
**workplace**
14:10,12,14,
24
**works**
20:10 96:4
**world**
5:16,23
10:8,21,23
11:12,15
12:7,12,25
13:19 14:9,
18 15:3,9,17
16:14,16,22
18:10,14
19:7,9 21:6

22:16,24
23:10 28:5
31:3,25
32:8,17,23
34:3,13,22
35:22 36:2,
4,5,18,24
38:8,19
39:16,20
41:17 50:6
54:24 61:17
65:3 68:19
69:6,10,16
70:7,12
71:14,18
72:9 74:19
75:7,17
82:10,13,19,
22 83:9
91:10,19
95:16 97:23
98:8,10,22
102:3 103:7,
13 104:14,16
107:22
108:5,22,25
109:8
112:15,18
113:12,25
115:14,16,17
116:18
119:9,11,17
120:4 122:4,
7,22,24
123:9,11,16,
21 124:8,11
125:17 126:3
127:3,4
**worries**
41:9 61:13
**write**
44:20
**writing**
54:2 84:3,11
88:10 89:23
**written**
27:15 30:14
47:8 84:7

90:4 98:19
**wrote**
42:15 46:23
60:6 64:23
94:5,18 96:2
97:9
**WV**
17:5 19:17
37:5 39:25
52:23 58:22
62:22 64:9
65:24 68:8
78:7 87:3,25
92:8 93:7
111:17
118:4,14
**WV-000035**
111:9
**WV-000036**
111:10
**WV-000048**
17:7
**WV-000050**
17:8
**WV-000067**
63:4
**WV-000070**
63:5
**WV-000078**
37:8
**WV-000079**
37:9
**WV-000080**
40:8
**WV-000081**
92:15
**WV-000082**
92:16
**WV-000231**
53:4
**WV-000232**
53:5
**WV-000240**
78:13
**WV-000241**
78:14

Melanie Freiberg
February 16, 2023

**WV-000242**
  87:9
**WV-000244**
  87:10
**WV-002852**
  118:19
**WV-002853**
  118:20
**WV-002858**
  59:4
**WVUS**
  113:6,18
  116:2,11

---

**Y**

---

**yeah**
  23:14 32:6
  57:2 69:25
  79:6 82:3
  100:4 101:6
  105:17,23
  107:9 115:13
  118:9 123:6
  125:10
**year**
  11:9 15:14,
  15 18:21,25
  22:23 23:10
  83:3 84:3
**York**
  5:4

---

**Z**

---

**ZIP**
  5:11
**Zoom**
  54:10