THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AUBRY MCMAHON,

          Plaintiff,

      vs.

WORLD VISION, INC.

          Defendant.

CASE NO. 2:21-CV-00920-JLR

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

*NOTE ON MOTION CALENDAR:*
*May 5, 2023*

DEF. WORLD VISION'S OPPOSITION
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Page i

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

# Table of Contents

I. OVERVIEW OF POSTURE ON SUMMARY JUDGMENT. ........................................1

   A. The Undisputed Facts and Law Require Judgment for World Vision. ...............1

   B. No Genuine Issue of Fact Exists, Only a Difference of Religious Opinion. ........2

   C. As No Genuine Issue of Fact Exists, Summary Judgment is Proper....................5

II. LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT *HERE*..................8

   A. MSJ re Disparate Treatment: *Opara v. Yellen* (9th Cir. 2023)...................................8

   B. MSJ re First Amendment: *Our Lady of Guadalupe* (S.Ct. 2020)..............................9

III. RESPONSE TO EACH OF PLAINTIFF'S ARGUMENTS.............................................9

   A. Plaintiff Cannot Establish Her Claims As a Matter of Law.................................9

      1. No Sex or Sexual Orientation Discrimination in this Case............................9

         a) No Sex and Sexual Orientation Discrimination Here. ..............................9

         b) The Theory of Plaintiff's Case Is Flawed....................................................12

      2. No Marital-Status Discrimination in this Case.................................................14

   B. Plaintiff Cannot Overcome Each and Every WV Affirmative Defense. ............15

      1. Plaintiff Cannot Overcome Title VII's ROE. .....................................................17

      2. Plaintiff Cannot Overcome the Ministerial Exception ("ME"). .....................20

      3. Plaintiff Cannot Overcome the Statutory BFOQ Defense. ............................26

      4. Plaintiff Cannot Overcome WV's Other Constitutional Defenses. ..............26

         a) Both of Plaintiff's Claims Are Barred by Religious Autonomy.............28

         b) Both of Plaintiff's Claims Fail Free-Exercise Scrutiny..............................30

         c) Both Claims Fail Expressive-Association Scrutiny. ..................................31

      5. Plaintiff Cannot Overcome the WLAD ROE. ...................................................31

      6. Defendant's RFRA Defense Is Not At Issue on Summary Judgment. .........32

IV. CONCLUSION................................................................................................................32

DEF. WORLD VISION'S OPPOSITION    Page ii
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

"We believe [our] efforts are a witness to Jesus Christ through life, word, sign, and deed, and encourage individuals to respond to the gospel." WORLD VISION FAITH IN ACTION STUDY BIBLE, ix (Zondervan 2005).[1]

Defendant World Vision, Inc. ("World Vision" or "WV") herein responds to Plaintiff's Motion for Summary Judgment (Dkt. 24; "Pls. MSJ"), with references, as appropriate, to World Vision's own Motion (Dkt. 26; "Defs. MSJ").[2]

## I.    OVERVIEW OF POSTURE ON SUMMARY JUDGMENT.

### A.  The Undisputed Facts and Law Require Judgment for World Vision.

In this atypical Title VII case, which involves no invidious discrimination, a deeply religious employer is exercising its religious freedom in staffing. All material facts are agreed. This is unsurprising as many material factual issues were decided by this Court and the Ninth Circuit in *Spencer v. World Vision, Inc.*, 570 F.Supp.2d 1279 (W.D.Wash. 2008), *aff'd as amended on denial of reh'g en banc*, 633 F.3d 723 (9th Cir.), *cert. denied*, 565 U.S. 816 (2011). Both fact and law continue to favor World Vision here.

Neither of Plaintiff's claims withstands summary judgment. First, her Title VII claim (under *Bostock v. Clayton County*, 140 S.Ct. 1731 (2020)) and her WLAD claim both

---

[1] Hardback copies of this illustrated NIV Bible featuring WV's work as a response to Scripture ("WV Bible") were distributed to counsel and filed with the Court. Dkt. 22. *See also* Freiberg Decl. (Dkt. 28) at ¶29 (discussing and authenticating the WV Bible).

[2] WV's document nomenclature remains: (a) Declarations are denoted as Scott Ward's ("**SW**"), Melanie Freiberg's ("**MF**"), and Shannon Osborne's ("**SO**"); (b) their authenticated exhibits are denoted, e.g., **SW-01** for SW-Exhibit 1; and (c) references to a paragraph incorporate Exhibit(s) referenced in that paragraph, e.g., **MF ¶7** incorporates Exhibits MF-01 and MF-02 therein. When referring to any of the five depositions taken in this case, WV will use the exhibits to Plaintiff's MSJ, which attached full, authenticated transcripts of all five depositions. *See* Pls. MSJ at 2 n.1 ("All exhibits cited herein (i.e., as 'Exh. __') are references to exhibits attached to the Declaration of Casimir Wolnowski' [**Dkt. 25**].). For example, the deposition of Christine Talbot, which is Exhibit 12 to Dkt. 25, is referenced herein as "**Talbot Dep. (Dkt. 25-12) at __**."

are inextricably premised on her quarrel with WV's Biblical understanding of Christian love and marriage—a religious dispute beyond court jurisdiction. Second, even if the First Amendment did not bar this lawsuit altogether, it compels dismissal of both claims on several complementary but independent grounds. Third, in any event, Title VII and WLAD each contain a religious organization exemption ("ROE") to protect such "religious convictions." 140 S.Ct. at 1753-54. Each such ground alone is sufficient to deny Plaintiff summary judgment and to dismiss her Complaint. No other outcome is possible unless every such ground is resolved against World Vision. This case should be dismissed with prejudice.

**B.  No Genuine Issue of Fact Exists, Only a Difference of Religious Opinion.**

This case presents only "undisputed facts" and "differences of opinion" on a religious question.[3] Nothing more. Plaintiff freely described this difference of religious opinion in her deposition testimony. Her MSJ says nothing about it, likely because she now fears it may doom her lawsuit. It does doom her lawsuit, as World Vision has explained. *See* Defs. MSJ (Dkt. 26) at 11-12.

World Vision defines Christian love and marriage from the Bible, which WV holds to be the authoritative Word of God. *See id.* at 7. WV seeks to honor God by seeking to employ those who seek to follow Him, individually and corporately, in faith and conduct, publicly and privately, in accordance with His Word. *See id.* Thus, WV requires that staff behavior be consistent with the teachings of Scripture. Since it is not

---

[3] *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2056 n.1 (2020) ("*OLG*") (summary judgment ignores "differences of opinion on certain facts").

possible, in WV's view, to identify every form of behavior the Bible defines as acceptable or unacceptable to God, WV provides Standards of Conduct to clarify expectations and assist job candidates and employees in deciding whether WV is the right place for them to serve God. One such form of behavior is sexual conduct. *See id.*

For World Vision, sexual conduct is inseparable from marriage. WV understands the Bible to define marriage as a covenant between a man and a woman and to intend and direct that all sexual expression of human love occur within such a covenant. *See id.* at 7-8. That is, the only Biblically approved setting for human sexual conduct is within a monogamous heterosexual marriage. *See id.*[4] Sexual conduct outside this Biblical covenant—sexual activity with someone other than a spouse of the opposite sex—falls short of God's will and design and, like any other sin, requires repentance. *See id.* WV believes "all have sinned" but that Christians, when they sin, are to return to God in repentance and receive His forgiveness. To WV, SSM reflects open, ongoing, unrepentant sin contrary to its deeply held belief that marriage is a Biblical covenant between a man and a woman. *See id.*

Plaintiff disagrees. *See id.* at 8. Like World Vision, she professes Christianity. But she believes that marriage, from "a religious standpoint," is defined simply by "who you love," Pls. Dep. (Dkt. 25-9) at 21, and she seems to equate all expressions of love with her understanding of the "unconditional love of Jesus." *Id.* at 182-85. She sees the Biblical doctrine of marriage held by WV as "hate"—the opposite of the "love

---

[4] *See also, e.g.*, C.S. Lewis, MERE CHRISTIANITY 95-103 (Macmillan 1952) (explaining *Christian Marriage* in his Book on Christian Behaviour as the "right working" of "sexual impulse").

