THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AUBRY MCMAHON,<br><br>      Plaintiff,<br><br>  vs.<br><br>WORLD VISION, INC.<br><br>      Defendant. | CASE NO. 2:21-CV-00920-JLR<br><br>DEFENDANT WORLD VISION'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT<br><br>*NOTE ON MOTION CALENDAR:*<br>*May 5, 2023* |

DEF. WORLD VISION'S REPLY BRIEF ON SUMMARY JUDGMENT
CASE NO. 2:21-CV-00920-JLR

Page i

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

Table of Contents

I.  WV DEFENSES THAT REMAIN EFFECTIVELY UNOPPOSED. .............................1

   A. Plaintiff Fails to Rebut WV's Jurisdictional Defense. ............................................1

   B. Plaintiff Fails to Rebut WV's Religious Autonomy Argument............................3

   C. Plaintiff Fails to Rebut WV's Free Exercise Argument. .......................................7

   D. Plaintiff Concedes WV's Expressive Association Argument................................8

II. WV DEFENSES THAT REMAIN UNDEFEATED. ........................................................9

   A. Plaintiff's Claims Fail to Meet the Three-Step Test..................................................9

   B. Plaintiff Fails to Rebut WV's ROE Argument. .........................................................9

   C. Plaintiff Fails to Rebut WV's BFOQ Argument.......................................................11

   D. Plaintiff Fails to Rebut WV's ME Argument. ..........................................................11

III. CONCLUSION: THIS CASE MUST BE DISMISSED WITH PREJUDICE. .............17

DEF. WORLD VISION'S REPLY
BRIEF ON SUMMARY JUDGMENT
CASE NO. 2:21-CV-00920-JLR

Page ii

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

On cross-motions for summary judgment, Defendant World Vision herein replies to Plaintiff's Opposition ("Pls. Opp."; Dkt. 30) to WV's own Motion for Summary Judgment ("Defs. MSJ"; Dkt. 26), with references, as appropriate, to WV's Opposition ("Defs. Opp."; Dkt. 32) to Plaintiff's own Motion ("Pls. MSJ"; Dkt. 35). This brief follows the same nomenclature as WV's two prior briefs.

## I. WV DEFENSES THAT REMAIN EFFECTIVELY UNOPPOSED.

### A. Plaintiff Fails to Rebut WV's Jurisdictional Defense.

"Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (quoting Fed.R.Civ.P. 12(h)(3)). Thus, objections to "jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Id.* (citation omitted). Consequently, "a federal court may not entertain an action over which it has no jurisdiction." *Hernandez v. Campbell*, 204 F.3d 861, 865 (9th Cir. 2000) (citations omitted).

In both its briefs, WV has argued the court may not entertain this action over which jurisdiction is lacking. *Id.*; *see* Defs. MSJ at 1, 11-13; Defs. Opp. at 2-5. Neither of Plaintiff's briefs mentions "jurisdiction" in name or substance, except for the uncontested proposition that the "ministerial exception is an 'affirmative defense … not a jurisdictional bar.'" Pls. MSJ at 12. She fails to argue, let alone refute, this point.

Plaintiff's only argument that even approaches this point helps sink her case. This argument occurs in her opposition, not to WV's jurisdictional defense, but to its

DEF. WORLD VISION'S REPLY
BRIEF ON SUMMARY JUDGMENT
CASE NO. 2:21-CV-00920-JLR

Page 1

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

ROE defense, which itself reflects her misunderstanding of the jurisdictional bar she faces. *See* Pls. Opp. at 2-6. There, Plaintiff makes two weak arguments.

First, Plaintiff dismisses as a "red herring," *id*. at 6, the "purported *disagreement* with [WV's] sincerely held religious and Christian theological beliefs surrounding the biblical understanding of Christian love and marriage," because "this argument does not bring Plaintiff's claims within the purview of the Title VII [ROE]," *id*. at 5. This is error. The jurisdictional bar is grounded in the First Amendment, not Title VII. Yet, Plaintiff cites only two ROE cases: *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362 (9th Cir. 1986) and *Vigars v. Valley Christian Ctr.*, 805 F.Supp. 802 (N.D.Cal. 1992).

*Fremont*, to the extent it addresses "jurisdiction," states that the ROE "deprives the EEOC of [it]." *Id*. at 1366. Where there is "convincing evidence" that an employer's staffing decision stems from its "religious discrimination," i.e., its free exercise of religion, the ROE "deprives the EEOC of jurisdiction to investigate" pretext for that Title VII claim. *Id*. at 1366.[1] *Fremont* deals with the statutory bar to *Title VII claims*—not the First Amendment bar to hear a case at all. *Vigars* actually reinforces WV here. In Plaintiff's words, *Vigars* means that the "dislike of pregnancy outside of marriage [that] stems from a religious belief *may* be relevant to the Court's *First Amendment analysis*[.]" Pls. Opp. at 5 (emphasis added). WV agrees.

