1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

AUBRY MCMAHON,

CASE NO. C21-0920JLR

11

Plaintiff,

ORDER

12

v.

WORLD VISION, INC.,

13

Defendant.

14

15

## I.   INTRODUCTION

16

Before the court are (1) Plaintiff Aubry McMahon's motion for partial summary

17

judgment as to liability (Pl. MSJ (Dkt. # 24); Pl. Reply (Dkt. # 33)) and (2) Defendant

18

World Vision, Inc.'s ("World Vision") motion for summary judgment (Def. MSJ (Dkt.

19

# 26); Def. Reply (Dkt. # 34)).  Each party opposes the other's motion.  (Pl. Resp (Dkt.

20

# 30); Def. Resp. (Dkt. # 32).)  The court has considered the motions, the parties'

21

submissions in support of and in opposition to the motions, the relevant portions of the

22

//

ORDER - 1

1  record, and the applicable law.  Being fully advised,[1] the court DENIES Ms. McMahon's

2  motion for partial summary judgment and GRANTS World Vision's motion for summary

3  judgment.

## II.    BACKGROUND

5       Below, the court discusses the relevant factual and procedural background.

### A.    The Parties

7       Ms. McMahon is "an openly gay woman."  (Pl. MSj at 2; 4/11/23 Wolnowski

8  Decl. (Dkt. # 25) ¶ 10, Ex. 9 ("McMahon Dep. Tr.") at 85:21-86:4, 91:11-92:13.)  She

9  became engaged to her girlfriend in November 2019, and they married in September

10  2020.  (*Id.* at 29:10-11.)  Ms. McMahon became pregnant around June 2020 via a sperm

11  donor from a "cryobank."  (*Id.* at 35:1-6, 36:20-22.)  Their child was born on March 6,

12  2021.  (*Id.* at 43:9-12.)

13       Founded in 1950 by Dr. Robert Pierce, World Vision declares itself to be a

14  "Christian ministry dedicated to sharing the gospel of Jesus Christ, primarily through

15  humanitarian outreach to children and families around the world who are poor and

16  underserved."  (Freiberg Decl. (Dkt. # 28) ¶ 18.)  It "operates in many ways like a

17  Christian church and implements its programs through and as supported by local

18  churches in the United States and around the world."  (*Id.*)  Under World Vision's

19  //

21       [1] Neither party has requested oral argument (*see* Def. MSJ at 1; Pl. MSJ at 1), and the
22  court has determined that oral argument would not be helpful to its disposition of the motions,
*see* Local Rules W.D. Wash. LCR 7(b)(4).

Articles of Incorporation, "[t]he primary, exclusive and only purposes for which this corporation is organized are religious ones," namely:

> To perform the functions of the Christian church including, without limitation, the following functions[:]  to conduct Christian religious and missionary services, to disseminate, teach and preach the Gospel and teachings of Jesus Christ, to encourage and aid the growth, nu[r]ture and spread of the Christian religion and to render Christian service, both material and spiritual to the sick, the aged, the homeless and the needy.

(*Id.* ¶ 19, Ex. MF 9 at WV-000017-18.)  The Articles of Incorporation also require World Vision and its employees "[t]o continually and steadfastly uphold and maintain the following statement of faith of this corporation":

> (a) We believe the Bible to be the inspired, the only infallible, authoritative Word of God;
> (b) We believe that there is one God, eternally existent in three persons: Father, Son, and Holy Spirit;
> (c) We believe in the deity of our Lord Jesus Christ, in His virgin birth, in His sinless life, in His miracles, in His vicarious and atoning death through His shed blood, in His bodily resurrection, in His ascension to the right hand of the Father, and in His personal return in power and glory;
> (d) We believe that for the salvation of lost and sinful man regeneration by the Holy Spirit is absolutely essential;
> (e) We believe in the present ministry of the Holy Spirit by whose indwelling the Christian is enabled to live a godly life;
> (f) We believe in the resurrection of both the saved and the lost; they that are saved unto the resurrection of life and they that are lost unto the resurrection of damnation.
> We believe in the spiritual unity of believers in our Lord Jesus Christ.

(*Id.* at WV-000007-08; *see also* Freiberg Decl. ¶ 20 (providing links to World Vision's Statement of Faith and the Apostles' Creed).)  According to World Vision, "[t]he above stated religious beliefs of World Vision reflect its ultimate foundation as a Christian ministry.  Everything else World Vision does or aspires to do is built on this foundation." (Freiberg Decl. ¶ 22.)

Additionally, central to World Vision's core principles and policies are the phrase "witness to Jesus Christ" and doctrines about being a faithful witness to, for, and about Jesus Christ.  (*See id.* ¶¶ 30-31.)  Indeed, World Vision's job postings require "witnessing to Christ and ministering to others through life, deed, word and sign."  (*Id.* (first citing *id.*, Ex. MF 10; and then citing 4/11/23 Wolnowski Decl. ¶ 2, Ex. 1 ("Job Posting") at WV-000048).)  World Vision believes that it and its staff's "corporate and individual behavior witnesses, reflects, and testifies about what we believe as a ministry and as individual believers."  (Freiberg Decl. ¶ 37.)  Accordingly, World Vision "seeks to honor God by requiring all staff to '[f]ollow the living Christ, individually and corporately in faith and conduct, publicly and privately, in accord with the teaching in His Word (the Bible).'"  (*Id.* ¶ 32, Ex. MF 14 ("CCW Policy") at WV-000027; *see also id.* ¶ 33, Ex. MF 15 ("BECC Policy") at WV-000031-32 (requiring that staff "behavior [be] consistent with the teachings of Scripture" and stating that because World Vision "seeks to be an organization that is 'Christian' in every sense of the word," "all staff represent [World Vision] and, more importantly, the Gospel of Jesus Christ, in their work as well as in their private lives").)

