THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AUBRY MCMAHON,

        Plaintiff,

v.

WORLD VISION, INC.,

        Defendant.

Case No.:  **2:21-cv-00920-JLR**

**PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT ON AFFIRMATIVE DEFENSES**

**NOTE ON MOTION CALENDAR: OCTOBER 20, 2023**

Plaintiff Aubry McMahon proved that Defendant World Vision, Inc., discriminated against her on the basis of sex, sexual orientation, and marital status in violation of federal and state law by rescinding her employment offer because she was in a same-sex marriage. Dkt. 44. In accordance with this Court's orders of July 24, 2023 (Dkt. No 44), August 14, 2023 (Dkt. No. 49), and August 21, 2023 (Dkt. 51), Plaintiff renews her motion for summary judgment on Defendant's affirmative defenses. All of World Vision's five remaining affirmative defenses fail as a matter of law and *303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023), has no application to the present case.

## I.      APPLICABLE SUMMARY JUDGMENT STANDARDS

Under Fed. R. Civ. P. 56, "either party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." *Verkist v. U.S.*, C21-0721JLR-DWC, 2022 WL 17586014, at *2 (W.D. Wash. Dec. 12, 2022). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and the

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 1
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

1    movant is entitled to judgment as a matter of law. *Id.* A fact is "material" if it "might affect the

2    outcome of the suit under the governing law." *Id.*

3        Where, as here, the moving party does not bear the ultimate burden of persuasion at trial as

4    to the issues on which summary judgment is sought, the moving party has both an initial burden of

5    production and the ultimate burden of persuasion on the motion for summary judgment. *Id.* The

6    moving party must either produce evidence negating an essential element of the nonmoving party's

7    defense or show that the nonmoving party does not have enough evidence of an essential element to

8    carry its ultimate burden of persuasion at trial. *Id.* If the moving party meets its burden of production,

9    the burden then shifts to the nonmoving party to identify specific facts from which the jury could

10   reasonably find in the nonmoving party's favor. *Id.* If the defendant fails to meet this burden the

11   plaintiff is entitled to summary judgment on the affirmative defense. *Id.* at *4.

12   ## II.    NEITHER THE TITLE VII NOR THE WLAD RELIGIOUS
13   ## ORGANIZATION EXEMPTIONS BAR PLAINTIFF'S CLAIMS

14       Defendant erroneously asserts that Plaintiff's claims are barred pursuant to Title VII's

15   religious employer exemption. That provision reads in its entirety:

16       [42 U.S.C. §§ 2000e *et seq.*] shall not apply to an employer with respect to the
17       employment of aliens outside any State, or to a religious corporation, association,
        educational institution, or society with respect to the employment of individuals of a
18       particular religion to perform work connected with the carrying on by such
        corporation, association, educational institution, or society of its activities.
19

20   42 U.S.C. § 2000e-1(a).

21       It is settled law in the Ninth Circuit that this provision bars only *religious* discrimination

22   claims brought against a religious employer. *Spencer v. World Vision, Inc.*, 633 F.3d 723, 724 (9th

23   Cir. 2011) (per curiam) ("World Vision, Inc. qualifies as an entity exempt under 42 U.S.C. § 2000e-

24   1(a) from Title VII's general prohibition against religious discrimination"). "The Ninth Circuit…has

25   squarely limited the federal exemption to barring claims of *religious* discrimination, holding that

26   while 'religious institutions may base relevant hiring decisions upon religious preferences, they are

     not immune from liability for discrimination' on other grounds protected by Title VII." *Richardson*

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 2
2:21-CV-00920-JLR

1  *v. Northwest Christian Univ.*, 242 F. Supp. 3d 1132, 1153 (D. Or. 2017) (quoting *EEOC v. Fremont*

2  *Christian Sch.*, 781 F.2d 1362, 1366 (9th Cir. 1986) (internal punctuation omitted)).

3        "[A]lthough Congress permitted religious organizations to discriminate in favor of members

4  of their faith, religious employers are not immune from liability for discrimination based on … sex

5  …." *EEOC v. Pacific Press Pub. Ass'n.*, 676 F.2d 1272, 1276 (9th Cir. 1982). "The legislative

6  history shows that Congress consistently rejected proposals to allow religious employers to

7  discriminate on grounds other than religion: '(church-affiliated) organizations remain subject to the

8  provisions of Title VII with regard to race, color, sex or national origin.'" *Id.* at 1277 (quoting

9  Section by Section Analysis of H.R. 1746, The Equal Employment Opportunity Act of 1972, 1972

10  Legis. Hist. 1845; 118 Cong. Rec. 7167).

11        Defendant previously attempted to recast Plaintiff's claims as ones alleging religious

12  discrimination, but this Court's order of July 24, 2023, forecloses this argument. Dkt. No. 44. That

13  Defendant's discrimination was motivated by a sincerely held religious objection to same-sex

14  marriage does not bring Plaintiff's claims within the purview of the Title VII religious organization

15  exemption. *See, e.g., Fremont Christian School*, 781 F.2d at 1364-65, 1366 (religious school which

16  paid men health benefits but denied such benefits to similarly situated women because of sincerely

17  held religious belief that men are the "heads of the household" not entitled to assert Title VII

18  religious employer exemption). A solid wall of Ninth Circuit authority dating back more than 40

19  years holds that the Title VII religious employer exemption does not bar Plaintiff's claims.

20        Although the WLAD religious employer exemption is not limited to religious discrimination

21  claims, it applies only to discrimination claims brought by employees who fall under the First

22  Amendment ministerial exception. *Woods v. Seattle's Union Gospel Mission*, 197 Wn.2d 231, 250,

23  481 P.3d 1060 (2021), *cert. denied*, 142 S. Ct. 1094 (2022). "The *Woods* opinion informed religious

24  organizations that an applicant or employee is permitted to bring an employment discrimination

25  claim against an organization if the position for which the applicant applies or the employee holds

26  is non-ministerial." *Union Gospel Mission of Yakima, WA v. Ferguson*, 1:23-CV-3027-MKD, 2023

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 3
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

WL 5674119, at *6 (E.D. Wash. Sep. 1, 2023). As set forth below, Plaintiff's job as a customer service representative did not qualify for the ministerial exception.

### III.   DEFENDANT CANNOT SHOW PLAINTIFF'S DONOR/CUSTOMER SERVICE REPRESENTATIVE JOB FELL WITHIN THE FIRST AMENDMENT'S MINISTERIAL EXCEPTION

#### A. The Ministerial Exception Applies only to "Certain Important Positions" with "Vital Religious Duties"

The ministerial exception is an "affirmative defense … not a jurisdictional bar." *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 195 n.4 (2012). Therefore, an employer who asserts the ministerial exception as a defense has the burden of proving it. *Fitzgerald v. Roncalli High School, Inc.*, 73 F.4th 529, 531 (7th Cir. 2023). Even when the record evidence is viewed in a light most favorable to World Vision, Defendant cannot meet its burden of persuasion that the customer service representative position for which Plaintiff was hired qualifies for the ministerial exception.

