1
2
3
4

THE HONORABLE JAMES L. ROBART

5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

AUBRY MCMAHON,

9                Plaintiff,

10        vs.

11   WORLD VISION, INC.

12               Defendant.

13

CASE NO. 2:21-CV-00920-JLR

DEFENDANT WORLD VISION'S
OPENING BRIEF ON SUMMARY
JUDGMENT (ROUND 2)

*NOTE ON MOTION CALENDAR:*
*October 20, 2023*

**ORAL ARGUMENT REQUESTED**

14
15
16
17
18
19
20
21
22
23
24
25
26
27

Def. WV's Opening Brief on
Summary judgment (Round 2)
Case No. 2:21-CV-00920-JLR

Page i

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

# Table of Contents

I.   INTRODUCTION. ................................................................................................ 1

II.  THE MINISTERIAL EXCEPTION REQUIRES JUDGMENT FOR WV. ................... 3

   A.  The Law of the Ministerial Exception: Overview. ...................................... 4

   B.  The DCSR Position Is Clearly Ministerial in Nature: Overview. ........................ 5

   C.  The Ministerial Nature of DCSRs Is Clear From DCS-led Chapels. ................... 8

   D.  The Ministerial Nature of DCSRs Is Clear from DCS Prayer Calls. ................... 10

   E.  The Ministerial Nature of DCSRs Is Clear from DCS Shout-Outs. .................... 11

   F.  The Ministerial Exception Applies to the DCSR Position: Summary. .............. 12

   G.  Plaintiff's Litigation Conduct Illustrates Why the ME Applies. ......................... 13

III. FREE EXERCISE REQUIRES JUDGMENT FOR WV. ............................................... 14

   A.  Applying Title VII/WLAD to WV Invokes Free Exercise. ................................. 14

   B.  Law of Free Exercise: Overview. ...................................................................... 15

   C.  Title VII/WLAD Favor Some Secular Activity Over Religious Activity. ......... 15

   D.  This Action Applies Exemption-Ridden Laws. ................................................. 16

   E.  The Result Sought Is Non-Neutral Toward WV Regardless of Motive. ........... 17

   F.  Applying Title VII or WLAD to WV Fails Strict Scrutiny. ................................. 18

IV. EXPRESSIVE ASSOCIATION REQUIRES JUDGMENT FOR WV. ......................... 19

   A.  Applying Title VII/WLAD to WV Infringes Expression/Association. .............. 19

   B.  Law of Expressive Association: Overview. ....................................................... 19

   C.  Expressive Association Allows WV to Decide Who Will Communicate Its
      Religious Message and Carry Out Its Mission. ................................................. 21

   D.  The Result Sought Is Non-Neutral Toward WV Regardless of Motive. ........... 23

   E.  Plaintiff Seeks to Compel Expression and Punish a Viewpoint. ....................... 23

   F.  This Action May Result in Content or Viewpoint Discrimination. .................... 24

   G.  This Action Fails All Applicable Scrutiny. ....................................................... 25

   H.  *303 Creative* Further Supports WV's Case. .................................................... 26

DEF. WV'S OPENING BRIEF ON      Page ii
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

V.  BOTH ROEs ALSO REQUIRE JUDGMENT FOR WORLD VISION. ...................... 26

    A.  Title VII's ROE Disposes of the Federal Claim. ..................................... 26

    B.  WLAD's ROE Disposes of the State Claim. ......................................... 28

VI. BOTH BFOQs ALSO REQUIRE JUDGMENT FOR WORLD VISION. .................. 28

    A.  Title VII's BFOQ Disposes of the Federal Claim. ................................. 28

    B.  WLAD's BFOQ Disposes of the State Claim. ....................................... 29

VII.      CONCLUSION. ................................................................................................ 29

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

World Vision, Inc. ("WV") requests judgment dismissing this suit for sex-based discrimination under Title VII of the Civil Rights Act of 1964 and the Washington Law Against Discrimination ("WLAD"). *See also Spencer v. World Vision*, 570 F.Supp.2d 1279 (W.D.Wash. 2008), *aff'd*, 633 F.3d 723 (9th Cir.), *cert. denied*, 565 U.S. 816 (2011).

## I.     INTRODUCTION.

"Plaintiff does not dispute World Vision's refusal to hire anyone who is in a same-sex marriage is based upon sincerely held religious beliefs." Pls. MFR/Dkt.40 at 2. Thus, WV's marriage policy is based on religious "doctrine[, not] secular animus." *Alicea-Hernandez v. Cath. Bishop of Chicago*, 320 F.3d 698, 703 (7th Cir. 2003) ("*Alicea*").

Yet, this action puts two sets of rights on a collision course. "Anti-discrimination laws and policies serve undeniably admirable goals, but when those goals collide with the protections of the Constitution, they must yield—no matter how well-intentioned." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 2023 WL 5946036, *23 (9th Cir. Sept. 13, 2023) (en banc) ("*FCA*") (citing *303 Creative v. Elenis*, 143 S.Ct. 2298, 2315 (2023) ("*303 Creative*")). When these "two regrettably clash," *id.* *3, inalienable rights secured by the First Amendment prevail over more recently recognized rights to sexual and gender autonomy. Otherwise, the law would cause religious groups like WV "'as it currently identifies itself to cease to exist,'" *Slattery v. Hochul*, 61 F.4th 278, 290 (2d Cir. 2023) ("*Slattery*"), and destroy religious diversity. *Accord FCA*, *23.

The discrimination label works both ways. It applies here as it did in *Garcia v. Salvation Army*, 918 F.3d 997 (9th Cir. 2019) ("*Garcia*"). "In a final effort to avoid the ROE's reach, Garcia maintains that she has not pleaded a cause of action labeled

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

'religious discrimination' [but her] complaint centers around religious discrimination." *Id.* at 1005. Plaintiffs often shun the "religious discrimination" label to avoid the fate of the plaintiffs in *Spencer*: robust religious defenses. Here, however, Plaintiff admitted her case is rooted in a dispute over religious policy. Dkt.26 at 6-8.

This lawsuit "cannot foreclose the exercise of constitutional rights by mere labels." *NAACP v. Button*, 371 U.S. 415, 429 (1963). "[T]he text of the First Amendment itself ... gives special solicitude to the rights of religious organizations," *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189 (2012) ("*Hosanna*"), which *Bostock* itself emphasized, *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1754 (2020).

In cases like ours, the line is fixed. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group*, 515 U.S. 557 (1995) ("*Hurley*"); *Boy Scouts v. Dale*, 530 U.S. 640 (2000) ("*Dale*"); *Masterpiece Cakeshop v. Colo. C.R. Com'n*, 138 S.Ct. 1719 (2018) ("*Masterpiece*"); *Fulton v. City of Phila.*, 141 S.Ct. 1868 (2021) ("*Fulton*"); and *303 Creative*. The Ninth Circuit has emphatically sided with the First Amendment. *FCA*, 2023 WL 5946036, *15-21 (Free Exercise); *id.* *24-37 (Forrest, J., concurring) (Free Expression); *Green v. Miss USA*, 52 F.4th 773 (9th Cir. 2022) (same), *reh'g en banc denied*, 61 F.4th 1095 (2023) ("*Green*"). *See also Tandon v. Newsom*, 141 S.Ct. 1294 (2021) ("*Tandon*").

