THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AUBRY MCMAHON,

        Plaintiff,

    vs.

WORLD VISION, INC.

        Defendant.

CASE NO. 2:21-CV-00920-JLR

DEFENDANT WORLD VISION'S
OPPOSITION TO PLAINTIFF'S
RENEWED MOTION FOR
SUMMARY JUDGMENT (ROUND 2)

*NOTE ON MOTION CALENDAR:*
*October 20, 2023*

**ORAL ARGUMENT REQUESTED**

DEF. WV'S OPPOSITION BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page i

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

# Table of Contents

I.  INTRODUCTION. ........................................................................................1

II.  BOTH ROEs REQUIRE JUDGMENT FOR WORLD VISION. ....................1

    A.  Plaintiff's Arguments on the Religious Organization Exemptions. ....................1

    B.  *Spencer* Does Not Limit the ROE to Religious Discrimination Claims. ...............2

    C.  The Dicta in *Fremont* and *Pacific Press* Do Not Control this Case. ........................3

    D.  WV's ROE Argument Is Not a Recasting of Plaintiff's Sex Claim ......................5

    E.  WLAD's ROE Disposes of the State Claim. .............................................................5

III.  THE MINISTERIAL EXCEPTION REQUIRES JUDGMENT FOR WV. ...................6

    A.  The Key to ME: The Religious Employer's Expectations for the Role. ...............6

    B.  Plaintiff's Arguments on the Ministerial Exception. .............................................8

    C.  ME Applies to Subsets of Employees with Vital Religious Duties. ....................8

    D.  DCSRs Meet More Than Enough *Hosanna* Factors. ...........................................10

    E.  As a DCSR, Plaintiff Would Have Performed ME Duties. ................................12
        *1.*  DCSRs at Bottom Are ME Roles. ....................................................................12
        *2.*  DCSRs Not Only Participate In But Lead Chapels. ......................................13
        *3.*  DCSRs Do Lead Devotions. ............................................................................14
        *4.*  DCSR Prayer With Supporters Is a Clear WV Expectation. .........................16

    F.  In Sum: Plaintiff Was Expected to Perform ME Duties. .....................................18

IV.  EACH REMAINING DEFENSE REQUIRES JUDGMENT FOR WV. ...................21

    A.  Overview of Plaintiff's Remaining Arguments ....................................................21
        *1.*  Plaintiff Distorts *Bostock* to Avoid Addressing Key Defenses. ....................21
        *2.*  Plaintiff Misrepresents the Presence and Strength of Precedent. ...................22
        *3.*  Plaintiff Disregards *Bear Creek*/*Braidwood* and *Slattery*. .................................23
        *4.*  No AG-Certification Is Appropriate in As-Applied Challenges. ...................23

    B.  Plaintiff's Arguments on WV's Remaining Defenses ...........................................24

    C.  WV Has Established a BFOQ Under Both Title VII and WLAD. ......................24
        *1.*  WV Has Established a BFOQ for DCSRs Under Title VII. ...........................24
        *2.*  WV Has Established a BFOQ for DCSRs Under WLAD. ..............................25

    D.  WV Has Established Its Free Exercise Defense. ....................................................26
        *1.*  WV Challenges Title VII and WLAD Only As-Applied. ..............................26
        *2.*  As Applied, Neither Statute is Generally Applicable. ...................................26

DEF. WV'S OPPOSITION BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page ii

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

*3.* As Applied, Neither Statute Is Neutral Toward Religion. ............................29

E. WV Has Established Its Free Expression/Association Defense. ........................30

*1.* Expressive Association Doctrine Applies to Employment Cases. ...............30

*2.* Free Exercise and Free Speech Merge into Free Expression Here................31

*3.* As Applied, Both Statutes Fail Every Free Expression Test.........................31

*4.* As Applied, Both Statutes Punish and Compel Expression.........................32

*5.* As Applied, Neither Statute is Neutral Toward Religion. ...........................32

*6.* *Hishon* Adds Nothing to this Case. ...............................................................33

F. *Pittsburgh Press* Adds Nothing to This Case........................................................34

V. CONCLUSION..............................................................................................................37

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

## I.   INTRODUCTION.

> "We believe [our] efforts are a witness to Jesus Christ through life, word, sign, and deed, and encourage individuals to respond to the gospel." WORLD VISION FAITH IN ACTION STUDY BIBLE, ix (Zondervan 2005). [Dkt. 22]

Directly contrary to Plaintiff's assertions, her lawsuit pressures World Vision ("WV") "to 'speak' a message with which it disagrees." Pls. MSJ-II at 29. Plaintiff's lawsuit would punish World Vision's expressive religious activities and beliefs and compel it to employ someone as its "**Voice**, **Face** and **Heart**," *infra* at 9, who rejects those same expressive religious activities and beliefs. The result is severe pressure on WV to change its expressive religious activities and beliefs. That is exactly what the Christian small business faced in *303 Creative v. Elenis*, 600 U.S. 570, 143 S.Ct. 2298 (2023), and the result here must be the same. Where antidiscrimination "law and the Constitution collide, there can be no question which must prevail." 143 S.Ct. at 2315.

For the reasons explained in its cross-motion and reinforced here, World Vision is entitled to summary judgment, independently, on each defense herein: Ministerial Exception, Free Exercise of Religion, Free Expression/Expressive Association, the Religious Organization Exemptions, and the Bona Fide Occupational Qualifications. All issues, state and federal, are properly before the Court on federal question and (if needed) diversity-of-citizenship jurisdiction. The Court should rule for World Vision.

## II.   BOTH ROES REQUIRE JUDGMENT FOR WORLD VISION.

### A.   Plaintiff's Arguments on the Religious Organization Exemptions.

Plaintiff argues: (A) Title VII's Section 702 Religious Organization Exemption ("ROE"), 42 U.S.C. §2000e-1(a), is inapplicable because: (B) the ROE is limited to

religious discrimination claims by *Spencer v. World Vision*, 633 F.3d 723 (9th Cir. 2011);

(C) the ROE is similarly limited by the legislative history and dicta included in *EEOC*

*v. Fremont Christian Sch.*, 781 F.2d 1362 (9th Cir. 1986) and *EEOC v. Pacific Press Pub.*

*Ass'n*, 676 F.2d 1272 (9th Cir. 1982); and (D) WV's ROE argument is an attempt to

"recast" Plaintiff's sex-discrimination claim as one for religious discrimination; and

Plaintiff further argues that (E) WLAD's ROE is inapplicable because the role Plaintiff

sought does not qualify for the Ministerial Exception. Pls. MSJ-II/Dkt 52 at 2-4.

### B.   *Spencer* Does Not Limit the ROE to Religious Discrimination Claims.

First, *Spencer* did not establish a religious-discrimination-claims-only limitation

on the ROE. *Spencer* solely addressed religious discrimination claims because such

claims were the sole claims made in the lawsuit. Of relevance here, what *Spencer* did

hold was this: "If World Vision qualifies for the exemption, it is entitled to terminate

employees for exclusively religious reasons, without respect to the nature of their

duties." *Id.* at 726 n.3. That is enough for World Vision here. WV rescinded a job offer

for "exclusively religious reasons"—*its* religious reasons—as the ROE entitled it to do.

Second, the ROE is a provision for employers, not employees, and it does not

permit artful pleading by employees to defeat it. "In a final effort to avoid the ROE's

reach, Garcia maintains that she has not pleaded a cause of action labeled 'religious

discrimination.'" *Garcia v. Salvation Army*, 918 F.3d 997, 1005 (9th Cir. 2019). That is

precisely what Plaintiff maintains here. Engrafting such a pleadings limitation on the

ROE would defeat its religious-freedom protection. The "canon of constitutional

avoidance counsels against [Plaintiff's] interpretation of section 2000e-1 [since it] raises

Def. WV's Opposition Brief on
Summary Judgment (Round 2)
Case No. 2:21-cv-00920-JLR

Page 2

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

serious questions under both [Religion Clauses]." *Spencer*, 633 F.3d at 728-29 (citing

*NLRB v. Cath. Bishop,* 440 U.S. 490, 500 (1979)). The Court "must" reject it. *Id.*

**C.    The Dicta in *Fremont* and *Pacific Press* Do Not Control this Case.**

First, *Pacific Press* and *Fremont* never analyzed the plain-meaning argument

addressing the ROE's "This subchapter shall not apply." 42 U.S.C. §2000e-1(a). That

may be unfortunate, but their legislative-history discussion cannot overcome plain

meaning. "This Court has explained many times over many years that, when the

meaning of the statute's terms is plain, our job is at an end. The people are entitled to

rely on the law as written, without fearing that courts might disregard its plain terms

based on some extratextual consideration." *Bostock v. Clayton County*, 140 S.Ct. 1731,

1749 (2020). That rule was the entire foundation for *Bostock's* holding that "sex" in Title

VII included "sexual orientation." As the Court just reiterated unanimously, "we

cannot replace the actual text with speculation as to Congress' intent." *Perez v. Sturgis

Pub. Sch.*, 143 S.Ct. 859, 865 (2023). For this reason alone, the dicta of *Pacific Press* and

*Fremont* must fail.

