THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AUBRY MCMAHON,

          Plaintiff,

    vs.

WORLD VISION, INC.

          Defendant.

CASE NO. 2:21-CV-00920-JLR

DEFENDANT WORLD VISION'S
REPLY IN SUPPORT OF SUMMARY
JUDGMENT (ROUND 2)

*NOTE ON MOTION CALENDAR:*
*October 20, 2023*

**ORAL ARGUMENT REQUESTED**

DEF. WV'S REPLY IN SUPPORT OF
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page i

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

## Table of Contents

I.   Introduction..................................................................................................1

II.  No Binding Authority Limits the ROE to Religious Claims. .....................................4

III. The Role Plaintiff Sought Fulfills ME Duties.................................................................5

    A. WV Accurately Quotes Governing Law................................................................5

    B. DCSR Duties Are ME Duties, Esp. When Considered Holistically. ...................6

        *1.* The Job Posting, Application Process, and Other Undisputed Evidence
            Clearly Showed ME Duties. ...............................................................6

        *2.* Plaintiff's Job Duties Were Part of Same Small Subset. ...................................9

        *3.* ME Qualification Would Apply Only to Plaintiff's Position. .......................11

IV. Believing and Embodying WV Doctrine Is a BFOQ.................................................13

    A. Record Evidence Before and After Rescission Satisfies BFOQ. .........................13

    B. The BFOQ Is Embodying, Living, and Communicating WV's Doctrine. .........15

V.  FEC, FSC, & EAD All Must and Do Apply to Employment. ...................................15

    A. Title VII Triggers the Tests Established by *Fulton* and *Tandon*. ..........................15

    B. *Slattery* and *Bear Creek* Are Both EAD-in-Employment Cases. ...........................17

    C. *303 Creative* Substantially Strengthens WV's Case. .............................................18

VI. CONCLUSION...........................................................................................19

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

# I.    INTRODUCTION.

"'All agree this case is ripe for summary judgment.'" Pls. MSJ-II Opp./Dkt. 56 at 2. This undisputed record and the applicable law compel judgment for World Vision on each remaining defense. Each requires exempting Plaintiff's role. The simplest path may be the Ministerial Exception, which may be why Plaintiff has invested so much effort opposing it. Regardless, Plaintiff has a steep hill to climb. This becomes clear by considering the strength of the defense she treats most dismissively: lack of neutrality and general applicability under the First Amendment.

"Plaintiff does not dispute World Vision's refusal to hire anyone who is in a same-sex marriage is based upon sincerely held religious beliefs." Pls. MFR/Dkt.40 at 2. Thus, WV's marriage policy is based on religious "doctrine[, not] secular animus." *Alicea-Hernandez v. Cath. Bishop*, 320 F.3d 698, 703 (7th Cir. 2003). Indeed, "how could one distinguish religious discrimination from sex discrimination in [this] situation?" *Starkey v. Roman Cath. Archdiocese*, 41 F.4th 931, 947 (7th Cir. 2022) (Easterbrook concurrence). Accordingly, nobody accuses WV of invidious intent, hostility, or animus. But labeling a marriage policy like WV's—with facial distinctions like WV's—as "discriminatory" can itself be "discriminatory." *FCA v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 692 (9th Cir. 2023) (en banc). If Title VII and WLAD operate to grant secular exemptions while denying a religious one to WV, their application to WV will be *non-neutral* "no matter how well-intentioned," *id*. at 695, "regardless of design or intent," *id*. at 689, and "even in the absence of any motive to do so," *id*. at 672, and will be

"subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus,'" *id*. at 686 n.8.

But *non-general applicability* presents an even easier case. Ever since *Church of Lukumi v. City of Hialeah*, 508 U.S. 520 (1993), the Court has been refining the test of individualized/discretionary exemptions from *Emp. Div. v. Smith*, 494 U.S. 872 (1990). *Fulton v. Philadelphia*, 141 S.Ct. 1868 (2021) rejected a cramped view of this test. *Tandon v. Newsom*, 141 S.Ct. 1294 (2021) ignored it altogether. As *FCA* shows, the test is this: (1) whether "*any* comparable secular activity [is being treated] more favorably than religious exercise," *Tandon*, 141 S.Ct. at 1296, and, if so, (2) what is "the asserted government interest that justifies the regulation at issue," *id*., and (3) what is "the asserted harm of granting specific exemptions to particular religious claimants," *Fulton*, 141 S.Ct. at 1881, since, (4) if there is no compelling "interest in denying [such] an exception," *id*., (5) it "must" be granted, *id*. *FCA* fully enforced this *Tandon*-driven mandate that religious exercise be treated at least as well as **any** comparable secular exercise—with comparability judged by the asserted interests of the law at issue.

