1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   AUBRY MCMAHON,

                CASE NO. C21-0920JLR

11              Plaintiff,

                ORDER

12       v.

13   WORLD VISION, INC.,

14              Defendant.

15            **I.   INTRODUCTION**

16         Before the court are (1) Plaintiff Aubry McMahon's renewed motion for partial

17   summary judgment, and (2) Defendant World Vision, Inc.'s ("World Vision") renewed

18   motion for summary judgment.  (Pl. 2d MSJ (Dkt. # 52); Def. 2d MSJ (Dkt. # 53); *see*

19   *also* Pl. Reply (Dkt. # 60); Def. Reply (Dkt. # 61).)  Each party opposes the other's

20   motion.  (Pl. Resp (Dkt. # 56); Def. Resp. (Dkt. # 58).)  The court has considered the

21   motions, the parties' submissions in support of and in opposition to the motions, the

22   //

ORDER - 1

1  relevant portions of the record, and the applicable law.  Being fully advised,[1] the court

2  GRANTS Ms. McMahon's motion for partial summary judgment and DENIES World

3  Vision's motion for summary judgment.

4  ## II.    BACKGROUND

5      World Vision is a Christian nonprofit organization that offered employment to Ms.

6  McMahon as a customer service representative, but later rescinded that job offer upon

7  learning of Ms. McMahon's same-sex marriage.  World Vision did so pursuant to a

8  policy that reflects its sincerely held religious belief that marriage is a Biblical covenant

9  between a man and a woman, but that facially discriminates on the basis of sex, sexual

10  orientation, and marital status.  The instant motions address whether and on what basis

11  World Vision is shielded from liability under Title VII of the Civil Rights Act of 1964

12  ("Title VII") and the Washington Law Against Discrimination ("WLAD") for sex, sexual

13  orientation, and marital status discrimination under these circumstances.

14      As the parties agree, the facts here are largely undisputed and the issues are ripe

15  for summary judgment.  (*See* Def. 2d MSJ at 3; Pl. Resp. at 2.)  The court concludes that

16  none of World Vision's remaining affirmative defenses shield it from liability under Title

17  VII and WLAD, and Ms. McMahon is entitled to judgment as a matter of law.  Below,

18  the court discusses the relevant factual and procedural background before addressing the

19  merits.

20

21      [1]  World Vision has requested oral argument (*see* Def. 2d MSJ at 1), but the court has
determined that oral argument would not be helpful to its disposition of the motions, *see* Local

22  Rules W.D. Wash. LCR 7(b)(4).

**A.    The Parties**

Ms. McMahon is "an openly gay woman." (Pl. 1st MSJ (Dkt. # 24) at 2; *see also* 4/11/23 Wolnowski Decl. (Dkt. # 25) ¶ 10, Ex. 9 ("McMahon Dep. Tr.") at 85:21-86:4, 91:11-92:13.) She became engaged to her girlfriend in November 2019, and they married in September 2020. (McMahon Dep. Tr. at 29:10-11.) Ms. McMahon became pregnant around June 2020 via a sperm donor from a "cryobank." (*Id.* at 35:1-6, 36:20-22.) The couple's child was born on March 6, 2021. (*Id.* at 43:9-12.)

World Vision is a nonprofit organization (Freiberg Decl. (Dkt. # 28) ¶ 53), "whose mission is to follow our Lord and Savior Jesus Christ in working with the poor and oppressed to promote human transformation, seek justice, and bear witness to the good news of the Kingdom of God." (*Id.* ¶ 31, Ex. MF-13 ("Mission Statement").) Founded in 1950 by Dr. Robert Pierce, World Vision declares itself to be a "Christian ministry dedicated to sharing the gospel of Jesus Christ, primarily through humanitarian outreach to children and families around the world who are poor and underserved." (Freiberg Decl. ¶ 18.) It "operates in many ways like a Christian church and implements its programs through and as supported by local churches in the United States and around the world." (*Id.*) Under World Vision's Articles of Incorporation, "[t]he primary, exclusive and only purposes for which this corporation is organized are religious ones," namely:

> To perform the functions of the Christian church including, without limitation, the following functions[:]   to conduct Christian religious and missionary services, to disseminate, teach and preach the Gospel and teachings of Jesus Christ, to encourage and aid the growth, nu[r]ture and spread of the Christian religion and to render Christian service, both material and spiritual to the sick, the aged, the homeless and the needy.

(*Id.* ¶ 19, Ex. MF-09 at WV-000017-18.)  The Articles of Incorporation also require

World Vision and its employees "[t]o continually and steadfastly uphold and maintain the

following statement of faith of this corporation":

> (a)  We believe the Bible to be the inspired, the only infallible,
> authoritative Word of God;
> (b)  We believe that there is one God, eternally existent in three
> persons:  Father, Son, and Holy Spirit;
> (c)  We believe in the deity of our Lord Jesus Christ, in His virgin birth,
> in His sinless life, in His miracles, in His vicarious and atoning death through
> His shed blood, in His bodily resurrection, in His ascension to the right hand
> of the Father, and in His personal return in power and glory;
> (d)  We believe that for the salvation of lost and sinful man
> regeneration by the Holy Spirit is absolutely essential;
> (e)  We believe in the present ministry of the Holy Spirit by whose
> indwelling the Christian is enabled to live a godly life;
> (f)  We believe in the resurrection of both the saved and the lost; they
> that are saved unto the resurrection of life and they that are lost unto the
> resurrection of damnation.
> We believe in the spiritual unity of believers in our Lord Jesus Christ.

(*Id.* at WV-000007-08; *see also* Freiberg Decl. ¶ 20 (providing links to World Vision's

Statement of Faith and the Apostles' Creed).)  According to World Vision, "[t]he above

stated religious beliefs of World Vision reflect its ultimate foundation as a Christian

ministry.  Everything else World Vision does or aspires to do is built on this foundation."

(Freiberg Decl. ¶ 22.)

Today, all World Vision staff are responsible for "confessing they are committed

Christians," "agreeing 'wholeheartedly' with World Vision's core religious principles,"

"'communicating [World Vision's] Christian faith [and] witness,' which is 'integrated

[into] everything [it] does,' 'accurately and with integrity,'" and "participating 'regularly'

in 'prayer activities, devotionals, and weekly chapel services.'"  (Osborne Decl. (Dkt.

# 29) ¶ 12 (citing *Spencer v. World Vision, Inc.*, 633 F.3d 723, 738-40 (9th Cir. 2011)

(O'Scannlain, J., concurring)).)  To that end, every World Vision staff member receives

an employee guidebook titled the "Orange Book:  Living Out Our Values," in order "to

help them better understand, comply with, and carry out World Vision's mission, vision,

and core values."  (Freiberg Decl. ¶ 53; *see id.*, Ex. MF-29 ("Orange Book").)  The

Orange Book makes clear that prayer, in particular, "plays a central role in World

Vision's ministry."  (Osborne Decl. ¶ 46 (quoting Orange Book at WV-000718).)  World

Vision provides prayer rooms, encourages employees to begin and end each work or

project meeting with prayer, and begins each fiscal year with an entire day dedicated to

prayer.  (*Id.*)  The Orange Book also instructs that "[e]ach World Vision team is expected

to spend one additional hour each week in team devotions," which individual teams

arrange according to their weekly schedules.  (Orange Book at WV-000718.  And all

employees "are invited and expected" to attend a weekly "organization-wide chapel"

service, which is typically live-streamed from Federal Way or Washington, D.C. every

Wednesday.  (*Id.*)

Additionally, central to World Vision's core principles and policies are the phrase

"witness to Jesus Christ" and doctrines about being a faithful witness to, for, and about

Jesus Christ.  (*See* Freiberg Decl. ¶¶ 30-31.)  World Vision's job postings require

"witnessing to Christ and ministering to others through life, deed, word and sign."  (*Id.*

¶ 30 (first citing *id.*, Ex. MF-10; then citing 4/11/23 Wolnowski Decl. ¶ 2, Ex. 1 ("Job

Posting") at WV-000048).)  World Vision believes that it and its staff's "corporate and

individual behavior witnesses, reflects, and testifies about what we believe as a ministry

and as individual believers." *(Id.* ¶ 37.)  Accordingly, World Vision "seeks to honor God

by requiring all staff to '[f]ollow the living Christ, individually and corporately in faith

and conduct, publicly and privately, in accord with the teaching in His Word (the

Bible).'" *(Id.* ¶ 32, Ex. MF-14 at WV-000027; *see also id.* ¶ 33, Ex. MF-15 ("BECC

Policy") at WV-000031-32 (requiring that staff "behavior [be] consistent with the

teachings of Scripture" and stating that because World Vision "seeks to be an

organization that is 'Christian' in every sense of the word," "all staff represent [World

Vision] and, more importantly, the Gospel of Jesus Christ, in their work as well as in

their private lives").)

Because "[i]t is impossible . . . to identify every form of behavior that we

understand the Bible defines as acceptable and unacceptable to God" (BECC Policy

Manual at WV-000031), World Vision provides Standards of Conduct ("SOC") to

"clarify expectations and assist candidates/employees in deciding whether or not [World

Vision] is the right place for them to serve the Lord." (Freiberg Decl. ¶ 40, Ex. MF-18

("SOC") at WV-000035.)  In World Vision's view, the Bible confines the "express[ion

of] sexuality solely within a faithful marriage between a man and a woman."  *(Id.* ¶ 41,

Ex. MF-19 at WV-004694 (stating that any sexual conduct outside this "Biblical

covenant" represents unacceptable "open, ongoing and unrepentant" sin); *see also id.*

¶¶ 39-49 (discussing World Vision's view of Biblical marriage).)  Accordingly, the SOC

prohibits, among other things, "sexual conduct outside the Biblical covenant of marriage

between a man and a woman."  (SOC at WV-000036.)