DEF. WORLD VISION'S OPPOSITION   Page 3
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

of Jesus"—as expressed by her product design, "Love Is A Terrible Thing To Hate." *See id.* at 77 ("[M]y T-shirt design … 'Love is a terrible thing to hate' … exemplifies … my definition of marriage.").[5] The pervasiveness of this Biblical doctrine in many churches was the reason Plaintiff's wife stopped attending church. *See id.* at 100.

Plaintiff sees no "Bible verses or teachings … around marriage" that disqualify or refute her position, *id.* at 22, which she views as consistent with the essentials of Christian theology. *See id.* at 165, 164 ("God is my creator[;] He died to forgive my sins and I want to live for him, do good for him, keep him as the center of my life—I think that is the most important part"; "to keep Christ central in our individual and corporate lives [is] a huge important aspect"). She rejects the "interpretation that some people have of the Bible," which "has been engrained in some faith communities," and reproves them for not "taking into consideration [other] parts of the Bible." *Id.* at 96-97. She holds a different view of what the "unconditional love of Jesus" means, *id.* at 183-84, a "very different understanding what the Bible says," *id.* at 97-98. On these theological points, she believes WV's understanding is "very wrong":

> Q: Is it fair to say that you think World Vision has a wrong under-standing of the unconditional love of Jesus?
> *A: Yeah. Yeah, I think that—yeah, because they're putting conditions on it.*
> Q: [T]hat's pretty central to your disagreement with World Vision that's at issue in this lawsuit. Is that fair?
> *A: What part?*
> Q: The idea that you and World Vision have different understandings of the unconditional love of Jesus.

---

[5] *See also id.* at 95, 99. "A: [I'd] never want somebody to feel like they're less [worthy] because of who they love. Like that shirt, 'Love is a terrible thing to hate[.]'" *Id.* at 95. "Q: [L]ike your shirts say, Love Is A Terrible Thing to Hate, you've got some principles … guiding you and you're … up front about them. A: Yeah." *Id.* at 99. *See also* Defs. MSJ at SW ¶7 & Dkt. 27-4.

DEF. WORLD VISION'S OPPOSITION
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Page 4

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

1
2
3
4

*A: Now, yes.*
Q. Fairly central to the lawsuit [is] your sense that World's Vision's understanding of the unconditional love of Jesus is wrong. Is that fair?
*A. I don't agree with it … I don't agree with it …. [F]or me it seems very wrong that World Vision is claiming [that view].*[6]

5

This difference of religious opinion and exegesis is the sole material

6

disagreement of fact. Plaintiff has testified to it. Its existence is indisputable and is

7

indisputably toxic to civil court jurisdiction. *See* Defs. MSJ (Dkt. 26) at 11-12; *Serbian*

8

*Eastern Orthodox v. Milivojevich*, 426 U.S. 696, 713 (1976); *Demkovich v. St. Andrew*, 3

9
10

F.4th 968, 981 (7th Cir. 2021) (en banc). "Most district courts to consider [this issue]

11

have treated it as *jurisdictional*."[7] This case should be dismissed with prejudice.

12

**C.  As No Genuine Issue of Fact Exists, Summary Judgment is Proper.**

13

If this case is justiciable at all, it should be resolved on summary judgment. No

14
15

material facts are in dispute, as Plaintiff fully agrees. "It is undisputed that Defendant

16

rescinded its job offer to Plaintiff for the position of customer service representative

17

because it learned she was in a same-sex marriage." Pls. MSJ (Dkt. 24) at 1. Specifically,

18
19

Plaintiff's offer was "rescinded on the basis of the 'inability for [Plaintiff] to meet one

20

of the fundamental requirements of employment with [Defendant], which [was]

21

affirming and complying with the standards of conduct which were described in the

22

interview process … in that she was in a same-sex marriage.'" *Id.* at 4 (quoting Talbot

23
24
25

---

[6] Pls. Dep. (Dkt. 25-9) at 183-85 (emphasis added).

26
27

[7] *Moon v. Moon*, 431 F.Supp.3d 394, 404 (S.D.N.Y., 2019), *aff'd as modified*, 833 Fed.Appx. 876 (2d Cir. 2020), *cert. denied*, 141 S.Ct. 2757 (2021) (citations omitted; emphasis added). The rule could hardly be otherwise; courts must not entertain what is essentially a religious dispute.

DEF. WORLD VISION'S OPPOSITION
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Page 5

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

Dep., Dkt. 25-12, at 58, 29). This "was the one and only reason." *Id*.[8]

To be clear, this one reason has three aspects, as World Vision has explained. *See* Defs. MSJ (Dkt. 26) at 9. First, the actions of entering into and living in a SSM defy World Vision's religious understanding of and conduct standards regarding Biblical marriage. Second, the action of living openly in a SSM embodies an ongoing public stance promoting such conduct. Third, these actions evince sexual conduct contrary to WV's religious beliefs and conduct standards. *See id.*; *see also* MF (Dkt. 28) at ¶49.

World Vision has earnestly pursued clarity on these points. It welcomes job applicants of any sexual orientation so long as they agree with its statement of faith and comply with its conduct policies. *See* Defs. MSJ at 8 n.8 (citing MF (Dkt. 28) at ¶45 and policies therein). It actively seeks staff who live out Biblical standards of conduct. It expects all staff, whatever their sexual orientation, to live by these standards, including remaining celibate outside of Biblical marriage: i.e., a Biblical covenant between a man and a woman. *See id*. This stance embodies WV's interpretation of Scripture and is made clear to all job applicants. *See id*.

Aspects one and three above are two sides of the same coin. Openly entering into and living in a SSM openly defies or flaunts World Vision's deeply held religious beliefs and policy regarding Biblical marriage.[9] A SSM also reflects ongoing violation

---

[8] WV accepts this "one and only" label for purposes of this motion. *See* Talbot Decl. (Dkt. 25-12) at 58 ("I don't recall any other reason that that offer would have been rescinded.").

[9] *See supra* at 2-3; Defs. MSJ at 7-9; *see also, e.g.*, Aubry McMahon and Jaclyn Foreman's Wedding Website, accessed 2/23/2023, https://www.zola.com/wedding/jaclynandaubry.

DEF. WORLD VISION'S OPPOSITION   Page 6
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

of the conduct standards about sexual conduct, as WV's presumption that marriage and sexual conduct are intertwined remains unrebutted in this case. Each of these two aspects provides an independent ground for rescission of Plaintiff's offer. These two aspects are woven throughout WV's policies. *See, e.g.*, Defs. MSJ at 6-9, 12-23, SW-06 (Dkt. 27-6), MF ¶¶ 19-60 & MF-09 to MF-35, SO (Dkt. 29) ¶¶ 13-57 & SO-03 to SO-19.

Regarding aspect two, living openly in a SSM embodies an ongoing public stance promoting such conduct in at least two ways. First, as Plaintiff testified, the public image of her SSM promotes a specific stance. For example, her products Web page depicts her SSM to promote her products with a pro-SSM message. *See* Defs. MSJ at 14 n.12 & Dkt. 27-2 to 27-5.[10] Second, Plaintiff testified that she actively advocates for SSM. In addition to the words on her products and designs, Plaintiff provided other examples of her verbal efforts to "advocate" and "raise awareness." Pls. Dep. (Dkt. 25-9) at 63-85. As to the intensity of such efforts, she and her wife are pursuing this very lawsuit "because we felt [obligated to do so] as advocates [of] the LGBTQ community," *id.* at 242, "so much so [that] when World Vision offered us a settlement [we] said we are not taking it." *Id.*[11] Plaintiff's advocacy is frequent and bold, and it cuts across

---

[10] *See also* Bonfire, *Just Be,* https://www.bonfire.com/store/just-be (Plaintiff's sales page listing and linking 30 products with designs, images, and words advocating her views). Plaintiff authenticated and discussed her Bonfire page and products. *See* Pls. Dep. (Dkt. 25-9) at 70-81. The public image of her SSM is itself a nonverbal message. *See, e.g., id.* & *id.* at 64, 68-69 (describing how the public knowledge and image of her SSM affects her wife's students).