Second, Plaintiff says that even if these "purported theological disagreements" matter, they were unknown to WV when it rescinded her offer. *Id*. at 5. This timing is

---

[1] The court also addressed First Amendment limitations on remedies. 781 F.2d at 1369-70 ("The intrusion at issue in this case is an injunction[.]").

irrelevant. If the Court lacks jurisdiction over this case because it amounts to a theological controversy, it makes no difference when or how WV learned of it. The question is for the Court and the Court will address it whenever *the Court* learns of it.

WV's argument, which Plaintiff has not opposed, is that this lawsuit presents a religious controversy, a "religious thicket," into which the Court may not enter. *See* Defs. MSJ at 11-12 (quoting *Serbian Eastern Orthodox v. Milivojevich*, 426 U.S. 696, 713 (1976)); Defs. Opp. at 5. Plaintiff asks this Court to impose her view of Christ's Words on World Vision. Pls. Dep. at 183, 160-177. Plaintiff cultivated this thicket but now would hand the Court a machete and invite it to hack away. This litigation must stop at the religious thicket, not attempt to tunnel through it. The case must be dismissed.

**B.     Plaintiff Fails to Rebut WV's Religious Autonomy Argument.**

In both its briefs, WV has argued that, even if this Court has jurisdiction, both of Plaintiff's claims are barred by the religious autonomy doctrine. *See* Defs. MSJ at 22-23; Defs. Opp. at 28-30. Plaintiff devotes just two paragraphs to this argument. She asserts autonomy is "simply a generalized rearguing of the ministerial exception." Pls. Opp. at 21. Similarly, she asserts that "an expansive reading of the church autonomy doctrine would render the ministerial exception superfluous." Pls. MSJ at 24.

Plaintiff ignores the Supreme Court's summation of the law in *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2060 (2020) ("*OLG*").[2] Autonomy is a

---

[2] *OLG* was not close. Its seven-justice majority merely clarified the unanimous decision in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012) ("***Hosanna***").

DEF. WORLD VISION'S REPLY
BRIEF ON SUMMARY JUDGMENT
CASE NO. 2:21-CV-00920-JLR

Page 3

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

doctrine anchored in the Court's precedent since at least 1872. *Id.*[3] The ministerial exception is a "component" of autonomy first recognized by the Court in *Hosanna* in 2012. Autonomy secures the "independence of religious institutions" by "outlaw[ing]" government "intrusion" in their "internal management decisions," *id.*, including, perhaps especially, their internal staffing decisions. As one component of autonomy, the ME insulates staffing decisions of "certain key roles." *Id.* Autonomy turns on the religious nature of the *employer* and its *decisions* while the ME turns on the religious nature of the *job*. Thus, autonomy protects all *religiously motivated* staffing decisions, not just those for *certain key roles* subject to the ME, where the "minister" is insulated regardless of any religious motivation in the employer's *decision*.

World Vision argues for the ME while also underscoring the importance of its parent doctrine of autonomy. The ME has a critical role, and applies here, but it does not, and cannot, alone determine the boundaries of a religious employer's authority to require its employees to reflect its religious doctrines. That is the parent's role.

As World Vision has argued,[4] autonomy applies in Title VII cases, *e.g.*, *Bryce v. Episcopal Church*, 289 F.3d 648 (10th Cir. 2002), including those based on sexual

---

[3] *OLG* traces the autonomy doctrine from *Watson v. Jones*, 80 U.S. 679 (1872) through *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952) and *Serbian E. Orthodox, supra*, 426 U.S. 696 (1976). But autonomy is a broad, nearly ubiquitous principle. "This kind of state inspection and evaluation of the religious content of a religious organization is fraught with the sort of entanglement that the Constitution forbids. It is a relationship pregnant with dangers of excessive government direction ... of churches." *Larson v. Valente*, 456 U.S. 228, 255 (1982) (citation omitted). Indeed, the Supreme Court "has repeatedly cautioned courts against venturing into this constitutional minefield" of sorting between the religious and the secular. *Spencer*, 633 F.3d at 730.