Because it is "impossible . . . to identify every form of behavior that we understand the Bible defines as acceptable and unacceptable to God," World Vision provides Standards of Conduct ("SOC") to "clarify expectations and assist candidates/employees in deciding whether or not [World Vision] is the right place for them to serve the Lord."  (*Id.* ¶ 40, Ex. MF 18 ("SOC") at WV-000035.)  In World Vision's view, the Bible confines the "express[ion of] sexuality solely within a faithful

1    marriage between a man and a woman."  (*Id.* ¶ 41, Ex. 19 ("CCW/SOC FAQ") at

2    WV-004694 (stating that any sexual conduct outside this "Biblical covenant" represents

3    unacceptable represents "open, ongoing, unrepentant" sin); *see also id.* ¶¶ 39-49

4    (discussing World Vision's view of Biblical marriage).)  Accordingly, the SOC prohibits,

5    among other things, "sexual conduct outside the Biblical covenant of marriage between a

6    man and a woman."  (SOC at WV-000036.)

7         To be eligible for employment at World Vision, an individual must, among other

8    things, be able and willing to affirm and comply with the World Vision Statement of

9    Faith and/or Apostle's Creed, the Business Ethics and Christian Conduct Policy ("BECC

10   Policy"), the Christian Commitment and Witness Policy ("CCW Policy"), and the World

11   Vision SOC.  (*See, e.g.*, Freiberg Decl. ¶ 34, Ex. MF 16; 4/11/23 Wolnowski Decl. ¶ 13,

12   Ex. 12 ("Talbot Dep. Tr.") at 40:2-5, 88:22-89:6.)

13   **B.      World Vision Extends an Offer of Employment to Ms. McMahon**

14        In or around November or December 2020, Ms. McMahon saw a job posting for

15   the position of customer service representative with World Vision on the website

16   Indeed.com.  (McMahon Dep. Tr. at 139:18-22, 148:5-25; 4/11/23 Wolnowski Decl.

17   ¶ 11, Ex. 10 ("3/10/23 Freiberg Dep. Tr.") at 12:3-8.)  According to the job description, a

18   World Vision customer service representative will "serve as a liaison between donors and

19   the general public as well as provide basic levels of customer service for all special

20   programs."  (Job Posting at WV-000048.)  The customer service representative will also

21   "[h]elp carry out our Christian organization's mission, vision, and strategies" and

22   "[p]ersonify the ministry of World Vision by witnessing to Christ and ministering to

others through life, deed, word and sign." (*Id.*)  Additionally, the job posting provides that a customer service representative will:

> 1. Keep Christ central in our individual and corporate lives.  Attend and participate in the leadership of devotions, weekly Chapel services, and regular prayer.
>
> 2. Maintain reliable, regular attendance.  Report to work on time and return from breaks and lunches on time.
>
> 3. Under supervision, learn to answer inbound customer service calls and make outbound calls, to current and potential donors in response to all media presentations and World Vision products and services.  Answer incoming calls using an Automated Call Distribution system utilizing a standard script for guidance. Recognize and respond to up-sell opportunities and actively cross-sell other [World Vision] programs when appropriate.
>
> 4. Through training and active participation, gain the skills necessary to assess callers' needs and input information accurately and efficiently using data entry and ten-key skills.
>
> 5. Achieve and maintain an acceptable level of individual statistics to accomplish Call Center business goals.
>
> 6. Develop skills to utilize technology for maintaining and updating donor information as appropriate.
>
> 7. Accepts [sic] constructive feedback and welcomes [sic] instruction and direction.
>
> 8. Under supervision, research and effectively respond to inquiries utilizing a variety of resource materials and methods.
>
> 9. Learn and effectively communicate World Vision's involvement in ministries and projects around the world.
>
> 10. Work collaboratively with team members.
>
> 11. Be sensitive to Donor's needs and pray with them when appropriate.
>
> 12. Perform other duties as assigned.

1   13. Keep informed of organizational announcements, activities and changes
2   via regular reading of the WVUS Intranet and other corporate
    communication tools.

3   (*Id.* at WV-000049.)

4   According to World Vision's "applicant tracking system," Ms. McMahon

5   submitted her job application materials on or about November 25, 2020.  (4/11/23

6   Wolnowski Decl. ¶ 3, Ex. 2; McMahon Dep. Tr. at 186:5-24; 4/11/23 Wolnowski Decl.

7   ¶ 12, Ex. 11 ("Miolla Dep. Tr.") at 15:14-16:4.)  Following an interview process,

8   Catherine Miolla, a talent acquisition partner at World Vision (Miolla Dep. Tr. at

9   11:23-12:5), made a verbal offer of employment to Ms. McMahon on January 4, 2021

10  (*id.* at 22:4-10, 46:6-47:6; 112:10-14).  The following day, Ms. Miolla sent a formal

11  written offer letter of employment to Ms. McMahon.  (4/11/23 Wolnowski Decl. ¶ 4, Ex.