The U.S. Supreme Court first recognized the ministerial exception in *Hosanna-Tabor*. The Court held that the determination of whether a particular employee qualifies as a minister should be made on a case-by-case basis, stating "[w]e are reluctant, however, to adopt a rigid formula for deciding when an employee qualifies as a minister." *Id.* at 190. In *Hosanna-Tabor*, the Supreme Court relied on the following factors to find the exception applied: "the formal title given [to the employee],…the substance reflected in that title, [the employee's] own use of that title, and the important religious functions…the employee performed for the Church." *Id.* at 192. The Supreme Court revisited the ministerial exception in *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020). In that case, the Court clarified the *Hosanna-Tabor* test and ruled that the ministerial exception applied to employees with "vital religious duties" as part of "playing a vital part in carrying out the mission of the church." *Id.* at 2066. Courts are "to take all relevant circumstances into account and to determine whether each particular position implicate[s] the fundamental purpose of the exception." *Id.* at 2067.

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 4
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

The ministerial exception is based on the principle that the antidiscrimination laws cannot constitutionally intrude on a religious organization's "selection of the individuals who play *certain key* roles" within the organization. *Id.* at 2060 (emphasis supplied). "[C]ourts are bound to stay out of employment disputes involving those holding *certain important positions* with churches or other religious institutions." *Id.* (emphasis supplied). "Ministers" have "a role distinct from that of most of [the religious organization's] members." *Hosanna-Tabor*, 565 U.S. at 191.

A religious employer "cannot show entitlement to the ministerial exception simply by asserting that everyone on its payroll is a minister or by requiring that all employees sign a ministerial contract." *Fitzgerald*, 73 F.4th at 531-32. *Hosanna Tabor* and *Our Lady of Guadulupe* "make clear that the ministerial exception does not apply to *everyone* employed by a religious entity." *Palmer v. Liberty Univ.*, 72 F.4th 52, 71 (4th Cir. 2023) (Motz, J., concurring) (emphasis in original). "[T]he ministerial exception is just that— an *exception*, applicable only to a subset of a religious entity's employees." *Id.* Merely having "religious responsibilities" does not make the employee a minister. *Trotter v. United Lutheran Seminary*, No. 20-570, 2021 WL 3271233, at *4 (E.D. Pa. July 30, 2021). "Determination of whether the ministerial exception applies hinges on whether Plaintiff 'performed vital religious duties' as part of playing 'a vital part in carrying out the mission of the [religious organization].'" *Richter v. Archdiocese of Kansas City in KS*, Case No. 21-cv-252- SAC-TJJ, 2022 WL 3017318, at *7 (D. Kan. July 29, 2022).

Whether the ministerial exception applies "is a multi-factored, fact-specific inquiry." *Fitzgerald*, 73 F.4th at 531. The Supreme Court's clarification of the ministerial exception in *Our Lady of Guadulupe* did not render the *Hosanna-Tabor* factors irrelevant. *See, e.g.*, *id.*; *Ratliff v. Wycliffe Assocs., Inc.*, Case No. 6:22-cv-1185-PGB-RMN, 2023 WL 3688082, at *4 (M.D. Fla. May 26, 2023); *Palmer v. Liberty Univ.*, Case No. 6:20-cv-31, 2021 WL 6201273, at *5-8 (W.D. Va. Dec. 1, 2021), *vacated and appeal dismissed*, 72 F.4th 52 (4th Cir. 2023). Rather, *Our Lady of Guadulupe* instructs courts to apply the *Hosanna Tabor* factors as appropriate but also to engage in "a holistic consideration" of "what [the] Plaintiff does." *Ratliff*, 2023 WL 3688082 at *4.

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 5
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

**B. The *Hosanna-Tabor* Factors Show Plaintiff Was Not Hired to Be a Minister**

In deciding whether a defendant has proven that the ministerial exception applies, a court should consider, among other things: (1) the formal title given to the plaintiff, (2) the substance reflected in that title, (3) the plaintiff's use of that title, and (4) whether the plaintiff performed important religious functions. *Fitzgerald*, 73 F.4th at 531. Here, the first two factors weigh heavily against the ministerial exception, the third does not apply, and, as set forth in the following section, Plaintiff would not have performed important religious functions for World Vision.

In or around November or December 2020, Plaintiff saw a job posting for the position of customer service representative with Defendant on the website Indeed.com. Exh. 9, at 139:18-22; 148:22-25; Exh. 10, at 12:3-8.[1] According to the job description, a customer service representative fields inbound calls and makes outbound calls to donors and potential donors utilizing a "standard script" in order to "sell" and "up-sell" those individuals on World Vision products and programs. Exh. 1. After interviewing McMahon for the position, Defendant made a verbal job offer to her on January 4, 2021. Exh. 11, at 46:24-47:6; 112:10-14. Plaintiff was sent a formal offer letter the next day. Exh. 3; Exh. 11, at 47:24-48:6. It stated: "On behalf of [Defendant], I am pleased to provide you with this letter as written confirmation of our verbal offer for the full-time position of Donor/Customer Service Representative (DCR Trainee) commencing 2/1/2021." Exh. 3. Defendant rescinded its job offer three days later, after learning Plaintiff was in a same-sex marriage. Exh. 6.

The employee's job title is the first "relevant circumstance" as to whether the ministerial exception applies. *Our Lady of Guadalupe*, 140 S. Ct. at 2062. "Simply giving an employee the title of 'minister' is not enough to justify the exception. And by the same token, since many religious traditions do not use the title 'minister,' it cannot be a necessary requirement." *Id.* at 2063-64. However, an employee's job title can show whether "the recipient has been given an important position of trust" and "evidence[] the importance attached to her role." *Id.* at 2063.

A court should "determine whether the wording of the title coneys a religious—as opposed

---

[1] All exhibits cited herein (*i.e.*, as "Exh. __") are references to exhibits attached to the Declaration of Casimir Wolnowski dated April 11, 2023, Dkt. No. 25.

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

to secular—meaning." *Conlon v. Intervarsity Christian Fellowship/USA*, 777 F.3d 829, 834 (6th Cir. 2015). Here, the relevant job title was "donor/customer service representative." Nothing about this title implies the position is ministerial in nature. The job title is purely secular. Religious traditions use many different titles to describe those into whose hands "[t]he members of a religious group put their faith…," *Hosanna-Tabor*, 565 U.S. at 188, but "customer service representative" is not among them. *Cf. Conlon*, 777 F.3d at 834-35 ("pastor," "reverend," "priest," "bishop," or "rabbi," "spiritual director" and "spiritual formation specialist" are titles that identify as somebody covered by the ministerial exception).

Critically, Defendant does not hold customer service representatives out to the public as ministers. *Cf. Hosanna-Tabor*, 565 U.S. at 191. There is no requirement that a candidate for this position have any formal religious educational training. Exh. 10, at 13:13-21. In fact, there is no requirement to have had *any* religious training whatsoever. *Id.* at 14:22-15:3. The only formal education requirement for the customer service representative position is to be a high school graduate or have a GED equivalent. *Id.* at 13:22-14:3. There is no process for commissioning as a minister upon the conclusion of customer service representative training. *Id.* at 15:19-16:3.

In sum, "nothing about [Plaintiff's] job title or the way that [Defendant] held her out indicates that she was a minister." *Palmer*, 2021 WL 620127, at *5.