This action is harming WV in loss of rights and resources, requiring dismissal. "It is axiomatic that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *FCA*, *23. There also is ongoing diversion of "extensive" staff time "from working on ministry-advancing activities to instead address the impact of" this action, including "a huge amount [of]

prayer that would normally [be] devoted [to] ministry." *Id*. *13. The urgency of such harms led the en-banc Ninth Circuit to issue two injunctions, one pending appeal, 64 F.4th 1024 (10-1 vote), and the other on the merits (9-2/7-4 on rationale).

Ultimately, all agree that World Vision "hires only Christians for all positions." *Spencer*, 570 F.Supp.2d at 1289. Thus, Plaintiff can qualify for WV employment only if she qualifies as a "Christian" as defined by WV. How can the judiciary decide whether Plaintiff is a "Christian," much less one as defined by WV?

All agree this case is ripe for summary judgment. That judgment, as shown below, should favor World Vision. In prior Orders, this Court decided that jurisdiction, autonomy, and prima facie case are inappropriate grounds,[1] and now is exploring the remaining grounds of ministerial exception ("ME"), free exercise of religion ("Free Exercise"), expressive association ("Expressive Association"), religious organization exemptions in federal and state law ("ROEs"), and bona fide occupational qualifications in federal and state law ("BFOQs"). Each is addressed below.

## II.    THE MINISTERIAL EXCEPTION REQUIRES JUDGMENT FOR WV.

World Vision begins with the Ministerial Exception for four reasons. First, the Supreme Court has firmly embraced the ME as one vital way to protect religious

---

[1] WV continues to preserve these grounds, and the Religious Freedom Restoration Act, for any appeal, and notes that another court recently found the First Amendment issue jurisdictional. *McRaney v. N. Am. Mission Bd.*, 2023 WL 5266356, *5 (N.D.Miss. Aug. 15, 2023). Even if not jurisdictional, this issue still must bar the claims, especially where, as here, the Plaintiff makes her case not just theoretically religious, but explicitly so. Defs. MSJ 6-9; Opp. 2-5; Reply 1-3.

employers post-*Smith*.[2] The Court adopted the ME unanimously, *Hosanna*, and then swiftly reinforced it, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049 (2020) ("*OLG*"). Second, the ME is simple when it applies. It operates as an absolute bar to claims, uncomplicated by any balancing tests or judicial scrutiny of burdens, interests, and tailoring. Third, the evidence supporting the ME satisfies both BFOQs. Fourth, the ME disposes of the WLAD claim.

### A.      The Law of the Ministerial Exception: Overview.

"The Supreme Court has broadly defined what employment positions are eligible for" the ME. *Orr v. Christian Bros. High Sch.*, 2021 WL 5493416, *1 (9th Cir. 2021). These positions include all those that perform (a) "important religious functions," *Hosanna*, 565 U.S. at 192, or (b) "certain key roles," *OLG*, 140 S.Ct. at 2060. Prototypical roles are those that (i) "personify" an employer's beliefs, *Hosanna*, 565 U.S. at 188, or (ii) serve as a "messenger" or "voice for [its] faith," *Id*. at 199, 201 (Alito/Kagan). *Accord OLG*, 140 S.Ct. at 2064 ("messenger"); *Starkey v. Roman Cath. Archdiocese*, 41 F.4th 931, 940 (7th Cir. 2022) ("*Starkey*"); *Fitzgerald v. Roncalli High Sch.*, 73 F.4th 529 (7th Cir. 2023) ("*Fitzgerald*"); *see also Alicea*, 320 F.3d at 703 ("press secretary").

Such personnel need not be religious "leaders," need not "minister to the faithful," and need not do more than "simply relay religious tenets." *OLG*, 140 S.Ct. at 2067 n.26 (rejecting such requirements). Ministerial roles are defined by employers. *See id*. at 2066 (deference is due an employer's "definition and explanation of their roles"

---

[2] *Emp. Div. v. Smith*, 494 U.S. 872 (1990) ("*Smith*") weakened protection for Free Exercise. Filling the breach began with *Church of Lukumi v. City of Hialeah.*, 508 U.S. 520 (1993) ("*Lukumi*").

Def. WV's Opening Brief on
Summary judgment (Round 2)
Case No. 2:21-cv-00920-JLR

Page 4

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

and their "role [in] the life of the religion"); *Fitzgerald*, 73 F.4th at 531 ("we show deference"). *OLG* "gave significant deference to the *church's stated expectations* about how a given role was to be performed." *Butler v. St. Stanislaus Kostka Cath. Acad.*, 609 F. Supp. 3d 184, 192 (E.D.N.Y. 2022) ("*Butler*").

Titles often mean little. *OLG* reversed a Ninth Circuit panel that understandably found "Grade 5 Teacher" to convey no "religious … meaning." *Biel v. St. James Sch.*, 911 F.3d 603, 608 (9th Cir. 2018), *rev'd* by *OLG*.[3] Instead: "What matters, at bottom, is what an employee does," *OLG*, 140 S.Ct. at 2064, and "[w]hat an employee does involves what an employee is entrusted to do, not simply what acts an employee chooses to perform," *Starkey*, 41 F.4th at 941. What matters are Plaintiff's "job duties" and "responsibilities," *id.*, as defined by "her employment documents," *id.*, including job description, contract, and handbook, *id.* 937-41, as well as employer's testimony, *Butler*, 609 F.Supp.3d at 192–93. The question here is, what employer-defined job duties would Plaintiff have been *responsible for*? *OLG*, 140 S.Ct. at 2066.

**B.    The DCSR Position Is Clearly Ministerial in Nature: Overview.**

On January 5, 2021, WV offered Plaintiff the job she applied for: "DSR Trainee." 6/12/23 Order 5-7. If Plaintiff passed 9-11 weeks training, she would join Donor

---

[3] *OLG* reversed two Ninth Circuit decisions that had found "lay teachers" of "secular" subjects whose only required religious training was a half-day conference, insufficiently religious for the ME. 140 S.Ct. at 2069. *See also Puri v. Khalsa*, 844 F.3d 1152 (9th Cir. 2017); *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951 (9th Cir. 2004); *Bollard v. Cal. Province of Society of Jesus,* 196 F.3d 940 (9th Cir.1999). To the extent these cases have ongoing ME vitality, they support WV. *See Butler*, 609 F.Supp.3d at 200 (citing *Elvig & Bollard* ); *Tucker v. Faith Bible Chapel*, 36 F.4th 1021, 1028 n.2 (10th Cir. 2022) (*Puri & Bollard*); and *id*. at 1066 (Bacharach, J., dissenting) (*Elvig*).

DEF. WV'S OPENING BRIEF ON                    Page 5
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

Contact Services ("DCS"). *Id.*[4] In this role, she would tell WV's supporters about its religious activities, especially its program that connects donors with children to support and pray for the children, who also may wish to "learn about the Christian faith." *Spencer*, 633 F.3d at 737. Plaintiff would:

- "Help carry out our Christian organization's mission, vision, and strategies."

- "Personify the ministry of World Vision by witnessing to Christ and ministering to others through life, deed, word and sign."

- "[K]eep Christ central in our individual and corporate lives."

- "Attend and participate in the leadership of devotions, weekly Chapel services, and regular prayer."

- "Be sensitive to Donor's needs and pray with them when appropriate."