Second, *Garcia* vitiated such dicta. "This subchapter shall not apply" exempts

qualifying entities "from the *entire subchapter* of Title VII." 918 F.3d at 1004 (emphasis

retained; citation omitted). "[T]he ROE's text … 'painted with a broader brush,

exempting religious organizations from the *entire subchapter* of Title VII' [which]

includes protections against retaliation and discriminatory harassment[.]" *Id.* Just so

here. The ROE's "entire subchapter of Title VII" includes protections against "sex" and

other forms of discrimination, barring Plaintiff's claims.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

1      Third, a religious-discrimination-claims-only limitation not only constitutes an

2  "extratextual consideration" forbidden by *Bostock*, 140 S.Ct. at, 1749; it is erroneous as

3  recognized by *Starkey v. Roman Cath. Archdiocese*, 41 F.4th 931, 945-47 (7th Cir. 2022)

4  (Easterbrook, J., concurring); *Fitzgerald v. Roncalli High Sch.*, 73 F.4th 529, 534-37 (7th

5  Cir. 2023) (Brennan, J., concurring); and *Bear Creek Bible Church & Braidwood Mgt. v.*

6  *EEOC*, 571 F.Supp.3d 571, 590-91 (N.D.Tex. 2021), *aff'd on other grounds*, 70 F.4th 914

7  (5th Cir. 2023). *See also* Defs. MSJ 2-5, 16-20; Opp. 17-20; Reply 9-11; MSJ-II 26-28.

8      Plaintiff's limitation is wrong for yet another reason: the parallel ROE in the

9  Americans with Disabilities Act. 42 U.S.C. §12113(d)(1). If this substantially similar

10  exemption to employ "individuals of a particular religion" protects only against

11  *religious-discrimination claims*, the ADA's ROE would be absurd, because the ADA

12  prohibits only *disability* discrimination—and *not* religious discrimination.

13      Fourth, both *Pacific Press* and *Fremont* rely mainly on *EEOC v. Mississippi College*,

14  626 F.2d 477 (5th Cir. 1980). *See Pacific Press* (citing *Miss. Coll.* twelve times); *Fremont*

15  (seven times). Yet, *Mississippi College* is a sex-discrimination case; there was no claim

16  for religious discrimination. 626 F.2d at 479-80 (plaintiff later amended her sex-

17  discrimination claim to add race). The court explicitly rejected the EEOC's argument

18  that the §702 ROE "does not exempt race or sex discrimination by a religious education

19  institution from the scope of Title VII." *Id.* at 481. Thus, the main precedent on which

20  *Pacific Press* and *Fremont* rely contradicts their religious-claims-only dicta.

DEF. WV'S OPPOSITION BRIEF ON        Page 4
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**D.      WV's ROE Argument Is Not a Recasting of Plaintiff's Sex Claim.**

World Vision's reliance on its First Amendment rights to free religious exercise and expression is not a recasting of Plaintiff's sex-based claims as ones based on religion. Such confusion is common, as many courts refer to the *defense* or *justification* of religiously motivated staffing decisions as a form of *religious discrimination*—i.e., discrimination by the employer based on the employer's religion. *Mississippi College* held "that if a religious institution of the kind described in §702 presents convincing evidence that the challenged employment practice resulted from discrimination on the basis of religion, §702 deprives the EEOC of jurisdiction to investigate further to determine whether the religious discrimination was a pretext for some other form of discrimination." *Id*. at 485. There was no *claim* for *religious discrimination* there. Instead, the reference to "discrimination on the basis of religion" described the college's *defense* under its Baptist-preference policy. The Ninth Circuit has similarly characterized such defenses. "[T]he ROE permits religious organizations to discriminate based on religion[.]" *Garcia*, 918 F.3d at 1006. Indeed, *Fremont* adopts the same *Mississippi College* holding above. *Fremont*, 781 F.2d at 1366. Using "discrimination" to describe such defenses can confuse. But the point remains clear: the ROE protects any discrimination under "this subchapter" when it is discrimination based upon the *employer's* religion.

**E.      WLAD's ROE Disposes of the State Claim.**

As Plaintiff notes, *Woods v. SUGM*, 197 Wash.2d 231 (2021) construed the state ROE to apply to positions that qualify for the Ministerial Exception ("ME"). The role Plaintiff sought does qualify for the ME, as argued below. Thus, it also qualifies for the

DEF. WV'S OPPOSITION BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 5

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

state ROE. Regardless, state law must yield to all of WV's First Amendment defenses. *See Werft v. Desert Sw. Ann. Conf.*, 377 F.3d 1099, 1100 n.1 (9th Cir. 2004).

## III.   THE MINISTERIAL EXCEPTION REQUIRES JUDGMENT FOR WV.

### A.   The Key to ME: The Religious Employer's Expectations for the Role.

The key cases for the ME are *Our Lady of Guadalupe v. Morrissey-Berru*, 140 S.Ct. 2049 (2020) and *Hosanna-Tabor Evang. Luth. Church & Sch. v. EEOC*, 565 U.S. 171 (2012). Both cases emphasize context, taking "all relevant circumstances into account." Pls. MSJ-II at 4 (quoting *OLG*, 140 S.Ct. at 2067). And *OLG* tells us that "circumstances [are] relevant because of their relationship to [an employee's] 'role in conveying the [religious employer's] message and carrying out its mission.'" *Id*. at 2063.

Plaintiff asserts that the "central inquiry … is not what the *employer* does but what the *employee* does." Pls. MSJ-II at 7. This is partially correct. What "the employer does" provides context for whether "what the employee does" is sufficiently religious. The key is this: "ministerial duties" are defined "in context" by a "religious employer's" "religious expectations" for a "particular role." The undisputed record provides the context: the character of the employment setting and the role at issue.

There is no dispute over the character of the employment setting. The employer, World Vision, exists "only" to "conduct Christian religious and missionary services, to disseminate, teach and preach the Gospel and teachings of Jesus Christ, to encourage and aid the growth, nurture and spread of the Christian religion" and "[t]o continually and steadfastly uphold and maintain [its] statement of faith." 6/12/23 Order 3. World Vision "operates in many ways like a Christian church and implements

its programs through and as supported by local churches[.]" *Id.* at 2. WV is a "church" under federal tax law; it employs "only Christians" for all positions; and its "religion pervades [its] workplace." Defs. MSJ at 4, 25, 2-3 (all citing *Spencer*).

But there is disagreement over the legal significance of what the undisputed record says about one role. Plaintiff emphasizes: "What matters, at bottom, is what an employee does." Pls. MSJ-II at 7 (quoting *OLG*, 140 S.Ct. at 2064). But "[w]hat an employee does involves what an employee is entrusted to do," *Starkey v. Roman Cath. Archdiocese*, 41 F.4th 931, 941 (7th Cir. 2022)—i.e., "expected" to do, *id.* at 939-40 (using "expected" four times); *accord Fitzgerald v. Roncalli High School*, 73 F.4th 529 (7th Cir. 2023). In *Fitzgerald*, where Starkey's colleague also sued Roncalli High School, Fitzgerald said she "exaggerated" her "religious" duties because "she wanted … a raise." *Id.* at 533. "'[T]he very fact that she would exaggerate about performing religious tasks to get a raise *only underscores that it was [the employer] Roncalli's expectation that she perform them*.'" *Id.* (emphasis added).

Courts use forms of "require" and "expect" interchangeably in describing job elements. *OLG* did this twice in one paragraph. "[T]heir employment agreements and faculty handbooks *specified in no uncertain terms* that they were *expected* to help the schools carry out this mission …." 140 S.Ct. at 2066 (emphasis added). "And not only were they *obligated* to provide instruction about the Catholic faith, but they were *also expected* to guide their students, by word and deed …." *Id.* (emphasis added). In defining *expectations*, employers define *duties* or *responsibilities*. *Hosanna* (using *duties* 11 times); *OLG* (*responsibilit** 14 times). An employer defines these expectations, duties,

Def. WV's Opposition Brief on
Summary judgment (Round 2)
Case No. 2:21-cv-00920-JLR

Page 7

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

or responsibilities in job postings, offer letters, contracts, policies, handbooks, and training materials, *id*. 937-41, as well as its testimony, *Butler v. St. Stanislaus Kostka Cath. Acad.*, 609 F.Supp.3d 184, 192-93 (E.D.N.Y. 2022). In the end, courts must give "significant deference to the [employer's] *stated expectations* about how a given role was to be performed." *Id*. (emphasis retained). The *expectations* of *employers* control. Contrary to Plaintiff's contention, the test is not "what Plaintiff would have 'done,'" Pls. MSJ-II/Dkt.52 at 7, but what she *should* have done *as defined by VV*.

### B.    Plaintiff's Arguments on the Ministerial Exception.

In Section III of her brief, Pls. MSJ-II at 4-19, Plaintiff argues that the ME is inapplicable because: (A) it cannot apply to "everyone" but just a "subset" of staff; (B) "nothing about" the DCSR title or its presentation satisfies *Hosanna* factors; and (C) Plaintiff's DCSR duties would have been non-ministerial as follows: (1) DCSR "at bottom" is a "secular" role; (2) "all" WV employees, not just DCSRs, "must participate in chapel"; (3) even if DCSRs are "required to lead devotions," that is "equally true for most other" employees; and (4) "praying with donors or potential donors" is "not a job requirement." WV responds to each of these, starting at subsection (C), next.