*Yeshiva Univ. v. YU Pride All.*, 143 S.Ct. 1 (2022) shows how this test governs a sexual-conduct policy. Justice Sotomayor stayed a state court decision that ordered a Jewish college to recognize a LGBT student group. The Court vacated that stay (5-4) solely because "applicants have at least two further avenues for expedited or interim state court relief. If applicants seek and receive neither expedited review nor interim relief from the New York courts, they may return to this Court." *Id*. Four justices didn't want to wait. *Id*. at 1-3 (Alito, Thomas, Gorsuch, Barrett, JJ., dissenting). And their

DEF. WV'S REPLY IN SUPPORT OF
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 2

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

application of the controlling *Lukumi/Fulton/Tandon* First Amendment analysis is illustrative here.

"[Title VII] treats a vast category of secular groups more favorably than religious [groups] like [WV]." *Yeshiva*, 143 S.Ct. at 2. For example, Title VII "exempts any" employer with fewer than 15 employees and "is therefore inapplicable to" the vast majority of employers. *Id*. If WV is to be "denied an exemption, [there must be a] showing that granting an exemption to [WV] would undermine the policy goals of [Title VII] to a greater extent than the exemptions afforded to hundreds of diverse secular groups." *Id*. "Unless [an exemption] is granted, [WV] will be required to [hire those in same-sex marriages and thus] to make a 'statement' in support of [a message and even] an interpretation of [Scripture] with which [it] disagrees. The loss of First Amendment rights for even a short period constitutes irreparable harm[.]" *Id*. at 3.

WV seeks an exemption for itself based on its sincere religious exercise. Both ROEs provide for such an exemption, and the Constitution commands that one be granted here. Unless Plaintiff shows a compelling reason to deny an exemption to WV, the Court "must do so" and exempt WV. *Fulton*, 141 S.Ct. at 1881. The reason is this. At least *5,249,162* employers are exempt from Title VII and at least *96,005* Washington employers are exempt from WLAD. Defs. MSJ-II Opp. ("Defs. Opp.") at 27. The public interest in protecting citizens from discrimination cannot be compelling—*as applied to WV, on this undisputed record*—when exemptions are given to over five million other employers. *Id*. Whether or not such secular exemptions *undermine* the statutory

interests, they *affect* those interests in the *same way a religious exemption would*. *Fulton* and *Tandon* require a religious exemption here unless strict scrutiny is met.

On this record, the law **compels a specific exemption for one particular religious claimant: WV**. Exempting WV as to the specific role at issue here will not cause the sky to fall on antidiscrimination law. It will merely add exemption No. 5,249,163 from Title VII and exemption No. 96,006 from WLAD. What will cause the sky to fall, or at least the First Amendment to fall, is to decide that new protections for sexual traits trump doubly and triply protected First Amendment rights.

This brief tracks the order of Pls. MSJ-II Opp. Brief/Dkt.56 ("Pls. Opp.").

## II.    NO BINDING AUTHORITY LIMITS THE ROE TO RELIGIOUS CLAIMS.

First, Plaintiff reasserts her "solid wall" of authority to mean Title VII's ROE covers only "religious discrimination claims." Pls. Opp. 3. But nothing compels the view that "This subchapter shall *not apply*" means "This subchapter *shall apply* to everything except claims for religious discrimination." Plaintiff's "solid wall" is dicta in two 40-year-old cases that involved no credible claim of religiously motivated staffing and that pre-date *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327 (1987) and the many ROE decisions that followed. Defs. MSJ 16-20; MSJ Reply/Dkt.34 at 3-11.

Second, Plaintiff opposes WV's use of *Garcia v. Salvation Army*, 918 F.3d 997 (9th Cir. 2019). WV relies on two excerpts: (1) "First, the ROE's text reaches beyond hiring and firing. Congress 'painted with a broader brush, exempting religious organizations from the *entire subchapter* of Title VII with respect to the *employment* of persons of a particular religion. The 'entire subchapter' of Title VII includes protections against

retaliation and discriminatory harassment amounting to a hostile work environment." 918 F.3d at 1004. (2) "In a final effort to avoid the ROE's reach, Garcia maintains that she has not pleaded a cause of action labeled 'religious discrimination.' Even so, the complaint centers around religious discrimination." *Id.* at 1005. These excerpts, in context, speak for themselves.