*//*

To be eligible for employment at World Vision, an individual must, among other things, be able and willing to affirm and comply with the World Vision Statement of Faith and/or Apostles' Creed, the Business Ethics and Christian Conduct Policy, the Christian Commitment and Witness Policy, and the World Vision SOC.  (*See, e.g.*, Freiberg Decl. ¶ 34, Ex. MF-16; 4/11/23 Wolnowski Decl. ¶ 13, Ex. 12 ("Talbot Dep. Tr.") at 40:2-5, 88:22-89:6.)

**B.     The Customer Service Representative Position at World Vision**

In or around November or December 2020, Ms. McMahon saw a job posting for the position of customer service representative with World Vision on the website Indeed.com.  (McMahon Dep. Tr. at 139:18-22, 148:5-25; 4/11/23 Wolnowski Decl. ¶ 11, Ex. 10 ("3/10/23 Freiberg Dep. Tr.") at 12:3-8.)  The position was a "remote" one during "[c]all center hours" between 6:00 AM to 6:00 P.M., with compensation ranging from $13 to $15 per hour depending on location and cost of living "as well as a comprehensive benefits package."  (Job Posting at WV-000048.)

According to the job description, a World Vision customer service representative will "acquire and maintain donor relationships through basic inbound and outbound calls" (*id.*)—placing calls to existing donors whose information World Vision maintains in a database, and fielding calls from "potentially existing donors or [those who] may be looking to donate" (3/10/23 Freiberg Dep. Tr. at 22:10-23)  In doing so, customer service representatives "serve as a liaison between donors and the general public as well as provide basic levels of customer service for all special programs."  (Job Posting at WV-000048.)  The customer service representative will also "[h]elp carry out our Christian

organization's mission, vision, and strategies" and "[p]ersonify the ministry of World Vision by witnessing to Christ and ministering to others through life, deed, word and sign." (*Id.*)

In addition, the job posting provides that a customer service representative will:

1. Keep Christ central in our individual and corporate lives.  Attend and participate in the leadership of devotions, weekly Chapel services, and regular prayer.

2. Maintain reliable, regular attendance.  Report to work on time and return from breaks and lunches on time.

3. Under supervision, learn to answer inbound customer service calls and make outbound calls, to current and potential donors in response to all media presentations and World Vision products and services.  Answer incoming calls using an Automated Call Distribution system utilizing a standard script for guidance. Recognize and respond to up-sell opportunities and actively cross-sell other [World Vision] programs when appropriate.

4. Through training and active participation, gain the skills necessary to assess callers' needs and input information accurately and efficiently using data entry and ten-key skills.

5. Achieve and maintain an acceptable level of individual statistics to accomplish Call Center business goals.

6. Develop skills to utilize technology for maintaining and updating donor information as appropriate.

7. Accepts [sic] constructive feedback and welcomes [sic] instruction and direction.

8. Under supervision, research and effectively respond to inquiries utilizing a variety of resource materials and methods.

9. Learn and effectively communicate World Vision's involvement in ministries and projects around the world.

10. Work collaboratively with team members.

11. Be sensitive to Donor's [sic] needs and pray with them when appropriate.

12. Perform other duties as assigned.

13. Keep informed of organizational announcements, activities and changes via regular reading of the WVUS Intranet and other corporate communication tools.

(*Id.* at WV-000049.)  Candidates for the customer service representative position are not required to have any sort of formal religious education or training.  (3/10/23 Freiberg Dep. Tr. at 13:13-20.)  Rather, the job posting sought candidates with the following qualifications:

- High school graduate/GED or equivalent.  Basic routine work experience
- Prefer a minimum of 1 year previous customer service/sales work experience
- Must have access to a reliable, high speed internet connection
- The ability to multi-task in a fast pace [sic] environment
- Must be able to train and work 40 hours a week
- Have strong technical skills with all Microsoft Office Suite
- The ability to type 20 wpm or more
- Enjoys making a difference in the world!
- Must be available to start training on February 1st

(Job Posting at WV-000050.)

According to World Vision, customer service representatives serve as the "Voice, Face, and Heart" of the organization as they "interact all day with the ministry's donors, its lifeblood."  (Osborne Decl. ¶ 19, Ex. SO-07 ("DCS Policies") at WV-000425; *id.* ¶ 23.)  Customer service representatives play a crucial role in fundraising, which World Vision views as "a form of ministry in itself."  (*Id.* ¶ 43 (citing *id.*, Ex. SO-17 ("Ministry of Fundraising") at WV-001363 ("Fund-raising isn't merely a means to make ministry

1    possible.  Done right, fund-raising is ministry.”)).)  Indeed, as reflected in the job posting,

2    customer service representatives are expected to “pray[] for and with the persons with

3    whom they talk” “when appropriate.”  (*Id.* ¶ 14; Job Posting at WV-000049.)  This is

4    because spiritual “[t]ransformation of donors is just as vital to World Vision as that of the

5    children they sponsor.”  (Osborne Decl. ¶ 23 (citing *id.*, Ex. SO-10 (“Why Focus on

6    Donor Transformation?”)).)  World Vision customer service representatives fielded more

7    than 15,000 prayer requests during the calendar year 2020, praying for diverse needs

8    ranging from “a mother’s biopsy” to “a recent widow’s troubled daughter” to “a family

9    dairy farm’s fate.”  (*Id.* ¶ 38 (citing *id.* ¶ 37, Ex. SO-15).)

10         Praying with donors is not a requirement of the customer service representative

11   role, and the failure to do so does not result in discipline or termination.  (3/10/23

12   Freiberg Dep. Tr. at 24:2-11, 30:14-31:2.)  A guidance document provided to customer

13   service representatives offers “talking points that point toward God’s love, scripture, and

14   the offer for prayer” in the event of a call with someone in crisis, and the document

15   encourages customer service representatives to “offer to pray with the donor over the

16   phone” “[i]f comfortable.”  (4/11/23 Wolnowski Decl. ¶ 15, Ex. 14 (“Guidance

17   Document”) at WV-006113-14.)  In order to encourage such prayer, managers give

18   “shout outs” to customer service representatives who leave lasting impressions on donors

19   through prayer.  (Osborne Decl. ¶ 40 (citing *id.*, Ex. SO-16 (“Shout Outs”) at

20   WV-003103 (“I had to share this amazing shout out from a donor for [unnamed customer

21   service representative]!  [Donor] was simply overwhelmed when he shared with me that

22   [unnamed customer service representative] prayed for him and showed him the love of

the Lord on their phone call amidst his own personal trials . . . .  Thank YOU, [unnamed

customer service representative] for ministering to our donors, and BEING the light.")).)

Customer service representatives also get the opportunity to lead team devotions

and World Vision's weekly organization-wide chapel services.  (*Id.* ¶¶ 25-29.)  The

chapel services last up to an hour and have consisted of Bible reading, customer service

representative messages, praise and worship time, testimonials, and prayer.  (*Id.* ¶¶ 25, 28

(citing *id.* ¶ Ex. SO-13).)  Leading chapel is not a requirement of the customer service

representative position and instead occurs based on individual "interest and desire to

lead."  (4/11/23 Wolnowski Decl. ¶ 14, Ex. 13 ("2/16/23 Freiberg Dep. Tr.") at

22:20-23.)  Leading team devotions, on the other hand, is a "part of every [World Vision]

job description" and thus is equally expected of customer service representatives.[2]

(Freiberg Decl. ¶ 55, Ex. MF-31 at WV-002813 ("Prayer Materials").)

---

[2]  The record is not a picture of clarity regarding the extent to which World Vision
requires all customer service representatives to lead team devotions.  When asked about this
topic in a deposition on February 16, 2023, World Vision's Rule 30(b)(6) designee Melanie
Freiberg testified that World Vision expects only that customer service representatives
"participate in devotions" and leading them is "not [] a require[ment]."  (2/16/23 Freiberg Dep.
Tr. at 22:11-16, 25:16-17.)  But in a later deposition on March 10, 2023, Ms. Freiberg
contradicted her prior testimony by stating that "every [customer service representative] or
trainee is required to attend devotions and to ultimately lead devotions."  (3/10/23 Freiberg Dep.
Tr. at 43:18-20.)  As Ms. McMahon points out (Pl. 2d MSJ at 12-13), one cannot create a dispute
of fact sufficient to defeat summary judgment "merely by contradicting his or her own sworn
deposition testimony" with later sworn testimony.  *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*,
158 F.3d 1002, 1008 (9th Cir. 1998).  Yet, World Vision's written "Devotion Guidelines"
expressly state that leadership of devotions is "part of every [World Vision] job description."
(Prayer Materials at WV-002813; *see also* Job Posting at WV-000049 (noting that customer
service representatives will "[a]ttend and participate in the leadership of devotions").)  Ms.
McMahon does not dispute that "'leadership of devotions' is 'a part of *every* [World Vision] job
description.'"  (Pl. 2d MSJ at 13 (quoting Prayer Materials at WV-002813).)  Accordingly, the
court will assume for purposes of these motions that, to the extent customer service

**C.     World Vision Extends and Rescinds Ms. McMahon's Offer of Employment**

World Vision's "applicant tracking system" indicates that Ms. McMahon submitted her job application materials for the customer service representative position on or about November 25, 2020.  (4/11/23 Wolnowski Decl. ¶ 3, Ex. 2; McMahon Dep. Tr. at 186:5-24; 4/11/23 Wolnowski Decl. ¶ 12, Ex. 11 ("Miolla Dep. Tr.") at 15:14-16:4.)  On December 4, 2020, Ms. McMahon conducted a phone screening interview with Catherine Miolla (Wolnowski Decl. ¶ 6, Ex. 5 ("Phone Screener"); Miolla Dep. Tr. at 19:20-20:11), a talent acquisition partner at World Vision (Miolla Dep. Tr. at 11:23-12:5).  In that interview, Ms. Miolla asked Ms. McMahon questions about her background and interest in World Vision and her comfort level with job "requirement[s]" like "making inbound and outbound calls" and "upselling" World Vision programs.  (*Id.* at WV-000067-68.)  Ms. Miolla also asked questions about Ms. McMahon's personal faith and willingness to comply with World Vision's SOC (*id.* at WV-00068-69), though she did not mention that Ms. McMahon might be expected to pray with donors if hired as a customer service representative (*see generally id.  See also* Miolla Dep. Tr. at 20:17-21:9, 23:20-24:13).