[11] Within hours of losing the WV job offer, Plaintiff posted to Facebook, seeking "a legal person I could talk with." Pls. Dep. (Dkt. 25-9) at 247. She did not deny that her Facebook post generated over 100 responses before it was taken down. *See id.* at 247-49. Plaintiff is passionate about her views. *See, e.g., id.* at 185 ("I'm sorry. I feel like I'm getting on a rant").

various media.[12]

Thus, WV would have reached the same staffing decision once Plaintiff's public stance came to light. *See, e.g.*, *Maguire v. Marquette Univ.*, 814 F.2d 1213, 1218 & n.3 (7th Cir. 1987) (given plaintiff's "pro-abortion stance," employer "would have reached the same decision even if she were a man") ("*Maguire*"). Plaintiff admits she is a "vocal advocate for a conflicting viewpoint." *Green v. Miss USA*, 52 F.4th 773, 805 (9th Cir. 2022) ("*Green*") (VanDyke, J., concurring) ("Green is not a biological woman—and as explained in the majority opinion, is a vocal advocate for a conflicting viewpoint."). She regularly has "publicly engaged in conduct regarded by [WV] as inconsistent with its religious principles." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991); *accord Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 627 (6th Cir. 2000) (plaintiff helped lead a group "that publicly supported homosexual lifestyles, a view that clashed with the [denomination's public position] and the College's avowed mission").

## II.  LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT *HERE.*

Plaintiff does not fully and correctly state the current legal standards for summary judgment in this religious employment discrimination case.

### A.  MSJ re Disparate Treatment: *Opara v. Yellen* (9th Cir. 2023).

First, Plaintiff fails to cite the Ninth Circuit's recent standards governing

---

[12] *See* @GruenWeddings, https://twitter.com/GruenWeddings/status/1109508257565966337 ("Wedding Experts Live Podcast" "joined today by Aubry McMahon who says she [was] rejected by [a] wedding venue"); David Sentendrey, *Lesbian Couple Says SC Venue Turned Them Away*, Queen City News (Mar. 6, 2019), https://www.qcnews.com/news/lesbian-couple-says-sc-wedding-venue-turned-them-away (TV news interviews of Plaintiff and her wife).

summary judgment in disparate-treatment cases such as this. *Opara v. Yellen*, 57 F.4th 709 (9th Cir. 2023) ("*Opara*") clarifies the precise standards applicable to this case, as explained by World Vision. *See infra* at 9-11; Defs. MSJ (Dkt. 26) at 13-16.

**B.  MSJ re First Amendment: *Our Lady of Guadalupe* (S.Ct. 2020).**

Second, while Plaintiff correctly notes the importance of the Supreme Court's recent precedent on the First Amendment defense of ministerial exception (and its parent doctrine of religious autonomy), she fails to note its significance for deciding summary judgment in this context. *OLG* clarified the summary judgment standards in this precise situation, where "differences of opinion on certain facts" are immaterial and only "*material* fact[s that are both] genuinely in dispute" and "essential to [the] holding" can defeat summary judgment. 140 S.Ct. at 2056 n.1.

**III.    RESPONSE TO EACH OF PLAINTIFF'S ARGUMENTS.**

The following sections address each section of Plaintiff's Argument in turn.

**A.  Plaintiff Cannot Establish Her Claims As a Matter of Law.**

**1.  *No Sex or Sexual Orientation Discrimination in this Case.***

To prevail on her MSJ, Plaintiff must first establish all required elements of at least one of her two disparate-treatment claims under the standards of *Opara* and *OLG*. Plaintiff makes no attempt to fulfill the standards of either case and both of her claims are insufficient to proceed, *see* Defs. MSJ at 13-16, as further explained below.

**a)  No Sex and Sexual Orientation Discrimination Here.**

Plaintiff misapprehends the role of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) ("*MD*"). She is partially correct when she states that a "plaintiff does not have

to rely on the *McDonnell Douglas* framework to prove a case of disparate treatment." Pls. MSJ at 5. The correct statement, under *Opara*, is that a "plaintiff does not have to rely on the *McDonnell Douglas* [factors for Steps One and Three] to prove [*those Steps* in] a case of disparate treatment." *Opara* allows an alternate approach to *those Steps*.

*Opara* actually doubles down on the "three-step framework" of *MD* in all disparate treatment cases under Title VII or ADEA: "(1) Step One: The Prima Facie Case," "(2) Step Two: Legitimate, Nondiscriminatory Reason," and "(3) Step Three: Pretext." 57 F.4th at 721-24. While *Opara* makes the use of the *MD* "factors" optional for Steps One and Three, *Opara* still requires all three *MD Steps*. "Under either approach, staving off a motion for summary judgment on disparate treatment claims under ADEA or Title VII entails three steps." 57 F.4th at 721. "[R]egardless of the approach a plaintiff takes on step one—i.e., establishing the prima facie case via direct or circumstantial evidence or the *McDonnell Douglas* factors—once an employer articulates some legitimate, nondiscriminatory reason for the challenged action, the employee must show that the articulated reason is pretextual." *Id.* at 723.[13]

Plaintiff fails this three-step test. Under Step One, she cannot establish a prima facie case under either approach to Step One: her class and activity are not protected; her conduct disqualifies her for the position; similarly situated applicants are not treated differently; and, relatedly, causation is lacking. *See* Defs. MSJ at 13-14. Even if

---

[13] "Here too, a plaintiff can prove pretext in multiple ways: [essentially *MD* factors]." *Id.* (citing *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1123 (9th Cir. 2004) as "discussing pretext showing in Title VII case utilizing *McDonnell Douglas* factors.").

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

she could, WV has articulated a legitimate, nondiscriminatory reason under Step Two that cannot be rebutted as pretext under Step Three, because pretext inquiry is prohibited here under any approach. *See id*. at 14-16. WV has presented "convincing evidence" that its policy is based on religious precepts, precluding "investigat[ion of] pretext." *EEOC v. Fremont Christian Sch*., 781 F.2d 1362, 1366 (9th Cir. 1986). "[W]e will not subject to examination the genuineness of a proffered religious reason for an employment action." *Rweyemamu v. Cote*, 520 F.3d 198, 207 (2d Cir. 2008). Plaintiff "cannot carry [her] burden at step three by instigating a debate over whether [WV] really believes its position on marriage, or what [its] precise contours [are.]" *Butler v. St. Stanislaus Kostka Cath. Acad*., 609 F.Supp.3d 184, 201 (E.D.N.Y. 2022).[14]

Even if pretext inquiry were permitted, there is nothing in the record "creating a genuine issue as to whether [WV's] proffered reasons were 'false' or whether her termination was due in whole or in part to her [sex]." *Opara*, 57 F.4th at 729; *see OLG*, 140 S.Ct. at 2056 n.1 (material fact must be "genuinely in dispute"); Defs. MSJ at 15-16. In the face of "abundant and uncontroverted" evidence, "plaintiff's creation of only a weak issue of fact as to whether the employer's reason was untrue will not suffice." *Opara*, 57 F.4th at 724 (citations and internal punctuation omitted). Here, there is not a weak issue; there is no issue. WV produced "abundant and uncontroverted" evidence that the reason for its staffing decision was its sexual conduct standard. Indeed, Plaintiff embraces this as the "one and only reason," *see supra* at 5-6, and nowhere

---

[14] *Appeal dismissed* (2d Cir. Aug. 26, 2022).

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

suggests a motive other than WV's understanding of Biblical marriage.

### b) The Theory of Plaintiff's Case Is Flawed.

The proper result here flows inexorably from Plaintiff's flawed theory of the case. Plaintiff appears to conflate "sexual orientation" or "being homosexual," Pls. MSJ (Dkt. 24) at 6, with sexual activity or conduct. That was not the holding of *Bostock*. *See* Defs. MSJ at 13-16. Regardless, religious freedom guarantees that arise from or enforce the First Amendment must supersede Title VII's commands in appropriate cases.