[4] *See* Defs. MSJ at 10, 15, 20-23, 26-27; Defs. Opp. at 13, 29-32.

orientation, *e.g.*, *Butler v. St. Stanislaus Kostka Cath. Acad.*, 609 F.Supp.3d 184 (E.D.N.Y. 2022). But that is hardly all. Autonomy principles figure decisively in many Title VII cases, including *Spencer*. "[Plaintiff's] cramped reading of the [ROE] raises serious questions under both the Free Exercise Clause and the Establishment Clause. As we must, we reject this constitutionally questionable interpretation." *Spencer*, 633 F.3d at 729. "If the government coerced staffing of religious institutions by persons who rejected or even were hostile to the religions the institutions were intended to advance, then the shield against discrimination would destroy the freedom of Americans to practice their religions." *Spencer* at 742 (Kleinfeld, J., concurring). In short, courts "avoid the First Amendment concerns which always tower over us when we face a case that is about religion." *Killinger v. Samford Univ.*, 113 F.3d 196, 201 (11th Cir. 1997).

Autonomy is unambiguous. It includes the "constitutionally-protected interest of religious organizations in making religiously-motivated employment decisions," *Hall v. Baptist Mem'l Health Care*, 215 F.3d 618, 623 (6th Cir. 2000). "The decision must itself be religious[i.e.,] founded on religious beliefs." *Starkey v. Roman Cath. Archdiocese*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring). "[A]ttempting to forbid religious discrimination against non-minister employees where the position involved has *any* religious significance is uniformly recognized as constitutionally suspect, if not forbidden."[5] *Little v. Wuerl*, 929 F.2d 944, 948 (3d Cir. 1991) (citing *EEOC v. Miss. Coll.*,

---

[5] WV is not, as Plaintiff claims, recasting *her claim* as one for "religious discrimination." WV is claiming a religious justification ("religious discrimination") as *its defense*. *Starkey,* 41 F.4th at 946-47 (Easterbrook, J.). "It is undisputed that [WV] deems same-sex marriages improper on

DEF. WORLD VISION'S REPLY  
BRIEF ON SUMMARY JUDGMENT  
CASE NO. 2:21-CV-00920-JLR

Page 5

Ellis | Li | McKinstry  
1700 Seventh Avenue, Suite 1810  
Seattle, WA 98101-1820  
206.682.0565  Fax: 206.625.1052

626 F.2d 477 (5th Cir. 1980); *Maguire v. Marquette Univ.,* 627 F.Supp. 1499 (E.D.Wis. 1986); and *Feldstein v. Christian Science Monitor,* 555 F.Supp. 974 (D.Mass. 1983) (emphasis added)). Indeed, the First Amendment protects a religious employer who offers a "religious justification" for gender discrimination involving a *non-ministerial* employee. *Curay-Cramer v. Ursuline Acad.*, 450 F.3d 130, 142 (3d Cir. 2006).

In prior briefs, World Vision cited these "ROE cases" to emphasize that statutes must not be construed to violate the Religion Clauses. *See* Defs. MSJ at 10, 14, 17, 20, and Defs. Opp. at 8, 19, 29 (citing *NLRB v. Cath. Bishop*, 440 U.S. 490, 500 (1979)). As such, these cases may be considered statutory-construction cases. But, citing *Catholic Bishop* or similar precedent, they all construe a statutory exemption broadly to bar sex and other discrimination claims in order to *protect the independence or autonomy of the religious employers*. Without using the word "autonomy," they all vindicate it.

Plaintiff cites not one appellate case in opposition. She cites only *Starkey v. Roman Cath. Archdiocese*, 496 F.Supp.3d 1195 (S.D.Ind. 2020), without noting that it was decided at the motion-to-dismiss stage and that, at the summary-judgment stage, the same court ruled for the same religious employer, twice, on similar facts. *See Starkey v. Roman Cath. Archdiocese*, 553 F.Supp.3d 616 (S.D. Ind. 2021), *aff'd*, 41 F.4th 931 (7th Cir. 2022) and *Fitzgerald v. Roncalli High Sch.*, ___ F.Supp.3d ___, 2022 WL 16707372 (S.D. Ind. Sept. 30, 2022), *appeal filed* (7th Cir. Oct. 31, 2022).

---

doctrinal grounds and that avoiding such marriages is a kind of religious observance." *Id*.

DEF. WORLD VISION'S REPLY BRIEF ON SUMMARY JUDGMENT CASE NO. 2:21-CV-00920-JLR

Page 6

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

Finally, Plaintiff never addresses *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327 (1987). There, the Court explains the massive First Amendment problem if the ability of a religious organization to make religiously motivated employment decisions were based on a subjective, fact-specific, post-hoc judicial inquiry for every job:

> [I]t is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious. The line is hardly a bright one, and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission. Fear of potential liability might affect the way an organization carried out what it understood to be its religious mission. [483 U.S. at 336]

The same concerns exist when a religious employer's ability to carry out its religious mission turns on its guess as to which positions might be covered by the ME. *Id*. Such employers must self-censor by eliminating religious qualifications or else face serial litigation: "The prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment, and it cannot be dismissed by saying it will happen only once." *New York v. Cathedral Acad.*, 434 U.S. 125, 133 (1977).