12  3 ("Job Offer"); Miolla Dep. Tr. at 47:24-48:6; 48:22-49:3.)  In relevant part, the letter

13  stated:  "On behalf of World Vision, Inc., I am pleased to provide you with this letter as

14  written confirmation of our verbal offer for the full-time position of Donor/Customer

15  Service Representative Trainee (DSR Trainee) commencing 2/1/2021."  (Job Offer.)  The

16  letter also stated that consideration for employment as a Donation Services

17  Representative was dependent upon her successful completion of a nine-to-eleven-week

18  training and evaluation program.  (*Id.*)

19  **C.    World Vision Rescinds the Job Offer**

20  The same day World Vision sent Ms. McMahon written confirmation of the job

21  offer, Ms. McMahon sent an email to Ms. Miolla, which read:

22  //

ORDER - 7

1
2
3

> Hey there, I just have a quick question!  My wife and I are expecting our first baby in March and I wanted to see if I would qualify for any time off since I'll be a new employee?  I will be the one having the baby so I just wanted to check to see if any time would be allowed off. If not, no worries, thanks so much!

4 (Freiberg Decl. ¶ 9, Ex. MF 4 ("Post-Offer Emails") at WV-000080.)  After receiving

5 Ms. McMahon's email, Ms. Miolla decided to bring the email to the attention of Melanie

6 Freiberg, a senior director of talent management at World Vison.  (*Id.* ¶ 10.)  Shortly

7 thereafter, Christine Talbot—who, at the time, held the position of senior vice president

8 of human resources at World Vision (Talbot Dep. Tr. at 11:16-21)—became aware of

9 Ms. McMahon's email (*id.* at 19:22-20:6).

10       According to Ms. Talbot and Ms. Freiberg, the email "indicated potential

11 noncompliance with World Vision's Standards of Conduct and related policies

12 surrounding World Vision's deeply held religious conviction that sexual conduct should

13 not be outside of marriage and that marriage is a Biblical covenant between a man and a

14 woman."  (Freiberg Decl. ¶ 10; Talbot Dep. Tr. at 21:8-25.[2])  In her deposition, Ms.

15 Talbot clarified that "in [Ms. McMahon's January 5, 2021] email, [Ms. McMahon]

16 self-identifies herself being married to another woman.  And [World Vision's] standards

17 of conduct require—you know, to be eligible for employment, require that a job applicant

18 or a job offeree affirm their ability to live according to [World Vision's] standards of

19 conduct which specifically names marriage to be a biblical covenant between a man and a

20

21       [2] Additionally, according to Ms. Freiberg, Ms. McMahon's January 5, 2021 email
"conflicted with her previous representations that she could and would comply with this standard
22 of conduct about marriage and sexual conduct."  (Freiberg Decl. ¶ 11, Ex. MF 5 ("DSRT Phone
Screening") at WV-000067-70 (notes regarding one of Ms. McMahon's phone interviews).)

woman." (Talbot Dep. Tr. at 21:18-25; *see also id.* at 40:2-6, 47:3-12 ("If an applicant is

unable or unwilling to affirm and comply with that standard, they're not eligible for

employment.").)

    After receiving Ms. McMahon's January 5, 2021 email, "World Vision engaged in

internal discussions about the application of its Biblical marriage policy, and the

Scriptural truths on which it is based, to Ms. McMahon's situation." (Freiberg Decl.

¶¶ 50-51.) Ms. Freiberg, Ms. Talbot, and other managers at World Vision were involved

the discussions. (*See id.*; 4/11/23 Wolnowski Decl. ¶ 14, Ex. 13 ("2/16/23 Freiberg Dep.

Tr.") at 74:23-76:22.) After these discussions, Ms. Talbot decided that Ms. McMahon's

offer would be rescinded because of Ms. McMahon's "inability" "to meet one of the

fundamental requirements of employment with [World Vision], which would be

affirming and complying with the standards of conduct which were described in the

interview process; specifically, Ms. McMahon's inability to comply with the SOC

prohibiting sexual conduct outside the Biblical covenant of marriage between a man and

a woman." (Talbot Dep. Tr. at 29:6-9, 46:17-20, 48:18-19, 58:8-16, 60:16-20,

65:18-66:10, 67:7-17; 2/16/23 Freiberg Dep. Tr. at 103:12-21, 105:17-106:5; Freiberg

Decl. ¶¶ 9-13, 48-51 (discussing the decision to rescind Ms. McMahon's offer and why

her conduct made her unsuitable for the role); SOC at WV-000036.) On January 8, 2021,

"after several attempts by World Vision to discuss this matter further with Ms.

//

//

//

ORDER - 9

1    McMahon," World Vision informed Ms. McMahon that it was rescinding the job offer.[3]

2    (Freiberg Decl. ¶¶ 12-13; Post-Offer Emails at P-0080-81.)

3        In July 2021, Ms. McMahon filed the instant lawsuit, claiming that World Vision

4    unlawfully discriminated against her in violation of Title VII of the Civil Rights Act of

5    1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Washington Law Against

6    Discrimination ("WLAD"), RCW 49.60, *et seq.* (*See* Compl. (Dkt. # 1) ¶¶ 6.1-7.3.) On

7    April 11, 2023, the parties filed cross-motions for summary judgment. (*See generally*

8    Def. MSJ; Pl. MSJ.)

9                          **III.   ANALYSIS**

10        Title VII makes it unlawful for an employer "to fail or refuse to hire or to

11    discharge any individual, or otherwise to discriminate against an individual with respect

12    to his compensation, terms, conditions, or privileges of employment, because of such

13    individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *see*

14    *also Bostock v. Clayton Cnty., Ga.*, ___ U.S. ___, 140 S. Ct. 1731, 1739-47, 1754 (2020)

15    (concluding that firing a person based on their sexual orientation or transgender status is

16    discrimination "because of sex"). Similarly, in relevant part, the WLAD makes it

17    unlawful for an employer to refuse to hire or to discharge any person, or otherwise to

18

19

20

21

22

---

[3] In a call later that day, Ms. McMahon asked if the offer was being rescinded because she is in a same-sex marriage. (2/16/23 Freiberg Dep. Tr. at 105:17-106:5; *see also* Freiberg Decl. ¶ 13, Ex. MF 8 (recording of excerpt from call).) Ms. Freiberg responded that the offer was being rescinded "because . . . the standards of conduct . . . are to not have any sexual . . . conduct outside of marriage, and marriage is defined as being between a man and a woman. So that's—that's the behavior that all employees have to comply with." (2/16/23 Freiberg Dep. Tr. at 105:17-106:5; *see also* Freiberg Decl., Ex. MF 8.)