### C. Plaintiff Would Not Have Performed Ministerial Duties as a Donor/Customer Service Representative

#### 1. The Customer Service Representative Position was "at Bottom" a Secular One

The central inquiry in determining whether an employee falls within the ministerial exception is not what the *employer* does but what the *employee* does. "What matters, at bottom, is what an employee does." *Our Lady of Guadalupe*, 140 S. Ct. at 2064. Here, Defendant rescinded Plaintiff's employment as Donor/Customer Service Representative before she ever performed that position. Therefore, what Plaintiff would have "done" is gleaned from the job description that Defendant posted. *See Butler v. St. Stanisilaus Kostka Catholic Academy*, 609 F. Supp. 3d 184, 196

(E.D.N.Y. 2022) (where employee is terminated before performing the job, court should look to job description for "what an employee does"). The section entitled "The Job" reads:

> As a Customer Service Representative, you will participate in a training program to gain a working knowledge and understanding of the position and to perform the essential functions of the job at a level of performance that consistently meets expectations. You will learn, understand and develop the skills necessary to acquire and maintain donor relationships through basic inbound and outbound calls. Serve as a liaison between donors and the general public as well as provide basic levels of customer service for all special programs. Help carry out our Christian organization's mission, vision, and strategies. Personify the ministry of World Vision by witnessing to Christ and ministering to others through life, deed, word and sign. You will also …
>
> 1. Keep Christ central in our individual and corporate lives. Attend and participate in the leadership of devotions, weekly Chapel services, and regular prayer.
>
> 2. Maintain reliable, regular attendance. Report to work on time and return from breaks and lunches on time.
>
> 3. Under supervision, learn to answer inbound customer service calls and make outbound calls, to current and potential donors in response to all media presentations and World Vision products and services. Answer incoming calls using an Automated Call Distribution system utilizing a standard script for guidance. Recognize and respond to up-sell opportunities and actively cross-sell other [World Vision] programs when appropriate.
>
> 4. Through training and active participation, gain the skills necessary to assess callers' needs and input information accurately and efficiently using data entry and ten-key skills.
>
> 5. Achieve and maintain an acceptable level of individual statistics to accomplish Call Center business goals.
>
> 6. Develop skills to utilize technology for maintaining and updating donor information as appropriate.
>
> 7. Accepts constructive feedback and welcomes instruction and direction.
>
> 8. Under supervision, research and effectively respond to inquiries utilizing a variety of resource materials and methods.
>
> 9. Learn and effectively communicate World Vision's involvement in ministries and projects around the world.

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 8
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

10. Work collaboratively with team members.

11. Be sensitive to Donor's needs and pray with them when appropriate.

12. Perform other duties as assigned.

13. Keep informed of organizational announcements, activities and changes via regular reading of the WVUS Intranet and other corporate communication tools.

Exh. 1.

A holistic consideration of this job description demonstrates that Plaintiff would not have performed "vital religious duties." The job description is not for a role that is important "in the life of the religion." *Cf. Our Lady of Guadalupe*, 140 S. Ct. at 2066. As the job description makes clear, the main duties of the customer service representative position related to furthering Defendant's charitable activities. The essential function of the customer service representative position was to "learn, understand and develop the skills necessary to acquire and maintain donor relationships through basic inbound and outbound calls. … [s]erve as a liaison between donors and the general public as well as provide basic levels of customer service for all special programs." Exh. 1.

Customer service representatives receive inbound calls from individuals who are "potentially existing donors or may be looking to donate" or customer service representatives will "make outbound calls to existing donors." Exh. 10, at 22:10-18. Customer service representatives learn of existing donors' identities through access to a database maintained by Defendant. Exh. 10, at 22:19-23. Donors are predominantly Christian, but not exclusively. Exh. 10, at 22:24-23:4. Donors are not members of World Vision. *Id.* Melanie Freiberg ("Freiberg"), who held the position of "HR Director talent management," Exh. 13, at 11:14-16, was Defendant's 30(b)(6) designee. She agreed that the main duty of a customer service representative is to "acquire and maintain donor relationships through the basic inbound and outbound calls." Exh. 10, at 20:20-24.

In its original motion for summary judgment, Defendant claimed the customer service representative job description showed that Plaintiff "would be a 'crucial member' of [donor customer services] and a 'key liaison' and 'voice of World Vision' to [their] donors and the general public.'"

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 9
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

Dkt. No. 26 at p. 26. However, the job description for a "call center customer service representative" containing these duties was posted on March 7, 2022, Exh. 1 to Declaration of Casimir Wolnowski (May 1, 2023), Dkt. No. 31, at WV000186. That was more than a year after the date Plaintiff's job offer was rescinded, and notably, nearly eight months after the present lawsuit was filed. Significantly, the terms "crucial member," "key liaison," and "voice of World Vision" do not appear in the job posting for which Plaintiff applied. This alone undermines Defendant's argument that the job for which it hired Plaintiff qualifies for the ministerial exception.

Although not dispositive, the amount of time an employee spends on secular versus religious duties is relevant to whether that employee falls within the ministerial exception. *Hosanna-Tabor*, 565 U.S. at 194. Here, it is undisputed that Plaintiff would have spent most of her time performing secular customer service duties. Moreover, of the 13 enumerated components of the job description, ten are entirely secular. Only three even touch-upon religion:

> Help carry out our Christian organization's mission, vision, and strategies. Personify the ministry of World Vision by witnessing to Christ and ministering to others through life, deed, word and sign;

> Keep Christ central in our individual and corporate lives. Attend and participate in the leadership of devotions, weekly Chapel services, and regular prayer; and,

> Be sensitive to Donor's needs and pray with them when appropriate.

The first two religious aspects of the customer service representative position were equally applicable to every other employee of World Vision. As for the third, it is undisputed that praying with donors was not a job requirement of the customer service representative position.

### 2. All World Vision Employees Must Participate in Chapel Services

All World Vision employees are expected to participate in chapel services. All staff members regularly participate in "prayer activities," Dkt. No. 26 at p. 25. An entire workday is set aside each year for prayer which *all* staff must attend. Dkt. No. 28, at ¶ 26. Freiberg's declaration states that a guidebook (which is referred to as the "Orange Book") is made available to all employees of World Vision upon hire and its purpose is to help employees "better understand, comply with, and carry

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 10
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

out World Vision's mission, vision, and core values." Dkt. No. 28, at ¶53. Under the heading which reads "Weekly Chapel," the Orange Book states, in relevant part: "World Vision staff are invited and expected to worship every week (usually Wednesday) in an organization-wide chapel in Federal Way, [Washington] (or in the Washington, D.C. office)." Dkt. No. 28, Exh. 29, at WV000718. It is undisputed that all World Vision employees are expected to participate in chapel, as Defendant admitted in its original summary judgment motion. Dkt. No. 26 at p. 25. That customer service representatives are expected to participate in chapel does not differentiate them from any other World Vision employee and does not make them "ministers."

    Freiberg made clear at her deposition that while there is an expectation for World Vision staff members to *attend* chapel, "leading chapel is not [a job requirement]" and *leading* chapel for a customer service representative depends on "interest and desire to lead." Exh. 13, at 22:11-23. It is also worth mentioning that around the time Plaintiff would have begun working for Defendant (*i.e.*, early February 2021), weekly chapel was conducted virtually, and there was only one weekly service for all World Vision employees to attend. Exh. 11, at 123:16-124:10. Thousands of employees logged into an online virtual platform to "attend" chapel, usually on Wednesdays. There was no expectation for them to lead chapel. Nothing about World Vision's expectations with respect to customer service representatives' participation in chapel brings them within the ministerial exception.