6/12/23 Order 5-7 (quoting Job Posting-2020). Plaintiff would be a "crucial member" of DCS and a "key liaison and 'voice of World Vision' to our donors and the general public." Job Posting-2022.[5] Finally, Plaintiff would reflect WV's faith and ministry to its supporters. Viewing a DCS-led chapel service will leave no doubt. *See infra.*

As a baseline, all DCSRs are responsible for "important religious functions." *Hosanna*, 565 U.S. at 192. As *Spencer* found, **all** WV staff are responsible for: (1) confessing they are committed Christians (633 F.3d at 738-40); (2) "wholeheartedly" agreeing with its core principles (*id.*); (3) "communicating [its] Christian faith [and] witness," which is "integrated [into] everything [it] does," "accurately and with

---

[4] "**DCSR**" herein means DCS Representative ("DSRT" while in Training). *See* SO ¶6-7; MF ¶5.

[5] *See* SO ¶24 (2022 Posting remains an accurate description of the job Plaintiff sought).

DEF. WV'S OPENING BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 6

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

integrity" (*id*.); (4) participating "regularly" in "prayer activities, devotionals, and weekly chapel services" (570 F.Supp.2d at 1288). Those requirements continue today, including the core element of *prayer*, MF/Dkt.28 at ¶¶25-27, 55; SO/Dkt.29 ¶¶11-13; *id*. 14-41. WV exists "only" to "spread" its "Christian faith" as "infallibl[y]" and "authoritative[ly]" established by "the Bible." 633 F.3d at 736. It "hires only Christians," 570 F.Supp.2d at 1289, and requires of them a "commitment to [a] shared faith [and] a common understanding of how that faith is lived out day-to-day," *id*. at 1282, empowering them to "live out their faiths in daily life."[6] *See* 6/12/23 Order 2-5.

But DCSRs are even more "ministerial." *See* 6/12/23 Order 5-7 (job duties). First, the DCSR role is "key." *OLG*, 140 S.Ct. at 2060. That's why DCSRs need 9-11 weeks of training before joining DCS, whose "Mission Statement" begins, "***Consumed and called by Jesus Christ***." SO/Dkt.29 at ¶19. Second, "[b]eing a part of DCS means you are the ***Voice***, ***Face*** and ***Heart*** of World Vision." *Id*. Third, the role is very religious. *See* SO ¶¶19-48 (details). DCSRs interact all day with the ministry's donors, always "sensitive to [their] needs and pray[ing] with them," *id*., since spiritual transformation of donors is as vital to WV as that of the children they sponsor, *id*. ¶¶23, 42-50. DCSRs minister through outbound and inbound calls by explaining how WV witnesses to Christ in its work. *Id*. ¶19. For WV, DCSRs are a "key liaison and 'voice'" who must perform their duties "persuasively and convincingly." SO ¶¶24, 57. Plaintiff's "job did, and would have continued to, include important ministerial duties." *Butler*, 609

---

[6] *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421 (2022) ("*Kennedy*").

DEF. WV'S OPENING BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 7

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

F.Supp.3d at 196. The job postings and undisputed testimony of DCS managers alone establish this ministerial nature. *See OLG*, 140 S.Ct. at 937-41.

Long before Plaintiff filed this action, both *Spencer* opinions described WV's workplace as pervasively Christian, as did WV's website, which Plaintiff reviewed. Yet Plaintiff evidently believed DCS was a secular enclave within a pervasively Christian ministry. Her Complaint asserted her role would be "working in a call center [without] any religious duties [or] any duties that can be characterized as 'religious.'" Compl./Dkt.1 ¶¶5.7, 5.10. Plaintiff then had 20 months of discovery, including a 30(b)(6) deposition, three other depositions, and 6,197 pages of document production, to explore these religious duties. The evidence of the religious nature of these duties is extensive, *e.g.*, Defs. MSJ at MF ¶¶19-60 & SO ¶¶17-57, undisputed, and indisputable. Regardless, Plaintiff's "opinion does not dictate what activities [WV] may genuinely consider to be religious." *Grussgott v. Milwaukee Jewish Day Sch.*, 882 F.3d 655, 659-60 (7th Cir. 2018). What matters is what she was "expected to follow." *Id.*

## C.     The Ministerial Nature of DCSRs Is Clear From DCS-led Chapels.

That DCSRs perform ministerial duties is shown by five WV-wide chapel services led by DCS. *See* Defs. MSJ at MF/Dkt.28 ¶52 & SO/Dkt.29 ¶¶25-36.[7] The service in 2019 shows exactly the role Plaintiff sought in 2020. *See* SO at 25-36 & SO-13 (authenticating videotape of this service and all excerpts below). DCS opened this June 26, 2019 service with prayer and Bible reading (0:07-5:04) followed by DCSR messages

---

[7] The underlying video recordings were filed with the Clerk. Dkt.23.

Def. WV's Opening Brief on
Summary Judgment (Round 2)
Case No. 2:21-cv-00920-JLR

Page 8

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

(5:05-9:35), praise and worship time (9:36-20:45), DCSR testimonials (20:46-23:26), DCSR panel discussion (23:27-48:26), more testimonials (48:28-50:44), and closing prayer (50:45-53:05). The excerpts below speak for themselves.

"[G]od brought us here [to DCS] to be the voice, face, and heart of World Vision [to serve] our donors in the name of Jesus…. In the last year, donors called us over 210,000 times. We also called them over 100,000 times … and ministered to our donors through prayer. [We] replied to 51,000 emails and letters and prayed for nearly 10,000 prayer requests." (6:04-6:37)

> I have been in call centers for 11 years, but nothing prepares you for [the] prayer requests. One man said his sister-in-law passed away that very morning. Several women just lost their husbands. Many people have health and financial issues. However, the Lord cares for each one. I am grateful and blessed for a chance to tell them how good the Lord is. I'm grateful they trust me to share, and I'm blessed by how much appreciation and love they give to myself and World Vision[.] [22:00-22:30] [Video testimonial by a DCSR]

Below are responses from DCSR panelists to this question from the moderator: "How has working [in] DCS impacted your faith and walk with Christ?"

> [W]orking in DCS [really] puts us on the front lines of World Vision. [We] openly discuss our stories, give our testimonies, both to each other as friends, coworkers, and also to donors and have them share their testimonies with us. [It] has been an incredible way to witness Christ and everything that he's done for us as people, as an organization, and for our donors. [24:35-25:29] Fellowship that we have with coworkers and donors, it's so amazing. We're praying with each other. We're praying with the donors. [27:26-27:33] [I]t's a calling to come to World Vision [where we] actually pray for people all over the world when we answer [the phone] and ask, Can I pray for you? And the requests are just amazing. And then God gets to use us in a mighty way to pray for our donors[.] When you work in a place that's also a ministry, it just opens this fire for Jesus within you. [27:51-28:49] We … pray with our donors, as you have heard from most every testimony from DCS today. We …

pray for one another and we … pray together for those who have experienced devastation[.] [29:47-30:49]

Clearly, DCS is no common call center. "[I]n prayer, the donors share so many things with us [.]" (39:16-39:58)

[Talking to donors allows us] to share what's on our hearts and to be a mouthpiece for our ministry. [40:45-40:54] I'm glad I get to be the mouthpiece[.] I know that by opening up my mouth and allowing for the Holy Spirit to flow like living water, this allows room for the donor to know more about how they can actually help[.] Now, not everyone can actually give, but [God] puts a calling in each and everybody's heart, and how they can serve. [I] also take mental notes [from] our chapels and glean information that may be useful for when I'm talking to the donors. Next, I pour out my heart to every [caller] because we just don't know [what they're] going through[. 41:02-42:30]