### C.    ME Applies to Subsets of Employees with Vital Religious Duties.

Plaintiff argues that the ME does not apply to "everyone" but is an "exception" for a "subset" of employees. *Id*. at 5. World Vision easily meets such a standard. It has 1,009 employees, only 76 (or 7.5%) of whom are part of DCS, and 60 (or 5.9%) of whom handle inbound and outbound calls. *See* Second Sharon Osborne Decl. ("SO2") (Exhibit 1 hereto) at ¶4. In January of 2021, World Vision had 898 employees, only 74 (or 8.2%)

of whom were DCS staff, and 58 (or 6.5%) of whom handled the calls. *Id*. ¶5. DCSRs handle nearly all inbound and most outbound calls. *Id*. ¶6. The 9-11 weeks of formal advance training for DCSRs is more than any other advance training required of other WV employees. *Id*. ¶7. "Consequently, DCSRs represent a small but vital subset of all WV employees," *id*. ¶8, and for good reason, since they "are the ***Voice***, ***Face*** and ***Heart*** of World Vision." SO/Dkt.29 at ¶19.

That "small but vital subset" of DCSRs acts as a vital mouthpiece for WV's ministry to supporters, potential supporters, other ministries, and the public. Defs. MSJ 5-6, 23-28; Opp. 20-26; Reply 11-16; MSJ-II 3-14. In the year prior to the 2019 chapel, "donors called [DCS] over 210,000 times," DCS "called them over 100,000 times," and DCS "ministered to our donors through prayer," in real-time calls, replying "to 51,000 emails and letters and pray[ing] for nearly 10,000 prayer requests." MSJ-II at 9 and SO ¶¶25-36 & SO-13 (authenticating chapel video/excerpts, donor-call audio/excerpts, and DCS shout-outs). DCSRs interact all day with donors, always "sensitive to [their] needs and pray[ing] with them." SO ¶¶23, 42-50. DCSRs minister in outbound and inbound calls by explaining how WV witnesses to Christ in its work. *Id*. ¶19. For WV, a DCSR is a "key liaison and voice" who must perform that role "persuasively and convincingly." *Id*. ¶¶24, 57. DCSRs literally are the "voice" of WV: its ministry and its faith. That's why DCSRs need 9-11 weeks of training before joining DCS, whose "Mission Statement" begins, "***Consumed and called by Jesus Christ***." *Id*. ¶19. That DCSRs "are the ***Voice***, ***Face*** and ***Heart*** of World Vision," *id*., was demonstrated beyond doubt by the DCS-led chapel services, calls with donors, and shout-outs.

DEF. WV'S OPPOSITION BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 9

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

### D.     DCSRs Meet More Than Enough *Hosanna* Factors.

Plaintiff selectively cites ME law, ignoring many points that WV drew from *OLG*, *Hosanna*, and key circuit cases. Defs. MSJ-II/Dkt.53 at 3-14. Plaintiff embraces *Hosanna* and largely ignores the more recent and controlling *OLG*. And despite *OLG's* warning that the *Hosanna* factors are not "even … necessarily important in all other cases," 140 S.Ct. at2063, Plaintiff focuses on four such factors: "(1) the formal title given to Plaintiff, (2) the substance reflected in that title, (3) Plaintiff's use of that title, and (4) whether Plaintiff performed important religious functions." Plaintiff states: "In sum, "nothing about [Plaintiff's] job title or the way that [Defendant] held her out indicates that she was a minister." Pls. MSJ-II at 7. Each issue is addressed below.

First, as to formal title, it is true that donor/customer service representative, standing alone, is no more explicitly religious than "Grade 5 Teacher," which the Ninth Circuit found to convey no "religious … meaning." *Biel v. St. James Sch.*, 911 F.3d 603, 608 (9th Cir. 2018). But *OLG* reversed the Ninth Circuit's title-focused rationale. As Plaintiff admits, a "minister-like" title neither is nor can be a "necessary requirement." Pls. MSJ-II at 6 (quoting *OLG*). It is merely one possible indicator. Still, a Donor Service Representative in an explicitly Christian charity like WV conveys at least as much religious content as a lay teacher in a Christian school.

Second, as to the substance reflected in that title and how World Vision presents it to the public, both are answered by the public Job Posting. *See* 6/12/23 Order 5-7. The Posting says DCSRs (a) help "carry out our Christian … mission, vision, and strategies," *id*. at 5, (b) "[p]ersonify the ministry of World Vision by witnessing to

Def. WV's Opposition Brief on
Summary judgment (Round 2)
Case No. 2:21-cv-00920-JLR                    Page 10                    Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

Christ and ministering to others through life, deed, word and sign," *id*. at 5-6, (c) "[k]eep Christ central in our individual and corporate lives," *id*. at 6, (d) "[a]ttend and participate in the leadership of devotions, weekly Chapel services, and regular prayer," i*d*., and (e) are "sensitive to Donor's needs and pray with them when appropriate," *id*. The Posting says DCSRs are the primary voice of World Vision's ministry to the rest of the world. That ministry, undisputed evidence establishes, is church-like, pervasively Christian, and exists "only" to "conduct Christian religious and missionary services, to disseminate, teach and preach the Gospel and teachings of Jesus Christ, to encourage and aid the growth, nurture and spread of the Christian religion" and "[t]o continually and steadfastly uphold and maintain [its] statement of faith." *Id*. 3. All these duties plainly reflect ministerial functions.

Third, as the Posting makes clear, the purpose of listing the job's "essential functions" was to explain WV's "expectations" for it. Pls. MSJ-II at 8 (quoting Posting). "As a [DCSR], you will participate in a training program to gain a working knowledge and understanding of the position and to perform the *essential functions* of the job at a level of performance that consistently meets *expectations*." *Id*. (emphasis added). To say a job function is "essential" to WV is to say that it is "required" or "expected" by WV. *Supra* §III(A) (explaining the ME law of employer expectations).

Finally, how Plaintiff would have been expected to use her DCSR title and conduct her DCSR duties is addressed below.

DEF. WV'S OPPOSITION BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 11

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

### E. As a DCSR, Plaintiff Would Have Performed ME Duties.

#### 1. DCSRs at Bottom Are ME Roles.

Plaintiff misjudges the DCSR role. She quotes the same expressly Christian *essential functions* of the Job Posting but suggests they show the job is not "important in the life of [WV's] religion." Pls. MSJ-II at 9. That suggestion contradicts the Court's findings in the 6/12/23 Order and the undisputed record. Plaintiff also recognizes that WV donors are "predominantly" though not "exclusively" Christian, but seems unaware what that means to WV. With donors who are fellow believers, DCSRs impart WV's "Christian … mission, vision, and strategies." With donors who are not, DCSRs do the same but with an evangelistic opportunity to draw them to Christ. With both, Plaintiff as a DCSR "would need to support donor transformation via 'Christ's transforming love, grace, and power,'" by inspiring those donors who share World Vision's faith and by sharing that faith with those who don't," because "[t]ransformation of donors is just as vital to World Vision as that of the children they sponsor." SO¶¶23, 50, 42 & SO-10.

Thus, even if a DCSR's "main duty" were, as Plaintiff asserts, to "acquire and maintain donor relationships through the basic inbound and outbound calls," they do so "persuasively and convincingly" as the "*Voice*, *Face* and *Heart* of World Vision" in hundreds of thousands of inbound and outbound calls annually with supporters and potential supporters who are Christians and those who are not. For those who are not Christians (yet), the opportunity for DCSRs is to "witness to Jesus Christ" through their words in the hope of drawing them toward saving faith in Jesus Christ. The latter

DEF. WV'S OPPOSITION BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 12

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

goal is part of "donor transformation" with consequences both temporal and eternal. SO ¶¶23, 42-44. It spreads the Gospel, saving souls through Jesus' love, grace, and power, and it generates lasting support for the children and families that WV supports, saving lives now and also for eternity.

All this explains why Plaintiff's criticism of the 2022 Job Posting is irrelevant. WV testified that the 2022 Posting reflects what was, and remains, WV's expectations for the DCSR role that Plaintiff sought. SO ¶24. The 2022 Posting and its clarifications are thus incorporated into WV's testimony and have the same effect. Nevertheless, since those 2022 clarifications were modest, WV places little weight on them here.

### 2.   DCSRs Not Only Participate In But Lead Chapels.

Plaintiff, in order to dilute or obscure the religious duties of DCSRs, argues that "[a]ll World Vision employees are **expected** to participate in chapel services[, all] staff members regularly participate in 'prayer activities' [and an] entire workday is set aside each year for prayer which *all* staff must attend." Pls. MSJ-II at 10 (bold added). Plaintiff also argues "that all World Vision employees are **expected** to participate in chapel." *Id.* at 11 (bold added). In two paragraphs on WV religious "expectations" of all staff, Plaintiff uses a form of "expect" seven times. *Id.* at 10-11. But Plaintiff insists that many of these *expectations* are not unyielding *requirements* in the sense of each failure justifying termination. *Id.* These arguments misfire for several reasons.