## III.    THE ROLE PLAINTIFF SOUGHT FULFILLS ME DUTIES.

### A.    WV Accurately Quotes Governing Law.

First, Plaintiff says WV "misstates the governing law." Pls. Opp. 3. WV simply quotes from *Our Lady of Guadalupe v. Morrissey-Berru*, 140 S.Ct. 2049 (2020) and *Hosanna-Tabor Evangelical Lutheran Church v. EEOC*, 565 U.S. 171, 189 (2012). Plaintiff's disagreement is with those cases.

Second, Plaintiff says that "having a religious role is insufficient to trigger the" ME. Pls. Opp. 4. That may be so, but the small subset of WV employees known as DCSRs fulfill *particular* "religious roles"—i.e., "personif[ication]," "messenger," "voice," and/or "key" roles—identified as ME touchstones by *Hosanna* and *OLG*. Defs. Opp. 8-9. In WV's ministry, where calls with supporters and potential supporters are vital, "DCSRs handle nearly all inbound and most outbound calls." *Id.* While all WV employees have "religious roles," the unique and vital religious role of DCSRs to voice and personify WV's ministry to the world constitutes a fraction of all religious roles at WV. *Id.* at 8-9, 17-18. Surely, *this* role qualifies as "distinct from that of most of [WV's] members." Pls. Opp. 5 (quoting *Hosanna*, 565 U.S. at 191).

Third, Plaintiff says an employer cannot show ME entitlement "simply by asserting that everyone on its payroll is a minister[.]" Pls. Opp. 4 (quoting *Fitzgerald v. Roncalli H.S.*, 73 F.4th 529, 531 (7th Cir. 2023)). WV made no such assertion. Employers define the duties and expectations for each job and those duties and expectations either qualify the job for the ME or do not. For DCSRs, they do. Defs. MSJ-II/Dkt.53 at 3-14; Opp. 6-21. If Plaintiff is saying workers can define (or defy) their own job duties, or their employer's expectations, her position defies *Hosanna*, *OLG*, *Fitzgerald*, and reality.

**B.    DCSR Duties Are ME Duties, Esp. When Considered Holistically.**

> **1.    The Job Posting, Application Process, and Other Undisputed Evidence Clearly Showed ME Duties.**

First, Plaintiff argues that courts must "take all relevant circumstances into account." Pls. Opp. 5 (quoting *OLG*, 140 S.Ct. at 2067). WV agrees. But to Plaintiff, "all relevant circumstances" means only those that support her case. The extensive audio, visual, and documentary evidence of ME duties submitted by WV contrasts starkly with the few pages and selective quotes submitted by Plaintiff.

Second, Plaintiff says WV "does not suggest that the *Hosanna-Tabor* factors support application of the ministerial exception in this case." *Id*. But that is exactly what WV suggests. Defs. Opp. 10-11. DCSRs meet *Hosanna*, as WV has argued, and easily meet *OLG*, the more recent and controlling precedent. *Id*.

Third, Plaintiff says DCSRs have no "important position of trust." Pls. Opp. 5. That is a peculiar description of the primary messenger, mouthpiece, and personifier of WV's entire faith and mission to the world. In any case, it is just one possible factor.

DEF. WV'S REPLY IN SUPPORT OF
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 6

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

Fourth, Plaintiff demeans DCSR religious training by isolating two sentences in the Job Posting. *Id.* at 6. Plaintiff omits not only all the religious criteria in the Posting but all the formal training DCSRs receive during their training period and thereafter. Christianity is learned not only by reading Scripture and creeds, but by doing, being, and associating. Christians learn to pray by praying, by hearing it, by participating with others doing it, by listening to God's response during it, and by nurturing and encouragement. This is made crystal clear in the Job Posting and by the DCS-led chapels, prayer calls, and shout-outs. SO-01/Dkt.29-1 (WV0050); Defs. MSJ-II 8-12.

Fifth, Plaintiff belittles the role by emphasizing its "low wage" and remote working environment. Pls. Opp. 15, 6-7. But many believers called to ministries like WV accept, or even prefer, low wages out of religious commitment. Under Plaintiff's definition, Mother Teresa would not qualify.

Sixth, Plaintiff again condemns the 2022 Job Posting, *id.* n.2, though it is doubly verified. It is expressly incorporated into WV testimony. SO/Dkt.29 at ¶24 & SO-11. Its key content is separately addressed in WV testimony. *Id.* at ¶¶17-57.

Seventh, Plaintiff says the DCSR's "primary function" is to "[s]erve as a liaison" with "donors and the general public." Pls. Opp. 7. The "primary" function of DCSRs is to witness to Christ and serve as primary messenger, mouthpiece, and personifier of WV's faith and mission to the world. *Liaising* is a part of this.