Ms. McMahon advanced in the interview process and Ms. Miolla extended a verbal offer of employment on January 4, 2021.  (*Id.* at 22:4-10, 46:6-47:6; 112:10-14.) The following day, Ms. Miolla sent a formal written offer letter of employment to Ms. McMahon.  (4/11/23 Wolnowski Decl. ¶ 4, Ex. 3 ("Job Offer"); Miolla Dep. Tr. at 47:24-

---

representatives are required to lead team devotions, the same is required of all other World Vision employees.

48:6; 48:22-49:3.)  In relevant part, the letter stated:  "On behalf of World Vision, Inc., I am pleased to provide you with this letter as written confirmation of our verbal offer for the full-time position of Donor/Customer Service Representative Trainee (DSR Trainee) commencing on 2/1/2021."  (Job Offer.)

The letter also stated that consideration for employment as a customer service representative was dependent upon Ms. McMahon's successful completion of a nine-to-eleven-week training and evaluation program.  (*Id.*)  Among other things, that program typically includes training surrounding World Vision as a religious organization founded upon "the Bible and Scripture"—"about who we are and who we are in Christ"—as well as how to pray with donors, attending chapel, and leading and participating in devotions.  (3/10/23 Freiberg Dep. Tr. at 15:7-16.)  Successful trainees transition into the customer service representative role at the conclusion of the program, though World Vision does not consider this process to be "a religious commissioning." (*Id.* at 15:19-16:3.)

Ms. McMahon, however, never entered the training program or commenced her employment with World Vision.  The same day World Vision sent Ms. McMahon written confirmation of her job offer, Ms. McMahon sent an email to Ms. Miolla, which read:

> Hey there, I just have a quick question!  My wife and I are expecting our first baby in March and I wanted to see if I would qualify for any time off since I'll be a new employee?  I will be the one having the baby so I just wanted to check to see if any time would be allowed off.  If not, no worries, thanks so much!

(Freiberg Decl. ¶ 9, Ex. MF-4 ("Post-Offer Emails") at WV-000080.)  After receiving Ms. McMahon's email, Ms. Miolla decided to bring the email to the attention of Melanie

1   Freiberg, a senior director of talent management at World Vison.  (*Id.* ¶ 10.)  Shortly

2   thereafter, Christine Talbot—who, at the time, held the position of senior vice president

3   of human resources at World Vision (Talbot Dep. Tr. at 11:16-21)—became aware of

4   Ms. McMahon's email (*id.* at 19:22-20:6).

5           According to Ms. Talbot and Ms. Freiberg, the email "indicated potential

6   noncompliance with World Vision's Standards of Conduct and related policies

7   surrounding World Vision's deeply held religious conviction that sexual conduct should

8   not be outside of marriage and that marriage is a Biblical covenant between a man and a

9   woman." (Freiberg Decl. ¶ 10; Talbot Dep. Tr. at 21:8-25.[3])  In her deposition, Ms.

10  Talbot clarified that in Ms. McMahon's January 5, 2021 email, Ms. McMahon

11  "self-identifies herself being married to another woman.  And [World Vision's] standards

12  of conduct require . . .to be eligible for employment . . . that a job applicant or a job

13  offeree affirm their ability to live according to [World Vision's] standards of conduct

14  which specifically names marriage to be a biblical covenant between a man and a

15  woman." (Talbot Dep. Tr. at 21:18-25; *see also id.* at 40:2-6, 47:3-12 ("If an applicant is

16  unable or unwilling to affirm and comply with that standard, they're not eligible for

17  employment.").)

18          After receiving Ms. McMahon's January 5, 2021 email, "World Vision engaged in

19  internal discussions about the application of its Biblical marriage policy, and the

20

21          [3]  Additionally, according to Ms. Freiberg, Ms. McMahon's January 5, 2021 email
    "conflicted with her previous representations that she could and would comply with this standard
    of conduct about marriage and sexual conduct."  (Freiberg Decl. ¶ 11; *see* Phone Screener at
22  WV-000067-70 (notes regarding Ms. McMahon's initial phone screening interview).)

1    Scriptural truths on which it is based, to Ms. McMahon's situation." (Freiberg Decl.

2    ¶ 50.) Ms. Freiberg, Ms. Talbot, and other managers at World Vision were involved in

3    the discussions. (*See id.*; 2/16/23 Freiberg Dep. Tr. at 74:23-76:22.) After these

4    discussions, Ms. Talbot decided that Ms. McMahon's offer would be rescinded because

5    of Ms. McMahon's "inability" "to meet one of the fundamental requirements of

6    employment with [World Vision], which would be affirming and complying with the

7    standards of conduct which were described in the interview process"; specifically, Ms.

8    McMahon's inability to comply with the SOC prohibiting sexual conduct outside the

9    Biblical covenant of marriage between a man and a woman. (Talbot Dep. Tr. at

10   58:12-16; *see also id.* at 29:6-9, 46:17-20, 48:18-19, 60:16-20, 65:18-66:10, 67:7-17;

11   2/16/23 Freiberg Dep. Tr. at 103:12-21, 105:17-106:5; Freiberg Decl. ¶¶ 9-13, 48-51

12   (discussing the decision to rescind Ms. McMahon's offer and why her conduct made her

13   unsuitable for the role); SOC at WV-000036.) On January 8, 2021, "after several

14   attempts by World Vision to discuss this matter further with Ms. McMahon," World

15   Vision informed Ms. McMahon that it was rescinding the job offer.[4] (Freiberg Decl.

16   ¶¶ 12-13; Post-Offer Emails at P-0080-81.)

17   //

18

19

20   [4] In a call later that day, Ms. McMahon asked if the offer was being rescinded because she is in a same-sex marriage. (2/16/23 Freiberg Dep. Tr. at 105:17-106:5; *see also* Freiberg Decl. ¶ 13, Ex. MF-08 (recording of excerpt from call).) Ms. Freiberg responded that the offer was being rescinded "because . . . the standards of conduct . . . are to not have any

21   sexual . . . conduct outside of marriage, and marriage is defined as being between a man and a woman. So that's—that's the behavior that all employees have to comply with." (2/16/23

22   Freiberg Dep. Tr. at 105:17-106:5; *see also* Freiberg Decl., Ex. MF-08.)

1

### D.      Procedural History

2        In July 2021, Ms. McMahon filed the instant lawsuit, claiming that World Vision

3   unlawfully discriminated against her in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*,

4   and WLAD, RCW 49.60, *et seq.*  (*See* Compl. (Dkt. # 1) ¶¶ 6.1-7.3.)  On April 11, 2023,

5   the parties filed cross-motions for summary judgment.  (*See generally* Pl. 1st MSJ; Def.

6   1st MSJ (Dkt. # 26).)  On June 12, 2023, the court granted World Vision's motion for

7   summary judgment and denied Ms. McMahon's motion for partial summary judgment,

8   concluding that (1) the theological nature of this dispute did not deprive the court of

9   subject matter jurisdiction, but (2) the Church Autonomy Doctrine, one of numerous

10  affirmative defenses raised in World Vision's motion, barred Ms. McMahon's claims for

11  sex, sexual orientation, and marital status discrimination under Title VII and WLAD.

12  (6/12/23 Order (Dkt. # 38) at 13-26.)  In particular, the court applied a burden-shifting

13  framework to Ms. McMahon's claims and concluded "that 'the only way for the jury to

14  find pretext would be to question [World Vision's] explanation of religious doctrine.'"

15  (*Id.* at 24 (quoting *Butler v. St. Stanislaus Kostka Cath. Acad.*, 609 F. Supp. 3d 184,

16  203-04 (E.D.N.Y. 2022)).)  Accordingly, the court determined that it could not resolve

17  Ms. McMahon's claims based on neutral principles of law and, as a result, "the Church

18  Autonomy Doctrine foreclose[d] judicial inquiry into World Vision's religiously

19  motivated personnel decision."  (*Id.* at 25.)  The court therefore entered judgment in

20  World Vision's favor.  (Judgment (Dkt. # 39) (vacated)).

21  //

22  //

ORDER - 16

1    Ms. McMahon moved for reconsideration, arguing the court manifestly erred in

2 concluding that "the Church Autonomy Doctrine bars the claims of a non-ministerial

3 employee who was terminated pursuant to a hiring policy that facially discriminates on

4 the basis of sex, sexual orientation, and marital status." (Pl. Mot. for Recon. (Dkt. # 40)

5 at 1.) Specifically, Ms. McMahon urged "that the court erred by analyzing this case,

6 which involves an adverse action taken pursuant to a facially discriminatory employment

7 policy, as a pretext case akin to *Butler v. St. Stanislaus Kostka Catholic Academy*, 609 F.