*Bostock* did not disturb religious conduct policies such as World Vision's. In the Court's own words, its "holding [was] that employers are prohibited from firing employees on the basis of homosexuality or transgender status." *Id*. at 1753. The Court was unequivocal: "The only question before us is whether an employer who fires someone simply for being homosexual or transgender [has] discriminated against that individual 'because of [their] sex.'" *Id*. (quoting Title VII).

To be clear, "*Bostock* does not protect sexual conduct; it protects employees from being treated differently based on their biological sex, which is an immutable characteristic distinct from sexual conduct itself." *Bear Creek Bible Church v. EEOC*, 571 F.Supp.3d 571, 623 (N.D.Tex. 2021) (citing *Maner v. Dignity Health*, 9 F.4th 1114, 1123 (9th Cir. 2021)), *appeal argued sub nom.*, *Braidwood Mgt. v. EEOC* (5th Cir. Feb. 7, 2023).[15] As the Ninth Circuit recognized in *Maner*, "*Bostock* does not necessarily extend to 'sexual activity.'" *Id*. (quoting *Maner*, 9 F.4th at 1123). Since, like many religious

---

[15] Argued Feb. 7, 2023 before Smith, Clement, & Wilson, JJ.

DEF. WORLD VISION'S OPPOSITION       Page 12
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

employers, WV disapproves "premarital sex, adultery, and any other kind of sexual activity that occurs outside the context of a marriage between a man and a woman[, and not just] homosexual conduct, the Court [should rule] that so long as the prohibitions apply evenly to men and women, [WV] does not favor one biological sex over the other, and therefore does not violate Title VII." *Bear Creek*, at 623.

Fundamentally, Plaintiff's opinion ignores the view of World Vision (and much of traditional Christian and other religions) that God holds humans accountable for their conduct regardless of orientations or predispositions inherent in their fallen natures. Adherence to this view surely is the "free exercise of religion." In fact, "it must be emphasized that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned." *Obergefell v. Hodges*, 576 U.S. 644, 679 (2015).

What seemingly is lost in Plaintiff's arguments is the idea of choice. Conduct is no more immutable than it is predetermined. Men and women of any orientation can choose celibacy, as some have, for various reasons, throughout history. As World Vision has explained with deep love and humility, it welcomes people of all sexual orientations so long as they agree with its statement of faith and abide by its standards of conduct. *See supra* at 6. Such a position, held by many and grounded in deeply held religious convictions of long standing, assumes and requires choice.[16]

---

[16] All societies forbid certain forms of sexual conduct to which some people may be naturally oriented, for various reasons, e.g., age, vulnerability, or biological relationship.

DEF. WORLD VISION'S OPPOSITION      Page 13
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

1    Plaintiff mischaracterizes World Vision's staffing decision as based on her sex

2   or sexual orientation. Plaintiff probed WV's decision thoroughly during the 20-month

3   discovery period, yet there is no material factual dispute about it. WV's decision was

4   based on its conduct standards, including sexual conduct standards, applicable to all

5   staff and to men and women equally regardless of sexual orientation. *See* MF (Dkt. 28)

6   at ¶¶44-45. As WV understands the Bible, Christians must confine their sexual conduct

7   to Biblical marriage, or abstain. If and when they fail, WV believes they must turn away

8   from such behavior. If Plaintiff had agreed to abide by, and then (with God's help)

9   abided by, these standards for all staff, repenting when she failed, she could work for

10  WV. She admittedly did not agree, nor abide, but instead has disagreed with WV's

11  Christian theology underlying its standards. She is free to disagree but not to compel

12  World Vision to replace its beliefs with her beliefs by employing her.

13       ## 2. *No Marital-Status Discrimination in this Case.*

14       Plaintiff cannot establish marital-status discrimination for the same reasons she

15  cannot establish sex or sexual orientation discrimination, as explained above. As

16  Plaintiff concedes, "Marital status" is the legal status of being "married, single,

17  separated, divorced, or widowed." Pls. MSJ at 9. WV's employment decision was not

18  based upon Plaintiff being "married" or "single" but rather Plaintiff's non-compliance

19  with WV's standards of conduct for all employees, whether "married, single,

20  separated, divorced, or widowed." And even if Plaintiff could establish marital-status

21  discrimination, such a claim likely must yield to religious freedom guarantees. *See infra*

22  at 20-31; Defs. MSJ (Dkt. 26) at 20-34; *see Bostock*, 140 S.Ct. at 1753-54.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**B.  Plaintiff Cannot Overcome Each and Every WV Affirmative Defense.**

Plaintiff asserts that World Vision's 18-page Answer and Affirmative Defenses (Dkt. 14) lacked sufficient detail to support its affirmative defenses. *See* Pls. MSJ at 10. Plaintiff overlooks the purpose of notice pleading. "As its name implies, notice pleading … aims to produce a general chart of possible claims and defenses available to the parties before they embark on the voyage of litigation." *Harris v. Sec'y of U.S. Dep't of V.A.*, 126 F.3d 339, 343 (D.C. Cir. 1997). "The *fair notice* pleading requirement is met if the defendant 'sufficiently articulated the defense so that the plaintiff was not a victim of unfair surprise.'" *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999) (citation omitted). These standards are not new. Neither are Plaintiff's assertions.

This Court has not been sympathetic to such assertions. "Thus, the Court declines to apply a heightened pleading standard to affirmative defenses[. T]he Court is unable to conclude that, given a standard enumeration of common defenses against facts familiar to HP, HP does not have fair notice of the general nature of the defenses. The Court therefore denies HP's request to strike the eleven defenses for lack of factual basis[.]" *HP Tuners, LLC v. Sykes-Bonnett*, No. C17-5760 BHS, 2018 WL 10398218, at *2 (W.D.Wash. Oct. 11, 2018) (citations omitted). In this case, WV's pleading "alleged [43] *affirmative defenses*. [It] was an appropriate response to the Complaint, and raises possible defenses that will, in time, be dismissed or stricken[.]" *Bell v. Addus Healthcare*, No. C06-5188 RJB, 2006 WL 2222350, at *1 (W.D.Wash. Aug. 2, 2006).

Neither does Plaintiff even mention that World Vision explained its Affirmative Defenses in detail in its 60-page Responses to Plaintiff's First Set of Interrogatories

("Defs. RPFSI"), served on May 6, 2022. In response to Plaintiff's Interrogatory No. 11

("Separately for each affirmative defense set forth in Defendant's filed Answer identify

the factual basis for such defense."), *id*. at 24, WV provided detailed explanation of

each defense. For example, in response to "Affirmative Defense No. 1 based upon the

religious employer exemption(s) provided in 42 U.S.C. § 2000e-1(a)," WV provided

four pages on how and why Title VII's ROE applied to this case. *See* Defs. RPFSI at 26-

29. As to Defense No. 2 (BFOQ), WV provided more than a full page. *See id*. at 29-31.

And so on, through Defense No. 43 (Fraud). *See id*. at 56.

In all, World Vision explained its Affirmative Defenses over six pages in its

responsive pleading served August 4, 2021 (Dkt. 14 at 12-17) and another 32 pages in

its responsive discovery served May 6, 2022 (Defs. RPFSI at 24-56).[17] These 38 pages,

which Plaintiff has had for a full year, gave her more than fair notice to "embark on

the voyage of [this] litigation." *Harris*, 126 F.3d at 343. On her view, notice pleading

would morph into and obviate (hopelessly premature) dispositive motions.

To prevail on her MSJ, Plaintiff first must establish at least one of her two claims

and then must overcome each and every affirmative defense. Plaintiff argues against

just six of World Vision's 43 affirmative defenses, namely the (a) Title VII ROE, (b)

Ministerial Exception, (c) BFOQ defense, (d) religious autonomy and any other

constitutional defenses, (e) WLAD ROE, and (f) RFRA. Without argument, she asserts

---

[17] From May 6, 2022, she still had another ten months before the March 13, 2022 discovery cut-off, during which she took four depositions (including Rule 30(b)(6)) and served additional discovery requests. If she did not take advantage of this time, that was her decision.

DEF. WORLD VISION'S OPPOSITION          Page 16
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

that every other affirmative defense, including "[a]ny other constitutional defense[,] fails as a matter of law." Pls. MSJ (Dkt. 24) at 23-24. Her broad assertion is simply wrong. World Vision will address below each of Plaintiff's separately identified arguments in the order she presented them.