WV's church autonomy argument is supported by many court decisions, by policy, and by logic. Plaintiff offers one quote from one district court case that was eventually decided for the religious employer. Nothing more. Since autonomy constitutionally bars both of Plaintiff's claims, her case must be dismissed.

C.     **Plaintiff Fails to Rebut WV's Free Exercise Argument.**

In both its briefs, WV has argued that, even if Plaintiff's case survives the jurisdictional bar, autonomy, and ME, both her claims fail strict scrutiny under the

DEF. WORLD VISION'S REPLY
BRIEF ON SUMMARY JUDGMENT
CASE NO. 2:21-CV-00920-JLR

Page 7

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

Free Exercise Clause. *See* Defs. MSJ at 20-21 & n.19, 28-32; Defs. Opp. at 30-31. In response, Plaintiff baldly asserts that Title VII and WLAD are "neutral, generally applicable" laws subject only to "rational basis review." Pls. MSJ at 25-26; Pls. Opp. at 19-20. Plaintiff addresses none of the arguments or cases cited by WV. She ignores all the recent, compelling Supreme Court cases applying strict scrutiny to laws that (like Title VII) could be construed and applied to religious exercise while freely affording secular exemptions. *See* Defs. MSJ at 20-21 & n.19 (collecting cases). Plaintiff effectively concedes this argument, and both of her claims must be dismissed.

### D.   Plaintiff Concedes WV's Expressive Association Argument.

In both its briefs, WV has argued that, even if Plaintiff's case survives the jurisdictional bar, autonomy, ME, and Free Exercise, both of Plaintiff's claims fail strict scrutiny under the Expressive Association doctrine of the Free Speech and Assembly Clauses. *See* Defs. MSJ at 32-34; Defs. Opp. at 27, 31. Plaintiff never addresses this issue, even obliquely. This *concession* requires that both of her claims be dismissed.[6]

---

[6] Relatedly, Plaintiff asserts that, if the "Court were to give serious consideration to the constitutional challenges Defendant appears to be making to Title VII and the WLAD as applied to Plaintiff's claims," the Court must give notice (certification) to the federal and state attorneys general under 28 U.S.C. § 2403. This assertion is meritless legally and factually. "The validity of a statute is not drawn in question every time rights claimed under such statute are controverted …. The validity of a statute [is] drawn in question when the existence, or constitutionality, or legality of such statute [is] denied, and the denial forms the subject of direct inquiry." *Peruta v. Cnty. of San Diego*, 771 F.3d 570, 575 (9th Cir. 2014) (quoting *U.S. v. Lynch*, 137 U.S. 280, 285 (1890)), *rev'd on other grounds en banc*, 824 F.3d 919 (9th Cir. 2016); *accord Atkins v. Rios*, 2022 WL 16720414, at *2 (E.D.Cal. Nov. 4, 2022). *See also Dynamics Corp. of Am. v. CTS Corp.*, 637 F.Supp. 389, 395 (N.D. Ill.), *aff'd*, 794 F.2d 250 (7th Cir. 1986) (Posner, J.), *rev'd on other grounds*, 481 U.S. 69 (1987). The purpose of § 2403 is to give the AG "a fair opportunity" to "save" the "statute," 794 F.2d at 259, not each and every application of it. "[S]o long as the court confines its discussion to the application of the statute to the facts, and not the validity

## II. WV DEFENSES THAT REMAIN UNDEFEATED.

### A. Plaintiff's Claims Fail to Meet the Three-Step Test.

Plaintiff has never met the three-step framework of *Opara v. Yellen*, 57 F.4th 709, 721 (9th Cir. 2023) ("Under either approach, staving off a motion for summary judgment on disparate treatment claims under ADEA and Title VII entails three steps."). *See* Defs. MSJ at 13-16; Defs. Opp. at 9-12. She never addresses WV's argument on these points and thus concedes them. Her claims should be dismissed.[7]

### B. Plaintiff Fails to Rebut WV's ROE Argument.

WV has argued that Title VII's ROE bars Plaintiff's Title VII claim and that WLAD's ROE bars her WLAD claim. *See* Defs. MSJ at 16-20 (Title VII ROE) and *id.* at 34-36 (WLAD ROE); Defs. Opp. at 17-20 (Title VII) and *id.* at 31-32 (WLAD).

Plaintiff's argues that the ROE is limited to cases where the plaintiff happens to claim *religious* discrimination. Pls. Opp. at 6. This argument is untenable after *Bostock v. Clayton County*, 140 S.Ct. 1731 (2020), which rested solely on the text of Title VII.