1    discriminate against a person with respect to the terms and conditions of employment,

2    because of "age, sex, marital status, [or] sexual orientation."  RCW 49.60.180.  Here, Ms.

3    McMahon brings claims for sex and sexual orientation discrimination under Title VII and

4    WLAD, as well as marital status discrimination under WLAD.  (*See* Compl. ¶¶ 6.1-7.3.)

5         World Vision moves for summary judgment in its favor on each of Ms.

6    McMahon's claims.  (*See generally* Def. MSJ.)  It argues that the court should dismiss

7    Ms. McMahon's claims because:  (1) the court lacks "jurisdiction over this theological

8    dispute"; (2) even if the court has jurisdiction, Ms. McMahon's Title VII claim "lacks a

9    valid basis and causation"; (3) even if viable, her Title VII claim is barred by Title VII's

10   religious organization exemption; (4) her Title VII and WLAD claims are also barred by

11   the First Amendment under the doctrine of religious autonomy, the ministerial exception,

12   the Free Exercise clause, and the Expressive Association doctrine; and (5) her WLAD

13   claim is further barred by Washington's religious organization exemption.  (*Id.* at 11.)

14   Ms. McMahon opposes World Vision's motion (*see generally* Pl. Resp.) and cross-moves

15   for partial summary judgment in her own favor on her Title VII and WLAD claims with

16   respect to the issue of liability.  (*See generally* Pl. MSJ.)  Below, the court sets out the

17   relevant legal standard before turning to consider the parties' arguments in favor of their

18   respective motions.

19   **A.    Summary Judgment Legal Standard**

20        Summary judgment is appropriate if the evidence viewed in the light most

21   favorable to the non-moving party shows "that there is no genuine dispute as to any

22   material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two ways:  (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.  Where cross motions are at issue, the court must "evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences."  *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006); *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) ("[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in

//

ORDER - 12

1    opposition to both motions, before ruling on each of them." (quoting *Fair Hous. Council*

2    *of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001))).

3    **B.     Whether the Court Lacks Jurisdiction Over This Matter**

4          As a threshold point, the court addresses World Vision's argument that the court

5    "lacks jurisdiction to resolve this theological dispute." (Def. MSJ at 11 (capitalization

6    omitted).) World Vision argues that the First Amendment deprives this court of subject

7    matter jurisdiction because this case involves a dispute regarding World Vision's

8    understanding of the Bible and Ms. McMahon's disagreement with that understanding

9    and such "religious controversies are not the proper subject of civil court inquiry". (*Id.* at

10   11-12 (quoting *Serbian E. Orthodox Diocese for U. S. of Am. v. Milivojevich*, 426 U.S.

11   696, 713 (1976)).)

12         The court disagrees. "Federal question jurisdiction is statutorily established,

13   giving district courts 'original jurisdiction of all civil actions arising under the

14   Constitution, laws, or treaties of the United States.'" *Elvig v. Calvin Presbyterian*

15   *Church*, 375 F.3d 951, 955 (9th Cir. 2004) (quoting 28 U.S.C. § 1331). Additionally, "in

16   any civil action of which the district courts have original jurisdiction, the district courts

17   shall have supplemental jurisdiction over all other claims that are so related to claims in

18   the action within such original jurisdiction that they form part of the same case or

19   controversy under Article III of the United States Constitution." 28 U.S.C. § 1367.

20   Because Ms. McMahon brings federal claims under Title VII (Compl. ¶¶ 6.1-7.3), and

21   because her state law claims are sufficiently related to her federal claims (*see id.*), the

22   court has subject matter jurisdiction over Ms. McMahon's claims. Numerous circuit

1    courts have concluded that First Amendment defenses to Title VII claims, such as the

2    ministerial exception and Church Autonomy Doctrine,[4] "can be likened 'to a government

3    official's defense of qualified immunity'; both 'may serve as a barrier to the success of a

4    plaintiff's claims, but [neither] affect[s] the court's authority to consider them.'"

5    *Skrzypczak v. Roman Cath. Diocese Of Tulsa*, 611 F.3d 1238, 1242 (10th Cir. 2010) (first

6    quoting *Bryce v. Episcopal Church in the Diocese of Co.*, 289 F.3d 648, 654 (10th Cir.

7    2002); and then quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 303 (3d Cir. 2006));

8    *see also Belya v. Kapral*, 45 F.4th 621, 633 (2d Cir. 2022) ("Other examples also suggest

9    that the church autonomy doctrine is a defense and not a jurisdictional bar from suit.");

10   *Elvig*, 375 F.3d at 955 (holding that the ministerial exception does not require dismissal

11   for lack of subject matter jurisdiction where there are federal claims).

12        In sum, the religious nature of this dispute does not deprive the court of subject

13   matter jurisdiction over this action.  As discussed below, however, Ms. McMahon's

14   claims are barred by the Church Autonomy Doctrine.