### 3. Even Assuming that Customer Service Representatives Were Required to Lead Devotions, that Was Equally True for Most Other Employees

    With respect to Defendant's claim that customer service representatives had to "attend and participate in the leadership of devotions," even assuming these were actual job requirements, they were equally required of almost every other World Vision employee. Exh. 11, at 124:24-125:7; Exh. 13, at 22:11-19; Dkt. No. 26 at p. 25. This undisputed fact cuts against Defendant's assertion that customer service representatives were ministers.

    Participating in devotions is required of every World Vision employee. Exh. 11, at 124:24-125:7; Exh. 13, at 22:11-19. Defendant believes that teaching the word of the Lord is an essential

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 11
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

function of every position at World Vision on account of merely working "in a Christian organization and bearing witness of Christ." *Id.* at 17:3-21. Freiberg testified that every customer service representative or trainee was required to attend "devotions" when the "entire donor contact center shuts down." *Id.* at 43:18-44:3. Freiberg characterized participating in devotions as an "indirect" way in which World Vision staff members teach the word of the Lord and that this is accomplished through "sharing Scripture" or "things that they have heard [ ] within their church." *Id.* at 16:4-16. Freiberg believes teaching the word of the Lord is a main function simply by virtue of "being Christian," *Id.* at 18:7-21, and being a "representative of Christ." *Id.* at 16:22-25.

A document entitled "WVUS Devotion Guidelines" is disseminated to all World Vision staff members, Dkt. No. 28 at ¶ 55. It sets forth World Vision employees' responsibilities regarding "leading devotions." "Leadership of devotions" is "a part of *every* WVUS job description" and it is contemplated that leading devotions rotates among all staff members. Exh. 3 (emphasis added). These Guidelines also state that for staff members who are not comfortable leading devotions, it is suggested they "ask [ ] another staff member to co-lead with them." When Freiberg was asked whether leading devotions was an obligatory function of a customer service representative, she responded unequivocally at her initial deposition—which was held on February 16, 2023—that the expectation is to "*participate* in devotions" rather than to lead. Exh. 13, at 22:5-16. She also testified that each team within World Vision determines whether the responsibilities of leading those devotions are shared among team members. Exh. 13, at 22:15-19. Further, when asked whether it would be a disqualifier for employment if an employee outright refused to lead as opposed to being merely a participant, Freiberg replied: "To lead a devotion … would not be a required expectation." Exh. 13, at 23:16-25:18.

However, at Freiberg's second deposition—which was conducted March 10, 2023—she contradicted her prior testimony that the leading of devotions was an encouraged task rather than a required one. She testified on March 10, 2023, that every customer service representative or trainee is "required to attend devotions and to ultimately lead devotions." Exh. 10, at 43:18-20. A party

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 12
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

cannot create a triable issue of fact by contradicting its own prior sworn deposition testimony. *See,*
*e.g.*, *Harris v. City of Seattle*, 315 F. Supp. 2d 1105, 1111 (W.D. Wash. 2004). Accordingly, this
Court should disregard Freiberg's second deposition testimony that customer service representatives
are required to lead devotions. Even if this Court were to credit that testimony, it would still not be
a basis to find the ministerial exception applicable to customer service representatives. As noted just
above, "leadership of devotions" is "a part of *every* WVUS job description." Exh. 3.

Even assuming leading devotions is a "religious duty" for all World Vision employees, it is
a minor one. *All* World Vision staff members are permitted to spend a maximum of 45 minutes per
week involved in devotions (whether it be leading one or merely being present at one). Accordingly,
in any given week, assuming a World Vision staff member is leading the devotion for the entirety
of the sessions (which would go against the idea of rotating leadership), "leading devotions" would
amount to less than two percent of a full-time employee's work week.

One of the significant factors in determining whether an employee falls within the ministerial
exception is whether she had "a role distinct from that of most of [the organization's] members."
*Hosanna-Tabor*, 565 U.S. at 191. World Vision's own documents show that customer service
representatives' participation in chapel and leading devotions was no different from most of the
organization's other employees. The limited extent to which customer service representatives
participate in chapel services and devotions does not make them ministers, any more than such
participation makes every other World Vision employee a minister.

### 4. It is Undisputed that Praying with Donors or Potential Donors was not a Job Requirement of the Customer Service Representative Position

The eleventh enumerated requirement of the customer service representative job description
reads: "Be sensitive to Donor's needs and pray with them when appropriate." Thus, the customer
service representative job description *encourages* but does not mandate those employees to pray
with potential donors. Freiberg confirmed that while praying with donors is *encouraged*, it is not a
job requirement. Exh. 10, at 24:2-11. In a "guidance document" bearing the heading "Showing
Empathy on a Call During a Crisis (Talking Points)"—which was a document used to assist customer

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 13
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

service representatives in communicating with donors—under each heading there is a sentence which reads: "If comfortable, offer to pray with the donor over the phone." *Id.* at 26:20-25; Exh. 14. Freiberg testified that this sentence informs customer service representatives that they have a choice to offer to pray with donors, rather than it being mandatory, and that "there is not … disciplinary action if [the customer service representatives] don't pray [with donors]." Exh. 10, at 30:14-23.

Defendant provides to all its employees a document entitled "Giving Word to Our Faith Framework" (abbreviated shorthand as "GWF Framework"), which "references [Defendant's] beliefs in terms of what [it] believe[s], what [it] experiences in the world, and how [it] guide[s] messaging around our Christian faith." *Id.* at 32:5-12. The GWF Framework states: "The Giving Word to our Faith messaging framework is guidance to enable us to speak boldly and unapologetically to people of various contexts about what our faith and Christian identity mean for our work." Exh. 7. Further, a handbook on the GWF Framework advises that it is intended to be utilized "[t]o create clarity and understanding about how our faith influences our work." Exh. 8, at p. WV-006121.

The framework document states: "The examples provided below are indicative only and based on insights about contextual audiences gathered during workshops. End users will need to articulate their own insights for their audiences and apply the framework accordingly." Exh. 7. Freiberg made clear that these two sentences communicate to employees that it is their choice whether or not to implement these ideas and "provides some discretion on how to utilize [the framework]." Exh. 10, at 40:15-21. The GWF Framework confirms that praying with donors is *encouraged* but not *required* of customer service representatives.

In sum, the job duties of the customer service representative position for which World Vision hired McMahon were overwhelmingly secular: acquiring and maintaining donors through inbound and outbound telephone calls. The limited, religious aspects of the position were either equally applicable to nearly all other World Vision employees or optional. A religious employer has a First Amendment right to require its employees to perform religious functions, but doing so does

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 14
2:21-CV-00920-JLR

not make the employees a "minister" under the First Amendment. If all employees have similar religious roles within a religious organization, then none "play certain key roles," hold "certain important positions," or perform "a role distinct from that of most of its members," and the ministerial exception does not apply to any of those employees. The donor/customer service duties Plaintiff would have performed for World Vision do not "implicate[] the fundamental purpose of the exception." *Our Lady of Guadalupe*, 140 S. Ct. at 2067.

### D. Other Cases Involving the Ministerial Exception Demonstrate Its Inapplicability to the Donor/Customer Service Representative Position

The job responsibilities of a customer service representative are distinctly different from those of religious-school teachers and counselors, the positions about which litigation in this subject area has recently predominated. In *Hosanna-Tabor,* the plaintiff, Perich, was employed by an evangelical Lutheran church and school as a "called teacher" who taught a religion class four days a week and led her students in prayer three times a day. 565 U.S. at 192. Perich held herself out as a minister and the church held her out as a minister as well. *Id.* at 191-92. In *Our Lady of Guadalupe*, the plaintiff was employed by a Roman Catholic primary school as a "lay fifth or sixth grade teacher" and part of the curriculum she taught included religion. 140 S. Ct. at 2056. Like the teacher in *Hosanna-Tabor*, the teacher in *Our Lady of Guadalupe* "performed vital religious duties." *Id.* at 2066. Underlying both these decisions was the Supreme Court's recognition that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* at 2064.