I usually hear lovely stories of how God has called them to be prayer warriors or intercessor[s] and it's [a]mazing to be able to open my mouth and allow for the holy spirit to work. [43:25-43:42]

[I] had the life changing opportunity, like many of [us in DCS], to visit our colleagues in Kenya. [Those] staff in the field [say] you are the ears and mouths of this organization. And *that* is what it looks like for World Vision to be the body of Christ. [46:53-48:05]

### D.     The Ministerial Nature of DCSRs Is Clear from DCS Prayer Calls.

DCSRs pray faithfully with donors, as illustrated by ten donor calls in the record.[8] In each of these 2020 calls, DCSRs prayed with donors about their needs and the needs of the children they sponsor. These needs included an elderly man's constant pain, a wife's kidney infection, a mother's biopsy, a widow's troubled daughter, a father's broken hip, a husband's safety as a first-responder to Covid, a brother-in-law's

---

[8] *See* 2020Call1–2020Call10 (Dkt. 23 & Dkt. 29-15) (private info redacted). "These ten samples reflect the more than 15,000 prayer requests recorded during … 2020." SO (Dkt. 29) ¶37.

wife going to hospice, a family dairy farm's fate, a church's desire to rebuild its youth ministry, and an emotional young woman "really worried that I'm going to lose my job." Consider this one example with a female donor, in April 2020, early into Covid:

> **Donor**: "My uncle … contracted the virus [and my mom] had to make the decision today to remove life support. So, please pray for my mom. [I]t's her big brother [and] it was sudden…. [I]f you guys could pray for my mom, I'd appreciate that very much."
> **DCSR**: "[I]f you're comfortable, would you be okay if I prayed right now over the phone?"
> **Donor**: "Yes. Definitely. That would be great."
> **DCSR**: "Dear Lord, I just want to lift up [donor] and her family as well as her uncle specifically…. I pray for comfort and for healing for the family, specifically for [her] mother as she goes through this time with her big brother…. [W]e pray for comfort and for support for this entire family…. So, thank you so much for your comfort, dear Lord, and we thank you for loving us, in Jesus' name. Amen."
> **Donor**: "Amen. Thank you so much for that. I really appreciate that."
>  [DCS Prayer Call, April 1, 2020, at 0:53-3:50.]

### E. The Ministerial Nature of DCSRs Is Clear from DCS Shout-Outs.

Such prayer is expected and encouraged, as shown by "shout outs," a training tool of DCS managers "to show all DCSRs how important prayer is to the[ir] work." SO ¶40. Samples in the record include: "Mr. [Donor was] overwhelmed when he shared [that DCSR] prayed for him and showed him the love of the Lord on their phone call amidst his own personal trials he shared with her." *Id.* "Michael [Donor] was blown away [by DCSR, who] offered prayer [that] deeply touched [him.] Thank you [DCSR] for reminding donors we are a ministry ready to be God's hands and feet!" *Id.* "Ms. [Donor called] this morning to share [her] incredible [call with DCSR, who] prayed the most beautiful prayer over [her,] straight from the heart of Jesus." *Id.* "Mrs. [Donor said she] was touched by [DCSR's] prayer [and] is incredibly thankful for [our]

ministry." *Id.* "[Donor] wanted us to know how amazing [DCSR] is. She said [he] was compassionate, kind and so very caring. As she [told] how [he prayed] for her she got choked up …. This [is] pure ministry [and] you understand what is truly important." *Id.* ¶41. "Mrs. [Donor called] to say: '[DCSR] was amazing [and such] a blessing today for me because I asked for prayer and [she] encourage[d] me and lifted me to the Lord and I feel amazing. She is a beautiful human being and she praises GOD! She is in the *right position*.'" *Id.* "Mrs. [Donor] called to [commend DCSR for praying for her] daughter [which] touched [her] heart. She said she believes [in] World Vision [and that DCSR] is in the *right place* in the *kingdom of God.*" *Id.* (Italics added.)

**F.     The Ministerial Exception Applies to the DCSR Position: Summary.**

"*OLG* commands … deference" to such employer attestations of ministerial duties. *Butler*, 609 F.Supp.3d at 197. Any other view "would require the Court to disregard [WV's] evidence—discussed above at length—that [Plaintiff] was obligated to live [the mission] every day by word and deed." *Id.* at 196. "This evidence, when considered holistically, is fatal to [her] claim." *Id.*

As a DCSR, Plaintiff would embody the ME in many ways *beyond* the "press secretary" in *Alicea*, who qualified for the ME by "developing a working relationship with various constituencies." 320 F.3d at 704. First, Plaintiff would be a "key" "messenger" and "voice of World Vision." SO ¶¶17, 19, 24, 35-36, 42, 57. Second, she would "personify its ministry" to its supporters. *Id.* ¶¶4, 22, 42, 57. Third, she would support donor transformation via "Christ's transforming love, grace, and power." *Id.* ¶¶23, 42-50. Fourth, she would associate with colleagues to be "God's hands and feet."

*Id.* ¶¶35, 40-42. Fifth, she would perform "ministry" through fundraising itself. *Id.* ¶43-44. All this she would do "convincingly" to advance WV's "Christian" "mission, vision, and strategies." *Id.* ¶¶24, 45, 57. All day she would speak with supporters and colleagues amid opportunities to "[p]ray, pray again, and pray some more," seeking God's blessing on WV, its supporters, and its programs, as "resourced by Him." *Id.* ¶¶15, 45-47. To do all this, she had to live it. *Id.* ¶¶24, 48, 57; MF ¶¶23, 33-38, 48, 56.

In sum, Plaintiff was to "personify," *Hosanna*, 565 U.S. at 188, be a "voice" for, *id.* at 201 (Alito/Kagan), and be a "messenger" for WV's faith, *id.* at 199; *accord OLG*, 140 S.Ct. at 2064 ("messenger"); *Starkey*, 41 F.4th at 940 (same). Any of these roles would suffice. But her role required more. It required her to "wholeheartedly" share WV's Christian faith (Pls. Dep. 244 & Exh. 15: WV-0045) and to live and promote it "accurately and with integrity," "persuasively and convincingly," organically and spontaneously, to supporters, colleagues, and the public. She was to "live[ it] out day-to-day." *Supra* at 7. Those were her responsibilities. They were religious. They were important. They were key to WV's mission. The ministerial exception applies.

### G.   Plaintiff's Litigation Conduct Illustrates Why the ME Applies.

The importance of *Hosanna* and *OLG* is not lost on Plaintiff, who devoted most of her prior argument to the ME. The role Plaintiff sought is a voice and messenger of WV to outsiders. A chief duty is praying spontaneously with callers. "Prayer unquestionably constitutes the 'exercise' of religion." *Sause v. Bauer*, 138 S.Ct. 2561, 2562 (2018) (unanimous). Another chief duty is discussing WV's Bible-based policies and stances in real time. Plaintiff concedes she could do neither properly.

First, Plaintiff admits that her own views of Christianity, Scripture, and same-sex marriage would inhibit her answering any donor questions about WV's marriage policy beyond reciting from a "script." *See* Pls. Dep., SW-01, at 201-03.

Second, Plaintiff shrinks from praying spontaneously with callers. *See* Pls.Dep./Dkt.25-9 at 178:5-179:21. Plaintiff's depositions of WV witnesses and prior briefing repeatedly sought WV's assurances that a refusal to pray would not be a fireable offense. 30(b)(6) Dep./Dkt.25-10 at 29:3-32:4. *Accord* Pls.MSJ/Dkt.24 at 17-18; Pls.Opp./Dkt.30 at 17-18; Pls.Reply/Dt.33 at 7-8. Yet, such prayer is a clear expectation for the DCSR role. *See supra* at 6-13.