First, while each failure to meet these religious expectations may not be a "fireable offense," that does not diminish one iota their character as World Vision's expectations for the role. As explained *supra* §III(A), it is the role and right of *employers*

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

to define their expectations for each job, not that of their employees. WV trains, encourages, and coaches its DCRSs: (a) to help "carry out our Christian … mission, vision, and strategies," 6/12/23 Order at 5, (b) to "[p]ersonify the ministry of [WV] by witnessing to Christ and ministering to others through life, deed, word and sign," *id.* at 5-6, (c) to "[k]eep Christ central in our individual and corporate lives," *id.* at 6, (d) to "[a]ttend and participate in the leadership of devotions, weekly Chapel services, and regular prayer," i*d.*, and (e) to be "sensitive to Donor's needs and pray with them when appropriate," *id.* Plaintiff cites no authority for her notion that the ME requires menacing requirements and immediate terminations, and WV is aware of none.

Second, while it may be true that some religious duties of DCSRS are expected of all staff, what is not true is that all staff share the unique, important, vital, key role of DCSRs. As explained *supra* §III(C), DCSRs express and personify WV's Christian faith to the rest of the world, including its supporters and potential supporters. DCSRs constitute a small subset of WV staff who have these duties.

Third, Plaintiff continues to emphasize the virtual nature of chapel attendance during the pandemic. Unless Plaintiff means to suggest that such pandemic-driven virtual attendance would continue indefinitely, necessarily altering WV's expectations for chapel attendance, this fact has no relevance to this case at all.

### 3.   DCSRs Do Lead Devotions.

Plaintiff's theory is as follows: "With respect to [WV's] claim that [DCSRs] had to 'attend and participate in the leadership of devotions,' even assuming these were actual job requirements, they were equally required of almost every other [WV]

DEF. WV'S OPPOSITION BRIEF ON       Page 14
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

employee." Pls. MSJ-II at 11. Plaintiff argues that "leading devotions" is not "obligatory," i.e., not a "disqualifier," and that, even if it is a job "requirement," it is a "minor one." *Id*. at 12-13. And Plaintiff suggests, again, that nothing about DCSR religious duties is "distinct" from most staff. *Id*. Plaintiff's entire theory fails badly.

First, Plaintiff again contends that WV's *expectations* must be *disqualifying, obligatory, requirements*. *OLG, Hosanna,* and key circuit cases disagree. In reality, few employers impose such harsh requirements and it is doubtful they could attract and retain staff if they did. Instead, WV disciples, coaches, encourages, and trains its DCSRs, including with on-the-job training via participation and leadership in the regular religious activities, including devotions. Defs. MSJ-II at 3-14.

Second, Plaintiff again concedes that World Vision's religious expectations for DCSRs are "undisputed." Indeed, they are. The Court has a fully developed and undisputed record before it, and that record establishes WV's expectations for DCSRs.

Third, Plaintiff seems unaware that she undercuts her "obligatory requirement" requirement. While conceding that "[p]articipating in devotions is required of every [WV] employee," Pls. MSJ-II at 11, Plaintiff describes this particular "expectation" as a "requirement" without explaining the difference. In fact, there is no difference. The *requirements* of the job are the employer's *expectations* for it, and vice versa, as the cases clearly show. *Supra* §III(C)(1). Any other approach would result in nonsense.

Fourth, Plaintiff devotes much space to her theory that "leading devotions" is optional for DCSRs who are free to neglect this expectation if they are "uncomfortable" with it. Pls. MSJ-II at 12-13. This distracts from the reality of any job setting. The goal

DEF. WV'S OPPOSITION BRIEF ON       Page 15
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

of any successful employer is to help struggling or uncomfortable employees become comfortable and competent in meeting its expectations. WV is the same. Plaintiff's theory here amounts to an exercise in semantics and distinctions without a difference. In fact, this theory turns the employment setting upside down, reversing the roles of employers and employees and rendering the ME meaningless.

Fifth, Plaintiff's theory devolves to redundancy and confusion. Responding to repetitive hypotheticals at deposition, WV explained that certain expectations were not "required expectations" in the draconian sense. Pls. MSJ-II at 13. This ironic term of "required expectations" resulted directly from Plaintiff's zeal to establish that certain failures in religious "expectations" were not rigid "requirements" that mandate termination. Defs. MSJ-II at 14 (citing the briefs and depositions).[1] It remains undisputed that this is a duty stated in the Job Posting and that DCSRs in fact regularly perform this duty. SO ¶20-22 & Exh. SO-01.

Sixth, Plaintiff suggests again that the religious duties of DCSRs are the same as all staff's. This again is simply wrong. DCSRs constitute a small subset of WV staff entrusted with voicing and personifying its Christian mission, vision, and strategies.

### 4. DCSR Prayer With Supporters Is a Clear WV Expectation.

As World Vision has shown, and Plaintiff does not contest, DCSR prayer with callers is vital (for many reasons). Instead, Plaintiff quibbles over whether such prayer is *mandatory*. "Thus, the [DCSR] job description *encourages* but does not mandate those

---

[1] Plaintiff distorts Melanie Freiberg's individual deposition testimony to avoid her binding 30(b)(6) testimony on a thoroughly prepared topic. *See* 30(b)(6) Dep./Dkt.25-10 at 6:16-8:6.

DEF. WV'S OPPOSITION BRIEF ON          Page 16
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

employees to pray with potential donors." Pls. MSJ-II at 13 (emphasis retained). Plaintiff notes that DCSRs enjoy "some discretion," *id*. at 14, in deciding when and how to pray. Of course, this is so. WV expects prayer to be organic and spontaneous in response to the needs of the moment and each caller. The many calls recounted from the record show that this discretion on *how* to pray is, and must be, used to pray more and more effectively with callers, not less. *E.g.*, Defs. MSJ-II at 9-12. In such matters vital to being "the **Voice**, **Face** and **Heart** of World Vision," *supra* §III(C), Plaintiff would be comfortable, at most, only reading from scripts. Defs. MSJ-II at 14.

Plaintiff has devoted an extensive amount of her discovery and briefing to disputing the existence of some draconian prayer requirement for DCSRs. *Supra* §III(E)(4); Defs. MSJ-II at 14. "But this does not help her case…. As [WV] persuasively explain[s], 'the very fact that she would [vigorously dispute] performing religious tasks … underscores that it was [WV's] expectation that she perform them.'" *Fitzgerald*, 73 F.4th at 533. It also further underscores why she was unfit to perform them "persuasively and convincingly," SO ¶¶24, 57, and why such requirements establish a BFOQ, as argued *infra* §IV(A). And it does nothing to counter the extensive evidence that DCSRs regularly and repeatedly pray with callers. Defs. MSJ-II at 8-13.

Plaintiff suggests her duties would be "overwhelmingly secular: acquiring and maintaining donors through inbound and outbound telephone calls." Pls. MSJ-II at 14. "If all employees have similar religious roles within a religious organization, then none 'play certain key roles,' hold 'certain important positions,' or perform 'a role distinct from that of most of its members[.]'" *Id*. at 15. These assertions are distortions of the

DEF. WV'S OPPOSITION BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 17

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

record. DCSRs, with their unique and vital functions, constitute a small fraction of WV's "religious roles." *Supra* §III(C). As for Plaintiff's "overwhelmingly secular" description of DCSRs, the undisputed record refutes it. Plaintiff asks this Court to substitute her secular characterizations of the DCSR role for the undisputed religious character, functions, and expectations of World Vision. That directly contradicts *OLG.*

### F.      In Sum: Plaintiff Was Expected to Perform ME Duties.

Plaintiff's final arguments against the ME consist of cherry-picking some cases and mischaracterizing others. Pls. MSJ-II at 15-19. These arguments fail as well.

First, Plaintiff is correct to cite the two key cases, *OLG* and *Hosanna*, and note the importance of context. *Id.* at 15. But Plaintiff takes away the wrong lessons while also ignoring the context of her own case. Plaintiff notes that *OLG* involved a "lay fifth or sixth grade teacher" at a Catholic school whose curriculum "included religion." *Id*. But Plaintiff does not explain how that setting is meaningfully different from DCSRs voicing and personifying the Christian mission, vision, and strategies of a pervasively Christian charity that operates like a church. *Supra* at 6-7. If anything, DCSRs are *more* ministerial than the lay teaching jobs in *OLG.*

Second, Plaintiff argues that *Butler* fits *OLG* and *Hosanna* better than WV does. While *Butler*, *OLG*, and *Hosanna* all involved schools, their principles and context apply equally here. As Plaintiff notes, Butler's job was reserved *for a practicing Catholic*, his contract required him to perform religious duties, he received religious training, and he was fired "after expressing discomfort with the ministerial aspects of the position." Pls. MSJ-II at 15. Our case is similar. DCSRs must be practicing Christians of a

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

particular kind, must perform religious duties specified in WV postings and policies, and must successfully complete 9-11 weeks of training (including religious orientation and religious on-the-job training); and Plaintiff also has expressed "discomfort" with ME aspects of the job (e.g., leading devotions and praying with supporters). *Supra* §III(E)(3)-(4). *Butler* is apt here in other ways, too. Whereas *Hosanna* and *OLG* involved age and disability discrimination, *Butler* was a sex discrimination case just like ours. And, crucially—unlike *OLG* and *Hosanna*—*Butler* involved a "facially discriminatory" religious policy against same-sex marriage, just as the Court found in this case. Finally, whereas Butler was a practicing Catholic serving at his Catholic school, plaintiff in *OLG* admitted she was *not a practicing Catholic* serving at hers. 140 S.Ct. at 2069. Yet, the ME still applied. Our case fits *OLG* as well as *Butler* does, or better.