Eighth, Plaintiff points to a number of DCSR duties that appear secular to imply the role must be *essentially secular*. That was not the law even before *OLG* and even according to a concurring opinion Plaintiff cites many times: "*Hosanna* [and *OLG*]

clarify that the ministerial exception can apply even when an employee, in addition to performing religious functions, has substantial secular responsibilities." *Palmer v. Liberty Univ.*, 72 F.4th 52, 71 (4th Cir. 2023) (Motz concurrence). Judge Richardson's concurrence provides even greater support for WV. *Id.* at 75-83.

Ninth, Plaintiff ignores many religious duties she would have as a DCSR. The Job Posting requires that she "[l]earn and effectively communicate [WV's] ministries and projects," Pls. Opp. 8, "to current and potential donors," *id.* at 7. She would "perform 'ministry' through outbound and inbound calls being able to explain World Vision's ministry, its programs and how World Vision witnesses to Christ in its work[.]" SO ¶42. The record is full of such religious ministries and projects, e.g., "Empowered Worldview," which "integrates Scripture to help people restore their true identity in Christ, recognize their God-given value and use their talents and resources to change their lives." Dkt.28-17 (WV1138). Each day Plaintiff would explain such WV programs to callers so that "[e]very current, and potential donor and partner will clearly understand our mission to bear witness to Jesus Christ—through life, deed, word, and sign—in ways that encourage people to respond to the gospel of Jesus Christ," Dkt.29-19 (WV1125)—i.e., evangelism. *Accord* Defs. Opp. 12-13.

Tenth, Plaintiff distorts WV's *Giving Word to Our Faith Framework* ("GWF"). Pls. MSJ-II 14. WV refuted these distortions and provided the full GWF document, which speaks well for itself. Defs. MSJ Reply/Dkt.34 at 12 n.10 (and exhibit noted therein).

DEF. WV'S REPLY IN SUPPORT OF
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Page 8

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

Eleventh, Plaintiff distorts 30(b)(6) deposition testimony by quoting counsel's question as though it were WV's answer, while omitting the actual answer. Pls. MSJ-II/Dkt.52 at 9 ("main duty"). Contrary to Plaintiff's representations, WV testified:

> "[T]he most significant [duty] is to help carry out our Christian mission—our Christian organization's mission, vision, and strategies, and personifying the—the—the witnessing to Christ. That those are the main functions, most essential responsibilities of this role…. [I]n terms of the importance of the role, the main functions are to represent our Christian identity." [Dkt.25-10 at 20:8-21:2.]

Twelfth, and overall, Plaintiff selectively cites the record to support her view of the role. Her subjective view is immaterial. The duties of, and expectations for, a DCSR are defined by WV, and are clearly established by the record. Any redefinition of WV's religious definition of these roles is not only forbidden but offensive.

### 2.    Plaintiff's Job Duties Were Part of Same Small Subset.

First, Plaintiff says "Plaintiff's Religious Job Duties Would Have Been the Same as Those of Every other World Vision Employee." Pls. Opp. 8-12. Not so. The "religious role" of DCSRs as primary liaison, messenger, mouthpiece, and personifier of WV's faith and mission is *uniquely* vital. Defs. Opp. 8-9. DCSRs constitute a fraction of WV's employees (all of whom share many religious duties) and thus a fraction of overall religious roles at WV. *Id*. This fraction has averaged about seven percent (7%) of WV's workforce from January 2021 until today. *Id*. Seven percent of all roles is not "all" roles; nor is seven percent of all job duties "all" job duties.

Second, Plaintiff's lead case is *Ratliff v. Wycliffe Assocs.*, 2023 WL 3688082 (M.D.Fla. 2023). Pls. Opp. 8. Plaintiff never explains how a Bible translator's "Software Developer II," who merely provides a digital platform, is like a DCSR, who voices and

personifies a pervasively Christian ministry to the world. Far more apt is *Alicea*, *infra*, where the Seventh Circuit found a press-secretary role fulfilled the ME.

Third, in arguing that DCSRs perform the same religious duties as "every other World Vision employee," Pls. Opp. 9, Plaintiff catalogues key religious functions of WV. *Id*. at 9-12. Those functions, despite Plaintiff's indifference, are "uniquely" performed by the seven-percent subset of employees known as DCSRs. Plaintiff seems to think that one role cannot satisfy the ME unless all other roles in the ministry have virtually no religious duties. That contradicts *Hosanna* and *OLG*.