8 Supp. 3d 184 (E.D.N.Y. 2022) and invoking the Church Autonomy Doctrine in light of

9 that pretext analysis." (7/24/23 Order (Dkt. # 44) at 4-5 (citing 7/12/23 Reply (Dkt. # 43)

10 at 2-4.)[5]

11    "With the benefit of additional briefing and further explanation by the parties," the

12 court reversed course and granted Ms. McMahon's motion. (7/24/23 Order at 5, 11.) On

13 reconsideration, the court agreed that Ms. McMahon suffered an adverse employment

14 action based on a facially discriminatory employer policy—which constitutes *per se*

15 intentional discrimination under controlling precedent—and thus, Ms. McMahon was not

16 required to demonstrate pretext under a burden-shifting framework. (*Id.* at 7-10.) And

17 because "the court need not 'question the reasonableness, validity or truth of' World

18 Vision's religious beliefs or doctrines to conclude that World Vision's rescission of Ms.

19

20

---

21 [5] Neither party sought reconsideration of the court's conclusion with respect to subject matter jurisdiction. (*See generally* Pl. Mot. for Recon.; 8/14/23 Order at 3; *see also* 6/12/23 Order at

22 13-14 (concluding that "the religious nature of this dispute does not deprive the court of subject matter jurisdiction over this action").) That portion of the court's June 12, 2023 order remains in effect.

1   McMahon's job offer pursuant to its Biblical marriage SOC . . . constitutes unlawful, sex,

2   sexual orientation, and marital status discrimination," "Ms. McMahon can establish

3   unlawful discrimination using neutral principles of law," and "the Church Autonomy

4   Doctrine does not preclude review of her claims." (*Id.* at 10-11.)  On July 23, 2023, the

5   court vacated the portion of its June 12, 2023 order concerning the Church Autonomy

6   Doctrine, vacated the final judgment, and directed the parties to propose a briefing

7   schedule for renewed cross-motions for summary judgment concerning World Vision's

8   remaining affirmative defenses.  (*Id.* at 11-12.)

9          World Vision moved for reconsideration and clarification of the court's July 23,

10   2023 order.  (Def. Mot. for Recon. (Dkt. # 46).)  On August 14, 2023, the court denied

11   reconsideration and clarified that World Vision would not be permitted to reargue its lack

12   of subject matter jurisdiction and Church Autonomy Doctrine affirmative defenses in the

13   renewed motions for summary judgment.  (8/14/23 Order (Dkt. # 49) at 4.)  The court

14   directed that the parties' renewed motions "may address World Vision's remaining

15   affirmative defenses and the impact, if any, of the Supreme Court's recent decision in *303*

16   *Creative LLC v. Elenis*, [600] U.S. [570], 143 S. Ct. 2298 (2023) on those defenses."  (*Id.*

17   at 5 (footnote omitted); *see also id.* at 5 n.3 ("The remaining affirmative defenses are

18   World Vision's religious organization exemption, ministerial exception, Free Exercise

19   Clause, Expressive Association, and bona fide occupational qualification defenses.").)

20          Now before the court are the parties' renewed cross-motions for summary

21   judgment.  (*See generally* Pl. 2d MSJ; Def. 2d MSJ.)  Below, the court sets out the

22   //

1   relevant legal standard before turning to the parties' arguments in support of their

2   respective motions.

3                          **III.   ANALYSIS**

4           Title VII makes it unlawful for an employer "to fail or refuse to hire or to

5   discharge any individual, or otherwise to discriminate against an individual with respect

6   to his compensation, terms, conditions, or privileges of employment, because of such

7   individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *see*

8   *also Bostock v. Clayton Cnty.*, 590 U.S. __, 140 S. Ct. 1731, 1739-47, 1754 (2020)

9   (concluding that firing a person based on their sexual orientation or transgender status is

10  discrimination "because of sex"). Similarly, in relevant part, WLAD makes it unlawful

11  for an employer to refuse to hire or to discharge any person, or otherwise to discriminate

12  against a person with respect to the terms and conditions of employment, because of

13  "age, sex, marital status, [or] sexual orientation." RCW 49.60.180. Here, Ms. McMahon

14  brings claims for sex and sexual orientation discrimination under Title VII and WLAD,

15  as well as marital status discrimination under WLAD. (*See* Compl. ¶¶ 6.1-7.3.)

16          World Vision moves for summary judgment in its favor on each of Ms.

17  McMahon's claims. (*See generally* Def. 2d MSJ.) It argues that the court should dismiss

18  Ms. McMahon's claims under Title VII and WLAD because they are barred by: (1) Title

19  VII and WLAD's religious organization exemptions; (2) the ministerial exception;

20  (3) Title VII and WLAD's bona fide occupational qualification ("BFOQ") defenses; (4)

21  the Free Exercise Clause; (5) the freedom of expressive association; and (6) the Supreme

22  Court's recent decision in *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023). (*Id.* at 3,

26.)  Ms. McMahon opposes World Vision's motion (*see generally* Pl. Resp.) and

cross-moves for partial summary judgment in her own favor on her Title VII and WLAD

claims with respect to the issue of liability (*see generally* Pl. 2d MSJ).  Below, the court

sets out the relevant legal standard before turning to the parties' arguments in favor of

their respective motions.

**A.    Summary Judgment Legal Standard**

Summary judgment is appropriate if the evidence viewed in the light most

favorable to the non-moving party shows "that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it

might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  A factual dispute is "'genuine' only if there is sufficient evidence for a

reasonable fact finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*,

247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine dispute

of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at

323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can

show the absence of such a dispute in two ways:  (1) by producing evidence negating an

essential element of the nonmoving party's case, or (2) by showing that the nonmoving

party lacks evidence of an essential element of its claim or defense.  *Nissan Fire &*

*Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party

meets its burden of production, the burden then shifts to the nonmoving party to identify

specific facts from which a factfinder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250. Where cross motions are at issue, the court must "evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006); *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) ("[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." (quoting *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001))).

**B.    Religious Organization Exemption**

Both Title VII and WLAD contain religious organization exemptions. While the parties do not dispute that World Vision qualifies as a religious organization under Title VII and WLAD, they dispute whether the exemptions apply to this case. The court addresses each exemption in turn, concluding that neither one bars Ms. McMahon's claims.

1.    Title VII

"'[I]n recognition of the constitutionally-protected interest of religious organizations in making religiously-motivated employment decisions' and to prevent excessive government entanglement, Congress declared that religious organizations are exempt from Title VII's prohibition against discrimination in employment on the basis of religion." *Spencer v. World Vision, Inc.*, 570 F. Supp. 2d 1279, 1283 (W.D. Wash.

1    2008), *aff'd*, 619 F.3d 1109 (9th Cir. 2010), and *aff'd*, 633 F.3d 723 (9th Cir. 2011)

2    (quoting *Hall v. Baptist Mem'l. Health Care Corp.*, 215 F.3d 618, 623 (6th Cir. 2000)).

3    The exemption provides that Title VII does not apply "to a religious corporation,

4    association, educational institution, or society with respect to the employment of

5    individuals of a particular religion to perform work connected with the carrying on by

6    such corporation, association, educational institution, or society of its activities."  42

7    U.S.C. § 2000e–1(a); *see, e.g.*, *Spencer*, 633 F.3d at 724-25 (per curiam) (holding that

8    World Vision was entitled to Title VII's religious employer exemption where World

9    Vision terminated plaintiffs' employment "on account of their religious beliefs").

10          It is well-established in the Ninth Circuit that Title VII's religious employer

11   exemption offers qualifying employers immunity only from religious discrimination

12   claims.  "While the language of [the religious employer exemption] makes clear that

13   religious institutions may base relevant hiring decisions upon religious preferences,

14   'religious employers are not immune from liability [under Title VII] for discrimination

15   based on . . . sex'" and other protected grounds.  *EEOC v. Fremont Christian Sch.*, 781

16   F.2d 1362, 1366 (9th Cir. 1986) (quoting *EEOC v. Pac. Press Publ'g Ass'n*, 676 F.2d

17   1272, 1276 (9th Cir. 1982), *abrogated on other grounds as recognized by Am. Friends*

18   *Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991)) (holding Title

19   VII's religious employer exemption did not immunize religious school from sex

20   discrimination claim where the school denied health insurance benefits to women based

21   on its religious belief that only men can be the head of the household).  This court has

22   already determined that "World Vision rescinded Ms. McMahon's job offer pursuant to a

1   facially discriminatory policy" and "Ms. McMahon was treated differently because of her

2   sex, sexual orientation, and marital status." (7/24/23 Order at 6-7.) Thus, World Vision

3   cannot invoke the religious employer exemption to defend against Ms. McMahon's Title

4   VII claims because those claims are premised on sex and sexual orientation

5   discrimination—not religious discrimination. *Fremont Christian Sch.*, 781 F.2d at 1366.

6         World Vision argues that a plain language analysis of the religious employer

7   exemption yields a different result. Relying on *Garcia v. Salvation Army*, 918 F.3d 997

8   (9th Cir. 2019), World Vision interprets the statutory text to "exempt[] qualifying entities

9   'from the *entire subchapter* of Title VII,'" irrespective of the type of discrimination at

10  issue. (Def. 2d MSJ at 27 (quoting *Garcia*, 918 F.3d at 1004)); *see also* 42 U.S.C.

11  § 2000e-1(a) ("This subchapter shall not apply . . . ."). According to World Vision,

12  "*none* of Title VII applies to a qualifying entity's qualifying decisions," and it is

13  undisputed here that World Vision is a religious entity entitled to the exemption. (Def.

14  2d MSJ at 27.) This argument misapprehends *Garcia*, which addressed whether the

15  exemption "reaches beyond hiring and firing"—not whether it reaches beyond religious

16  discrimination claims. *Garcia*, 418 F.3d at 1004. *Garcia* states that "the [religious

17  organization exemption]'s text reaches beyond hiring and firing. Congress 'painted with

18  a broader brush, exempting religious organizations from the *entire subchapter* of Title

19  VII with respect to the *employment* of persons of a particular religion.'" *Id.* (quoting

20  *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 194 (4th Cir. 2011)) (holding the

21  religious employer exemption barred the plaintiff's retaliation and hostile work

22  environment claims where those claims were premised on religious discrimination).