### 1. Plaintiff Cannot Overcome Title VII's ROE.

Plaintiff devotes one page to Title VII's Religious Organization Exemption ("ROE"). *See* Pls. MSJ at 11-12. World Vision thoroughly refuted these arguments, *see* Defs. MSJ at 16-20, which fail for several independent reasons.

First, Plaintiff ignores the statute's language. She quotes the opening words of 42 U.S.C. § 2000e-1(a)—"This subchapter shall not apply"—and then ignores them, negating *Bostock's* logic that Title VII's words control. "*This subchapter* refers [to] all of Title VII." *Starkey v. Roman Cath. Archdiocese*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring). Thus, *none* of Title VII applies to a qualifying religious entity, which *Spencer* has already held World Vision is. *See* Defs. MSJ at 2-5, 16-20. The statute is clear, its "plain" "meaning" controls, and "our job is at an end." *Bostock*, 140 S.Ct. at 1749. It is "'our job to apply faithfully the law Congress has written,' and '[w]e cannot replace the actual text with speculation as to Congress' intent.'" *Luna Perez v. Sturgis Pub. Sch.*, 143 S.Ct. 859, 865 (2023) (unanimous) (citations omitted).

Like the dicta in some cases, Plaintiff never explains "why *this subchapter* means something less than all of Title VII." *Starkey*, 41 F.4th at 946 (Easterbrook, J.). Regardless, the Ninth Circuit has held that the ROE exempts qualifying entities "from the *entire subchapter* of Title VII.'" *Garcia v. Salvation Army*, 918 F.3d 997, 1004 (9th Cir.

DEF. WORLD VISION'S OPPOSITION
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Page 17

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

2019) (citation omitted). The ROE applies to Plaintiff's sex-related claims precisely as *Bostock* contemplated. *Bostock*, at 1753-54 (presuming the ROE is available in "cases like ours," i.e., sex claims just like Plaintiff's). Thus, the ROE precludes Plaintiff's claim.

Second, and additionally, this "plain meaning 'becomes even more apparent when viewed in' the broader statutory context." *Babcock v. Kijakazi*, 142 S.Ct. 641, 645 (2022) (citation omitted). Title VII defines "religion" broadly to "include[] all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). So, a "straightforward reading of § 2000e–1(a), coupled with § 2000e(j), shows [WV] was entitled to [rescind Plaintiff's offer] without regard to any of the substantive rules in Title VII." *Starkey*, 41 F.4th at 946 (Easterbrook, J.). This "straightforward reading" of the ROE permits "religious employer[s] to require the staff to abide by religious rules," *id.*, to enable them to "define and carry out their religious missions." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 339 (1987). "Thus, a religious employer is not liable under Title VII when it refuses to employ an individual because of sexual orientation or gender expression, based on religious observance, practice, or belief." *Bear Creek*, 571 F.Supp.3d at 591. A contrary rule is "inconceivable." *Id.* (citation omitted).

Third, and additionally, the ROE's "structure … supports this interpretation." *Id.* at 591. The "alien" exemption that is paired with the ROE "provides no limitation." *Id.* (citing 42 U.S.C. § 2000e-1(a)). "If the [ROE] were somehow limited only to certain types of Title VII claims (i.e., of religious discrimination), one would expect the alien exemption to have a parallel limitation (i.e., claims of race or national-origin discrimination)." *Id.* (citation omitted). "Without such limitations, the [ROE] must be

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

read equally broadly." *Id.* Thus, the alien exemption "has been understood to mean what it says: *none* of Title VII's substantive rules applies to aliens covered by [it]. What is true for the alien exemption must be true for the religious exemption as well." *Starkey*, 41 F.4th at 947 (Easterbrook, J.) (citation omitted); *see also* Defs. MSJ at 18.

Fourth, and additionally, familiar rules of constitutional avoidance compel this result. "[A]n Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available." *NLRB v. Cath. Bishop*, 440 U.S. 490, 500 (1979) (citing Chief Justice John Marshall). Citing *Cath. Bishop*, among other cases, *Spencer* decided this question. "Thus, the cramped reading of the [ROE] put forth by [Plaintiff] raises serious questions under both the Free Exercise Clause and the Establishment Clause. As we must, we reject this constitutionally questionable interpretation." *Spencer*, 633 F.3d at 729. Plaintiff's claim cannot survive the ROE.

Plaintiff makes only two arguments, one implausible and the other frivolous. The frivolous argument is that *Spencer* constitutes "settled law in the Ninth Circuit that [the ROE] bars only *religious* discrimination claims brought against a religious employer." Pls. MSJ at 11. *Spencer* constitutes no such thing. It held the ROE applies to World Vision as an organization because WV is sufficiently religious in character and purpose to qualify for the **Religious** Organization Exemption. *See* Defs. MSJ at 2-5.

The implausible one is this. Plaintiff cites *Fremont Christian* and *EEOC v. Pac. Press Pub. Ass'n*, 676 F.2d 1272 (9th Cir. 1982) for their 40-year-old dicta that the ROE covers only religious discrimination claims. These cases do not apply here because neither involved a credible claim of a religiously motivated staffing decision. Thus,

DEF. WORLD VISION'S OPPOSITION
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR          Page 19          Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

neither analyzed the ROE and neither had occasion to render any applicable holding.

Their dicta lacks any force now, following *Amos*, *Spencer*, *Garcia*, and *Bostock*.[18]

### 2. *Plaintiff Cannot Overcome the Ministerial Exception ("ME").*

Plaintiff has never understood the role she sought. In November of 2020, by her

own evidence, she responded to a job posting that included these duties:

> Help carry out our Christian organization's mission, vision, and
> strategies. Personify the ministry of World Vision by witnessing to Christ
> and ministering to others through life, deed, word and sign. You will
> also … Keep Christ central in our individual and corporate lives. Attend
> and participate in the leadership of devotions, weekly Chapel services,
> and regular prayer…. Be sensitive to Donor's needs and pray with them
> when appropriate.

Job Posting, 2020 (P0013-15); *see also* Pls. Dep. (Dkt. 25-9) at 147-48 (authenticating and

discussing this Job Posting, attached to her Dep. as Exh. 8).[19] Yet, in July of 2021, she

alleged in her Complaint that her role "was essentially going to be working in a call

center [without] any religious duties [or] any duties that can be characterized as

'religious.'" Compl. (Dkt. 1) ¶¶5.7, 5.10. There appears to be a disconnect here.[20]

Plaintiff then had 20 months of discovery, including a 30(b)(6) deposition of WV

---

[18] *See also, e.g., Garcia*, 918 F.3d at 1004 n.11 (In *Pac. Press*, "[w]e did not hold that *religion-based* retaliation claims are beyond the reach of the ROE.").

[19] The Job Posting is among Plaintiff's key evidence. It was produced at P0011-20. It was discussed at each deposition and made an exhibit to the first three. *See* Freiberg Dep. (Dkt. 25-13 & Exh. 1); Pls. Dep. (Dkt. 25-9 & Exh. 8); Miolla Dep. (Dkt. 25-11 & Exh. 1). It also was discussed at the 30(b)(6) deposition (Dkt. 25-10 at 11-13, 42-50), and was the subject of the latest written discovery. *See* Pls. 2d Doc. Reqs. (2/17/2023) and Defs. Resps. (WV6101-6112).

[20] Long before Plaintiff filed this lawsuit, both *Spencer* opinions described WV's pervasively Christian workplace. *See* Defs. MSJ at 2-5. It is not clear what led Plaintiff to believe that DCS was a secular enclave within a pervasively Christian ministry that has its own Bible.

and 6,197 pages of documents produced by WV, to explore these religious duties. The evidence of the religious nature of these duties is both extensive, *see, e.g.*, Defs. MSJ at MF ¶¶19-60 (general) & SO ¶¶17-57 (specific), and undisputed—indeed, indisputable.