---

of the statute itself, the public interest concerns of § 2403(b) are not implicated." 637 F.Supp. at 395. WV does not challenge the constitutional validity of either statute. Plaintiff seems to concede as much. *See* Pls. Opp. at 19:8-10. Thus, government participation is unnecessary. (Should the government end up participating, however, WV's reserved RFRA defense would apply. *See* Defs. MSJ at 29 n.25; Defs. Opp. at 32.)

[7] Plaintiff's WLAD claim of marital status discrimination is misplaced. *See* Defs. Opp. at 14. Casting WV's conduct standards as discrimination, *see* Pls. Opp. at 6-8, Plaintiff relies upon a single case, *Busey v. Richland Sch. Dist.*, 172 F.Supp.3d 1167 (E.D.Wash. 2016), *aff'd*, 732 F.App'x 577 (9th Cir. 2018). But *Busey* is irrelevant here. In *Busey*, the employer was a public school district, there was no religious element present, and there was neither policy nor contract prohibiting the plaintiff's consensual relationship with another employee. Yet the school district terminated him for his "extramarital affair." *Id.* at 1180–81. Here, in stark contrast, WV's religious conduct policies are the undisputed reason for rescision of the job offer.

Title VII's ROE states: "This *subchapter* shall not apply [to] a religious corporation [with] respect to the employment of individuals of a particular religion to perform work connected with the carrying on [of] its activities." 42 U.S.C. § 2000e-1(a) (emphasis added). Title VII's definition of "religion" includes "all aspects of religious observance and practice, as well as belief." § 2000e(j). Plaintiff's religious-claims-only limitation is rejected not just by *Starkey*, 41 F.4th at 946-47 (Easterbrook, J.), as she concedes, but also by *Bear Creek Bible Church v. EEOC*, 571 F.Supp.3d 571, 623 (N.D.Tex. 2021). It also fails *Garcia v. Salvation Army*, 918 F.3d 997, 1004 (9th Cir. 2019) (ROE exempts religious entities "from the *entire subchapter* of Title VII'").

Plaintiff's argument would be more accurate if it said that 40-year-old Ninth Circuit nonbinding "obiter dicta" "suggests" a religious-claims-only-limitation, which is found nowhere in Title VII, contradicts the plain language of Title VII, is abrogated by later controlling cases such as *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 339 (1987), *Spencer*, and *Garcia*, is ignored by the cases applying the ROE to sex-discrimination such as *Miss. Coll.*, *Curay-Cramer*, *Bear Creek*, *Maguire v. Marquette Univ.*, 627 F.Supp. 1499 (E.D. Wis. 1986), *aff'd on narrower ground*, 814 F.2d 1213 (7th Cir. 1987), and *Henry v. Red Hill Evangelical Lutheran Church*, 201 Cal.App.4th 1041 (2011), and defies the crux of *Bostock*—Title VII's text means what it says—which crux created her cause of action here. Her federal claim would not even be cognizable if *Bostock* had relied on legislative history or anything other than the plain language of Title VII.[8]

---

[8] It is illogical to conclude Congress gave religious groups the right to hire only Christians but not to have Christian standards of conduct. Such a conclusion renders the first right illusory.

DEF. WORLD VISION'S REPLY
BRIEF ON SUMMARY JUDGMENT
CASE NO. 2:21-CV-00920-JLR

Page 10

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

Plaintiff concedes the ME trumps her WLAD ROE argument. *See* Pls. MSJ at 21:22-23; Pls. Opp. at 3:4-7. Since WV has met the requirements for the ME, it has also met the requirements for the WLAD. *See* Defs. MSJ at 23-28; Defs. Opp. at 20-26. Therefore, the ROEs bar both of Plaintiff's claims in this case.

C.   **Plaintiff Fails to Rebut WV's BFOQ Argument.**

WV has argued that Title VII's BFOQ defeats Plaintiff's Title VII claim and that WLAD's BFOQ defeats her WLAD claim. *See* Defs. MSJ at 30 n.26 (Title VII BFOQ) and *id*. (WLAD BFOQ); Defs. Opp. at 26 (Title VII) and *id*. (WLAD). Even under the law as misstated by Plaintiff, Pls. MSJ at 22-24, the same facts that support WV's ME defense establish its BFOQ defense.[9] *See Starkey*, 41 F.4th at 947 (Easterbrook, J., concurring) (suggesting BFOQ may well apply in this context).