15   **C.    Whether Ms. McMahon's Claims are Barred by the Church Autonomy
          Doctrine**

16        World Vision argues that Ms. McMahon's claims are barred by the Church

17   Autonomy Doctrine.  (Def. MSJ at 22-23; Def. Resp. at 27-30; Def. Reply at 3-7.)

18   Below, the court summarizes the Church Autonomy Doctrine and then discusses how the

19   doctrine implicates the court's analysis in employment discrimination cases where, as

20

21        _____

          [4] The cases World Vision cites with respect to its subject matter jurisdiction argument
22   involve the Church Autonomy Doctrine and the ministerial exception.  (*See, e.g.*, Def. MSJ at
     11-12.)

1    here, the religious institution has proffered a religious reason for the employee's

2    termination.

3        1.    The Church Autonomy Doctrine

4        The First Amendment provides, in part, that "Congress shall make no law

5    respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S.

6    Const. amend. I.  Rooted in the First Amendment's Religion Clauses, the Church

7    Autonomy Doctrine[5] protects the right of religious institutions[6] "to decide for

8    themselves, free from state interference, matters of church government as well as those of

9    faith and doctrine."  *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in*

10   *N. Am.*, 344 U.S. 94, 116 (1952); *see also Our Lady of Guadalupe Sch. v. Morrissey-*

11   *Berru*, ___ U.S. ___, 140 S. Ct. 2049, 2055 (2020) ("The independence of religious

12   institutions in matters of 'faith and doctrine' is closely linked to independence

13   in . . . 'matters of church government.'"  (quoting *Hosanna-Tabor Evangelical Lutheran*

14   *Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 185 (2012))).  Courts have recognized,

15   therefore, that "[t]o allow anyone 'aggrieved by [a religious association's] decisions' to

16   'appeal to the secular courts and have [those decisions] reversed' subverts the rights of

17   religious associations to retain independence in matters of faith, doctrine, and internal

18   government."  *Belya*, 45 F.4th at 630 (quoting *Kedroff*, 344 U.S. at 114-15); *see also*

19

20   _____

     [5] This doctrine is also known as ecclesiastical abstention.  *See, e.g.*, *Puri v. Khalsa*, 844
21   F.3d 1152, 1162 (9th Cir. 2017).

22       [6] No one disputes that World Vision is a religious institution.  (*See* Pl. Resp. at 3);
     *Spencer v. World Vision, Inc.*, 633 F.3d 723, 741, 748 (9th Cir. 2011) (concluding the same).

1   *Puri*, 844 F.3d at 1163 (stating that the Church Autonomy Doctrine "recognizes that

2   'First Amendment values are plainly jeopardized when church [disputes are] made to turn

3   on the resolution by civil courts of controversies over religious doctrine and practice'"

4   (quoting *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian*

5   *Church*, 393 U.S. 440, 449 (1969))).  As a result, courts have long been cautioned to

6   avoid interfering with religious institutions in matters of faith, discipline, internal

7   organization, "the conformity of the members of the church to the standard of morals

8   required of them," or "ecclesiastical rule, custom, or law."  *See, e.g.*, *Milivojevich*, 426

9   U.S. at 713-14; *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1872); *Kedroff*, 344 U.S. at

10  114-16.

11          The Church Autonomy Doctrine is not without limits, however.  A court may

12  resolve disputes involving religious parties if such disputes are capable of being resolved

13  on the basis of "neutral principles of law."  *Puri*, 844 F.3d at 1166 (quoting *Jones v. Wolf*,

14  443 U.S. 595, 602-04 (1979)).  Specifically, the Church Autonomy Doctrine will not

15  apply if the court is able to resolve the dispute without resolving underlying controversies

16  over religious doctrine or calling into question the reasonableness, validity, or truth of a

17  religious doctrine or practice.  *See, e.g.*, *Bollard v. Cal. Province of the Soc'y of Jesus*,

18  196 F.3d 940, 944-50 (9th Cir. 1999) (explaining that sexual harassment claim against

19  religious employer was capable of being resolved on neutral grounds and thus there was

20  no intrusion on church autonomy where the jury only had to make "secular judgments

21  about the nature and severity of the harassment and what measures, if any, were taken by

22  the [employer] to prevent or correct it"); *Elvig*, 375 F.3d at 958-65 (same); *DeMarco v.*

1   *Holy Cross High Sch.*, 4 F.3d 166, 169-73 (2d Cir. 1993) (noting that notwithstanding the

2   Church Autonomy Doctrine, a plaintiff can "challenge as pretextual the employer's

3   [religious] justification without calling into question the value or truthfulness of religious

4   doctrine" by focusing the inquiry on secular factual questions, such as "whether the rule

5   applied to the plaintiff has been applied uniformly"); *Butler v. St. Stanislaus Kostka Cath.*

6   *Acad.*, 609 F. Supp. 3d 184, 199 (E.D.N.Y. 2022) (same), *appeal dismissed* (Aug. 26,

7   2022).

8          Finally, the court notes that the Supreme Court and the Ninth Circuit have not

9   clearly delineated how the Church Autonomy Doctrine interacts with the ministerial

10  exception[7] in employment cases—i.e., whether the Church Autonomy Doctrine can be

11  invoked to bar employment claims brought by non-ministerial employees where the

12  religious employer offers a religious justification for the given action.  Although Ms.