*Butler v. St. Stanislaus Kostka Catholic Academy*, 609 F. Supp. 3d 184 (E.D.N.Y. 2022), also involved a Catholic school teacher and is a straightforward application of *Our Lady of Guadalupe*. In sharp contrast to the customer service representative position here, the job to which Butler applied required "a practicing Catholic committed to the mission of Catholic education." 609 F. Supp 3d at 194. Butler's employment contract required him "to teach and convey the Roman Catholic Faith" and "to include the Church's teachings within the content/subject matter of all subjects." *Id*. Butler received "ministerial training in his orientation." *Id.* at 198. "Butler was not only terminated from a

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 15
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

ministerial position at St. Stans—he was terminated from that position after expressing discomfort with the ministerial aspects of the position." *Id. Butler* is far removed from the present case.

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931 (7th Cir. 2022), and *Fitzgerald v. Roncalli High School, Inc.*, 73 F.4th 529 (7th Cir. 2023), are also easy cases after *Our Lady of Guadalupe*. Starkey and Fitzgerald were co-Directors of Guidance at a Catholic school. 41 F.4th at 940; 73 F.4th at 532. Starkey was a member of the school's Administrative Council and was "entrusted with communicating the Catholic faith to children, supervising guidance counselors, and advising the principal on matters related to the school's religious mission." 41 F.4th at 940. She also had the responsibility of "guiding the religious mission of the school." *Id.* Starkey was also "one of the school leaders responsible for the vast majority of [its] daily ministry, education and operations." *Id.* (internal quotation omitted). Likewise, Fitzgerald was "one of a handful of key, visible leaders of the school." 73 F.4th at 532 (internal punctuation omitted). Both Fitzgerald and Starkey participated in the school's religious leadership committee. *Id.* at 532-33. Both Starkey and Fitzgerald held themselves out as ministers. *Id.* Accordingly, the ministerial exception barred both Starkey's and Fitzgerald's discrimination claims. *Starkey,* 41 F.4th at 942; *Fitzgerald*, 73 F.4th at 534.

However, not every employee of a religious organization who has some religious responsibilities falls within the ministerial exception. In *Palmer v. Liberty Univ.*, Case No. 6:20-cv-31, 2021 WL 6201273, at *5 (W.D. Va. Dec. 1, 2021), *vacated and appeal dismissed*, 72 F.4th 52 (4th Cir. 2023), the plaintiff was an art professor for a Christian university. The court found that the plaintiff's job duties were primarily secular even though she started each class session with a prayer and attended convocation with her students. The plaintiff had no formal religious training. *Id.* at *15. Neither the plaintiff nor the school held her out as a minister. The fact that the plaintiff and the school regarded her as a "Christian teacher" did not make her a minister. *Id.* at *14. The court concluded that because "the core function" of the plaintiff's job was secular, the ministerial exception did not apply to plaintiff's position, even though she performed some religious functions. *Id.* at *22. "Palmer was not a key religious figure…." *Palmer v. Liberty Univ.*, 72 F.4th 52, 74 (4th Cir. 2023) (Motz, J.,

concurring). "The ministerial exception, as interpreted by the Supreme Court, simply does not apply to Palmer." *Id.*

*DeWeese-Boyd v. Gordon College*, 487 Mass. 31, 63 N.E.3d 1000 (2021), *cert. denied*, 142 S. Ct. 942 (2022), also shows that just because an employee performs some religious functions for a religious organization, that does not bring her within the ministerial exception. There, the college argued that the ministerial exception applied to an associate professor of social work because the integration of religion into daily life and work is part of the college's mission for everyone in its employ, "whether they be coaches, food service workers, or transportation providers." *Id.* at 54. Massachusetts' highest court disagreed. "The integration of religious faith and belief with daily life and work is a common requirement in many, if not all, religious institutions." *Id.* "While it may be true that…Christians have an undeniable call to minister to others," that does not make all Christians "necessarily ministers" under *Our Lady of Guadalupe* and *Hosanna-Tabor. Id.* at 48 (internal quotation marks omitted); *see also Richardson v. Northwest Christian Univ.*, 242 F. Supp. 2d 1132, 1145 (D. Or. 2017) (distinguishing being "a Chrisitan" from being a "a minister").

The Massachusetts Supreme Judicial Court recognized that expanding the ministerial exception beyond those "'individuals who play certain key roles' in a religious institution" to all employees who integrate faith into their work would have enormous consequences and result in the "elimination of civil law protection against discrimination…." *DeWeese-Boyd*, 487 Mass. at 48 (quoting *Our Lady of Guadalupe*, 140 S. Ct. at 2060); *Id.* at 54. "[T]he potential for conflict between the[] fundamental legal principles" of First Amendment religious autonomy and the right to obtain and hold employment without discrimination on the basis of sexual orientation or another legally protected characteristic "is therefore of obvious and great concern, not only to the individual plaintiffs, but also for our civil society and religious institutions." *Id*. at 42.[2]

As Plaintiff was not hired to be a religious school teacher, the grounds for applying the

---

[2]  Concurring in the denial of certiorari, Justice Alito questioned the Massachusetts Supreme Judicial Court's "understanding of religious education" but did not disagree with the state court's general pronouncements regarding the ministerial exception. 142 S. Ct. 952, 954-55. Indeed, Justice Alito re-emphasized that the ministerial exception is limited to "the selection of the employees who play 'certain key roles'" in the religious institution. *Id.* at 954.

ministerial exception here are even weaker than in *Palmer* and *DeWeese-Boyd*. This case is much more similar to *Ratliff v. Wycliffe Assocs., Inc.*, Case No. 6:22-cv-1185-PGB-RMN, 2023 WL 3688082 (M.D. Fla. May 26, 2023), where the court held that a software developer for a Bible translation company did not fall within the ministerial exception. The plaintiff's job title there was "Software Developer II," and his primary duty was to develop software for Bible translation. *Id.* at *1. The employer terminated the plaintiff when it learned he had entered into a same-sex marriage. *Id.* at *2. The plaintiff brought a Title VII claim for sexual orientation discrimination. *Id.* The employer argued that the plaintiff qualified "as a *minister* of Defendant's religious mission" because the express conditions of his employment required him to "'sense a call from God to ministry' and meet Defendant's 'high standards for spirituality and the Christian faith.'" *Id.* at *5 (internal punctuation omitted). The plaintiff's job description included "having 'a personal relationship with Jesus Christ' and sensing 'a call from God to ministry.'" *Id.* at *5 n. 8. The court held that this was "a far cry from accepting a job akin to a minister." *Id.* at *5 "Defendant did not bestow Plaintiff with a ministerial title nor anything even remotely similar…." *Id.* The plaintiff in *Ratliff* did not hold himself out as a minister. *Id.* "[N]either the Plaintiff's title nor the fundamental nature of his position persuades the Court that he was anything but a secular employee." *Id.*