Plaintiff remains uncomfortable with expectations of praying and discussing WV's policies with supporters. How could it be otherwise? She does not meet WV's Christian requirements for the position and she rejects its marriage policy. Plaintiff's own views reinforce why the position is special, ministerial, *and* a religious BFOQ.

## III.   FREE EXERCISE REQUIRES JUDGMENT FOR WV.

### A.   Applying Title VII/WLAD to WV Invokes Free Exercise.

WV's "beliefs about marriage and sexuality fall within the ambit of the First Amendment," *FCA*, 46 F.4th at 1093,[9] which protects "religious" "objections to gay marriage," *id.* "Although this is a civil lawsuit between private parties, the application of [law by] courts in a manner alleged to restrict First Amendment freedoms

---

[9] This *FCA* panel opinion was vacated by the en-banc court, but "[v]acated opinions remain persuasive, although not binding, authority." *Doe I v. Cisco Sys.*, 73 F.4th 700, 717 n.10 (9th Cir. 2023). The panel opinion was largely confirmed by the en-banc opinion.

DEF. WV'S OPENING BRIEF ON                    Page 14
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

constitutes [state action]." *NAACP. v. Claiborne Hardware*, 458 U.S. 886, 916 n.51 (1982) (citing *NY Times v. Sullivan*, 376 U.S. 254, 265 (1964)); *accord Cohen v. Cowles Media*, 501 U.S. 663, 668 (1991). Thus, the "Free Exercise Clause is applicable in private civil suits." *Listecki v. Official Comm*, 780 F.3d 731, 741 (7th Cir. 2015) (citing *Hosanna* & *NY Times*); *accord Paul v. Watchtower Bible & Tract Soc.*, 819 F.2d 875, 880 (9th Cir. 1987) ("*Paul*") (citing *NY Times*). When EEOC issued Plaintiff a right-to-sue letter, it opted out and left Title VII's application in this action to the judicial system. Any enforcement of Title VII and WLAD herein constitutes state action and triggers First Amendment scrutiny.

## B.   Law of Free Exercise: Overview.

Free Exercise has "three bedrock requirements[:] First, a purportedly neutral 'generally applicable' policy may not have 'a mechanism for individualized exemptions.' Second, the government may not 'treat ... secular activity more favorably than religious exercise.' Third, the government may not act in a manner 'hostile to ... religious beliefs' or inconsistent with [the] bar on even 'subtle departures from neutrality.' The *failure to meet any one of these* [is subject to] strict scrutiny." *FCA*, 2023 WL 5946036, *16 (citing *Fulton*, *Tandon*, *Masterpiece*, *Lukumi*, *Smith*) (italics added).

## C.   Title VII/WLAD Favor Some Secular Activity Over Religious Activity.

Initially, and dispositive here, government may not "treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 141 S.Ct. at 1296 (emphasis retained). Title VII and WLAD do exactly this with each secular exemption.

Title VII exempts employers: (1) having fewer than 15 employees, (2) assessing members of the "Communist Party [or] affiliated with a Communist-front

DEF. WV'S OPENING BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 15

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

organization," and (3) located "on *or near* Indian reservations." *Bear Creek Bible Church v. EEOC*, 571 F.Supp.3d 571, 613 (N.D.Tex. 2021), *aff'd on other grounds*, 70 F.4th 914 (5th Cir. 2023) ("*Bear Creek*") (citing 42 U.S.C. § 2000e(b); § 2000e-2(f)&(i)). In addition, Title VII contains highly discretionary exemptions for bona fide occupational qualifications ("BFOQs"). § 2000e-2(e). WLAD has similar exemptions: RCW 49.60.040(11) (exempting employers with fewer than eight employees); RCW 49.60.040(10) (exempting employers of family members and domestic workers by excluding them from definition of *employee*); RCW 49.60.180(1) (BFOQs).

The small-employer exemptions alone exclude the vast majority of all U.S. employers from the requirements of Title VII and WLAD. *See* CRS Report 40860, https://crsreports.congress.gov/product/pdf/R/R40860. In 2019, the U.S. had "5,771,290 nonfarm employer firms … employing 128,898,227 people." *Id.* 4. Of these employers, "78.3% had fewer than 10 employees [and] 88.8% had fewer than 20." *Id*. Every such secular exemption from antidiscrimination law treats some secular activity more favorably than religious exercise such as WV's. *Tandon*, 141 S.Ct. at 1296. *Some* is more than any. *Id*. This feature alone compels strict scrutiny. *Id*.

### D.     This Action Applies Exemption-Ridden Laws.

Second, "Title VII is not a generally applicable statute due to the existence of individualized exemptions[.]" *Bear Creek*, 571 F.Supp.3d at 613. The notion that Title VII must be enforced uniformly to "eradicate[e] all forms of discrimination is undercut by" its exemptions. *Id*. (citing small-employer, Communist, and Indian exemptions but not BFOQs). This holding is reinforced by adding BFOQs—which are "formalized,"

"individualized," and "discretionary" under even the narrowest reading of *Fulton*. The mere "existence" of these "mechanisms," *FCA*, 2023 WL 5946036, *16, provides anything but "evenhanded, across-the-board" treatment, *Kennedy*, 142 S.Ct. at 2423. Thus, Title VII and WLDA are not "enforced evenhandedly and, therefore, [are] not generally applicable." *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022). The reason for strict scrutiny "is obvious: if a government can easily grant an exemption, then the law stops being applied neutrally or generally." *FCA*, 46 F.4th at 1093.

### E.      The Result Sought Is Non-Neutral Toward WV Regardless of Motive.

Third, all "disparate treatment of religion" is non-neutral. *Roman Cath. Diocese v. Cuomo*, 141 S.Ct. 63, 66 (2020) ("*Cuomo*"). Here, the relief Plaintiff seeks would result in her religious understanding being imposed on WV in place of its own understanding. If Plaintiff were atheist or Arian (a Christian heresy), she clearly would be unqualified for the DCSR position and have no case. Yet, Plaintiff professes Christianity and seeks government endorsement that her religious views about marriage and sexuality are entitled to greater protection than WV's profoundly different views of Biblical Christianity and marriage. Such relief would be non-neutral regardless of "any motive," *FCA*, 2023 WL 5946036, *3, and "regardless of design or intent," *id*. at *17. *Accord Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020) (quoting *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008)).[10]

_____

[10] To be clear, WV is not suggesting that this Court is anything other than neutral. But the *result* sought *by Plaintiff* through purported neutral application of law is anything but neutral. Landmark cases have found state action in "judicial enforcement" of private conduct—

DEF. WV'S OPENING BRIEF ON            Page 17
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

**F.      Applying Title VII or WLAD to WV Fails Strict Scrutiny.**

Denial of an exemption to WV plainly is not the "least restrictive means of achieving some compelling state interest." *Thomas v. Rev. Bd.*, 450 U.S. 707, 718 (1981). "[O]nly those interests of the highest order [can] overbalance legitimate claims to the free exercise of religion.'" *Id.* Such interests must be "compelling" in "[c]ontext." *Gonzales v. O Centro Espirita*, 546 U.S. 418, 431 (2006). "Rather than rely on broadly formulated interests, courts must scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Fulton*, 141 S.Ct. at 1881-82 (cleaned up). As for the least restrictive means, "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Id.*

Under the Title VII and WLAD exemptions above, *most* U.S. employers can discriminate on any basis with relative impunity. All such exemptions "pose an identical risk to," and "significantly undercut[]," the government's "interest in ensuring" nondiscrimination. *FCA*, 2023 WL 5946036, *18. These vast exemptions harm antidiscrimination interests far more than any religious exemption for WV would. Regardless, every single instance of exemption treats *some* "comparable secular activity more favorably than religious exercise." *Tandon*, 141 S.Ct. at 1296.