Third, Plaintiff distinguishes *Starkey* and *Fitzgerald* as "easy cases after [*OLG*]," Pls. MSJ-II at 16, due to the plaintiffs' shared "responsibility of 'guiding the religious mission of the school,'" *id.* DCSRs are no less ministerial for voicing and personifying WV's mission, vision, and strategies. Defs. MSJ-II at 5-8. Thus, DCSRs are an *easy* case.

Fourth, Plaintiff relies on *Palmer v. Liberty Univ.*, 72 F.4th 52 (4th Cir. 2023). But as Judge Motz observed, *Hosanna* and *OLG* "clarify that the ministerial exception can apply even when an employee, in addition to performing religious functions, has substantial secular responsibilities." 72 F.4th at 71 (Motz, J., concurring). And as Judge Richardson observed, the teachers in *OLG* "had neither a religious title nor a religious degree, two factors that *Hosanna-Tabor* alluded to," *id.* at 81 (Richardson, J., concurring), but "those factors [merely] made *Hosanna-Tabor* 'an especially easy' case,"

Def. WV's Opposition Brief on
Summary judgment (Round 2)
Case No. 2:21-cv-00920-JLR

Page 19

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

*id.* (quoting *OLG*). Even so, *Hosanna* did not require employers to "bat a thousand on the factors that it identified." *Id.* In fact, a batting average of five hundred satisfied *OLG*, where teachers met two *Hosanna* factors. *OLG*, 140 S.Ct. at 2063-69.

Fifth, Plaintiff relies on the state court decision in *DeWeese-Boyd v. Gordon Coll.*, 487 Mass. 31 (2021), *cert denied*, 142 S.Ct. 952 (Feb. 28, 2022). Much more instructive is the four-justice statement, 142 S.Ct. at 952-55 (Alito, J., joined by Thomas, Kavanaugh, & Barrett, JJ., respecting denial of cert.), concurring due to the "preliminary posture" of the decision below. *Id.* at 952. These four were willing to wait since "nothing … would preclude … seeking review in this Court when the decision is actually final.'" *Id.* at 955. These four clearly explained *OLG* and its application in this case, *id.* at 952-55, and it seems likely that Justices Roberts, Gorsuch, or Kagan—all of whom joined the Opinion of the Court in both *OLG* and *Hosanna*—would provide the fifth vote.

Sixth, Plaintiff relies on *Ratliff v. Wycliffe Assocs.*, 2023 WL 3688082 (M.D.Fla. May 26, 2023), where a "software developer for a Bible translation company" did not meet the ME. It is hard to see how a software developer, who merely provides a digital platform, is akin to DCSRs, who voice and personify a ministry to the rest of the world.

Seventh, Plaintiff ignores the many ME cases cited by WV. As just one example, the plaintiff in *Alicea-Hernandez v. Cath. Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003) qualified for the ME because, "in her capacity as Hispanic Communications Manager, [she] served in part as a press secretary," *id.* at 703, whose "official duties included composing media releases and correspondence as well as developing a working relationship with various constituencies of the Hispanic community[,]" *id.* at 703–04.

DEF. WV'S OPPOSITION BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 20

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

That role voiced and personified its employer to a single constituency. By contrast, DCSRs perform that role as to *all* WV constituencies. DCSRs are more vital still, since they personally handle the hundreds of thousands of annual calls and are the primary voice of World Vision, and its specific religious beliefs and policies, to the world.

It bears repetition that Plaintiff rests her entire case on the "undisputed facts." World Vision agrees that all facts relevant to summary judgment are undisputed. But those undisputed facts compel summary judgment for World Vision.

## IV.   EACH REMAINING DEFENSE REQUIRES JUDGMENT FOR WV.

### A.   Overview of Plaintiff's Remaining Arguments.

#### 1.   Plaintiff Distorts *Bostock* to Avoid Addressing Key Defenses.

The remaining affirmative defenses are BFOQ, Free Exercise Clause ("FEC"), and Expressive Association Doctrine ("EAD"). 8/14/23 Order at 5 n.3. Plaintiff would reduce these three to one. Plaintiff implies that—since *Bostock* named just three religion defenses (ROE, ME, and RFRA), and since ROE and ME have been argued above and RFRA is not presently before the Court—BFOQ, FEC, and EAD deserve little attention. *See* Pls. MSJ-II at 19-20. There is a simple answer to such reasoning. That *Bostock* named only three examples, rather than four, six, or ten, is no indication of the merit of other defenses in other cases. As *Bostock* itself noted, "other employers in other cases may raise free exercise arguments that merit careful consideration[.]" 140 S.Ct. at 1754. In fact, under Plaintiff's reasoning, *Bostock's* naming of RFRA means RFRA definitely applies to non-federal-party cases—just like two of the three cases consolidated in *Bostock*, and this one. Plaintiff would face WV's reserved RFRA defenses now.

DEF. WV'S OPPOSITION BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 21

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

2.      **Plaintiff Misrepresents the Presence and Strength of Precedent.**

Plaintiff says WV cited no case that "accepted BFOQ, Free Exercise Clause, or Expressive Association … where a religious employer has *facially discriminated* against an *employee or applicant* based on *her sexual orientation*." *Id.* (emphasis added). If true, that assertion would be unsurprising because such cases generally did not exist until after *Bostock* (June 15, 2020) and only since then has the Supreme Court been defining how sexual orientation (and other newly protected traits) interact with the First Amendment. Since then, the Supreme Court has sided with First Amendment rights. *See OLG* (July 8, 2020); *Fulton v. City of Phila.*, 141 S.Ct. 1868 (2021); and *303 Creative* (2023). This circuit has done likewise. *See, e.g.*, *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 46 F.4th 1075 (9th Cir. 2022), *and on reh'g en banc*, 2023 WL 5946036 (9th Cir. Sep. 13, 2023); *Green v. Miss USA*, 52 F.4th 773 (9th Cir. 2022), *reh'g en banc denied*, 61 F.4th 1095 (9th Cir. Mar. 14, 2023). Other circuits have, too. *See, e.g.*, *New Hope Family Servs. v. Poole*, 966 F.3d 145 (2d Cir. 2020); *Bear Creek/Braidwood* (5th Cir 2023); *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021); *L.W. by Williams v. Skrmetti*, ___ F.4th ___, 2023 WL 6321688 (6th Cir. Sept. 28, 2023); *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968 (7th Cir. 2021) (en banc); *Starkey* (7th Cir. 2022); *Fitzgerald* (7th Cir. 2023); *Bus. Leaders In Christ v. Univ. of Iowa*, 991 F.3d 969 (8th Cir. 2021); *Intervarsity Christian Fellowship v. Univ. of Iowa*, 5 F.4th 855 (8th Cir. 2021); *Parents Defending Educ. v. Linn Mar Sch. Dist.*, ___ F.4th ___, 2023 WL 6330394 (8th Cir. Sept. 29, 2023); *Adams by Kasper v. Sch. Bd. of St. Johns*, 57 F.4th 791 (11th Cir. 2022) (en banc).

DEF. WV'S OPPOSITION BRIEF ON          Page 22
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

### 3.   Plaintiff Disregards *Bear Creek/Braidwood* and *Slattery*.

But Plaintiff's assertion is not true. From the start, WV has relied on *Bear Creek Bible Church & Braidwood Mgt*, 571 F.Supp.3d 571, *aff'd in part on RFRA grounds*, 70 F.4th 914, where the district court, reviewing policies precisely like WV's, ruled for one or both religious employers on ROE, RFRA, Free Exercise, and Expressive Association grounds. The Fifth Circuit affirmed solely on RFRA. The district court's decision refutes Plaintiff's assertion squarely, and the Fifth Circuit's decision rejects it in all but name, since the RFRA and Free Exercise defenses there, and here, result in the same strict scrutiny. Also from the start, WV has relied on *Slattery v. Hochul*, 61 F.4th 278, 290 (2d Cir. 2023), which squarely holds that Expressive Association applies to employment cases like ours. The only real difference is that the protected trait in *Slattery* was reproductive rights, not sexual orientation.