Fourth, Plaintiff's agreement that DCSRs are the "Voice, Face, and Heart of World Vision," *id*. at 10—which is the pervasively Christian charity that Plaintiff herself describes it to be, *id*. at 9-12—is itself sufficient to find a DCSR qualifies for the ME. Plaintiff's comparison of DCS to "cable television" call centers, *id*. at 10, "does not pass the straight-face test," *FCA*, 82 F.4th at 692.

Fifth, while Plaintiff admits praying with donors is a unique DCSR religious duty, she reverts to her flawed "mandatory requirement"—no job duty counts unless it is a mandate whose slightest violation is a fireable offense. Pls. Opp. 11. This disregards the law and how WV as a ministry *disciples* its staff. Defs. Opp. 14-18.

Sixth, Plaintiff minimizes DCSR prayer with two assertions: (1) WV "does not proselytize [in its] services" to its beneficiaries (quoting *Spencer*), and (2) praying "with a donor or a potential donor [is not] religious education or indoctrination." Pls. Opp. 11. The first assertion is true but irrelevant; the focus here is not WV's *beneficiaries* but its *supporters and potential supporters* who interact all day every day with DCSRs. The

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

second assertion is false. DCSRs educate and indoctrinate callers in WV's religious doctrines and programs and hope to evangelize them for Christ. *Supra* at 8-9.

Seventh, and fatally, Plaintiff's overview of the uniquely, pervasively Christian character of WV and its employees, Pls. Opp. 9-12, testifies to the religious thicket here. There is no way to neatly divide sacred from secular here. There are no neutral principles that can decide it. There is no proper way to choose Plaintiff's view of Christianity over WV's, or to second-guess WV's determination that she is not the kind of Christian who meets WV's religious hiring criteria. *See infra*.

### 3.    ME Qualification Would Apply Only to Plaintiff's Position.

First, Plaintiff argues that a ME ruling would "Strip All World Vision Employees and Most Customer Service Employees of Religious Employers of their Legal Protections from Employment Discrimination." Pls. Opp. 12-15. But, at most, a ME ruling here covers only the seven percent of WV employees who perform the unique religious duties of DCSRs. That would not strip *all* WV employees—nor *most* customer service agents of religious employers everywhere—of legal protection. And WV seeks only a narrow exemption as to one applicant, Plaintiff, which is required by multiple First Amendment doctrines. This Court's ruling would have no binding effect beyond that one exemption. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011).

Second, Plaintiff says WV has ignored the ME's "fundamental purpose." Pls. Opp. 5, 13, 15. What WV has done all along is to demonstrate the ME touchstones of "personif[ication]," "messenger," "voice," and/or "key role" that *Hosanna* and *OLG* say *demonstrate* the ME's "fundamental purpose." Defs. Opp. 8-9.

Third, DCSRs don't just "interface with the public." Pls. Opp. 13. At WV, where financial, spiritual, and prayer support depends on supporters and potential supporters, "DCSRs handle nearly all inbound and most outbound calls." Defs. Opp. 9. DCSRs interface, yes. They also liaise, personify, indoctrinate, and evangelize, and not just to one constituency, e.g., *Alicea* (Hispanic community), but to *many* WV constituencies. DCSRs fit the ME better than the plaintiff in *Alicea*.

Fourth, Plaintiff says DCSRs are mere "switchboard operators" who play no role in "determin[ing] how best to reach donors." Pls. Opp. 14. This ignores the uncontested (1) testimony of WV managers and (2) illustrations of DCS-led chapels, prayer calls, and shout-outs. Each day, DCSRs develop the skills and the passion to reach each supporter/partner for Christ and for WV's beneficiaries:

- "[I]t's a calling to come to [WV where we] actually pray for people all over the world when we answer [the phone] and ask, Can I pray for you? … And then God gets to use us in a mighty way[.]" Defs. MSJ-II 9.

- "I'm glad I get to be the mouthpiece … by opening up my mouth and allowing for the Holy Spirit to flow like living water, this allows room for the donor to know more about how they can actually help[.] *Id*. at 10.

- "[DCSR: If] you're comfortable, would you be okay if I prayed right now over the phone? [Donor:] Yes. Definitely. That would be great. [DCSR: prays specifically for this donor's needs. Donor:] Amen. Thank you so much for that." *Id*. at 11.

Def. WV's Reply in Support of                Page 12
Summary judgment (Round 2)
Case No. 2:21-cv-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

- "[Donor called] to say: '[DCSR] was amazing [and such] a blessing today for me because I asked for prayer and [she] encourage[d] me and lifted me to the Lord and I feel amazing. She is a beautiful human being and she praises GOD! She is in the *right position*.'" *Id.* (italics added).