*Garcia* did not expand the religious employer exemption to bar claims premised on other forms of discrimination beyond religious discrimination as World Vision urges.  To the contrary, *Garcia* keeps with Ninth Circuit precedent in confirming that the religious employer exemption "permits religious organizations to discriminate based on religion." *Id.* at 1006.

Because Ms. McMahon's claims do not concern religious discrimination and she instead has established unlawful discrimination on the basis of sex and sexual orientation, World Vision is not shielded by Title VII's religious employer exemption. *Fremont Christian Sch.*, 781 F.2d at 1366.  Ms. McMahon is entitled to summary judgment on this affirmative defense.

2. WLAD

WLAD exempts "religious or sectarian organization[s] not organized for private profit" from its scope in certain circumstances.  RCW 49.60.040(11).  Although WLAD's religious organization exemption is not limited to religious discrimination claims, it applies only to discrimination claims brought by employees who fall under the First Amendment's ministerial exception. *See Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1067-70 (Wash. 2021).  As discussed below, the ministerial exception is not applicable in this case, and thus, WLAD's religious organization exemption does not apply.  Ms. McMahon is entitled to summary judgment on this affirmative defense.

//

//

//

1  **C.    Ministerial Exception**

2      World Vision argues its decision to rescind Ms. McMahon's job offer is protected

3  by the First Amendment's ministerial exception.  For the reasons discussed below, the

4  court concludes that World Vision is not entitled to the exception in this case.

5      The First Amendment provides, in relevant part, that "Congress shall make no law

6  respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S.

7  Const. amend. I.  "Among other things, the Religion Clauses protect the right of churches

8  and other religious institutions to decide matters of 'faith and doctrine' without

9  government intrusion."  *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. __,

10  140 S. Ct. 2049, 2060 (2020) (internal quotation marks omitted) (quoting *Hosanna-Tabor*

11  *Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012)).  Rooted in

12  this principle, the ministerial exception ensures that courts "stay out of employment

13  disputes involving those holding certain important positions with churches and other

14  religious institutions."  *Id.*  To that end, the exception bars "employment discrimination

15  [claims] brought on behalf of a minister, challenging her church's decision to fire her."

16  *Hosanna-Tabor*, 565 U.S. at 195-96 & n.4 (noting that the exception is an affirmative

17  defense to such claims).

18      The Supreme Court first recognized the ministerial exception in *Hosanna-Tabor*.

19  The Court declined to apply a "rigid formula" to the determination of whether a particular

20  employee qualifies as a minister subject to the exception.  *Id.* at 190.  That determination

21  must be made on a case-by-case basis, guided by relevant factors including "the formal

22  title, . . . the substance reflected in that title, [the employee's] own use of that title, and

1   the important religious functions . . . performed for the Church." *Id.* at 190, 192.  In

2   addition, the amount of time an employee spends on religious or secular activities is

3   relevant, but not determinative, in assessing that employee's status.  *Id.* at 194.  The

4   teacher in *Hosanna-Tabor* qualified as a minister even though "her religious duties

5   consumed only 45 minutes of each work-day" where she held the title "Minister of

6   Religion, Commissioned" at a Lutheran grade school, completed a significant degree of

7   religious training and a formal process of commissioning in order to attain her position,

8   openly relayed to others her role in ministry, and her duties included conveying the

9   Church's message and mission "to the next generation" through frequent religious

10  teaching, prayer, and devotional exercises with students.  *Id.* at 191-93.

11       The Supreme Court revisited the ministerial exception in *Our Lady of Guadalupe*

12  *School v. Morrissey-Berru*, 591 U.S. __, 140 S. Ct. 2049 (2020).  In that case, the Court

13  clarified that the four factors relevant to its analysis in *Hosanna-Tabor* "may be

14  important" but are not "necessary requirement[s]" in all other cases.  *Id.* at 2063-64.

15  Courts are "to take all relevant circumstances into account and to determine whether each

16  particular position implicate[s] the fundamental purpose of the exception."  *Id.* at 2067;

17  *see also id.* at 2066 (stating that an employer's "definition and explanation" of the

18  employee's role and the employee's "role [in] the life of the religion" are important

19  considerations).  "What matters, at bottom, is what an employee does."  *Id.* at 2064.

20  Although the teachers in *Our Lady of Guadalupe* "were not given the title of 'minister'

21  and ha[d] less religious training" than the teacher in *Hosanna-Tabor*, "their core

22  responsibilities as teachers of religion were essentially the same."  *Id.* at 2055, 2066

("Educating and forming students in the Catholic faith lay at the core of the mission of the schools where they taught . . . ."). Because the teachers performed "vital religious duties" in that "they were the members of the school staff who were entrusted most directly with the responsibility of educating their students in the faith," and "both their schools expressly saw them as playing a vital part in carrying out the mission of the church," the ministerial exception barred their claims. *Id.* at 2066.

World Vision bears the ultimate burden to prove that Ms. McMahon would have been a minister, *e.g.*, *Fitzgerald v. Roncalli High School, Inc.*, 73 F.4th 529, 531 (7th Cir. 2023), but it fails to carry that burden. The court begins with the *Hosanna-Tabor* factors, keeping in mind that no single factor is necessary or dispositive.

First, the job posting title "Customer Service Representative" is secular. (Job Posting at WV-000048.) The same is true of the title "Donor/Customer Service Representative Trainee," which appears in Ms. McMahon's offer letter. (Job Offer at WV-000078.) This factor weighs in Ms. McMahon's favor.

Second, Ms. McMahon's title lacks ministerial or religious substance. In *Hosanna-Tabor*, the Supreme Court found it meaningful that the plaintiff completed "a significant degree of religious training and a formal process of commissioning" in order to attain her title "Minister of Religion, Commissioned." 565 U.S. at 191. Here, Ms. McMahon would have had to complete a nine-to-eleven-week training and evaluation program in order to transition from trainee to customer service representative. (Job Offer at WV-000078.) The program would have had some religious components, including training surrounding World Vision as a religious organization founded upon "the Bible

1    and Scripture"—"training about who we are and who we are in Christ." (3/10/23

2    Freiberg Dep. Tr. at 15:7-11.) It would have also included "support for how to pray, how

3    to pray with donors, attending chapel, [and] leading and participating in devotions." (*Id.*

4    at 15:11-13.) But nothing in the record suggests that Ms. McMahon's training would

5    have risen to the level of doctrinal instruction present in *Hosanna-Tabor*. *See*

6    *Hosanna-Tabor*, 565 U.S. at 191 (noting that the employee's "religious training"

7    comprised eight college-level courses including biblical interpretation, church doctrine,

8    and the ministry of the Lutheran teacher). It is undisputed that the customer service

9    representative position did not require any kind of formal religious education or training

10   (3/10/23 Freiberg Dep. Tr. at 13:13-20), and instead required only a high school diploma

11   or GED equivalent (*id.* at 13:22-14:3; Job Posting at WV-000050) and basic

12   administrative skills such as proficiency in Microsoft Office Suite and "[t]he ability to

13   type 20 wpm or more" (Job Posting at WV-000050). And World Vision does not

14   consider the transition process from trainee to customer service representative to be a

15   religious commissioning. (3/10/23 Freiberg Dep. Tr. at 15:19-16:3.) This factor weighs

16   in Ms. McMahon's favor.

17       The third factor—whether Ms. McMahon held herself out as a minister—is

18   inapplicable here, as Ms. McMahon never commenced employment at World Vision.

19       Fourth, the court examines whether Ms. McMahon would have served important

20   religious functions. In *Hosanna-Tabor*, this factor favored application of the ministerial

21   exception to a teacher whose "job duties reflected a role in conveying the Church's

22   message and carrying out its mission," and who taught religion four days a week, led

1   prayer three times a day, took students to a weekly school-wide chapel service, led the

2   chapel service twice per year, performed devotional exercises every morning with fourth

3   graders, and thereby played an "important role in transmitting the Lutheran faith to the

4   next generation." *Hosanna-Tabor*, 565 U.S. at 192.  Here, World Vision argues that as

5   "a baseline," all customer service representatives serve "important religious functions,"

6   including "confessing they are committed Christians," "'wholeheartedly' agreeing with

7   [World Vision's] core principles," communicating World Vision's Christian faith and

8   witness accurately and with integrity, and participating regularly in prayer activities,

9   devotionals, and weekly chapel services.  (Def. 2d MSJ at 6-7 (first citing *Spencer*, 633

10  F.3d at 738-40; then quoting *Spencer*, 570 F. Supp. 2d at 1288).)  But as World Vision

11  acknowledges, all of its staff share these responsibilities, which therefore do not

12  distinguish customer service representatives as holding a "certain important" ministerial

13  position within World Vision. *Our Lady of Guadalupe*, 140 S. Ct. at 2060.

14      World Vision argues Ms. McMahon would have served important religious

15  functions by sometimes leading the weekly organization-wide chapel services and team

16  devotions.  (Def. 2d MSJ at 8-10; Def. Resp. at 14-16.)  But it is undisputed that leading

17  the chapel services is neither required nor even expected of customer service

18  representatives, and instead occurs based solely on the individual's "interest and desire to

19  lead."  (2/16/23 Freiberg Dep. Tr. at 22:20-23.)  It is also undisputed that leading the

20  weekly team devotions is "part of every [World Vision] job description" (Prayer

21  Materials at WV-002813), and so does not distinguish customer service representatives

22  //

from any other World Vision employee as playing a "certain important" ministerial role. *Our Lady of Guadalupe*, 140 S. Ct. at 2060.