Yet, her MSJ still mischaracterizes the role as well as the law. After quoting the full Job Posting, she quotes its explicitly religious duties before largely ignoring them. Pls. MSJ at 14-22. She asserts without facts that the role was largely devoid of religious training, Pls. MSJ at 15, despite extensive contrary evidence. *See, e.g.*, Defs. MSJ at MF (Dkt. 28) ¶¶34, 35, 53, 54, 55, 56, & 60 and SO (Dkt. 29) ¶¶20, 21, 23, 43, 45, & 46 (and the cited and attached policies and documents). It is doubtful that Jesus Christ Himself, or any of His Disciples, would qualify as ministers under the Plaintiff's wooden definition of the ministerial exception ("ME"). *See* Pls. MSJ (Dkt. 24) at 12-22. World Vision refuted this cramped and distorted view of the law in its MSJ (pp. 23-28), but now highlights additional record evidence of the precise DCSR role she sought.

DCSRs perform ministerial duties as shown by five WV-wide chapel services led by DCS. *See* Defs. MSJ at MF (Dkt. 28) ¶52 & SO (Dkt. 29) ¶¶25-36.[21] The service on June 26, 2019 shows exactly the role Plaintiff sought in 2020. *See* SO at 25-36 & SO-13 (authenticating the videotape of this service and all excerpts that follow below). DCS opened this service with prayer and Bible reading (0:07-5:04) followed by DCSR messages (5:05-9:35), praise and worship time (9:36-20:45), DCSR testimonials (20:46-23:26), DCSR panel discussion (23:27-48:26), more testimonials (48:28-50:44), and

---

[21] The underlying video recordings of these chapels were filed with the Clerk. Dkt. 23.

DEF. WORLD VISION'S OPPOSITION
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Page 21

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

closing prayer (50:45-53:05). The excerpts below speak for themselves.

"[G]od brought us here [to DCS] to be the voice, face, and heart of World Vision [to serve] our donors in the name of Jesus…. In the last year, donors called us over 210,000 times. We also called them over 100,000 times … and ministered to our donors through prayer. [We] replied to 51,000 emails and letters and prayed for nearly 10,000 prayer requests." (6:04-6:37)

> I have been in call centers for 11 years, but nothing prepares you for [the] prayer requests. One man said his sister-in-law passed away that very morning. Several women just lost their husbands. Many people have health and financial issues. However, the Lord cares for each one. I am grateful and blessed for a chance to tell them how good the Lord is. I'm grateful they trust me to share, and I'm blessed by how much appreciation and love they give to myself and World Vision[.] [22:00-22:30] [Video testimonial by a DCSR]

Below are responses from DCSR panelists to this question from the moderator: "How has working [in] DCS impacted your faith and walk with Christ?"

> [I've] always felt like working in DCS [really] puts us on the front lines of World Vision. [We] openly discuss our stories, give our testimonies, both to each other as friends, coworkers, and also to donors and have them share their testimonies with us. [It] has been an incredible way to witness Christ and everything that he's done for us as people, as an organization, and for our donors. [24:35-25:29] Fellowship that we have with coworkers and donors, it's so amazing. We're praying with each other. We're praying with the donors. [27:26-27:33] [I]t's a calling to come to World Vision [where we] actually pray for people all over the world when we answer [the phone] and ask, Can I pray for you? And the requests are just amazing. And then God gets to use us in a mighty way to pray for our donors[.] When you work in a place that's also a ministry, it just opens this fire for Jesus within you. [27:51-28:49] [I] believe the Lord placed me [here this] last decade [and] simply remind[s] me to look around and see his faithfulness[.] To see it in our donors [and] countless stories of redemption … around the world. We … pray with our donors, as you have heard from most every testimony from DCS today. We … pray for one another and we … pray together for those who have

DEF. WORLD VISION'S OPPOSITION          Page 22
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

experienced devastation[.] [29:47-30:49]

Clearly, DCS is no common call center. "[I]n prayer, the donors share so many things with us, as you've heard already. One family called [after a] terrible car accident[. T]he mother and the son were injured very badly, and they called us for prayer. Well, four months later, they called us back [and] were just in joy. They were healed [and] really believed that our prayers for them helped them heal [and] put their lives back together, and they just couldn't wait to share [what] God had done in their lives. So, God is everywhere in our work and he's in our donors[.]" (39:16-39:58)

> [Talking to donors allows us] to share what's on our hearts and to be a mouthpiece for our ministry. [40:45-40:54] I'm glad I get to be the mouthpiece[.] I know that by opening up my mouth and allowing for the Holy Spirit to flow like living water, this allows room for the donor to know more about how they can actually help[.] Now, not everyone can actually give, but [God] puts a calling in each and everybody's heart, and how they can serve. [I] also take mental notes [from] our chapels and glean information that may be useful for when I'm talking to the donors. Next, I pour out my heart to every [caller] because we just don't know [what they're] going through[. 41:02-42:30] I love sharing World Vision's needs [with] our donors[. They] just love World Vision [and] I always [tell] them what our need is. [They can] lift our need in prayer and if they are able [to donate]. I thank them whether it's monetary or prayer. And at this time I usually hear lovely stories of how God has called them to be prayer warriors or intercessor[s] and it's [a]mazing to be able to open my mouth and allow for the holy spirit to work. [42:46-43:42]

When DCSRs visit World Vision field offices, they often experience what they as Christians view as taking their place in the global Church—the Body of Christ:

> [I] had the life changing opportunity, like many of [us in DCS], to visit our colleagues in Kenya. [Those] staff in the field [say] how thankful they are—and the heroes we are to the children. [And] we protest and say, How can you say that: you are the heroes; [you're] literally serving the children. And they say, But we [couldn't] do any of that work if you weren't sending gifts halfway around the [world]. And we say, But we

wouldn't have anything to ask for if it wasn't for [the] incredible things [you are doing] with those funds. And they say, But we [couldn't] do anything if not for your generous donors. And we say, But you are the hands and feet of this organization. [And] they say, But you are the ears and mouths of this organization. And *that* is what it looks like for World Vision to be the body of Christ. [46:53-48:05] Being in DCS has been a faith-building experience because you can see God moving everywhere you look, from the obvious events in the field to the miracles of every day…. The miraculous is part of our culture [and] gives us hope daily. [48:26-48:51] Working in DCS has impacted my faith [and] I'm constantly reminded of the privilege I have to be the voice for those who are unable to speak up for themselves [whom] we serve in Christ. [50:27-40]

As a DCSR, Plaintiff's responsibilities would include praying faithfully with donors, as illustrated by ten donor calls entered in the record.[22] In each of these 2020 calls, DCSRs prayed with donors about their needs and the needs of the children they sponsor. These donor needs included an elderly man's constant pain, a wife's kidney infection, a mother's biopsy, a recent widow's troubled daughter, a father's broken hip, a husband's safety as a doctor responding to Covid, a brother-in-law's wife going to hospice, a family dairy farm's fate, a church's desire to rebuild its youth ministry, and an emotional young woman "really worried that I'm going to lose my job." Consider this one example with a female donor, in April 2020, early into Covid:

> **Donor**: "My uncle … contracted the virus [and my mom] had to make the decision today to remove life support. So, please pray for my mom. [I]t's her big brother [and] it was sudden…. [I]f you guys could pray for my mom, I'd appreciate that very much."
> **DCSR**: "[I]f you're comfortable, would you be okay if I prayed right now over the phone?"
> **Donor**: "Yes. Definitely. That would be great."
> **DCSR**: "Dear Lord, I just want to lift up [donor] and her family as well as her uncle specifically…. I pray for comfort and for healing for the

---

[22] *See* 2020Call1–2020Call10 (Dkt. 23 & Dkt. 29-15) (private info redacted). "These ten samples reflect the more than 15,000 prayer requests recorded during … 2020." SO (Dkt. 29) ¶37.

DEF. WORLD VISION'S OPPOSITION
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Page 24

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

family, specifically for [her] mother as she goes through this time with her brother…. [W]e pray for comfort and for support for this entire family…. So, thank you so much for your comfort, dear Lord, and we thank you for loving us, in Jesus' name. Amen."

**Donor**: "Amen. Thank you so much for that. I really appreciate that."

**DCSR**: "Of course [and] don't hesitate to give us a call [and] reach out[.]"

**Donor**: "Okay. Thank you so much. And I really—I really appreciate you calling. It was really well timed. So, thank you." [DCS Prayer Call, April 1, 2020, at 0:53-3:50.]