D.   **Plaintiff Fails to Rebut WV's ME Argument.**

WV's ME defense rises from a strong record. *See* Defs. MSJ at 23-28; Defs. Opp. at 26-26. The DCSR Job Posting ("JP") when Plaintiff applied in November of 2020 is agreed. *See* Pls. MSJ at 13-14 (setting out JP in full). Its "essential functions" include:

> Serve as a *liaison* between donors and the general public as well as provide basic levels of customer service for all special programs. Help carry out our Christian organization's mission, vision, and strategies. *Personify* the ministry of World Vision by witnessing to Christ and ministering to others through life, deed, word and sign. You will also[:]
>   1. Keep Christ central in our individual and corporate lives. Attend and participate in the leadership of devotions, weekly Chapel

---

[9] Plaintiff's Title VII claim, under *Bostock*, is based on sex, and Title VII allows sex to be a BFOQ. 42 U.S.C. § 2000e-2(e). Even assuming *arguendo* that WV's conduct standards were deemed about status (which they are not) rather than conduct, then religion, sex, and sexual orientation would be BFOQs for WV. This is clear from WV's Standards of Conduct and the undisputed script read to Plaintiff in her interview. *See* Defs. MSJ at 7-9, 19, 27-28; Pls. Dep. at 201-03.

DEF. WORLD VISION'S REPLY
BRIEF ON SUMMARY JUDGMENT
CASE NO. 2:21-CV-00920-JLR

Page 11

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

> services, and regular prayer….
> 9. Learn and effectively communicate World Vision's involvement in ministries and projects around the world….
> 11. Be sensitive to Donor's needs and pray with them when appropriate.[10]

Plaintiff flips these essential functions upside down to claim that providing "basic levels of customer service," *id.*, is the whole JP, which "merely *touches* upon religion, and only vaguely," Pls. MSJ at 14-15 ("main duties [are] entirely secular").[11]

This is disingenuous. Even a biased reading of the above religious language indicates it is, in order of priority and in focus, the centerpiece of the JP, and alone suggests DCSRs may qualify for the ME. DCSRs are "liaisons" that "personify" WV to the public, including its lifeblood of donors. *See* Defs. MSJ at 23-28; Defs. Opp. at 20-26. An abundance of additional evidence indicates DCSRs are "key." Fully 9-11 weeks of training are required to join DCS, whose "Mission Statement" begins, "*Consumed and called by Jesus Christ*," SO (Dkt. 29) ¶19, and states, "Being a part of DCS means you are the ***Voice***, ***Face*** and ***Heart*** of World Vision." *Id.* The latter description is reinforced throughout WV's 6,197-page discovery record. *See* SO ¶¶17-29.

---

[10] JP 2020 (P0013-15), as set out in Pls. MSJ at 13-14 (emphasis added). Plaintiff's objection to "crucial member," "key liaison," and "voice of World Vision" in later JPs is addressed below.

[11] Plaintiff also relies upon a single page from WV's *Giving Word to Our Faith* ("GWF") and related PowerPoint to argue that DCSR duties are secular and do not involve religious training or communication. *See* Pls. MSJ at 16; Dkt. 25-7; Dkt. 25-8. To the contrary, the full GWF document (WV6158 to 6169) (Second Scott Ward Declaration ("SW2") Exhibit 1) demonstrates the importance of GWF training of DCSRs to faithfully communicate WV's Christian witness and ministry to donors and potential donors. There is no mandatory script—DCSRs must respond to God's leading and to the other person in such communications—but DCSRs cannot "violate any of these points" (Dkt. 25-8, WV6119) and must "be sure nothing expressed contradicts other messages in the [GWF] grid." SW2-01, WV6161 to 6166.

DEF. WORLD VISION'S REPLY  
BRIEF ON SUMMARY JUDGMENT  
CASE NO. 2:21-CV-00920-JLR

Page 12

Ellis | Li | McKinstry  
1700 Seventh Avenue, Suite 1810  
Seattle, WA 98101-1820  
206.682.0565  Fax: 206.625.1052

Plaintiff claims there is no "suggestion of religious leadership" for DCSRs. Pls. Opp. at 19; *see id*. at 14-18 (claiming no expectation of leadership in chapel, devotions, or prayer).[12] But leadership is not required for the ME. *See, e.g.*, *OLG*, 140 S.Ct. 2067 & n.26. Even if it were, Plaintiff admits that "every [DCSR] or trainee is 'required to attend devotions and to ultimately lead devotions.'" Pls. Opp. at 15.[13]

Plaintiff also confuses "expectations" with disciplinary offenses. *See, e.g., id*. at 18-19 (if DCSRs fail to pray with donors "no discipline will come of it"). Discipline might or might not "come of it," but discipleship would. Learning to lead, co-lead, or help lead chapel, devotions, and prayer is encouraged, expected, and ultimately required as part of the discipleship/training process. Indeed, WV's approach to these requirements, and to any shortcomings in meeting them, is itself Christian discipleship in action—WV disciples (coaches) its DCSRs so that they can be more faithful disciples of Jesus Christ. *See, e.g.*, Dkt. 25-10 at 48:5-22; SO (Dkt. 29) ¶¶17-25, 42, 48. All such job expectations are defined by employers, not employees. *See OLG*, 140 S.Ct. at 2066-67. World Vision need not fire someone for not praying to show that its expectations concerning prayer are serious and enforceable.