13  McMahon contends that the Church Autonomy Doctrine is no broader than the

14  ministerial exception in employment discrimination cases, the only support she provides

15  for this proposition is *Starkey v. Roman Cath. Archdiocese*, 496 F. Supp. 3d 1195,

16

17

---

18         [7] The ministerial exception derives from the Church Autonomy Doctrine and forecloses
    employment discrimination claims brought by ministerial employees against religious
19  organizations.  *See Our Lady of Guadalupe*, 140 S. Ct. at 2060-61 (stating that a religious
    institution's freedom to make hiring decisions that are essential to the institution's central
20  mission is "a component" of their autonomy); *Bollard v.*, 196 F.3d at 946 ("[T]he ministerial
    relationship lies so close to the heart of the church that it would offend the Free Exercise Clause
21  simply to require the church to articulate a religious justification for its personnel decisions.").
    Given the court's conclusion regarding the Church Autonomy Doctrine (*infra* § III.C.2), it does
22  not reach the issue of whether Ms. McMahon is properly characterized as a ministerial employee.

1206-07 (S.D. Ind. 2020).[8] (*See, e.g.*, Pl. MSJ at 24 (asserting that such "an expansive

reading of the church autonomy doctrine would render the ministerial exception

superfluous" (quoting *Starkey*, 496 F. Supp. 3d at 1206-07)).) Additionally, Ms.

McMahon fails to rebut, or even address, the numerous circuit and district court decisions

cited by World Vision that support its contention that the Church Autonomy Doctrine

may bar a non-ministerial employee's employment claims against a religious employer in

certain limited circumstances. (*Compare* Def. MSJ at 20-23, Def. Resp. at 27-30, *and*

Def. Reply at 3-7, *with* Pl. MSJ at 24, Pl. Resp. at 20-21, *and* Pl. Reply at 10.) In light of

the case law cited by World Vision, Ms. McMahon's failure to address or rebut these

decisions, and the lack of clear guidance from the Supreme Court and Ninth Circuit on

the issue, the undersigned joins other courts in declining to conclude "that the ministerial

exception eclipses [the Church Autonomy Doctrine] in employment-discrimination

cases." *See, e.g.*, *Butler*, 609 F. Supp. 3d at 204, 200-01 & n.17 (concluding that under

the current case law, the court was "constrained to conclude that no such limitation

exists").

2.  The Church Autonomy Doctrine Bars Ms. McMahon's Employment
    Discrimination Claims

At the summary judgment stage, a plaintiff must first make out a prima facie case

of their discrimination claim by offering evidence that "gives rise to an inference of

---

[8] The court does not find *Starkey*'s limited reasoning persuasive because the undersigned does not read *Our Lady of Guadalupe* to foreclose the application of both doctrines in the employment context given that the Supreme Court implied that the ministerial is a component of the Church Autonomy Doctrine in *Our Lady of Guadalupe*. *See Our Lady of Guadalupe*, 140 S. Ct. at 2060-61.

unlawful discrimination."[9] *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). For the purposes of this order, the court assumes that Ms. McMahon has stated a prima facie case of sex, sexual orientation, and marital status discrimination.[10] After the plaintiff establishes a prima facie case of discrimination, "[t]he burden . . . shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Opara*, 57 F.4th at 723 (internal quotation marks omitted) (quoting *Boeing Co.*, 577 F.3d at 1049) (noting that the burden flips to defendant to make such a showing regardless of whether plaintiff establishes a prima facie case via direct or circumstantial evidence or the *McDonnell Douglas* factors); *Kastanis v. Educ. Emps. Credit Union*, 859 P.2d 26, 31 (Wash. 1993), *amended*, 865 P.2d 507 (Wash. 1994). Here, World Vision has consistently maintained that it rescinded Ms. McMahon's offer on the basis of the "inability for [Ms. McMahon] to meet one of the fundamental requirements of employment with [World Vision], which would be affirming and complying with the [SOC] which were described in the interview process." (Talbot Dep. Tr. at 58:8-16; SOC at WV-000036 (prohibiting "sexual conduct outside the Biblical covenant of marriage

---

[9] The plaintiff may make a prima facie case either by meeting the four-part test laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or by producing direct or circumstantial evidence "'demonstrating that a discriminatory reason more likely than not motivated' the defendant's contested conduct." *Opara v. Yellen*, 57 F.4th 709, 721-23 & n.9 (9th Cir. 2023); *Alonso v. Qwest Commc'ns Co., LLC*, 315 P.3d 610, 616 (Wash. Ct. App. 2013).

[10] (*See* Pl. MSJ at 6-10 (alleging that direct evidence, including World Vision's SOC and Ms. Freiberg and Talbot's deposition testimony, establishes that World Vision rescinded the job offer because Ms. McMahon is in a same-sex marriage (citing Talbot Dep. Tr. at 45:22-46:8, 47:3-12, 68:12-69:5; 2/16/23 Freiberg Dep Tr. at 102:15-22)).)

between a man and a woman").)  Specifically, World Vision rescinded the offer after

learning that Ms. McMahon was in a same-sex marriage, which, according to World

Vision, evidenced sexual conduct contrary to World Vision's SOC and deeply held

religious beliefs regarding Biblical marriage.  (*See, e.g.*, Talbot Dep. Tr. at 29:6-9,

46:17-20; 2/16/23 Freiberg Dep. Tr. at 103:12-21, 105:17-106:5; Freiberg Decl. ¶¶ 9-13,

48-51 (discussing the decision to rescind Ms. McMahon's offer and why her conduct

made her unsuitable for the role); *id.* ¶¶ 39-49 (discussing World Vision's "stance" and

understanding as to Biblical marriage); CCW/SOC FAQ at WV-004694 (same).)

"[O]nce an employer articulates some legitimate, nondiscriminatory reason for the

challenged action, the employee must show that the articulated reason is pretextual."