Like the customer service representative position here, the software developer position in *Ratliff* "did not reflect any degree of religious training, much less subsequent formal recognition" as minister. *Id.* The employer in *Ratliff* argued, similar to World Vision here, that the plaintiff was a minister because his job duties were "essential to Defendant's mission to share the Christian faith with unreached people groups around the world." *Id.* at *6. In rejecting this argument, the *Ratliff* court contrasted the nature of the plaintiff's duties as a software developer with the key roles that employees in *Hosanna-Tabor* and *Our Lady of Guadalupe* played in religious instruction. *Id.* at *6. While McMahon's customer service role would have required her to interact directly with World Vision's customers, unlike the position in *Ratliff*, it is equally true here that "the plaintiffs in *Hosanna-Tabor* and *Our Lady of Guadalupe* played a far different role in conveying their religious

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 18
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

organizations' message and carrying out their mission than did Plaintiff." *Id.* (internal punctuation omitted). Just like the plaintiff in *Ratliff*, McMahon did not have an "idiosyncratic religious title, background, education, or function." *Id.* And just like the plaintiff in *Ratliff*, McMahon's role at World Vision fell "outside the intended scope of the ministerial exception." *Id.*

"[T]he ministerial exception has been carefully circumscribed to avoid unnecessary conflict with civil law." *DeWeese-Boyd*, 484 Mass. at 54. Where the exception applies, an employee has no recourse under either federal or state anti-discrimination laws. *See Id.* at 42. Title VII was enacted to implement the Equal Protection Clause of the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976). The laws against workplace discrimination in Washington are "an explicit, well-defined, and dominant public policy." *Int'l Union of Operating Engineers v. Port of Seattle*, 176 Wn.2d 712, 721, 295 P.3d 736 (2013). "It is no exaggeration to say that the ministerial exception condones animus." *Palmer v. Liberty Univ.*, 72 F.4th 52, 74 (4th Cir. 2023) (Motz, J., concurring) (internal quotation omitted). "When it comes to key religious figures, this is a necessary tradeoff." *Id.* However, an employee who is not a key religious figure "does not shed her right to be free from religious discrimination simply because she believes in God, prays at work, and is employed by a religious entity." *Id.* While Defendant has the constitutional right "to choose those who will guide it on its way," *Hosanna-Tabor*, 565 U.S. at 196, the First Amendment does not give Defendant a carte blanche exemption from the laws against employment discrimination. *See DeWeese-Boyd*, 487 Mass. at 42; *Palmer*, 72 F.4th at 74 (Motz, J., concurring).

The undisputed facts here demonstrate that the customer service representative position does not qualify for the ministerial exception. Therefore, Plaintiff is entitled to summary judgment on Defendant's ministerial exception affirmative defense.

## IV.   DEFENDANT'S REMAINING AFFIRMATIVE DEFENSES FAIL AS A MATTER OF LAW

In *Bostock*, "the Court identified *three* potential avenues of legal recourse for religious and faith-based employers to shield themselves from any potential infringement of their religious rights" as a result of the Court's holding that Title VII prohibits discrimination on the basis of sexual

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 19
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

orientation. *Braidwood Mgt. Inc., v. EEOC,* 70 F.4th 914, 918 (5th Cir. 2023) (emphasis supplied). Those avenues are (1) Title VII's religious employer exemption, (2) the ministerial exception, and (3) the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb-2000bb-4. *Id.* RFRA applies only to cases where the government is a party and is not one of the defenses before the Court. See Dkt. No. 40 n.3.

Defendant's prior summary judgment filings did not identify a single instance where a court has accepted a Bona Fide Occupational Qualification ("BFOQ"), Free Exercise Clause, or Expressive Association affirmative defense in a case where a religious employer has facially discriminated against an employee or applicant based on her sexual orientation. That's because the Title VII religious exemption and First Amendment ministerial exception provide full protection to religious employers' constitutional rights. Where, as here, those two affirmative defenses do not apply, there are no other special affirmative defenses available to religious employers who have engaged in facial employment discrimination in violation of federal and state law.

### A. Defendant Cannot Establish a BFOQ Defense Under Title VII or the WLAD

Title VII's BFOQ defense provides as follows:

> [I]t shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify, or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program, on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.

42 U.S.C. § 2000e-2(e)(1).

"The BFOQ defense is written narrowly, and this Court has read it narrowly." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW, v. Johnson Controls, Inc.*, 499 U.S. 187, 201 (1991). The BFOQ defense is "meant to be an extremely narrow exception to the general prohibition to general prohibition of discrimination on the basis of sex." *Dothard v.*

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 20
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

*Rawlinson*, 433 U.S. 321, 334 (1977). Title VII "limits the situations in which discrimination is permissible to 'certain instances' where sex discrimination is 'reasonably necessary' to the 'normal operation' of the 'particular' business." *Johnson Controls*, 499 U.S. at 201. "Each one of these terms…prevents the use of general subjective standards and favors an objective, verifiable requirement." *Id.* "But the most telling term is 'occupational'; this indicates that these objective, verifiable requirements must concern job-related skills and aptitudes." *Id.* "By modifying 'qualification' with 'occupational,' Congress narrowed the term to qualifications that affect an employee's ability to the job." *Id.*

To escape summary judgment on a BFOQ defense, the employer must raise a genuine issue whether (1) its facially discriminatory policy is reasonably necessary to the normal operation of its particular business, and (2) the policy concerns job-related skills and aptitudes. *Frank v. United Airlines, Inc.*, 216 F.3d 845, 855 (9th Cir. 2000). The "employer must show 'a high correlation' between a qualification and ability to perform job functions." *EEOC v. Kamehameha Schools/Bishop Estate*, 990 F.2d 458, 466 (9th Cir. 1993) (quoting *Johnson Controls*, 499 U.S. at 202). Defendant cannot meet that burden here.

Similar to the Title VII BFOQ defense, the WLAD BFOQ applies "narrowly to jobs for which a particular quality of protected status will be essential to or will contribute to the accomplishment of the purposes of the job." WAC 162-16-240. To establish a BFOQ under Washington law, the employer must show that "excluding members of a particular protected status group is essential to the purposes of the job." *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 358, 172 P.3d 688 (2007) (internal quotation marks omitted). Furthermore, the employer must "establish that all or substantially all persons in the excluded class would be unable to efficiently perform the duties of the position at issue, and the essence of the operation would be undermined by hiring

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

anyone in that excluded class." *Id.* (internal quotation marks omitted).

Defendant's Title VII and WLAD BFOQ defenses both fail as a matter of law. The job Defendant offered Plaintiff was that of a donor/customer service representative. Defendant has a facially discriminatory hiring policy that precludes the employment of individuals in same-sex marriages. Put another way, Defendant requires married employees to be in a heterosexual marriage as a condition of employment. Such a requirement does not even constitute an "occupational qualification" within the meaning of Title VII because the requirement in no way relates to the "job-related skills and aptitudes" of a donor/customer service representative. Nor can Defendant show that its ban on hiring donor/customer service representatives in same sex-marriage is essential to the purposes of the job, that people in same sex marriages would be unable to efficiently perform the duties of the position at issue, and the essence of Defendant's operation would be undermined by hiring anyone in a same-sex marriage as a donor/customer service representative. Whether Plaintiff was in a same-sex or heterosexual marriage had no impact on her ability to do the customer service representative job. Indeed, donors would have had no way of knowing whether Plaintiff was in a heterosexual marriage, a same-sex marriage, divorced, or single.