Is denying exemption to WV the least restrictive means to achieve a compelling government interest? To ask this question is to answer it. If extensive secular

---

without implying the judiciary itself was complicit in that conduct. *Shelley v. Kraemer*, 334 U.S. 1 (1948) (enforcement of racially restrictive covenants); *NY Times*, 376 U.S. 254 (enforcement of libel law). *See Paul*, 819 F.2d at 880 (9th Cir.) (citing *Shelley* and *NY Times*).

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

exemptions are available under Title VII and WLAD, without fatally undermining their purposes, then an exemption for WV is available. Since "the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S.Ct. at 1881. Denying exemption to WV would *not* "preserv[e] the promise of the free exercise of religion," *Bostock*, 140 S.Ct. at 1754, providing "proper protection" to WV to live-out its belief "that, by divine precepts, same-sex marriage should not be condoned," *Obergefell v. Hodges*, 576 U.S. 644, 679 (2015). *See* MF/Dkt.28 at ¶¶29-40 (WV's belief). The highest-order interest is protecting "deep and sincere religious beliefs" opposed "to gay marriage," *Masterpiece*, 138 S.Ct. at 1727-28, which are "due proper respect," Respect for Marriage Act, Pub. L. 117-228, §2(2) (Dec. 13, 2022).

## IV.    EXPRESSIVE ASSOCIATION REQUIRES JUDGMENT FOR WV.

### A.    Applying Title VII/WLAD to WV Infringes Expression/Association.

This action is subject to Free Expression and Association for the same reasons it is subject to Free Exercise. *See supra* §III(A).

### B.    Law of Expressive Association: Overview.

The Free Speech Clause "work[s] in tandem" with the Free Exercise Clause, "doubly protect[ing]" "expressive religious activities." *Kennedy*, 142 S.Ct. at 2421. Likewise, "[s]peech and association claims often run together." *Green*, 52 F.4th at 808 (VanDyke, J., concurring). Thus, after analyzing Free Exercise, the Ninth Circuit required only a footnote to hold that FCA was "likely to prevail on their Free Speech claim as well." *FCA*, 2023 WL 5946036, *15.

DEF. WV'S OPENING BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 19

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

The Constitution "necessarily protects the right of those who join together to advance shared beliefs, goals, and ideas, which, if pursued individually, would be protected by the First Amendment." *Sullivan v. Univ. of Wash.*, 60 F.4th 574, 579 (9th Cir. 2023) (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("*Jaycees*")). This right bars "intrusion into the internal structure or affairs of an association' like a 'regulation that forces the group to accept members it does not desire.'" *Dale*, 530 U.S. at 648. Courts largely defer to a group's "assertions regarding the nature of its expression [and its] view of what would impair it[.]" *Id.* at 653. Any such group may "exclude anybody who does not share in its values." *Apilado v. N. Am. Gay Amateur Athletics*, 792 F.Supp.2d 1151, 1156 (W.D.Wash. 2011) (excluding non-gay softball players).

This rule "applies with special force [to] religious groups, whose very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna*, 565 U.S. at 200 (Alito/Kagan); *see FCA*, 2023 WL 5946036, *18. Indeed, the "main point of [*Hosanna*] was that the Religion Clauses add to the mix when considering freedom of association." *Hobby Lobby Stores v. Sebelius*, 723 F.3d 1114, 1136 (10th Cir. 2013) (en banc), *aff'd*, 573 U.S. 682 (2014). Thus, Free Exercise cases "bear[] on the appropriate" Free Speech analysis. *Green*, 52 F.4th at 787 n.14 (9th Cir.). "The members of [plaintiff's church] no longer want to associate with her. We hold that they are free to make that choice." *Paul*, 819 F.2d at 883 (9th Cir.).

"World Vision's *members*—here, its employees—are coreligionists," *Spencer*, 633 F.3d at 730, who associate for expressive purposes. Expressive Association applies to employment as much as public-accommodations law. *Slattery*, 61 F.4th at 291. It is

DEF. WV'S OPENING BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR            Page 20            Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

more vital in employment, where a foe or skeptic does not merely associate with a religious group but operationalizes and personifies it. "[WV] has a right to limit its employees to people who share its views and will effectively convey its message." *Id.*

Expressive Association and Free Expression often merge in cases like this. In *303 Creative*, a web designer holding views virtually identical to WV's was pressured by antidiscrimination law to express the state's preferred message on SSM by serving same-sex couples. In *Green*, the Miss USA Pageant was pressured to include a biologically-male contestant who identified as female. Neither case relied explicitly on the Expressive Association doctrine but both relied heavily on its key precedents: *Hurley*, *Dale*, and *Jaycees*. Whether viewed as "speech," "compelled speech," or "expressive association," the results and much of the analysis are the same. *See Green*, 52 F.4th at 803-808 (concurrence) (Expressive Association). *See also Bear Creek*, 571 F.Supp.3d at 614-16 (explaining *Hishon v. King & Spalding*, 467 U.S. 69 (1984)).

### C.     Expressive Association Allows WV to Decide Who Will Communicate Its Religious Message and Carry Out Its Mission.

The "only purposes for which [WV exists] are religious ones," namely, to "conduct Christian religious and missionary services, to disseminate, teach and preach the Gospel and teachings of Jesus Christ, to encourage and aid the growth, nu[r]ture and spread of the Christian religion." 6/12/23 Order 3 (quoting Articles). While WV offers humanitarian relief services, it does so "in the context of sharing with" all allies its Bible-based Christian witness. *Slattery*, 61 F.4th at 287.

DEF. WV'S OPENING BRIEF ON                   Page 21
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

World Vision is "a community of Christians," *Spencer*, 633 F.3d at 741 & n.23, associating together to "preach" and "spread" "the Christian religion" in particular ways, 6/12/23 Order 3, including by "life, deed, word and sign," *id*. 6. "To be eligible for employment at [WV], an individual must … be able and willing to affirm and comply with the [WV] Statement of Faith and/or Apostle's Creed, the [BECC] Policy, the [CCW] Policy, and the World Vision SOC." *Id*. 5. "Additionally, central to [WV]'s core principles and policies are … being a faithful witness to, for, and about Jesus Christ. WV "seeks to honor God by requiring all staff to [f]ollow the living Christ, individually and corporately in faith and conduct, publicly and privately, in accord with the teaching in His Word (the Bible)." *Id*. Because WV "seeks to be … 'Christian' in every sense of the word," "all staff represent [WV] and, more importantly, the Gospel of Jesus Christ, in their work as well as in their private lives." *Id*.