### 4.   No AG-Certification Is Appropriate in As-Applied Challenges.

Plaintiff argues that World Vision challenges the validity of Title VII and WLAD, mandating notice to the attorneys general under 28 U.S.C. § 2403 so they can defend the statutes. Pls. MSJ-II at 23. But WV challenges these statutes only as-applied, to seek an exemption for itself. Such cases require no AG notice. This has long been the law. *See U.S. v. Lynch,* 137 U.S. 280, 285 (1890); *accord Peruta v. Cnty. of San Diego*, 771 F.3d 570, 575 (9th Cir. 2014), *rev'd on other grounds en banc*, 824 F.3d 919 (9th Cir. 2016); *Atkins v. Rios*, 2022 WL 16720414, at *2 (E.D.Cal. Nov. 4, 2022); *Dynamics Corp. of Am. v. CTS Corp.*, 637 F.Supp. 389, 395 (N.D. Ill.), *aff'd*, 794 F.2d 250 (7th Cir. 1986) (Posner,

DEF. WV'S OPPOSITION BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 23

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565   Fax: 206.625.1052

J.), *rev'd on other grounds*, 481 U.S. 69 (1987). Otherwise, AGs would have time for little else. But if an AG *does* participate, WV's reserved RFRA defense surely will apply.

**B.   Plaintiff's Arguments on WV's Remaining Defenses.**

Plaintiff devotes three pages to BFOQ in §IV(A), just three pages (total) to Free Exercise and Expressive Association in §IV(B), and two pages to *Pittsburgh Press* in §IV(B). See Pls. MSJ-II at 20-29; These arguments are addressed below as follows: (C) BFOQs; (D) Free Exercise; (E); Expressive Association; and (F) *Pittsburgh Press*.

**C.   WV Has Established a BFOQ Under Both Title VII and WLAD.**

**1.   WV Has Established a BFOQ for DCSRs Under Title VII.**

Plaintiff argues that the BFOQ permits discrimination only in "'certain instances' where sex discrimination is 'reasonably necessary' to the 'normal operation' of the 'particular' business," Pls. MSJ-II at 21, and "occupational" "must concern job-related skills and aptitudes." *Id*. World Vision DCSRs precisely qualify. This is why Judge Berzon, the dissenter in *Spencer*, thought the BFOQ a better fit than the ROE to protect World Vision's religious hiring rights. Defs. MSJ-II at 28.

Judge Berzon saw a "strong argument that belief in World Vision's Statement of Faith or the Apostles' Creed is a BFOQ for employees directly involved in carrying out World Vision's religiously-motivated humanitarian mission." 633 F.3d at 756. If belief in WV's Christian doctrine is a BFOQ for *all* employees directly involved in carrying out WV's religiously-motivated mission, then DCSRs surely provide an even better, tighter fit. DCSRs are the small subset of WV staff serving as the mouthpiece and personification of WV's religiously-motivated mission. WV expects DCSRs to

fully believe and live its mission in order to voice its mission, vision, strategies, and policies persuasively and convincingly. These qualifications are "job-related skills and aptitudes" that are "reasonably necessary to the normal operation" of "World Vision's religiously-motivated humanitarian mission." DCSRs are a clear, tight fit for BFOQ.

Plaintiff has only strengthened this case for BFOQ by relentlessly trying to limit DCSR duties to mere suggestions to pray with callers (if/when comfortable) and to explain WV's Biblical marriage policy (if she can read it from a script). Defs. MJS-II at 14. Plaintiff now asserts that her same-sex marriage and views would *not* render her "unable to efficiently perform" the expected duties and would have "no impact on her ability to do" so. That assertion is refuted by her own briefing and testimony.

### 2.   WV Has Established a BFOQ for DCSRs Under WLAD.

Plaintiff describes WLAD's BFOQ as "stricter" than Title VII's, Pls. MSJ-II at 23, but provides no support for that notion. As Plaintiff states, the WLAD BFOQ applies narrowly to jobs for which a particular quality "will be essential to *or will contribute to* the accomplishment of the purposes of the job." *Id.* (emphasis added). This rule is stated less strictly than Title VII's. In any case, DCSRs fit the state court tests quoted by Plaintiff—"essential to the purposes of the job" and needed to "efficiently perform the duties of the position" and avoid "undermin[ing]" the "essence of the operation"—for the reasons stated above. *See also* Defs. MSJ-II at 28-29.

Def. WV's Opposition Brief on
Summary Judgment (Round 2)
Case No. 2:21-cv-00920-JLR

Page 25

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

**D.**     **WV Has Established Its Free Exercise Defense.**

   ***1.***     **WV Challenges Title VII and WLAD Only As-Applied.**

Plaintiff's sole argument against the Free Exercise Clause ("FEC") is that Title VII and WLAD are both "neutral" toward religion and "generally applicable." Pls. MSJ-II at 23-25. While citing to *Fulton* where convenient, Plaintiff relies on decades-old cases of the Ninth Circuit and one district court case within this circuit, all of which, to the extent relevant, are overtaken by *Fulton* (2021), *Tandon v. Newsom*, 141 S.Ct. 1294 (2021), and *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421 (2022). Plaintiff does not cite *Tandon* or *Kennedy*, and for good reason.

Moreover, as noted above, World Vision challenges the "application" of these statutes in this case, seeking an exemption from each. Under the FEC, "courts must scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Fulton*, 141 S.Ct. at 1881-82. The challenged "law" is the official action of applying that law to WV. That action clearly is neither neutral nor generally applicable, as previously explained, Defs. MSJ-II at 14-26, and highlighted below.

   ***2.***     **As Applied, Neither Statute is Generally Applicable.**

As Plaintiff states, Title VII "clearly targeted the elimination of all forms of discrimination." Pls. MSJ-II at 25 (quoting *Fremont*). The same is true of WLAD. Both laws seek to eliminate invidious discrimination in employment. But their application in this case fails two "bedrock" requirements of general applicability. *FCA*, 2023 WL 5946036, *16. "First, a purportedly neutral 'generally applicable' policy may not have 'a mechanism for individualized exemptions.'" *Id.* "Second, the government may not

DEF. WV'S OPPOSITION BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR          Page 26          Ellis | Li | McKinstry
                                                     1700 Seventh Avenue, Suite 1810
                                                     Seattle, WA 98101-1820
                                                     206.682.0565  Fax: 206.625.1052

'treat ... secular activity more favorably than religious exercise.'" *Id.* Failure of either requires strict scrutiny. *Id.* Both antidiscrimination laws fail both requirements.

First, both laws have exemption mechanisms that permit discrimination with impunity. Defs. MSJ-II at 15-17. The small-employer exemptions are telling. In the U.S., there are 6,140,612 employers employing 134,163,349 workers, including 159,271 Washington employers employing 2,959,864 workers.[2] These totals include: 5,249,162 employers with fewer than fifteen employees (within Title VII's fewer-than-fifteen exemption), employing 17,509,563 workers; and 96,005 Washington employers with fewer than five employees (well under WLAD's fewer-than-eight); employing 148,089 workers.[3] In sum, **5,249,162 employers** are exempt from Title VII, leaving **17,509,563 workers** unprotected by Title VII, and **96,005 Washington employers** are exempt from WLAD, leaving **148,089 workers** unprotected by WLAD.[4] The "mere existence" of the small-employer, Communist, Indian, domestic worker, and BFOQ exemptions triggers strict scrutiny. Defs. MSJ-II at 15-19. As BFOQs are highly discretionary, they meet even the "overly narrow" view of *Fulton* that *FCA* rejected. *FCA*, *17.

---

[2] "U.S. & States NAICS, Detailed Employment Sizes," https://www2.census.gov/programs-surveys/susb/tables/2020/us_state_naics_detailedsizes_2020.xlsx.

[3] *Id.*

[4] "[M]ore than half (54%) of all employer businesses in 2018 had fewer than five employees" and they "accounted for 5.5% of total employment." *The Majority of U.S. Businesses Have Fewer Than Five Employees*, U.S. Census Bureau (Jan. 19, 2021), [https://perma.cc/E7KH-AG6A], https://www.census.gov/library/stories/2021/01/what-is-a-small-business.html. See also https://www.census.gov/data/tables/2020/econ/susb/2020-susb-annual.html. See, e.g., https://advocacy.sba.gov/wp-content/uploads/2022/08/State_Profiles_2022.pdf.

DEF. WV'S OPPOSITION BRIEF ON       Page 27
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

Second, the existence and of use of the exemptions treat secular conduct better. *Tandon* is unequivocal. "First, government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 141 S.Ct. at 1296 (emphasis retained). "Second, whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue. Comparability is concerned with the risks various activities pose, not the reason for [those activities]." *Id. Accord FCA*, 2023 WL 5946036, *16-18. Every single exemption in Title VII and WLAD harms their antidiscrimination interest, and pose the same risk of discrimination, in precisely the same way an exemption for WV would. The unfettered discretion implicit in the BFOQs only makes those exemptions worse under *Fulton*.