- "[Donor] called to [say] she believes [in] World Vision [and that DCSR] is in the *right place* in the *kingdom of God*." *Id.* (italics added).

*Accord* Defs. MSJ/Dkt.26 at 23-28; MSJ Opp./Dkt.32 at 20-26; MSJ Reply/Dkt.34 at 11-16; MSJ-II/Dkt.53 at 3-14; MSJ-II Opp./Dkt.58 at 6-21. The record is extensive.

## IV.    BELIEVING AND EMBODYING WV DOCTRINE IS A BFOQ.

### A.    Record Evidence Before and After Rescission Satisfies BFOQ.

First, Plaintiff asserts that knowledge gained by WV after the job rescission is "legally irrelevant." Pls. Opp. 15. This is not true. Just as employers define the duties and expectations that fit or don't fit the ME, they define the occupational qualifications that meet or don't meet BFOQs. WV agrees with Judge Berzon that, if WV did "not qualify for the ROE," it has a "strong argument" that belief in its specific Christian doctrines is a BFOQ for any/all WV employees "directly involved in carrying out [its] religiously-motivated humanitarian mission." 633 F.3d at 756 (Berzon, J., dissenting). An essential part of WV's specific Christian doctrine is its Biblical marriage/sexual conduct policy. 6/12/23 Order 2-5 (describing WV policies). It is a BFOQ.

Second, here and as to all WV defenses, due to what WV was bound to learn about Plaintiff, WV "would have reached the same decision even if she were not" in a same-sex marriage, since she firmly opposed WV's marriage policy and advocated

Def. WV's Reply in Support of
Summary judgment (Round 2)
Case No. 2:21-cv-00920-JLR

Page 13

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

against such policies. Defs. MSJ 14 & n.12; Opp. 8; *Maguire v. Marquette Univ.*, 814 F.2d 1213, 1218 & n.3 (7th Cir. 1987) (given plaintiff's "pro-abortion stance," employer "would have reached the same decision even if she were a man"). It was "inevitable." *North v. Madison Area Ass'n*, 844 F.2d 401, 408 (7th Cir. 1988). Plaintiff acknowledges her "LGBTQ activism," Pls. Opp. 25 n.8, but says it doesn't matter unless WV knew about it when it rescinded her offer, *id*. Regardless of when WV learned, Plaintiff is a "vocal advocate for a conflicting viewpoint," Defs. MSJ 14 n.12 (quoting *Green v. Miss USA*, 52 F.4th 773, 805 (9th Cir. 2022) (VanDyke, J., concurring)), and her testimony about it is relevant to her qualifications for the job, *id*.

Third, Plaintiff says that WV "seriously mischaracterizes [her] deposition testimony." Pls. Opp. 15. Not so. Here is Plaintiff's unedited testimony:

> **Q:** So … I think you used the word advocate, to advocate their position on marriage if anyone called and you were talking to them about it; is that correct?
>
> **A:** Yeah. Yeah. I mean ***I don't feel like, me personally, I would be comfortable saying much about it***. But just stating if they said, What's World Visions' view on marriage, I would respond with their exact words of World Vision defines marriage between a man and a woman. And if they asked questions or there was any pushback with that, I think at that point I would either seek direction from somebody like higher up or just say that I wasn't sure how to answer that. Because I think that does get a little bit—that's something ***I wouldn't be comfortable answering***, because I feel like that gets a little wishy washy and I wouldn't want to say the wrong thing and turn somebody away or I wouldn't want to get in trouble. ***So I would try to stick to the script***, if you will.

Pls. Dep. 201-202 (emphasis added). *Accord id*. at 203-204. Plaintiff expressed similar discomfort over praying with donors. Defs. MSJ-II 14. Her clear discomfort with WV's religious expectations is clear evidence why they fulfill both ME and BFOQ.

DEF. WV'S REPLY IN SUPPORT OF       Page 14
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

**B.      The BFOQ Is Embodying, Living, and Communicating WV's Doctrine.**

First, Plaintiff says the relevant BFOQ is: "not being in a same-sex marriage." Pls. Opp. 15. That is inaccurate. As Judge Berzon said, WV's "strong argument" for a BFOQ is its requirement to believe in its specific Christian doctrines. Even more so for DCSRs, due to their unique and vital role. The BFOQ here is for the mouthpiece of WV to embody, live, and with integrity communicate faithfully, persuasively, and convincingly WV's specific Christian doctrine, which includes its Biblical marriage policy. These DCSR duties are BFOQs under religion, sex, and/or sexual orientation.