World Vision also highlights the important responsibility of praying with donors—a responsibility held by customer service representatives alone. (Def. 2d MSJ at 7, 9-13.) World Vision expects and encourages its customer service representatives to pray with donors "[i]f comfortable" and "when appropriate." (Guidance Document at WV-00613-12; Job Posting at WV-000049.) That expectation is demonstrated through the job posting (Job Posting at WV-000049), the customer service representative guidance document (Guidance Document at WV-00613-12), evidence that Ms. McMahon's training would have included instruction on how and when to pray with donors (3/10/23 Freiberg Dep. Tr. at 15:7-16), and donor shout-outs (Shout Outs). World Vision emphasizes that customer service representatives serve as the "Voice, Face, and Heart" of its organization by fostering donor relationships in prayer and ministering "through fundraising itself." (Def. 2d MSJ at 7 (quoting Donor Contact Services: DCS Policies at WV-000425), 13 (citing Osborne Decl. ¶¶ 43-44).) Indeed, spiritual "[t]ransformation of donors is just as vital to World Vision as that of the children they sponsor." (Osborne Decl. ¶ 23 (citing Why Focus on Donor Transformation?); *see also* Mission Statement (showing that World Vision's mission statement includes reference to "human transformation").) World Vision thus sees customer service representatives as "playing a vital part in carrying out the mission" and "message" of the organization, and it is entitled to some deference in explaining the customer service representative's role "in the life of the religion." *Our Lady of Guadalupe*, 140 S. Ct. at 2066.

1        At the same time, it is undisputed that praying with donors was not a job

2   requirement and the failure to do so did not subject a customer service representative to

3   discipline or termination.  (3/10/23 Freiberg Dep. Tr. at 24:2-11, 30:14-23.)  Because

4   praying with donors was not strictly required and Ms. McMahon never commenced her

5   employment at World Vision, it is impossible to know whether or how often Ms.

6   McMahon would have performed this job function.  It is telling, however, that while Ms.

7   Miolla asked interview questions about Ms. McMahon's comfort level with placing

8   donor calls and upselling World Vision programs, Ms. Miolla did not ask similar

9   questions with respect to donor prayer in Ms. McMahon's phone screening interview.

10  (Phone Screener at WV-000068 (stating to Ms. McMahon that "making inbound and

11  outbound calls" and "upselling" programs are "requirement[s]" of the customer service

12  representative position).  *See generally id.* (no mention of praying with donors); Miolla

13  Dep. Tr. at 20:17-21:9 (same).)  That World Vision declined to even raise the subject of

14  donor prayer in Ms. McMahon's screening interview negates the stated importance of

15  that job function.  The court concludes that this factor, at most, carries moderate weight

16  and slightly favors World Vision.  In general, customer service representatives perform a

17  uniquely important religious function at World Vision by praying with donors if

18  comfortable and when appropriate, but there is no knowing for certain whether Ms.

19  McMahon would have actually done so, too.

20        On balance, the *Hosanna-Tabor* factors weigh in Ms. McMahon's favor.  But

21  more importantly, the court must assess from a holistic view "what an employee does."

22  *Our Lady of Guadalupe*, 140 S. Ct. at 2064.  As noted, this inquiry is made more difficult

by the fact that World Vision rescinded Ms. McMahon's job offer before she commenced

employment.  Although Ms. McMahon never worked at World Vision, what she would

have done can be gleaned from the job posting for which she applied and received her job

offer.  *See Butler*, 609 F. Supp. 3d at 193-94, 196 (relying on public job listing in

determining whether the ministerial exception applied to a Catholic school teacher where

the teacher was terminated before the school year began).  That job posting demonstrates

that the thrust of the customer service representative position is administrative, not

ministerial.  Of the more than a dozen job responsibilities enumerated in the posting, a

significant majority are secular in nature.  (*See* Job Posting at WV-000049.)  These

include placing and answering donor calls, data entry, updating donor information,

maintaining individual statistics and metrics, "up-sell[ing]" and "cross-sell[ing]" World

Vision programs, describing World Vision's activities around the world, maintaining

attendance, and keeping apprised of company communications and the World Vision

Intranet.  (*Id.*)  And the job posting listed nine skills and qualifications—each one

secular—ranging from previous sales work experience to typing proficiency.  (*Id.* at

WV-000050.)  Meanwhile, a customer service representative's religious responsibilities

are limited to "help[ing] carry out [World Vision's] mission, vision, and strategies,"

"[p]ersonify[ing] the ministry of World Vision by witnessing to Christ and ministering to

others through life, deed, word and sign," "attend[ing] and participat[ing] in the

leadership of devotions, weekly Chapel services, and regular prayer," and praying with

donors "when appropriate."  (*Id.*)  The court has already considered donor prayer and

credited this job function in World Vision's favor.  The remaining religious

1   responsibilities are shared by all World Vision employees (Freiberg Decl. ¶ 53 (citing

2   Orange Book); Osborne Decl. ¶ 12), and therefore do not warrant application of the

3   ministerial exception to Ms. McMahon.

4     Even when considering the facts in the light most favorable to World Vision,

5   under a totality of the circumstances, the customer service representative role does not

6   implicate the fundamental purpose of the ministerial exception. *See Our Lady of*

7   *Guadalupe*, 140 S. Ct. at 2067.  The exception is rooted in constitutional principles

8   respecting autonomy in "matters of church government." *Id.* at 2060 (quoting

9   *Hosanna-Tabor*, 565 U.S. at 186).  "[A] component of this autonomy is the selection of

10  the individuals who play certain key roles." *Id.*  Applying the ministerial exception to the

11  principally administrative customer service representative position would expand the

12  exception beyond its intended scope, erasing any distinction between roles with mere

13  religious components and those with "key" ministerial responsibilities. *Id.*  The

14  undisputed facts demonstrate that Ms. McMahon does not qualify for the ministerial

15  exception.  She therefore is entitled to summary judgment on this affirmative defense.

16  **D. BFOQ**

17    World Vision raises a BFOQ defense under both Title VII and WLAD, but World

18  Vision cannot establish a BFOQ in this case.  Title VII permits an employer to

19  discriminate on the basis of "religion, sex, or national origin in those certain instances

20  where religion, sex, or national origin is a bona fide occupational qualification reasonably

21  necessary to the normal operation of that particular business or enterprise."  42 U.S.C. §

22  2000e–2(e)(1).  WLAD similarly permits discrimination "because of . . . sex, marital

1    status, [and] sexual orientation" if "based upon a bona fide occupational qualification."

2    RCW 49.60.180.  "The BFOQ defense is written narrowly, and [the Supreme] Court has

3    read it narrowly."  *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of*

4    *Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 201 (1991); *see also Hegwine v.*

5    *Longview Fibre Co.*, 172 P.3d 688, 698 (Wash. 2007) (noting that WLAD's "BFOQ

6    exception should be applied narrowly" (quoting WAC 162-16-240)).

7         Because World Vision rescinded Ms. McMahon's job offer based on

8    non-compliance with the SOC—which facially discriminates against those in same-sex

9    marriages—the relevant BFOQ is not being in a same-sex marriage.  To escape summary

10   judgment on its BFOQ defense under Title VII, World Vision carries the burden of

11   raising a genuine issue as to whether not being in a same-sex marriage is "'reasonably

12   necessary' to the 'normal operation' of its 'particular business,' and that [this

13   requirement] concern[s] job-related skills and aptitudes."  *Frank v. United Airlines, Inc.*,

14   216 F.3d 845, 855 (9th Cir. 2000) (quoting *Johnson Controls*, 499 U.S. at 187) (holding

15   that an airline "made no showing that having disproportionately thinner female than male

16   flight attendants bears a relation to flight attendants' ability to greet passengers, push

17   carts, move luggage," or "provide physical assistance in emergencies," and thus the

18   airline's discriminatory weight requirements were "not justified as a BFOQ").  To escape

19   summary judgment on its BFOQ defense under WLAD, World Vision must raise a

20   genuine issue as to whether excluding those in a same-sex marriage was "essential

21   to . . . the purposes of" the customer service representative position or that "all or

22   substantially all" persons in a same-sex marriage "'would be unable to efficiently

1    perform the duties' of the position, such that hiring them would undermine [World

2    Vision]'s operations." *Hegwine*, 172 P.3d at 698 (first quoting WAC 162-16-240; then

3    quoting *Franklin Cnty. Sheriff's Off. v. Sellers*, 646 P.2d 113, 117 (Wash. 1982)) (holding

4    that the employer "offered no evidence that excluding pregnant women was essential to

5    the clerk/order checker position or that substantially all pregnant women are incapable of

6    meeting the position's lifting requirement" and the employer therefore could not

7    "succeed with a BFOQ defense").

8         World Vision has not met its burden.  Nothing in the record indicates that being in

9    a same-sex marriage affects one's ability to place and field donor calls, converse with

10   donors, pray with donors, update donor information, upsell World Vision programs, or

11   participate in devotions and chapel.  *See Frank*, 216 F.3d at 855.  World Vision has not

12   shown that excluding those in a same-sex marriage is essential to the customer service

13   representative position or that all or substantially all people in same-sex marriages would

14   be unable to perform the duties of the customer service representative role.  *See Hegwine*,

15   172 P.3d at 698.  Ms. McMahon is therefore entitled to summary judgment on World

16   Vision's BFOQ defenses under Title VII and WLAD.

17   **E.    Free Exercise**

18        World Vision claims that enforcement of Title VII and WLAD in this instance

19   impinges its Free Exercise rights under the First Amendment, but Title VII and WLAD

20   are neutral and generally applicable laws that survive constitutional scrutiny.

21        The Free Exercise Clause, which applies to the states through the Fourteenth

22   Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise"

1   of religion.  U.S. Const. amend. I; *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,

2   508 U.S. 520, 531 (1993) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)).