Such prayer is expected and encouraged, as shown by sample "shout outs" from DCS managers. "Mr. [Donor was] overwhelmed when he shared [that female DCSR] prayed for him and showed him the love of the Lord on their phone call amidst his own personal trials he shared with her. He said he has never had such an amazing experience with an organization." WV3103. "Michael [Donor] was blown away [by DCSR, who] offered prayer [that] deeply touched [him.] Thank you [DCSR] for reminding donors we are a ministry ready to be God's hands and feet!" *Id*. at 3105. "Ms. [Donor called] leadership this morning to share [her] incredible [call with DCSR, who] prayed the most beautiful prayer over [her,] straight from the heart of Jesus." *Id*. at 3106. "Mrs. [Donor said she] was touched by [DCSR's] prayer [and] is incredibly thankful for [our] ministry." *Id*. at 3107. "Susanna [Donor] wanted us to know how amazing [DCSR] is. She said [he] was compassionate, kind and so very caring. As she [told] how [he prayed] for her she got choked up …. This [is] pure ministry [and] you understand what is truly important." *Id*. at 3108-09. "Mrs. [Donor called] to say: '[female DCSR] was amazing [and such] a blessing today for me because I asked for prayer and [she] encourage[d] me and lifted me to the Lord and I feel amazing. She is a beautiful human being and she praises GOD! She is in the *right position*.'" *Id*. at 3110

DEF. WORLD VISION'S OPPOSITION
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Page 25

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

(emphasis added). "Mrs. [Donor] called to [commend DCSR for praying for her] daughter [which] touched [her] heart. She said she believes [in] World Vision [and that DCSR] is in the *right place* in the *kingdom of God*." *Id.* at 3112 (emphasis added).

The above excerpts (Dkt. 29-16) show the duties and responsibilities of the role Plaintiff sought. They show what she would have been responsible for, and World Vision has explained how that meets the ME. *See* Defs. MSJ at 23-28.

### 3. *Plaintiff Cannot Overcome the Statutory BFOQ Defense.*

Under the facts sustaining the ME above, World Vision's religious requirements for a DCSR, including WV's required agreement to comply with its Biblical conduct standards, qualify as a bona fide occupational qualification ("BFOQ"). WV's religious requirements for a DCSR satisfy the keys to Title VII's test ("affect[ing] an employee's ability to [do] the job") and WLAD's ("will contribute to the accomplishment of the purposes of the job"). *See* Pls. MSJ at 23; *see also EEOC v. Kamehameha Sch.*, 990 F.2d 458, 465-66 (9th Cir. 1993). The extensive evidence for this BFOQ is undisputed or indisputable. *See supra* at 20-26; Defs. MSJ at 23-28 and SO ¶¶17-57, MF ¶¶19-60.

### 4. *Plaintiff Cannot Overcome WV's Other Constitutional Defenses.*

Plaintiff devotes over ten pages to the ministerial exception, Pls. MSJ (Dkt. 24) at 12-22, which she concludes "is the only constitutional defense potentially available." *Id.* at 23. Due to this mistaken conclusion, Plaintiff devotes only two paragraphs to all other "potentially available" constitutional defenses. *Id.* at 24-25. She characterizes all such defenses as a "hodgepodge … grounded in the First Amendment and other constitutional provisions," *id.* at 24, and laments a lack of "specificity as to what facts

DEF. WORLD VISION'S OPPOSITION
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Page 26

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

(if any) form the bases for these defenses." *Id*. As shown above, this lament ignores WV's 60-page discovery response that was served a year ago, with its 32 pages of "specificity" as to the "facts" that "form the bases for these defenses." *See supra* at 15-16. *Without argument*, she asserts that every other affirmative defense, including "[a]ny other constitutional defense[,] fails as a matter of law." *Id*. at 25. In effect, Plaintiff implicitly concedes that there are no disputed material facts as to such defenses and she offers no substantive legal argument against them.

World Vision reserves all 43 affirmative defenses, but focuses on just five First Amendment defenses for MSJ purposes. *See* Defs. MSJ (Dkt. 26) at 11-34. (1) Both Religion Clauses preclude jurisdiction over this lawsuit that is steeped in theological dispute. *See id*. at 11-12. But if the lawsuit is viable, Plaintiff's claims still fail as "the First Amendment can bar the *application* of employment discrimination laws." *Bostock*, 140 S.Ct. at 1754 (emphasis added). This is such a case for several reasons. (2) Both claims are barred by both Religion Clauses under the religious autonomy doctrine. Defs. MSJ at 21-23. (3) Both claims are barred by both Religion Clauses under the ministerial exception. *Id*. at 23-28. (4) Both claims fail strict scrutiny under the Free Exercise Clause. *Id*. at 28-32. (5) Both claims fail strict scrutiny under the expressive association doctrine of the Free Speech and Assembly Clauses. *Id*. at 32-34.

World Vision has already addressed (1) and (3) in the pages above. *See supra* at 2-5 (jurisdiction) and 20-26 (ME). The other three First Amendment defenses—(2) religious autonomy, (4) free exercise, and (5) expressive association—are addressed below in order and as renumbered in outline format. Again, Plaintiff does not counter

DEF. WORLD VISION'S OPPOSITION        Page 27
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

these other three First Amendment defenses with *any* legal argument.

### a) Both of Plaintiff's Claims Are Barred by Religious Autonomy.

Plaintiff made only a fleeting reference to ME's parent doctrine of church or religious *autonomy* ("autonomy"). *See* Pls. MSJ at 24. Though she cited *OLG* many times in her MSJ, *id.* at 12-21, she never acknowledged its unequivocal statement of the law:

> [T]he Religion Clauses protect religious institutions [in] matters "of faith and doctrine" [against] government intrusion. State interference in that sphere would *obviously violate the free exercise* of religion, and *any attempt* by government to dictate or *even to influence such matters would constitute [an] establishment of religion*. The First Amendment *outlaws* such intrusion. The independence of religious institutions in matters of "faith and doctrine" [protects] their autonomy with respect to internal management decisions [and] a *component of this autonomy* is the selection of the individuals who play certain *key roles*. Th[is] "*ministerial exception*" [requires courts] to stay out of employment disputes involving those holding certain important positions[.][23]

The parent doctrine of autonomy turns on the religious nature of the *employer* and its *decision*. The subsidiary doctrine of ministerial exception turns on the religious nature of the *job*. When either doctrine applies, it "outlaws such intrusion," *id.*, "bar[ring] the *application* of employment discrimination laws." *Bostock*, 140 S.Ct. at 1754. "The ministerial exception derives from, and is but one manifestation of, a broader (and well-settled) principle [of] *church autonomy*." *Butler*, 609 F.Supp.3d at 191 (citing *OLG*, 140 S.Ct. at 2061). World Vision "invokes the principle of church autonomy in addition to the ministerial exception." *Id.* Autonomy would "mandate summary judgment … even if [Plaintiff] had not been hired into a ministerial role. This

---

[23] *OLG*, 140 S.Ct. at 2060 (citations omitted; emphasis added).

DEF. WORLD VISION'S OPPOSITION
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Page 28

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

is because [WV] has pointed to documentary evidence that [Plaintiff's job offer] was terminated for religious reasons, and the principle of church autonomy precludes a jury from questioning the veracity of those reasons (or the weight to be accorded them) under the guise of pretext analysis in this case." *Id.* When either doctrine applies, there is no judicial scrutiny, no balancing of interests. Claims are "flatly barred." *Id.* at 198.