---

[12] Plaintiff makes much of the "virtual" attendance at chapel in early 2021, Pls. Opp. at 13-14, which of course was in the middle of the pandemic and adds nothing to Plaintiff's contention.

[13] Quoting WV's 30(b)(6) testimony. Plaintiff also admits that staff may ask other staff to "co-lead with them." Pls. Opp. at 14. Co-leading is still leading. Plaintiff's suggestion that Ms. Freiberg, at her Rule 30(b)(6) deposition (Mar. 10, 2023) "contradicted her prior testimony" from her fact deposition (Feb. 16, 2023) is wrong. First, her prior fact testimony was in response to counsel's vague hypothetical. Second, she had 22 days to investigate the topic for her testimony as WV's 30(b)(6) designee and simply had more complete factual information.

DEF. WORLD VISION'S REPLY
BRIEF ON SUMMARY JUDGMENT
CASE NO. 2:21-CV-00920-JLR

Page 13

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

Plaintiff sums up World Vision's ME argument as "asserting that all of its employees are ministers because 'all staff are responsible for important religious functions.'" Pls. Opp. at 9. And Plaintiff claims DCSR religious duties are "equally required of every other [WV] employee." *Id*. at 14; *see also id*. at 13, 16, 17, 19.[14]

The record refutes this. Unlike most WV staff, DCSRs speak for WV every day. They handle hundreds of thousands of calls, including over 10,000 prayer calls, every year. *See* SO (Dkt. 29) ¶¶29, 37. They are the front-line voices and *personifiers* of WV, as the DCS-led chapels, prayer calls, and shout-outs place beyond doubt. *See* Defs. Opp. at 22-24 ("[G]od brought us here [to DCS] to be the voice, face, and heart of World Vision"; "I'm constantly reminded of the privilege I have to be the voice for those [whom] we serve in Christ"; we get "to be a mouthpiece for our ministry"; "I'm glad I get to be the mouthpiece"; I've "always felt like working in DCS [really] puts us on the front lines of World Vision"; It's "a calling to come to World Vision [where we] actually pray for people all over the world when we answer [the phone] and ask, Can I pray for you?"; "I pour out my heart to every [caller] because we just don't know [what they're] going through"; "I love sharing World Vision's needs [with] our donors [and it's a]mazing to be able to open my mouth and allow for the holy spirit to work.").

Additional unique religious duties of DCSRS, not performed by many other WV staff, include the following daily activities as WV's mouthpiece: explaining how

---

[14] It is unsurprising that a deeply religious ministry like WV would require serious religious commitments of *all* staff. *Spencer, 633 F.3d at 735-41*. Indeed, that is precisely why religious autonomy is so crucial. But such generally shared religious requirements reinforce rather than undermine the specific expectations of the DCSR position that demonstrate it meets the ME.

DEF. WORLD VISION'S REPLY
BRIEF ON SUMMARY JUDGMENT
CASE NO. 2:21-CV-00920-JLR

Page 14

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

WV witnesses to Jesus Christ in its work and its programs, SO (Dkt. 29) ¶¶42, 45, 54 (which includes WV's Christian child-sponsorship program, a key donor program where WV works towards transformation of both child and donor-sponsor); explaining WV's religious programs and ministries, *id*. at ¶42; performing other DCSR-specific duties in the JP, Pls. MSJ at 13-14 (#3, #8, #9 ); responding when callers and donors ask about Jesus Christ and Christianity, SO ¶¶49, 50. Each of these religious duties is uniquely suitable for DCSRs, and each helps WV witness to Jesus, facilitate donor transformation, share the Gospel, and fulfill WV's core purpose of advancing by all means "the Gospel [of] Jesus Christ."[15] SO ¶¶23, 57.

Plaintiff claims the record evidence fails to prove a DCSR "undertakes 'vital religious duties' [in] carrying out the mission [or] whose role is important 'in the life of the religion.'" Pls. Opp. at 11. The record proves just the opposite, as shown above. *See also* SO ¶¶23-25, 42, 53-57; Defs. MSJ at 5-6, 25-28; Defs. Opp. at 20-26.[16]

Finally, Plaintiff starves *OLG* and *Hosanna* of all meaning. Those cases do not require most of the traits or attributes that Plaintiff demands. No one in *OLG* had "minister" in their title or obtained ordination. Neither case featured divinity degrees.

---

[15] It is undisputed that DCSRs' required duties include informing donors about WV's Christian witness and ministry. *See, e.g.*, SO ¶¶4, 22, 42, 54; Dkt. 25-10 at 20:11-19.