*Opara*, 57 F.4th at 723.  A plaintiff "can prove pretext in two ways:  (1) indirectly, by

showing that the employer's proffered explanation is 'unworthy of credence' because it is

internally inconsistent or otherwise not believable, or (2) directly, by showing that

unlawful discrimination more likely motivated the employer."  *Chuang v. Univ. of Calif.

Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000).  However, the "ultimate

burden of persuading the trier of fact that the defendant intentionally discriminated

against the plaintiff remains at all times with the plaintiff."  *Reeves v. Sanderson

Plumbing Prod., Inc.*, 530 U.S. 133, 143, 146-48 (2000) (quoting *Burdine*, 450 U.S. at

253); *Kastanis*, 859 P.2d at 31 (stating that even a plaintiff using the direct evidence

method must ultimately prove that intentional discrimination).

"In cases against religious employers, these inquiries are constrained, to some

degree, by the First Amendment."  *Butler*, 609 F. Supp. 3d at 201.  The Church

1   Autonomy Doctrine precludes a plaintiff from establishing pretext by, for example,

2   "instigating a debate over whether the Church really believes its position on marriage, or

3   what the precise contours of that position are." *Id.* at 200-01.  On this point, the court

4   finds the reasoning in *Butler v. St. Stanislaus Kostka Catholic Academy* persuasive.  609

5   F. Supp. 3d 184 (E.D.N.Y. 2022).  Although the court ultimately decided *Butler* on the

6   basis of the ministerial exception, the court also concluded that even if the plaintiff was

7   not a ministerial employee, the Church Autonomy Doctrine would bar his claim for

8   discrimination on the basis of sexual orientation.  *Id.* at 198.  In *Butler*, the plaintiff was

9   let go shortly after he was hired as a teacher at a Catholic school when he revealed,

10  among other things, that he was gay and planned on marrying his boyfriend eventually.

11  *Id.* at 187-89.  The school contended that its termination of the plaintiff was predicated on

12  his "statement of intended conduct," which the school viewed as "a clear and obvious

13  violation of Church teachings," "rather than his sexuality itself" and thus, a

14  non-discriminatory reason for termination.  *Id.* at 189.  As a result, the plaintiff faced the

15  burden of demonstrating pretext.  *Id.* at 200.  The court stated that the plaintiff could not

16  demonstrate pretext by "treating as broadly up-for-debate" the school's assessment that

17  the plaintiff's email expressing his intent to marry his boyfriend violated an important

18  religious tenet.  *Id.* at 200-01.  To the contrary, in order to demonstrate pretext, the

19  plaintiff was required to "focus upon factual questions such as whether the asserted

20  reason for the challenged action comports with the defendant's policies and rules,

21  whether the rule applied to the plaintiff has been applied uniformly, and whether the

22  putative non-discriminatory purpose was stated only after the allegation of

discrimination." *Id.* (quoting *DeMarco*, 4 F.3d at 171).  Because the plaintiff had not

presented evidence of pretext that would allow the claim to be resolved on a purely

secular basis, the court concluded that the only way for a jury to find pretext would have

been to question the sincerity of the school's explanation of its religious doctrine and the

importance of that doctrine to the school.  *Id.* at 200-04.  The court found the plaintiff's

claim barred because such an inquiry would violate the Church Autonomy Doctrine.  *Id.*

at 203.

Relying on this precedent, World Vision contends that because it rescinded Ms.

McMahon's job offer for religious reasons, "the principle of church autonomy precludes

a jury from questioning the veracity of those reasons (or the weight to be accorded them)

under the guise of pretext analysis in this case."  (Def. Resp. at 29 (quoting *Butler*, 609 F.

Supp. 3d at 191); *id.* at 30 (stating that the Church Autonomy Doctrine applies because

"[b]y defying [World Vision]'s Biblical Standards of Conduct, [Ms. McMahon] breached

its 'standard of morals,' via 'misconduct [that] is rooted in religious belief'" and World

Vision's decision to rescind the offer was "the result of managerial 'meetings to discuss

that decision and the [religious] doctrine underlying it'" (first quoting *Watson*, 80 U.S. at

733; and then quoting *Bryce*, 289 F.3d at 657, 660)); *see also* Def. MSJ at 22-23

(collecting cases supporting World Vision's Church Autonomy Doctrine argument); Def.

Reply at 3-7 (same).)

Ms. McMahon fails to discuss or rebut the numerous cases cited by World Vision

in support of this argument.  (*See generally* Pl. Reply at 10; Pl. MSJ at 24; Pl. Resp. at

20-21.)  The closest Ms. McMahon comes to addressing World Vision's argument is

1  through two sentences in her reply brief in which she contends that her claims do not

2  "impermissibly impinge upon" World Vision's religious autonomy because "this case is

3  not one regarding a religious theological dispute and [Ms. McMahon's] claims clearly

4  regard discrimination on the basis of sex, sexual orientation and being in a same-sex

5  marriage." (Pl. Reply at 10.)  But the Church Autonomy Doctrine's application is not

6  limited to religious discrimination claims.  As discussed above, the Church Autonomy

7  Doctrine requires the court to abstain from resolving employment discrimination claims

8  where a religious institution takes an adverse action pursuant to a religious belief or

9  policy—regardless of whether the employer allegedly discriminated on religious or other

10  protected grounds—unless it is possible for the court resolve the claims without resolving

11  underlying controversies over religious doctrine or calling into question the

12  reasonableness, validity, or truth of a religious doctrine or practice.[11]  (*See supra*

13  § III.C.1-2.)