The only Ninth Circuit case that Defendant initially cited in support of its BFOQ defenses, *EEOC v. Kamehameha Schools/Bishop Estate*, found the defense inapplicable. That case involved a private school that required all teachers to be Protestant. Both the EEOC and the schools moved for summary judgment on the schools' BFOQ defense as applied to teachers *other than* those in religious education. The district court ruled in favor of the schools, but the Ninth Circuit reversed. The appellate court held that that there was no evidence "that adherence to the Protestant faith is essential to the performance of this job." 990 F.2d 466. Likewise, there is no evidence that Plaintiff's being in a same-sex marriage would have interfered with her ability to perform the essential

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 22
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

functions of her job as customer service representative. Defendant's Title VII BFOQ defense fails as a matter of law and fails a fortiori under the stricter requirements of the WLAD.

Plaintiff is entitled to summary judgment on World Vision's BFOQ defenses.

**B.   The Free Exercise Clause and the Right of Expressive Association Do Not Immunize Defendant from Statutory Prohibitions on Employment Discrimination**

Defendant asserts the statutory prohibitions on sex, sexual orientation, and marital status discrimination set forth in Title VII and the WLAD abridge its First Amendment freedoms of religion and of expressive association and trigger strict scrutiny. As set forth below, these contentions are contrary to established precedent. But it is important to recognize the breadth of Defendant's constitutional challenges to existing federal and state discrimination law. Congress deliberately included religious organizations within Title VII's prohibition on sex discrimination. Religious organizations are subject to the statutory prohibitions on employment discrimination set forth in RCW 49.60. Defendant is asking this Court to declare these legislative determinations unconstitutional.

If this Court were to give serious consideration to Defendant's argument that Plaintiff's claims under Title VII and the WLAD against it are unconstitutional then this court *must*, under 28 U.S.C. § 2403, certify to the Attorney General of the United States that there is a constitutional challenge to a federal statute, and to certify to the Washington Attorney General that there is a constitutional challenge to a state statute. *See, e.g., Lucarelli v. Hershey Co.*, Case No. C07-1314RSM, 2007 WL 3010425, at *1 (W.D. Wash. Oct. 11, 2007). However, because Defendant's constitutional challenges to Title VII and WLAD are without merit, the Court can reject them without going through the certification required by 28 U.S.C. § 2403.

**1.   Title VII and the WLAD are Not Subject to Strict Scrutiny Because they are Neutral with Respect to Religion and Generally Applicable**

"[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021) (citation omitted). "[T]here is no general constitutional immunity, over and above the ministerial exception, that can protect a religious institution from the

law's operation." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct 2367, 2397 n.1 (2020) (Kagan, J., concurring in the judgment). Both Title VII and the WLAD are neutral and generally applicable within the meaning of *Fulton*. Where the challenged law is "neutral and generally applicable," courts employ rational basis review, which asks whether the government action at issue is "rationally related to a legitimate governmental purpose." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1084 (9th Cir. 2015).

A law is not neutral with respect to religion "when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877. That cannot be said of either Title VII or the WLAD. Both statutes require the accommodation of religious beliefs and practices. *E.g.*, *Groff v. DeJoy*, 143 S. Ct. 2279 (2023); *Kumar v. Gate Gourmet Inc.*, 180 Wn.2d 481, 325 P.3d 193 (2014). Title VII is "a permissible content neutral regulation of conduct." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993); "Title VII neither regulates religious beliefs, nor burdens religious acts, because of their religious motivation. On the contrary, it is clear that Title VII is a secular, neutral statute.…" *Vigars v. Valley Christian Ctr of Dublin, CA*, 805 F. Supp. 802, 809 (N.D. Cal. 1992).

"A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton,* 141 S. Ct. at 1877 (quoting *Employment Division, Dep't of Human Resources v. Smith*, 494 U.S. 872, 884 (1990)) (internal punctuation omitted). "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. Title VII and the WLAD are both generally applicable laws under these tests. Neither statute provides individualized exemptions from their blanket prohibitions on employment discrimination based on the defendant's particular reasons for committing unlawful discrimination. Indeed, it is Defendant who would destroy these statutes' general applicability by carving out a special constitutional exemption for employers who engage in unlawful discrimination for religious reasons.

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

Free exercise claims "must fail if prohibiting the exercise of religion...is not the *object* of the law but merely the incidental effect of a generally applicable and otherwise valid provision...." *American Friends Service Committee Corp. v. Thornburgh*, 951 F.2d 957 (9th Cir. 1991) (quoting *Smith*, 494 U.S. at 878) (internal punctation omitted). The Ninth Circuit has already rejected Defendant's contention that the First Amendment prohibits application of Title VII to facially discriminatory conduct that is religiously motivated. In *EEOC v. Fremont Christian School*—which was decided before *Smith* adopted rational basis review for generally applicable laws that are neutral with respect to religion—the employer argued that applying Title VII to its policy of supplying health insurance only to male heads of household would violate the First Amendment because that policy was "grounded in religious belief." 781 F.2d 1362, 1367 (9ᵗʰ Cir. 1986). Applying strict scrutiny, the Ninth Circuit disagreed. *Id.* at 1368. "By enacting Title VII, Congress clearly targeted the elimination of all forms of discrimination as a highest priority. Congress' purpose to end discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions." *Id.* at 1368-69 (internal punctuation omitted). *Fremont Christian School*'s conclusion applies a fortiori under rational basis review.

RCW 49.60 is a "neutral, generally applicable law subject to rational basis review." *State v. Arlene's Flowers, Inc.*, 193 Wn.2d 469, 523, 441 P.3d 1203 (2019), *cert. denied*, 141 S. Ct. 2884 (2021). "And the WLAD clearly meets that standard." *Id.*

*Fremont Christian Schools* and *Arlene's Flowers* dispose of Defendant's Free Exercise challenge to the constitutionality of Plaintiff's sex, sexual orientation, and marital status discrimination claims. Plaintiff is entitled to summary judgment on that affirmative defense.

### 2.   There is No Expressive Association Defense to Employment Discrimination Claims

In *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984), the Supreme Court unanimously rejected the argument that application of Title VII's prohibition on sex discrimination to a law firm partnership infringed on the employer's constitutional rights of expression association. "Invidious private discrimination may be characterized as a form of exercising freedom of association protected

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 25
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

by the First Amendment, but it has never been accorded affirmative constitutional protections." *Id.* (internal punction omitted). *Hishon* establishes that there is no First Amendment expressive association defense to statutory employment discrimination claims.

In its prior summary judgment filings, Defendant ignored *Hishon* and asserted that *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000), shows that World Vision has a First Amendment expressive association defense to Plaintiff's statutory employment discrimination claims. *Dale* held that New Jersey's prohibition on sexual orientation discrimination in public accommodation did not require the Boy Scouts to admit a gay assistant scoutmaster. *Id.* at 643. The majority reasoned that the presence of an openly gay scoutmaster "would significantly burden the Boy Scouts' desire to not promote homosexual conduct as a legitimate form of behavior," and because Dale was "a gay rights activist" having him as scoutmaster would send a message "both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as legitimate form of behavior." *Id.* at 653 (internal quotations omitted).