The WV community associates together in expressive activities to further their shared stances. One such stance is its marriage policy. WV's policy statement, *Do you hire LGBTQ individuals?*, states: "People of any sexual orientation can work at World Vision as long as they agree with our statement of faith and abide by our conduct policy.[11] [We hire] people who live out biblical standards of conduct. We expect all employees, regardless of sexual orientation, to live by these standards, outlined in our conduct policy, including remaining celibate outside of marriage. It's our deeply held belief that marriage is a Biblical covenant between a man and a woman. This is made

---

[11] Similarly, "FCA leadership positions are open to all students [who] 'sincerely affirm FCA's Statement of Faith and its standards of conduct.'" *FCA*, 2023 WL 5946036, *4.

DEF. WV'S OPENING BRIEF ON          Page 22
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

clear to people applying to work at World Vision. [O]ur stance [reflects] our interpretation of Scripture." MF/Dkt.28 ¶45 (quoting WV-0731 at MF-20). This was made clear in WV's SOC and the undisputed script read to Plaintiff in her interview. *See* Defs.MSJ/Dkt.26 at 7-9, 19, 27-28; Pls.Dep. at 201-03; Defs.Recon.Opp./Dkt.42 at 5.

Thus, WV requires biblically sound behavior from its community, including "express[ion of] sexuality solely within a faithful marriage between a man and a woman" to honor the "Biblical covenant of marriage." 6/12/23 Order 4-5. These views express WV's "'stance' and understanding as to Biblical marriage." *Id*. 20. Thus, WV "takes an official position with respect to homosexual conduct, and that is sufficient for First Amendment purposes." *Dale*, 530 U.S. at 655. This is how WV defines itself, the "nature of its expression," and "what would impair it[.]" *Id*. at 685.

### D.   The Result Sought Is Non-Neutral Toward WV Regardless of Motive.

Again, non-neutrality is the result sought by Plaintiff. *See supra* n.11. Free Expression and Association also mandate neutrality regardless of motive. *FCA*, 2023 WL 5946036, *15. A "benign motive, content-neutral justification, or lack of 'animus'" or other "innocuous justification cannot transform" a non-neutral law into a neutral one. *Reed v. Town of Gilbert*, 576 U.S. 155, 165-66 (2015) ("*Reed*"). Thus, this action may discriminate against Expressive Association regardless of motives.

### E.   Plaintiff Seeks to Compel Expression and Punish a Viewpoint.

WV cares about its "message concerning [marriage and] sex outside of marriage," *Slattery*, 61 F.4th at 287, just like the business in *303 Creative*. Both see their work as *expressive* under *Hurley* and *Dale*. Both welcome "all people regardless of ...

DEF. WV'S OPENING BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR                    Page 23                    Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

sexual orientation," 143 S.Ct. at 2309, but will "not violate [their] beliefs," *id*. at 2317, and "contradict[] biblical truth," *id*. at 2309. First Amendment "protections belong [not] only to speakers whose motives the government finds worthy [but] to speakers whose motives others may find misinformed or offensive." *Id*. at 2317. Lawsuits may not force speakers to "accommodate other views" by forcing them to promote SSM against their religious beliefs. *Id*. at 2318. The Ninth Circuit is unequivocal. "Green seeks to use the power of the state to force Miss [USA] to express a message contrary to what it desires to express. The First Amendment says no." *Green*, 52 F.4th at 802–03.

### F.    This Action May Result in Content or Viewpoint Discrimination.

The result Plaintiff seeks discriminates against WV's views on marriage. "Under the First Amendment's protection of free exercise of religion and free speech, the government may not 'single out' religious groups 'for special disfavor' compared to similar secular groups." *FCA*, 2023 WL 5946036, *3. "A law disfavoring ideas or messages the government finds offensive is viewpoint discriminatory." *Id*. *36 (Forrest, J., concurring) (citing *Iancu v. Brunetti*, 139 S.Ct. 2294, 2299–301 (2019)).[12]

---

[12] The result Plaintiff seeks disfavors WV's view of marriage. In current public opinion and policy, any objections to SSM may be disfavored views. *Id*. *20-23. And Plaintiff has testified that WV's view of marriage is wrong theologically. Defs. MSJ 6-8 (citing Pls. Dep.). Either way, this action may discriminate against WV's content *and* viewpoint. Views publicly supportive of such suits appear hostile to stances now considered passé, ignorant, intolerant, or (in Plaintiff's view) un-Christian. *See id*. *7 (comments such as "HATRED ISN'T A RELIGIOUS BELIEF" and "evangelicals, like FCA are charlatans and not in the least bit Christian based").

**G.      This Action Fails All Applicable Scrutiny.**

The enforcement of Title VII and WLAD sought by Plaintiff fails all scrutiny. First, government actions based on content or viewpoint "are presumptively unconstitutional and may be justified only [by strict scrutiny]," *Reed*, 576 U.S. at 163, 168-69. *accord FCA*, 2023 WL 5946036, *3; *id*. *36 (Forrest, J., concurring). The same is true of compelled speech. "Application of [antidiscrimination law] would force the Pageant to include Green and therefore alter its speech. Such compulsion is a content-based [law and] warrants strict scrutiny." *Green*, 52 F.4th at 791. "[E]xpressive association [also invokes] strict scrutiny." *Slattery*, 61 F.4th at 286; *accord Intervarsity Christian Fellowship v. Univ. of Iowa*, 5 F.4th 855, 864 (8th Cir. 2021); *Bus. Leaders In Christ v. Univ. of Iowa*, 991 F.3d 969, 979-82 (8th Cir. 2021). This action infringes all these rights, and fails strict scrutiny, for the reasons explained in §III above.

Second, this action fails each element of the scrutiny applied by *Jaycees*, which requires (a) "compelling state interests" (b) "unrelated to the suppression of ideas" (c) "that cannot be achieved through means significantly less restrictive of associational freedoms." *Id*. at 623. Here, the application of antidiscrimination law to WV, far from being "unrelated to the suppression of ideas," suppresses specific ideas about SSM. That failure alone is fatal. It also fails *Jaycees'* other elements for the reasons stated in §III(F) above. *See Green*, 52 F.4th at 803-808 (concurrence) (applying *Jaycees*).

Third, this action fails the more tailored scrutiny of *Dale*. "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability

DEF. WV'S OPENING BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 25

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

to advocate public or private viewpoints." 530 U.S. at 648. The "forced inclusion" of a person in Plaintiff's position would "significantly burden" World Vision's "right to oppose or disfavor [same-sex] conduct" or marriage. *Id*. at 653-59 (applying *Hurley*, 515 U.S. at 571-75). "All of this is confirmed by *Hurley*." *Green*, 52 F.4th at 788-92.

Plaintiff's public advocacy also is troubling.[13] Plaintiff's hire would make an "avowed [LGBTQ] rights activist," *Dale*, 530 U.S. at 655-56, a voice of WV. WV has the "right to choose to send one message but not the other." *Id*. at 655–56. WV would have reached the same decision on Plaintiff once her public stance came to light: she is a "vocal advocate for a conflicting viewpoint." *Green*, 52 F.4th at 805 (concurrence).

## H.    *303 Creative* Further Supports WV's Case.

For all the reasons explained above, *303 Creative* strongly supports WV's expressive association and related defenses. *See supra* at 21-24.

# V.    BOTH ROES ALSO REQUIRE JUDGMENT FOR WORLD VISION.

## A.    Title VII's ROE Disposes of the Federal Claim.

The Religious Organization Exemption begins with "This subchapter shall not apply." 42 U.S.C. § 2000e-1(a). "[W]e cannot replace the actual text with speculation as to Congress' intent." *Perez v. Sturgis Pub. Sch.*, 143 S.Ct. 859, 865 (2023) (unanimous).