*Tandon* says: *not any*. Thus, "a regulation that burdens religiously motivated conduct will 'trigger strict scrutiny' even if contains just *one* comparable secular exception to its restrictions." *Pleasant View Baptist Church v. Beshear*, 78 F.4th 286, 303 (6th Cir. 2023) (Murphy, J., concurring) (quoting *Tandon*). This case involves not just "*one*" comparable exemption, but at least 5,249,162 exemptions from Title VII and at least 96,005 exemptions from WLAD. *Supra* at 27. Since "the government must treat religious conduct as favorably as the least-burdened comparable secular conduct," *id.*, this case requires strict scrutiny and, ultimately, an exemption. There is no credible argument that an exemption for World Vision will harm the government's interests more than any or all of the millions of exemptions already provided.

Def. WV's Opposition Brief on
Summary Judgment (Round 2)
Case No. 2:21-cv-00920-JLR

Page 28

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

### 3.   As Applied, Neither Statute Is Neutral Toward Religion.

Plaintiff's entire argument for neutrality is that neither statute explicitly targets religion nor has suppression of religion as its "object." Pls. MSJ-II at 25 (citing *AFSCC v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991) and *Fremont*). Any relevant holdings of these 40-year-old cases have been vitiated by *Fulton*, *Tandon*, *Kennedy*, and *FCA*.

First, *Fulton*, *Tandon*, *Kennedy*, and *FCA*—not *Fremont*—control here. *Fremont* applied an earlier, generalized "compelling interest/narrow tailoring" test replaced long ago with truly *strict* scrutiny designed to produce specific exemptions. "Rather than rely on broadly formulated interests, courts must scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Fulton*, 141 S.Ct. at 1881-82 (cleaned up). As for the "tailoring" component, "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Id*. That test is the law; the only way to pass it is to recognize an exemption for WV.

Second, "object" or motive is irrelevant. Since government must remain "steadfastly neutral to religion," *FCA*, 2023 WL 5946036, *3, non-neutral policies are non-neutral regardless of "any motive," *id*., or any "design or intent," *id*. at *17, and "no matter how well-intentioned," *id*. at *23. Through their exemption mechanisms, Title VII and WLAD operate to grant secular exemptions while denying a religious one to WV, resulting in non-neutrality "no matter how well-intentioned." *Id*. Similarly, a policy that includes "caste" as a protected trait, though well-intentioned, is non-

Def. WV's Opposition Brief on Summary Judgment (Round 2) Case No. 2:21-cv-00920-JLR

Page 29

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565   Fax: 206.625.1052

neutral. *Kumar v. Koester*, 2023 WL 4781492, *4 (C.D.Cal. July 25, 2023)."[5] Simply put, laws, regulations, and policies that burden religion by treating it "differently" are non-neutral whether or not the lawmakers, regulators, or policymakers intend this result.[6]

As Plaintiff makes no attempt to satisfy the scrutiny imposed by Supreme Court precedent, WV is entitled to an exemption on FEC grounds. Defs. MSJ-II at 18-19.

### E.   WV Has Established Its Free Expression/Association Defense.

#### 1.   Expressive Association Doctrine Applies to Employment Cases.

The Constitution "necessarily protects the right of those who join together to advance shared beliefs, goals, and ideas, which, if pursued individually, would be protected by the First Amendment." *Sullivan v. Univ. of Wash.*, 60 F.4th 574, 579 (9th Cir. 2023) (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). This Expressive Association Doctrine ("EAD") "applies with special force [to] religious groups, whose very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna*, 565 U.S. at 200 (Alito/Kagan); *see FCA*, 2023 WL 5946036, *18. "World Vision's *members*—here, its employees—are coreligionists," *Spencer*, 633

---

[5] The source of state action typically is administrative policy, as in *Kumar*, or legislation, as in www.politico.com/news/2023/10/07/newsom-veto-caste-discrimination-00120495.

[6] This is why it is irrelevant if "faith-based bigotry did not motivate" a policy, since the "constitutional benchmark is 'government neutrality,' not 'governmental avoidance of bigotry.'" *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020) (quoting *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008) (McConnell, J.). The predicate for non-neutrality often is "merely the intent to treat differently." *Weaver*, at 1260. Labeling FCA's religious policy "discriminatory" itself amounted to discrimination. *FCA*, 2023 WL 5946036, at *20. *See Kennedy*, 142 S.Ct. at 2431. "In the name of protecting religious liberty, the District would have us suppress it. Rather than respect the First Amendment's double protection for religious expression, it would have us preference secular activity." *Kennedy*, 142 S.Ct. at 2431.

DEF. WV'S OPPOSITION BRIEF ON          Page 30
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

F.3d at 730, who associate for expressive purposes. The EAD applies to employment law and to cases such as this one. *Slattery*, 61 F.4th at 291. It is even more vital in employment, where a foe or skeptic does not merely associate with a religious group but operationalizes and personifies it. "[WV] has a right to limit its employees to people who share its views and will effectively convey its message." *Id*.

### 2.     Free Exercise and Free Speech Merge into Free Expression Here.

In general, "free speech, free exercise of religion, [and similar doctrines are] variants of *freedom of expression*." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 302 (D.C. Cir. 2006) (emphasis added). In particular, the FEC and FSC "work in tandem." *Kennedy*, 142 S.Ct. at 2421. "Where the Free Exercise Clause protects *religious exercises*, whether communicative or not, the Free Speech Clause provides overlapping protection for *expressive religious activities*." *Id*. (emphasis added). Thus, "the First Amendment *doubly protects* religious speech[.]" *Id*. (emphasis added). Where this "double" protection for Free Exercise and Speech applies, the government "must satisfy *at least* 'strict scrutiny.'" *Id*. at 2426 (emphasis added). The EAD and Compelled Speech are flip sides—if not the same side—of the same coin in this case. *See 303 Creative*; *FCA* (majority and Forrest concurrence); *Green* (majority and VanDyke concurrence); and *Slattery*. *See also* Defs. MSJ-II at 19-26 (doctrinal overlap).

### 3.     As Applied, Both Statutes Fail Every Free Expression Test.

The operation of Title VII and WLAD against World Vision violates the doctrines and fails the tests of every applicable Supreme Court precedent, including *Jaycees (1984)*; *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group*, 515 U.S. 557 (1995); *Boy*

*Scouts v. Dale*, 530 U.S. 640 (2000); *Reed v. Town of Gilbert*, 576 U.S. 155 (2015); and *303 Creative* (2023). Defs. MSJ-II at 19-26 (analyzing each case and its application here).

### 4.   As Applied, Both Statutes Punish and Compel Expression.

WV cares about its "message concerning [marriage and] sex outside of marriage," *Slattery*, 61 F.4th at 287, just like the business in *303 Creative*. Both see their work as *expressive* under *Hurley* and *Dale*. Both welcome "all people regardless of … sexual orientation," *303 Creative*, 143 S.Ct. at 2309, but will "not violate [their] beliefs," *id.* at 2317, and "contradict[] biblical truth," *id.* at 2309. Lawsuits may not force speakers to "accommodate other views" by forcing them to promote same-sex marriage against their beliefs. *Id.* at 2318. The Ninth Circuit is unequivocal. "Green seeks to use the power of the state to force Miss [USA] to express a message contrary to what it desires to express. The First Amendment says no." *Green*, 52 F.4th at 802–03.

### 5.   As Applied, Neither Statute is Neutral Toward Religion.

Due to non-neutrality, *supra* §IV(D)(3), the operation of Title VII and WLAD against WV also constitutes content- and viewpoint-discrimination. Defs. MSJ-II at 23-24. Any speech regulation of "specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Reed*, 576 U.S. at 169. But "discrimination among viewpoints [is] a 'more blatant' and 'egregious form of content discrimination.'" *Id.* at 168-69. And any "standard requiring a purpose or intent to suppress a viewpoint is incompatible with *Reed*[.]" *FCA*, 2023 WL 5946036, at *15 n.8. "In reversing our court, *Reed* held that '[a] law that is content based on its face is subject to strict scrutiny **regardless of the government's benign motive, content-**

DEF. WV'S OPPOSITION BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 32

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

*neutral justification, or lack of animus* toward the ideas contained' in the regulated speech.' Thus, even if the District were correct that there was no intent to suppress FCA's religious viewpoint … *intent is irrelevant* in the Free Speech analysis [and FCA is] likely to prevail on their Free Speech claim as well." *Id.* (emphasis added).

### 6. *Hishon* Adds Nothing to this Case.

Plaintiff cites *Hishon v. King & Spalding*, 467 U.S. 69 (1984) for the notion that the Expressive Association Doctrine ("EAD") cannot apply to employment cases. Plaintiff relies on a single sentence quoted out-of-context from a decades-old case for propositions long since abandoned. Her argument fails for at least four reasons.

First, *Hishon* does not stand for Plaintiff's proposition. It did not hold once and for all that the EAD is dead in employment cases. This precise argument was rejected in a Title VII case like ours. *Bear Creek & Braidwood Mgt.*, 571 F.Supp.3d at 616. Rather, *Hishon* held that the law firm in that case failed to "meet its burden to show how its expressive association would be impaired by permitting a female to make partner." *Id.* Thus, *Hishon* is clearly distinguishable from Plaintiff's proposition.