Second, Plaintiff's entire argument here, Pls. Opp. §IV(B), underscores why the essential disputes before the Court are ecclesiastical and doctrinal, and not amenable to decision consistently with the First Amendment. *See also* Defs. MSJ/Dkt. 26 at 6-8. Plaintiff ignores WV's undisputed explanations why embodying its essential Christian doctrines, founded on the authoritative Word of God, is essential to being the voice and personifier of WV's faith and ministry.

Third, Plaintiff again describes WLAD's BFOQ as stricter than Title VII's without explaining why. WV meets WLAD's BFOQ the same way. Defs. Opp. 29.

**V.      FEC, FSC, & EAD ALL MUST AND DO APPLY TO EMPLOYMENT.**

**A.      Title VII Triggers the Tests Established by *Fulton* and *Tandon*.**

First, Plaintiff devotes most of her argument to her theme that "There Is No Standalone Free Exercise, Expressive Association, or Free Speech Defense to a Private Employment Discrimination Action." Pls. Opp. 19-28. How could that be? Is enforcement of antidiscrimination laws the one sphere of government activity immune

to the First Amendment? Not even national security is immune to religious freedom requirements. *Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022) (rebuking and enjoining Marine Corps' grooming policies infringing religious freedom of recruits).

Second, Plaintiff reasserts neutrality and general applicability. Pls. Opp. 19. That assertion is a dead end. ***If a religious exemption to a law harms its goals no more than a secular exemption, the religious one must be granted***. *Supra* at §I. Every secular exemption in Title VII and WLAD is relevant to the *Fulton/Tandon* inquiry into the requirement for a religious exemption. *Id*. WV emphasizes BFOQs only because they make its case even easier: their individualized, discretionary nature meets even a cramped view of *Fulton*. *But see FCA*, 82 F.4th at 687 (rejecting "overly narrow" view of *Fulton*). The Court must apply "at least" "strict scrutiny," *Kennedy v. Bremerton Sch. Dist.*, 42 S.Ct. 2407, 2426 (2022), and exempt WV when that test is not met. *Supra* at §I.

Third, Plaintiff reasserts that WV "has not cited a single case accepting these arguments in the context of a private employment discrimination action." *Id*. at 19. This, again, is plainly wrong. From the start, WV has cited *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023) and *Bear Creek Bible Church & Braidwood Mgt. v. EEOC*, 571 F.Supp.3d 571, 590-91 (N.D.Tex. 2021), *aff'd on other grounds*, 70 F.4th 914 (5th Cir. 2023). *Slattery* is an employment discrimination case (though not Title VII), and *Bear Creek* nearly mirrors our case. *Bostock* is only three years old. Such post-*Bostock* cases will continue.

Fourth, Plaintiff's strongest argument comes from a *footnote in a concurrence*: "[T]here is no general constitutional immunity, over and above the ministerial exception, that can protect a religious institution from the law's operation." *Little*

*Sisters of the Poor v. Penn.*, 140 S.Ct. 2367, 2398 n.1 (2020) (Kagan, J., joined by Breyer, J., concurring). But that view was endorsed by just two justices; it spoke only to "general constitutional immunity" and not application of specific constitutional doctrines in specific cases; and it didn't refer to Title VII. Regardless, that view is not the law.

### B. *Slattery* and *Bear Creek* Are Both EAD-in-Employment Cases.

Plaintiff argues that "No Court Has Recognized a First Amendment Expressive Association Defense to a Private Employment Discrimination Action." Pls. Opp. 21.

First, WV has repeatedly cited *Slattery* and *Bear Creek*. Both not only recognize an EAD defense but use it to rule for religious employers.

Second, *Hishon v. King & Spalding*, 467 U.S. 69 (1984) did not immunize employment cases from the EAD. If it had, all intervening applications of the EAD in antidiscrimination cases would have turned out differently. Defs. Opp. 33-34.

Third, Plaintiff asserts that religious employers such as WV have no "greater rights" under the EAD than do secular employers. But the EAD is just an associational right to engage in First Amendment freedoms like free exercise of religion. Plaintiff's theory completely disregards the Free Exercise Clause and its "special solicitude" for religious groups, *Hosanna*, 565 U.S. at 189, and its double (even triple) protection for "expressive religious activities," *Kennedy*, 142 S.Ct. at 2421, 2431, 2433.

Fourth, Plaintiff says WV "has failed to demonstrate 'any serious burden' on its expressive activities from complying with federal and state laws that prohibit employment discrimination[.]" Pls. Opp. 24. This is flatly contradicted by *Slattery*, *Bear Creek*, and the undisputed record. Defs. Opp. 23, 31-34.