3   But "[n]ot all burdens on religion are unconstitutional," and "[t]he state may justify a

4   limitation on religious liberty by showing that it is essential to accomplish an overriding

5   governmental interest."  *United States v. Lee*, 455 U.S. 252, 257-58 (1982).  "[L]aws

6   incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free

7   Exercise Clause so long as they are neutral and generally applicable."  *Fulton v. City of*

8   *Philadelphia*, 593 U.S. __, 141 S. Ct. 1868, 1876 (2021) (citing *Emp. Div., Dep't of Hum.*

9   *Res. of Or. v. Smith*, 494 U.S. 872, 878-882 (1990) ("We have never held that an

10  individual's religious beliefs excuse him from noncompliance with an otherwise valid

11  law prohibiting conduct that the State is free to regulate.")).  Neutral and generally

12  applicable laws are subject to rational basis scrutiny.  *See, e.g.*, *Stormans, Inc. v. Selecky*,

13  586 F.3d 1109, 1137 (9th Cir. 2009).

14       "Government fails to act neutrally when it proceeds in a manner intolerant of

15  religious beliefs or restricts practices because of their religious nature."  *Fulton*, 141 S.

16  Ct. at 1877 (first citing *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. __,

17  138 S. Ct. 1719, 1730-32 (2018) (holding an adjudicatory body of the Colorado Civil

18  Rights Commission failed to act neutrally in an administrative proceeding when it

19  demonstrated "hostility" towards a bake shop owner's religiously-grounded opposition to

20  same-sex marriage); then citing *Lukumi Babalu Aye*, 508 U.S. at 533 (holding that a city

21  ordinance lacked neutrality and targeted the Santeria religion where it effectively

22  prohibited any killing of animals for the purpose of Santeria ritual sacrifice but ensured

1   "killings that are no more necessary or humane in almost all other circumstances are

2   unpunished")).  Here, World Vision has not shown that either Title VII or WLAD is

3   intolerant of religious beliefs or was enacted to burden religious employers' employment

4   practices because of their religion.  *See Fulton*, 141 S. Ct. at 1877.  The object of Title

5   VII and WLAD is not to target religion, but rather to eliminate discrimination in

6   employment.  *See Fremont Christian Sch.*, 781 F.2d at 1368; RCW 49.60.010.  Indeed,

7   both schemes tolerate and respect religious beliefs in myriad ways, for example by

8   including a religious organization exemption that permits qualifying religious entities like

9   World Vision to "base relevant hiring decisions upon religious preferences." *Fremont*

10  *Christian Sch.*, 781 F.2d at 1366; *see also* 42 U.S.C. § 2000e–1(a); RCW 49.60.040(11);

11  *Spencer*, 633 F.3d at 724.  Thus, Title VII and WLAD are neutral for purposes of the

12  Free Exercise Clause.

13       Title VII and WLAD are also generally applicable.  A law generally applies if it

14  does not selectively "impose burdens only on conduct motivated by religious belief."

15  *Lukumi Babalu Aye*, 508 U.S. at 543.  Conversely, "[a] law is not generally applicable if

16  it invite[s] the government to consider the particular reasons for a person's conduct by

17  providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877

18  (internal quotation marks omitted) (quoting *Smith*, 494 U.S. at 884).  In *Fulton v. City of*

19  *Philadelphia*, for example, a city ordinance governing foster care referrals prohibited

20  agencies from rejecting prospective foster or adoptive parents from services based upon

21  sexual orientation "unless an exception is granted by the Commissioner . . . in his/her sole

22  discretion." *Id.* at 1878 (quoting Supp. App. Brief for City Respondents at 16-17, *Fulton*,

141 S. Ct. 1868 (No. 19-123)).  "[T]he inclusion of a formal system of entirely discretionary exceptions" rendered the ordinance "not generally applicable."  *Id.*  World Vision claims Title VII and WLAD fail general applicability because they contain "individualized" and "discretionary" exemptions, but that is incorrect.  (Def. 2d MSJ at 16-17 (citing exemptions related to small employers, Communists, and Indian reservations, as well as BFOQs).)  Unlike *Fulton*, the cited exemptions here are categorical.  Their application does not depend on individualized discretion; they contain no mechanism to import such discretion, and they therefore do not invite "the government to decide which reasons for not complying with the [law] are worthy of solicitude."  *Fulton*, 141 S. Ct. at 1879.  As neither Title VII nor WLAD seeks to selectively burden religiously motivated conduct, both are generally applicable.  *See Lukumi Babalu Aye*, 508 U.S. at 543.

Relying on *Tandon v. Newsom*, 593 U.S. __, 141 S. Ct. 1294 (2021), World Vision argues that Title VII and WLAD are not neutral or generally applicable because they contain various "secular" exemptions and therefore treat "some secular activity more favorably than religious exercise."  (Def. 2d MSJ at 15-16 (citing exemptions related to small employers, Communists, and Indian reservations, as well as BFOQs).)  World Vision is correct that *Tandon* "clarif[ies] that targeting is not required for a government policy to violate the Free Exercise Clause.  Instead, favoring comparable secular activity is sufficient" to trigger strict scrutiny.  *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 686 (9th Cir. 2023) (citing *Tandon*, 141 S. Ct. at 1296 ("[G]overnment regulations are not neutral and generally applicable, and

1    therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any*

2    comparable secular activity more favorably than religious exercise.")).  The Supreme

3    Court explained in *Tandon* "that California could not impose COVID-related gathering

4    restrictions on at-home religious exercise while providing more favorable treatment to

5    comparable secular activities by exempting gatherings at places such as hair salons, retail

6    stores, movie theaters, and indoor restaurants." *Id.* at 688-89 (citing *Tandon*, 141 S. Ct.

7    at 1297).  Unlike the COVID restrictions in *Tandon*, however, World Vision's cited

8    exemptions do not demonstrate disparate treatment between comparable secular and

9    religious activity.  To illustrate, if Title VII and WLAD exempted small *religious*

10   employers but not small *secular* employers, that would offend *Tandon*.  But the mere

11   existence of an exemption for *all small* employers—religious and secular alike—does not

12   transform Title VII and WLAD from neutral and generally applicable laws into those

13   triggering strict scrutiny.

14        Because Title VII and WLAD are neutral laws of general applicability, the court

15   applies rational basis scrutiny.  *See, e.g.*, *Stormans*, 586 F.3d at 1137.  This deferential

16   form of scrutiny asks whether the challenged law is "rationally related to a legitimate

17   government purpose," and World Vision bears the burden to negate "every conceivable

18   basis which might support it." *Id.* (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 320

19   (1993)).  Title VII and WLAD easily meet this standard, as they both advance the

20   government's legitimate interest in eradicating discrimination in employment.  *See*

21   *Fremont Christian Sch.*, 781 F.2d at 1368 (holding that Title VII's "purpose to end

22   discrimination is equally if not more compelling than other interests that have been held

1   to justify legislation that burdened the exercise of religious convictions" (quoting *Pac.*

2   *Press*, 676 F.2d at 1280)); *State v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1231 (Wash.

3   2019) (holding in an as-applied Free Exercise challenge that WLAD "is a neutral,

4   generally applicable law subject to rational basis review" and "clearly meets that

5   standard").  Ms. McMahon is entitled to summary judgment on World Vision's Free

6   Exercise defense.

7   **F.    Expressive Association**

8        There are two forms of constitutionally protected association:  intimate and

9   expressive association.  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984).  World

10  Vision invokes the latter, arguing its First Amendment freedom of expressive association

11  protects its decision not to associate with Ms. McMahon.  The court disagrees.

12       "Among the rights protected by the First Amendment is the right of individuals to

13  associate to further their personal beliefs.  While the freedom of association is not

14  explicitly set out in the Amendment, it has long been held to be implicit in the freedoms

15  of speech, assembly, and petition."  *Healy v. James*, 408 U.S. 169, 181 (1972); *see also*

16  U.S. Const. amend. I ("Congress shall make no law respecting an establishment of

17  religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of

18  the press; or the right of the people peaceably to assemble, and to petition the government

19  for a redress of grievances.").  Expressive association "plainly presupposes a freedom not

20  to associate."  *Roberts*, 468 U.S. at 623.  "The forced inclusion of an unwanted person in

21  a group infringes the group's freedom of expressive association if the presence of that

22  person affects in a significant way the group's ability to advocate for public or private

1   viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).  But freedom of

2   expressive association is not absolute.  *Id.*  "Infringements on that right may be justified

3   by regulations adopted to serve compelling state interests, unrelated to the suppression of

4   ideas, that cannot be achieved through means significantly less restrictive of associational

5   freedoms." *Roberts*, 468 U.S. at 623.

6          To determine whether World Vision is protected by the First Amendment's

7   freedom of expressive association, the court "must determine whether [World Vision]

8   engages in 'expressive association.'"  *Dale*, 530 U.S. at 648.  "The First Amendment's

9   protection of expressive association is not reserved for advocacy groups.  But to come

10  within its ambit, a group must engage in some form of expression, whether it be public or

11  private."  *Id.*  Relying on *Dale*, World Vision argues its "community associates together

12  in expressive activities to further their shared stances," and that "[o]ne such stance is

13  [World Vision's] marriage policy."  (Def. 2d MSJ at 22.)  According to World Vision,

14  "[t]he 'forced inclusion' of [Ms. McMahon] would 'significantly burden' World Vision's

15  'right to oppose or disfavor same-sex conduct' or marriage" in violation of the First

16  Amendment.  (*Id.* at 26 (quoting *Dale*, 530 U.S. at 571-75).)  Ms. McMahon vigorously

17  argues that World Vision's reliance on *Dale* is misplaced, and that "there is no First

18  Amendment expressive association defense to statutory employment discrimination

19  claims."  (Pl. 2d MSJ at 25-28.)