Ninth Circuit precedent agrees. The "autonomy principle has procedural, as well as substantive, components[, preventing] courts from subjecting religious institutions to 'protracted legal process pitting church and state as adversaries,'" *id.* at 199–200 (quoting *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 949 (9th Cir. 1999)), and "offers some protection from 'the expense and indignity of the civil legal process,'" *id.* at 200 (quoting *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 957 (9th Cir. 2004)). Like *Spencer*, 633 F.3d at 731, both *Bollard* and *Elvig* rely on *Cath. Bishop*, which reproved the "the very process of inquiry" in such situations. *Cath. Bishop*, 440 U.S. at 502. *Accord EEOC v. Cath. Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996).[24]

A good illustration is *Bryce v. Episcopal Church*, 289 F.3d 648 (10th Cir. 2002).[25] There, following her same-sex civil union, a youth minister sued her church employer under Title VII "for remarks about homosexuals and [her] homosexual activities." *Id.* at 651-53. The court declined to decide if plaintiff's role met the "ministerial exception" because her claims were precluded by the "broader church autonomy doctrine." *Id.* at

---

[24] *Cath. Bishop* remains "good law." *Jusino v. Fed'n of Cath. Tchrs.*, 54 F.4th 95, 102 (2d Cir. 2022).

[25] *Bryce* was cited with approval in *Hosanna*, 565 U.S. at 188 n.2.

658 n.2. Under that doctrine, personnel decisions are insulated where "the alleged misconduct is 'rooted in religious belief.'" *Id*. at 657 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). As plaintiff suffered for "violating Episcopal doctrine," *id*. at 652—specifically, entering a same-sex union—and the challenged employment action consisted of "meetings to discuss that decision and the ecclesiastical doctrine underlying it, the courts will not intervene." *Id*. at 660; *accord Butler*, 609 F.Supp.3d at 199; *Garrick v. Moody Bible Inst.*, 412 F.Supp.3d 859, 871-73 (N.D.Ill. 2019) (citing *Bryce*); *Payne-Elliott v. Roman Cath. Archdiocese*, 193 N.E.3d 1009, 1013-14 (Ind. 2022) (same).

By defying WV's Biblical Standards of Conduct, Plaintiff breached its "standard of morals," *Watson v. Jones*, 80 U.S. 679, 733 (1871), via "misconduct [that] is 'rooted in religious belief.'" *Bryce*, 289 F.3d at 657. That is sufficient. But in addition, as in *Bryce*, WV's staffing decision was the result of managerial "meetings to discuss that decision and the [religious] doctrine underlying it." *See* MF ¶¶50-51 (explaining religious dimension of the decision-making process). "Under controlling case law, the church autonomy doctrine applies in the employment-discrimination context, as it does elsewhere. And this principle forecloses judicial inquiry into the plausibility of [WV's] asserted religious justifications in this case." *Butler*, 609 F.Supp.3d at 204.

### b)  Both of Plaintiff's Claims Fail Free-Exercise Scrutiny.

Plaintiff does not address this defense.[26] World Vision relies on its previous arguments, *see* Defs. MSJ (Dkt. 26) at 29-32, but adds a few observations about the

---

[26] Plaintiff's only mention of strict scrutiny are two stray references in her discussion of the WLAD. *See* Pls. MSJ (Dkt. 24) at 25-26.

DEF. WORLD VISION'S OPPOSITION     Page 30
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

quality of the government interests in the context of this case. Antidiscrimination laws serve an "important interest" but do not qualify as a public policy of the highest order. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 46 F.4th 1075, 1099 (9th Cir. 2022).[27] Here, the public policy of "highest order," *Yoder*, 406 U.S. at 215, the one *Bostock* was "deeply concerned with," *Bostock*, 140 S.Ct. at 1754, is "preserving the promise of the free exercise of religion enshrined in our Constitution [and whose] guarantee lies at the heart of our pluralistic society," *id.* This guarantee protects "deep and sincere religious beliefs" opposed "to gay marriage." *Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*, 138 S.Ct. 1719, 1728 (2018). Such beliefs are "due proper respect," Respect for Marriage Act, Pub. L. 117-228, §2(2) (Dec. 13, 2022), not vilification or subordination.

### c) Both Claims Fail Expressive-Association Scrutiny.

Plaintiff does not address this defense. World Vision relies on its previous arguments. *See* Defs. MSJ (Dkt. 26) at 32-34. *See also* Free Exercise discussion, above.

### 5. Plaintiff Cannot Overcome the WLAD ROE.

Plaintiff agrees that the scope of WLAD's ROE is governed by *Woods v. SUGM*, 197 Wash. 2d 231 (2021).[28] In her words, the test for the WLAD ROE is "whether or not the employee's position fits within the ministerial exception consistent with the tests

---

[27] *Reh'g en banc granted, opinion vacated*, 59 F.4th 997, *injunction pending appeal granted*, 64 F.4th 1024 (2023) (en banc). Normally, "[v]acated opinions remain persuasive … authority," *Spears v. Stewart*, 283 F.3d 992, 1017 n.16 (9th Cir. 2001), unless and until their logic is overruled. Here, the logic was actually reinforced by the en-banc court, which (over just one dissent) issued an injunction pending appeal, meaning it found a likelihood of success. *FCA*, 64 F.4th 1024.

[28] *Woods* did not decide the federal constitutional issues, which should have led to a different result. WV reserves the right to revisit this issue in light of any applicable legal developments.

laid out in *Hosanna-Tabor* and *Our Lady of Guadalupe*." Pls. MSJ at 25. As WV has argued at length, the DCSR position that Plaintiff sought meets these tests. *See supra* at 20-26 and Defs. MSJ at 23-28. The DCSR position therefore meets the WLAD ROE. Regardless, Plaintiff's state claim must bow to each and every WV defense based in the U.S. Constitution. *See* MSJ at 34-36; *see also supra* 20-31.

### 6.   *Defendant's RFRA Defense Is Not At Issue on Summary Judgment.*

WV has not asserted any RFRA defense for MSJ purposes, *see* Defs. MSJ at 25 n.25, but reserves it for subsequent proceedings and precedential developments.

## IV.   CONCLUSION.

Plaintiff's MSJ should be denied and her case dismissed with prejudice. As part of the Court's decision, World Vision respectfully suggests that the Court include alternate rulings to help withstand appeal, since an ongoing "process of inquiry" will continue to infringe WV's First Amendment rights. *Cath. Bishop*, 440 U.S. at 502. The Ninth Circuit has been clear: courts should follow the "well-trodden path" of "reaching and deciding a dispositive First Amendment issue that will avoid forcing the parties through unnecessary and protracted litigation." *Green*, 52 F.4th at 800 (citations omitted). They should offer protection from "the expense and indignity of the civil legal process," *Elvig*, 375 F.3d at 957, not subject religious institutions to "protracted legal process pitting church and state as adversaries," *Bollard*, 196 F.3d at 949. In fact, *Spencer* itself requires this. 633 F.3d at 731.

Summary judgment for Plaintiff would require ruling against every applicable and validly asserted affirmative defense. Summary judgment for World Vision would

require ruling in favor of just one of its defenses based in the U.S. Constitution, which necessarily trumps both (all) statutory claims. Alternate rulings would help limit this litigation, preserving the parties' and public's resources and legal rights, if they would support appellate affirmance on an alternate ground.

This case should be dismissed with prejudice.

Respectfully submitted,

DATED this May 1, 2023

ELLIS, LI & McKINSTRY PLLC

By:   *s/ Nathaniel L. Taylor*

Nathaniel L. Taylor, WSBA No. 27174
Abigail J. St. Hilaire, WSBA No. 48194
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
Telephone: (206) 682-0565
Fax: (206) 625-1052
Email: ntaylor@elmlaw.com
Email: asthilaire@elmlaw.com

GAMMON & GRANGE, P.C.
Scott J. Ward, VSB #37758
    (admitted pro hac vice)
J. Matthew Szymanski, VSB # 33150
    (admitted pro hac vice)
1945 Old Gallows Road, Suite 650
Tysons, Virginia 22182
Telephone: (703) 761-5012
Email: SJW@gg-law.com
Email: JMS@gg-law.com

*Attorneys for Defendant*
*World Vision, Inc.*

DEF. WORLD VISION'S OPPOSITION
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Page 33

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

I certify that this memorandum contains 10,012 words, in compliance with the 10,500-word limit in the Court's Order on Over-Length Briefs filed 4/5/2023 (Dkt. 21).

DEF. WORLD VISION'S OPPOSITION
TO PL.'S MOT. FOR SUM. JUDGMT.
CASE NO. 2:21-CV-00920-JLR

Page 34

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052