[16] In discovery, WV provided the six most-recent DCSR JPs. Modifiers in the most recent JPs call a DCSR a "crucial member" of DCS and a "key liaison and 'voice of World Vision.'" JP-2022, SO-11 (WV184). As WV testified, these modifiers merely explain or clarify what remains true of the job description or was already occurring or described from other sources. *See* Defs. MSJ at 5-6; SO (Dkt. 29) ¶¶19 (DCS Mission Statement), 24 & n.1. WV attempts to improve its JPs over time in response to changes in facts and law. This is an exercise in prudence, not manipulation. *But cf.* Pls. Opp. at 11 (such "after-the-fact changes [are] highly significant.").

DEF. WORLD VISION'S REPLY
BRIEF ON SUMMARY JUDGMENT
CASE NO. 2:21-CV-00920-JLR

Page 15

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

Neither required the employee to be a leader or to do more than "simply relay religious tenets."[17] *OLG*, 140 S.Ct. at 2067 & n.26. There was no stop-watch measurement of prayer time versus instructional time; in fact, the Court warned against measuring the percentage of time spent in religious mission. *Id*. at 2066-67 & n.26.[18] Rather, the Court focused on the employers' expectations, including teachers praying with and for their students (here, donors); leading others to Mass or worship (here, mandatory weekly chapel and daily devotions); teaching from and with a lens of Christian formation ("expected to guide [by] word and deed, toward the goal of living [in] accordance with the faith," *id*. at 2066); and praying with and for the beneficiaries of their mission.

In sum, the Court found vital religious duties and expectations as the religious employers defined those duties and expectations in light of their religious missions. Here, Plaintiff applied for a job with precisely such duties and expectations, though with different audiences or beneficiaries. That Plaintiff chose to invest nearly half her briefs battling the ME shows her appreciation of its relevance and illuminates the underlying religious dispute at the heart of her claims. It also showcases the need for autonomy and other protections for a religious ministry like World Vision to be able to decide for itself what it believes, how that authentic faith translates to how it and those who carry it out should live, and who will speak for it and minister on its behalf.

---

[17] Indeed, in *OLG*, the ME applied to the plaintiff even though she was not required by her employer to share its Catholic faith.

[18] Only the dissent credited the "amount of time." 140 S.Ct. at 2075, 2080.

DEF. WORLD VISION'S REPLY  
BRIEF ON SUMMARY JUDGMENT  
CASE NO. 2:21-CV-00920-JLR

Page 16

Ellis | Li | McKinstry  
1700 Seventh Avenue, Suite 1810  
Seattle, WA 98101-1820  
206.682.0565  Fax: 206.625.1052

## III. CONCLUSION: THIS CASE MUST BE DISMISSED WITH PREJUDICE.

This Court and the Ninth Circuit already ruled that World Vision is a Christian humanitarian relief organization whose Christian witness "pervades the workplace" and "is integrated into [and] communicated as part of [all it] does." *Spencer*, 633 F.3d at 739, 741; *accord Spencer*, 570 F.Supp.2d at 1281–82, 1289. Those facts have not changed. Under controlling law, any one of the grounds in WV's MSJ and discussed above is sufficient to dismiss this case with prejudice.

Respectfully submitted,

DATED this May 5, 2023

        ELLIS, LI & McKINSTRY PLLC

        By:  *s/ Nathaniel L. Taylor*
        Nathaniel L. Taylor, WSBA No. 27174
        Abigail J. St. Hilaire, WSBA No. 48194
        1700 Seventh Avenue, Suite 1810
        Seattle, WA 98101-1820
        Telephone: (206) 682-0565
        Fax: (206) 625-1052
        Email: ntaylor@elmlaw.com
        Email: asthilaire@elmlaw.com

        GAMMON & GRANGE, P.C.
        Scott J. Ward, VSB #37758
          (admitted pro hac vice)
        J. Matthew Szymanski, VSB # 33150
          (admitted pro hac vice)
        1945 Old Gallows Road, Suite 650
        Tysons, Virginia 22182
        Telephone: (703) 761-5012
        Email: SJW@gg-law.com
        Email: JMS@gg-law.com

        *Attorneys for Defendant*
        *World Vision, Inc.*

DEF. WORLD VISION'S REPLY BRIEF ON SUMMARY JUDGMENT
CASE NO. 2:21-CV-00920-JLR
Page 17
Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

I certify that this memorandum contains 5199 words, in compliance with the 5,250-word limit on Reply Briefs in the Court's Order on Over-Length Briefs filed 4/5/2023 (Dkt. 21).

DEF. WORLD VISION'S REPLY BRIEF ON SUMMARY JUDGMENT
CASE NO. 2:21-CV-00920-JLR

Page 18

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052