14       Indeed, the sole authority Ms. McMahon cites in her reply is consistent with this

15  conclusion. (*See* Pl. Reply at 10 (citing *Bohnert v. Roman Cath. Archbishop of San*

16

---

17      [11] The Supreme Court recently clarified the causation standard applicable to Title VII

18  claims in *Bostock v. Clayton Cnty., Ga.*, ___ U.S. ___, 140 S. Ct. 1731 (2020), emphasizing that "but for" cause does not mean the sole cause and events can have multiple "but for" causes.  To the extent Ms. McMahon is arguing that church autonomy principles do not bar her claims

19  because a jury could find that sex, sexual orientation, and marital status discrimination are all "but for" causes, in addition to World Vision's religious justification, the court notes that the

20  *Bostock* Court explicitly left open the question of how doctrines protecting religious liberty interact with Title VII.  *Bostock*, 140 S. Ct. at 1739-49, 1754 (noting that how doctrines

21  protecting religious liberty interact with Title VII, and presumably the new causation standard, "are questions for future cases").  Neither party identifies binding authority, following *Bostock*,

22  that addresses whether the Church Autonomy Doctrine requires abstention where at least one of the "but for" causes is a religious justification.

*Francisco*, 136 F. Supp. 3d 1094, 1115 (N.D. Cal. 2015)).)  In *Bohnert v. Roman Cath.*

*Archbishop of San Francisco*, the court concluded that the plaintiff's hostile work

environment claim was not barred by the Church Autonomy Doctrine because, among

other things, the defendant "did not present any facts suggesting that its religious doctrine

tolerates harassment or required it to respond in a way that conflicts with its teachings"

and evaluating the defendant's response to sexual harassment would involve only purely

secular judgments and inquiries.  *Bohnert*, 136 F. Supp. 3d at 1115-16.  Here, by contrast,

World Vision has offered a religious justification for its actions and Ms. McMahon has

not presented any meaningful secular evidence that would enable a finding of pretext

without calling into question the value or truthfulness of World Vision's religious

doctrine, such as evidence regarding "whether the asserted reason for the challenged

action comports with the defendant's policies and rules, whether the rule applied to the

plaintiff has been applied uniformly, and whether the putative non-discriminatory

purpose was stated only after the allegation of discrimination" *Butler*, 609 F. Supp. 3d at

201 (quoting *DeMarco*, 4 F.3d at 170-71).

   In light of the case law presented by World Vision and Ms. McMahon's failure to

rebut the same, as well as the religious justification offered by World Vision and the lack

of secular evidence of the nature described above, it appears that "the only way for the

jury to find pretext would be to question [World Vision's] explanation of religious

doctrine, or to question how much that particular religious doctrine really mattered to

[World Vision]." *Butler*, 609 F. Supp. 3d at 203-04 (collecting cases discussing this

impermissible inquiry).  Such inquiries, however, are barred by the Church Autonomy

1   Doctrine.  *Id.*  Accordingly, because the record before the court does not allow for the

2   resolution of Ms. McMahon's claims on the basis of neutral principles of law, the Church

3   Autonomy Doctrine forecloses judicial inquiry into World Vision's religiously motivated

4   personnel decision.  *See, e.g.*, *id.* at 189, 200-04.

5        The court joins other courts that have considered the Church Autonomy Doctrine's

6   applicability to employment discrimination claims in cautioning religious employers

7   against over-reading the impact of the court's holding.  It is by no means the case that all

8   claims of discrimination against religious employers are barred.  Indeed, as the court has

9   discussed above, many such claims may not raise serious constitutional questions.  For

10  example, if a religious employer does not offer a religious justification for an adverse

11  employment action against a non-ministerial employee or if the plaintiff presents

12  sufficient secular evidence that would allow a factfinder to conclude that the religious

13  justification was pretext without wading into the plausibility of the asserted religious

14  doctrine, it is unlikely that serious constitutional questions will be raised by applying

15  Title VII.  *See, e.g.*, *Bollard*, 196 F.3d at 947 ("The Jesuits do not offer a religious

16  justification for the harassment Bollard alleges . . . . There is thus no danger that, by

17  allowing this [sexual harassment] suit to proceed, we will thrust the secular courts into

18  the constitutionally untenable position of passing judgment on questions of religious faith

19  or doctrine."); *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130,

20  141 (3d Cir. 2006) ("Requiring a religious employer to explain why it has treated two

21

22

1    employees who have committed essentially the same offense differently poses no threat

2    to the employer's ability to create and maintain communities of the faithful.").[12]

3                          **IV.    CONCLUSION**

4            For the foregoing reasons, the court DENIES Ms. McMahon's motion for partial

5    summary judgment (Dkt. # 24) and GRANTS World Vision's motion for summary

6    judgment (Dkt. # 26).  The court further DENIES as moot Ms. McMahon's motions *in*

7    *limine* (Dkt. # 36).

8            Dated this 12th day of June, 2023.

9

10

11   JAMES L. ROBART
     United States District Judge

12

13

14

15

16

17

18

19
     _____

20   [12] *See also, e.g.*, *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 872 (N.D. Ill. 2019)
     (noting that portions of plaintiff's Title VII claims, such as complaints of antagonistic treatment
     by male colleagues, may be untethered from plaintiff's disagreements with employer's religious
     views and would therefore not be barred); *Weissman v. Congregation Shaare Emeth*, 38 F.3d
21   1038, 1045 (8th Cir. 1994) ("Because, on the record before us, the Temple has asserted no
     religious grounds for Weissman's termination, his ADEA claim does not pose a significant risk
22   of infringement upon the Constitution.").