*Dale* made clear that its holding was "not to say an expressive association can erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Id.* "The forced inclusion of an unwanted person in a group infringes the group's freedom of expression if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Id.* at 648. That was true in *Dale* because he was a leader in the gay Scouts community, *id.* at 653, but not true in *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984), which rejected an expressive association challenge to enforcement of a state law prohibiting sex discrimination in public accommodations in a private organization. "We are persuaded that Minnesota's compelling interest in eradicating discrimination against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members' associational rights." *Id.* at 623.

More than one court has rejected Defendant's contention that *Dale* bars enforcement of Title VII's anti-discrimination prohibitions against religious institutions. *Billard v. Charlotte Catholic*

*High School*, No. 3:17-cv-00011, 2021 WL 4037431, at *22 (W.D.N.C Sept. 3, 2021), *appeal filed*, (Apr. 25, 2022); *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 496 F. Supp. 3d 1195, 1208 (S.D. Ind. 2020). In *Billard*, the plaintiff claimed he was fired from his substitute teaching position because of his sexual orientation. 2021 WL 4037431 at *1. Relying "almost entirely" on *Dale*, the defendants argued the plaintiff's claims were barred by freedom of expressive association. *Id.* at *23. *Billard* correctly recognized that there are "critical aspects of the *Dale* decision that make it inapplicable to this case." *Id. Dale* involved a private membership organization in which the plaintiff was a volunteer. *Id. Dale* concerned public accommodations law, not employment discrimination law. *Id.* The Boy Scouts expressly acknowledged that they would have been subject to laws prohibiting discrimination in employment based on sexual orientation. *Id.* (quoting *Dale*, 530 U.S. 672, Stevens, J., dissenting). The constitutional violation in *Dale* was that the state had "tried to require the group to propound a point of view contrary to its beliefs by directing its membership choices." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023) (internal quotations omitted).

*Billard* acknowledged that the plaintiff's decision to marry his partner was "not in keeping with Catholic teachings" and "while retaining Plaintiff implicates Defendants' expressive mission, it does not significantly do so." *Id.* at * 24. "Even though there is some impairment of Defendant's expressive activities, Title VII is sufficiently compelling to warrant its application here." *Id.* The ministerial exception and the statutory carve out for religious employers with respect to religious discrimination claims showed Title VII was "narrowly tailored" and did not unnecessarily interfere with First Amendment freedoms. *Id.* Therefore, the First Amendment right to expressive association did not bar the plaintiff's statutory employment discrimination claims.

*Starkey* similarly rejected the assertion that freedom of association preluded a claim of sexual orientation discrimination against a religious organization that opposed homosexuality on religious grounds. 496 F. Supp. 3d at 1209. "*Dale* does not require anti-discrimination laws to give way automatically in the face of a freedom of association defense asserted by an expressive

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 27
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

organization." *Id.* at 1208. Applying Title VII to a religious employer does not implicate the issues that concerned the Supreme Court in *Dale*. *Id.* *Dale* did not arise in the employment context and did not overrule *Hishon*. *Id.* The plaintiff in *Dale* "sought membership in a private organization." *Id.* at 1209. Furthermore, "if a religious employer could simply assert a freedom of association defense and defeat a discrimination claim…the ministerial exception is unnecessary." *Id*.

*Billard's* and *Starkey*'s analysis of freedom of expressive association and employment discrimination law is persuasive. *Hishon* controls this case, not *Dale*. This Court should grant Plaintiff's motion for summary judgment on Defendant's expressive association defense.

### C. Fifty Years Ago, the Supreme Court Ruled that the Free Speech Clause does not Provide a Defense to Laws that Prohibit Facially Discriminatory Hiring Practices and *303 Creative LLC* Doesn't Affect that Controlling Precedent

In *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376 (1973), the Supreme Court ruled that there is no First Amendment Free Speech defense to laws that prohibit facially discriminatory employment practices. There, a local human relations commission held that a newspaper had violated a city ordinance by using an advertising system that published employment opportunities under headings designating job preference by sex. *Id.* at 377-78. The newspaper claimed that the commission's decision violated the First Amendment by restricting the newspaper's editorial judgment. *Id.* at 381. The Court acknowledged that the advertisements were commercial speech and the law at issue implicated the newspaper's First Amendment interests. *Id.* at 381-82. Enforcement of the anti-discrimination law would "affect the make-up of the help-wanted section of the newspaper…. Pittsburgh Press will be required to abandon its present policy of providing sex-designated columns and allowing advertisers to select the columns in which their help-wanted advertisements will be placed." *Id.* at 383-84. The Court, however, rejected the newspaper's First Amendment challenge: "Discrimination in employment is not only commercial activity, it is illegal commercial activity…." *Id.* at 388. *Pittsburgh Press* establishes that the First Amendment does not provide a Free Speech defense to laws prohibiting facially discriminatory employment practices.

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

Nothing in *303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023), affects the Court's decision in *Pittsburgh Pres*s. The plaintiff in *303 Creative* had sought an injunction prohibiting the State from forcing her to create wedding websites celebrating same-sex marriages, which contradicted her personal beliefs. *Id.* at 2308. The issue in *303 Creative* was whether a state could use "its [public accommodations] law to compel an individual to create speech she does not believe." *Id.* at 2308. The majority framed the question thus: "Can a State force someone who provides her own expressive services to abandon her conscience and speak *its* preferred message instead?" *Id.* at 2318. The majority ruled that doing so violated the Free Speech Clause of the First Amendment. The majority explicitly disavowed the dissent's assertion that the Court's opinion permitted discrimination against "members of a protected class." *Id.* ("we do no such thing").

*303 Creative* did not involve employment discrimination and Plaintiff's case does not involve compelled speech. This Court's enforcement of the federal and state prohibitions on sex, sexual orientation, and marital status discrimination in employment will not require World Vision to "speak" a message with which it disagrees. And even if it did, *Pittsburgh Press* makes clear that the Free Speech Clause does not provide a constitutional defense to the enforcement of laws that prohibit facially discriminatory employment practices. Accordingly, this Court should rule that *303 Creative* does not provide World Vision with an affirmative defense to its discrimination against Plaintiff in violation of federal and state law.

## V.    CONCLUSION

This Court should grant Plaintiff's renewed Motion for Summary Judgment on Affirmative Defenses and set a trial solely on the issue of damages.

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

1

2    RESPECTFULLY SUBMITTED, this 22nd day of September 2023.

3                            **FRANK FREED SUBIT & THOMAS LLP**

4                            By:  /s/ Michael C. Subit
5                            Michael C. Subit, WSBA No. 29189
                             705 Second Avenue, Suite 1200
6                            Seattle, Washington 98104
                             Phone: (206) 682-6711
7                            Fax:  (206) 682-0401
                             Email:  msubit@frankfreed.com
8

9                            I certify that this memorandum contains 10,372
                             words in compliance with the Court's Order of April
10                           5, 2023 (Dkt 21)

11                           **NISAR LAW GROUP, P.C**.

12                           By:  /s/ Casimir Wolnowski
13                           Casimir Wolnowski
                             One Grand Central Place
14                           60 East 42nd Street, Suite 4600
                             New York, New York 10165
15                           Phone: (646) 889-1007
                             Fax:  (516) 604-0157
16                           Email : cwolnowski@nisarlaw.com
                             *Admitted Pro Hac Vice*
17

18                           *Attorneys for Plaintiff*

19

20

21

22

23

24

25

26

PLAINTIFF'S RENEWED
MOTION FOR SUMMARY JUDGMENT - 30
2:21-CV-00920-JLR

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711