---

[13] *See* Bonfire, *Just Be*, https://www.bonfire.com/store/just-be (Plaintiff's "Just Be" designs featuring her same-sex marriage and related views). Plaintiff testified of such advocacy, Pls. Dep., SW-01, at 63-85, including that she and her wife are pursuing this very lawsuit "because we felt [obligated to do so] as advocates [of] the LGBTQ community." *Id*. 242. *See* https://twitter.com/GruenWeddings/status/1109508257565966337 ("Wedding Experts Live Podcast" "joined today by Aubry McMahon who says she [was] rejected by [a] wedding venue"); https://www.qcnews.com/news/lesbian-couple-says-sc-wedding-venue-turned-them-away (TV news interviews of Plaintiff and her wife).

DEF. WV'S OPENING BRIEF ON              Page 26
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

*Bostock's* insistence that Title VII's plain meaning controls, 140 S.Ct. at 1749, is the only reason Plaintiff has a Title VII claim. "This subchapter shall not apply" exempts qualifying entities "from the *entire subchapter* of Title VII.'" *Garcia*, 918 F.3d at 1004 (emphasis retained); *see Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring); *Fitzgerald*, 73 F.4th at 534-35 (Brennan, J., concurring); *Bear Creek*, 571 F.Supp.3d at 590. Thus, *none* of Title VII applies to a qualifying entity's qualifying decisions, and *Spencer* already held WV qualifies. *See* Defs. MSJ 2-5, 16-20, Opp. 17-20.

The only counterargument is based on obiter dicta in *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1366 (9th Cir. 1986) and *EEOC v. Pac. Press*, 676 F.2d 1272, 1276 (9th Cir. 1982) that the ROE covers only claims *pled as religious discrimination claims.* That dicta cannot survive *Garcia.* 918 F.3d at 1004 ("*entire subchapter*"); *id.* at 1005 ("Garcia maintains that she has not pleaded a cause of action labeled 'religious discrimination' [but her] complaint centers around religious discrimination."). Further, since neither *Pac. Press* nor *Fremont* involved a credible claim of religiously motivated staffing, neither analyzed the ROE and neither rendered a relevant holding. Both came before *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327 (1987), which held the "purpose" of the ROE was "alleviating significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Id.* at 339. Both ignored the ROE's text (*see Starkey* and *Fitzgerald* concurrences above) and substituted "speculation as to Congress' intent." *Perez*, 143 S.Ct. at 865. The dicta in *Pac. Press* and *Fremont* lacks any force after *Amos*, *Spencer*, *Garcia*, and *Bostock*.

DEF. WV'S OPENING BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR                    Page 27                    Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

Such a "cramped reading" of the ROE would raise "serious" constitutional questions and therefore "must [be] reject[ed]." *Spencer*, 633 F.3d at 729.

## B.   WLAD's ROE Disposes of the State Claim.

The state ROE is in RCW 49.60.040(11). It was construed in *Woods v. SUGM*, 197 Wash.2d 231, 246-52 (2021) to apply to positions that qualify for the federal ministerial exception ("ME"). Since the DCSR position that Plaintiff sought qualifies for the ME, it qualifies for WLAD's ROE. Regardless, WLAD must yield to the First Amendment. *Werft v. Desert Sw. Ann. Conf.*, 377 F.3d 1099, 1100 n.1 (9th Cir. 2004).

## VI.   BOTH BFOQS ALSO REQUIRE JUDGMENT FOR WORLD VISION.

### A.   Title VII's BFOQ Disposes of the Federal Claim.

As Judge Berzon stated in *Spencer*: "If World Vision does not qualify for the [ROE], it may well have a strong argument that belief in World Vision's Statement of Faith or the Apostles' Creed is a BFOQ for employees directly involved in carrying out [WV's] religiously-motivated humanitarian mission[.]" 633 F.3d at 756 (Berzon, J., dissenting) (citing, inter alia, 42 U.S.C. § 2000e-2(e)(1) and *EEOC v. Kamehameha Sch.*, 990 F.2d 458, 465 (9th Cir. 1993)). World Vision agrees. Its religious requirements for a DCSR "'affect an employee's ability to do the job,'" and "'relate to the essence or to the central mission of [its] business.'" *Id.* at 465-66. *See Starkey*, 41 F.4th at 947 (Easterbrook, J., concurring) (suggesting BFOQ may well apply in this context).

Much as the job duties of chaplains in *McCollum v. California DOC*, 647 F.3d 870 (9th Cir. 2011) were BFOQs because they required chaplains to be "clergy of the denominated faith in order to conduct" their duties, *id.* at 881, the duties of DCSRs

DEF. WV'S OPENING BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 28

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

require them to be Christians of a particular sort. First, they must "belie[ve in] World Vision's Statement of Faith or the Apostles' Creed." *Spencer*, 633 F.3d at 756 (Berzon, J., dissenting). Second, they must agree to follow the SOC and the "living Christ, individually and corporately in faith and conduct … in their work as well as in their private lives." 6/12/23 Order 4. Third, they must be ready, willing, and able, spontaneously, persuasively, and convincingly to (a) pray with callers and (b) discuss WV's policies. *See supra* at 6-13; Defs. MSJ 23-28; Opp. 20-26; SO ¶¶17-57; MF ¶¶19-60.

These duties are BFOQs under religion, sex, and/or sexual orientation. *See* §2000e-2(e)(1) and *Bostock*. This is clear from WV's SOC and the undisputed script read to Plaintiff in her interview. *See* Dkt.26 at 7-9, 19, 27-28; Pls. Dep. at 201-03; Dkt.42 at 5.

**B.    WLAD's BFOQ Disposes of the State Claim.**

The religious DCSR duties detailed above both "[are] essential to" and "will contribute to the accomplishment of the purposes of the job." *Hegwine v. Longview Fibre*, 162 Wash.2d 340, 358 (2007) (analyzing WLAD's BFOQ). Further, "all or substantially all" people in same-sex marriages "would be unable to efficiently perform the duties" of DCSRs, "such that hiring them would undermine [WV'] operations." *Id*. Even assuming *arguendo* that WV's BFOQ is "facially discriminatory," WV has established a "strong correlation" between its BFOQ and the needs of its religious operations. *Kries v. WA-SPOK Primary Care*, 190 Wash.App. 98, 131 (2015).

**VII.   CONCLUSION.**

When an antidiscrimination "law and the Constitution collide, there can be no question which must prevail." *303 Creative*, 143 S.Ct. at 2315.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

Respectfully submitted,

DATED this September 22, 2023

ELLIS, LI & McKINSTRY PLLC

By:  */s/ Nathaniel L. Taylor*

Nathaniel L. Taylor, WSBA No. 27174
Abigail J. St. Hilaire, WSBA No. 48194
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
Telephone: (206) 682-0565
Fax: (206) 625-1052
Email: ntaylor@elmlaw.com
Email: asthilaire@elmlaw.com

GAMMON & GRANGE, P.C.
Scott J. Ward (pro hac)
J. Matthew Szymanski (pro hac)
1945 Old Gallows Road, Suite 650
Tysons, Virginia 22182
Telephone: (703) 761-5012
Email: SJW@gg-law.com
Email: JMS@gg-law.com

*Attorneys for Defendant*
*World Vision, Inc.*

I certify that this memorandum has 8,383 words within the limit of LCR 7(e).

Def. WV's Opening Brief on
Summary judgment (Round 2)
Case No. 2:21-cv-00920-JLR                    Page 30

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052