Second, *Hishon* is overtaken by decades of precedent. "Because *Bostock* did not deal with a freedom of association claim, and [*Hishon*] merely held that the employer in that case did not meet its burden to prove expressive association, the Court concludes that [*Dale*] is the most analogous case." *Id.* And *303 Creative* just bolstered this analysis. Thus, *Hishon* is both distinguishable and strictly limited, if not abrogated.

Third, without citing *Hishon*, the Second Circuit in *Slattery* just applied the EAD in a case analogous to ours. The statute there banned "employers from taking adverse

employment actions against employees for their 'reproductive health decisions.'" 61 F.4th at 283. "'The right to expressive association allows Evergreen to determine that its message will be effectively conveyed only by employees who sincerely share its views…. [F]oreclosing Evergreen's ability to reject employees whose actions suggest that they believe the opposite of the message it is trying to convey … severely burdens Evergreen's First Amendment right to freedom of expressive association. For this reason, strict scrutiny applies." *Id*. at 288–89. *Hishon* is no obstacle to the EAD.

Fourth, the two out-of-circuit district court decisions that Plaintiff cites offer her little support. *See* Pls. MSJ-II at 26-27 (citing *Starkey* and *Billard*). The motion-to-dismiss analysis in *Starkey* that Plaintiff cites was abandoned by the same judge who later ruled for the employer on ME grounds (553 F.Supp.3d 616). And *Billard* seems destined to follow the same path. At oral argument, the Fourth Circuit clearly forecasted an ME ruling (www.ca4.uscourts.gov/OAarchive/mp3/22-1440-20230920.mp3).

### F.   *Pittsburgh Press* **Adds Nothing to This Case.**

Plaintiff cites the 50-year-old case of *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376 (1973) for the remarkable proposition that "there is no First Amendment Free Speech defense to laws that prohibit facially discriminatory employment practices." Pls. MSJ-II at 28. This proposition fails because *Pittsburgh Press* does not stand for it, *303 Creative* slams the door on it, and several other reasons.

First, *Pittsburgh Press* is far afield. It involved Free Press and Commercial Speech rights of a newspaper that divided want-ads in columns for "**Jobs—Male Interest**" and "**Jobs—Female Interest**." 413 U.S. at 392. "We are called upon to decide whether

DEF. WV'S OPPOSITION BRIEF ON
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR                Page 34                Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

the Ordinance as so construed violates the freedoms of speech and of the press[.]" *Id.* at 378. None of this is relevant to our case. *Pittsburgh Press* was a "classic … commercial speech case," *id.* at 385, treated very differently at that time, and still treated differently today, from *classic private/religious speech* cases like ours. Indeed, the Court specifically found that each of the advertisements at issue were "classic examples of commercial speech," *id.*, unprotected by the First Amendment. That stands in stark contrast to our case, where WV's "expressive religious activities," *Kennedy*, 142 S.Ct. at 2421, are not just "doubly protected by the Free Exercise and Free Speech Clauses," *id.* at 2433; *accord id.* at 2421 ("doubly protects"); *id.* at 2431 ("double protection"); they are **triply protected** by the FEC, the FSC, **and** the EAD. *See also* Defs. MSJ-II at 19-26.

Second, the *Pittsburgh Press* Court itself limited its decision, opening with a warning that "a full understanding of the context in which [this case] arises is critical to its resolution," *id.* at 378, and concluding with an entire paragraph "emphasiz[ing]" the decision's limits. *Id.* at 391-92. "We emphasize that nothing in our holding allows government at any level to …. Nor, a fortiori, does our decision authorize any restriction whatever, whether of content or layout, on …. On the contrary, we reaffirm unequivocally the protection afforded to editorial judgment and to the free expression of views on these and other issues, however controversial." *Id.*

Third, *Pittsburgh Press* stands for nothing like Plaintiff's proposition. "We hold only that the Commission's modified order, narrowly drawn to prohibit placement in sex-designated columns of advertisements for nonexempt job opportunities, does not infringe the First Amendment rights of Pittsburgh Press." *Id.* at 391. For her theory,

Plaintiff cites a single sentence: "Discrimination in employment is not only commercial activity, it is illegal commercial activity under the Ordinance." *Id*. at 388. Plaintiff never identifies the "illegal" "commercial" "activity" in our case. In *Pittsburgh Press*, the application of the Ordinance was *unchallenged*; so, there was no determination that the potentially-protected commercial activity was *illegal*. The sentence quoted by Plaintiff does not even support the notion that any and all allegedly illegal commercial activity receives no FSC protection, let alone her broad assertion that the FSC provides no "defense to the enforcement of laws that prohibit facially discriminatory employment practices " Pls. MSJ-II at 29. One searches the opinion in vain for any such statement.

Fourth, Plaintiff offers no authority for her proposition, but WV found two recent cases that undercut it. *Chelsey Nelson Photography v. Louisville/Jefferson Cnty.*, 624 F.Supp.3d 761 (W.D.Ky. 2022) mirrors, and correctly anticipated, *303 Creative*. "For the reasons explained above, Nelson's decisionmaking about her photography is not 'illegal commercial activity.' Rather, it is speech protected by the First Amendment." *Id*. at 801 (quoting *Pitt. Press*). The law restricting the speech inherent in the commercial activity was successfully challenged; thus, the "commercial activity" was not "illegal." *Greater Philadelphia COC v. City of Phila.*, 949 F.3d 116 (3d Cir. 2020) concerned a law restricting employer use of an applicant's wage history in wage negotiations. The Third Circuit rejected the City's argument that "*Pittsburgh Press* is analogous because even though there were legal uses for sex-specific advertisements—i.e., the specific exemptions recognized by the Commission—the Court still concluded that sex-specific advertising was *related to illegal activity*[.]" 949 F.3d at 142 (emphasis added).

The same analysis applies here: (1) Unlike the presumptively illegal activity in *Pittsburgh Press*, the allegedly commercial activity here is WV's "doubly" (triply) protected "expressive religious activities," *Kennedy*, 142 S.Ct. at 2421, which neither are nor can be "illegal commercial activity." (2) Like the exemptions in *Pittsburgh Press*, the exemptions under Title VII and WLAD remove our case from the parameters of *Pittsburgh Press*. The "legal uses for sex-specific [hiring policies]—i.e., the specific exemptions [of small employer, BFOQ, etc.]"—preclude WV's hiring policy from being "illegal commercial activity" (or "related to" it, a test the Third Circuit rejected).

Fifth, for similar reasons, *303 Creative* slams the door. *Pittsburgh Press* appears not once in the majority opinion and only once as an unexplained *see* citation in the dissenting opinion. 600 U.S. at 628 (Sotomayor, J., joined by Kagan & Jackson, JJ., dissenting). If *Pittsburgh Press* had any power to remove FSC protection for or related to "illegal commercial activity," it would have dictated a different result in *303 Creative*.

Sixth, Plaintiff's reliance on this FSC argument supports the merger of FEC, FSC, and EAD in this case, as explained by WV in Section IV(E)(2) above.

Finally, it is telling that Plaintiff's main response to *303 Creative* is to distort one sentence from 50-year-old *Pittsburgh Press* and ignore more recent and relevant cases.

## V.   CONCLUSION.

Plaintiff's key assertion bears repeating: that "[t]his Court's enforcement of [Title VII and WLAD] will not require World Vision to 'speak' a message with which it disagrees." Pls. MSJ-II at 29. Plaintiff's lawsuit seeks to do exactly that. It would punish WV's deeply held religious beliefs, expression, and expressive activities. And

DEF. WV'S OPPOSITION BRIEF ON          Page 37
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

it would compel WV to employ Plaintiff as its "*Voice*, *Face* and *Heart*," Defs. MSJ-II at

5-8, to speak on its behalf religious messages that she rejects and to engage in religious

conduct (such as prayer with callers) that she has testified she is not able to do. Defs.

MSJ-II at 14. The result is severe pressure on World Vision to change its religious

message—and its expressive religious activities— against its will. In such cases, where

an antidiscrimination "law and the Constitution collide, there can be no question

which must prevail." *303 Creative*, 143 S.Ct. at 2315.

Respectfully submitted,

DATED this October 13, 2023

ELLIS, LI & McKINSTRY PLLC

By:   */s/ Nathaniel L. Taylor*

Nathaniel L. Taylor, WSBA No. 27174
Abigail J. St. Hilaire, WSBA No. 48194
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
Telephone: (206) 682-0565
Fax: (206) 625-1052
Email: ntaylor@elmlaw.com
Email: asthilaire@elmlaw.com

GAMMON & GRANGE, P.C.
Scott J. Ward (pro hac)
J. Matthew Szymanski (pro hac)
1945 Old Gallows Road, Suite 650
Tysons, Virginia 22182
Telephone: (703) 761-5012
Email: SJW@gg-law.com
Email: JMS@gg-law.com
*Attorneys for Defendant World Vision, Inc.*

I certify that this brief has 10,428 words, within the limits of the Court's 4/5/23
Order (Dkt. 21). For Opening Briefs in this Round, WV followed the 8,400-word limit
of LCR 7(e), while Plaintiff followed the expanded 10,500-word limit of the 4/5/23
Order. WV will now follow Plaintiff's lead and use the expanded 4/5/23 limits.