Fifth, Plaintiff's reliance on the out-of-circuit district court rulings in *Billard* and in *Starkey* (on motion-to-dismiss, later abandoned)—the only relevant precedent she has—is misplaced. Defs. Opp. 34. There is no good reason to follow those outliers.

Sixth, *Dale* applies, as does *Green*, for all the reasons argued in prior briefing, Defs. MSJ 19-26; Opp. 33, and the reasons explained in *Bear Creek*.

Seventh, Plaintiff dismisses *Slattery* because the antidiscrimination law there had "no express exemption for religious employers or for small employers." Pls. Opp. 25. How this harms WV's EAD defense is a mystery, as is Plaintiff's remark that the protected pro-choice conduct in *Slattery* is less protected after *Dobbs*. The compelled hiring, association, and speech that Plaintiff would impose on WV would subvert its "primary," "religious" mission—the "continual[] and steadfast[]" advancement of which is the "only" reason WV exists. E.g., 6/12/23 Order 3; Defs. MSJ 21-23.

Eighth, as for strict scrutiny, Plaintiff cannot prove its satisfaction on this undisputed record, under controlling law. *See supra* at §§I & V; Defs. MSJ 18-19, 25-26; Opp. 23, 27-34. Failure of strict scrutiny requires an exemption for WV.

### C.    *303 Creative* Substantially Strengthens WV's Case.

Plaintiff claims "*303 Creative* Does Not Aid" World Vision. Pls. Opp. 28. First, Plaintiff says *Pittsburgh Press Co. v. Pittsburgh Comm'n*, 413 U.S. 376 (1973) means "the First Amendment does not provide a free speech defense to laws prohibiting facially discriminatory employment practices." Pls. Opp. 28. *Pittsburgh Press* means nothing like that. Defs. Opp. 34-37. Second, Plaintiff offers no real support for her theory, which would upend First Amendment law and render indefensible Free Speech precedents

of the last 50 years, including *303 Creative*. *Id*. Third, a "facially discriminatory" policy cannot mean what Plaintiff says. Pls. MSJ-II at 20-29. Policies in these "collision" cases over same-sex marriage are much alike. Most make the same facial distinctions as WV's. *E.g.*, *Maxon v. Fuller Theol.*, 2021 WL 5882035 (9th Cir. 2021). If such distinctions were vital, they would have thwarted the religious claimants in *303 Creative*, *Fulton*, *Masterpiece*, *FCA*, *Maxon*, *Starkey*, *Butler*, *Bear Creek*, *Fitzgerald*.[1]

## VI.   CONCLUSION.

Plaintiff testified she was "okay" with WV believing its marriage policy "even though I didn't personally believe it ... because that's their choice and their definition of their own Christianity and what it means to them." Pls. Dep. 201. Any decision for Plaintiff would choose her view of Christianity over WV's. Defs. MSJ/Dkt.26 at 6-8 (Pls. Dep. dispute over Christianity and Scripture). Plaintiff's claims must be rejected.

Respectfully submitted,

DATED this October 20, 2023

ELLIS, LI & McKINSTRY PLLC

By:   */s/ Nathaniel L. Taylor*

Nathaniel L. Taylor, WSBA No. 27174
Abigail J. St. Hilaire, WSBA No. 48194
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
Telephone: (206) 682-0565
Fax: (206) 625-1052
Email: ntaylor@elmlaw.com
Email: asthilaire@elmlaw.com

---

[1] WV rejects Plaintiff's use of *Fitzgerald* to say "[t]here is no dispute ... that Title VII prohibits this kind of sex discrimination." Pls. Opp. 2. That issue was undisputed in *Fitzgerald*, not here.

DEF. WV'S REPLY IN SUPPORT OF          Page 19
SUMMARY JUDGMENT (ROUND 2)
CASE NO. 2:21-CV-00920-JLR

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

GAMMON & GRANGE, P.C.
Scott J. Ward (pro hac)
J. Matthew Szymanski (pro hac)
1945 Old Gallows Road, Suite 650
Tysons, Virginia 22182
Telephone: (703) 761-5012
Email: SJW@gg-law.com
Email: JMS@gg-law.com
*Attorneys for Defendant World Vision, Inc.*

I certify that this brief has 5,242 words, within the limits of the Court's 4/5/23 Order (Dkt. 21).

Def. WV's Reply in Support of
Summary judgment (Round 2)
Case No. 2:21-CV-00920-JLR

Page 20

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052