20         *Dale* held that the Boy Scouts of America's First Amendment freedom of

21  expressive association shielded it from a gay scout's discrimination claim under a New

22  Jersey public accommodations law.  *Dale*, 530 U.S. at 644.  Because the very mission of

1    the Boy Scouts was to "instill values in young people," the Supreme Court concluded that

2    acceptance of an openly gay and outspoken "gay rights activist" as a Scout leader would

3    "force the organization to send a message, both to the youth members and the world, that

4    the Boy Scouts accepts homosexual conduct as a legitimate form of behavior," which the

5    First Amendment does not tolerate.  *Id.* at 649, 653, 656.  The Court made careful note

6    that its holding was "not to say that an expressive association can erect a shield against

7    antidiscrimination laws simply by asserting that mere acceptance of a member from a

8    particular group would impair its message."  *Id.* at 653.  Most critically, *Dale* did not

9    arise under Title VII or in the employment discrimination context because the plaintiff

10   was only a Boy Scout *volunteer*, not an employee.  *See id.* at 644, 651.  At issue was the

11   application of a New Jersey law banning discrimination on the basis of sexual orientation

12   in places of public accommodation.  *Id.* at 645.  The Court's analysis rests on cases

13   involving non-employment contexts such as political parties and parade groups.  *See id.*

14   at 653-55 (first citing *Democratic Party of U.S. v. Wisconsin ex rel. La Follette*, 450 U.S.

15   107, 124 (1981); then citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,

16   515 U.S. 557, 574-75 (1995)).  And central to the Court's holding was its observation

17   that New Jersey "applied its public accommodations law to a private entity without even

18   attempting to tie the term 'place' to a physical location."  *Id.* at 657 & n.3 (noting that

19   several courts had previously "ruled that the Boy Scouts is not a place of public

20   accommodation").  The legal issues here and in *Dale* are distinct, and *Dale* does not

21   support application of the expressive association doctrine to Ms. McMahon's claims.

22   *//*

1    The court is persuaded that this employment discrimination action does not

2  implicate World Vision's expressive associational rights.  Indeed, the Supreme Court has

3  previously rejected such a defense in the context of employment discrimination.  *See*

4  *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) ("[I]nvidious private discrimination

5  may be characterized as a form of exercising freedom of association protected by the

6  First Amendment, but it has never been accorded affirmative constitutional protections."

7  (quoting *Norwood v. Harrison*, 413 U.S. 455, 470 (1973))); *see also Wisconsin v.*

8  *Mitchell*, 508 U.S. 476, 487 (1993) ("In *Hishon*, we rejected the argument that Title VII

9  infringed employers' First Amendment rights.").[6]

10    World Vision cites an out-of-circuit case for the proposition that a party may raise

11  an expressive associational defense to employment discrimination claims (Def. 2d MSJ at

12  20 (citing *Slattery v. Hochul*, 61 F.4th 278, 291 (2d Cir. 2023)), but that case fails to

13  address the Supreme Court's holding in *Hishon* and is distinguishable from the present

14  case.  *Slattery* concerned whether an anti-abortion crisis pregnancy center, Evergreen

15  Association, Inc. ("Evergreen"), plausibly stated a claim that a New York labor law

16  unconstitutionally burdened its expressive associational rights "by preventing it from

17  disassociating itself from employees who, among other things, seek abortions."  61 F.4th

18  at 283 (noting that the challenged law barred adverse action against employees based on

19

20    [6] Moreover, as at least one other court has observed, if World Vision could raise an
expressive association defense to defeat any Title VII claim, it is difficult to conceive why the
Supreme Court would have carved a specific constitutional exception to liability under Title VII

21  for only ministerial employees.  *See Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
496 F. Supp. 3d 1195, 1209 (S.D. Ind. 2020) ("If freedom of association applies in the religious

22  employment context, the ministerial exception is unnecessary.").

1    their reproductive health decisions).  The Second Circuit reversed the lower court's

2    dismissal of the claim, concluding that the statute would have forced Evergreen "to

3    employ individuals who act or have acted against the very mission of its organization,"

4    which triggered strict scrutiny.  *Id.* at 288 (analogizing to *New Hope Family Services v.*

5    *Poole*, 966 F.3d 145 (2d Cir. 1979), a non-employment case related to alleged

6    discrimination in adoption referrals).  Importantly, Evergreen's "very mission" was to

7    encourage pregnant persons to choose paths other than abortion.  *Id.* at 284, 288.  In

8    contrast, World Vision's "very mission" is not to oppose or discourage same-sex

9    marriage, but "to follow our Lord and Savior Jesus Christ in working with the poor and

10   oppressed to promote human transformation, seek justice and bear witness to the good

11   news of the Kingdom of God."  (Mission Statement.)  Enforcing Title VII and WLAD in

12   this instance would not require World Vision to employ someone who acts against its

13   "very mission."  *Slattery*, 61 F.4th at 288.  Thus, even assuming that World Vision could

14   raise an expressive association defense akin to *Slattery*, *Slattery*'s reasoning has no force

15   here.

16         World Vision cites just one other case in which a court accepted an expressive

17   association defense in the employment discrimination context.  (*See* Def. 2d MSJ at 21

18   (citing *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571 (N.D. Tex. 2021), *aff'd*

19   *in part, rev'd in part, and vacated in part on other grounds sub nom. Braidwood Mgmt.,*

20   *Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023)); *see also* Def. Reply at 16 (same).)  But *Bear*

21   *Creek* relies almost exclusively upon *Dale* in holding that expressive association

22   precluded liability under Title VII.  *See Bear Creek*, 571 F. Supp. 3d at 614-15.  The

1  court finds *Bear Creek* unpersuasive because it fails to recognize the crucial distinctions

2  discussed above that render *Dale* inapplicable to the employment discrimination context.[7]

3      The court concludes that World Vision's expressive association defense fails as a

4  matter of law, and Ms. McMahon is therefore entitled to summary judgment on this

5  affirmative defense.

6  **G.      *303 Creative LLC v. Elenis***

7      Finally, the court's July 24, 2023 and August 14, 2023 orders invited the parties to

8  address the "impact, if any, of the Supreme Court's recent decision in *303 Creative LLC*

9  *v. Elenis*, [600] U.S. [570], 143 S. Ct. 2298 (2023) on" World Vision's remaining

10  affirmative defenses.  (8/14/23 Order at 5; *see also* 7/24/23 Order at 11.)  The court is

11  satisfied that *303 Creative*, which arose under the First Amendment's Free Speech

12  Clause, has no application to this case.  *303 Creative* addressed compelled speech in the

13  context of a Colorado public accommodations law, which forbade businesses from

14  engaging in discrimination when selling goods and services to the public.  600 U.S. at

15  577-78.  The Supreme Court held that Colorado could not compel a website designer who

16  opposed same-sex marriage to create a wedding website for a same-sex couple without

17  offending the Free Speech Clause of the First Amendment.  *Id.* at 579-80, 589.

18  //

19

20
_____

21      [7]  Notably, *Bear Creek* also addressed an argument under the Free Exercise Clause nearly identical to that of World Vision—reaching the opposite conclusion as here.  *See Bear Creek*, 571 F. Supp. 3d at 612-14 (holding that Title VII is not generally applicable and triggers strict

22  scrutiny because it carves "secular" exemptions related to small businesses, Communists, and Indian reservations).

1    This employment discrimination action, however, does not involve compelled

2    speech.  In general, speech for First Amendment purposes includes "the spoken or written

3    word" as well as "conduct [that] possesses sufficient communicative elements." *Texas v.*

4    *Johnson*, 491 U.S. 397, 404 (1989).  The Supreme Court has rejected "the view that an

5    apparently limitless variety of [expressive] conduct can be labeled 'speech.'" *United*

6    *States v. O'Brien*, 391 U.S. 367, 376 (1968).  To determine whether expressive conduct

7    constitutes speech for First Amendment purposes, courts consider "whether an intent to

8    convey a particularized message was present, and whether the likelihood was great that

9    the message would be understood by those who viewed it." *Johnson*, 491 U.S. at 404

10   (cleaned up).  "[I]t is the obligation of the person desiring to engage in assertedly

11   expressive conduct to demonstrate that the [Free Speech Clause] even applies." *Clark v.*

12   *Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).

13          World Vision has not shown that continuing to employ Ms. McMahon would

14   amount to expressive conduct that communicates its views so as to constitute "speech"

15   within the meaning of the First Amendment.  "It is possible to find some kernel of

16   expression in almost every activity a person undertakes . . . but such a kernel is not

17   sufficient to bring the activity within the protection of" the Free Speech Clause.  *City of*

18   *Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).  Because enforcement of Title VII and

19   WLAD would not result in compelled speech, *303 Creative* has no bearing on this case.

20                              **IV.   CONCLUSION**

21          World Vision rescinded Ms. McMahon's job offer pursuant to a policy that

22   facially discriminates on the basis of sex, sexual orientation, and marital status in

1   violation of Title VII and WLAD.  (7/24/23 Order at 6-10; 8/14/23 Order at 3.)  Because

2   World Vision's remaining affirmative defenses—the religious organization exemptions,

3   the ministerial exception, the BFOQ defense, freedom of expression, and freedom of

4   association—fail as a matter of law, World Vision is liable for sex and sexual orientation

5   discrimination under Title VII and WLAD, as well as marital status discrimination under

6   WLAD.  The court therefore DENIES World Vision's motion for summary judgment

7   (Dkt. # 53) and GRANTS Ms. McMahon's motion for partial summary judgment (Dkt.

8   # 52).

9           This case will now proceed to trial to determine the appropriate relief that should

10  be granted.  Accordingly, and pursuant to the court's July 24, 2023 and August 14, 2023

11  orders, the court will enter a separate order setting forth a new trial schedule.  (7/24/23

12  Order at 12; 8/14/23 Order at 5.)

13          Dated this 28th day of November, 2023.

14

15                                          JAMES L. ROBART
                                            United States District Judge

16

17

18

19

20

21

22